UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

**SOLOMAN OLUDAMISI AJIBADE** and
**ADENIKE HANNAH AJIBADE,** as natural
parents of Mathew Ajibade, and

**THE ESTATE OF MATHEW AJIBADE** and
**CHRIS OLADAPO,** its Executor,

    **Plaintiffs,**

       **v.**

**ROY HARRIS,** in his official capacity as
Chatham County Sheriff,

**CORIZON HEALTH, INC.,**

**CORIZON, LLC,**

**GREGORY BROWN,**

**BURT AMBROSE,**

**FREDERICK BURKE,**

**ABRAM BURNS,**

**GREG CAPERS,**

**MAXINE EVANS,**

**ANDREW EVANS-MARTINEZ,**

**PAUL FOLSOME,**

**DEBRA JOHNSON,**

**JASON KENNY,**

**CHRISTOPHER REED,**

**ERIC VINSON,** and

**BENJAMIN WEBSTER,**

    **Defendants.**

**CASE NO.**

**CV 416 - 082**

## COMPLAINT

Now come the Plaintiffs, Soloman Oludamisi Ajibade, Adenike Hannah Ajibade, and the Estate of Mathew Ajibade, and its executor, Chris Oladapo, and for their Complaint against the Defendants state as follows:

## PRELIMINARY STATEMENT

1.      This case involves the homicide of a citizen, Mathew Ajibade, by government officials and their private contractors.

2.      Mr. Ajibade was arrested by Savannah police in the throes of an episode of mental illness. These police were informed about his mental state and his need for prescription medicine, and were even given the pill bottle at the arrest to give to Mr. Ajibade. They took Mr. Ajibade to the Chatham County Detention Center ("CCDC").

3.      At the CCDC, Mr. Ajibade was physically beaten and kicked in the head. He was also forcibly restrained by employees of the Chatham County Sheriff's Office. While already restrained in a restraint chair and not posing a threat to anyone, Mr. Ajibade was stunned with a Taser device at least four times.

4.      No medical care was rendered to Mr. Ajibade.

5.      Mathew Ajibade died in the custody of the Chatham County Sheriff, his deputies, and their private contractors.

6.      Several of the deputies involved—Defendants here—were fired from their jobs.

7.      The Defendants' conduct deprived Mr. Ajibade of his various constitutional rights—to be free of the excessive use of force, to adequate attention to serious medical needs while in custody, to equal protection of the laws, and to due process

2

under law. Each Defendant is liable for at least one constitutional violation. Each Defendant's conduct was also, at the minimum, tortious.

8.      Each Defendant caused Mr. Ajibade grievous physical and mental pain, suffering, anxiety, harm, and caused his subsequent death.

9.      The homicide of Mathew Ajibade was a blatant violation of federal constitutional, civil rights and state law. And this action is brought to seek justice to the fullest extent of those laws.

## JURISDICTION AND VENUE

10.     The Court has original jurisdiction over this action pursuant to 42 U.S.C. § 1331, the federal-question statute. As to the state-law claims, the Plaintiffs invoke the Court's supplemental jurisdiction under 42 U.S.C. § 1367.

11.     Venue lies in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

12.     Likewise, the Savannah Division is the division where a substantial part of the events or omissions giving rise to the claim occurred. LR 2.1(b).

## PARTIES

13.     Mathew Ajibade was a 21-year-old college student and citizen of the United States residing in the state of Georgia.

14.     Plaintiffs Adenike Ajibade and Soloman Oludamisi are Mathew Ajibade's natural parents.

15.     Plaintiff Estate of Mathew Ajibade is Mr. Ajibade's valid legal estate. Plaintiff Chris Oladapo has been appointed the executor of the estate. These Plaintiffs will be referred to together as "the Estate."

3

16.     The Estate is the proper plaintiff to bring all claims other than wrongful death because all of Mr. Ajibade's constitutional and tort claims survived his death under Georgia's survival statute, O.C.G.A. § 9-2-41, and in the case of constitutional claims, also under 42 U.S.C. § 1988 in combination with the survival statute.

17.     All references to Defendants' titles and positions throughout this Complaint refer to their status at the time of Mr. Ajibade's custody and death—January 1 and 2, 2015—except for Harris, who replaced Al St. Lawrence, the Sheriff of Chatham County at the time.

