**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

|  |  |
|---|---|
| **SOLOMAN OLUDAMISI AJIBADE** and **ADENIKE HANNAH AJIBADE,** as natural parents of Mathew Ajibade, and | |
| **THE ESTATE OF MATHEW AJIBADE** and Chris Oladapo, its Executor, | **CASE NO. 4:16-CV-82-WTM-GRS** |
| **Plaintiffs,** | |
| ***v.*** | |
| **JOHN WILCHER,** in his official capacity as Chatham County Sheriff, et al., | |
| **Defendants.** | |

**PLAINTIFFS' MEMORANDUM OF AUTHORITIES IN OPPOSITION TO DEFENDANT SHERIFF WILCHER'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 113)**

The Sheriff's motion should be denied in all respects, other than Count 6. The Sheriff of Chatham County is not immune to suit under the Eleventh Amendment, because he is a County actor and not a State one. Chatham County is unique in Georgia, and the difference mandates a different result than with other counties. As for the wrongful death claim, even the Sheriff does not seek its complete dismissal, and it is properly premised on other claims, so it survives too.

### I.      Introduction.

Before turning to the legal merits, Plaintiffs provide the Court with some facts relating to Mathew Ajibade's treatment at the Chatham County jail, and also facts establishing *Monell* liability against the Sheriff. This tragic case was made all the more so

because it was a foreseeable result in a larger pattern. By this introduction, which is by no means a complete set of the facts, Plaintiffs intend to provide context for the Court.

A.   **In his motion, the Sheriff does not dispute the facts of Mathew Ajibade's entry into the Chatham County jail, the uses of force against him, and his death.**

Mathew Ajibade was a 21-year-old college student with a history of bipolar disorder. On January 1, 2015, Mathew experienced a mental health crisis that caused him to behave erratically. Savannah Metro police officers responded and were told he was "acting strange throughout the day." (Ex. A, police report, at PA01310.) Mathew's girlfriend gave them a pill bottle containing his prescription drugs for bipolar disorder. *Id.*

Instead of taking Mathew for a mental health evaluation and treatment, police transported Mathew to the Chatham County Detention Center. (Ex. B, Hall report, at PA696-97.) The Sheriff's deputies accepted custody of Mathew—and his pill bottle—and put him in a solitary cell where he waited almost four hours. *Id.* at PA699, PA714, PA730 (almost four hours). During this time, they received a phone call from Mathew's boss, Kammie Kinsey, and one of the deputies wrote "Possible M/H"—mental health problem—on the phone record. *Id.* at PA714 (investigative report); Ex. C ("M/H").

While Mathew was alone, the Sheriff and his contractor, Defendant Corizon Health, did absolutely nothing to ascertain his mental status, perform a mental health evaluation, or contact a mental health counselor. (Ex. D, Brown Dep. 37:18-20, 171:20-172:1, 196:14-18.) This failure to follow obvious clues to Mathew's mental state violated policies the Sheriff and Corizon supposedly maintained. (Ex. E, Sheriff's policy, at Sheriff1-01836,

2

¶(B)(4) ("screened for psychiatric illness at the time of commitment"); Ex. F, Corizon's policy ("screening is performed on inmates at arrival").)

Mathew was eventually released from the solitary cell and deputies began processing him into the system. (Ex. B at PA730.) He was ordered to sit in a red chair, but told the deputy he didn't see the chair and "began walking around 'aimlessly.'" *Id*. at PA714. Over this, the Sheriff's deputies started a physical confrontation intended to take Mathew to the ground. *Id*. at PA714-17. Multiple deputies engaged. *Id*. During this scuffle, Defendant Capers punched Mathew in the head. *Id*. at PA717. Also during this scuffle, an older female officer (Rowland) stumbled and fell over. *Id*. at PA716-17. Rowland's fall gave the other officers a reason to victimize Mathew. This scuffle ended with Mathew handcuffed and in leg irons, his underwear pulled down past his buttocks and genitals, face down, and surrounded by deputies. *Id*. at PA715 (cuffed); Ex. G, Capers Dep. 96:2-8 (underwear). Security footage also exists. (Ex. H, photo no. 1.)

A supervisor then ordered that Mathew be placed in a restraint chair, which secures the shoulders, hips, and legs and totally immobilizes a person. (Ex. G, Capers Dep. 96:15-17.) Security footage shows the chair being wheeled into one of the jail cells used for detox purposes. (Ex. H, photo no. 2.) Each detox cell has its own camera, glass doors, and is within direct line of sight of the booking area and nurse's station. (Ex. G, Capers Dep. 97:1-6, 94:12-18; Ex. D, Brown Dep. 206:8-207:5.) If Mathew *had* to be in jail, this would have been a good location to secure and observe someone mentally disordered.

However, security footage clearly showed the restraint chair being *removed* from that cell and wheeled down the hall to an older, more remote part of the facility. (Ex. H,

photo no. 4; Ex. G, Capers Dep. 93:22-94:11.) *Critically, those cells did not have cameras in them and are not in the general booking area.* Deputies carried Mathew by his arms and legs, face down, still handcuffed behind his back and shackled, in a parade right past the detox cell with the chair in it to this more remote cell. (Ex. H, photo nos. 3 and 5.) The restraint chair trailed behind. *Id*., photo no. 4.

