# EXHIBIT B

# CHATHAM COUNTY SHERIFF'S OFFICE

# INTERNAL AFFAIRS UNIT

# INVESTIGATIVE REPORT



| | |
|---|---|
| **CASE NUMBER:** | **SO-IA-ID-01-15-001** |
| **INVESTIGATOR:** | **CPL.  RICK HALL** |
| **DATE CLOSED:** | |

**APPROVED BY:** _____   **DATE:**_____
Internal Affairs Commander

**REVIEWED BY:** _____   **DATE:** _____
Chief Deputy

1



PLAINTIFF'S
EXHIBIT
**P12**

PA00692

| IA Report Bates | | Description |
|---|---|---|
| **Start** | **End** | |
| PA00692 | 00735 | Investigative Report SO-IA-ID-01-15-001 |
| PA00700 | | Ambrose Policy Violation letter |
| PA00701 | 00703 | Burke Policy violation letter and separation report |
| PA00704 | 00706 | Burns policy violation letter and separation report |
| PA00707 | | Folsome policy violation letter |
| PA00708 | | Johnson policy violation letter |
| PA00709 | | Evans-Martinez policy violation letter |
| PA00710 | | Reed policy violation letter |
| PA00711 | 00713 | Vinson policy violation letter and separation report |
| PA00737 | | Administrative incident report |
| PA00738 | 00739 | Inmate incident report - Evans |
| PA00740 | 00741 | Miscellaneous incident report - Martinez |
| PA00742 | 00743 | Inmate incident report - Rodriguez |
| PA00744 | 00745 | Inmate incident report - Kenny |
| PA00746 | 00747 | Inmate incident report - Burns |
| PA00748 | 00749 | Inmate incident report - Wilson |
| PA00750 | 00751 | Inmate incident report - Cody |
| PA00752 | 00753 | Inmate incident report - Solomon |
| PA00754 | 00755 | Inmate incident report - Smith |
| PA00756 | 00757 | Inmate incident report - Burke |
| PA00758 | 00759 | Inmate incident report - Groover |
| PA00760 | 00761 | Inmate incident report - Reed |
| PA00762 | 00763 | Inmate incident report - Cooper |
| PA00764 | 00765 | Inmate incident report - Burns |
| PA00766 | 00767 | Miscellaneous incident report - Jones/Clerk |
| PA00768 | 00769 | Miscellaneous incident report - Lopez |
| PA00771 | 00775 | Use of force form - Rowland |
| PA00776 | 00778 | Use of force form - Solomon |
| PA00779 | 00781 | Use of force form - Richardson |
| PA00782 | 00784 | Use of force form - Vinson |
| PA00785 | 00787 | Use of force form - Capers |
| PA00788 | 00790 | Use of force form - Burns |
| PA00791 | 00793 | Use of force form - Burke |
| PA00794 | 00796 | Use of force form - Groover |
| PA00797 | 00799 | Use of force form - Kenny |
| PA00800 | 00808 | Statement of incident - Evans |
| PA00809 | 00812 | Statement of incident - Brown |
| PA00813 | 00821 | Statement of incident - Richardson |
| PA00822 | 00826 | Statement of incident - Groover |

| | | |
|---|---|---|
| PA00827 | 00831 | Statement of incident - Kenny |
| PA00832 | 00836 | Statement of incident - Capers |
| PA00837 | 00841 | Statement of incident - Vinson |
| PA00842 | 00846 | Statement of incident - Burns |
| PA00847 | 00851 | Statement of incident - Cody |
| PA00852 | 00856 | Statement of incident - Burke |
| PA00857 | 00861 | Statement of incident - Young |
| PA00862 | 00870 | Statement of incident - Johnson |
| PA00871 | 00875 | Statement of incident - Cahall |
| PA00876 | 00877 | Statement of incident - Brown |
| PA00878 | | Statement of incident - Thrift |
| PA00879 | | Statement of incident - Thorpe |
| PA00880 | | Notification of investigation - Wilson |
| PA00881 | | Notification of Investigation - Rowland |
| PA00883 | 00888 | Corizon General Health Services Policy & Procedure |
| PA00889 | 00890 | IA Report Supplemental Interview - O'Neill |
| PA00892 | 00894 | 3-01/010.40 Use of Force |
| PA00895 | 00899 | 30-1/010.45 Use of Less Than Lethal Force |
| PA00900 | 00902 | Procedures for use of restraint chair |
| PA00904 | 00914 | Photos from incident |
| PA00916 | 00917 | Preliminary Autopsy overview |
| PA00918 | 00926 | GBI Autopsy official report |
| PA00927 | 00928 | GBI Forsensic report - Blood alcohol |
| PA00929 | 00930 | GBI Forensic report - Toxicology |
| PA00932 | 00933 | Detailed history for police event |
| PA00934 | | Field arrest report |
| PA00935 | | Arrest and transport disclosure log |
| PA00937 | 00940 | ARS Narrative Report |
| PA00941 | | CCSD Uniform Booking Form |
| PA00942 | | CCSO Investigative CHRI Request |
| PA00943 | 00945 | Criminal history name and identifier search |
| PA00946 | | Defendant Record |
| PA00947 | | Victim notification form |

| | | |
|---|---|---|
| PA00949 | 00964 | Taser log |
| PA00965 | 00969 | Taser camera log |
| PA00970 | | Restraint chair log |
| PA00971 | 00989 | Photos from incident |
| PA00990 | 00993 | Restraint chair photos |
| PA00994 | | Photo of convenience store |
| PA00995 | 00997 | Restraint chair photos |
| PA00998 | 01050 | Scene photos |
| PA01052 | | Timeline of attempt to revive Ajibade |
| PA01053 | | Watch commander log |
| PA01054 | 01059 | Surveilance video notes |
| PA01060 | | CCSO Receipt for property |
| PA00161 | | Evans policy violation letter |
| PA00162 | | Memoranum Results of investigation - Evans |
| PA01063 | 01065 | Hall Investigative report - Evans |
| PA01066 | 01074 | Statement of incident - Evans |
| PA01075 | | Restraint chair log |



| CHATHAM COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS UNIT INVESTIGATIVE REPORT | CASE NUMBER: SO-IA-ID-01-15-001 |
|---|---|

| INCIDENT: INMATE DEATH | LOCATION: 1050 CARL GRIFFIN DR. RECEIVING AND DISCHARGE |
|---|---|

| COMPLAINANT: CHATHAM COUNTY SHERIFF'S OFFICE |
|---|

| ASSIGNED INVESTIGATOR: CPL. RICK HALL | DATE: 1/9/15 |
|---|---|

**INVOLVED EMPLOYEE(S):** Lt. Debra Johnson, Sgt. Anza Rowland, Cpl. Maxine Evans, Cpl. Jason Kenny, Ofc. Mark Capers, Ofc. Eric Vinson, Ofc. Samuel Richardson, Ofc. Frederick Burke, Ofc. David Cody, Ofc. Aisha Groover, Ofc. Abram Burns, Ofc. Antonio Solomon, Ofc. Burt Ambrose

**BASIS OF INVESTIGATION:**

On 1/1/15, detainee Matthew Ajibade (Ah-GEE-bah-DAY) was arrested and transported to the Chatham County Detention Center. AJIBADE became disorderly during the booking process and had to be restrained by deputies. The detainee was placed in a restraint chair and was found unresponsive during a restraint check.

**OVERVIEW:**

Matthew AJIBADE was arrested on 1/1/15 by Savannah-Chatham Metro Police at 1114 Abercorn St. at the El Cheapo convenience store. Upon investigating the incident, Metro Scpl. Reggie Owens and Apo. Lorenza Baker arrested AJIBADE and booked him into the Chatham County Detention Center on charges of Battery (DVA) and Obstruction by Resisting Arrest. Scpl. Owens detailed in his report AJIBADE resisted arrest by refusing to release his girlfriend (Fisayo Odewole) when directed and began violently attempting to evade arrest.

AJIBADE was transported to the CCDC by Owens with Baker serving as the backup officer. Deputies accepted AJIBADE and he was placed in cell #6 in the booking area. At approximately 2330 hrs, AJIBADE was released from the cell to begin the booking process. He began being uncooperative with the booking officers, refusing to follow instructions and being argumentative. The booking officers attempted several times to gain AJIBADE'S cooperation and when he continued to refuse, the decision was made to place him back in the booking cell. An officer touched him on the arm in an effort to guide AJIBADE back to the cell and he pulled away from the officer. Efforts were then made to gain control of AJIBADE, at which point he became combative and aggressively resisted the officers.

Sgt. A. Rowland then introduced a Taser X-26 electronic control device in an effort to subdue AJIBADE as he continued to struggle with the officers. As Sgt. Rowland attempted to deploy a "drive stun" on him, AJIBADE was able to gain control of the device and activate it while making contact with the officers. One of the officers was able to eventually kick the device out of AJIBADE'S hand as the officers continued to struggle with him. A 10-78 was called over the radio and additional officers responded to the incident. After a prolonged struggle to restrain AJIBADE, he was carried to an isolated cell in the former "pre-booking" area. As the officers

2

PA00693

attempted to place AJIBADE in a restraint chair he continued to struggle against the officers' efforts. Cpl. J. Kenny, who responded to the 10-78, requested the X-26 be given to him to help officers get AJIBADE into the chair. Kenny deployed 4 short cycles of the X-26 on AJIBADE. Officers were able to restrain AJIBADE in the chair and asked the booking nurse to check the restraints for appropriate fit.

Over the course of approximately 20 minutes after AJIBADE was placed in the restraint chair, several officers conducted only visual checks of him. At approximately 0135 hrs, Cpl. Evans conducted a visual check and did not notice any movement or vocalization from AJIBADE. She opened the cell door and called out to him. Upon getting no response from him she asked the nurse to accompany her as she opened the cell to further check him. When he failed to respond to voice and physical stimulation, Evans requested more officers come and assist with removing him from the restraint chair. AJIBADE was placed on the floor and attempts to revive him began. The nurse retrieved the AED (defibrillator) and began administering resuscitation charges. EMS was called and responded to the booking area approximately 25 minutes later. The determination was soon made to discontinue resuscitation attempts.

## INVESTIGATION:

On 1/2/15 I was contacted by Lt. Gregg Rhode and directed to respond to the Chatham County Detention Center due to a use of force issue and an inmate death. Upon my arrival, Lt. Rhode and Sgt. W. Blanton informed me an arrestee by the name of Matthew AJIBADE had become disorderly and violent during the booking procedure. Staff members were required to use force to control the arrestee and place him in a restraint chair. Shortly after being placed in the restraint chair, the arrestee was found unresponsive. Attempts to resuscitate the arrestee were unsuccessful. The Georgia Bureau of Investigation was contacted per policy. Upon their arrival, agents identified staff members involved in the incident and began interviews. Photos of the scene were obtained and the coroner's office was notified. I compiled a list of staff members with direct contact with the arrestee during the incident and arranged to speak with them following the G.B.I. interviews.

## DEATH NOTIFICATION:

### *(Complete Death Notification Report attached to case file)*

On 1/2/15 at approximately 0400 hrs, Sgt. Blanton made contact with Fisayo Odewole, the girlfriend of Matthew AJIBADE, in an effort to obtain next of kin information. Odewole informed Sgt. Blanton AJIBADE had no family in the United States; all of his family was in Nigeria, Africa. (Odewole later stated AJIBADE'S mother lived in Maryland, but she did not know how to contact her.) Due to this information, the determination was made to conduct a death notification in person with Odewole. Lt. Rhode and Sgt. Blanton contacted Father O'Brien for assistance on the matter. The three responded to her residence at 209B E. Duffy St. Lt. Rhode and Sgt. Blanton noted there was broken glass on the floor; several pills lying on the floor; a hole in the wall and blood on the walls and floor. Upon advising her of the passing of AJIBADE, Odewole was visibly upset but briefly spoke about the behavior and mental state of AJIBADE on the previous day.

Father O'Brien asked Odewole if AJIBADE had any problems. Odewole explained "Yes. (Unintelligible)...he was acting hyper; acting crazy. He was talking to himself and doing crazy stuff and I was trying to help him". Lt. Rhode asked her if AJIBADE had displayed odd behavior prior to this incident. Odewole said he had not. She went on to say "He had it under control 2 years ago so I don't know what happened." When asked what it was he had under control, she said his "mental issues". She continued "He had it under control. Everything was perfect; it was okay." Odewole said AJIBADE was supposed to be taking meds. She said "I did give him ne

3

medication he was on yesterday".   She verified the pills on the floor were one of the medications AJIBADE had been taking for his "mental issues".

**ARREST:**

Scpl. Reginald Owens and APO Lorenza Baker were dispatched to a call of a domestic incident in the area of Abercorn St. and E. Duffy St. on 1/1/15. Scpl. Owens was the first to arrive on the scene. Sgt's Tarik Wilson and Shinita Young were supervisors called to the scene by Owens. All officers were interviewed on the incident:

**SCPL. REGINALD OWENS:**

On 1/9/15, I responded to the Savannah-Chatham Metro Police Professional Standards Unit and met with Sgt. J. Wright for an interview with Reginald Owens. Scpl. Owens was identified as the primary officer on the call involving Matthew AJIBADE and Fisayo Odewole. Scpl. Owens gave the following account of the incident:

He was dispatched to a call of a domestic dispute in progress near 208 E. Duffy St. When he got to the intersection of Abercorn St. and Duffy St. he observed someone placing a blanket over a woman's head. His backup officer, APO Lorenza Baker arrived and the two got out of their vehicles and approached the suspects. He could see the male had a tight grip on the female in a hugging manner. The male was behind the female, somewhat off to her side. The female (later identified as Fisayo Odewole) was able to pull the blanket off of her head and he could see her face was bloody. The blanket and the male (later identified as AJIBADE) had blood on them as well.

