# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

SOLOMAN OLUDAMISI AJIBADE and   )
ADENIKE HANNAH AJIBADE, as      )
natural parents of Mathew       )
Ajibade, and                    )
                                )
THE ESTATE OF MATHEW AJIBADE    )
and CHRIS OLADAPO, its          )
Executor,                       )
                                )
            Plaintiffs,         )CIVIL ACTION NO.
                                )
        vs.                     )4:16-CV-82-WTM-GRS
                                )
JOHN WILCHER, in his official   )
capacity as Chatham County      )
Sheriff, et al.,                )
                                )
            Defendants.         )


VIDEOTAPED DEPOSITION OF


GREGORY BROWN


September 13, 2016

9:33 a.m.


218 West State Street

Savannah, Georgia


Mynjuan P. Jones, RPR, CCR-B-1422

```
 1                 APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiffs:
 3        TROY A. RAFFERTY, Esq.
          WILLIAM F. CASH, III, Esq.
 4        Levin, Papantonio, Thomas, Mitchell, Rafferty
          & Proctor, P.A.
 5        316 South Baylen Street
          Suite 600
 6        Pensacola, Florida  32502
          trafferty@levinlaw.com
 7        bcash@levinlaw.com

 8        CAMERON C. KUHLMAN, Esq.
          The Claiborne Firm, P.C.
 9        410 East Bay Street
          Savannah, Georgia  31401
10
11   On behalf of the Defendants Debra Johnson and Andrew
     Evans-Martinez:
12
          BENJAMIN PERKINS, Esq.
13        Oliver Maner, LLP
          218 West State Street
14        Savannah, Georgia  31401
          bperkins@olivermaner.com
15
16   On behalf of the Defendants Corizon Health, Corizon,
     and Gregory Brown:
17
          THOMAS S. CARLOCK, Esq.
18        Carlock Copeland
          191 Peachtree Street, NE
19        Suite 3600
          Atlanta, Georgia  30303-1740
20        tcarlock@carlockcopeland.com

21        THOMAS A. WITHERS, Esq.
          Gillen, Withers & Lake, LLC
22        8 East Liberty Street
          Savannah, Georgia  31401
23        twithers@gwllawfirm.com

24

25
```

```
 1   On behalf of the Defendant Sheriff John Wilcher:

 2        R. JONATHAN HART, Esq.
          JENNIFER R. BURNS, Esq.
 3        Chatham County Attorney's Office
          124 Bull Street
 4        Suite 240
          Savannah, Georgia  31401
 5        jburns@chathamcounty.org

 6
     Also Present:
 7   Debra Johnson
     Mark Capers
 8   Dave Liebhauser, Videographer

 9

10                        - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Gregory Brown

Page 37

1  then to go do a medical check of that person?
2      A.   You know, at that time -- you know, if
3  there's a use of force -- you're talking about the
4  tasing or the issue of drive-stunning people?
5      Q.   Either one.
6      A.   Let's say drive-stunning somebody.
7      Q.   Sure.
8      A.   You know, I am unaware that there is a
9  policy that requires me to do that.  And what I would
10 say is that no, no.
11           If I'm asked to check somebody, hey, would
12 you check this person out, yeah, I'd be more than
13 happy to.
14     Q.   And that was your understanding the night
15 that Mathew Ajibade came into the CCDC January 1st
16 and then January 2nd, correct?
17     A.   Correct.
18     Q.   And, in fact, you never did a medical
19 examination of Mr. Ajibade, did you?
20     A.   I did not.
21     Q.   While you were there the night -- I want
22 to go now to the night Mr. Ajibade actually came into
23 the CCDC.
24           You were -- and I'm just setting -- I know
25 you've said this before but just to kind of bring us

Page 140

1      Q.    But they have to be tied to something
2   to -- oh, you mean they just zip-tie the straps
3   together?
4      A.    Yes.
5      Q.    Okay.  I got you.
6            Let me show you a copy of what we've
