# EXHIBIT N

# Official Report



**Division of Forensic Sciences**
**Georgia Bureau of Investigation**
**State of Georgia**

**Headquarters**
**DOFS Case #:** 2014-6006596
**Report Date:** 04/14/2015

George Herrin, Jr., Ph.D.
Deputy Director

\* NAME Accredited \*



**Requested Service:** Autopsy
  **Agency:** Chatham Co. Coroner
  **Agency Ref#:**
  **Requested by:** S. Smith

**Case Individuals:**
  Victim: MATHEW AJIBADE

**Evidence:**
  2014-6006596-001      DECEDENT

**Results and Conclusions:**
  Evidence Submission: 001
    SUMMARY OF AUTOPSY FINDINGS:

  I. Decedent being detained in booking area of Chatham County jail at time of death
  II. Physical altercation with law enforcement personnel
      A. Multiple superficial abrasions of the torso and extremities
      B. Perioral lacerations and contusions
      C. Scalp contusion, right occipital scalp
      D. Small volume subdural hemorrhage
      E. Bilateral subpleural pulmonary contusions
      F. Multiple conducted electrical weapon applications - left hip, right leg, and abdomen
  III. Physical restraint following physical altercation
      A. Decedent restrained in restraint chair
      B. Spit mask over head
  IV. Myocardial bridging, left anterior descending coronary artery
  V. Rare focus of abnormal myocytes, interventricular septum
  VI. History of bipolar disorder
  VII. Blood toxicologic testing results:
      A. THC level (marijuana): 11 ng/mL
      B. THC-COOH level (marijuana metabolite): 44 ng/mL
      C. 11-OH-THC (marijuana metabolite): 2.1 ng/mL
      D. Negative for ethanol
  VIII. Vitreous fluid analysis results limited by specimen quality, per Grady Hospital Labs
      A. Sodium 135 mEq/L, Chloride 111 mEq/L, Potassium >10.0 mEq/L, Creatinine 1.0 mg/dL; Specimen unsuitable for urea nitrogen and glucose analysis

CAUSE OF DEATH:

Sudden death associated with physical altercation with law enforcement personnel and subsequent restraint

OTHER SIGNIFICANT CONDITIONS:

Use of conducted electrical weapon

MANNER OF DEATH:

Homicide

OPINION:



PLAINTIFF'S EXHIBIT P1

Report Date: 04/14/2015
Report Id: MC7ZR48Z0NW3QY
Template Rev. 2014-12-02

PA00918

It is my opinion that the death of Matthew Ajibade, a 21-year-old man, is classified as sudden death associated with a physical altercation with law enforcement personnel and subsequent restraint. A conducted electrical weapon (TASER) was also employed during the restraint process.

Timeline summary:
Mr. Ajibade was arrested at his home on the evening January 1, 2015, following a physical altercation with his girlfriend. During the arrest, responding officers were required to take Mr. Ajibade on the ground for resisting arrest. Following the arrest, he reportedly appeared uninjured and refused medical attention at the scene.

Video surveillance footage captures the arrival of Mr. Ajibade in the back seat of the patrol car and his subsequent transfer into a holding cell at 19:43. During this process, Mr. Ajibade appears calm and cooperative. He does not appear agitated or overly excited. He remains in the holding cell alone, in view of a surveillance camera, for the next 3 hours and 45 minutes. During this time period, he is seen alternately sitting, standing, laying down, and using a phone in the cell. At one point, he removes his shirt, but puts it back on a short time later. He appears generally calm.

