# EXHIBIT R

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

```
SOLOMAN OLUDAMISI AJIBADE and   )
ADENIKE HANNAH AJIBADE, as      )
natural parents of Mathew       )
Ajibade, and THE ESTATE OF      )
MATHEW AJIBADE and CHRIS        )
OLADAPO, its Executor,          )
                                )
          Plaintiffs,           )
                                )
     vs.                        )CIVIL ACTION NO.
                                )
JOHN WILCHER, in his official   )4:16-CV-82-WTM-GRS
capacity as Chatham County      )
Sheriff, et al.,                )
                                )
          Defendants.           )
                                )
```

DEPOSITION OF

GREGG RHODE

March 30, 2017

9:41 a.m.

Oliver Maner

218 West State Street

Savannah, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

```
 1                APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3        WILLIAM F. CASH III, Esq.
          LEVIN, PAPANTONIO, THOMAS, MITCHELL,
 4            RAFFERTY & PROCTOR, P.A.
          316 South Baylen Street
 5        Suite 600
          Pensacola, Florida   32502
 6        850-435-7163
          bcash@levinlaw.com
 7

 8   On behalf of the Defendants Debra Johnson
     and Andreux Evans-Martinez:
 9
          LAUREN E.H. MEADOWS, Esq.
10        OLIVER MANER LLP
          218 West State Street
11        Savannah, Georgia   31401
          912-236-3311
12        lmeadows@olivermaner.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   On behalf of the Defendants Corizon Health, Corizon,
     and Gregory Brown:
 2
         EMILY C. WARD, Esq.
 3       CARLOCK COPELAND & STAIR LLP
         191 Peachtree Street, NE
 4       Suite 3600
         Atlanta, Georgia  30303-1740
 5       404-522-8220
         eward@carlockcopeland.com
 6
         THOMAS A. WITHERS, Esq.
 7       GILLEN, WITHERS & LAKE, LLC
         8 East Liberty Street
 8       Savannah, Georgia  31401
         912-447-8400
 9       twithers@gwllawfirm.com

10
     On behalf of the Defendants Sheriff John Wilcher and
11   the Chatham County Detention Center:

12       JENNIFER R. BURNS, Esq.
         CHATHAM COUNTY ATTORNEY'S OFFICE
13       124 Bull Street
         Suite 240
14       Savannah, Georgia  31401
         912-652-7881
15       jburns@chathamcounty.org

16

17

18

19

20                          - - -

21

22

23

24

25
```

1    Q.    How long had you been in internal affairs?
2    A.    I was transferred there as a sergeant in
3  2011, I believe.  And then I was promoted in 2015 to
4  lieutenant, in December of 2015, I think.  And then I
5  took over that unit as commander in IA that December
6  of 2015, if I'm not mistaken.  And then January 20 --
7  no.  December 2014 -- I'm getting my years confused.
8  What day did --
9    Q.    The death -- he came into the jail on
10 January 1st, 2015.
11   A.    2015.  It was December 2014 --
12   Q.    Okay.
13   A.    -- that I took over.  And then 20 --
14 January he dies.
15   Q.    Right.  Died on the morning of January
16 2nd.
17   A.    Okay.
18   Q.    Okay.  So a month before you had become
19 commander of the IA unit?
20   A.    Correct.
21   Q.    All right.
22   A.    But I had worked in the unit since 2011.
23   Q.    Okay.  And just so I'm clear, the
24 commander is the top executive in the IA unit?
25   A.    Over that unit.

Page 25

1      Q.    Okay.  Let me ask you about the Taser
2   policies.  This is a good time to get into that.  The
3   Tasers, as we understand, were pulled in May of 2015;
4   right?
5      A.    I have no idea when they were pulled.
6      Q.    You remember that happening?
7      A.    I do recall it happening.  I just don't
8   know when.
9      Q.    Okay.  Do you recall anything that was
10  done with the Tasers after that point?
11     A.    Yes.  I tasked somebody with pulling an
12  investigator to pull in all the video off of it.  If
13  anything was suspect, we addressed it.
14     Q.    And who was that?
15     A.    That was -- I want to say it was
16  Jeffrey Young.
17     Q.    Okay.  We've heard of an officer named
18  O'Neill Young.  Is that the same person or is that
19  someone different?
20     A.    O'Neill Young?
21     Q.    Yeah.
22     A.    I don't know who that is.
23     Q.    Okay.  All right.  So Mr. Young.  So
24  Mr. Young, as I understand it, went through and
25  watched every video that was available, that was

Page 30

1    you look at it.  But to go headhunt and dig up and
2    try to compile information just to do it, that should
3    have been done by others.  That's -- and then when
4    they find it, they give it to us.
5         Q.    Right.
6         A.    That's how it works.
7         Q.    So our record's clear, you're saying that
8    supervisors should have been responsible to see what
9    deputies were doing.  And if they had a problem, they
10   should have referred it to you for --
11        A.    That's what supervisors do.
12        Q.    Right.
13        A.    And if it's not done that way, then we
14   don't have anything to act on.
15        Q.    So as I understand it, after coming out of
16   this review of every Taser that you could get your
17   hands on, and having Mr. Young watch every video that
18   he could find --
19        A.    Uh-huh.
20        Q.    -- I know at least one investigation that
21   involves Sergeant Moultrie.  I'm curious if you can
22   tell me are there other investigations that were
23   spawned as a result of watching these videos that you
24   can remember?
25        A.    There were.

1      Q.    Can you tell me who they were?
2      A.    No. I cannot -- names, I cannot remember.
3      Q.    Okay. Can you give me situations or, you
4   know --
5      A.    Okay. Let me say this. There was
6   investigation that -- I do recall one -- I don't
7   recall the officer's name -- that he was using the
8   Taser on his son or to threaten his son. And we
9   discovered that. We're like what is this? And he
10  had it at home. And he didn't do his homework or
11  something and he was clicking -- like what?
12           Okay. Well, that came from it. So we
13  investigated that. Hey, you can't do this. It's a
14  department-issued Taser. No. That's inappropriate.
15  So he was counseled on that. So that was an
16  investigation, so to speak. Not much of one --
17     Q.    Right.
18     A.    -- but an investigation nonetheless.
19           And so there were others that were looked
20  at. There were -- there was another one that it
21  looked egregious on its face, but then we read
22  reports and so forth before and after and so forth
23  and discovered it was not excessive. Or that was --
24  it did not appear to be excessive. Here's the
25  report.

1        So we did do investigations.  How many and
2   names, I cannot recall.
3        Q.   Would all those have been catalogued in a
4   certain place?
5        A.   Catalogued?
6        Q.   Let me put it to you this way.  Was there
7   a cover letter, a memo or a report to your boss that
8   said, hey, Rusty, here's a list of everything that
9   came out of the department-wide Taser review.  We're
10  done with the review.  Here are 11 investigations we
11  opened.  Signed me.
12            Was there anything tidy that wrapped it up
13  like that?
14       A.   I can't recall.
15       Q.   Okay.
16       A.   I can't recall.
17       Q.   If that didn't happen, would this stuff be
18  in IA Pro?
19       A.   Absolutely in IA Pro.  Everything's in IA
20  Pro.  Everything we did was in IA Pro.  Everything.
21       Q.   Okay.
22       A.   From background -- everything is in there.
23       Q.   The incident that you said looked
24  egregious but wasn't, can you recall more details
25  about who was involved and what the circumstances