# EXHIBIT S



# MEMORANDUM

**TO:**       **Major Russell Smith**

**FROM:**     **Sergeant Warren Blanton, Internal Affairs Unit**

**DATE:**     **July 09, 2015**

**RE:**       **Results of investigation SO-IA-UOF-05-15-037**

On 05/18/2015, Inv. P. Delatorre was assigned to investigate a complaint made by detainee Patrick A. Brinson (DIN P0312002). Brinson alleged he was Tased while in full restraints during a previous incarceration at the Chatham County Detention Center. The date of the incident was later determined to be December 03, 2013. Sgt. Jennifer Moultrie was determined to be the officer who Tased Brinson.

Inv. Delatorre interviewed Sgt. Moultrie in reference to Brinson's complaint. She admitted Tasing Brinson while he was fully restrained and being placed in the restraint chair. During the interview, she alluded to other incidents in which she Tased restrained individuals. Inv. Delatorre found two additional incidents involving Sgt. Moultrie Tasing fully restrained individuals, Detainees Hephzibah Abraham (DIN P1303256) on 11/25/2013 and Mozee, Christopher (DIN P0912231) on 07/16/2014. Sgt. Moultrie only properly completed mandatory paperwork (U.O.F. report, incident report) for one of the three incidents. She had no explanation as to why she did not complete the required reports properly. During the interview, Sgt. Moultrie admitted Tasing all three detainees while they were fully restrained.

A preponderance of the evidence suggests **Moultrie** possibly violated the following departmental policies:

**CONDUCT GENERAL**          3-01/010.05

**USE OF FORCE**             3-01/010.40

**INCOMPETENCE**            3-01/040.10

**NEGLECT OF DUTY**          3-01/040.20

**INCIDENTS, REPORTING OF**  3-01/015.30

**1** | P a g e

Sheriff1-007508

Cpl. Kimberly Richards was interviewed as to her actions involving Sgt. Moultrie's Tasings of Abraham and Brinson. She claimed to have no memory of either incident. Inv.'s Delatorre and T. Desautels provided her with reports of the two incidents. She still claimed not to remember any details of the incidents. She blamed her memory issues on a motor vehicle accident which occurred in 2005. She was asked how she could effectively perform her duties if she could not remember what those duties entailed. She stated she uses a notebook to help her remember important things.

It was discovered Richards testified before a Grand Jury in relation to the Brinson incident. She was asked how she could testify about an incident which she had no memory of. She stated she read from her incident report, but had no independent recollection.

A preponderance of the evidence suggests **Richards** possibly violated the following departmental policies:

**INCIDENTS, REPORTING OF**   3-01/015.30

**CONDUCT-GENERAL**        3-01/010.05

**INCOMPETENCE**          3-01/040.10

**NEGLECT OF DUTY**        3-01/040.20

Lt. Wanda Williams was interviewed in relation to Sgt. Moultrie's Tasing of detainee Mozee. She admitted she knew Sgt. Moultrie "accidentally" Tased Mozee using the attached Taser cartridge, although Moultrie claimed she meant to Drive-Stun him. Lt. Williams stated she discussed the incident with Maj. G. Wilson and both came to the decision Sgt. Moultrie would receive a counseling and Personnel Conduct Report (PCR) for her actions. When asked if she performed the disciplinary action, Lt. Williams admitted she never followed through.

A preponderance of the evidence suggests **Williams** possibly violated the following departmental policies:

**SUPERVISORS**                    3-01/005.05

**EVALUATION OF SUBORDINATES WORK**    3-01/005.10

I respectfully request this case be considered closed.

Sheriff1-007509

cc: Sheriff Al St. Lawrence
    Melissa Khone, Jail Administrator
    Major Kim Middleton
    Major Gloria Wilson

Sheriff1-007510

# CHATHAM COUNTY SHERIFF'S OFFICE

# INTERNAL AFFAIRS UNIT

# INVESTIGATIVE REPORT



| CASE NUMBER: | SO-IA-UOF-05-037 |
| INVESTIGATOR: | P. DELATORRE |
| DATE CLOSED: | |

**APPROVED BY:** _____ **DATE:** _____
Internal Affairs Commander

**REVIEWED BY:** _____ **DATE:** _____
Chief Deputy

Sheriff1-007511

| | CHATHAM CO. SHERIFF'S OFFICE<br>INTERNAL AFFAIRS UNIT | | CASE NUMBER:<br>SO-IA-UOF-05-15-037 |
|---|---|---|---|
| **INCIDENT:** USE OF FORCE | | **LOCATION:** CCDC | |
| **COMPLAINANT:** PATRICK DEANGELO BRINSON | | **INVOLVED EMPLOYEE(S):**<br>SGT. MOULTRIE, CPL. K. RICHARDS<br>DEP. C. TOWNSEND, DEP. O. YOUNG | |
| **ASSIGNED INVESTIGATOR:**<br>P. DELATORRE | **DATE:**<br>5/18/2015 | | |

## DETAILS:

On May 18, 2015, this Investigator was assigned to conduct an investigation which stemmed from a complaint made by Inmate Patrick Deangelo Brinson (DIN-P0312002). The complaint involved a Use of Force incident against Brinson during a previous arrest which took place on December 3, 2013. Brinson alleged he was placed in hand and leg restraints and was Tased by an officer.

## PATRICK D. BRINSON INTERVIEW:

On May 15, 2015 at 1336 hours, Investigators Young and Desautels conducted an interview with Brinson in reference to his complaint. According to Brinson, he was arrested and brought to the Chatham County Jail on December 3, 2013. He just discovered his mother died and said he "Lost his mind", even to the point he wanted to hurt himself. He admitted he tried to "Bust my head on the floor" while in the booking area of the jail.

When Brinson arrived at the jail deputies swapped handcuffs with the Pooler PD officers and placed him in hand and leg restraints due to his behavior. Deputies then moved Brinson to a cell where they attempted to place him in a restraint chair. Brinson was crying at the time and told deputies he did not want to be in the restraint chair. He said Pooler PD arrested him for crying in public. Pooler PD officers believed he was drunk because of his crying. Officers charged him with Public Drunkenness and transported him to the jail.

Once Brinson was placed in the restraint chair he continued to cry. He said Deputies Ransom, O'Neil, Townsend and Cpl. Richards were involved in the incident. He stated Sgt. Moultrie approached him and "Tased me for nothing, because I wouldn't stop crying and screaming". He said Sgt. Moultrie told him to stop crying and moving in the restraint chair before he was "Tased".

Brinson said he wrote down the information regarding the incident and gave it to a nurse but never heard anything afterwards. He never placed the information in the kiosk system because he believed something would have happened to him. He decided not to do anything until he began watching the news coverage about similar incidents. He was unsure he could prove his case, believing deputies would be protected.

Brinson said he recently received the discovery information on this case, which he is being prosecuted for at th present time. He mentioned having copies of the reports written by the deputies involved. He believed the reports said he was in the restraint chair when he was "Tased". He also denied telling Dep. Townsend he planned to shoot him in the head after leaving the jail. He denied he ever threatened to hurt deputies saying he only wanted to hurt himself. He believed the reports written by deputies were different and they are hiding something.

2

Sheriff1-007512

Brinson said he was "Tased" while he was in the restraint chair, with each hand and foot handcuffed to the chair. Brinson said he was in the restraint chair with his right and left wrists handcuffed to the restraint chair, his left and right ankles were also handcuffed to the restraint chair. He said waist straps were on him as well. Investigator Young asked Brinson if he was "Tased" after he was fully strapped to the restraint chair and he said "Yes". He said his complaint was based on him being "Tased" while he was fully restrained in the restraint chair. He said he would deal with the threats he was accused of making when he went to court.

Brinson denied he was drunk when he was arrested but did say he went to Jalapenos restaurant. He was drinking his first drink when he received a phone call from his sister. His sister told him his mother had died and he "Spit all the drink". He denied being drunk because he was in the process of drinking his first drink when he was told his mother died. Brinson said he remembered all the details about the day his mother died and his subsequent arrest. He said he would always remember everything about that particular day.