18.     The Sheriff of Chatham County is the executive officer responsible for the Chatham County Sheriff's Office and its employees and agents. The Sheriff was responsible for the operation of the CCDC, including establishing policies for its operation; policies for the protection of detainees under his care, including the provision of adequate physical and mental health care; policies against the unconstitutional use of force; and its general operation in accordance with the law. The Sheriff is the final policymaker as to his own conduct and the execution of his duties.

19.     St. Lawrence, who occupied the office at the time of Mr. Ajibade's death, died in 2015.

20.     He was replaced by Defendant Sheriff Roy Harris, who presently occupies the office.

21.     In assuming the rights and duties of office, Roy Harris also assumed all liability the former sheriff held in his official capacity.

4

22.     Plaintiffs intend to pursue official-capacity claims against Harris, as St. Lawrence's replacement. References in this action to acts or omissions of St. Lawrence are intended to establish official-capacity liability against Harris.

23.     Defendants Corizon Health, Inc. (a Delaware corporation) and Corizon, LLC (a Missouri LLC)—together, the "Corizon Defendants"— had contracted with the Sheriff to provide physical and mental health care, screening, assessment, treatment, and attention to those detained at the CCDC.

24.     The Corizon Defendants were obligated to supply doctors, nurses, and other medical services to the Sheriff and his employees for the use of the detainees at CCDC.

25.     Defendant Gregory Brown was a nurse and an employee of at least one of the Corizon Defendants. He was directly responsible for Mr. Ajibade's medical care while he was detained at the CCDC.

26.     The remaining Defendants—Burt Ambrose, Frederick Burke, Abram Burns, Greg Capers, Maxine Evans, Andrew Evans-Martinez, Paul Folsome, Debra Johnson, Jason Kenny, Christopher Reed, Eric Vinson, and Benjamin Webster—are the "Corrections Officer Defendants." Each of these individuals was an employee of the Chatham County Sheriff and assigned to the Chatham County Detention Center where Mr. Ajibade died. The Corrections Officer Defendants were directly responsible for Mr. Ajibade's custody, supervision, and care at the CCDC. These Defendants are sued in their individual and official capacities.

27.     Each of the Defendants acted under color of law—either by being a government entity, government employee, or under contract with a government entity or government employee.

28.     Each individual Defendant was also acting within the course and scope of his or her employment.

### FACTS OF MR. AJIBADE'S ARREST, TREATMENT, LACK OF CARE, AND DEATH

29.     On January 1, 2015, Mathew Ajibade, a 21-year-old college student, suffered a manic bipolar episode.

30.     Savannah-Chatman Metropolitan Police Department officers received and responded to a call regarding Mr. Ajibade's behavior.

31.     At the scene, they were advised that Mr. Ajibade was in the midst of the manic bipolar episode and in need of medical treatment.

32.     They were also given a plastic prescription bottle containing divalproex ("generic Depakote"), a medicine used to treat chronic bipolar disorder.

33.     The Savannah police arrested Mr. Ajibade and took him to the Chatham County Detention Center ("CCDC").

34.     Mr. Ajibade arrived at the CCDC on January 1, 2015.

35.     At the CCDC, Mr. Ajibade was placed into the custody of Sheriff St. Lawrence, his deputies, and private contractors.

36.     CCDC personnel, including some of the Corrections Officer Defendants, are to conduct an intake process on each detainee.

37.     Mr. Ajibade was initially placed into a holding cell prior to the formal intake process, and left there for approximately three hours.

6

38.     During that time, no Defendant performed a physical or mental health screening, assessment, or referral. No Defendant reviewed any of Mr. Ajibade's medical records or chart. No Defendant administered divalproex to Mr. Ajibade. He was not seen by any doctor or nurse before being booked into the CCDC.

39.     During the intake process, a scuffle occurred between Mr. Ajibade and at least some of the Corrections Officer Defendants.

40.     During this scuffle, Mr. Ajibade was physically beaten and kicked in the head by at least some of the Corrections Officer Defendants.

41.     Ultimately, Mr. Ajibade was subdued and handcuffed by at least some of the Corrections Officer Defendants.

42.     At least some of the Corrections Officer Defendants placed Mr. Ajibade in a restraint chair.

43.     A "spit mask" was also placed over Mr. Ajibade's face.

44.     After Mr. Ajibade was placed in the chair, he posed no physical threat to any person.

45.     The incapacitation of a detainee, so that he cannot pose a physical threat to anyone else, is one purpose of using a restraint chair.