Defendant Kenny arrived at the remote cell, where Mathew lay face down on the floor awaiting the chair. (Ex. B at PA722, PA731.) With full awareness of Defendant Johnson, the watch commander present on the scene, Kenny requested a Taser. *Id*. at PA721-22, PA731. Kenny could already see blood on Mathew's mouth. *Id*. at PA722. Mathew remained handcuffed and in leg irons and was seated into the chair. *Id*. at PA723. According to Kenny and Capers, Mathew was at least partially restrained when Kenny applied the Taser to Mathew's groin area—four separate times. *Id*. (restrained); Ex. G, Capers Dep. 103:19-104:10 (restrained); Ex. I, Kenny Dep. 194:11-196:10 (location), 236:1-4 (four times). This was pure torture of a shackled, restrained man—not a use of force intended for any valid purpose—and it clearly exceeded Constitutional limits.

Deputies also affixed a "spit mask" to Mathew's face, even though Mathew was not spitting. (Ex. B at PA724 ("not trying to spit on officers").) After Mathew died, that mask was found to be caked with blood. (Ex. J (photo).)

After the deputies Tasered Mathew and restrained him, Corizon's nurse Defendant Brown came to the cell: not to check Mathew's mental condition, or to tend to his injuries, but solely to check tightness of the restraints. (Ex. D, Brown Dep. 140:20-141:20, 159:13-

160:23.) Brown knew Mathew was verbally unresponsive, but did nothing and "left it at that." *Id*. at 160:17-18. Brown was in the cell a total of 51 seconds. *Id*. at 153:14-24.

The door to Mathew's cell closed at 11:47:50pm, and it did not reopen until he was found dead, an hour and forty-nine minutes later. (Ex. B at PA732.) Mathew remained fully restrained. In the meantime, deputies were charged with checking Mathew's physical condition every 15 minutes. (Ex. K, Sheriff's policy at PA27.) Defendant Evans, claiming to have performed these checks, falsified the log she completed, and Brown signed it. (Ex. L (log); Ex. B at PA1064 ("she agreed it was not correct").) While still alive, Mathew screamed for help, including the words: "I can't breathe." *Id*. at PA732. In a naked show of callousness, Evans came into the area by Mathew's cell, retrieved her sandwich from a filing cabinet, and did not even look into Mathew's cell. *Id*.

So that is how Mathew died: beaten, bloodied, Tasered, hands cuffed behind his back, fully strapped to a restraint chair, with a spit mask covering his head, panicking and screaming, alone, ignored. The Georgia Bureau of Investigation's medical examiner found that these conditions directly caused his death. (Ex. M, Desamours Dep. 34:8-35:4; Ex. N, autopsy, at PA918.) The entire six or so hours he was in the jail, Mathew received *no* medical assessment or treatment. (Ex. D, Brown Dep. 37:18-20.)

After the death, Defendant Kenny was convicted of cruelty to an inmate, Defendant Evans was convicted of perjury and public record fraud, and Defendant Brown was convicted of making a false statement. (Ex. O at GBI1-311, -296, -303, -289.)

**B.     There exist substantial facts giving rise to "pattern and practice" liability on the part of the Sheriff of Chatham County.**

The foregoing shows a terrifying end to a young man's life. The tragedy of this case, as Plaintiffs have uncovered, is that there was a consistent abuse of force in this jail that made the death of someone like Mathew only a matter of time. The Sheriff is liable because he, as a policymaker and decisionmaker, knew or should have known of this pattern and practice of constitutional violations but did not take action to stop it.

Plaintiffs have uncovered several other episodes with features like those present in Mathew's death: namely, improper use of a Taser, improper use of restraints, use of force against a person already restrained or with a mental health disorder, or a combination of these. Officially, the Sheriff required each deputy to report on each use of force and required each of his supervisors to review and approve those reports. (Ex. P, Smith Dep. 76:2-8, 77:8-22.) However, that policy was plainly ignored. Instead, the picture is one of deputies running amok and supervisors turning a blind eye. As to Tasers, they were finally withdrawn from the jail in May 2015. (Ex. Q, Gilberg Dep. 284:11-15.) Many of the videos on each device had never been watched; a deputy was assigned to review each one, and investigations were begun. (Ex. R, Rhode Dep. 25:1-16.)

In one particularly gruesome investigation ("the Moultrie report"), investigators uncovered that a single deputy was responsible for *three* separate "incidents in which she Tased restrained individuals." (Ex. S, at Sheriff1-7508.) These happened between November 2013 and July 2014—all prior to Mr. Ajibade's death. *Id*. Shockingly, none of these three incidents came to light until about 10 to 20 months after they occurred. *Id.;*

Ex. P, Smith Dep. 165:8-24. The Moultrie report shows that the deputy's supervisors failed to discipline her, Ex. S at Sheriff1-7509, and failed to "notice a pattern developing" regarding Taser overuse, *id*. at Sheriff1-7532-33.