He then gave several verbal commands for AJIBADE to release the female as he and Baker approached the pair. AJIBADE did not release her and as Owens began trying to free her, AJIBADE began to struggle against them. They were able to get the female free and then placed AJIBADE on the ground with a balance displacement technique. He, Baker and AJIBADE fell against the door of the convenience store; he could not recall if Odewole also fell with them. They were able to get one handcuff on AJIBADE as he struggled against them. After a short time they eventually were able to get his other hand cuffed.

Once AJIBADE was restrained, he seemed to calm down. Baker maintained a watch on AJIBADE while he went to check on Odewole. At some point Sgt. T. Wilson and Sgt. S. Young (Both SCMPD officers) arrived on the scene. As they spoke to Odewole she said he (Ajibade) needed help. Odewole didn't seem to know AJIBADE'S background because she did not know of any specific mental illness or psychological issues. She only told officers AJIBADE had been acting strange throughout the day.

EMS was requested to the scene due to the injuries visible on Odewole's face and the fact force was used to restrain AJIBADE. He refused to respond to the EMT's and Odewole refused treatment for her injuries. It was initially believed AJIBADE needed a mental health evaluation. An inquiry was made as to whether EMS would transport AJIBADE to the hospital. The EMT's informed them because AJIBADE had displayed violent behavior, they would not be able to transport him per Southside EMS policy. After conferring with Sgt. Wilson and APO Baker, Owens learned AJIBADE told Baker Odewole was allegedly cheating on him and he was upset over the matter. Due to this information and because AJIBADE was not displaying any behavior indicative of requiring a mental health evaluation and also because Odewole did not have any definitive information concerning AJIBADE, it was later determined by Sgt. T. Wilson he would be transported directly to the detention center. Odewole provided Sgt. Young with a bottle of medication prescribed to AJIBADE and

4

PA00695

informed the sergeant she did not know what the medication was for.  The medication was turned over to Owens to accompany AJIBADE to the detention center.

AJIBADE was transported to the detention center without incident and was cooperative with the officers.  Upon entering the booking area, Baker informed one of the booking officers AJIBADE was a "possible 49" (mental health patient).  AJIBADE was then placed into one of the booking cells.

## APO LORENZA BAKER:

On 1/9/15 I interviewed APO Lorenza Baker, the secondary SCMPD officer in the arrest of Matthew AJIBADE on 1/1/15, at the SCMPD Professional Standards Unit.  Sgt. J. Wright of the PSU was present during the interview.  Baker gave the following account of the incident:

Upon arrival at the scene, Scpl. Owens was attempting to verbally gain compliance from AJIBADE, who was standing in front of a female (Odewole) in a somewhat shielding manner with his arms stretched behind him around the female.  The female had a bloody nose and looked somewhat confused.  AJIBADE was not complying with Owens' commands.  Owens then grabbed AJIBADE and attempted a leg sweep maneuver to incorporate balance displacement to take AJIBADE to the ground.  AJIBADE was able to maintain his balance but was falling backwards, eventually falling onto Owens with both falling against the door of the convenience store.  At that point, he and Owens grabbed AJIBADE and pulled him to the ground.  AJIBADE resisted their attempt to restrain him by not allowing them to place his hands behind his back.

After a brief struggle, they were able to get handcuffs on AJIBADE.  It required a lot of effort on their part because AJIBADE was surprisingly strong.  Upon being restrained, AJIBADE calmed down.  He asked AJIBADE what was going on with him.  AJIBADE said he was protecting his girl because some guys were trying to get her.  AJIBADE then told him Odewole said she had slept with another man.  He asked AJIBADE if that was the reason he punched Odewole; AJIBADE told him it was.  He relayed the information to Owens who asked Odewole about the matter.  She denied the allegation and went on to tell Owens AJIBADE purchased a ring for her that morning.

EMS was called to the scene but AJIBADE was not treated or transported.  AJIBADE was cooperative with them for the remainder of their interaction with him.  He did not display any behavior indicative of any mental health issue.  Odewole spoke to AJIBADE shortly before he was transported to the detention center.  She told him "you need help" and they told each other they loved one another.

I asked Baker if he suggested to anyone AJIBADE should go to the hospital for a mental health evaluation.  He said he suggested it to both Owens and Sgt. Wilson.  He continued saying Wilson determined AJIBADE would be transported to the jail based upon the violence inflicted upon Odewole and the lack of any behavior indicative of any severe mental issues.  He said Wilson stated if AJIBADE required any mental health evaluation, it could be arranged through the detention center.

He stated Sgt. S. Young had been keeping Odewole secure and at some point the two walked to Odewole's residence and retrieved some medication prescribed to AJIBADE.  Upon their return, Owens told Baker AJIBADE may have some mental health issues.  Baker went on to say he personally felt AJIBADE should have been transported to the hospital for a mental health evaluation but his opinion was overridden by the primary officer Owens and Sgt. Wilson.

PA00696

Upon arriving at the jail, he said AJIBADE was compliant and followed their commands.  He informed the booking officer force had to be used to restrain AJIBADE and he possibly suffered from mental health issues.

**SGT. SHINITA YOUNG:**

On 1/7/15 I conducted a telephone interview with Sgt. Shanita Young from SCMPD.  Upon being advised on the nature of the call, she gave the following account of the incident:

Upon her arrival, AJIBADE was handcuffed and sitting on the ground.  The details of the call were explained to her by Owens and Baker.  She spoke to Odewole about her injuries; Odewole was holding a towel to her nose.  She told Odewole EMS had been called to check on her and AJIBADE.  Odewole informed her AJIBADE had been experiencing "highs and lows" all day and how he purchased her a ring that morning; she stated due to his mood swings she thought something was mentally wrong with AJIBADE.  She asked Odewole if AJIBADE suffered from any mental conditions but Odewole was unaware of any issues, saying AJIBADE never told her of any mental health problems.

Young also spoke by phone to Kammie Kinsey, Service Manager for Wells Fargo Bank (AJIBADE'S supervisor).  Kinsey relayed to her AJIBADE did not seem to have mental issues.  Kinsey also told her Odewole most likely upset AJIBADE somehow.  Young told Kinsey both AJIBADE and Odewole would probably go to the hospital for treatment, dependent upon an EMS evaluation.  After EMT's spoke to AJIBADE they asked Odewole about her injuries.  Upon learning AJIBADE would not be going to the hospital, Odewole refused treatment.

Odewole then told her there was some medication AJIBADE had been taking but she did not know what it was for.  They both walked over to Odewole's residence where Young observed broken glass and a hole in the wall.  Odewole retrieved the medicine and the two walked back to the convenience store.  Odewole provided the medication to Owens.

**SGT. TARIK WILSON:**

On 1/7/15 I conducted a telephone interview with Sgt. Tarik Wilson from SCMPD.  Upon being advised on the nature of the call, he read verbatim from the Use of Force synopsis he completed per SCMPD.  On 1/14/15 I conducted a follow-up interview with Sgt. Wilson at the Professional Standards Unit of SCMPD with Lt. R. Gavin and Sgt. J. Wright in attendance.  Sgt. Wilson provided the following information on the incident:

Upon his arrival at the scene, AJIBADE was already restrained and he was briefed on the incident by Owens and Baker.  AJIBADE was being quiet and not wanting to answer officer and EMT questions.  Odewole was sitting nearby holding a towel or blanket to her nose.  He attempted to talk with her but she requested some water.  After he retrieved some water for her, he returned to find Sgt. Young speaking with her.  Both he and Young asked Odewole if AJIBADE was taking any medication.  She said he was but she did not know what for; she then added she could retrieve the medication.  At that time Young and Odewole walked to Odewole's residence.

Wilson said he was not informed of any mental health issues with AJIBADE.  He confirmed he decided AJIBADE would be transported to the detention center where medical staff could determine the use of the medication Odewole gave Owens and take additional steps if necessary.  Wilson further stated he did not hear

6

Baker make a suggestion AJIBADE was possibly suffering from a mental health issue and should be transported to the hospital.

**EMT ANDREW BUTLER (SOUTHSIDE EMS):**

On 1/14/15 Lt. R. Gavin, Sgt. J. Wright and I interviewed Andrew Butler; one of 2 EMT's who responded to the arrest scene of Matthew AJIBADE.  Butler gave the following account of the incident:

Upon reaching the scene, he could see a black male arrestee lying on the ground in handcuffs and a black female (Odewole) a short distance away.  His partner went to check on the male and he checked on Odewole. He could see she had an injury to her face but she wasn't cooperative with him.  He asked her what had taken place and she simply stated her nose was injured.  Just a few seconds later his partner approached his location and Odewole said to them she wanted to go to the hospital and asked if she could ride along with AJIBADE. His partner informed her officers determined AJIBADE was not going to the hospital, at which time Odewole then declined further treatment.

Butler said he did not speak to AJIBADE during the incident.  He also said he did not witness any odd or peculiar behavior from AJIBADE other than him seeming to be talking to himself though he did not know what he was saying.  He added Odewole did not reveal any information on the event or any mental issue which may have been affecting AJIBADE.

**EMT MICHAEL BARGERON (SOUTHSIDE EMS):**

On 1/14/15 Lt. R. Gavin, Sgt. J. Wright and I interviewed Michael Bargeron; one of 2 EMT's who responded to the arrest scene of Matthew AJIBADE.  Bargeron gave the following account of the incident:

Upon arrival at the scene, he approached the officers and a handcuffed AJIBADE.  The officers informed him AJIBADE punched the female, Odewole, who was also on the scene.  When they spoke to Odewole, she wanted to go to the hospital with AJIBADE.  When they informed her he was not being transported to the hospital, she did not want anything more to do with them.

I asked Bargeron what the officers told him concerning the incident.  He said he was told AJIBADE punched Odewole in the face, AJIBADE had been violent and Odewole was the injured party.  He said officers told him EMS had been called for Odewole; AJIBADE was being transported to jail.  He said when he approached the officers and AJIBADE, he spoke to AJIBADE, who looked up at him but did not respond.

When asked, Bargeron said no one on the scene informed him of any mental health issues; although he said Sgt. Young said AJIBADE was going to get an evaluation.  He spoke mainly with his partner Butler and the corporal (Owens).  He further stated AJIBADE seemed to be calm and non-violent.

**EDWARD JOHNS (WITNESS):**

On 1/8/15 I interviewed Edward Johns, a patron of the El Cheapo convenience store, who witnessed a portion of the incident with AJIBADE.  Mr. Johns gave the following account:

7

He was making a purchase at the El Cheapo and was at the checkout counter when he turned to exit the store. As he did, Odewole's face slammed against the door to the store. He could not tell if she tripped and fell or if she fell for some other reason. Blood was smeared on the glass door but he could not tell if the door caused the blood or if it happened some other way. He told the store manager he was going to remain in the store because he did not know what was taking place outside.

It was somewhat difficult to see out of the door due to the lights inside the store reflecting off the glass, but he could tell a male seemed to be holding onto her. He then saw 2 police officers struggling with the male; it appeared they were trying to get him to the ground. The officers did not throw any punches or kicks to AJIBADE. After they got him handcuffed, one of the officers said "this guy needs help".

When asked if AJIBADE was saying anything to the officers, Johns said he wasn't; he was in a "comatose" state. He added while AJIBADE was struggling with the female, he looked into the store at Johns and his eyes were "…black…which means his pupils were like (made an enlarging motion with his hands). He had black eyes; it looked like the devil was inside him. He was on a mission." He later added "…he had rage in him".

## ARRIVAL AT CHATHAM COUNTY DETENTION CENTER:

At 7:35pm Scpl. Owens and APO Baker arrived at the detention center with AJIBADE. As he was escorted into the booking area, he appeared calm and cooperative. Officer's Steven Cahall and O'Neill Young were assigned to booking at the time AJIBADE was escorted in the facility. Both officers were interviewed on 1/12/15 concerning their knowledge of AJIBADE. Officer Cahall did not recall any significant details about AJIBADE due to shift change coming shortly after his arrival. Cahall said AJIBADE seemed calm and cooperative from what he recalled. One of the Metro officers informed him AJIBADE was possibly suffering from a mental health issue. Cahall said he told the officer to inform the booking sergeant so the information could be passed to the oncoming shift. His interaction with AJIBADE was extremely limited. He provided a written statement concerning his interaction with AJIBADE.

Officer Young was the officer who attended to AJIBADE upon his arrival. He stated the Metro officer who escorted AJIBADE into the facility (Owens) informed him the blood on AJIBADE'S shirt was not his own, but was from the victim (Odewole). One of the Metro officers also informed Young and Cahall AJIBADE was possibly suffering from a mental health issue. Young conducted a pat search of AJIBADE and escorted him through the magnetometer near the booking Sgt's desk.

Young said AJIBADE was calm and followed his directives, but seemed to react slowly and did not speak throughout the intake process. Young said he attributed this behavior to the possible mental health issue the Metro officer mentioned. After he placed AJIBADE in cell #6, Owens informed him the nature of the arrest of AJIBADE and informed him force had to be used to restrain him. Owens also mentioned AJIBADE had medication which was brought to the facility with him but there was a possibility AJIBADE had not been taking the meds. Young did not notice any peculiar behavior from AJIBADE for the remainder of his shift (approx. 45 minutes). Officer Young provided a written statement concerning his interaction with AJIBADE.

## MEDICATION IDENTIFICATION:

Odewole provided Metro officers with medication she said AJIBADE had been taking. The prescription listed the medication as Divalproex SOD-DR (500 mg), a generic version of Depakote. Research indicated the drug is an anticonvulsant medication prescribed for manic phase of bipolar disorder (manic-depressive illness). Other uses include the treatment of seizures and migraine headaches. The information listed on the medication

8

PA00699

container indicated the medication was prescribed on 5/20/12 by Dr. Andrea Fritschle and expired on 5/20/13. Dr. Fritschle had been employed with Savannah Psychiatric Services at the time the prescription was written. A request to learn if the medication was refilled at any other time was denied by Savannah Psychiatric Services. The medication presented to correctional officers during AJIBADE'S intake process was inside a clear plastic bag which contained both the original container and approximately 10 pills. The medication was turned over to the Coroner's Office staff upon their arrival following the incident.