7   marked as Exhibit P-15, which is a picture of the
8   restraint chair.  Is that a copy of a photograph of
9   the restraint chair?
10     A.    Yes.
11           (Exhibit P-15 was marked for
12        identification.)
13     Q.    (By Mr. Rafferty)  You see those zip ties
14  up there, is that what you're talking about?
15     A.    Yes.
16     Q.    Okay.  And -- I don't have any copies.
17  Here I can center -- I just wanted him to identify
18  it.  I wasn't going to ask him anything more on it.
19  I wanted to make sure that was the -- the picture.
20           Okay.  Now, did you check his -- any of
21  his vitals?
22     A.    I did not.
23     Q.    Did you check his respiration?
24     A.    No, I did not.
25     Q.    Did you check his O2 saturation?

1      A.    No, sir.
2      Q.    Did you check for his -- did you check his
3  blood pressure?
4      A.    No, sir.
5      Q.    His pulse?
6      A.    No, sir.
7      Q.    Did you do any physical examination of him
8  other than what you've described and that is to make
9  sure that the straps and the restraints weren't too
10 tight?
11     A.    I did what I was told to do, and that's
12 what I do.
13     Q.    I understand that, but my question -- I
14 just want to make sure I know exactly what you did.
15 So my question is this:  Did you do any other medical
16 examination of him other than what you described,
17 which is the restraint check to make sure that the
18 restraints weren't too tight on both his hands, his
19 ankles, the zip ties, and the shoulder straps?
20     A.    No, I did not.
21           MR. CARLOCK:  Object to the form.  He said
22       something about the handcuffs.
23           MR. RAFFERTY:  I said the hands.
24           MR. CARLOCK:  Excuse me.  My apologies.
25     Q.    (By Mr. Rafferty)  You heard me say that?

Page 153

1  two, three, four, five, six deputies standing outside
2  the cell; is that correct?
3       A.    Correct.
4       Q.    Okay.  Stop it.  Now, that's Lieutenant
5  Johnson and who else is that coming out of there?
6       A.    I'm not sure.  I can't see.
7       Q.    Okay.  Go ahead.
8       A.    That's Deputy Vinson.
9       Q.    Okay.  Keep going.  I think this is you
10 coming out here in a second.  If you'll watch it and
11 let me know.  Is that you who just walked out?
12      A.    Yes, that's me.
13      Q.    Let's back it up to where he walks out.
14            Is that you starting to exit the cell
15 right there?
16      A.    Yes.
17      Q.    So at this time obviously whatever
18 restraint check you're doing is over, correct?
19      A.    Correct.
20            MR. RAFFERTY:  What is the time?
21            MR. CASH:  11:47:57.
22      Q.    (By Mr. Rafferty)  So roughly around 51
23 seconds that you were inside the cell, correct?
24      A.    Yes.
25      Q.    Okay.  Can you go ahead and play it.

1  presented with the name of the person that I checked.
2  That was the first time that I had seen that name.
3       Q.    Okay.  Well, you had seen that name on a
4  pill bottle before, correct?
5       A.    Correct.
6       Q.    So at this time after you'd done the
7  restraint check, you're aware that it's Mathew that
8  you did the restraint check on, right?
9       A.    Correct.
10      Q.    And you got the pill bottle, Depakote,
11 that says Mathew on it, right?
12      A.    Correct.
13      Q.    Do you do anything at that point to go and
14 figure out what kind of mental condition Mathew's in?
15      A.    No.
16      Q.    Do you do anything in terms of calling a
17 physician or mental health counselor that may be on
18 duty to help figure out what is going on?
19      A.    No.
20      Q.    Other than asking him if he was okay, did
21 you have any other conversation whatsoever with
22 Mathew in that cell?
23      A.    No.
24      Q.    And he did not respond to you at that
25 time, correct?