At 23:28, the holding cell door opens and Mr. Ajibade is approached by an officer who gives a direction for him to sit at a desk across the room. Mr. Ajibade initially walks across the room, but then refuses the command to sit. Over the next 4 minutes, he continues to resist commands, but appears calm and not agitated. At 23:32, three male officers take him to the ground in the supine position and he begins thrashing about. A struggle ensues. A female officer is seen approximately 30 seconds later applying a conducted electrical weapon (drive stun mode) in the left lower back/hip region through the decedent's underwear. Several additional officers join the struggle. The conducted electrical weapon is applied again to the posterior right thigh. The decedent is finally subdued, lying prone on the ground with his hands behind his back and ankles bound, at 23:38. He is lifted in the same position by the arms and legs, and carried into a separate holding area and into a holding cell. A restraint chair is seen being wheeled into the holding cell and a spit mask is retrieved. Mr. Ajibade is no longer in view of a surveillance camera, but officers admit to restraining him in the chair with his hands handcuffed behind his back, ankles secured to the chair legs, chest straps secured properly across his chest, and the spit mask appropriately placed over his head. Officer reports that the decedent was uncooperative while officers were transferring him to the restraint chair and the conducted electrical weapon was applied again to the abdominal region, in an attempt to gain compliance. All of the officers exit the holding cell and the door is closed at 23:48. Officers are seen observing Mr. Ajibade through the door's viewing window at 23:50 (~21 sec), 23:55 (~6 sec), 23:56 (~13 sec), and 00:09 (~30 sec).

At 01:36 on January 2, 2015, a female officer observes the decedent through the viewing window. At 01:37, she opens the door for approximately 20 seconds, then closes it. She and a second officer return at 01:38 and enter the cell. Mr. Ajibade was reportedly unresponsive at this time, with his head slumped over to the side. The spit mask and chest straps were reportedly still appropriately in place on the body. Over the next 4 minutes, several other officers arrive and the restraint chair is wheeled out at 01:43 with Mr. Ajibade still in it. He appears unresponsive. He is subsequently removed from the chair and CPR is started. A nurse arrives at 01:48 and takes over CPR. Emergency medical personnel arrive at 01:59 and appear to pronounce death.

Officers admit to delivering multiple strikes and kicks to the decedent during the struggle in an attempt to subdue him, including an inadvertent kick to the head. At autopsy, Mr. Ajibade was found to have multiple fresh blunt force injuries, including lacerations of the lips and generalized abrasions and contusions of the body, consistent with having been in a physical altercation. None of these injuries would have been lethal. Additionally, an isolated blunt impact site in the form of subscalpular hemorrhage was present on the posterior right side of the head, and there was a thin film of subdural hemorrhage covering the brain. This injury, as well, is not necessarily lethal. Autopsy also revealed myocardial bridging of the left anterior

descending coronary artery of the heart, a condition characterized by alteration of the normal epicardial course of a coronary artery into the myocardium. When this occurs, the artery is subjected to constriction when the heart contracts, which decreases blood flow and oxygen delivery to the heart muscle cells, thereby predisposing the individual to the development of cardiac dysrhythmias (abnormal heart rhythm). Additionally, a focus of abnormal myocytes was present within the heart. The etiology and significance of this finding is unclear.

Use of a conducted electrical weapon was admitted by law enforcement officers and was subsequently confirmed by interrogation of the weapon. The electrical stuns were delivered to the lower torso and extremities, and there is no evidence of precordial weapon discharges.

Mr. Ajibade has a reported medical history of bipolar disorder. He had been prescribed valproic acid (a mood stabilizing drug) in the past, but was reportedly non-compliant with his medication. However, Mr. Ajibade did not appear to be experiencing a manic or psychotic episode at the time of the altercation in the jail.

Blood toxicologic testing results were positive for marijuana and metabolites of marijuana. No other illicit or therapeutic drugs were present in his system.

Given the information available at this time, it is most likely that the decedent suffered a fatal cardiac dysrhythmia due to the excited physiological state induced by the extreme physical exertion, anxiety, and pain of the physical altercation. Additionally, Mr. Ajibade was left unattended for a period of 1 ½ hours, fully restrained in a restraint chair with a spit mask over his nose and mouth, and an asphyxial component to his death cannot be ruled out. The manner of death is classified as Homicide.

DATE, TIME, AND PLACE OF EXAMINATION:

Under the provisions of the Georgia Death Investigation Act, a complete autopsy is performed on the body of Mathew Ajibade in the morgue of the Georgia Bureau of Investigation, Division of Forensic Sciences in Decatur, Georgia on Tuesday, January 6, 2015, commencing at 0900 hours.

PRESENTATION, CLOTHING, AND PERSONAL EFFECTS:

The body is received in the supine position in a black plastic disaster bag. Attached to the bag are two identification tags bearing the decedent's name and "Chatham County". An identification tag inscribed with the decedent's name encircles the left great toe. A white sheet is beneath the body and is discarded. A yellow-metal necklace encircles the neck and is released with the body.