Brinson was asked to describe the person who "Tased" him (Sgt. Moultrie). Investigators reminded him his earlier statement was Sgt. Moultrie approached him from the front and "Tased" him. He said the person who "Tased" him was a black male, approximately 5 feet 8 inches in height. Brinson said Sgt. Moultrie was approximately as tall as both investigators. He was asked a second time if Sgt. Moultrie was male or female. Brinson was certain he was describing a male. He further described Sgt. Moultrie as having an average build but not skinny. Sgt. Moultrie was described as being approximately the size of Investigator Desautels.

Brinson said he did not remember any facial features, but for a third time said Sgt. Moultrie was a male. He recalled Sgt. Moultrie told him to be still and quiet. He denied attempting to rock the restraint chair. He felt the deputies were wrong because he was suffering at the time but was told to stop crying. He pointed out marks on his upper left bicep, which he said was made from being shot with the Taser prong. He showed two marks where the prongs entered his skin and had to be forcibly removed. He also said he was "Tased" two times, with the second time being in his chest. He said he also had two marks on his chest from the Taser. Investigators took pictures of the alleged prong marks on his left arm and chest.

Brinson said the two Tasing incidents took place about ten minutes apart. He said an unknown officer removed the prongs from his body. After the prongs were removed, an unknown nurse checked him for additional injuries. He said he began to cooperate in order to get a bond so he could see his mother before she died. He explained his mother was actually unresponsive and rushed to the hospital. He left Jalapenos restaurant and headed to the Murphy's gas station for gas and he was crying at the time. He said an attendant at the gas station called the police saying he smelled of alcohol. Brinson explained he smelled of alcohol because he spit his drink all over his clothing when he first heard about his mother.

Brinson said he did not understand why he was "Tased" when he was already in the restraint chair. Investigators wanted him to describe Sgt. Moultrie for a fourth time and again he said a black male was the deputy who "Tased" him. He said Sgt. Moultrie stood about 3 feet away from the front his body when he was "Tased". The first Taser shooting hit his upper left arm with the prongs entering his arm. The prongs were removed from his arms and, after he recovered, he cleared his throat of mucous and tears and spit it out.

Brinson was asked to describe the Taser itself. He described the Taser as "Black I believe" with a red beam. He said the Taser looked like "A Glock, like a pistol". He said Sgt. Moultrie had salt and pepper colored hair, with a moustache. He said he attempted to flip the restraint chair over and injure his head. Deputies entered the cell again and placed a helmet on his head. It was at this time Sgt. Moultrie shot him for a second time with the Taser on his chest. He said the prongs entered his chest area because he has scars on his chest from the Taser.

3

Unknown deputies removed the second set of prongs from his chest before the nurse arrived. A copy of this interview has been placed in the evidence room.

On May 19, 2015 at 1524 hours, a second interview was conducted by Investigator Meyers along with this Investigator. Investigators wanted to speak with Brinson in reference to his original statement made on May 15, 2015. He provided several inaccurate statements which could be proven false.

Brinson was told investigators had good news for him and he sat down looking confidant. He was sitting up straight and made eye contact with investigators. Investigators told Brinson the video footage from the actual Taser used in the 2013 incident was found. He was also told the video footage showing his actions from the time he entered the jail facility was also located. Brinson slumped down in his chair and looked down to the ground. Brinson was no longer making eye contact with investigators.

Brinson was told he was being given a formal complaint form to complete if he still wished to follow through with his complaint. Brinson was told the video footage showed several inaccuracies from his original statement. One such inaccuracy was Brinson accusing Sgt. Moultrie of shooting him with the Taser twice. The first Tasing was on his left arm and the second in his chest area. In the initial interview Brinson said he was Tased twice with the prongs entering his body.

Brinson was told the video clearly showed he was drive-stunned, with no prongs entering his body. Investigators explained the difference between a drive-stun and being shot with a Taser. Brinson was reminded the original investigators asked Brinson the same questions multiple times in order to make sure his statements were recorded.

Investigators also provided Brinson with a second inaccuracy in reference to the gender of Sgt. Moultrie. Brinson was certain he was Tased by a male, whom he believed to be Sgt. Moultrie. He was informed Sgt. Moultrie was a female, and it was her who drive-stunned him. Brinson blamed his memory for the inaccurate description. Brinson was reminded of what he told investigators in the initial interview when he stated he would always remember everything about that day because it was the day his mother died.

Brinson was warned that providing false statements or writings during an investigation was against the law and he could be charged with a felony. He was advised to provide a written statement with accurate information only. Brinson said he was Tased while in restraints. Investigators told Brinson he should have been honest during his initial interview. He was told the actual Tasing incident was being investigated and if violations of policy took place it would be handled.

Brinson was asked to provide a factual summary of what took place. He said officers had to drag him inside the jail because he refused to walk. He admitted he was "Trying to hurt myself" by hitting his head on the floor. He admitted he was disorderly because the arresting officers would not give him a breathalyzer test when he was arrested. Brinson agreed the deputies were right in not allowing him to harm himself.

Brinson recalled leg restraints being placed on him before deputies attempted to place him in the restraint chair. He admitted he was resisting as deputies tried to place him in the restraint chair. He blamed his attitude on his mother dying a short time earlier. He said he was Tased even though he was in hand and leg restraints and he did not understand why. He said he reported the incident to a counselor but nothing was ever said to him about it.

4

Sheriff1-007514

When Brinson was brought back to jail recently over felony obstruction charges, he decided to make another complaint. He was asked if he was Tased twice and his response was "I guess not, your saying I wasnt". Brinson was told he was present and to give his version of what really took place. Brinson replied "Naw, I know I was Tased though". Investigators told Brinson he was not shot twice with a Taser with prongs entering his body. He replied "I agree with you".

Investigators asked Brinson to explain why he originally said he was shot with the Taser while fully restrained in the restraint chair, when he actually wasn't. Brinson based his accusation on the written reports submitted by the deputies involved. Brinson said he was not a risk to anyone but himself. He believed the deputies used excessive force against him. Investigators reminded him of his erratic behavior and how deputies were having difficulty controlling his movements. Brinson admitted he wanted to hurt himself and he was very capable of doing so. He admitted the restraint chair was needed due to his behavior, but he stated the Taser was not necessary.

Brinson became upset when confronted with the inaccurate statements he provided in his earlier interview. He was confronted with the fact he told investigators a male deputy shot him twice with a Taser. He now said he "thought" a male deputy shot him with a Taser. He also said he did not remember any female deputies except the ones who were holding his arms. Investigators read most of the inaccurate statements he provided during his first interview. Brinson did not deny any of the inaccurate statements he made. Brinson was asked what he would think if someone provided the same inaccuracies and he said "A liar yeah".

Brinson provided a written statement with clarification from his original complaint. In the written statement Brinson said he was not sure who Tased him. He also said "I don't believe I was Tased twice". When investigators went over the written report Brinson said the incident happened 18 months earlier and his memory affected his recollection. He was asked why he did not tell the investigators days earlier he did not remember instead of stating inaccuracies. He replied "I don't know I was wrong". He added, "I guess I made some statements I shouldn't have made".

## SGT. MOULTRIE INTERVIEW:

On May 15, 2015 at 1044 hours, Investigators Young and Meyers conducted an interview with Moultrie. Moultrie was read her Garrity warning and she agreed to cooperate during the investigation. Investigators informed her she was being questioned in reference to an incident which took place on December 3, 2013. She was told reports submitted by other deputies said she drive-stunned Brinson. Her response was "I really can't, I really can't recall".

Moultrie was given a copy of a report submitted by one of the deputies involved in the incident in order to refresh her memory. Moultrie read the report but said she still did not remember the incident. Investigators told Moultrie no report was found that was written by her. She was told a report was found where she disciplined Dep. Reddick for observing the altercation but not providing assistance. Moultrie remembered Dep. Reddick "Coming in, I do remember that now".