46.     Policies in effect required a doctor or nurse to check Mr. Ajibade's vital signs and general medical condition after he was in a violent altercation, Tasered, or once he was placed into the restraint chair. These checks were to be conducted every fifteen minutes while Mr. Ajibade was restrained.

47.     These policies were established by the Corizon Defendants and the Sheriff.

7

48.    But Mr. Brown, the nurse hired by the Corizon Defendants, *never* checked Mr. Ajibade's vital signs while he was in the restraint chair.

49.    Mr. Brown did not check Mr. Ajibade's vital signs before he was restrained.

50.    Mr. Brown did not check Mr. Ajibade's vital signs after he was restrained.

51.    Mr. Brown did check whether the restraints on Mr. Ajibade's body were correctly applied.

52.    Mr. Brown did not check Mr. Ajibade's vital signs after he was Tasered.

53.    Mr. Brown did not check Mr. Ajibade's vital signs after he was in a violent altercation.

54.    After Mr. Ajibade was placed in the restraint chair, Corrections Officer Defendant Jason Kenny used a Taser in "drive-stun" mode on Mr. Ajibade's body at least four times.

55.    "Drive-stun" mode means that the Taser is applied directly against the body, rather than being fired from a distance.

56.    Drive-stun mode is solely to accomplish "pain compliance." There is no other reason.

57.    The Taser is a device capable of producing a 50,000-volt electric shock. It is intended to neutralize physical threats from suspects so that officers are not in physical danger.

58.    But Mr. Ajibade posed no physical threat to any person at the time Deputy Kenny chose to use the Taser on him.

8

59.     The other Corrections Officer Defendants were present at the time Mr. Kenny used the Taser.

60.     Some of them were above Mr. Kenny in the chain of command and supervised him at the time.

61.     All of the Corrections Officer Defendants who were aware of Mr. Kenny's decision to use the Taser ratified that decision.

62.     None of the Corrections Officer Defendants objected to the use of the Taser or attempted to prevent Mr. Kenny from using the Taser.

63.     Under the policies in effect, a doctor or nurse was required to assess the detainee's physical health, including vital signs, each time a detainee was subjected to the Taser.

64.     These policies were also established by the Corizon Defendants and the Sheriff.

65.     At 11:50pm on January 1, Mr. Ajibade was transferred to a holding cell and left alone there.

66.     No one checked on Mr. Ajibade while he was in the holding cell.

67.     At 1:36am on January 2, Mathew Ajibade was found dead.

68.     On May 12, 2015, the Georgia State Medical Examiner issued a Certificate of Death declaring Mr. Ajibade's manner of death a homicide. The official cause of Mr. Ajibade's death was blunt force trauma.

69.     On June 24, 2015, Mr. Kenny, Ms. Evans, and Mr. Brown were criminally indicted for crimes arising from their role in the events of January 1–2.

## DUTIES OF THE DEFENDANTS

70.    From the moment Mr. Ajibade arrived at the CCDC, he was continuously and exclusively under the control of former Sheriff St. Lawrence and these Defendants: the Corrections Officer Defendants; the Corizon Defendants; and Corizon's nurse Brown.

71.    During the entire time Mr. Ajibade was in custody at the CCDC, those in control of him had a legal duty to attend to his serious medical needs (including by providing adequate medical care, medical supervision, and mental health care); to observe, obey, and uphold the laws of the United States and Georgia; to respect his constitutional rights; and to treat him with humanity, dignity, and respect.

72.    More specifically, the Sheriff; his deputies, including the Corrections Officer Defendants; the Corizon Defendants; and their employee nurse Brown all shared the duty to perform an appropriate physical and mental health intake and screening of Mr. Ajibade upon his booking into the CCDC.

## CONSTRUCTION OF COMMON ALLEGATIONS

73.    This Complaint should be construed as if the allegations of paragraphs 1 through 72 are realleged and incorporated into each of the Counts stated below.

## COUNT 1:

### Use of Excessive Force
### (Corrections Officer Defendants)

74.    The Fourth Amendment provides citizens the constitutional right to be free from the use of excessive force.

75.    The Fifth Amendment provides citizens with the constitutional right to be free from the deprivation of life and liberty without due process of law.

10

76.    42 U.S.C. § 1983 provides a civil remedy for violations of these constitutional rights by those acting under color of law.

77.    The Corrections Officer Defendants, who were acting under color of law, violated these constitutional rights when they:

a)    Beat Mr. Ajibade and kicked him in the head.

b)    Drive-stunned him, or otherwise used the Taser on him, while he was already secured in a restraint chair.

c)    Through their actions and inactions, caused him to suffer enormous anxiety, physical pain, injury, and ultimately, death.