The former head of Internal Affairs testified to other Taser abuses. (Ex. R, Rhode Dep. 7:1-14, 30:15-32:2.) In one case, a deputy took a Taser home and threatened his son about his schoolwork. *Id*. Some of the other incidents involve "mental health"-classified detainees and restrained inmates. One deputy was permitted to routinely carry his Taser in a holster among the "mental health" population. (Ex. T, Hill Dep. 122:24-123:20.)

Taser use was so casually permitted, supervisors didn't know for months when they were deployed and apparently didn't care even when they did know. *After* Mathew died and *after* the Sheriff conducted his video review, he admitted to the *Washington Post:* "There was a culture from top to bottom that they thought they could use the Taser however they wanted. Deputies were using it as punishment, and you can't use it as a form of punishment. There was just too much use." (Ex. U at PA4661-64 ¶¶ 7-9, PA4669 (same), PA4684 (same).) In sum, Plaintiffs have a strong claim to pursue based on a pattern and practice of excessive force at the jail.

## II.   Because the Sheriff, rather than the State, controls the jail where Mathew Ajibade died, he is not immune from Plaintiff's Count 4 § 1983 claim arising from the jail's pattern and practice of excessive force.

By operation of law, the Chatham County jail is uniquely situated when compared to most other jails in the State of Georgia. Because the Sheriff of Chatham County controls the jail where Mathew Ajibade died, rather than the State of Georgia, and because it is Chatham County's liability and not the State of Georgia's liability at issue, the Sheriff is

not entitled to Eleventh Amendment immunity from Mathew Ajibade's 42 U.S.C. § 1983 claims resulting from the pattern and practice of excessive force at the jail.

### A. *Manders* is the binding framework for analyzing a claim of Eleventh Amendment immunity.

The Sheriff does not challenge any of these facts on this motion. His motion is a purely legal argument under the Eleventh Amendment, citing to *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). A proper *Manders* analysis leads to the conclusion that the Sheriff of Chatham County is not immune.

Under *Manders*, Eleventh Amendment immunity turns on whether the governmental defendant is a state actor, or in its words, "wear[s] a 'state hat.'" *Id*. at 1312. To determine state actor status, the Court must engage in a detailed analysis of the relevant state law and specific facts at issue. That assessment must be done "in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id*. at 1308. This means that Sheriff Wilcher could be a state actor for some functions and a county actor for others.

The Eleventh Circuit gave four factors in *Manders* to determine if an entity like the Sheriff "is an 'arm of the state' in carrying out a particular function." *Id*. at 1309. They are:

> (1) how state law defines the entity;
>
> (2) what degree of control the State maintains over the entity;
>
> (3) where the entity derives its funds; and
>
> (4) who is responsible for judgments against the entity.

*Id.* Plaintiffs now review each *Manders* factor in turn, matching the facts and law applicable to Sheriff Wilcher and against those that were present in *Manders*. We start with *Manders* factor 2: control.

**B.     Chatham County has substantial control over the Sheriff's jail. (Factor 2: control.)**

Perhaps the most relevant and important factor is control: which entity has control over the governmental function at issue? *Manders* took pains to review whether Clinch County had control over the Clinch County Sheriff and his use of force. *Id*. at 1322. The court found that the State had "direct and substantial control over the sheriff[]" and that Clinch County had a "total lack" of control. *Id*. In particular, Clinch County had "no authority, control over, or involvement in Sheriff Peterson's force policy at the jail, or his training and disciplining of deputies in that regard." *Id*. The State of Georgia, however, has structured Chatham County and its corresponding Sheriff differently: Chatham County has considerable control over its Sheriff.

**1.     The Chatham County Jail Act distinguishes Chatham County from other Georgia counties.**

Unlike their Georgia peers, Chatham County and the Sheriff of Chatham County are subject to a unique statute. This statute, specific to jail operations, puts the Sheriff in a subordinate position to the County. For purposes of this brief, Plaintiffs will refer to this statute—an act of the Georgia General Assembly—as the Chatham County Jail Act. 1881 Ga. L., p. 393. (Ex. V.) Here are some relevant provisions:

> Sec. II. [T]he Sheriff of the county of Chatham shall be *ex officio* the Jailer of said county, and shall have the appointment of one Deputy Jailer, **subject to the supervision**

of the County Commissioners of said county, . . . . The said Sheriff shall also have the appointment of **such jail guards as said County Commissioners may deem necessary** for the protection of said jail.

Sec. IV. **[I]t shall be the duty of said Sheriff to make a report in writing to the said County Commissioners of Chatham county** on the first day of each and every month, setting therein the conditions of said jail, the names and number of prisoners received in and discharged from said jail during the preceding month, . . . **the names and number of prisoners as were under treatment for sickness or disease by the jail physician, the names and number of prisoners who have died, . . . and any other information necessary or proper to place said County Commissioners in possession of full and complete knowledge of the condition of said jail and its inmates,** and as they may require. He shall further report in writing [on other matters].