**BOOKING PROCESS:**

At 11:28 PM on 1/1/15, Officer S. Richardson released AJIBADE from cell #6 to begin the booking process. Richardson escorted AJIBADE to the booking area

**OFC. SAMUEL RICHARDSON:**

On 1/2/15 Sgt. W. Blanton and I interviewed Ofc. Richardson concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

He reported to the booking area for his shift on 1/1/15. He performed a unit count along with the officers on the outgoing shift. The officers informed him the detainee in cell #6 (AJIBADE) was possibly suffering from some mental health issue. At that time, he did not witness any peculiar behavior or anything odd about AJIBADE other than his shirt was torn. He did not recall seeing any blood or injuries on AJIBADE.

Following the count, his shift took over the responsibilities of the Receiving and Discharge Unit. He recalled at one point while AJIBADE was in cell #6, he removed his shower shoes and was using them as makeshift drum sticks to beat on the bunk in the cell. Sometime during the evening, he received a phone call from Kammie Kinzie, AJIBADE'S supervisor. Ms. Kinzie relayed to him she had spoken to AJIBADE'S sister, he believed, and indicated AJIBADE had a possible history of mental illness. She told him of an incident in the past where AJIBADE walked into the middle of a street and just stood there. He made a note of Kinzie's call and the information she told him.

Later in the evening he released AJIBADE from the holding cell to begin the booking process. Due to past instances of detainees misunderstanding his directions, he informed AJIBADE he needed him to have a seat in the red chair behind the desk, which he pointed out to AJIBADE. He approached the desk but then told Richardson he didn't see a red chair. AJIBADE then began walking around "aimlessly"; at one point walking towards the booking slider door and then sitting in the black officer's chair at the last booking desk.

AJIBADE looked towards the slider door a few times, so he positioned himself between AJIBADE and the door. He told him again to take a seat in the red chair as he pointed out the chair. AJIBADE got up and began wandering around again, then finally stood with his back against the block column nearby. He felt AJIBADE did that in an effort to protect himself; or to deter any efforts to approach him from the rear. It became clear to him AJIBADE was not going to cooperate with the booking process. He then told AJIBADE to return to the cell. As he directed him to return to the cell he gestured with his hand towards the cell.

AJIBADE was not moving towards the cell so he lightly touched him on his right arm to guide him to the cell; doing so in a polite, tactful manner. When he touched him, AJIBADE became disorderly, flailing his arms and screaming loudly. At that point, he put his hands on both of AJIBADE'S shoulders in an attempt to turn him towards the cell. AJIBADE then seemed to become "rigid", refusing to move.

9

Pvt. Capers arrived by that time and grabbed AJIBADE'S legs as Richardson had control of AJIBADE'S shoulders. He felt as though they were going to have to use more force and restrain AJIBADE due to the way the situation was playing out. They fell to the floor and he could not recall if Pvt. Vinson began assisting them yet at that point. AJIBADE ended up on his back though they intended to place him on his stomach. They then began trying to roll him onto his stomach while maintaining control of his arms and legs. As they were rolling him over, Sgt. Rowland came over with the Taser and saw they were having trouble controlling him.

He believed Rowland "drive stunned" AJIBADE 2 times; once on the right side near his ribcage and once on the upper right thigh. He added there may have been a third Tasing but he believed the Taser contacted Rowland rather than AJIBADE. He could not be clear if Rowland or AJIBADE had control of the device at that point but he knew at some point AJIBADE did gain control of the device and possibly made contact with Capers and Vinson with it. He may have also been targeted by AJIBADE because he could feel the charge from the device. As all of these actions were happening, AJIBADE continued to flail his arms and kick his feet at the officers.

Vinson was finally able to kick the Taser from AJIBADE'S hand and the three continued to attempt to gain control of him. He had a hold on AJIBADE'S right arm and attempted to place his knees on the back of AJIBADE'S shoulder; at the same time he was attempting to locate a pressure point on his AJIBADE'S jaw line to induce pain compliance. AJIBADE at one point was able to pull both of his arms underneath his body. As they struggled with him, the officers were continually giving verbal directives to him to stop resisting and to place his hands behind his back. He was eventually able to get a handcuff on AJIBADE'S right wrist while someone else was able to cuff his left wrist. Leg irons were applied and officers carried AJIBADE from the booking area to the "old pre-booking" area. Richardson was asked if he recalled any strikes or blows being used against AJIBADE during the struggle. He recalled only the kick being used by Vinson to get the Taser away from AJIBADE.

When asked, Richardson said he was not one of the officers who carried AJIBADE to the cell. He said he retrieved the restraint chair and followed the officers carrying AJIBADE into cell #4. Those officers then placed him into the chair. He said as the officers attempted to secure him in the chair, AJIBADE continued to scream and yell and resist the officers so Cpl. J. Kenny, who was in the cell, asked for a Taser to be brought into the cell. Richardson said he retrieved the Taser from Lt. Johnson and retrieved a spit mask (*video evidence revealed Richardson handed in the Taser and flex cuffs, not a spit mask*) and handed both items into the cell. He said once the officers exited the cell he returned to the booking area and resumed his duties.

I asked if he could recall if AJIBADE continued yelling and screaming throughout the incident. Richardson said while there were some moments when he would get silent for a short period, he continued to be vocal and struggle with the officers. He added the vocalizations by AJIBADE were just screaming as far as he could tell; he heard no discernible words or phrases from him. He did recall AJIBADE saying he "couldn't breathe" at some point, but noted he said it when he was being combative with the officers while on the floor.

I then asked Richardson about the activities which occurred inside the cell where AJIBADE was placed. He explained there were numerous officers inside the cell; naming Cpl. Kenny, Pvt. Burke and Pvt. Vinson. He said after he took the Taser into the cell, he stepped out and was no longer actively involved in the incident. When asked, Richardson could not recall hearing any vocalization from AJIBADE following his being secured in the restraint chair and the cell being locked. He added his only other interaction with AJIBADE was when Cpl. Evans asked him to assist her in checking on him when he was found unresponsive. Richardson said he

PA00715

and Nurse Gregory Brown entered the cell; Brown began checking for responsiveness and vital signs on AJIBADE. When he got no response, Brown advised Evans to call a code over the radio.

Evans called the code and once enough staff members responded, they pushed AJIBADE and the chair out of the cell. Nurse Brown instructed the officers to remove him from the chair and to remove the restraints from AJIBADE; as they did so Brown retrieved the AED device. Brown applied the devise to AJIBADE but it indicated "No shock advised" and to begin CPR. Lt. Johnson arrived on the scene and requested EMS be called. Lt. Johnson directed Richardson to prepare to travel to the hospital with AJIBADE. As he did so, EMS personnel arrived. Shortly thereafter Lt. Johnson advised him to disregard the hospital trip. Ofc. Richardson provided a written statement on the incidents.

## PVT. MARK CAPERS:

On 1/2/15 Inv. N. Meyers and I interviewed Pvt. Capers concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

The outgoing shift assisted them with a head count and Ofc. Cahall relayed to them the detainee in cell #6 (AJIBADE) was possibly suffering from a mental health issue. Following the count, AJIBADE remained in the cell until he was brought out for booking. At one point during the evening Capers entered the booking area and noticed AJIBADE was slapping his shower shoes together. He saw AJIBADE also appearing to talk to the wall in the corner of the cell. AJIBADE looked over at him, smiled and gave him a thumbs up sign. He gave AJIBADE a thumbs up back.

At approximately 11:25 PM Richardson had AJIBADE step out of the cell for the booking process. Due to the nformation about AJIBADE possibly suffering from a mental disorder, Capers decided to remain in the area while Richardson booked him. Richardson directed AJIBADE to sit in the red chair; but AJIBADE replied he didn't see a red chair. AJIBADE then sat down in the officer's chair and not the red chair as directed.

Richardson continued directing AJIBADE to sit where he was directed. Capers said he felt as if the situation may escalate so he put on some latex gloves then contacted Pvt. Vinson to inform him of the situation. Vinson came into the booking area and Capers retrieved restraints from the sergeant's desk. He also advised Sgt. Rowland to bring the Taser to where AJIBADE was. As he walked back to assist Richardson, AJIBADE began screaming. Richardson put his hand on AJIBADE as if to guide him back towards the cells. Somehow Richardson and AJIBADE began to struggle so he and Vinson began assisting Richardson with controlling AJIBADE.

They were able to get AJIBADE to the ground; he ended up on his back. He seemed to relax for just a moment so Capers attempted to start applying the restraints. Suddenly AJIBADE began yelling in some foreign language and just "went crazy". AJIBADE slapped Capers with an open hand as the officers struggled to control him. AJIBADE was then able to kick Capers in the head with his heel. Sgt. Rowland came over and attempted to gain AJIBADE'S compliance with verbal commands. Capers yelled for Rowland to "drive stun" AJIBADE. Capers said when Rowland did Tase him, AJIBADE seemed to get a burst of energy and began struggling harder with the officers.

Sgt. Rowland somehow got pushed backwards and AJIBADE was able to roll onto his stomach. Sgt. Rowland attempted to "drive stun" him again but he managed to wrestle the Taser from her; it appeared as though AJIBADE pushed or pulled her over. AJIBADE was waving the Taser around and was able to contact the device to Capers, Vinson and Rowland. Vinson was finally able to kick the Taser from AJIBADE'S hand and

11

PA00716

they continued to struggle with him attempting to get the restraints applied. He added they were tired but AJIBADE was still at "115%".

Capers saw Sgt. Rowland on the ground with blood coming from her nose. She was attempting to call a signal on the radio but was out of breath so Vinson used her radio to call the signal. The first person Capers saw respond to the signal was Ofc. Solomon, who began to assist in trying to control AJIBADE. Vinson and Solomon were able to wrestle AJIBADE'S arms from underneath his body and apply the restraints on him. The officers then carried AJIBADE to the cell. He was placed in the restraint chair as he continued to yell and resist the officers. Nurse Brown checked the restraints and that concluded the incident.

When asked, Capers said AJIBADE used both open hand and closed fist strikes against the officers. He also indicated he himself used closed fist strikes to AJIBADE'S chest during the struggle (*Video evidence revealed 1 closed fist strike thrown by Capers made contact with AJIBADE'S facial area. A second strike contacted the upper chest/shoulder area*). I asked Capers if he recalled any strikes being thrown by any other officers once AJIBADE was on the ground. He said once AJIBADE was on his stomach, he took control of AJIBADE'S legs. He said he was exhausted and simply wanted to maintain control of his legs and did not recall any other strikes being used.

As other officers arrived in response to the 10-78 being called, Capers said he was extremely tired and took no further action in restraining AJIBADE. Other officers applied the restraints on AJIBADE and carried him to the cell. Capers said his only other involvement occurred after AJIBADE was placed in the restraint chair. He said he went to the cell and used a flex cuff to secure the chain on the leg irons to the chair. He said as he was doing so AJIBADE was being vocal and trying to resist being secured in the chair. He added there were so many officers in the cell it became hot so he exited the cell.

I asked Capers if he responded to the Code Blue (Black) called in response to AJIBADE. Caper said he did as he was in the Watch Commander's office at the time. When he arrived in the "old pre-booking" area he saw Cpl. Evans holding a cell door open. When he approached he saw AJIBADE in the chair, unresponsive. Nurse Brown was in the cell attempting to get a response from him by calling out to him and doing a "chest rub". He said at that point, Lt. Johnson instructed the responding officers to get AJIBADE out of the cell and place him on the floor. He said he believed Ofc. Burns and Ofc. Cooper removed the restraints from AJIBADE once he was placed on the floor. I asked Capers if there were any visible injuries on AJIBADE he could see. Capers said other than the torn shirt (which he was wearing upon entry to the detention center) he could not see any injuries. Ofc. Capers provided a written statement on the incidents.

**PVT. ERIK VINSON:**

On 1/2/15 Inv. N. Meyers and I interviewed Pvt. Vinson concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

He was in the property room outside of booking when he received a phone call from Pvt. Capers advising him an incident with a detainee was developing and asked him to respond to the booking area. When he arrived in booking, he observed Richardson attempting to begin the booking process on AJIBADE but he was being uncooperative and failing to follow directives. Richardson then informed Vinson he would just put AJIBADE back in the cell. AJIBADE began yelling so he, Capers and Richardson took him to the ground in an attempt to put restraints on him. Vinson said he was trying to control AJIBADE'S head due to his thrashing about. AJIBADE calmed for a few seconds then began yelling again in a foreign language. At that point he began aggressively resisting the officers; throwing punches and kicks.

12

Sgt. Rowland arrived and gave AJIBADE several verbal commands which he ignored. Rowland then attempted to "drive stun" him. Vinson was unsure if the Taser made contact at that point. I later asked for clarification as to when and how many times Vinson had been contacted with the Taser. He said just once, when AJIBADE pushed Rowland's hand away. AJIBADE then seemed to get a burst of energy and became more aggressive in resisting them. AJIBADE was able to free one of his hands and get control of the Taser from Rowland. Vinson opined it was at that point when Rowland was struck in the nose. AJIBADE triggered the Taser and was waving it around. He said he told Capers to hold AJIBADE'S arm so he could take the Taser from him. He added he knew he couldn't just take it from AJIBADE due to his surprising strength. Vinson began kicking at the Taser to get it away from AJIBADE and was finally able to do so. Sgt. Rowland picked up the Taser and began attempting to request assistance on the radio but she soon collapsed.