```
 1        A.    Correct.
 2        Q.    He didn't say yes, I'm okay or no, I'm not
 3   okay?
 4        A.    No, except just to stare at me.  He didn't
 5   say anything else.
 6        Q.    Is that literally the only thing you said,
 7   was are you okay?
 8        A.    That's it.
 9        Q.    Did you say that I'm here to offer you
10   medical assistance if you need it?
11        A.    No, sir, I did not.
12        Q.    And you asked him whether he was okay that
13   one time?
14        A.    Yes.
15        Q.    And he didn't answer you?
16        A.    No.
17        Q.    And you left it at that?
18        A.    Yes.
19        Q.    Did you ask him if he knew who he was or
20   where he was?
21        A.    I did not.
22        Q.    Or why he was there?
23        A.    No.
24        Q.    Or what year it was or anything?
25        A.    No.  I think you asked me if I did some
```

1    and not injuring the inmate," correct?
2        A.    Yes.
3        Q.    That's what you did, right?
4        A.    Yes.
5        Q.    Okay.  And once again, you weren't
6    familiar with this policy though that night either,
7    were you?
8        A.    No.
9        Q.    Going on to Paragraph 11, it says
10   "restrained inmates must be directly observed by the
11   security staff at a minimum of every 15 minutes and
12   by medical staff at least every two hours.  Inmates
13   slash MR" -- that's mental health and mental
14   retardation, correct?
15       A.    Yes.
16       Q.    "MH/MR staff shall also conduct documented
17   periodic checks of the restrained inmates at
18   intervals of at least every hour."  Do you see that?
19       A.    Yes, I see that.
20       Q.    And you never contacted mental health
21   counselors, correct, that night?
22       A.    No.
23       Q.    So we know there weren't any every-
24   one-hour documented mental health checks done on
25   Mathew, right?

Page 172

1      A.     Correct.
2      Q.     And you didn't do checks every hour on
3   Mathew either, did you?
4      A.     No.
5             MR. CARLOCK:  Every hour?  Is that what
6       you said?
7             MR. RAFFERTY:  Yes.
8      Q.     (By Mr. Rafferty)  In fact, you didn't do
9   any regularly -- regular interval checks of him,
10  correct?
11     A.     No.
12     Q.     Now you can set that aside.  All right.  I
13  want to show you now -- you understand and I know
14  you've seen the restraint log with your signature on
15  it, correct?
16     A.     Yes.
17            (Exhibit P-7 was marked for
18       identification.)
19     Q.     (By Mr. Rafferty)  I'm handing you what's
20  been marked for identification purposes as P-7, which
21  is a copy of the restraint -- the corrections bureau
22  restraint chair log.  Do you see that at the top,
23  sir?
24     A.     Yes, sir.
25     Q.     Let me see that.  I guess that's not the

 1   correct?
 2       A.   No.
 3       Q.   And then it says "review procedures to
 4   notify mental health if the inmate is currently or
 5   has recently received mental health treatment."  Do
 6   you see that?
 7       A.   Yes, I do.
 8       Q.   Okay.  And you didn't notify the mental
 9   health counselor on call, did you?
10       A.   I wasn't aware that he was mentally ill.
11       Q.   You didn't notify the mental health
12   counselor, did you?
13       A.   I wasn't aware he was mentally ill.
14       Q.   Let me ask the question again.  I
15   understand you've got that answer and you got that
16   out there, but my question is at no time that night
17   did you contact the mental health counselor, did you?
18       A.   No.
19       Q.   I'm not trying to fuss with you.  I just
20   want to get it --
21       A.   I'm not trying to fuss with you either,
22   sir.
23       Q.   -- get that answer out there.  Okay?  I
24   want to make sure we've got everybody straight.
25            Then it says "review procedure to follow

1  refrigerator here (indicating).
2       Q.   So is this something that you would pull
3  your chair up to or that you could look out?
4       A.   No, I mean, I never really -- I don't sit
5  to that.  You use this space to sit.  I'm always to
6  my desk.  This is just like a little -- like again a
7  half of a wall with a ledge.
8       Q.   Okay.  So basically this here (indicating)
9  that we're looking at with the dark sides, the two
10 dark sided walls on the map, those are half walls?
11      A.   I believe so.
12      Q.   Okay.
13      A.   I'm sure this is.  I think the back
14 wall --
15      Q.   So you could see out in this direction
16 (indicating), correct?
17      A.   Yes.
18      Q.   Okay.  So you would be looking out towards
19 the detox cells if you were standing up looking out
20 that way?
21      A.   Yes.
22      Q.   Okay.  And the detox cells, they have
23 glass fronts?
24      A.   Yes.
25      Q.   So you can see in them?

```
 1        A.    Yes.
 2        Q.    Could you from your perspective there,
 3   from looking there, could you look into the detox
 4   cells?
 5        A.    Yes.
 6        Q.    I didn't mean to take that from you.  I
 7   was just going to fold it up and try to clean up my
 8   area here.
 9              Okay.  At some point you came to realize
10   that, in fact, Mr. Ajibade had been kicked in the
11   head, correct?
12        A.    Yes.
13        Q.    During the altercation?
14        A.    Yes.
15        Q.    And that he had also been hit by
16   officer -- I'm just going to say CO Capers because I
17   can't remember his rank, by CO Capers.  You knew he
18   got hit too, correct?
19        A.    Yes.
20        Q.    And one closed -- at least three closed
21   fist hits, correct?
22        A.    Yes.
23        Q.    And at least one closed fist hit to the
24   face, correct?
25        A.    Yes.
```