The body is clad in the following:

1. White long-sleeve shirt (previously cut/torn) with focal red-brown stains on the sleeves and around the collar
2. Gray underwear

The following items are submitted with the body:

1. A brown paper bag labeled "1-2-15, 7:30 am, Black clothing in main area by cell door, marker #3" which contains a pair of black sweatpants, turned inside out.
2. A brown paper bag labeled "1-2-15, 7:30 am, White/mesh prisoner face mask with suspected blood, marker #8" which contains a mask-like device. The mask is constructed with white fabric comprising the lower portion of the mask and fine black mesh at the top of the mask, which is secured with a white plastic disk. There is a band-like area of dark red-brown staining, consistent in appearance with blood, on the inner surface of the mask.

The mask and all articles of clothing are retained in this facility.

DIAGNOSTIC AND THERAPEUTIC DEVICES AND MARKINGS:

1. Defibrillator pads are on the right upper chest and left lateral chest.
2. A total of four electrocardiogram pads are on both sides of the chest and abdomen.

POSTMORTEM IMAGING STUDIES:

Two, full-body, x-ray images of the body are obtained and reveal what appear to be two false teeth in the front of the mouth. No radiopaque projectiles are seen in the head, torso or extremities.

POSTMORTEM CHANGES:

The body has been refrigerated and is cold to the touch. Rigor mortis is generalized, fully developed, and difficult to break. Postmortem lividity is difficult to appreciate, secondary to skin pigmentation. The corneas show early film formation. The vermillion borders of the lips and mucous membranes are slightly dry. The body is well-preserved.

FEATURES OF IDENTIFICATION:

The body is unembalmed and that of a dark-skinned male, appearing consistent with the reported age of 21 years, measuring 69" in length and weighing 191 pounds, as received. The body is well-developed and well-nourished. The frontal hairline and sides of the head have been shaved to approximately 1/8" in length. The remaining, coarse, black head hair is styled into innumerable dreadlocks, which range up to 6" in maximum length. Facial hair consists of a thin black French beard, soul patch, and light facial beard. The irides appear dark brown. The natural teeth are in a good state of repair. A 1 5/8 x ½" obliquely-oriented, keloidal scar is on the lateral left side of the upper back. A 5 ½" linear, obliquely-oriented scar is on the volar right forearm. A ½" fine linear scar is on the interphalangeal joint of the dorsal right thumb. A 1 x ¾" ovoid scar is on the left lower leg. No tattoos are seen.

EVIDENCE OF ACUTE INJURY:

Head:

1. A 5/8 x ¼" faint pink-purple contusion, with mild underlying soft tissue swelling, is on the right side of the face, just inferior to the lateral canthus of the right eye.
2. A 1/2" fine, curvilinear, crusted abrasion is at the tip of the nose.
3. A 1 ¼" linear array of superficial lacerations, measuring approximately 3/16" each, is on the buccal mucosa of the right side of the lower lip, extending toward the rear of the mouth.
4. A 1" linear array of superficial and deep lacerations, measuring approximately 3/16" each, is on the buccal mucosa of the left cheek, extending posteriorly from the left labial commissure.
5. A ½ x 5/8" dark purple contusion is on the mandibular alveolar mucosa on the left.
6. A 1 ¼ x 1" area of subscalpular hemorrhage is on the right occipital scalp.
7. A thin film of subdural hemorrhage covers the cerebral hemispheres, most pronounced over the parietal lobes, and has an estimated volume of approximately 10 cc.

Torso:

1. Two obliquely-oriented faint purple contusions are on the right side of the abdomen, centered 5 ½" inches right of the anterior midline. The superior-most area of discoloration exhibits a superimposed, 3/16" linear brown abrasion. The inferior-most area of discoloration exhibits a superimposed punctate brown abrasion. Each contusion exhibits a ½ x ¼" faint blue-purple subcutaneous hemorrhage.
2. A 5/8 x ¼" longitudinally-oriented, faint purple contusion is on the right side of the lower abdomen, centered 4 ¾" right of the anterior midline. A 3/8 x ¼" faint pink-red subcutaneous hemorrhage is beneath the contusion.
3. A ½ x 3/16" transversely-oriented area of subcutaneous hemorrhage is on the lower right chest.