Moultrie said she may have drive-stunned Brinson but she did not know why she did not write a report on the incident. She now remembered Brinson being disorderly. She said "If he did come in disorderly, I did give the Taser, I know it". She remembered Brinson being placed in restraints and moved to a detox cell because he was struggling with deputies.

Sheriff1-007515

Moultrie said she could not remember whether Brinson was restrained in the restraint chair, or whether he was in any type of restraints when he was drive-stunned. She mentioned Dep. Reddick again, saying she reported his inaction by submitting a report. Moultrie admitted she drive-stunned inmates in the past who were in a restraint chair.

Moultrie said she was trained to use the drive-stun technique to gain compliance from inmates while they were being placed in the restraint chair, but not when they were restrained in a restraint chair. Moultrie said she did not believe the drive-stun took place after Brinson was placed in the restraint chair. She believed the drive-stun took place during the time deputies were trying to place him in the restraint chair.

Moultrie did not remember what restraints Brinson had on at the time he was drive-stunned. She said she believed he had hand and leg restraints on at the time, but she was not certain. She was certain the drive-stun took place before Brinson was placed in the restraint chair.

Moultrie was asked why she did not write a report detailing her actions in the incident. She said a report could be pending in reference to the incident. She acknowledged the incident involved a Use of Force. She believed another supervisor would have noticed she had not written a report. Investigators informed Moultrie she was the one who approved the report submitted by Cpl. Richards. She was asked whether she knew for certain she submitted a written report of this incident. She replied "I know I should have". She believed she did submit a report and it had been lost.

Investigator Young attempted to verify the information provided by Moultrie. He checked SharePoint and was unable to locate any other report submitted by Moultrie. She was asked if she was aware of any circumstance which would have prevented her from submitting a written report on the incident, but she said "No". Moultrie was asked to provide a guess on the number of times she was aware of an inmate having a helmet placed on their head. She was unable to provide an exact number of times.

Moultrie provided a written report based on her recollection of the incident. In the statement she admitted Brinson was drive-stunned due to his behavior. The drive-stun took place in order to assist deputies with placing the restraint chair restraints on Brinson.

On May 21, 2015 at 1458 hours, investigators conducted a second interview with Moultrie. Moultrie said she was familiar with her Garrity warning from her previous interview. She was told the interview was in reference to the incident with Brinson. She was told "I don't know" would not be a sufficient response to our questions. She was asked how many times she accidently Tased an inmate. Her response was "Two" but she then changed her response to remembering only one time.

Moultrie discussed the information she remembered from a previous incident. Based on the information she provided during the interview, investigators were able to locate a matching Use of Force report. It was determined to have taken place on July 16, 2014. The inmate was identified as Christopher Mozee (P0912231). Investigators were only able to locate a Use of Force report. Lt. Gellatly was the Watch Commander who responded to the scene.

Mozee, like Brinson, entered the jail disorderly and combative. He was described as being verbally abusive towards staff. The decision was made to place him in a restraint chair. Mozee was placed in hand and leg restraints. As he was being strapped into the restraint chair he attempted to stand up. Moultrie then Tased Mozee. She stated her intention was to drive-stun him.

6

The prongs entered Mozee in his chest area. She subsequently removed them from his body. According to reports submitted by deputies at the scene, Mozee was checked by Nurse Thrift after he was Tased. Nothing in Mozee's medical file supported those claims. Nurse Thrift completed the Intake Module for Mozee and made no mention of the Tasing incident.

Moultrie stated the Tasing of Mozee was "accidental" and she reported the incident to Lt. Gellatly. She said she reviewed the video footage from the incident with Lt. Gellatly. She admitted Lt. Gellatly told her the use of the Taser was improper. Moultrie said she submitted her report later in the evening and it was placed in a plastic bag containing the used cartridge from the Taser. Lt. Williams and Moultrie discussed the incident the following day. Moultrie said she was told her actions would have "Repercussions" by Lt. Williams. Investigators asked if she received any punishment since the incident took place and she said "No".

Moultrie said she could not remember details from the incident involving Brinson. One hour and 7 minutes into the interview, Moultrie said she "Drive-stunned him" while trying to place him in the restraint chair. She could not explain why Brinson accused her of Tasing him twice. She was unsure if she submitted a report. She did submit a report against Dep. Reddick for not assisting during the altercation with Brinson. Investigators asked how a report for Reddick was completed but not a Use of Force or Incident Report based on Brinson receiving a drive-stun. She could not understand why no report was written. Her supervisor on December 2013 was Lt. Williams. Moultrie agreed to search her residence for the missing reports. She provided a written statement detailing her knowledge of both incidents.

On May 22, 2015 at approximately 1000 hours, Moultrie contacted this Investigator. She stated she found a copy of her report from the Mozee incident. With the assistance of IT personnel, it was discovered her report was completed in the Administration section of the SharePoint program. Two members of IT spent hours attempting to locate the missing Incident and Use of Force Report from the Brinson incident. Neither had been located.

On May 26, 2015 at 1202 hours, investigators conducted a third interview with Moultrie. This Investigator read Moultrie her Garrity warning and she agreed to cooperate during the investigation. Investigators discussed the process taken to locate her reports from the Mozee and Brinson incidents. Investigators told Moultrie IT personnel were unable to locate an Incident Report or Use of Force report for the Brinson incident. She could not provide an explanation on why a report was not submitted.

Moultrie was asked to explain her reasoning for Mozee being Tased. She said Mozee was Tased because he was behaving disorderly as they attempted to place him in the restraint chair. Mozee was Tased by accident because she meant to drive-stun him but instead shot him with the prongs. This happened as deputies were placing him in the restraint chair.

Moultrie was asked to describe the actions of the deputies involved as they attempted to place Mozee in the restraint chair. She was holding the Taser as deputies were securing him in the restraint chair. Mozee was placed in the restraint chair with hand and leg restraints. At some point, Mozee became disorderly and began moving around. When asked for specifics, Moultrie said Mozee was trying to stand up. She was asked if Mozee could have stood. Moultrie did not think he would have been able to stand up with the restraints that were applied.

Moultrie was asked if Mozee was Tased because he had the opportunity to injure an officer. She answered the question by saying "No". Investigators asked why Mozee was Tased if he posed no threat. Her response was

7

"We were trying to get him secured to the chair".  She was asked additional questions in reference to how secure Mozee was in the restraint chair at the time he was Tased.

Moultrie said Mozee's hands were handcuffed on each side of the restraint chair.  His legs were also strapped to the restraint chair.  This prevented Mozee from swinging his arms or legs at deputies.  Mozee also had a waist strap on, and one of the shoulder straps was securely placed on him.  Moultrie admitted Mozee was only able to move his upper body.  Moultrie was asked if other deputies were holding Mozee when he began moving around.  She did not remember if deputies were holding Mozee's head or shoulders.  She admitted other deputies were trying to hold Mozee but she did not remember who they were.

Moultrie recalled giving Mozee warnings to stop moving around before he was Tased.  She was asked if Mozee should have been Tased if other deputies were holding him.  She said Mozee was moving around in the restraint chair as deputies were trying to secure him.  Moultrie was asked a second time if Mozee should have been Tased if deputies were holding him as he moved in the restraint chair.  Moultrie said "No, if they could, if we could have gotten him into the chair with no problems, no".  She said Mozee was not completely restrained in the restraint chair at the time he was Tased.

Investigators pointed out Moultrie's previous statement in reference to Mozee not being able to stand up at the time he was Tased.  She was reminded his arms, feet, waist and one shoulder was already strapped into the restraint chair, making him unable to stand up.  She was asked a third time why Mozee was Tased if he was not able to stand up.  Moultrie answered by saying under those circumstances she would not have had a reason to Tase Mozee.  Moultrie was asked if Mozee posed a threat to himself or other deputies by his actions before he was Tased.  She answered "No".

Moultrie was told about a third incident involving inmate Hephzibah Abraham.  She was asked how many times she used the Taser in the past and she believed it was no more than five times.  She could not remember whether she ever Tased a female inmate.  She was given a copy of the incident report and Use of Force she submitted in reference to this incident.  She remembered the incident after looking at Abraham's picture.