78.    Further, these Defendants' conduct shocks the conscience and offends traditional notions of decency.

79.    Mr. Ajibade's claim as set out in this Count survives his death and belongs to his Estate.

80.    As a direct and proximate result of these Defendants' violations of Mr. Ajibade's constitutional rights, Mr. Ajibade endured extreme physical, mental, and emotional pain and suffering, and death. The Estate of Mathew Ajibade incurred losses for funeral and burial expenses, lost net accumulations, and conscious pain and suffering endured by Mr. Ajibade just before death.

**WHEREFORE,** the Estate of Mathew Ajibade seeks judgment against the Corrections Officer Defendants, jointly and severally, for:

a)    Compensatory damages in an amount that will fully and fairly compensate it for its injury, damage, and loss.

b)    Punitive damages in an amount that will serve to adequately punish and deter the conduct in this Count.

c)    The costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

11

d)    Any other relief the Court deems appropriate.

## COUNT 2:

### Deliberate Indifference to Serious Physical and Mental Health Needs
### (Corizon Defendants, Brown, and the Corrections Officer Defendants)

81.    The Eighth Amendment guarantees citizens freedom from cruel and unusual punishments. State actors violate this guarantee when their conduct demonstrates deliberate indifference to the serious medical needs of detainees.

82.    The Fifth Amendment provides citizens with the constitutional right to be free from the deprivation of life and liberty without due process of law.

83.    42 U.S.C. § 1983 provides a civil remedy for violations of these constitutional rights by those acting under color of law.

84.    The Corizon Defendants, Mr. Brown, and the Corrections Officer Defendants, who were acting under color of law, violated these constitutional rights when they:

a)    Failed to conduct an appropriate physical and mental health screening of Mr. Ajibade, which would have detected that he was in the throes of a manic episode, which is a serious medical problem.

b)    Failed to appropriately classify Mr. Ajibade as a detainee with mental health needs and failed to provide appropriate treatment as should be provided to such a detainee.

c)    Failed to administer Mr. Ajibade his necessary prescription medicine, or any medication, as might have been indicated.

d)    Placed Mr. Ajibade into a restraint chair.

e)    Shocked him with a Taser while restrained in a chair.

f)    Failed to check Mr. Ajibade's vital signs and physical condition at any point during his restraint in the chair.

g)    Failed to medically evaluate Mr. Ajibade's physical condition after he was shocked with the Taser.

h)    Failed to check Mr. Ajibade's vital signs and physical condition when he was held in the isolation cell.

i)    Failed to check Mr. Ajibade's vital signs and physical condition after he was in a violent altercation.

j)    Failed to ever properly evaluate Mr. Ajibade's physical or mental condition while he was in custody.

85.    Mr. Ajibade's physical and mental condition was serious, obvious, known, and communicated to the Defendants in this Count.

86.    The Defendants in this Count displayed deliberate indifference to Mr. Ajibade's serious medical needs. They also behaved with callous, reckless disregard for these needs.

87.    The Defendants' actions and inactions described in this Count directly led to Mr. Ajibade's harms, including death.

88.    This result was foreseeable and known to the Defendants, or they should have known that this would be the result.

89.    Further, these Defendants' conduct shocks the conscience and offends traditional notions of decency.

90.    Mr. Ajibade's claim as set out in this Count survives his death and accrued to his Estate.

91.    As a direct and proximate result of these Defendants' violations of Mr. Ajibade's constitutional rights, Mr. Ajibade endured extreme physical, mental, and emotional pain and suffering, and death. The Estate of Mathew Ajibade incurred losses for funeral and burial expenses, lost net accumulations, and conscious pain and suffering endured by Mr. Ajibade just before death.

**WHEREFORE,** the Estate of Mathew Ajibade seeks judgment against the

Corizon Defendants, Brown, and the Corrections Officer Defendants, jointly and

severally, for:

a) Compensatory damages in an amount that will fully and fairly compensate it for its injury, damage, and loss.

b) Punitive damages in an amount that will serve to adequately punish and deter the conduct in this Count.

c) The costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

d) Any other relief the Court deems appropriate.

## COUNT 3:

### Maintaining a Pattern and Practice of Substandard Medical Conditions for Detainees, Causing Constitutional Violations (Corizon Defendants and Sheriff Harris, in his official capacity)

92.    The Defendants named in this Count maintained a pattern and practice of

inadequate and deplorable medical conditions for detainees at the CCDC.