Sec. V. . . . **Said commissioners shall have power to make proper rules and regulations for the government and control of said jail of Chatham county, and the prisoners and inmates therein, and, except as hereinbefore provided, are hereby invested with the management and care of said jail.**

*Id*. (emphasis added).

By passing the Chatham County Jail Act, the State of Georgia created a unique structure and County-held control. Under the Act:

- The Sheriff must report on all "conditions" so that the County has "full and complete knowledge" of those conditions.

- Among the Sheriff's duty to report to the County is specific information about detainees who have needed medical care in the jail and detainees who have died in the jail. (Mathew Ajibade was both.)

- The County is specifically granted the "power" to make rules and regulations "for the government and control" of the jail.

- The Chatham County Commissioners are "hereby *invested* with the management and care of" the jail. Under this provision, the County is affirmatively *charged* with the *duty* to control.

The Act governs the jail where Mathew Ajibade died. Although the jail has been moved a few times, it is still the Chatham County jail under control of the Sheriff. *See* http://www.chathamsheriff.org/Home/Our-History. And although the Act may be time-tested, it remains good law and is a local act with continuing force and validity, affirmed repeatedly by state and federal courts.

The Chatham County Jail Act supplies the element of control that was missing in *Manders*. It is clear, under the Act, that the County controls the jail and its operations and that the Sheriff acts only subordinate to that County control. For purposes *Manders*'s "control" element, the Sheriff is a County actor.

> **2.    The Georgia Supreme Court relied on the Chatham County Jail Act to emphasize the County's control over the jail.**

The Georgia Supreme Court has had occasion to pass on the Chatham County Jail Act. *Griffin v. Chatham County*, 261 S.E.2d 570 (Ga. 1979). In that case, the court noted: "The jail was returned to the county in 1881. Ga. L. 1881, p.393 [(citing the Act)]." *Id*. at 571. The dispute in the case was rather simple. Chatham County had a contract with the City of Savannah under which the County agreed to accept City prisoners. *Id*. The Sheriff of Chatham County refused to accept these City prisoners. The Supreme Court, relied on the Act and ruled for the County. *Id*. at 571-72.

This case is important because it is an expression of the highest court of Georgia, specifically holding that the County could control the activities of the Sheriff of Chatham County at the jail. Further, if there were any doubt about the Chatham County Jail Act's vintage, the Supreme Court has affirmed its continuing force.

3.     **The Eleventh Circuit twice has emphasized the vitality and relevance of the Chatham County Jail Act in *Manders* analyses.**

In two separate decisions, the Eleventh Circuit has specifically noted that the Chatham County Jail Act means Chatham County has special control when it comes to jail operations and uses of force in the jail. In other words, the Eleventh Circuit has already ruled twice that the Sheriff is a County actor when it comes to the "control" element.

The first decision was *Manders v. Lee* itself. *Manders* cited *Griffin v. Chatham County* and noted Chatham County's unique structural power:

> In *Griffin*, the Georgia Supreme Court concluded that the sheriff must accept city prisoners only because **a local act of the State legislature granted Chatham County power over the county jail** and that County's commission had contracted with the City of Savannah to maintain city prisoners in the county jail. *Id*. at 629-30. ***Griffin* involved a local act by the State legislature that was applicable only to Chatham County. That local act granted the Chatham County commissioners considerable power over the county jail** [(quoting Act)]. . . . **In the present case, there is no similar local act by the State legislature regarding the Clinch County jail. Absent such a local act, counties are precluded from power or authority over sheriffs.**

*Manders*, 338 F.3d at 1318, n. 34 (emphasis added).

This analysis was affirmed again by the Eleventh Circuit in *Powell v. Barrett*, 496 F.3d 1288 (11th Cir. 2007), *vacated on other grounds*, 541 F.3d 1298 (11th Cir. 2008). The *Powell* plaintiffs had argued that a certain constitutional amendment, "the JLCA," gave Fulton County the right to control the jail located in its territory. *Id*. at 1308. Rejecting this argument, the Eleventh Circuit said: "in *Manders*, we stated in a footnote that a local act of the State legislature could give a Georgia county control over the county jail, such as a

local act granting Chatham County control over its jail." *Id*. Contrasting the JLCA with the Chatham County Jail Act, the Eleventh Circuit noted that the "Chatham County act explicitly gives the commissioners of Chatham County the power to make 'rules and regulations' for the 'government and control'" of the jail. *Id*.

Particularly noteworthy, *Powell* also emphasizes that the Chatham County Jail Act isn't just a grant of the *right* to control—it actually "affirmatively *vests* the commissioners with the 'management and care' of the jail." *Id*. (emphasis added).

> **4.    Chatham County's control over the Sheriff's jail, and the County's actual use of that control, shows that the events which took the life of Mathew Ajibade were "County" and not "State" action for Eleventh Amendment immunity purposes.**

As the foregoing shows, Chatham County has a special and unique power and duty to control the Sheriff's operations at the Chatham County Detention Center. That control gives the Sheriff a "county hat" when he runs the jail. *Cf. Manders*, 338 F.3d at 1312.