I asked Vinson how control was ultimately gained of AJIBADE. He said officers responded to the area and were able to assist. When asked, he could not recall any officer utilizing any strikes against AJIBADE. Vinson later added he possibly used a knee strike in the struggle. He also later stated he had attempted to locate a pressure point along AJIBADE'S jaw line but was unable to locate any. He further stated he did not recall anyone sitting atop of AJIBADE'S body at any point during the struggle. Once AJIBADE was restrained, Vinson and other officers carried him to the "old pre-booking" area. Vinson said Lt. Johnson instructed them to place AJIBADE in one of the "detox" cells, however due to security concerns, he made the decision to place him in a cell in the "old pre-booking" area.

Vinson continued on to say as the officers attempted to place AJIBADE in the restraint chair, he was still being aggressive. I pointed out AJIBADE was fully restrained at the time and asked him to clarify "aggressive". Vinson said AJIBADE was struggling against the officers, moving his body about which made controlling him more difficult. He said when AJIBADE was placed in the chair he attempted to stand up at least once. At some point Cpl. Kenny entered the cell and took command of the situation. I asked Vinson if Kenny used the Taser on AJIBADE; he said he did not (*Cpl. Kenny stated in his interview he did in fact use the device on AJIBADE while he was restrained in the chair*). Vinson said he was in the cell when Nurse Brown came in but was going in and out of the cell as the restraints were being checked. When asked, Vinson said AJIBADE was still being vocal at the time he exited the cell.

I then asked Vinson what he observed when he responded to the Code Black in booking. He recalled AJIBADE still being in the chair in the cell. Asked to recall who was at the cell upon his arrival, he was unsure of the personnel present but seemed to recall Cpl. Evans and Nurse Brown. Vinson assisted in removing AJIBADE from the chair and removing the hand and leg restraints. He said at that point, various officers and personnel began attempting to revive AJIBADE.

**OFC. DAVID CODY:**

On 1/2/15 Inv. N. Meyers and I interviewed Ofc. Cody concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

He was assigned to the Medical Unit and responded to the 10-78 call in booking. When he arrived he could see some officers, possibly 3 or 4, involved in a struggle with AJIBADE. He assisted the officers and grabbed onto AJIBADE'S right leg to help restrain him as the others attempted to control his upper body. He could feel leg restraints on AJIBADE'S ankles at that point. Officers were able to get his hands cuffed so Cody then stood up and placed his foot on the chain of the leg restraints to keep AJIBADE from kicking. They then lifted

13

PA00718

AJIBADE off the ground with Cody holding his legs up by way of the chain and other officers carrying his upper body.

As they were carrying him, someone said to put him in one of the detox cells but then someone else said to put him in the "old pre-booking" area. When they arrived at the cell the restraint chair was not yet there but when it did get brought in they attempted to place AJIBADE in the chair. AJIBADE "stiffened" his body in an effort to resist being placed in the chair. As they gave verbal commands to AJIBADE to sit in the chair, Cpl. Kenny "drive stunned" him. Once they were able to get him in the chair, Cody noticed a small amount of blood on AJIBADE'S mouth and placed a spit mask over his head. Nurse Brown was then called in to ensure the restraints were properly applied. Once Brown checked him, Cody exited the cell. He was unsure if any officers remained in the cell after that point. Cody then reentered the booking area and opened the door for EMS personnel to render aid to Sgt. Rowland. He said later in the evening he returned to booking after learning a code was called in the area. Upon his arrival, Lt. Johnson was securing the door to the "old pre-booking" area.

I asked Cody if he observed any officer use any strikes against AJIBADE. He said he did not even though AJIBADE was aggressively struggling with them. He added the only instance of force he observed other than the officers trying to get AJIBADE'S arms restrained was when Kenny contacted the Taser to AJIBADE'S right thigh as they attempted to get him in the restraint chair. I then asked him to clarify if AJIBADE was fully restrained at that point. Cody confirmed he was but added AJIBADE was still moving his body around and making his body rigid to resist the officers' attempts.

I stepped out of the interview room for a moment and Cody began openly discussing the incident with Inv. Meyers. He told her he was interested in learning the toxicology findings on AJIBADE due to the fact he struggled extensively with several large, strong officers and still was struggling upon being restrained in the chair while the officers were exhausted from the struggle. I reentered the room as he went on to say while they struggled with him on the floor, AJIBADE yelled out "I can't breathe!" but he attributed it to AJIBADE attempting to rile up the other detainees who were watching the struggle from their cells. Cody added no officers were sitting or lying on top of AJIBADE or restraining his neck or throat at the time he made the statement.

When asked, Cody said upon being restrained AJIBADE quit being vocal as far as he could recall. Upon being placed in the restraint chair he could not recall any vocalizations from AJIBADE, but added there were several officers also in the room and could not discern if AJIBADE had vocalized. Ofc. Cody provided a written statement on the incident.

## OFC. ABRAM BURNS:

On 1/2/15 Inv. N. Meyers and I interviewed Ofc. Burns concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

He responded from Medical to the 10-78 in booking. When he arrived, AJIBADE was lying face down on the floor in restraints. AJIBADE was moving about but did not vocalize anything until he was being placed in the restraint chair. Officers Solomon, Capers, Vinson and one other officer (he could not recall who) picked AJIBADE up off the floor and began carrying him to a cell in the "old pre-booking" area. Burns prepared the chair for them and stood behind the chair as AJIBADE was being placed in it. He said AJIBADE then "stiffened" his body in an attempt to resist the officers. The officers gave him several verbal commands to sit in the chair. AJIBADE refused to cooperate so Kenny contacted him on the abdomen with the Taser. AJIBADE

14

PA00719

began moving about so Burns stabilized his head with a cradling hold. He later added he noticed a small amount of blood on AJIBADE'S mouth.

Eventually AJIBADE was seated in the chair. He was not vocal until the officers began attaching the chair straps around him. At that point AJIBADE said "I don't want to be here. I don't want to live!" The waist strap on the chair was applied incorrectly and as officers loosened it to correct it AJIBADE slouched down in the chair. Kenny gave verbal commands for him to sit up and when AJIBADE refused, Kenny applied a second "drive stun" to AJIBADE'S upper right thigh area. Officers were able to secure him in the chair and Nurse Brown stepped in to check the restraints.

I asked Burns if AJIBADE was responsive to the nurse as the restraints were being checked. He said he could not see anything because he stepped out of the way but he did not recall hearing any response from AJIBADE. He went on to say it seemed as if AJIBADE had calmed down but added it is common in his experience for detainees to become quiet once they are secured in the chair.

Burns was then asked about responding to the Code Blue (Black). He said he responded to the area and observed Nurse Brown attempting to elicit some kind of response from AJIBADE. Lt. Johnson was on the scene and was advised there was no response from him. Lt. Johnson directed Officers Capers, Vinson and Burns to remove AJIBADE from the chair and begin CPR (*Video footage revealed Pvt. Richardson also assisted in the ac*t). Once he was out of the chair and the restraints were removed from AJIBADE, Ofc. Rodriguez and Nurse Brown began performing CPR. Burns said he then departed the scene. He provided a written statement on the incidents.

**OFC. FREDRICK BURKE:**

On 1/2/15 Inv. N. Meyers and I interviewed Ofc. Burke concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

He was assigned to booking and he and the other officers conducted the shift change head count. When they reached cell #6, he had AJIBADE step out and provide his name. AJIBADE spoke in a very low voice and spelled out his name when Burke asked him to. During the shift change briefing, Cpl. Brome informed him AJIBADE was possibly suffering from a mental health issue.

Later in the evening he observed AJIBADE in the cell using his shower shoes to beat on various surfaces in a drumming fashion. Burke said AJIBADE did that about 3 times throughout the evening. He asked AJIBADE if he was alright and he said he was. He added AJIBADE was quiet for most of the time; never speaking, just playing with his shower shoes. On occasion when he spoke to him, AJIBADE would mouth the words but would not speak. Burke said he didn't know AJIBADE and therefore could not determine if the behavior was common for him or not.

He was in Unit 2 when the 10-78 was called. He responded to booking and observed several officers struggling to control AJIBADE. He did not see any of the officers throw any strikes or kicks to AJIBADE adding: "it appeared like they were just hangin' on for dear life. They were exhausted, soakin' wet...trying to cuff the guy".
Burke explained he assisted in holding AJIBADE'S legs in order for Vinson to apply the leg restraints. When asked, he said he did not see any of the officer's atop AJIBADE in any manner which would have restricted his breathing. He added at no time did he hear any cries or screams of pain or any discernable words; only grunts

15

PA00720

and sounds of "combat". Burke then corrected himself and recalled hearing AJIBADE saying at some point he couldn't breathe.

He assisted in carrying AJIBADE into the cell and said once they put him on the floor he began to struggle with them again. As he and Cpl. Kenny attempted to place him in the restraint chair, he said AJIBADE was struggling like "a fish out of water". Burke said Kenny had the Taser pointed at AJIBADE but he did not recall hearing it being triggered. When asked if he ever made his body rigid to resist the officers Burke did not recall it but said he was "wiggling", adding AJIBADE couldn't swing his arms or legs due to him being restrained. I asked him if AJIBADE tried to stand up or slouch in the chair to avoid being restrained. Burke said he did slouch several times but was not vocal as he recalled. As I questioned him further on vocalizations by AJIBADE, he said he wasn't in the cell very long because Lt. Johnson called for him to exit the cell to transport Sgt. Rowland to the hospital. Burke said he did not take part in the Code Black later in the evening. He provided a written statement on the incident.

## PVT. ANTONIO SOLOMON:

*(Pvt. Solomon was not interviewed on the day of the incident. Solomon's participation in the incident was simply overlooked at the time of initial interviews. This overview of his statement was drawn off of his interview conducted on 1/7/15 in regards to Taser use and is detailed in case # SO-IA-OM-01-15-005)*

On 1/2/15 Sgt. W. Blanton and Inv. N. Meyers interviewed Solomon concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

He responded to the booking area and observed Richardson, Vinson and Capers struggling on the floor with AJIBADE; he also observed Sgt. Rowland lying on the floor nearby. He assisted the officers in trying to get restraints on AJIBADE by trying to pull AJIBADE'S left arm from underneath his body. They continued to struggle with him until they were finally able to get restraints on him. He did not see any officer deliver any strikes to AJIBADE. They then lifted AJIBADE and carried him into the "old pre-booking" area.

Once they got AJIBADE to the cell, Cpl. Kenny arrived and took charge of the situation. The restraint chair was brought into the cell and Kenny explained to AJIBADE they were going to place him in the chair. He later added while AJIBADE was laid on the floor as they waited for the restraint chair, AJIBADE appeared to be tired. As they attempted to sit him in the chair, AJIBADE began to struggle with them again; Kenny gave verbal commands for him to stop resisting the officers. Kenny contacted the Taser to AJIBADE when he ignored the commands. Solomon recalled there were hand and leg restraints on AJIBADE at the time. He could recall Kenny triggering the Taser on at least one occasion but could not say for certain if the Taser had been triggered again. Once AJIBADE was fully restrained in the chair, Nurse Brown checked him. He stated at that point, AJIBADE was still conscious and breathing. Solomon provided a written statement of the incident.

## LT. DEBRA JOHNSON, WATCH COMMANDER:

On 1/9/15 Sgt. Blanton and I interviewed Lt. Johnson, watch commander at the time of the incident. Upon being provided with the Garrity Advisement, she gave the following account of the incident:

*(Interview not video recorded due to malfunction of the equipment. Johnson did complete a written statement on the incident)*

16

PA00721

She responded to the booking area due to the 10-78 having been called. When she arrived she observed several staff members struggling with AJIBADE. She retrieved the Taser and touched it to AJIBADE'S right leg (the Taser was not triggered), and gave him verbal commands to comply or she would activate the Taser. AJIBADE seemed to comply because staff was then able to apply restraints to his wrists and ankles. As officers were carrying AJIBADE from the area, Johnson told them to place him in a detox cell. She then turned her attention to Sgt. Rowland and the injuries she sustained in the struggle. Rowland informed her of the events which had taken place and how she got injured.

She did not witness much of the activity which occurred in the cell AJIBADE was eventually placed in. She did witness Cpl. Kenny with the Taser and giving verbal commands to AJIBADE. When asked, Johnson stated she believed it was against department policy to utilize an ECD against a restrained detainee. She went on to say she would only consider doing so in the event a detainee was biting officers or attempting to violently use his/her head to injure an officer. Johnson could not verify nor deny if any of those actions had taken place in the cell. She further explained she did not know Kenny utilized the Taser on AJIBADE until he told her he did so while they were waiting to speak to G.B.I. agents. Johnson added it was also department policy to notify a supervisor in the event a Taser is deployed on a detainee.

For clarification as to the proper method and purpose, I asked Johnson about restraint checks. She explained for a proper check on a detainee restrained in a chair, every 15 minutes officers should attempt to communicate with the detainee. If they do not receive any response they should call for assistance and request a nurse respond to the area to physically check on the detainee. As the conversation continued, Johnson said she was not aware there were no checks conducted on AJIBADE until Evans informed her of the fact she was in the area but did not check on him until he was found unresponsive. Johnson also said she was unaware medical staff were supposed to check on detainees in a restraint chair every 15 minutes. Her understanding was following the initial check of the restraints upon a detainee being placed in a chair another check was not required of medical staff until the 2 hour mark.

**CPL. JASON KENNY:**

On 1/2/15 Inv. N. Meyers and I interviewed Cpl. Kenny concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, he gave the following account of the incidents:

When he arrived in booking in response to the 10-78 call, AJIBADE was already restrained and being carried to the "old pre-booking" cell. Kenny said when he approached the cell he could see there were too many officers in the cell and commanded only CERT team members remain. Inside the cell AJIBADE had been placed on his stomach while they waited for the restraint chair to be brought in. At that point he requested a Taser be brought in as well. As they stood him up to place him in the restraint chair he could see a small amount of blood on AJIBADE'S mouth. When asked about any vocalizations by AJIBADE, Kenny said he screamed and groaned; he said he "drive stunned" him 4 times (3 times in the abdomen and once on the right thigh) while they were restraining him in the chair and knew AJIBADE yelled out when he did so. Kenny also said at one point AJIBADE said he didn't want to be there and wanted to die. Kenny said he informed AJIBADE the nurse would check him for injuries and make sure the restraints were applied correctly. He added he was in the cell when Nurse Brown checked AJIBADE. Kenny could not recall if Brown spoke to AJIBADE while checking the restraints.