4. A 5/8 x ¼" curvilinear area of red-purple subcutaneous hemorrhage is on the lower left lateral chest.
5. A ¾ x 7/16" faint brown abrasion is on the right side of the upper back.
6. Two, focal areas of red-purple subcutaneous hemorrhage, measuring ½ x 3/8" each, are on the right side of the back.
7. A 7/16 x 1/8" deep, dried red-brown abrasion is on the left side of the upper back and lies ½" medial to a superficial punctate abrasion. A 3/8" area of intramuscular hemorrhage, which extends approximately 3/8" deep, is in the left trapezius muscle, beneath these abrasions.
8. A 2 1/8 x 3/8" transversely-oriented, superficial brown abrasion is on the left side of the lower back. A 6 x ¾" transversely-oriented area of hemorrhage involves the subcutaneous adipose tissue beneath this abrasion.
9. A 7/16" faint linear brown abrasion is on the lateral left hip.
10. There is a 7/8 x ¾" focus of subpleural hemorrhage, extending approximately 5/16" into the lung parenchyma, involving the anterolateral lower lobe of the left lung. A similar ¾ x 3/8" focus of subpleural hemorrhage is on the posterolateral lower lobe of the right lung.

Extremities:

1. A 1 ½ x 1" teardrop-shaped, dried, dark brown abrasion is on top of the right shoulder.
2. Two, superficial red-brown abrasions, measuring 1/16" each, are on the anterior right shoulder.
3. A cluster of superficial and deep abrasions, ranging in size from 3/16" to ¼", is on the posterior right elbow.
4. A 3/16 x 3/16" dried brown abrasion is on the proximal interphalangeal joint of the right 2nd finger.
5. A cluster of three, dried brown abrasions, measuring 1/16", 3/16" and 5/8 x ½", is on top of the left shoulder.
6. A ¼" circular, dried brown abrasion is on the posterior left elbow.
7. A 5/8 x 5/8" area of subcutaneous hemorrhage is on the posterior left elbow beneath the abrasion.
8. A 1 1/8" curvilinear red-brown abrasion is on the volar left forearm.
9. A 3/8 x ¼" irregular brown abrasion is on the ulnar aspect of the left wrist.
10. A 2 ¼ x 2 ¼" area of faint pink-red discoloration is on the dorsal left wrist.
11. A 1 3/8 x 1 3/8" area of faint pink-red discoloration is on the ventral left wrist.
12. Two, superficial brown abrasions, measuring 1/8" and less than 1/16", are on the dorsal left 4th metacarpophalangeal joint.
13. A 3/8 x 7/16" superficial brown abrasion is on the anteromedial distal right thigh.
14. A 1/16" brown abrasion and a ½ x 3/16" red-brown abrasion are on the right lateral malleolus. The larger abrasion exhibits focal undermining of the epidermis superiorly.
15. A 5/8 x 9/16" dried red-brown abrasion is on the posteromedial left calf.
16. A ¼" longitudinally-oriented, linear, dried brown abrasion is on the anterior left shin.
17. Two, dried, brown abrasions, measuring 1/8" circular and ¼" linear, are on the left lateral malleolus.

These injuries, having been described above, will not be repeated.

EXTERNAL EXAMINATION:

The head is normocephalic. The face is morphologically unremarkable. The facial bones and mandible are free of palpable fracture. The conjunctivae are clear. Neither facial nor ocular petechiae are seen. The sclerae are anicteric. The nose is normally formed. The teeth, tongue and gums are free of injury. The external meati, pinnae, and mastoid regions are unremarkable. Each earlobe appears to contain one remote piercing defect.

The trachea is within the midline of the atraumatic neck. The neck is neither crepitant nor excessively mobile. There are no palpable masses.

The chest is stable and symmetric. The abdomen is flat and free of palpable organomegaly and masses. A 3/16" circular, flat black nevus is on the posterior left shoulder. The spine

appears straight and free of injury.