Moultrie remembered Abraham did not want to remove her street clothes in order to put on the jail jumpsuit.  An altercation soon began when she refused to follow instructions from the deputies.  The altercation was described as being somewhat of a wrestling match in order to change Abraham's clothing.  After she was placed in hand and leg restraints she was placed on a cart and wheeled to the female unit.  Moultrie did not mention Abraham was Tased during the altercation, she was also not certain if Lowe had the Taser present.

Investigators informed Moultrie about the information in Lowe's report indicating she was in possession of the Taser.  She was read the sentence in Lowe's report which stated, "Drive-stun inmate Abraham until she complied".  Moultrie did not remember the Tasing incident.  She was asked if she felt Lowe made a mistake in her report, but she said "No".  She said if Lowe told her to Tase Abraham "I guess I did it".

She was asked if Lowe mentioned the Tasing in her report would it be accurate.  Moultrie said if Lowe said she did then she agrees with it.  She was asked if Lowe ordered her to drive-stun Abraham 2-3 times would it be accurate.  She replied "I don't know".  She was reminded this was another critical incident involving a Taser which she was unable to recall.

Sheriff1-007518

Moultrie could not explain why the Taser was not mentioned in her report. Her response was she only remembered "Tussling with her". She was asked for a legitimate reason why no mention was made about the Taser being used but she did not provide an explanation.

Moultrie was reminded this was the third Tasing incident she had been involved in within the last 2 years. Two of the three incidents had not been documented by Moultrie. She did not provide any explanation for incidents not being documented properly. Investigators showed her video footage of the Mozee incident. Investigators did not previously tell Moultrie the footage existed.

While watching the video, investigators pointed out the actions of the deputies as they secured Mozee in the restraint chair. Investigators pointed out how deputies secured Mozee in the restraint chair with the exception of one of the shoulder straps. It was also pointed out deputies were holding Mozee's head and shoulder which stopped him from moving. She was asked if Mozee presented any threat to deputies or himself, her response was "No". Moultrie was asked if she Tased Mozee for the full 5 seconds, but she had no idea. She did not seem to have a working knowledge of the Taser, even though she is certified to use the device. Moultrie said, "I just Tased him and the prongs went out" when asked questions on the use. She did not know the device could be turned off while someone was being Tased.

Moultrie was asked if she believed Mozee needed to be Tased and she admitted it was not necessary. She was asked to provide a written statement discussing the incidents from Brinson, Mozee and Abraham. In her written statement, she admitted Tasing Brinson as he was being secured in the restraint chair. She also admitted she did not complete an incident or Use of Force report for the incident with Brinson. No explanation was provided on why the reports were not completed.

In reference to the incident with Abraham, Moultrie admitted to drive-stunning her after being ordered to by Lowe. In reference to the incident with Mozee, she admitted to accidently Tasing him. She admitted Mozee was already secured in the restraint chair when he was Tased.

It should be noted investigators obtained a copy of the Intake Incarceration History for Brinson. An entry was submitted by D. Morgan (Counselor) on December 3, 2013 at 1940 hours. Morgan mentioned Brinson was placed in the restrained chair and the Taser had been deployed.

## CPL. K. RICHARDS INTERVIEW:

On May 18, 2015 at approximately 1449 hours, investigators conducted an interview with Richards. This Investigator read Richards her Garrity warning and she agreed to cooperate during the investigation. Richards was told an inmate made a complaint stemming from an incident which took place on December 3, 2013. Richards was given a copy of both her reports in reference to this incident.

Upon looking at the report, Richards recalled testifying before the Chatham County Grand Jury in reference to the incident. The Grand Jury convened sometime around January 2015. Richards then asked if it was involving the "Pooler case", which it did. Richards read both reports but said she did not remember any details on the incident. Richards said she could only read what she had written in her report. Richards said she testified to the Grand Jury on the case, but only read from her report.

9

Sheriff1-007519

Investigators asked Richards for additional details but said she had no memory other than what was written in her report. She was told her report contained very little information with not enough details. Richards was not able to remember if an inmate was Tased during the incident. She was reminded, as a supervisor, her reports should be better.

Richards was asked to read over both reports but it still did not improve her memory of the incident. She said similar incidents took place on an almost daily basis and it was difficult for her to remember. She was asked if inmates were regularly Tased while in full restraints. She replied "I don't recall". She was asked how she felt about an inmate being Tased while in hand and leg restraints. At first she did not respond. Investigators asked for her knowledge of inmates being Tased while in hand and leg restraints. She replied "I don't know, I don't recall the specific policy".

Investigators asked Richards what her understanding was in 2013 regarding Tasing of restrained inmates. Richards said she never really "Thought about it". She explained she did not know the policy on using the Taser at the time. She did not know whether it was a common practice for deputies at the time. She did say it was not acceptable to Tase an inmate who was fully restrained.

Richards admitted she received training in the use of the Taser in the past, but she did not recall any of the information from the training. She said she believed her report was fine because it was approved by her sergeant and lieutenant. Richards provided us a written statement which stated she did not recall the incident.

On May 26, 2015 at 1356 hours, investigators conducted a second interview with Richards. Richards was told she was still under Garrity and she agreed to cooperate during the investigation. She was given a copy of a report she submitted on the incident involving Abraham. She read the report but said she had memory issues and had visited with a neurologist in the past. She explained she had a vehicular accident in 2005 causing her to suffer a head injury. She has had issues with her memory ever since. She writes things in a notebook to assist her with remembering things such as her passwords.

Richards was not able to recall the incident. She could only discuss what was written in her report. She did not recall whether a Taser was deployed during the incident. She was told her report did not mention a Taser at all. She said it was difficult to remember incidents from the booking area because so much happens on a daily basis. She was told reports are written to assist officers should an incident go to court. The officer would be able to recall the incident based on their written report.

Richards continued to bring up her head injury as the reason for her memory issues. She mentioned having an MRI when she visited her doctor, but had not been diagnosed with any medical condition from the doctor. She said the doctor could not find a reason for the memory loss. She was shown pictures of Abraham. She recalled a female inmate who was transported to Unit 9 on a cart. She was not certain if Abraham was the female who was carted to the female unit. It should be noted Moultrie and Ofc. Limehouse mentioned Abraham was carted to the female unit after she was drive-stunned.

Richards said she usually writes her reports "Right after an incident", while it's fresh in her mind. She was asked to discuss what actions took place that day but she was only able to recall what was listed in her report. She did not remember the other officers who were involved. Investigators began asking her questions about her accident which took place in 2005. She was able to recall all types of details involving the accident to include where it happened and the type of vehicle involved.

10

Richards was asked if other supervisors discussed her memory issues with her but she said "No". She again mentioned she took notes all the time to help her remember things. She was reminded about courtroom testimony and how, as an officer, she needed to recall events she was involved with. Whenever she attended court in the past she would go by the details listed in her report.

Richards was reminded this was the second incident in as many weeks which she was unable to discuss due to her memory. Investigators explained she should be able to remember significant events she becomes involved with. She said "Nothing visually comes to my head" when she is asked questions. She again mentioned her memory issues and the doctors she had visited in the past. Investigators asked her again if the doctors diagnosed her with a medical condition and again she said "No".

Investigators asked how she was able to study and remember things for the corporal's exam. Her response was "I passed the test". She was asked to explain how she functions each day at work and she said it was a job she performed each day. She was asked how she would function if she were transferred to a different unit and she said "I would function". She said she could remember a job she performed each day. Investigators asked how she could perform her job when she has issues with her memory.

Richards was told she should be able to read a report she submitted and independently recollect the information, even years later. Investigators discussed methods used by defense attorneys when officers testify in court and how they are good at making officers appear to be incompetent. She was asked if she believed she would appear to be competent or incompetent if she was unable to answer any question she was asked while on the witness stand. She would not answer the question.

Investigators informed Richards her report writing was below the minimal standards and, as a supervisor, more is expected of her. She was told she had an inability to recall critical incidents she had been involved in, where she submitted a written report. She was asked how she could keep up with the actions of her subordinates when she could not remember anything herself. She was not able to provide an explanation.