93.    The Defendants named in this Count shared the responsibility for medical

care at the CCDC.

94.    Harris bears responsibility for medical care by virtue of his holding a

statutorily-created office in which he is ultimately responsible for detainees' safety and

civil rights.

95.    Because this count is against Harris in his official capacity, and because

he succeeded St. Lawrence as Sheriff, he stands in the shoes of St. Lawrence as to

this count.

96.     The Corizon Defendants bear responsibility for medical care at CCDC because they contracted with the Sheriff to provide that care.

97.     As part of their contract, the Corizon Defendants were obligated to provide an adequate level of care, and to bring any failures to provide good care to the attention of the Sheriff.

98.     The Defendants named in this Count maintained a pattern and practice of maintaining inadequate medical conditions, and displaying deliberate indifference to the health and safety of detainees. This pattern and practice routinely and regularly caused the violations of constitutional rights of many detainees, including Mr. Ajibade.

99.     The Defendants named in this Count knew, or should have known, of a history, custom, propensity, and pattern for Corizon employees and deputies, officers, and employees at the CCDC to fail or refuse to provide prompt and competent access to and delivery of physical and mental health evaluation and treatment to detainees at the CCDC.

100.    These Defendants' disregard of this history, and their failure to correct it, proximately caused the violation of Mathew Ajibade's constitutional rights.

101.    The Defendants named in this Count had the duty:

a)      To train, supervise, and instruct deputies, officers, nurses, physicians, physical and mental health personnel, and other agents and employees to respect and not violate constitutional and statutory rights of CCDC detainees with regard to providing necessary medical care.

b)      To conduct a competent physical and mental health screening upon intake of each detainee at CCDC.

c)      To provide timely competent physical and mental health assessment, evaluation, intervention, referral, care, treatment, follow-up, and attention to mentally or physically ill CCDC detainees.

15

d)   To adequately train custodial and physical and mental health staff on understanding, recognizing, reporting, and responding to issues of physical and mental health of CCDC detainees.

e)   To monitor the physical and mental health care and treatment provided to detainees at the CCDC.

f)   To monitor and review the adequacy of medical and custodial staffing to ensure that adequate physical and mental health care and treatment is provided to detainees at the CCDC.

g)   To monitor and periodically review the classification and housing of physically or mentally ill CCDC detainees to ensure they are properly classified and housed.

h)   To administer necessary prescription drugs.

i)   To comply with statutory guidelines and the standard(s) of care protecting CCDC detainees.

j)   To establish guidelines for the use of force against detainees that are based in sound medicine and that contraindicate the use of force on detainees who are physically or mentally unable to withstand such force.

k)   To establish reasonable procedures to document and correct past violations, and to prevent future violations of constitutional rights of CCDC detainees at the CCDC, by not condoning, ratifying or encouraging the violation of those rights.

l)   To discipline employees who violate constitutional rights.

102.   The Defendants named in this Count breached each and every one of the duties set forth in the previous paragraph.

103.   The Plaintiffs are informed and believe that prior to the incident involving Mr. Ajibade, the Defendants named in this count committed or were aware of similar acts committed at CCDC, namely:

a)   Failing to train their employees as to the applicable constitutional and statutory requirements for providing adequate physical and mental health care.

b)   Failing to provide, or refusing to provide, timely access to and delivery of physical and mental health care, assessment, evaluation, intervention,

16

referral, and treatment for CCDC detainees with obvious or known serious physical and mental health conditions and needs.

c) Failing to provide, or refusing to provide, timely access to and delivery of necessary prescription medications to CCDC detainees.

d) Failing to provide, or refusing to provide, adequate housing and classification to CCDC detainees so they would have timely and adequate access to necessary physical and mental health care, assessment, evaluation, intervention, referral, and treatment.

e) Failing or refusing to designate certain types of force as medically contraindicated for CCDC detainees who have known, or knowable, serious physical and mental health conditions for which that type of force would be harmful.

f) Failing to provide or refusing to provide adequate monitoring and housing for CCDC detainees who present a risk of serious physical or mental harm and death.

g) Failing to discipline employees who have engaged in violations of constitutional rights.

h) Condoning practices that violate constitutional rights.

104. The Defendants named in this Count knew, or should have known, of this pattern or practice of constitutional violations, or the existence of facts, practices, customs or habits, which create the strong potential for unconstitutional acts.