State-created entities are often subject to county control in Georgia law, so this relationship is not unusual. For example, Bibb County holds seats on the Macon-Bibb County Transit Authority. 1980 Ga. L., p.4313, § 2.4. Dougherty County holds seats on the Albany-Doughtery Inner City Authority that manages parking. 1977 Ga. L., p.4220, § 4. Chatham County Commissioners themselves sit on the Chatham Area Transit Authority (along with other citizens). 1986 Ga. L., p.5082, § 2.2. Each of these is a state-created function or agency over which counties exercise at least some control.

Plaintiffs anticipate that Chatham County will argue that, *contra* the express command of the Chatham County Jail Act, Chatham County has not *used* the control it is

"affirmatively vest[ed]" with. *Powell*, 496 F.3d at 1308. That argument would fail, because it does not *matter* if Chatham County has failed to use its control. *Manders* said the question is "where Georgia law vests control." 338 F.3d at 1320. And Georgia law is clear.

Further, the County *has* exercised its control over the jail. Not only has the County participated in the purchase of Tasers (see below), but the County has actually made the judgment that Tasers are "valuable" and "necessary." For example, in 2008, the Board of Commissioners adopted a staff recommendation to buy X-26 Tasers, because it was "consistent with Board policy to approve the necessary equipment for law enforcement" and Tasers would "give officers an additional layer of defense." (Ex. W, composite exhibit of excerpts of meeting minutes, at M16 (recommended), M13 (Board vote).) These X-26 Tasers were specifically intended for the Detention Center, *id*. at M16, and are the exact kind used on Mr. Ajibade, Ex. X, Response No. 8. This is not just the County handing over unrestricted funds to the Sheriff; this is evidence of an affirmative policy decision by the County that Tasers should be deployed—*into the Detention Center*. It is the "control" contemplated by *Manders* and the kind of "rule and regulation" ordered by the Chatham County Jail Act.

Moreover, by 2014, the County had been purchasing competing "Karbon Arms"-brand devices, but after Karbon Arms lost a patent infringement battle, the County found itself in need of replacing the infringing devices. The Board of Commissioners believed "*the County* would be in a libelous situation" if it kept the devices, and voted to "replace *our* inventory of these type products." (Ex. W, 5/9/14 meeting minutes at M28 (quotes), M27 (unanimous vote) (emphasis added).) Once again, the County made a judgment that

14

Tasers "are intended to reduce officers' need to use lethal force without diminishing officers' effectiveness" and would "enhance the capabilities of law enforcement," including in the jail. *Id*. at M28. That is another demonstration of County deliberation and control.

The Sheriff is indisputably a County actor for purposes of *Manders*'s "control" element. To argue otherwise, Sheriff Wilcher would have to ask this Court to ignore these local deliberations; an Act of the Georgia General Assembly ; a decision of the state Supreme Court interpreting and applying that Act; and two decisions of the Eleventh Circuit specifically relying on that Act and that decision *within the context of Eleventh Amendment immunity*. The Sheriff's motion is silent on these critical authorities.

### C. Georgia law defines the Chatham County Sheriff as subordinate to Chatham County when he operates a jail. (Factor 1: how state law defines the entity.)

*Manders*'s factor 1 is "how state law defines the entity." *Manders*, 339 F.3d at 1309. The analysis on factor 2, control, is directly informative to the resolution of factor 1.

*Manders* engages in a lengthy discourse as to all the duties of a Georgia sheriff—including enforcing the law, keeping the peace, and attending to state courts*, id*. at 1312-18—but when it came time to actually applying factor 1, the Eleventh Circuit limited its scope of review to the governmental function at issue, *id.* at 1319. The court held, "we must focus on the nature of the particular function at issue here: force policy." *Id*. at 1319. Likewise, the Court should observe this limited scope and review the function Plaintiffs challenge here—also force policy, as applied in the jail. In so doing, the Court will again observe that, through the Chatham County Jail Act, Georgia has uniquely structured the

relationship between Chatham County and the Sheriff of Chatham County. And because state law defines the Sheriff as subordinate to the County, that means that state law has structured the Sheriff as an arm of the County for this function.

*Manders* mapped the terrain applicable to the typical Georgia sheriff. It pointed out that "Sheriff Peterson's authority and duty to administer the jail in his jurisdiction flows from the State, not Clinch County." *Id*. at 1315. In so doing, it cited *In re Irvin*, 328 S.E.2d 215, 217 (Ga. 1985) ("It is clear that the legislature has vested broad authority in the office of sheriff to administer the jails."). But, as before, the Georgia legislature has *not* vested broad authority in the Sheriff of Chatham County to administer the jail. This authority was placed in the County's hands. On factor 1, the Court should find that the Sheriff is a County actor, and not entitled to immunity as an arm of the State.

> **D.    The Sheriff of Chatham County derives all of his funds in operating the jail from Chatham County.**
> **(Factor 3: where the entity derives its funds.)**

*Manders*'s third factor is "where the entity derives its funds." *Manders*, 338 F.3d at 1323. On the facts of that case, this factor only "tilt[ed]" toward the State treasury and toward immunity. *Id*. at 1328. However, the rationale of *Manders*'s factor 3 does *not* apply when considered in light of Chatham County's special status, and the Court should reach the opposite result.