All personnel then exited the cell; Kenny said he was the last person to step out. I asked if he heard anything from AJIBADE once they exited. Kenny stated he could hear the restraints rattling from AJIBADE moving in

PA00722

the chair. Kenny went on to say he then spoke to other staff members to learn the events which had taken place before his arrival. He informed all staff members to complete reports on the incident and then stepped back into the "old pre-booking" area to look in on AJIBADE. When asked, Kenny said he could see AJIBADE moving a bit. He said at that point he returned to his assigned area, Unit 2. He did not respond later to the Code Black called for AJIBADE. Kenny provided a written statement on the incident.

*Cpl. Kenny was brought in for a follow up interview regarding his use of the Taser on a restrained detainee. Reference case # SO-IA-OM-01-15-005.*

*Due to the ongoing investigation of the above referenced case, the death investigation will remain open for corroboration of statements and possible discovery of newfound evidence.*

## 2nd INTERVIEW WITH CORPORAL JASON KENNY:

(At 1516 hours on 01/06/2015 Kenny was interviewed by Lt. Gregg Rhode and Sgt. Warren Blanton in the Internal Affairs Unit.  Interview was video recorded.)

The interview began by informing Kenny he was being re-interviewed in order to clarify some statements previously made by him during his initial interview. Kenny was informed the Garrity Advisement was still in effect.

Kenny was asked to repeat his role during the incident called in the Receiving and Discharge area on 01/01/2015. He stated when he got there he had no idea as to what transpired before he arrived.  He could see officers holding a restrained individual who was still being "jittery and resistant." He stated AJIBADE was only restrained behind his back with handcuffs but no leg restraints were on him at the time he was placed in the isolation cell.  This contradicted his statement made to investigators on 01/02/2015 when he stated, "…they already had him restrained" when he first encountered AJIBADE.  Kenny stated he requested only CERT members assist with the situation due to the fact they train and work together under similar circumstances regularly and therefore, were better equipped to handle the situation.

AJIBADE was resistant by stiffening his body, slouching down in the chair, and combative towards staff by kicking his feet while being placed in the restraint chair leaving Kenny no other option but to drive stun AJIBADE. None of the drive stuns to AJIBADE'S abdomen area were effective, only the last drive stun to his thigh gained full compliance. His main objective was to get AJIBADE to comply in order to get him strapped into the restraint chair successfully.

Lt. Rhode asked Kenny if AJIBADE was drive stunned while any straps in the restraint chair were secured. Kenny said "no, there was nothing fastened." He was asked again if AJIBADE was drive stunned after any of the straps were fastened. Kenny said all 4 drive stuns took place prior to any straps being secured. *(This is contradictory to Kenny's initial written statement where he stated "Pvt. Vinson and Pvt. Solomon placed the shoulder strap on…Pvt. Burns was placing the leg restraint on he tried to kick forward I Tase(d) the middle part of his thigh." Contradictory to his statement, in Taser video 0150 AJIBADE is shown restrained in the restraint chair by the waist strap and by the shoulder harness; however in video 0151 AJIBADE is drive stunned again.)*

Kenny stated he was taught by the department that restrained detainees are treated no differently than those that are not. There were at least 5 officers in the isolation cell when AJIBADE was resisting but they were unable to subdue him because of his strength. Kenny was asked where in the policy does it state that it is acceptable to

18

Tase someone who is fully restrained. Kenny stated in order to protect himself and his fellow officers it was ok to drive stun AJIBADE, he needed to gain compliance. He added he had been told by the Training Unit he cannot Tase a restrained detainee but, he can "drive stun" one in order to gain compliance.

Kenny said he initially drive stunned AJIBADE because he refused to sit back in the chair and he felt that was combative behavior. He made the call to keep AJIBADE handcuffed behind his back due to his previous combative behavior towards staff. Kenny was reminded he said he had no prior knowledge of what transpired before he arrived on scene. He then said Pvt. Vinson told him AJIBADE was combative towards staff which was the reason for leaving AJIBADE restrained behind his back.

When asked "how often do you Tase people or stun people that are restrained" (@27:33:17 **Captura time stamp**), Kenny offered no response. When asked if he did it regularly, he stated; "if they're being combative". He was asked again if he does it regularly. Kenny said no, he'd done it one time (27:54:56) prior to the incident with AJIBADE. He recalled a detainee "Tillman" was fully restrained when he "tried to spit on, um, Cpl. Hawkins". He was subsequently Tased and then placed into a restraint chair. Kenny was asked if he reported it to Internal Affairs or if he was ever asked by anyone why he utilized the Taser on a restrained detainee. Kenny chuckled and said "no."

Kenny was then asked how "Tillman" was restrained at the time he was Tased. He recanted his previous statement by saying, "we were putting him in restraints." Kenny was asked again, if he ever Tased someone who was fully restrained and he couldn't "recall" (@32:40).

Kenny, by his own admission in his written statement, implied AJIBADE was not trying to spit on officers at the time a spit mask was placed on him. According to him, the spit mask was applied because there was blood visible in AJIBADE'S mouth at the time in which he was being Tased and in order to not get blood spatter on officers, Pvt. Cody applied the spit mask. Kenny agreed with that series of events and stated "every use of force incident is different."

KENNY was asked his definition of combative behavior. He stated if an officer gives an order which is not followed, the detainee is being combative. He was asked how AJIBADE was combatively kicking. What he meant was AJIBADE was kicking by "locking his legs" forward as a means to avoid being seated in the restraint chair. He was asked if anybody was kicked by AJIBADE. Kenny said "no".

Kenny was reminded he had no previous knowledge of what transpired before he entered the cell and therefore, his actions were both unwarranted and excessive.

**OFC. AISHIA GROOVER:**

On 1/2/15 Inv. N. Meyers and I interviewed Ofc. Groover concerning the incidents involving AJIBADE. Upon being provided with the Garrity Advisement, she gave the following account of the incidents:

When she arrived in booking in response to the 10-78, she observed Vinson, Capers, Richardson and Solomon struggling with AJIBADE. At that point no one was securing his left side so she grabbed onto AJIBADE'S arm and put her knee on the back of his shoulder. AJIBADE'S strength was too much for her and Ofc. Burke took up her position. (*Video footage reveals Groover attempts to assist in restraining AJIBADE but due to the amount of officers in the struggle, is of little assistance.*) When asked, Groover said she did not witness anyone atop AJIBADE which would restrict his breathing; nor did she see anyone use any strikes against him. Groover then checked on Sgt. Rowland as the others carried AJIBADE to the cell.

19

Groover then went into the "old pre-booking" area and could hear officers giving commands and AJIBADE yelling. She assisted by holding the cell door open for additional officers to enter if necessary. She said she could hear the Taser being triggered in very short bursts and could see AJIBADE was continuing to resist the officers attempting to secure him in the chair. As Groover began to depart the area, Nurse Brown was entering the cell. She said at that point AJIBADE was no longer yelling but was still moving his head around.

I asked Groover if she responded to the Code Black called for AJIBADE. She said she did and upon her arrival, Ofc. Rodriguez, Ofc. B. Wilson and Nurse Brown were tending to AJIBADE. Two more nurses arrived and then Lt. Johnson dismissed all officers not actively involved in the resuscitation attempts. Groover provided a written statement on the incident.

## CPL. MAXINE EVANS:

On 1/2/15 Sgt. Blanton and I interviewed Cpl. Evans concerning the incidents involving AJIBADE. The Garrity Advisement was read and acknowledged by Evans prior to the interview.

Evans said she observed the same behavior from AJIBADE in cell#6 the floor officers had spoken about; drumming with his shower shoes and generally abnormal responses. When Richardson was preparing to begin the booking process on AJIBADE, Evans directed Capers to assist with the process due to the behavior she observed from AJIBADE earlier in the evening. Shortly thereafter, Evans was in the property room when she heard a 10-78 called in booking. She went around to the booking area and saw a scuffle; she also saw someone down on the floor not involved in the scuffle. She went closer and saw it was Sgt. Rowland and there was blood on her face. She radioed the watch commander and requested EMS. Nurse Brown then pulled Sgt. Rowland around behind the booking station and rendered aid to her. Evans assisted Brown with Rowland and did not observe much of the struggle with AJIBADE.

Soon thereafter, Richardson came back to the area and requested the Taser. Evans said she was not present when AJIBADE was placed in the restraint chair and said the next time she observed AJIBADE was when she checked him at 0130 hrs. When asked to confirm the time, she said it could have been 0100 hrs. She said following AJIBADE being placed in the restraint chair and secured in the cell, she could hear him yelling and making noise when she passed by the area of the cell.

Evans continued on to say she initiated a Restraint Check Log per department policy. She further explained the log is used to record the times the restraints on the chair are checked by personnel. I then asked her how many times she checked on AJIBADE. She stated she physically checked on him at 0130 hrs. Evans added she listed the start time on the Restraint Check Log as 2345, the approximate time she responded to booking for the 10-78. However, she acknowledged the start time of the log should have been 0000 hrs, possibly 0010 hrs. I pointed out she started the log close to 0000 hrs and did not physically check AJIBADE until 0130 hrs; Evans acknowledged the fact. When asked, Evans said it was her understanding detainees placed in the restraint chair should be checked once every hour.

I asked Evans about the first check she conducted on AJIBADE. She said the first time, she walked into the "old pre-booking" area to check on a female detainee who had been placed in the first cell, 3 cells down from AJIBADE'S cell. She said at that time, she did not look into AJIBADE'S cell nor did she hear anything from his cell. She went on to say the next time she physically saw AJIBADE was approximately 0130. She looked in the cell and observed him slumped over in the restraint chair. She called out to AJIBADE but got no response. She opened the cell door and called out to him again but still got no response. She continued to call

20

PA00725

out to him while simultaneously looking for any movement from him. When there was still no response from him, she requested Nurse Brown and Pvt. Richardson to accompany her to the cell and check on AJIBADE. I asked her if the nurse is supposed to accompany an officer when restraint checks are done; she acknowledged it was supposed to be done in that manner.

In reviewing Evans' actions during the event, I recalled her statement AJIBADE had been placed in the restraint chair at approximately 2345 hrs; she initiated a Restraint Chair Log at approximately 0000 hrs and the next time she physically observed AJIBADE was approximately 0130 hrs. Evans confirmed the events and further added she did not know if anyone had physically checked on him during the time between her checks. She also acknowledged restraint checks are meant to be conducted along with a nurse.

Evans continued on and stated once she, Richardson and Nurse Brown returned to the cell, Brown initially assessed AJIBADE was breathing, albeit very shallow. He requested Richardson remove the spit mask from him and then began shaking AJIBADE'S shoulder while calling out to him. Once he checked for a pulse, Brown told Evans she should call a code on the situation. From that point, Evans corroborated the events as put forth from the previously interviewed officers. Evans provided a written statement on the incidents.

*Later in the investigation, the Restraint Check Log Evans generated was discovered. After comparing the log with the statements Evans gave in her first interview, discrepancies were found in the times listed by Evans on the log. Cpl. Evans was brought in for a follow up interview regarding the times she listed on the restraint check log sheet. Reference case # SO-IA-OM-01-15-00. A copy of the Restraint Check Log is included in the case file.*

Cpl. Evans was brought in for a follow-up interview on 1/5/15 with Inv. Meyers and me. Evans was informed he Garrity Advisement she signed on 1/2/15 was still in effect.

I informed Evans of the fact AJIBADE was placed in the restraint chair at approximately 2345 hrs and asked her how many times she performed her restraint checks on him. Evans stated she checked him once and the clock in front of the Sgt.'s desk indicated the time was approximately 0130 or 0135. I then asked Evans to explain the procedures for performing a restraint check on a detainee. She explained officers are required to check the straps on the chair, which are around the detainee, are secured and not cutting off circulation. When asked, she confirmed the officers have to physically check the restraints. She was then asked to confirm a restraint check listed on the restraint check log sheet would indicate an officer physically checked the restraints on a detainee. She agreed with my assessment.

After she again confirmed she only physically checked AJIBADE once on the night of the incident, I provided her with a copy of the restraint check log she completed concerning AJIBADE. The log sheet had 5 restraint checks and times noted which Evans listed as having physically checked AJIBADE. I then asked Evans if the log was a true representation of the checks she performed; she acknowledged it was not correct. She also confirmed Nurse Brown signed the log sheet indicating the checks had been performed when he had in fact not done so. As the interview continued, Evans stated she heard him yell out at one point but when she looked in the cell, she "really didn't pay attention to whether he was moving or not".

I asked Evans if she felt it was acceptable for a Corporal to not conduct the restraint checks as directed by policy. Evans stated it was not acceptable and she should have performed the checks with the nurse correctly. Evans further acknowledged the fabrications she listed on the log were a case of falsifying documents. She vent on to say she filled in the times on the log sheet after AJIBADE had been found unresponsive; she said she

21

estimated the times for the checks but then acknowledged she did not physically check him at the times listed. Cpl. Evans then completed an additional written statement on the issue.

**NURSE GREGORY BROWN:**

On 1/8/15 Inv. N. Meyers and I interviewed Corizon Health Services employee Nurse Gregory Brown. Nurse Brown was on duty in booking on the night of the incidents involving AJIBADE. Brown came on duty at 1900 hrs on 1/1/15. AJIBADE arrived at the detention center approximately 35 minutes later.