The extremities are symmetrical and well-developed. The appendicular skeleton is stable to palpation and manipulation. All digits are present. The fingernails are intact, trimmed short, and are free of underlying dirt and debris. There is no peripheral edema. The toenails are intact and trimmed short.

The penile foreskin is short and the testes are descended bilaterally into the scrotum. The external genitalia, perineum, and anorectal areas appear normally formed. The inguinal regions and buttocks are normal.

There is no cervical, axillary, or inguinal lymphadenopathy.

INTERNAL EXAMINATION:

Head:

Please see "Evidence of Acute Injury".

The scalp is reflected using the standard intermastoidal incision. The calvarium is intact. The dura is intact and free of discoloration and thickening. The base of the skull is examined after stripping the dura and is intact. The leptomeninges are thin and transparent. No epidural or subarachnoid hemorrhage is seen. The brain weighs 1340 grams. No brain swelling or herniation is seen. The vessels over the brain are congested. The gyri and sulci are of normal distribution and development. The circle of Willis is normally distributed and free of atherosclerosis and aneurysm. The cerebellum, brainstem, and upper cervical spinal cord appear normally formed. The substantia nigra is normally pigmented. No focal or mass lesions are seen on external or cut brain surfaces. The ventricular system is normally formed.

Neck:

The skin of the neck is reflected to the angle of the mandible. Layered dissection of the strap muscles in the neck reveals no intramuscular or subcutaneous soft tissue hemorrhages. No trauma to the major airway or vital structures in the neck is seen. No airway mucosal edema is seen. The mucosa of the left aryepiglottic fold exhibits multiple papules ranging in size from 0.2 to 0.4 cm. The hyoid bone and laryngeal cartilages are free of fracture. The epiglottis is neither inflamed nor swollen. No foreign objects are in the airway. The carotid vessels are pliable and patent. The anterior cervical spine and atlanto-occipital joint are stable to palpation and manipulation.

Chest and Abdomen:

The skin of the chest and abdomen is reflected using the usual "Y"-shaped incision and exhibits the previously described subcutaneous hemorrhages. No intramuscular hemorrhages are seen. The sternum and chest plate are intact and upon their removal, no abnormal fluid or blood accumulations are in the body cavities. No unusual odors or color changes are noted. Examination of the organs in-situ shows normal organ morphology and relationships. The diaphragms are intact. The organs are removed using the Virchow technique.

Cardiovascular System:

The heart weighs 340 grams and exhibits the normal four-chambered anatomy. The red-brown myocardium is free of discrete lesions. The following wall thicknesses are measured: left ventricle 0.9 cm, interventricular septum 1.1 cm, right ventricle 0.3 cm. The coronary arteries are normally distributed with a right dominant distribution and are patent throughout their lengths. A 1.3 cm segment of myocardial bridging involves the proximal left anterior descending coronary artery, which extends approximately 0.3 cm deep to the epicardium. The epicardium, valve leaflets, chordae tendinae, and endocardium appear normally formed. The thoracoabdominal aorta and its major branches are normally distributed and exhibit scattered

fatty streaks.

Respiratory System:

Please see "Evidence of Acute Injury".

The trachea, hilar structures, and major vessels are grossly unremarkable. A small amount of regurgitated gastric content is in the trachea. The right and left lungs weigh 500 grams and 420 grams, respectively. The pleural surfaces are smooth and glistening. The red-purple cut surfaces are free of consolidation, thrombosis, embolism, infarction, and neoplasia.

Gastrointestinal System:

The tongue is without evident injury. The esophagus is lined by an unremarkable gray-tan mucosa. The gastric mucosa is normally rugated and the stomach contains approximately 60 cc of tan-brown unidentifiable digestate. No pills or pill fragments are seen. The small bowel, colon, and rectum are palpably unremarkable. No mucosal lesions are seen throughout the bowels. The colon contains a moderate amount of green-brown feces. The appendix is in the right lower quadrant of the abdomen.

Hepatobiliary System:

The liver weighs 1320 grams. The intact capsule is of normal thickness. The homogeneous dark red-brown parenchyma is free of steatosis, cirrhosis, and neoplasms. The gallbladder is normally formed and contains approximately 5 ml of thin green bile and no stones. The pancreas shows the normal lobular architecture, moderate autolysis, and is free of hemorrhage, fibrosis and fat necrosis.