Investigators asked Richards how she was able to recall details of her car accident but not be able to remember other events. She said because the accident was a traumatic experience for her, so she could remember it. She was reminded the altercations she had been involved with at the jail were traumatic events as well.

Richards was asked how she could not recall any details from the Abraham incident when it took place in a small dressing room with three other deputies. She could not provide a valid explanation. She provided possible excuses as to what may have taken place. She alluded to the fact she may have left the dressing room where the altercation took place. She was reminded her report did not mention she left the immediate area.

Investigators asked if she informed her supervisors about her memory problems, but she did not know for certain. Richards was told she was a liability for the Sheriff's Office since she was unable to recall any critical events she was involved with. Richards did not think she would be a liability if people asked her questions based on her written reports only.

Richards said her reports are used for her to testify. She was told her reports were not refreshing her memory. She was reminded about Brinson wishing to file a lawsuit against the Sheriff's Office and she would be a witness. She was asked if she believed she was a detriment to the Sheriff's Office due to her lack of memory. She did not believe she was.

Sheriff1-007521

She admitted she recently passed the sergeant's assessment and oral board. Investigator's asked how she was able to memorize the information needed to pass. She said she happened to know about the things they asked her. She was told more was expected of her since she was a supervisor and her training and experience did not appear to be commensurate with her years on the job. She was told her inability to testify in court made her ineffective as an officer.

Richards was told no one involved in the incident mentioned Abraham was drive-stunned during the altercation when they submitted their reports. Investigators continued to discuss the importance of being able to testify in court. She did not believe her lack of memory made her incompetent as an officer and supervisor. Richards was asked to provide a written statement detailing her account of the incident with Abraham. As she made her written statement, LT. Rhode spoke with her in reference to her memory issues. She continued to say she could not remember the incident. Lt. Rhode told her the memory issues were a problem for a career in law enforcement. She was asked to recall any incident involving a deployed Taser. She said she could not recall any.

A check of SharePoint was conducted and investigators discovered Richards drive-stunned inmate Hado Lengani on July 29, 2014, and inmate Harry Rosado on October 16, 2014 at 0030 hours. Richards was unable to remember either of the incidents. Richards submitted incidents reports along with Use of Force reports on both incidents.

Richards was asked if she recalled an incident where she located an ankle monitor left inside a cell and gave it to Lt. Gellatly. She remembered finding an ankle monitor. Lt. Rhode told her the ankle monitor incident took place a week before the Abraham incident. She said she did not remember when the incident took place. Richards was told she would be scheduled for a polygraph examination.

**DEP. C. TOWNSEND INTERVIEW:**

On May 19, 2015 at 0821 hours, investigators conducted an interview with Dep. Townsend. This Investigator read Townsend his Garrity warning and he agreed to cooperate during the investigation. Townsend was given a copy of the report to refresh his memory of the incident.

According to Townsend, Brinson was disorderly when he arrived at the jail. Brinson was making comments in reference to wanting to kill himself. He was placed in hand and leg restraints due to his behavior. He was taken to a detox cell due to his continued behavior. In order to prevent him from harming himself he was placed in a restraint chair.

Brinson made comments in reference to shooting deputies once he was released from the jail. Townsend said he did not take the threats seriously at the time. Townsend did not recall Brinson attempting to harm a deputy during the struggle with him. Townsend did not remember Brinson being drive-stunned with a Taser but knew Moultrie was the supervisor present.

Townsend was asked to discuss his understanding of the policy back in 2013 dealing with the use of the Taser with inmates who were in restraints. Townsend explained his understanding of the policy was inmates could be drive-stunned while in hand and leg restraints. Townsend said he was a member of the C.E.R.T. team during this incident and was trained in that manner. He was unable to recall the name of the supervisor or trainer who provided him with the information. He is no longer a member of the C.E.R.T. team, effective the month of May 2015. He understood the policy as of this date says the use of the Taser is not authorized on inmates who are in hand and leg restraints.

12

Sheriff1-007522

Townsend discussed how Brinson was resisting deputies the entire time they were trying to place him in the restraint chair. He said he believed the drive-stun was needed in order to provide deputies the time to place Brinson in the restraint chair. He said he was concerned Brinson would hurt himself because of his actions.

Investigators discussed the verbiage used in Townsend's report in reference to when Brinson was actually placed in the restraint chair. Townsend was certain Brinson was not seated in the restraint chair when he was drive-stunned. Townsend provided a written statement detailing his actions during the incident.

## DEP. O'NEIL YOUNG INTERVIEW:

On May 21, 2015 at 0856 hours investigators conducted an interview with Young. This Investigator read Young his Garrity warning and he agreed to cooperate during the investigation. Young was told he was being questioned in reference to a Tasing complaint made by an inmate, which took place in 2013. Young was allowed to read over the reports he submitted when the incident first took place. Young was also shown a Phoenix photo of Brinson and he remembered the incident.

According to Young, he was able to remember certain events. Young recalled two instances where an inmate was placed in a helmet due to their behavior. Brinson was described as behaving disorderly by making comments about not caring about anything. Brinson hit his head on the floor and the decision was made by Moultrie to place him in the restraint chair. Brinson continued to resist deputies as they attempted to place him in the restraint chair. Brinson was in hand and leg restraints at the time deputies were attempting to secure him in the restraint chair.

Moultrie was holding the Taser pointed at Brinson as deputies were trying to strap him into the restraint chair. He attempted to stand up as deputies were placing the shoulder straps on him. Young quickly realized Moultrie Tased Brinson instead of a drive-stun. Young said he could see the cartridge still attached to the Taser. The fact he was Tased meant the prongs actually entered Brinson's skin. Young said he believed the Tasing was an accident due to the facial expression made by Moultrie. Young believed he heard her tell Brinson "Sorry young man, you're supposed to sit in the chair".

Young was asked if he was certain Moultrie Tased Brinson with the prongs. He took his time and waited for several seconds before saying "She actually Tased him". He believed the prongs entered Brinson's chest area. A nurse was called to the scene in order for her to remove the prongs, but she informed the deputies she was no longer allowed to remove prongs. Young said the prongs were removed by Moultrie. He did not remember the name of the nurse who arrived on scene. It should be noted his initial report indicated it was Nurse Spain.

Young believed Moultrie was in close proximity to Brinson when he was Tased. He did not remember exactly where she was positioned when the Tasing took place. Brinson was actually sitting in the chair but was not strapped to the restraint chair when he was Tased. He was fairly certain Brinson was in hand and leg restraints. He remembered hearing Brinson make comments about not caring if he was Tased.

Young described Moultrie as someone who did not use the Taser often. He said he did not expect Brinson to be shot with the Taser, he believed a drive-stun would take place. He remembered the watch lieutenant (Lt. Gellatly) coming to the scene after the Tasing took place. Young overheard the conversation between Moultrie and Lt. Gellatly. He heard Moultrie tell Lt. Gellatly she Tased an inmate. He also heard Lt. Gellatly tell Moultrie her actions were wrong and she needed to write a statement. Young said he could not recite the conversation verbatim but was certain Moultrie and Lt. Gellatly discussed the Tasing incident.

13

Sheriff1-007523

Young was asked why the deputies involved only mentioned Brinson being drive-stunned. He replied "We didn't want to hem anybody up". He admitted his report only mentioned a drive-stun. He did not know why Moultrie did not submit a report. He was asked about his knowledge of policy in reference to the use of a Taser on inmates who were in full restraints back in 2013. In particular, he was asked if the use of the Taser was allowed on inmates who were in hand and leg restraints. Young said he knew shooting with a Taser while in full restraints was not allowed, but the use of the drive-stun was permitted in hand and leg restraints. He also said the use of the Taser was not permitted on inmates who were secured in a restraint chair.

Young believed the Tasing was necessary because Brinson was resisting deputies and because he was trying to exit the restraint chair. He believed deputies would still have been able to secure Brinson in the restraint chair without the use of a Taser. He believed a longer struggle with Brinson would have placed deputies at greater risk of injury but the situation would have been handled in the end.