105. These customs, policies, and practices were applied in such a manner, and known by the Defendants named in this Count to be applied in such a manner, that violations of the constitutional rights of CCDC detainees were likely and substantially certain to occur, and did occur.

106. Mr. Ajibade was harmed and suffered death in the manner threatened by the patterns and practices set out in this Count.

107. 42 U.S.C. § 1983 provides a civil remedy against those acting under color of law who establish a pattern or practice of violations of constitutional rights.

17

108.   Mr. Ajibade's claim as set out in this Count survives his death and accrued to his Estate.

109.   As a direct and proximate result of these Defendants' violations of Mr. Ajibade's constitutional rights, Mr. Ajibade endured extreme physical, mental, and emotional pain and suffering, and death. The Estate of Mathew Ajibade incurred losses for funeral and burial expenses, lost net accumulations, and conscious pain and suffering endured by Mr. Ajibade just before death.

**WHEREFORE,** the Estate of Mathew Ajibade seeks judgment against the Corizon Defendants and Sheriff Harris, in his official capacity, jointly and severally, for:

a)   Compensatory damages in an amount that will fully and fairly compensate it for its injury, damage, and loss.

b)   Punitive damages in an amount that will serve to adequately punish and deter the conduct in this Count.

c)   The costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

d)   The Court to temporarily and permanently enjoin the customs, policies, and practices alleged in this Count, and to declare that they are unconstitutional.

e)   Any other relief the Court deems appropriate.

### COUNT 4:

**Maintaining a Pattern and Practice of
Using Excessive Force Against Detainees,
Causing Constitutional Violations
(Sheriff Harris, in his official capacity)**

110.   Sheriff St. Lawrence maintained a pattern and practice of the excessive use of force against detainees at the CCDC.

111.   Because this count is against Harris in his official capacity, and because he succeeded St. Lawrence as Sheriff, he stands in the shoes of St. Lawrence as to this count.

112.   This pattern and practice routinely and regularly caused the violations of constitutional rights of many detainees.

113.   This pattern and practice proximately caused the violations of Mr. Ajibade's constitutional rights also.

114.   Sheriff St. Lawrence knew, and should have known, of a history, custom, propensity, and pattern for his deputies, officers, and employees at the CCDC to engage in the excessive use of force against detainees at the CCDC.

115.   During the year 2014, at least 64 inmates in the CCDC were Tasered.

116.   This rate is excessively high compared with other local police departments and jails.

117.   Some of the same deputies who are the Corrections Officer Defendants here have been accused of engaging in the use of excessive force on other detainees—both before *and* after Mr. Ajibade's homicide.

118.   Sheriff St. Lawrence, at other times than during Mr. Ajibade's homicide, condoned the use of a Taser on a detainee in restraints, or at least failed to punish an employee who did so.

119.   Specifically, on January 24, 2015—weeks after Mr. Ajibade was killed—Corporal Vivian Bacon of the Chatham County Sheriff's Office used a Taser on another detainee in restraints.

19

120.    Corporal Bacon was cited for misconduct and issued a "Letter of Disciplinary Action" on February 28, 2015. In the letter, it was claimed that her actions conflicted "with a verbal directive given by the Jail Administrator on January 6, 2015 and a written directive given by the Corrections Captains on January 9, 2015." Corporal Bacon was suspended for five days without pay and ordered to receive 40 hours of training including "Use of Force, Supervision and Taser Usage."

121.    Corporal Bacon appealed the punishment in a letter dated March 9, 2015, arguing that there was a difference between "tas[ing]" and "[d]rive stunning." She wrote that while she "ha[d] never tased anyone in full restraints," "[d]rive stunning previously has been a practice throughout the Department and had been utilitized (sic) prior to the letter on February 9th."

122.    In response to Corporal Bacon's appeal, the Jail Administrator reduced her discipline from a five-day suspension to a one-day suspension.

123.    The fact that Corporal Bacon's suspension for drive-stunning an inmate was reduced shows that her appeal was meritorious. The Sheriff's policy at the CCDC did not prohibit the use of drive-stunning detainees on January 24, 2015 when Corporal Bacon performed it, and his policy did not prohibit the use of drive-stunning detainees on January 1, 2015 when Deputy Kenny performed it on Mr. Ajibade.

124.    Sheriff St. Lawrence's disregard of the history and pattern of excessive use of force on detainees in his jail, and his failure to correct this pattern, proximately caused the violation of Mr. Ajibade's constitutional rights.