*Manders* held that "[p]ayment of Sheriff Peterson's budget, when required by the State, does not establish any control by Clinch County over his force policy at the jail or how he trains and disciplines deputies." *Id*. at 1324. Similarly, in *Pellitteri v. Prime*, 776 F.3d 777 (11th Cir. 2015), Lowndes County's paying the bill did not "tip the balance" into

immunity because the money was not spent at its discretion. These rationales do not apply to Chatham County. The analysis is different; the result is different.

First, as with other counties, Chatham County pays for all of the operations of the Sheriff, including the jail. The County's 2016 financial report shows $43.8 million spent to run the Detention Center and another $10.5 million for the Sheriff's Office. (Ex. Y at E-3.) In Chatham County, this legal requirement to do so is found in the Chatham County Jail Act's section V.

What is unique to Chatham County compared with other Georgia counties is in Section IV of the Act. This section requires the Sheriff to "report in writing . . . all sums of money received by him as Jailer . . . from any other sources," and requires him to deposit "said sums of money . . . into the county treasury." This makes clear that the Sheriff's money is the County's money. So does the County's financial report: "The offices of the independently elected officials"—including the Sheriff—"are not separate from the County and therefore are reported as part of the primary government." (Ex. Y at D-18.)

As noted above, *Manders* said that payment of the Sheriff Peterson's budget did not amount to "control by Clinch County over his force policy at the jail." *Id*. at 1324. By contrast, Chatham County *has* used its power of the purse to determine the force used in Sheriff Wilcher's jail. The County, relying on its power to regulate the jail, has purchased Tasers for the Sheriff to use for about a decade, and the abuse of a Taser was a central part of the constitutional violations against Mr. Ajibade. The following Taser purchases are disclosed in meeting minutes of the Chatham County Board of Commissioners:

17

| Date | Description | Amount | Comments and page cite |
|------|-------------|--------|------------------------|
| 8/26/05 | Ten Tasers for "Detention Center" | $6,052 | Board approval not needed (M2) |
| 5/11/07 | Ten Tasers for the Sheriff | $12,149 | Board voted unanimously (M4-M5) |
| 9/7/07 | Two Tasers for "Detention Center" | $2,645 | Board approval not needed (M7) |
| 4/25/08 | Five Tasers for "Court Services"/Sheriff | $6,537 | Board approval not needed (M9) |
| 6/13/08 | Nineteen X-26 Tasers "for the Detention Center" | $22,988 | Board voted unanimously (M13) to accept staff recommendation (M16) |
| 5/14/10 | Eight Tasers for the Sheriff | $9,815 | Board approval not needed (M18-19) |
| 5/28/10 | Three Tasers for the Sheriff | $3,665 | Board approval not needed (M21) |
| 6/11/10 | Three Tasers for the Sheriff | $3,665 | Board approval not needed (M23) |
| 9/9/11 | Five Tasers for the Sheriff | $6,169 | Board approval not needed (M25) |
| 5/9/14 | 150 Tasers for "Chatham County Detention Center" and other uses | $272,985 | Board voted unanimously (M27) to accept staff recommendation (M28) |

(Ex. W.) As discussed in the previous section, this shows the County has routinely made the supervisory and financial decision to put Tasers into the Sheriff's hands—sometimes specifically earmarked for the jail. Thereby, Chatham County directly provides the relevant funding for the Sheriff's use of force, the very function challenged in this action.

The Eleventh Circuit has never found that factor 3 is a slam dunk in favor of immunity. In *Manders*, this factor "tilt[ed]" toward immunity; in *Pellitteri*, the court "[could not] conclude that this factor" weighed in favor of immunity. *Manders*, 338 F.3d at 1324; *Pellitteri*, 776 F.3d at 782. Given the unique legal framework applicable to Chatham County, however, and Chatham County's repeated decisions to put Tasers into its jail, this factor does weigh in favor of County status and against immunity.

**E.**    **Chatham County is responsible for judgments against the Sheriff, and has already promised to pay such judgments here.**
**(Factor 4: the source of funds to pay an adverse judgment.)**

*Manders*'s final factor 4 is "the source of the funds that will pay any adverse judgment" against the sheriff. *Id*. at 1324-28. Unlike with the other factors, *Manders* refused to come down on the side of either the County or the State. *Id*. at 1328, 1329. Rather, it held that, "[a]t a minimum, this . . . factor does not defeat immunity." *Id*. at 1329. In light of the court's resolution of the other three factors in favor of immunity, Plaintiffs believe the *Manders* court essentially punted on factor 4. When this Court analyzes it, however, it is clear that the balance weighs in favor of the Sheriff being a County actor and not immune.