I asked Brown if the nurses assigned to booking conduct initial screenings of arrestees upon their arrival at the detention center. According to Brown, new arrivals are asked by the receiving officers if the arrestees are hurt or need to see the nurse. If they answer in the affirmative, a nurse will check them immediately. Otherwise, the arrestee will receive a more thorough screening after being booked. In the case of AJIBADE, Brown had not had contact with him prior to his altercation with the officers. However, he added an officer provided him with some medication the arresting officers said belonged to AJIBADE.

As the altercation between the officers and AJIBADE began, Brown heard the commotion and walked over to observe the situation. He said he saw Rowland attempt to use the Taser on AJIBADE and shortly thereafter he saw her stumble towards the wall. He then turned his attention to Rowland and dragged her behind the booking desk away from the altercation. For the duration of the altercation, Brown said he focused his attention on Rowland.

Brown said he responded to the cell where AJIBADE was taken and observed the officers attempting to place him in the restraint chair. Brown saw him struggling against the officers' attempts and heard him grunting, but not saying anything. AJIBADE seemed to calm down once he was secured in the chair and Brown said he stepped in to check the restraints. For clarity, I asked Brown to explain what exactly is involved in a restraint check. Brown said he would check any cuffs to make sure he could get 2 fingers between the cuff and the wrist and also ensure there is no binding on the chair straps against the subject's neck which would impede circulation.

I then asked Brown if medical staff maintained any kind of log to record restraint checks on individuals placed in the restraint chairs. Brown explained the AJIBADE incident was the first time he encountered such a situation and as far as medical staff policy, there was no log maintained; only the log maintained by the officers. Brown acknowledged medical staff signs the Restraint Log to confirm they performed the restraint checks. He also acknowledged he performed restraint checks in his previous employment in a correctional setting. Brown went on to say since his employment began with Corizon, he only had one other experience with a detainee in a restraint chair. In that instance he performed a restraint chair check, with the detainee being removed from the chair approximately 2 hrs later. He confirmed he only conducted one check on the detainee during the 2 hr period.

Brown was asked if Corizon Health provided him with any type of operations manual or policy manual which might address restraint checks upon his employment. Brown explained Corizon maintains an operations manual which is available for medical staff reference. I asked Brown if he had taken the time to review the manual since his employment began on 12/15/14; he said he had not.

I then asked Brown how many times he checked on AJIBADE while he was in the restraint chair. Following the initial check when he was first placed in the chair, Brown insisted he checked on him again at approximately

22

0100 hrs.  When I presented the fact video evidence showed he had not checked AJIBADE at 0100, he said he thought for sure he had done so.

The restraint check log sheet was then presented to Brown and I asked him if his signature indicates the checks had been done as directed by procedure.  He said he did sign the sheet, but only in one location underneath the times the officer listed for the checks.  I then pointed out his signature extended beyond one time block, indicating he signed off on all the restraint checks being performed and asked him if that might be a logical assumption.  Brown agreed his signature would imply the checks had been done.

I then showed Brown the log sheet and the information on the bottom directing restraints be checked every 15 minutes.  I also presented Brown with the Corizon policy concerning restrained detainees.  Brown read the policy and acknowledged the policy directed restraint checks be conducted every 15 minutes as well.  When asked, Brown stated he had not conducted the checks as policy directed and also he had no knowledge if the officers had conducted checks at the times listed on the log sheet.  Brown admitted it demonstrated poor responsibility on his part as a Corizon employee to assume the duties of the booking area nurse without availing himself to the documentation and policies which dictated the responsibilities of those areas.  I asked Brown why he did not conduct any restraint checks at the 15 minute intervals as directed, he said he did not know he was required to do so.

The questioning then turned to AJIBADE'S responsiveness when placed in the restraint chair.  Brown said when AJIBADE was first placed in the chair he struggled against the officer's efforts.  Following the control methods employed by the officers, including the use of the Taser, he seemed to calm down.  Brown said he checked the restraints and at that point AJIBADE was moving and conscious but would not respond to his questions.  Brown provided a written statement on the incidents.

## SGT. ANZA ROWLAND:

Due to her injuries sustained in the incident, Sgt. Rowland was not available immediately following the incident.  An interview was conducted with Rowland on 4/8/15 at her home.  Upon being provided with the Garrity Advisement, Rowland was asked about the incident.

Rowland said at the point AJIBADE was brought out of the holding cell to begin the booking process she was at the booking sergeant's desk taking care of various duties.  Cpl. Evans was also on duty but was out of the immediate area at the time.  Rowland first became aware of an issue with AJIBADE when Pvt. Capers approached the booking sergeant's desk and informed her he needed some leg restraints.  Capers informed her of a detainee being disorderly; she looked into the booking area and observed Pvt. Vinson and Ofc. Richards addressing a detainee (identified as AJIBADE); the officers were giving verbal commands to AJIBADE but he appeared to be non-compliant with the commands.  She retrieved the Taser and went over to assess the situation when she observed AJIBADE step back away from the officers.

At that point the officers took him to the ground and she attempted to deploy the Taser but decided a drive stun would be a better choice for the situation.  She deployed a drive stun on AJIBADE in the lower part of his left hip area.  AJIBADE jerked away and she attempted to find another location to deploy a drive stun.  She believed at that point AJIBADE grabbed her, the triggered Taser made contact with her and she was struck but she could not recall the order of events.  She added she could not recall where exactly she was struck and could not say with any certainty who grabbed her during the incident.  For clarification, I asked Rowland if she knew who struck her and how she was struck.  She said she did not know who struck her but knew she had been

PA00728

struck due to her entire face feeling numb. When pressed further, she said she did not know exactly how she had been struck or how the injury occurred.

The questioning then turned to Rowland's decision to introduce a Taser into the incident. Rowland explained she retrieved the Taser simply as a precautionary measure. She went on to say in incidents involving detainees and possible non-compliance she routinely relies on a Taser as a precautionary measure.

I then asked for clarification on how she remembered going down on the floor during the struggle. Rowland could not recall falling to the floor. She added after being struck she only recalled seeing Vinson kicking the Taser away from AJIBADE. She went over and picked up the Taser then leaned against a wall. Her legs became weak and she slid to the floor. She called a 10-78 and remembered Nurse Brown assisting her. She also remembered Cpl. Evans assisting her at one point. Rowland added her eyes were shut most times following the blow to her face but could hear voices around her; she could not discern what the voices were saying. *(At this point the recording device went dead. The remainder of the interview focused on use of a Taser on restrained subjects. A phone recording was used to capture Rowland's responses.)*

On 4/10/15 I contacted Sgt. Rowland by phone to continue the interview on the record. At the time the video recording device failed, the interview turned to the policy on the use of a Taser or any electronic control device (ECD). I asked Rowland to explain her understanding of the policy concerning the use of an ECD on a restrained subject. She said a device was not to be used on anyone in handcuffs or full restraints; she added a subject in only leg irons would still have use of their hands and could therefore be considered a threat. Rowland went on to say since her training on the use of a Taser she had not known of any memo, verbal directive or policy change which indicated the use of a Taser on a restrained individual changed. She also said she had not seen nor had knowledge of any employee using a Taser or other ECD on a restrained subject. The interview with Sgt. Rowland was concluded at that point.

## CORIZON HEALTH SERVICES POLICY:

A copy of the Corizon Health policy which governs employee duties in cases of restraint use was obtained during the investigation. The policy Restraint and Seclusion #J-I-01.00 subsection (q), reviewed and revised in 9/14, states "health care staff will monitor and document the following information in the medical record:

Every 15 minute checks for:
- Circulation and nerve damage assessment
- Monitoring of respirations
- Altered mental status

Every 30 minute checks for
- Hygiene especially if incontinent or menstruating
- Patients activity, mental status and signs of self injury

*A copy of the Corizon Health policy in its entirety is included in the case file.*

## SOUTHSIDE FIRE/EMS RESPONSE:

Southside Fire/EMS emergency medical technicians Tommy Parker and Francesca Everett responded to the detention center in response to AJIBADE being found unresponsive. The two were assigned as unit M-22 on he date of the incident. Southside Dispatch records reflect the following timeline for M-22:

24

PA00729

- 1:46 dispatched
- 1:48 enroute
- 1:56 arrived on scene
- 2:44 unit clear

Attempts to contact Parker and Everett for interviews were unsuccessful.

**TIMELINE OF EVENTS:**

*All times based on video timestamps and Metro Dispatch system.*

18:29 – 911 call received on domestic incident involving AJIBADE and Odewole/ Abercorn & Duffy (El Cheapo)
18:31 – Scpl. Owens and APO Baker dispatched
18:38 – Officers on scene/struggle with Metro officers visible on store video
18: 45 – Sgt. Young on scene
18:55 – Sgt. Wilson on scene
19:05 – EMS on scene
19:08 – EMS clear
19:24 – Units enroute to CCDC with AJIBADE
19:38 – Metro enters CCDC with AJIBADE
19:41 – AJIBADE slowly reacts to Ofc. Young's directives
19:42:05 – Ofc. Cahall informs Young AJIBADE is a possible Signal 49 (mental patient)
19:42:43 – Ofc. Young directs AJIBADE on magnetometer process; AJIBADE fails to perform correctly
.9:43 – AJIBADE placed in holding cell #6
23:28 – AJIBADE exits cell for booking process
23:28:29 – Ofc. Richardson directs AJIBADE to sit at booking desk; AJIBADE begins being uncooperative
23:30:22 – Ofc. Capers calls Ofc. Vinson and asks him to come to the booking area for possible issue
23:30:53 – AJIBADE ignores Richardson's directives; walks toward exit slider
23:30:57 – AJIBADE sits at booking desk; continues being argumentative with Richardson
23:31:59 – AJIBADE gets up; continues being uncooperative with Richardson & Vinson
23:32:34 – Richardson touches AJIBADE on arm in guiding manner to direct him to holding cell; AJIBADE becomes defensive asking why Richardson touched him and begins screaming
23:32:40 – Richardson begins more forcefully attempting to guide AJIBADE towards booking cell; AJIBADE resists
23:32:48 – Richardson and Capers approach AJIBADE from behind; attempt to place him on the floor
23:32:54 – AJIBADE is placed on the floor, face up.  He lays with his arms stretched out to his side; Richardson calmly directs AJIBADE to turn onto his stomach.
23:33:02 – AJIBADE begins violently resisting the officers. Rowland approaches the area with Taser
23:33:22 – Richardson gains control of AJIBADE'S legs; Capers and Vinson attempt to gain control of his arms
23:33:24 – Rowland Tases AJIBADE on the left hip as he continues to resist the officers; AJIBADE releases Capers' shirt and pushes the Taser away from his body
23:33:38 – Rowland moves in again to attempt a second Tasing; AJIBADE grabs Rowland's left wrist.
23:33:42 – AJIBADE'S grip on Rowland is broken; Rowland moves in to again attempt to Tase him
23:33:44 – Taser is triggered (unknown if contact is made with AJIBADE); Rowland is tripped in the struggle and falls forward; strikes her face on the floor; AJIBADE takes Taser from her hand and Tases both Capers and Richardson while on his back
23:33:50 – AJIBADE sits up; Capers strikes AJIBADE in the facial area; AJIBADE falls back but maintains

25

control of the Taser; Capers throws another strike in the facial/upper chest area; Vinson moves in and attempts to kick the Taser from AJIBADE'S right hand.

23:33:56 – Vinson successfully kicks the Taser from AJIBADE; Capers, Vinson and Richardson pin AJIBADE on the floor; AJIBADE appears calmed and stops actively resisting

23:34:03 – Rowland retrieves the Taser; she stumbles to booking desk and attempts to call signal; she collapses, Vinson retrieves restraints from floor where struggle began

23:34:22 – Nurse Brown approaches Rowland to assist her

23:34:46 – Vinson uses Rowland's radio to call 10-78; Richardson and Capers continue to hold AJIBADE down and wait for assistance

23:35:02 – AJIBADE again starts struggling against Capers and Richardson; Vinson moves in and delivers 2 knee strikes to AJIBADE'S left rib cage area; AJIBADE momentarily stops resisting

23:35:12 – Evans arrives and assists Rowland

23:35:18 – AJIBADE begins struggling with officers again; is able to move onto his back and begins aggressively resisting the officers

23:35:26 – Ofc. Solomon arrives and assists in the struggle with AJIBADE

23:36:03 – Ofc. Burke arrives and assists

23:36:30 – Ofc. Groover arrives and assists

23:36:41 – Ofc. Cody arrives and assists

23:36:54 – Lt. Johnson arrives; assesses the situation and retrieves the Taser

23:37:01 – AJIBADE ceases aggressive resistance; still passively resisting officers

23:37:24 – Lt. Johnson advises AJIBADE to cooperate with the officers or she will Tase him; see's he is restrained and no longer resistant; does not use Taser

23:39:18 – Officers Cody, Burke, Vinson and Solomon lift AJIBADE and carry him towards holding cell; Lt. Johnson orders he be placed in detox cell

23:39:35 – Officers decide to place AJIBADE in "old pre-booking" cell #4

23:39:38 – Cpl. Kenny enters booking area

23:39:58 – AJIBADE placed in cell #4 on the floor

23:40:00 – Ofc. Capers enters the cell

23:40:06 – Cpl. Kenny enters the cell

23:40:11 – Restraint chair taken into cell

23:40:23 – Ofc. Richardson enters the cell

23:40:27 – Richardson exits cell; an unknown officer mentions a spit mask; Kenny is heard saying "...and a Taser, too"; Ofc. Groover enters then immediately exits and mentions a Taser; AJIBADE yells out

23:40:36 – Groover exits the cell

23:41:00 – A female officer calls out for a spit mask

23:41:09 – Richardson reenters cell

23:41:10 – Lt. Johnson approaches the cell to assess the situation

23:41:22 – Richardson exits the cell

23:41:27 – Kenny is heard saying "calm down, calm down!"