Genitourinary System:

Each kidney weighs 140 grams. The capsules strip with ease revealing smooth cortical surfaces. The red-purple cut surfaces, including the pyramids, calyces, pelves, and vessels, are grossly unremarkable. The ureters are of normal caliber. The urinary bladder is normally formed and contains approximately 250 ml of clear yellow urine. The prostate gland is of normal size and has an unremarkable white-tan cut surface. The testes are symmetrical, of normal size, and have an unremarkable tan cut surface.

Reticuloendothelial System:

The spleen weighs 120 grams. The intact capsule is of normal thickness. The cut surface is dark red. The red pulp and white pulp appear normally distributed. No focal lesions are seen. Regional lymph nodes are grossly unremarkable. A small amount of residual thymus gland is present and unremarkable.

Endocrine System:

The thyroid gland is symmetrical and of normal size. The homogenous, dark purple parenchyma is free of hemorrhage, nodules, and cysts. The adrenal glands are symmetrical, of normal size, and are free of hemorrhage and nodularity.

Musculoskeletal System:

Please see "Evidence of Acute Injury".

The axial skeleton is free of fracture. No subcutaneous or intramuscular hemorrhages are noted in the posterior thighs. The dark red-brown skeletal muscles are symmetrical and grossly unremarkable. Reflection of the skin of the back, posterior extremities, and soles of feet reveals the previously described soft tissue hemorrhages. Dissection of the soft tissues of the posterior neck shows no evidence of intramuscular hemorrhage.

MICROSCOPIC DESCRIPTION:

Fourteen (14) hematoxylin-and-eosin stained slides are examined.

Slide Key:
1: Liver, Left adrenal gland, Left kidney
2: Thyroid gland, Prostate gland, Testis
3: Right kidney, Right adrenal gland
4: Spleen, Lymph node, Thymus gland
5: Left lung (x2)
6: Right lung (x3)
7: Coronary artery (x3)
8: Left ventricle (x2)
9: Right ventricle, Interventricular septum
10: Medulla, Substantia nigra
11: Pancreas, Pituitary gland
12: Laryngeal papules, Dura mater
13: Cerebral cortex, Hippocampus
14: Basal ganglia, Cerebellum

Cardiovascular System:
Sections of ventricular myocardium show generally normal myocytes and normal myofiber organization, except for a subendocardial area of enlarged, haphazardly oriented myocytes in the interventricular septum. No inflammation or fibrosis is seen. Sections of coronary artery show mild eccentric fibrointimal hyperplasia without significant luminal narrowing, and confirm myocardial bridging.

Respiratory System:
Sections of the lungs show scattered intra-alveolar macrophages and patchy intra-alveolar edema fluid. There is vascular congestion and extravasated intra-alveolar erythrocytes. The airways are patent and unremarkable. No acute inflammation, giant cells, or viral cytopathic effects are seen. No polarizable foreign material is seen. Sections of laryngeal mucosa papules show prominent submucosal lymphoid aggregates.

Hepatobiliary System and Pancreas:
A section of liver exhibits microvesicular steatosis involving approximately 10% of the sampled parenchyma. The portal areas are free of inflammation and fibrosis. Bile ducts are unremarkable. There is deposition of granular formalin pigment within the section. An iron stain is negative. A section of pancreas shows marked autolysis and no discernible histopathology.

Urogenital System:
Sections of the kidneys show normal architecture with unremarkable glomeruli, tubules, and vessels. No polarizable foreign material is seen. A section of prostate gland shows a minor focus of chronic inflammation. The testis shows no significant histopathology.

Reticuloendothelial System:
Sections of spleen and lymph node displays normal lymphoid architecture, with anthracotic pigmentation within the lymph node. A section of thymus gland shows fibroadipose tissue with scattered nest of lymphocytes.

Endocrine System:
Sections of thyroid and adrenal glands show normal architecture with no significant histopathology.

Central Nervous System:
Sections of brain and pituitary gland show normal cytoarchitecture. The gray and white matter are unremarkable. No inflammatory or neoplastic process is seen. There are patchy

microcalcifications within the dura.