Young was hesitant to provide information against other deputies; he did not want to get anyone in trouble. He informed investigators he had given his two week resignation notice before he arrived for the interview with investigators. He was asked to provide a written statement detailing his recollection of events. At the conclusion of the interview with Young, investigators believed Brinson may have actually been shot with a Taser by Moultrie. At this time, investigators were only aware of the incident involving Moultrie and Brinson. When investigators conducted an additional interview with Moultrie, an additional Tasing incident was discovered involving her.

## LT. GELLATLY INTERVIEW:

On May 21, 2015 at 1223 hours, investigators conducted an interview with Lt. Gellatly in reference to the incident with Brinson. Gellatly said he understood his Garrity warning and agreed to cooperate during the investigation. Gellatly was briefed on the incident and he recalled it. Gellatly actually recalled what took place with Mozee and, at the time, investigators were unaware Moultrie was involved in two incidents. Gellatly explained Moultrie accidently Tased an inmate, which is consistent with what happened with Mozee. He was certain the incident he was referring to took place on the midnight shift. Investigators initially believed he was referring to the Brinson incident.

Gellatly was shown a copy of the Watch Commander's Log, dated December 3, 2013. The log entry was at 1850 hours and it mentioned the incident with Brinson. It referenced Brinson being disorderly and combative with staff and him having to be placed in the restraint chair. It also mentioned Dep. Ransom injured her foot during the altercation with him. The log entry did not mention a Taser device was deployed. Gellatly was asked if the entry made at 1850 hours was made by him. He said he believed it was. He was not sure why no mention of the Taser was placed in the log book.

Gellatly did not recall anything about the Brinson incident. He said the Watch Commander should be notified before the Taser was used but he did not know anything about the incident. He was asked how an inmate could be Tased and the Watch Commander not know anything about it. He said the supervisor could have elected to not inform the Watch Commander about the Taser being deployed. He said at times he would be busy doing multiple things.

Gellatly said the incident was documented to the best of his ability. He was told Brinson was considering a lawsuit. Gellatly was aware the responsibility falls on the supervisor to make sure reports were submitted during incidents. In reference to the Brinson incident, Gellatly was not able to recall whether he conducted an

14

investigation of the incident. He was asked again if he made the log entry in the Watch Commander's Log at 1850 hours. He agreed it was his entry.

Gellatly talked about the Mozee incident again and mentioned he discussed it with Moultrie. He did not know exactly when it took place but was certain he reviewed the video footage and told Moultrie the deployment of the Taser was improper. He was asked to provide a written statement detailing his knowledge of the incidents involving Brinson and Mozee.

Lt. Rhode eventually spoke with Gellatly and one of the things they talked about was the log entry on December 3, 2013 at 1850 hours. Gellatly said he did not have good grammar skills, so his entries contained small words. Lt. Rhode asked Gellatly if the log entry was actually his. He was now unsure. Gellatly said the log entry had bigger words than what he would use.

## LT. W. WILLIAMS INTERVIEW:

On May 22, 2015 at 1218 hours, investigators conducted an interview with Lt. Williams. This Investigator read Williams her Garrity warning and she agreed to cooperate during the investigation. Williams was briefed on the purpose of the interview. Williams was the unit manager for the incidents involving Brinson, Mozee and Abraham. According to Williams, she remembered Moultrie had an accidental discharge of the Taser.

Williams was asked to explain the process taken after a use of force incident. Williams said deputies are to write a report and submit a Use of Force Form. She tried to read each report before she placed her "Signature on it". She could not recall whether she read the reports in these incidents because she receives "So much paperwork". She said Moultrie should have written the reports.

Williams recalled Moultrie was going to receive a counselling (PCR) in reference to the incident. During the counseling, she planned on trying to find out how the Tasing incident took place. Williams said she had discussed the incident with Maj. Wilson. The counselling never took place because shortly after the incident Moultrie took leave for several months in reference to her sick daughter. She said she was not required to submit any paperwork until Moultrie was counselled. Upon Moultrie's return to work, she had been moved to a different unit and was no longer under the supervision of Williams.

Williams was asked how long after an incident did it usually take her to counsel an officer. She said it only took her a few days but it was decided Moultrie would not be punished because of the personal problems she was having with her daughter. Williams said she and Maj. Wilson decided Moultrie would not be counselled for a while because of her personal problems. Investigators discovered Moultrie did not begin taking leave until the week of August 15, 2014. Moultrie began taking leave approximately 30 days after the incident with Mozee.

Williams remembered being given the Taser cartridge in a plastic bag along with the report on the incident. The Taser cartridge would have then been turned over to Sgt. Allen, who had the job of securing the Taser cartridges. The bags were not marked with anything which would distinguish it from other Taser cartridges. She said a system is now in place to mark the different Taser cartridges.

Williams was asked about her knowledge of the incident involving Brinson. She did not remember the incident but was allowed to read reports submitted by other deputies. After the interview, investigators discovered Williams signed the Use of Force Forms submitted by Dep. Young, Townsend and Cpl. Richards. She also signed the Incident Reports submitted by Dep. Ransom, Townsend, Cpl. Richards, and Young. Williams provided a written statement detailing her knowledge of the incidents discussed during the interview.

15

Sheriff1-007525

**DEP. RANSOM INTERVIEW:**

On May 22, 2015 at 1259 hours, investigators conducted an interview with Ransom. Investigator Meyers read Ransom her Garrity warning and she agreed to cooperate during the investigation. Investigators explained the reason for the interview. She was told an inmate made a complaint regarding a Tasing incident in December 2013. She was allowed to read a copy of the report she submitted when the incident took place. She recalled the incident and remembered the inmate was very disorderly and combative.

As Ransom recalled, the incident involving Mozee closely resembled the incident with Brinson. She described the actual Tasing of Mozee by Moultrie as an accident. She was then given the report she submitted for the incident which took place on July 2014, involving Mozee. After she read the Mozee report, she realized she made a mistake.

Ransom got the incidents mixed up, but after reading both reports was able to clear up the confusion. She was present for both incidents. The incident involving Mozee was where Moultrie actually shot the Taser by accident. She did not recall the drive-stun on Brinson by Moultrie. She said Moultrie was "Frantic" after she Tased Mozee. She believed Moultrie Tased him by accident and was actually trying to perform a drive-stun on Mozee. She provided a written statement detailing her actions on both incidents.

**LT. LOWE INTERVIEW:**

On May 22, 2015 at 1550 hours, investigators conducted an interview with Lt. Lowe. This Investigator read Lowe her Garrity warning and she agreed to cooperate during the investigation. Lowe was briefed on the reason for the interview. She was allowed to read submitted reports for the incident involving Brinson, though the report did not spark her memory. She was shown the Watch Commander's Log dated December 3, 2015. She admitted the log entry at 1850 hours appeared to be her entry. The entry discussed an incident involving Moultrie. It also discussed Ransom getting injured during an altercation with Brinson.

Lowe said she responds to all calls for assistance when able, but did not recall whether she responded to this incident. She was told Moultrie did not submit an Incident Report or Use of Force report for the incident. She said the Unit Manager would be the supervisor to obtain reports from Moultrie, not the Watch Commander. It was the responsibility of the Unit Manager to make sure all reports were submitted after an incident.

Lowe was asked if she would routinely review video footage of an incident after it took place and she agreed. She did not know if she reviewed the video footage of this incident. She believed if she had responded to the incident she would remember it. She could not explain why the "Drive-stun" was not mentioned in the Watch Commander's Log. She did not inform the Unit Manager of the incident involving Moultrie. After an individual is removed from the restraint chair nothing else was needed as far as passing along information to the Unit Manager or vise versa.

Lowe could not understand how a sergeant and corporal would be involved in a use of force incident involving the deployment of a Taser and not report the incident. She said the supervisors were well aware she was the person responsible for everything which happened during the shift and they should have informed her of the Taser deployment. Lowe said she must be notified before the Taser can be used during an incident. She did not recall being asked permission to use the Taser and, if she was asked, she would have responded to the scene. She was asked if Moultrie would be in violation of policy if she deployed the Taser without asking for permission and she said "It's possible".