125.   Sheriff St. Lawrence had the duty to:

a)   To train, supervise, and instruct his deputies, officers, and employees to respect and not violate constitutional and statutory rights of CCDC detainees with regard to the use of force.

b)   To establish policies which will not result in the excessive use of force against detainees at the CCDC.

c)   To establish policies which will limit the use of force against detainees at the CCDC to the minimum amount necessary to accomplish correctional objectives.

d)   To objectively investigate incidents of in-custody injury, deaths, inadequate classifications and contraindicated housing, and incidents of in-custody use of excessive force and uses of contraindicated force, and to take necessary remedial action.

e)   To establish guidelines for the use of force against detainees that are based in sound medicine and that contraindicate the use of force on detainees who are physically or mentally unable to withstand such force.

f)   To establish reasonable procedures to document and correct past violations, and to prevent future violations of constitutional rights of CCDC detainees at the CCDC, by not condoning, ratifying or encouraging the violation of those rights.

g)   To discipline employees who violate constitutional rights.

126.   The specific practices condoned by Sheriff St. Lawrence include:

a)   The use of unreasonable and excessive force, including the overuse, unnecessary use, excessive use, and use purely for punitive purposes, of Tasers and restraint chairs.

b)   The failure to provide or refusal to provide timely medical care to detainees after the application of Tasers or restraint chairs.

c)   The use of contraindicated force on detainees who are mentally or physically ill, or who have not been adequately assessed or evaluated for mental or physical health conditions.

d)   The use of Tasers on detainees who are restrained, including those in restraint chairs.

127.   Sheriff St. Lawrence was certainly aware of Taser usage at the CCDC.

128.    In September 2015, the Washington Post published a story quoting St. Lawrence. Part of that story reads:

> "'There was a culture from top to bottom that they thought they could use the Taser however they wanted,' St. Lawrence said in September in an interview with The Post. 'Deputies were using it as punishment, and you can't use it as a form of punishment. There was just too much use.'"

129.    The use of Tasers on detainees restrained in a restraint chair has been deemed a violation of a detainee's clearly established constitutional rights as a matter of law in the United States Circuit Courts.

130.    Sheriff St. Lawrence acted in a manner that shocked the conscience and offends traditional notions of decency.

131.    These customs, policies, and practices were the direct and proximate cause of the constitutional violations visited on Mr. Ajibade.

132.    These customs, policies, and practices were facially and de facto violative of the clearly established and known rights of CCDC detainees. Their implementation constitutes deliberate indifference to and reckless and callous disregard for the constitutional rights of CCDC detainees.

133.    These customs, policies, and practices were applied in such a manner, and known by Sheriff St. Lawrence to be applied in such a manner, that violations of the constitutional rights of CCDC detainees were likely and substantially certain to occur, and did occur.

134.    Sheriff Harris is now the proper Defendant for claims that would otherwise stand against Sheriff St. Lawrence in his official capacity.

135.    Mr. Ajibade was harmed and suffered death in the manner threatened by the customs, policies, and practices set out in this Count.

136.   42 U.S.C. § 1983 provides a civil remedy against those acting under color of law who establish a pattern or practice of violations of constitutional rights.

137.   Mr. Ajibade's claim as set out in this Count survives his death and accrued to his Estate.

138.   As a direct and proximate result of the Sheriff's violations of Mr. Ajibade's constitutional rights, Mr. Ajibade endured extreme physical, mental, and emotional pain and suffering, and death. The Estate of Mathew Ajibade incurred losses for funeral and burial expenses, lost net accumulations, and conscious pain and suffering endured by Mr. Ajibade just before death.

**WHEREFORE,** the Estate of Mathew Ajibade seeks judgment against Defendant Sheriff Harris, in his official capacity, for:

a)   Compensatory damages in an amount that will fully and fairly compensate it for its injury, damage, and loss.

b)   Punitive damages in an amount that will serve to adequately punish and deter the conduct in this Count.

c)   The costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

d)   The Court to temporarily and permanently enjoin the customs, policies, and practices alleged in this Count, and to declare that they are unconstitutional.

e)   Any other relief the Court deems appropriate.

## COUNT 5:

### Wrongful Death
### (All Defendants)

139.   This count for wrongful death is premised on the criminal, intentional, and negligent acts of each of the Defendants, as described in all the other Counts of this Complaint.

140.   As a direct and proximate result of the Defendants' wrongful acts, Mr. Ajibade died by homicide.

141.   Mr. Ajibade's death was a wrongful death within the meaning of the Georgia Wrongful Death Act, O.C.G.A. §§ 51-4-1, *et seq*.