First of all, because nothing in Georgia law requires the State to pay the judgment, the state treasury is not affected, so immunity does not automatically attach. Because "the State treasury would not be required to 'foot the bill' in any event, [factor 4] weigh[ed] in favor of denying immunity" in a case against a Georgia sheriff. *Lewis v. Whisenant*, No. CV515-77, 2016 WL 4223721, at *5 (S.D. Ga. Aug. 9, 2016) (Wood, C.J.).

But apart from the legal scheme, the Court should look to the record to determine this factor's outcome. The clearest, strongest evidence of who will pay the judgment in this case comes from the Sheriff's own interrogatory response served on August 8, 2016.

> 10. State whether any insurance agreements exist under which any person or company carrying on an insurance business may satisfy part or all of the judgment which may be entered in this action against you . . . .
>
> **ANSWER: No. Chatham County is self-insured.**

(Ex. X, Sheriff's Resp. to Pls.' Interrogatories.) In the same document, the Sheriff referred to himself over fifteen times as "the County Defendant." *Id*. at pp. 1-2; at Nos. 5, 11, 12, 13, 14; and p. 10 ("ATTORNEYS FOR COUNTY").

"A party is bound by the factual admissions in his pleadings." *Peery v. Serenity Behavioral Health Sys.*, No. CV106-172, 2009 WL 1228446, at *2 (S.D. Ga. May 4, 2009) (Moore, J.) (denying Eleventh Amendment immunity). Since the beginning of this action, the answer to "who will pay this judgment?" has been "Chatham County." At this late stage, the Sheriff should be judicially estopped from arguing anything else.

The Court should also look to the history of the relationship between Chatham County and the Sheriff's other lawsuits. Chatham County routinely pays the Sheriff's damages in legal claims. Not long ago, the County was engaged in long-running federal litigation over overcrowded conditions at the jail. The Eleventh Circuit referred to "the defendant (the County)" and noted the County was "operating a county jail." *Mercer v. Mitchell*, 908 F.2d 763, 765 (11th Cir. 1990). The County was always held financially liable for jail operations during this litigation (although the particular sanctions in this decision were overturned on unrelated grounds).

More recently, the County voted to represent the Sheriff and a deputy in a claim made by detainee Michael Corbett. (Ex. Z, excerpt of meeting minutes, at 50.) The very fact that the County went into executive session to consider the facts of that case, and whether or not to represent the Sheriff, shows that the County's decisionmaking body is involved in *and liable for* the Sheriff's legal claims.

Mr. Corbett, just like Mr. Ajibade, suffered a Taser shock while fully restrained in the jail. (Ex. AA at Bacon 2, 5.) The County paid to settle this claim in 2016 with a check drawn on its own treasury. (Ex. BB, settlement check.) The County paid.

In another case premised on federal employment law, *Simmons v. Chatham County Sheriff's Dept.*, No. 4:14-167, the County assumed the defense of the Sheriff and apparently settled the case via stipulated dismissal. (Ex. CC, complaint.)

Plaintiffs' counsel served Chatham County with an open records request seeking information about settlements the County has made on the Sheriff's behalf, including some disclosed in this litigation. (*Compare* Ex. X at No. 14 *with* Ex. DD at 2.) The County replied that it needs until May 11 to respond. (Ex. EE.) Plaintiffs will supplement this brief with further evidence of County-paid settlements if produced.

Given the County's voluntary defense of the Sheriff, its history of paying other claims, and most critically, its response that "Chatham County is self-insured" in this case, the Court should find that the funds for this judgment will come from the County. Thus, the Court should find that *Manders* factor 4 weighs against immunity.

### F. The Court's past rulings on *Manders* immunity are not counter to Plaintiffs' position.

The Plaintiffs are aware that the Court, and other judges in this district, have previously ruled Georgia sheriffs have immunity from suit under the Eleventh Amendment when it comes to the use of force. Chief Judge Wood has found, for example, that as to the Sheriff of Coffee County, *Manders* factors 1 and 2 (structure and control) run in favor of the State; factor 3 (who pays for operations?) "cuts both ways"; and on factor 4

(who pays judgments?), "in a way, both county and state funds might be implicated." *Townsend v. Coffee County*, 854 F. Supp. 2d 1345, 1351–52 (S.D. Ga. 2011) (Wood, C.J.). This Court relied on *Townsend* in dismissing a *pro se* action against the Sheriff of Chatham County. *Jackson v. Ruffini*, No. CV414-250, 2015 WL 6964676 (S.D. Ga. Nov. 10, 2015) (Moore, J.). And in a Liberty County case, this Court adopted an R&R that noted "county sheriffs and their deputies are *often* acting as 'arms of the State' when managing county jails." Ex. FF, R&R (S.D. Ga. Jan. 4, 2017) (Smith, M.J.) (emphasis added), *adopted by* Ex. GG, *Bowen v. Sikes*, No. CV416-049 (S.D. Ga. Feb. 3, 2017) (Moore, J.). However, these past decisions do not stand in the way of ruling in Plaintiffs' favor on the motion at bar.