23:42:02 – Richardson approaches the cell; passes in a spit mask

23:42:12 – Lt. Johnson asks "where is the Taser?" Someone says "Kenny got it.  I gave it to Kenny."

23:42:25 – Kenny says "(unintelligible)...spit mask on you, sir"

23:42:50 – Flex cuffs are requested in the cell; Richardson passes them in

23:42:58 – Kenny is heard saying "stay in the chair, sir; stay in the chair"

23:43:18 – AJIBADE screams out ***Taser timestamp shows 04:47:24*** AJIBADE says something unintelligible

23:43:26 – Kenny is heard saying "stay in the chair; stop resisting"

26

23:44:03 – Ofc. Ambrose enters the cell
23:44:15 – Ofc. Burke is summoned from the cell; exits
23:44:24 – Ofc. Capers exits the cell; Kenny asks for leg restraints
23:44:31 – Ofc. Richardson exits the cell
23:44:32 – Ofc. Ambrose steps into the cell doorway
23:44:36 – Ambrose reenters the cell; Vinson exits
23:44:44 – AJIBADE says something unintelligible; Kenny says "stop doing that…you'll get Tased again, sir. Please stop resisting."
23:44:56 – Vinson reenters the cell; AJIBADE is heard verbalizing unintelligibly
23:46:07 – Ofc. Reid enters the cell
23:46:34 – Ofc. Reid exits
23:47:05 – Nurse Brown enters cell for restraint check followed by Lt. Johnson; Brown announces to AJIBADE his intention to check restraints
23:47:50 – All officers and Brown exit the cell and secure the door
23:49:27 – Unintelligible vocalizations (resembling singing) can be heard from the area. A loud voice is then heard saying what is believed to be "I can't breathe" originating from AJIBADE
23:49:49 – More unintelligible speech heard believed to be originating from AJIBADE
23:50:02 – A shout is heard, believed to be originating from AJIBADE
23:50:08 – A louder shout is heard and again is believed to be originating from AJIBADE
23:50:50 – Kenny looks into the cell; vocalization can be heard, believed to be originating from AJIBADE
23:51:10 – Kenny leaves the area
23:51:29 – Another loud shout is heard, believed to be originating from AJIBADE
23:52:13 – A grunting sound is heard, believed to be originating from AJIBADE
23:52:38 – A short, high-pitched scream can be heard, believed to be originating from AJIBADE
23:53:12 – A sound similar to a throat clearing is heard, believed to be detainee in cell #1
23:55:06 – Kenny looks into the cell
23:55:15 – Kenny walks away from the cell
23:55:43 – Kenny again looks into the cell; Evans then looks into the cell
23:55:58 – Both officers leave the area
00:02:13 – A yell is heard, believed to be originating from AJIBADE
00:09:05 – Ofc. Vinson looks in the cell, followed by Capers who also looks in.
00:09:40 – Lt. Johnson enters the area; speaks to Vinson and Capers about the incident
00:10:35 – All 3 depart the area
00:30:31 – A scream is heard; origin unknown
00:34:06 – Someone clears their throat; origin unknown
00:35:15 – Evans and Capers place a female detainee in cell 2; both depart the area; do not check AJIBADE
00:36:59 – Evans returns to address unruly behavior by female detainee; Richardson steps in the area and steps out; Lt. Johnson enters the area and Richardson returns
00:37:50 – All 3 depart the area; do not check AJIBADE
00:49:51 – A grunting noise can be heard; believed to be originating from AJIBADE
00:56:46 – Evans enters the area and retrieves lunch from file cabinet; does not check AJIBADE
01:36:33 – Evans looks in on AJIBADE; does not see movement and opens cell door, calls out to AJIBADE; gets no response
01:37:36 – Evans goes to get Nurse Brown; asks Richardson for assistance
01:38:45 – Evans, Brown and Richardson return; attempts to get response from AJIBADE are unsuccessful; Brown tells Evans he is breathing; several more attempts to get a response fail; Evans requests Lt. Johnson to respond to the area
01:41:59 – Evans calls Code Blue

27

01:42:36 – Capers, Lt. Johnson, Vinson and Burns respond to the area; Johnson directs officers to remove AJIBADE from the restraint chair and for EMS to be called
01:43:56 – AJIBADE placed on the floor
01:45:27 – Restraints removed; defibrillator attached by Brown
01:46:05 – Defibrillator announces "No shock advised. Check for pulse. Start CPR"
01:46:26 – Ofc. Rodriguez begins chest compressions
01:46:52 – Ofc. Wilson takes over giving chest compressions while breathing bag being located; Nurses Thrift and Thorpe arrive
01:47:23 – Defibrillator cycles again; announces "No shock" advisory again
01:47:44 – Rodriguez starts chest compressions again; Brown utilizes breathing bag; Nurse Thrift takes over giving chest compressions
01:48:43 – Defibrillator announces "No shock" advisory again; resuscitation and defibrillator attempts continue until EMS arrives
01:58:49 – EMS personnel arrive; begin assessment
02:01:20 – EMS determines defibrillator is no longer useful, device removed; resuscitation efforts aborted; Lt. Johnson begins all-page and notification process
02:06:48 – Johnson asks Evans when AJIBADE was found unresponsive; Evans tells her she did a check on him at 01:00

*\*\*Note: between 23:49 and 00:49 vocalizations can be heard but cannot be attributed to AJIBADE with any degree of certainty. After 00:49, no vocalizations are heard.*

**TASER VIDEOS:**

*Copies of the synchronization report and device video footage are included in the case file.*

The electronic control device (ECD) utilized in the incident was identified as the Taser X26P (SN# X1300112A). Video footage from the device was downloaded and a synchronization report was generated for the device. It was discovered the device had not been synchronized via computer in some time. The result was timestamp information from the videos did not coincide with the times events actually occurred. The report indicated the device was triggered at the following times in the cell:

23:44:34 – 5 second duration
23:44:39 – 2 second duration
23:46:36 – 4 second duration
23:47:23 – 3 second duration
23:49:21 – 2 second duration

When compared with surveillance video footage, the times from the device are not in sync; however the device recorded events in proper fashion.

Downloaded video footage revealed the device was contacted to AJIBADE on 4 occasions. One video clip shows AJIBADE appearing to struggle against the officers' attempts to place him in the chair. The remaining clips provide very limited views of the events which had taken place in the cell. However, the longest running clip suggests AJIBADE was at one point contacted with the device while he appeared to be cooperative. In his interviews and written statements, Cpl. Kenny stated he contacted the device to AJIBADE a total of 4 times. Video footage appears to support his statements.

PA00733

**TOXICOLOGY AND BLOOD ALCOHOL RESULTS:**

The G.B.I. Division of Forensic Sciences completed toxicology and blood alcohol reports detailing the test results of the body tissue samples taken from AJIBADE'S body at the time of the autopsy. The reports indicate tests for ethyl alcohol via gas chromatography returned negative. Toxicology results detailed an Immunoassay drug screen which revealed the tissue samples were indicative of THC (marijuana) and negative for any other screened substances. Copies of the official G.B.I. reports were included in the case file.

**AUTOPSY RESULTS:**

The G.B.I. Division of Forensic Sciences completed the autopsy report on 4/14/15 which gave a summary of the autopsy findings. Following a thorough examination of Matthew AJIBADE, the cause of death in the incident was listed as a sudden death associated with a physical altercation with law enforcement personnel and subsequent restraint; the use of the Taser (electronic control device) was additionally listed as a significant condition in the cause of death.

The medical examiner's summary concluded: *"Given the information available at this time, it is most likely that the decedent suffered a fatal cardiac dysrhythmia due to the excited physiological state induced by the extreme physical exertion, anxiety and pain of the physical altercation. Additionally, Mr. AJIBADE was left unattended for a period of 1 ½ hours, fully restrained in a restraint chair with a spit mask over his nose and mouth, and an asphyxia component to his death cannot be ruled out. The manner of death is classified as a homicide."*

While several contributing factors were listed, no one cause of death could be definitively realized.

A copy of the G.B.I. Autopsy report in its entirety was included in the case file.

**FINDINGS AND CONCLUSION:**

Based upon video footage, interviews and written statements it is believed AJIBADE had been involved in two incidents involving violent behavior on his part prior to entering the Chatham County Detention Center.

Evidence suggests AJIBADE was the primary aggressor in a domestic violence incident with his girlfriend, Fisayo Odewole and then resisted the responding officers as well. Odewole mentioned AJIBADE'S possible mental illness to the officers and provided them with medication prescribed to him. The dates listed on the container plus the amount of medication remaining in the container suggests AJIBADE was not taking the medication as prescribed.

Arresting officers notified the booking officers of a possible mental health issue with AJIBADE; in addition, officers observed peculiar behavior from him during the intake process. Officers stated his behavior while in the holding cell awaiting the booking process was unremarkable for the most part.

AJIBADE became uncooperative and began aggressively resisting officers upon their attempts to complete the booking process. Sgt. Rowland attempted to deploy pain compliance against AJIBADE via a Taser but was unsuccessful. Rowland lost her footing in the struggle and fell forward and struck her face against the floor. This resulted in her receiving a broken nose; not caused by a blow from AJIBADE as originally believed. AJIBADE gained control of the Taser and was able to contact the device to Capers and Vinson. The officers were able to get the device away from AJIBADE and, following a prolonged struggle, restrain him.

29

PA00734

Lt. Johnson directed officers to place AJIBADE in a detox cell; however Ofc. Vinson made the decision to place him in the "old pre-booking" area due to security concerns. Officers then decided to place him in the restraint chair due to his combative behavior. It is believed the policy governing use of the restraint chair was not followed in that the incident was not video recorded as required.

Officers struggled to place AJIBADE in the restraint chair; at the time there were 5 officers inside the cell. Additionally, AJIBADE was handcuffed behind his back. Cpl. Kenny utilized the Taser to obtain pain compliance in securing AJIBADE in the restraint chair. Taser video footage suggests AJIBADE was struggling against the officers at one point; however subsequent footage suggests AJIBADE seemed compliant as the officers secured the additional restraints. It is believed the use of the Taser was not necessary due to the amount of security staff inside the cell and the fact AJIBADE was handcuffed. *(Subsequent interviews with Cpl. Kenny and Training Staff suggest the use of a Taser upon restrained detainees had not been clearly defined prior to the incident. Policy and Procedure manuals for the Chatham County Sheriff's Office do not address the specific issue. Reference case # SO-IA-OM-01-15-005)*

Upon being secured in the chair, various officers looked into the cell at AJIBADE. Cpl. Evans originated a Restraint Check Log as policy dictates. However, by her own admission and video footage evidence, Evans did not conduct a proper check on AJIBADE until she found him unresponsive. Video footage revealed no one physically checked on AJIBADE from 2348 hrs until 0136 hrs. Policy directs officers shall physically check detainees in the restraint chair every 15 minutes. Evans stated she understood the policy but failed to conduct the checks as directed. Additionally, Evans admitted the times she listed on the log as having performed checks were fraudulent. Evans said she listed the times with the intention of conducting the checks but failed to do so. *(Reference case # SO-IA-ND-01-15-005)*

Corizon employee Gregory Brown conducted a restraint check on AJIBADE upon his being restrained in the chair at 2347 hrs. Brown had no further contact with AJIBADE until summoned to the cell by Evans at 0136 hrs. Brown stated he had not been provided any policy or procedure manuals by Corizon management; nor had he familiarized himself with the manuals available in the Corizon offices. Brown nevertheless signed the Restraint Check log indicating he and Evans performed 15 minute restraint checks required by Corizon policy. Brown admitted fault in his interview and written statement.

Upon finding AJIBADE unresponsive staff members to include Gregory Brown, attempted to resuscitate him via defibrillator and CPR. The attempts were continued until EMS personnel arrived and took charge; with AJIBADE being declared expired shortly thereafter.

The completion of the G.B.I. Autopsy report indicated the death of AJIBADE could not be attributed to one particular action or injury and was likely the culmination of several factors. His excited psychological state, the use of the Taser and being restrained for an extended period (during which the behavior and health of AJIBADE was not properly monitored) were all listed as contributing factors in the death.

PA00735



PA00736



# MEMORANDUM

**TO:**     **Chief Deputy Roy J. Harris**
**FROM:**   **Lieutenant Gregg Rhode, Internal Affairs Unit**
**DATE:**   **February 26, 2015**
**RE:**      **Results of Investigation SO-IA-ND-01-15-003**

Internal Affairs initiated an investigation into the events surrounding the death of Inmate Matthew Ajibade on 01/02/15. Information surfaced from video footage of the incident which disputed official logbook entries made by Corporal Maxine EVANS. Times were listed in the logbook which reflected Ajibade being "checked" by EVANS on five separate occasions. Video footage obtained supported only one such check made by EVANS.

EVANS, during an interview, admitted to only checking Ajibade's restraints on one occasion. The other four entries in the logbook were completely fabricated by her AFTER Ajibade was found unresponsive.

Based on information gathered as a result of this investigation, I find Corporal Maxine EVANS willfully violated policy by falsifying official documents.