OTHER PROCEDURES:

1. Central blood, peripheral blood, vitreous fluid, and urine are submitted for toxicologic testing.
2. An air-dried blood spot card is retained in this facility.
3. Documentary and identification photographs are obtained.
4. A vitreous fluid sample is submitted to Grady Memorial Hospital labs for electrolyte analysis.
5. A sample of plucked head hair is retained in this facility.
6. Fingernails clippings are obtained and retained in this facility.
7. Postmortem fingerprints are obtained.
8. Articles of clothing are retained in this facility.
9. Representative tissue sections are processed to slides in 14 cassettes.
10. Personal effects are released with the body.
11. The examined organs are returned to the body cavity.
12. Jail video surveillance footage is reviewed.

Only those items discussed in the results above were analyzed for this report. The above represents the interpretations/opinions of the undersigned analyst. Evidence analyzed in this report will be returned to the submitting agency. Biological evidence (body fluids and tissues) and fire debris extracts will be destroyed after one year. This report may not be reproduced except in full without written permission of the laboratory.

Technical notes and data supporting the conclusions and findings in this report are maintained within the laboratory case records.

This case may contain evidence that must be preserved in accordance with O.C.G.A. § 17-5-56.

*Stacey M. Desamours, MD*

Stacey Desamours
Associate Medical Examiner

**Related Agencies:**

| Chatham Co. Sheriff's Office | ACN: SOIAID0115001 |
| GBI-Medical Examiner-HQ DOFS | ACN: DESAMOURS |
| Chatham Co. District Attorney | |
| Savannah/Chatham Metro Police Dept. | ACN: 150101045 |
| DOC-Internal Affairs - Forsyth | |
| Eastern Judicial Circuit | |
| GBI-Reg. 05-Statesboro | ACN: 0500973415 |

### End of Official Report

# Official Report



**Division of Forensic Sciences**
**Georgia Bureau of Investigation**
**State of Georgia**

**Headquarters**
**DOFS Case #:** 2014-6006596
**Report Date:** 01/12/2015

George Herrin, Jr., Ph.D.
Deputy Director

*ASCLD/LAB-International*
* Accredited *



**Requested Service:** Blood Alcohol - Postmortem
**Agency:** GBI-Reg. 05-Statesboro
**Agency Ref#:** 0500973415
**Requested by:** P Smith

**Case Individuals:**
Victim: MATHEW AJIBADE

**Evidence:**
On 01/06/2015, the laboratory received the following evidence from the GBI-Medical Examiner-HQ DOFS via Lockbox.

| | |
|---|---|
| 2014-6006596-002 | Sealed plastic bag(s) containing the following items identified as collected from Mathew Ajibade |
| 2014-6006596-002A | Four tube(s) containing central blood |
| 2014-6006596-002B | One tube(s) containing peripheral blood |
| 2014-6006596-002C | One tube(s) containing blood |
| 2014-6006596-002D | Three tube(s) containing urine |
| 2014-6006596-002E | One tube(s) containing vitreous fluid |
| 2014-6006596-002F | One jar containing liver |
| 2014-6006596-002G | One jar containing gastric contents |

**Results and Conclusions:**

**Subm#: 002B**
1) Ethyl Alcohol Result by Gas Chromatography: negative

**Measurement Uncertainty:**
Estimations of measurement uncertainty for ethyl alcohol, methyl alcohol, isopropyl alcohol and acetone concentrations are reported at a coverage probability of 99%.

Only those items discussed in the results above were analyzed for this report. The above represents the interpretations/opinions of the undersigned analyst. Evidence analyzed in this report will be returned to the submitting agency. Biological evidence (body fluids and tissues) and fire debris extracts will be destroyed after one year. This report may not be reproduced except in full without written permission of the laboratory.

Technical notes and data supporting the conclusions and findings in this report are maintained within the laboratory case records.

This case may contain evidence that must be preserved in accordance with O.C.G.A. § 17-5-56.