16

Sheriff1-007526

Lowe said it was possible she forgot to mention the "Drive-stun" incident in the Watch Commander's Log. She said it was difficult to believe Brinson was shot with a Taser twice without her knowing about it. Investigators reminded Lowe either she forgot to mention the incident in the Watch Commander's Log, or Moultrie did not discuss it with her. Lowe was asked if it was possible for Moultrie to have made a command decision to deploy the Taser without permission but she said "No".

Lowe was given a copy of a report she submitted involving former inmate Hephzibah Abraham. The incident took place on November 25, 2013 at 2100 hours. She recalled being involved in an altercation with Abraham because she did not want to change her clothes while in the booking area. During the altercation with Abraham, the report read she ordered Moultrie to "Drive-stun inmate Abraham until she complied". The report did not mention the Taser was deployed after the above comment. She went on to explain how Abraham was taken to the ground and placed in hand and leg restraints but there was no mention of the Taser being used. Lowe said Moultrie performed at least two drive-stuns on Abraham, who was not in full restraints.

Cpl. Richards and Limehouse (Former Deputy) were also involved in the altercation. Investigators informed Lowe none of the submitted reports mentioned the deployment of the Taser. Moultrie and Lowe submitted a Use of Force report and mentioned a Taser was present and used but it was not discussed in the Incident Report. Lowe did not understand why the deployment of the Taser was not discussed in her report. She did not understand why other deputies involved in the altercation did not mention the Taser. She was asked to provide a written statement detailing her account of the incidents with Brinson and Abraham.

## JEWEL LIMEHOUSE- (FORMER DEPUTY):

On May 27, 2015 at 1521 hours, this Investigator spoke with Jewel Limehouse (Former deputy) in reference to the incident involving Abraham. This Investigator briefed her on the incident and read the report she submitted. She remembered being called to the scene due to Abraham being combative after she refused to remove her street clothing and wear the jail jumpsuit. She recalled Abraham being placed in restraints and on a cart in order for her to be wheeled to the female unit. Initially, she did not mention the use of a Taser.

This Investigator asked if she remembered a Taser being used and she said Moultrie Tased Abraham. The Taser was used because Abraham was combative and resisting. She said she was 85 percent certain the Taser was deployed. She said if Moultrie did not Tase Abraham it was Lowe. The Tasing consisted of a single drive-stun.

Limehouse was told no one mentioned the use of the Taser when the reports were submitted. She was still 85 percent certain the Taser was used. She was asked why the Taser deployment was not mentioned in her report. She responded "I guess I omitted it". She said for a third time she was fairly certain the Taser was used. She recalled Richards was involved in the altercation as well. Richards was said to have assisted Limehouse as Abraham's clothing was removed. She said no one asked her to omit the use of the Taser in her report.

Sheriff1-007527

**FINDINGS AND CONCLUSIONS:**

**SGT. MOULTRIE**

The preponderance of evidence showed Sgt. Moultrie violated the following Standard Operating Procedures of the Chatham County Sheriff's Office: Employee Conduct, Use of Force, Incompetence, Incidents Reporting of and Neglect of Duty.

Sgt. Moultrie's actions have brought discredit to this Department through her failure to uphold the standards of a supervisor and failing to properly document critical incidents. The investigation began when Brinson made a complaint in reference to being Tased while he was in full restraints. During the course of the investigation, investigators discovered two other incidents involving Sgt. Moultrie. The investigation revealed improprieties with the 3 Taser related incidents, which involved 3 different inmates.

The incidents investigated took place on November 25, 2013, December 3, 2013 and July 16, 2014. The first incident involved inmate Abraham being drive-stunned by Sgt. Moultrie. Investigators discovered no mention was made of the Taser being utilized in the incident report she submitted. Sgt. Moultrie completed a Use of Force report for the Abraham incident and mentioned the Taser was used. Sgt. Moultrie was not able to provide an explanation as to why no incident or Use of Force report was submitted.

During the second incident, Sgt. Moultrie drive-stunned inmate Brinson. This incident took place on December 3, 2013. It was Brinson who initiated the investigation with his complaint. Brinson alleged he was shot with a Taser twice within 10 minutes of each other. Investigators were not able to corroborate Brinson's claim. Brinson was in fact drive-stunned but, according to submitted reports and testimony from deputies, he was drive-stunned one time.

The incident began when Brinson was being combative and disorderly. The decision was made to place him in the restraint chair. Deputies involved in the altercation submitted incident and Use of Force reports which claimed Sgt. Moultrie drive-stunned Brinson while he was being secured in the restraint chair. Brinson was already in hand and leg restraints at the time he was drive-stunned. Sgt. Moultrie did not submit an incident or Use of Force report. Sgt. Moultrie could not provide an explanation as to why no incident or Use of Force reports were submitted. Sgt. Moultrie also signed the Incident and Use of Force reports submitted by Cpl. Richards.

In the third incident, Sgt. Moultrie deployed the Taser on inmate Mozee even though he posed no threat to deputies or himself. The third incident took place on July 16, 2014. Sgt. Moultrie's reason for the Tasing was because Mozee began moving in the restraint chair. Mozee was already in the restraint chair, his feet were strapped, his hands were strapped, his waist was also strapped and one of his shoulders was strapped to the restraint chair. In addition, deputies were holding Mozee's head and shoulder which stopped him from moving any further. Sgt. Moultrie admitted Mozee would not have been able to stand up if deputies allowed him to.

After viewing the video footage of the incident, Sgt. Moultrie admitted he should not have been Tased. Sgt. Moultrie did not have a working knowledge of the Taser even though she is certified to operate the device. Video footage showed Sgt. Moultrie holding the Taser for several minutes and at no time did she remove the cartridge from the device. Sgt. Moultrie admitted her intention was to drive-stun Mozee and was surprised when he was actually Tased with the prongs. During the interview, Sgt. Moultrie said she was unaware the device could be turned off.

18

Sheriff1-007528

## 3-01/010.00   EMPLOYEE CONDUCT

### 3-01/010.05   CONDUCT – GENERAL

Law enforcement and civilian employees are entrusted with special responsibilities.   They must conduct themselves professionally at all times; never behaving in a manner that brings discredit to this Department or themselves.

b) Avoid any action or conduct which might reasonably result in this office being placed in a position of embarrassment or public ridicule.

## 3-01/010.40   USE OF FORCE

Members shall not use unnecessary force in handling prisoners, serving warrants, or at any other time. A member must be firm, resolute, and energetic in exercising the means necessary to properly perform his duty. When it is necessary to use force, a Use of Force Form will be completed giving all facts of the occurrence. This form will be available from the Section Heads.

Reasonable force is the minimal force needed, superior to that force used by a subject, which will enable the officer to establish control over, or to prevent or terminate, an unlawful act.

## 3-01/040.10   INCOMPETENCE

Members may be deemed incompetent and subject to suspension, reduction in rank, or dismissal when they:

a) Display reluctance to properly perform their assigned duties;

b) Act in a manner tending to bring discredit to themselves, the Department; or

c) Fail to assume responsibility or exercise diligence, intelligence, and interest in the pursuit of their duties.

## 3-01/040.20   NEGLECT OF DUTY

Any employee failing to perform a duty required by law, Departmental rule or regulation, or which he is expected to perform by virtue of his office or position within the Department, may be disciplined for neglect of duty.

Sheriff1-007529

**3-01/015.30   INCIDENTS, REPORTING OF**

Each member is responsible for reporting, through the chain of command, any unusual incident or incidents or circumstance outside the norm of Departmental operation which occur:

Incidents which shall be reported include any involving:

c) Actions by any person which are calculated to cause or may inadvertently cause embarrassment or harassment of the Department, or any employee thereof. Incident reports should be written and submitted on the date on which the incidents are first discovered by the reporting employee. Bureau Heads shall forward a copy of all incident reports generated on Incident Report Forms from their respective commands to the Street Division of the Enforcement Bureau. Copies of incident reports involving use of force, officer misconduct or policy violations will be forwarded to the Internal Affairs Unit.