142.   Section 51-4-4 provides a right of action for the wrongful death of a child killed by homicide.

143.   Under O.C.G.A. § 19-7-1(c)(2)(A), Plaintiffs Adenike Ajibade and Soloman Oludamisi are the parents entitled to prosecute this right of action.

**WHEREFORE,** Plaintiffs Soloman Oludamisi Ajibade and Adenike Hannah Ajibade seek judgment against the Defendants, jointly and severally, for:

a)   The full value of the life of Mathew Ajibade.

b)   The costs of suit and reasonable attorneys' fees.

c)   Any other relief the Court deems appropriate.

### COUNT 6:

**Assault and Battery**
**(Defendant Sheriff Harris, in his official capacity, and the**
**Corrections Officer Defendants)**

144.   The Defendants named in this Count, either directly, through their agents, or through ratification and agreement with acts committed by those they acted in concert with, intentionally engaged in an offensive touching of Mr. Ajibade's body.

145.   For purposes of this count, Sheriff Harris is liable in *respondeat superior* for the torts alleged to have been committed by Sheriff St. Lawrence's deputies, because Harris succeeded St. Lawrence as sheriff.

146.   These acts included, but were not necessarily limited to:

24

a)   Physically assaulting him and using excessive and unreasonable force, including using a Taser, unwarranted restraints, and kicking him in the head.

b)   Using excessive and unreasonable force, including a Taser, on Mathew Ajibade while he was restrained and therefore not a threat who warranted the use of such force.

c)   Using excessive and unreasonable force, including restraint in a restraint chair.

147.   Such intentional, offensive touching constitutes the tort of battery.

148.   These Defendants also displayed the intent to commit injury, coupled with their apparent ability to do so.

149.   Such intention constitutes the tort of assault.

150.   As a direct and proximate result of these Defendants' tortious acts of assault and battery, Mr. Ajibade endured extreme physical, mental, and emotional pain and suffering, and death. The Estate of Mathew Ajibade incurred losses for funeral and burial expenses, lost net accumulations, and conscious pain and suffering endured by Mr. Ajibade just before death.

**WHEREFORE,** the Estate of Mathew Ajibade seeks judgment against Sheriff Harris, in his official capacity, and the Corrections Officer Defendants, jointly and severally, for:

a)   Compensatory damages in an amount that will fully and fairly compensate it for its injury, damage, and loss.

b)   Punitive damages in an amount that will serve to adequately punish and deter the conduct in this Count.

c)   The costs of suit and reasonable attorneys' fees.

d)   Any other relief the Court deems appropriate.

### JURY DEMAND

The Plaintiffs demand trial by jury on each count a jury is permitted to hear.

25

Date: March 28, 2016                    Respectfully submitted,

                                        /s/ William R. Claiborne
                                        William R. Claiborne (Ga. Bar. No. 126363)

                                        /s/ Cameron C. Kuhlman
                                        Cameron C. Kuhlman (Ga. Bar. No. 596159)
                                        **THE CLAIBORNE FIRM, P.C.**
                                        410 East Bay Street
                                        Savannah, GA 31401
                                        Phone:   912-236-9559
                                        Fax:     912-236-1884
                                        E-mail:  will@claibornefirm.com

                                        /s/ Mark O'Mara
                                        Mark O'Mara (Fla. Bar. No. 359701)
                                        *Pro Hac Application Forthcoming*

                                        /s/ Alyssa Flood
                                        Alyssa Flood (Fla. Bar No. 99755)
                                        *Pro Hac Application Forthcoming*
                                        **O'MARA LAW GROUP**
                                        1416 East Concord Street
                                        Orlando, FL 32803
                                        Phone:   407-898-5151
                                        Fax:     407-898-2468
                                        E-mail:  mark@omaralawgroup.com

/s/ Troy A. Rafferty
Troy A. Rafferty (Fla. Bar No. 024120)
*Pro Hac Application Forthcoming*

/s/ Timothy M. O'Brien
Timothy M. O'Brien (Ga. Bar No. 548714)

/s/ William F. Cash III
William F. Cash III (Fla. Bar No. 68443)
*Pro Hac Application Forthcoming*
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone:    850-435-7059
Fax:        850-435-7020
E-mail:    trafferty@levinlaw.com
              bcash@levinlaw.com

*Counsel for the Plaintiffs*