First of all, most of the Southern District decisions Plaintiffs could find that tested a Georgia sheriff's Eleventh Amendment immunity involved a sheriffs other than Chatham County's. Because the Chatham County Jail Act places Chatham County and its sheriff in unique relationship to each other, these decisions are not apposite. *Manders* instructs courts to review *each* local official's statutory authority in light of *each* governmental function at issue. *Manders*, 338 F.3d at 1308.

Secondly, none of the plaintiffs or defendants involved in Chatham County cases—mostly *pro se* cases—appear to have fully briefed the issue. The Plaintiffs have reviewed past filings and it appears none of them brought the unique fact of the enacted, continuing Chatham County Jail Act to the attention of the Court. *E.g.*, *Logue v. Johnson*, No. CV410-240, ECF Nos. 84, 92. Plaintiffs' argument, while anticipated by the Eleventh Circuit, appears to be newly presented in this Court.

Accordingly, because past litigants either waived or failed to develop this issue, the Court's past decisions do not mandate a grant of immunity to the Sheriff of Chatham County in this case.

## III.   Plaintiffs do not oppose the grant of partial summary judgment solely as to Plaintiffs' Count 6 state law claim for assault and battery.

The Sheriff moves for summary judgment as to Plaintiffs' state-law claims for assault and battery against the Sheriff in his official capacity on a theory of *respondeat superior*. These claims are legally independent of the § 1983 claims against the Sheriff addressed above.

Sovereign immunity can be a valid defense to state-law torts, although there are waivers. One such waiver applies negligent acts. *Gilbert v. Richardson*, 452 S.E.2d 476, 484 (Ga. 1994) ("a county may be liable for a county employee's negligence in performing an official function to the extent the county has waived sovereign immunity"). Another such waiver is available in Georgia on grounds of government-purchased liability insurance. *Id*. Georgia has another waiver that applies to negligent performance of a sheriff's ministerial duties. OCGA § 36-33-1(b); *see City of Atlanta v. Mitcham*, 769 S.E.2d 320, 323 (Ga. 2015).

Plaintiffs maintain that Count 6 was properly invoked on the basis of state law, but concede that the facts as developed do not support the claim. Plaintiffs now do not oppose a grant of partial summary judgment in favor of the Sheriff as to Count 6. However, Plaintiffs maintain that disposition of this Count does not affect any other claim in this action.

**IV.    The Sheriff is not entitled to summary judgment as to Plaintiffs' Count 5 claim for wrongful death.**

The Sheriff also moves for summary judgment as to Plaintiffs' wrongful death claim. His motion is limited strictly "to the extent that" the wrongful death claim may be based on "barred" Count 4 (Section 1983 liability) or "barred" Count 6 (the conceded state-law torts claim). (Br. at 7.) He argues that because these counts fail, the wrongful death count also fails. He relies on slender authorities to reach this conclusion, but Plaintiffs do not dispute the rather straightforward logic.

However, Plaintiffs *do* dispute that there is no wrongful death cause of action against the Sheriff. Even the Sheriff does not seek the complete dismissal of Count 5, wrongful death. And Count 5 can be premised on any of the counts against the Sheriff, including Counts 3 and 4. Count 5 should stand against the Sheriff.

**V.    Conclusion.**

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny the Sheriff's Motion for Partial Summary Judgment as to Count 4 and Count 5 of Plaintiff's Complaint. Plaintiffs have no opposition to this Court granting the Sheriff's Motion for Partial Summary Judgment as to Count 6 of Plaintiff's Complaint.

Respectfully submitted,


/s/ Timothy M. O'Brien
Troy A. Rafferty (Fla. Bar No. 024120)
Timothy M. O'Brien (Ga. Bar No. 548714)
William F. Cash III (Fla. Bar No. 68443)
**LEVIN, PAPANTONIO, THOMAS,**
**MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone:     850-435-7084  (O'Brien)
Fax:        850-435-7020
E-mail:    trafferty@levinlaw.com
               tobrien@levinlaw.com
               bcash@levinlaw.com

William R. Claiborne (Ga. Bar No. 126363)
**THE CLAIBORNE FIRM, P.C.**
410 East Bay Street
Savannah, GA 31401
Phone:     912-236-9559
Fax:        912-236-1884
E-mail:    will@claibornefirm.com

Mark O'Mara (Fla. Bar No. 359701)
Alyssa Flood (Fla. Bar No. 99755)
**O'MARA LAW GROUP**
221 NE Ivanhoe Boulevard
Orlando, FL 32804
Phone:     407-898-5151
Fax:        407-898-2468
E-mail:    mark@omaralawgroup.com

Cameron C. Kuhlman (Ga. Bar No. 596159)
**DUFFY & FEEMSTER, LLC**
236 E. Oglethorpe Ave.
Savannah, GA 31401
Phone:     (912) 236-6311
Fax:        (912) 236-6423
Email:     cck@duffyfeemster.com

*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on April 19, 2017, this *Plaintiffs' Memorandum of Authorities in Opposition to Defendant Sheriff Wilcher's Motion for Partial Summary Judgment (ECF No. 113)* was filed on CM/ECF, which will serve it on all parties.

/s/ Timothy M. O'Brien
Timothy M. O'Brien