**The allegation against Maxine EVANS of CONDUCT-GENERAL 3-01/010.05 is hereby SUSTAINED.**

**The allegation against Maxine EVANS of NEGLECT OF DUTY 3-01/040.20 is hereby SUSTAINED.**

cc: Sheriff Al St. Lawrence
     Colonel Thomas Gilberg, Jail Administrator
     Colonel Brian Counihan, Enforcement Administrator
     Melissa Kohne, Assistant Jail Administrator
     Major Russell Smith
     Major Kim Middleton
     Major Gloria Wilson

**1 | P a g e**

PA01062

# CHATHAM COUNTY SHERIFF'S OFFICE

# INTERNAL AFFAIRS UNIT

# INVESTIGATIVE REPORT



| CASE NUMBER: | SO-IA-ND-01-15-003 |
|---|---|
| INVESTIGATOR: | RICK HALL |
| DATE CLOSED: | 2/10/15 |

APPROVED BY: _____  DATE: _02/26/15_
Internal Affairs Commander

REVIEWED BY: _____  DATE: 03/01/15
Chief Deputy

1

PA01063

| | CHATHAM COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS UNIT INVESTIGATIVE REPORT | CASE NUMBER: SO-IA-ND-01-15-003 |
|---|---|---|
| **INCIDENT:** Falsifying Documents | | **LOCATION:** Receiving and Discharge 1050 Carl Griffin Dr. Savannah, Ga |
| **COMPLAINANT:** CCSO | | **INVOLVED EMPLOYEE(S):** Cpl. Maxine Evans |
| **ASSIGNED INVESTIGATOR:** Rick Hall | **DATE:** 02/10/15 | |

## BASIS OF INVESTIGATION:

On 1/2/15 while investigating the death of detainee Matthew Ajibade (SO-IA-ID-01-15-001), it was noted a Restraint Chair log had been created by Cpl. Maxine EVANS. Upon reviewing the document and the video footage of the events in the incident, the times listed by EVANS as having properly checked the restrained Ajibade were found to be fraudulent.

## INVESTIGATION:

Cpl. EVANS was brought in for a follow-up interview on 1/5/15 with Inv. Meyers and I. EVANS was informed the Garrity Advisement she signed on 1/2/15 was still in effect. I informed EVANS of the fact Ajibade was placed in the restraint chair at approximately 2345 hrs and asked her how many times she performed her restraint checks on him. EVANS stated she checked him once and the clock in front of the Sgt.'s desk indicated the time was approximately 0130 0r 0135. I then asked EVANS to explain the procedures for performing a restraint check on a detainee. She explained officers are required to check the straps on the chair, which are around the detainee, are secured and not cutting off circulation. When asked, she confirmed the officers have to physically check the restraints. She was then asked to confirm a restraint check listed on the restraint check log sheet would indicate an officer physically checked the restraints on a detainee. She agreed with my assessment.

After she again confirmed she only physically checked Ajibade once on the night of the incident, I provided her with a copy of the restraint check log she completed concerning Ajibade. The log sheet had 5 restraint checks and times noted which EVANS listed as having physically checked Ajibade. I then asked EVANS if the log was a true representation of the checks she performed; she agreed it was not correct. She also confirmed Nurse Brown signed the log sheet indicating the checks had been performed when he had in fact not done so. As the interview continued, EVANS stated she heard him yell out at one point but when she looked in the cell, she "really didn't pay attention to whether he was moving or not".

I asked EVANS if she felt it was acceptable for a Corporal to not conduct the restraint checks as directed by policy. EVANS stated it was not acceptable and she should have performed the checks with the nurse correctly. EVANS further acknowledged the fabrications she listed on the log were a case of falsifying documents. Though EVANS wrote in her statements she performed the restraint checks "prematurely", further questioning revealed she had filled in the times on the log sheet after Ajibade had been found unresponsive. She said she estimated the times for the checks and acknowledged she did not physically check him at the times listed. Cpl. EVANS then completed an additional written statement on the issue.

PA01064

**FINDINGS AND CONCLUSION:**

Based upon surveillance video footage, interviews and her statements it is believed Cpl. EVANS failed to conduct proper restraint checks on Ajibade and did fraudulently complete the Restraint Chair log. Video footage shows EVANS visibly looked into the cell at 23:55 hrs at which time Ajibade is believed to be conscious; EVANS does not conduct any type of check on him until 01:36 hrs. EVANS admitted she did not conduct physical checks on Ajibade every 15 minutes per policy and then fabricated the times listed on the Restraint Chair log after Ajibade was found unresponsive.

Reports and other documentation of this investigation in its entirety will be retained as exhibits of the inquiry. This case is being forwarded to Administrators for resolution and a final disposition. Pending approval by the Sheriff, Chief Deputy or Administrator, the administrative investigation of this incident will be considered closed.

**POSSIBLE VIOLATIONS:**

3-01/010.05   CONDUCT – GENERAL
3-01/040.20   NEGLECT OF DUTY

3

PA01065



## CHATHAM COUNTY SHERIFF'S DEPARTMENT

## NOTIFICATION OF ADMINISTRATIVE INVESTIGATION

Internal Affairs Unit Case Number: _So - IA - ID - 01 - 15 - 001_

I wish to advise you that you are being questioned as part of an official Internal Affairs investigation by the Chatham County Sheriff's Office. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and Constitution of the United States of America and the State of Georgia. This includes the right to not be compelled to incriminate yourself. However, I also want to advise you that if you refuse to testify or answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges that could result in your dismissal. If you do answer, neither your statements or any information or evidence that is gained by reason of such statements can be used against you in any subsequent criminal proceeding (EXCEPT FOR PERJURY OR OBSTRUCTION OF JUSTICE CHARGES). However, these statements may be used against you in relation to subsequent departmental charges in accordance with Department Standard Operational Procedures (3-01/015.25)

In accordance with Department Standard Operating Procedures (4-07-/030.00) employees are required to correctly answer questions or render material and relevant statements to departmental personnel when so directed. Employees are also required to cooperate fully during any internal investigation involving departmental personnel.

I UNDERSTAND THE ABOVE INFORMATION AND FULLY REALIZE MY STATEMENT IS BEING GIVEN PURSUANT TO AN ADMINISTRATIVE/INTERNAL DEPARTMENTAL INVESTIGATION.

DATE: _01/02/15_

TIME: _1050_

_____
WITNESS

_W. Blanton_
WITNESS

_MAXINE Evans_
EMPLOYEE NAME: (PLEASE PRINT)

_____
EMPLOYEE SIGNATURE:

PA01066




# CHATHAM COUNTY SHERIFF'S OFFICE

# EMPLOYEE STATEMENT OF INCIDENT

Write a **detailed** narrative of the incident:

Upon arriving to B/D to start my shift PVT Browne and I was were talking. All other staff were conducting shift change count. I wasn't briefed on arrestee Ajibade, Matthew. The first time I noticed him was when I was in the Center Station area and he began banging on the window and the bed/seating inside holding cell #6. I turned around and asked what was wrong. PVT Burke also heard the noise and came to cell #6 and began to ask him the same thing. Shortly afterwards PVT Richardson opened the cell and told arrestee Ajibade to step out and go over to the pre-booking area. Due to his behavior I asked PVT Capers to stand by while I went to the property room to place property receipts into some of the female arrestee property bags. While doing that I heard a faint signal come over the radio (10-78). I immediately came out of the property room enroute back to the Center Station pre booking

_____
Employee Signature

01/02/15
Date

Page 1 of 4

PA01067

continued...

area. Upon entering the area I saw R&D male
officer's Vinson, Capers and I believe PVT Burke and
Richardson struggling with arrestee AliBade. Then I
looked and saw Sgt Bowland on the floor and Nurse
Brown was tending to her. I then began talking to
Sgt Bowland to Keep her calm, at that time Nurse
Brown stated "we need to get Ems for her". I then
came over the radio and call the watch commander informing
her that Ems was needed. I stayed with Sgt Bowland
until EMS arrived. I then returned to the Supervisors
desk to sign in new arrestee's and conducting
normal duties. In checking my paperwork I discovered
there was a request for a hit for a possible
arrest on a subject. I took the request and proceed
to go to the warrants room. After retrieving the warrant
I returned back to the Supervisor's desk and began
doing more paperwork. I got another GCIC Hit
for another possible warrant, which has to be answered
within a 10 min time frame. So I left to go back
to the warrant room again to retrieve the possible
warrant. Upon returning again I began to answer

Employee Signature

01/02/15
Date

continued...

PA01068

the hit confirmation. Then I began to catch up on paperwork. Remembering that inmate Alibache was in the restraint chair I went in to check him. As I looked into the cell he wasnu moving so I called out to him while tapping on the cell door, but he did not respond. I then opened the cell door calling his name and still got no response. I closed the cell door and got Nurse Brown and PVT Richardson to assist. I opened the door Nurse Brown and PVT Richardson stepped inside. Nurse Brown began to call his name while checking for signs of breathing. Nurse Brown then stated " he breathing slowly" then Nurse Brown told PVT Richardson to remove the spit mask that had been placed over his mouth. After PVT Richardson removed the spit mask I saw a string of spit coming from his mouth. Nurse Brown the check for a pulse and the stated " I don't feel a pulse Let get him out of the chair" he the said "call a code blue". At that time I went over the radio and called " code blue in RED". Central control repeated the call. Once it was heard all available staff

_____
Employee Signature

<u>01/02/15</u>
Date

PA01069

continued...

responded. Lt Johnson entered the cell and redirected to take arrestee Ajibade out of the chair. Once he was removed from the chair Nurse Brown began CPR. Lt Johnson told me to get a pad and record all the times. I stayed in the area and recorded the times while Nurse Brown, Thrift Ofc Rodriguez and Ofc Wilson took turns performing CPR until EMS arrived. EMS arrived in the area and ask Nurse Brown how long has it been but I didn't hear their response. Lt Johnson then began to tell some of the officers to report back to their units. I stepped out and returned to the supervisor desk to sign new arrestee's in. I generated a restraint chair log at 2345 based on the time I came back into the area. Approximately at 0130 hrs I checked arrestee Ajibade and found him to be unresponsive.

I have read each page of this statement consisting of 4 page.    Each page bears my signature.    Corrections, if any, bear my initials.    I hereby certify that the facts contained herein are true and correct.

_____
Employee Signature

Sworn and subscribed before me this _____2_____ day of ___January___, 20 _18_.


_____
Notary Public

PA01070




# CHATHAM COUNTY SHERIFF'S OFFICE
## EMPLOYEE STATEMENT OF INCIDENT

Event

**Write a detailed narrative of the incident:**

Approximately on the morning of 01/02/15 arrestee Ali Bude, Matthew had been disorderly and was placed into the restraint chair. I prematurely generated the restraint chair log placing times on the sheet that the arrestee had been checked while being in the chair. From the time he was placed into the chair approximately at 2345 I believed he was physically checde by the staff and Nurse. The times after that were times he wasn't physically check by anyone. It was only at 0130 that he was physically by myself (the NURSE was not present) is when he was found to be unresponsive and I then went and got Nurse Brown to physically check him. I realized that placing times on the restraint chair log was wrong if the individual was physically ed checked.

End of statement

_____          01/05/2015
Employee Signature                 Date

Page 1 of 4

PA01071

continued...



Employee Signature

continued...

Date  01 / 05 / 2015

Page 2 of 4

PA01072



_____                01/05/2015
Employee Signature                             Date

Page 3 of 4

PA01073

continued...

I have read each page of this statement consisting of 4 page.   Each page bears my signature.   Corrections, if any, bear my initials.   I hereby certify that the facts contained herein are true and correct.

Employee Signature

Sworn and subscribed before me this ____5____ day of ____JANUARY____, 20 _15_ .

Notary Public

Page 4 of 4

PA01074




## Corrections Bureau Restraint Chair Log

Tracking #: _____

| Lieutenant Authorized | LT JOHNSON | | | | | Inmate Name-DIN | AJIBADE, MATTHEW, | | | P1501045 | | | Date/Time Beginning | 01/01/2014 2345 | | | Resp-Nurse | | | NURSE BROWN,G | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security Staff Name | 1 Ck | 2 Ck | 3 Ck | 1 hr | 1 Ck | 2 Ck | 3 Ck | 2 hrs | 1 Ck | 2 Ck | 3 Ck | 4 hrs | 1 Ck | 2 Ck | 3 Ck | 5 hrs | 1 Ck | 2 Ck | 3 Ck | 6 hrs |
| ① EVANS | 2345 Mb | 2350 | 2354 | 0000 0030 | | | | | | | | | | | | | | | | Capt Notified |
| urses Name > | | | | | | | | | | | | | | | | | | | | Hrs- |
| Security Staff Name | 1 Ck | 2 Ck | 3 Ck | 7 hrs | 1 Ck | 2 Ck | 3 Ck | 8 hrs | 1 Ck | 2 Ck | 3 Ck | 10 hrs | 1 Ck | 2 Ck | 3 Ck | 11 hrs | 1 Ck | 2 Ck | 3 Ck | 12 hrs |
| | | | | | | | | | | | | | | | | | | | | Capt Notified |
| urses Name > | | | | | | | | | | | | | | | | | | | | Hrs- |
| Security Staff Name | 1 Ck | 2 Ck | 3 Ck | 13 hrs | 1 Ck | 2 Ck | 3 Ck | 14 hrs | 1 Ck | 2 Ck | 3 Ck | 16 hrs | 1 Ck | 2 Ck | 3 Ck | 17 hrs | 1 Ck | 2 Ck | 3 Ck | 18 hrs |
| | | | | | | | | | | | | | | | | | | | | Capt Notified |
| urses Name > | | | | | | | | | | | | | | | | | | | | Hrs- |
| Security Staff Name | 1 Ck | 2 Ck | 3 Ck | 19 hrs | 1 Ck | 2 Ck | 3 Ck | 20 hrs | 1 Ck | 2 Ck | 3 Ck | 22 hrs | 1 Ck | 2 Ck | 3 Ck | 23 hrs | 1 Ck | 2 Ck | 3 Ck | 24 hrs |
| | | | | | | | | | | | | | | | | | | | | Maj Notifier |
| urses Name > | | | | | | | | | | | | | | | | | | | | Hrs |
| Removed by Lieutenant. | | | Comments | | | | | | | Date-Ended | | | | | | Time-Ended | | | | |
| Reviewed by J – Manager | | | Comments | | | | | | | Date Reviewed | | | | | | | | | | |

*Checks must be no more than 15 minutes apart. Any Inmate placed in restraint chair for longer than six hours requires a Captain or above approval. No inmate should be placed in the restraint chair for more than twenty four hours without a Major or above approval.*

PA01075