*Kasey Wilson*
Kasey Wilson
Forensic Toxicologist

**Related Agencies:**
Chatham Co. Coroner

Chatham Co. Sheriff's Office  ACN: SOIAID0115001  
GBI-Medical Examiner-HQ DOFS  ACN: DESAMOURS  
Chatham Co. District Attorney  
Savannah/Chatham Metro Police Dept.  ACN: 150101045  
DOC-Internal Affairs - Forsyth  
Eastern Judicial Circuit

## End of Official Report

## Official Report



**Division of Forensic Sciences**
**Georgia Bureau of Investigation**
**State of Georgia**

**Headquarters**
**DOFS Case #:** 2014-6006596
**Report Date:** 01/20/2015

George Herrin, Jr., Ph.D.
Deputy Director

"ASCLD/LAB-International"
* Accredited *



**Requested Service:** Toxicology - Postmortem
**Agency:** GBI-Reg. 05-Statesboro
**Agency Ref#:** 0500973415
**Requested by:** P Smith

**Case Individuals:**
Victim: MATHEW AJIBADE

**Evidence:**
On 01/06/2015, the laboratory received the following evidence from the GBI-Medical Examiner-HQ DOFS via Lockbox.

| Submission # | Description |
|---|---|
| 2014-6006596-002 | Sealed plastic bag(s) containing the following items identified as collected from Mathew Ajibade |
| 2014-6006596-002A | Four tube(s) containing central blood |
| 2014-6006596-002B | One tube(s) containing peripheral blood |
| 2014-6006596-002C | One tube(s) containing blood |
| 2014-6006596-002D | Three tube(s) containing urine |
| 2014-6006596-002E | One tube(s) containing vitreous fluid |
| 2014-6006596-002F | One jar containing liver |
| 2014-6006596-002G | One jar containing gastric contents |

**Results and Conclusions:**

**Drug Screen Results by:** Immunoassay

| Subm#: | Drug Screen Classification | Result |
|---|---|---|
| 002A | blood-barbiturates | Negative |
| | blood-cannabinoids (marijuana) | Indicative |
| | blood-certain benzodiazepines | Negative |
| | blood-cocaine/cocaine metabolites | Negative |
| | blood-common opioids | Negative |

**Drug Confirmation Results**
Submission 002A
1) Negative for: {GC/MS}
   certain amphetamines, such as methamphetamine
2) Negative, certain basic drugs {LC/MS/MS}
   such as citalopram and methadone

Submission 002B
1) Positive, THC, 11 ng/mL (+/- 1 ng/mL) {LC/MS/MS}
   delta-9-tetrahydrocannabinol
2) Positive, THC-COOH, 44 ng/mL (+/- 6 ng/mL) {LC/MS/MS}
   11-nor-delta-9-tetrahydrocannabinol-9-carboxylic acid, a metabolite of THC
3) Positive, 11-OH-THC, 2.1 ng/mL (+/- 0.3 ng/mL) {LC/MS/MS}
   11-hydroxy-delta-9-tetrahydrocannabinol, a metabolite of THC

**Abbreviations:**
GC/MS = Gas chromatography/Mass Spectrometry
LC/MS/MS = Liquid Chromatography/Mass Spectrometry/Mass Spectrometry

**Measurement Uncertainty:**
Estimations of measurement uncertainty for all toxicology quantitations are reported at a coverage probability of 95.45%.

Only those items discussed in the results above were analyzed for this report. The above represents the interpretations/opinions of the undersigned analyst. Evidence analyzed in this report will be returned to the submitting agency. Biological evidence (body fluids and tissues) and fire debris extracts will be destroyed after one year. This report may not be reproduced except in full without written permission of the laboratory.

Technical notes and data supporting the conclusions and findings in this report are maintained within the laboratory case records.

This case may contain evidence that must be preserved in accordance with O.C.G.A. § 17-5-56.

*Jessica M Mehan*

Jessica Mehan
Forensic Toxicologist

**Related Agencies:**
Chatham Co. Coroner
Chatham Co. Sheriff's Office          ACN: SOIAID0115001
GBI-Medical Examiner-HQ DOFS          ACN: DESAMOURS
Chatham Co. District Attorney
Savannah/Chatham Metro Police Dept.   ACN: 150101045
DOC-Internal Affairs - Forsyth
Eastern Judicial Circuit

**End of Official Report**