## CPL. RICHARDS

The preponderance of evidence showed Cpl. Richards was in violation of the following Standard Operating Procedures of the Chatham County Sheriff's Office: Employee Conduct, Incompetence, and Neglect of Duty.

Cpl. Richard's actions have brought discredit to this Department through her failure to uphold the standards of a supervisor and failing to properly document critical incidents. The investigation began when inmate Brinson made a complaint in reference to being Tased while he was in full restraints. During the course of the investigation, investigators interviewed Cpl. Richards on two occasions. Cpl. Richards was involved in two incidents involving Sgt. Moultrie (Brinson and Abraham).

The first incident took place on November 25, 2013, involving Abraham. Sgt. Moultrie was ordered by Lowe to drive-stun Abraham "Until she complied". According to Lowe, Abraham was drive-stunned at least twice. Cpl. Richards submitted an incident report but did not mention the drive-stun. Cpl. Richards said she did not remember the drive-stun on Abraham and could not provide an explanation as to why it was not mentioned in her incident report.

Cpl. Richards was not able to provide any details on the drive-stun, she instead attempted to distance herself from the altercation altogether. According to Limehouse, Cpl. Richards was assisting her during the altercation with Abraham. Again, Cpl. Richards said she was unable to recall her actions in this incident. The report she submitted proved she was present throughout the incident.

The second incident took place on December 3, 2013, involving inmate Brinson. Sgt. Moultrie performed a drive-stun on Brinson, who was in hand and leg restraints. At the time Brinson was drive-stunned, he was in the process of being secured in the restraint chair. Cpl. Richards was present during this incident; she submitted a Use of Force and Incident report and later testified in a Grand Jury hearing. She reported her testimony consisted of nothing more than reading from her report of the incident. Cpl. Richards was unable to recall anything during the interview with investigators.

Sheriff1-007530

Cpl. Richards blamed her lack of memory on a car accident she had in 2005, where she suffered a head injury. It should be noted, Cpl. Richards did not mention the car accident until the second interview. Cpl. Richards said she had visited several doctors but had not been diagnosed with any illness. Cpl. Richards said she had trouble remembering details. Investigators pointed out how she was able to study and pass the corporal and sergeants assessment which required memory. Cpl. Richards was also able to recall the details of the car accident, along with an incident which took place a week prior to the incident with Abraham.

Cpl. Richards was not able to provide any details on the incidents involving Abraham or Brinson. In the incident with Abraham, Cpl. Richards, a supervisor, did not mention anything about Sgt. Moultrie performing at least one drive-stun. In both incidents, she was unable to recall any information even though she was provided with copies of her submitted reports.

### 3-01/015.30  INCIDENTS, REPORTING OF

Each member is responsible for reporting, through the chain of command, any unusual incident or incidents or circumstance outside the norm of Departmental operation which occur:

a) On their shift or within the employee's general area of responsibility; or

b) On another shift, or in another area to which the employee is not assigned but has reason to believe that the incident has not or will not be reported within that other Section or Division.

### 3-01/010.00  EMPLOYEE CONDUCT

### 3-01/010.05  CONDUCT – GENERAL

Law enforcement and civilian employees are entrusted with special responsibilities. They must conduct themselves professionally at all times; never behaving in a manner that brings discredit to this Department or themselves.

### 3-01/040.10  INCOMPETENCE

Members may be deemed incompetent and subject to suspension, reduction in rank, or dismissal when they:

a) Display reluctance to properly perform their assigned duties;

b) Act in a manner tending to bring discredit to themselves, the Department; or

c) Fail to assume responsibility or exercise diligence, intelligence, and interest in the pursuit of their duties.

### 3-01/040.20  NEGLECT OF DUTY

Any employee failing to perform a duty required by law, Departmental rule or regulation, or which he is expected to perform by virtue of his office or position within the Department, may be disciplined for neglect of duty.

Sheriff1-007531

**LT. WILLIAMS:**

The preponderance of evidence showed Lt. Williams was in violation of the following Standard Operating Procedure for the Chatham County Sheriff's Office:  Supervision, and Evaluation of Subordinates Work.

Lt. Williams was the Unit Manager during the incidents with Abraham, Brinson and Mozee.  Lt. Williams knew of the incident with Sgt. Moultrie "Accidently" Tasing Mozee.  Lt. Williams said she discussed the incident with Maj. Wilson and they agreed Sgt. Moultrie would receive a counselling (PCR) for the Tasing incident.  Both also agreed not to immediately counsel Sgt. Moultrie because she was having personal family issues at the time.  They agreed to wait until Sgt. Moultrie's personal problems were worked out.

Lt. Williams admitted she would normally handle a counselling within the next day or two.  Sgt. Moultrie worked for almost a month before taking leave for the next several months.  When Sgt. Moultrie returned to work she was moved to Medical and therefore no longer under Lt. Williams.  Sgt. Moultrie was never counselled because Lt. Williams did not follow-up when she returned to work.

Lt. Williams was asked if she was familiar with the Brinson incident but she did not remember the incident.  Investigators later discovered Lt. Williams in fact signed Incident and Use of Reports submitted by deputies on the Brinson incident.  The reports clearly mentioned Sgt. Moultrie performed a drive-stun on Brinson, who was in hand, leg restraints and placed in the restraint chair.  Lt. Williams should have known Sgt. Moultrie did not submit any reports documenting her actions against Brinson.

Lt. Williams did not notice a pattern developing with Sgt. Moultrie and the use of the Taser device.  Based on the investigation, Sgt. Moultrie's use of the Taser device had become questionable at best.  The investigation revealed Lt. Williams had not properly supervised her subordinates.

## 3-01/005.00  SUPERVISION

### 3-01/005.05  SUPERVISORS

Members designated as supervisors by virtue of their rank or classification shall, in conformance with Department policy and regulations, be responsible for the work and conduct of subordinate personnel.

Each supervisor shall take all reasonable steps to determine that his subordinates perform their duties completely and promptly, while keeping in compliance with Departmental rules. The supervisor shall accept responsibility for achieving essential objectives.

### 3-01/005.10  EVALUATION OF SUBORDINATE'S WORK

Supervisors shall strive to assist subordinates and improve their welfare.   Counseling by the supervisor may help the employee recognize problems and aid in reaching a solution.

Supervisors shall investigate reports of laxity in the performance of duty or violations of Department rules.  After determining the facts, the supervisor shall report those findings in writing to his immediate supervisor.

Sheriff1-007532

## LT. GELLATLY AND LT. LOWE:

The investigation revealed a possible flaw with the level of supervision currently being used by the Sheriff's Office. This opinion is based on the interviews conducted with Lt. Williams, Lt. Lowe and Lt. Gellatly. Under the current system, Watch Commander's do not conduct follow-up inquiries/investigations involving incidents which take place during their shifts.

As with the cases involving Sgt. Moultrie, Lt. Lowe and Lt. Gellatly were the Watch Commander's during the incidents with detainees Abraham, Brinson and Mozee. According to them, they will conduct basic investigations during critical incidents but no follow-ups are conducted. They will review an incident such as a Taser deployment, but do not discuss anything with the Unit Manager.

They have no idea if all the deputies involved submit reports or complete Use of Force reports. The shortcoming created the opportunity for Sgt. Moultrie to drive-stun Abraham at least once. Sgt. Moultrie did not mention the drive-stun in her Incident report. It also allowed Sgt. Moultrie to drive-stun Brinson without subsequently submitting a written Incident or Use of Force report.

It is recommended the current policy be reviewed in an effort to lessen the opportunity for errors by deputies to go uncorrected. In these situations, Lt. Lowe and Lt. Gellatly were involved at some level but had no ability to make sure the necessary reports were submitted properly. It is also recommended supervisor's pay closer attention to reports involving a Use of Force incident, making certain the necessary information is contained in the reports.

After reading numerous reports during this investigation, report writing is a significant issue. Reports were not clear or concise. The reports also frequently lacked detail. Many of the reports were confusing and did not provide specific information.

Sheriff1-007533