**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**SOLOMAN OLUDAMISI AJIBADE** and
**ADENIKE HANNAH AJIBADE,** as natural
parents of Mathew Ajibade, and

**THE ESTATE OF MATHEW AJIBADE** and
Chris Oladapo, its Executor,

      **Plaintiffs,**

        *v.*

**JOHN WILCHER,** in his official capacity as
Chatham County Sheriff, et al.,

      **Defendants.**

**CASE NO. 4:16-CV-82-WTM-GRS**

**PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF**
**THE SHERIFF'S EXPERT WITNESS DEBRA MASH**

Plaintiffs move under Rule 702 to exclude expert testimony, offered by the Sheriff, from Debra Mash, Ph.D.

Mash, who is not a medical doctor or pathologist, is not qualified to offer the core opinion she offers, which is on the cause of Mathew Ajibade's death. She stands apart from all four forensic pathologists who have opined—the GBI's, Plaintiffs', Corizon's, and the Sheriff's pathologist himself—in arguing that Mathew died of the medical condition "excited delirium." She also lacks an adequate methodology or foundation to offer that opinion. In part, this is because she cannot show certain medical facts that she *herself* has written are necessary to establish the diagnosis.

Mash also offers various other medical testimony, all of which is improper— including about other possible causes of death and about the cause of the bipolar episode

1

Mathew suffered while in the hands of the Defendants. She claims that Mathew used marijuana, which then worsened his manic episode. Even if Mathew did use marijuana, this causation testimony is similarly improper because Mash, who is not a medical doctor, is unqualified to offer it. Further, even if she *were* qualified, Mash lacks support from the medical literature and was unable to explain the methodology behind her opinion.

Mash has a financial past with Taser International and "encourages" Taser to send police defendants her way for expert work like this. A self-professed expert in addiction research and neuropharmacology, Mash is simply the wrong expert to offer the opinions she does, and the wrong expert for this case. She offers nothing that is properly admissible under the Rules of Evidence. Her testimony should be excluded in its entirety.

## I.    Legal standard

This is a "*Daubert* motion"—a motion to exclude proposed testimony because it runs afoul of Fed. R. Evid. 702 and caselaw interpreting it. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The burden to show that an expert's testimony is admissible rests on the proponent of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Under the Rule, an expert must be properly qualified to offer her opinions. Federal "caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." *Quiet Tech. DC-8, Inc. v. Hurel-DuBois UK Ltd.*, 326 F.d 1333, 1342 (11th Cir. 2003). An analysis of the expert's reliability is conducted separately from review of the expert's qualifications. *Id.*

The classic but not exhaustive list of factors courts may consider includes: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

## II.    Relevant facts

Mathew Ajibade was arrested by the Savannah-Chatham Metro Police Department on January 1, 2015 while in the throes of a manic episode. Mathew had been diagnosed as having bipolar disorder.

The evidence is undisputed that Mathew's girlfriend presented the arresting police officers with Mathew's pill bottle for a drug that treats bipolar disorder (generic Depakote). The evidence is also undisputed that this pill bottle made its way from the police, to the Sheriff's deputies, to Defendant Brown, a nurse who placed it on a shelf and did nothing further with it. The evidence is also undisputed that nobody assessed Mathew's psychiatric needs or history, nobody gave Mathew generic Depakote or any other drug, and nobody called the Corizon psychiatrist who was supposedly on call the night Mathew was killed.

While in the Jail, Mathew continued to experience manic symptoms. Rather than treating him humanely and with compassion and understanding for his mental state, the Sheriff's deputies beat him, shocked him with a Taser, and tied him to a chair. Then they left him alone in the cell where he died. Nurse Brown spent a total of 51 seconds in the cell

3

and, by his own admission, rendered no medical treatment at all. Mathew died and his death was recorded as a homicide. Nine deputies involved in the incident were fired, Nurse Brown was suspended, and Corizon was ultimately terminated from its contract, too—but all too late to save Mathew.

The parties disagree about what killed Mathew. The Georgia Bureau of Investigation's medical examiner, Dr. Stacey Desamours, is the only person to have performed an autopsy on Mathew's body (and the only pathologist not hired by one of the parties). In her opinion, Mathew died of all of the insults and injuries inflicted on him by the deputies, and he died because no one—including Nurse Brown—attended to his medical needs. Plaintiffs' expert pathologist, Dr. Dan Spitz, a practicing county medical examiner in the Detroit suburbs, agrees with this theory. The Sheriff's pathologist, Dr. Charles Wetli, who has not practiced since 2003, opines that Mathew died of a previously undiagnosed sickle cell trait. So does Corizon's pathologist, Dr. Gerald Gowitt. (Separate *Daubert* motions are being filed regarding Dr. Wetli and Dr. Gowitt's opinions.) All four of the pathologists affirmatively testified that excited delirium was not the proper diagnosis for Mathew's cause of death. All four pathologists also testified marijuana use was not a causal factor in his death.

### III.   Mash's background.

Mash is a Ph.D.-holding pharmacologist and a professor of neurology at the University of Miami (Fla.). (Ex. A, Mash Rep. 1.) She also serves as the director of that university's "Brain Endowment Bank." *Id*. She holds herself out as an expert in drug addiction and toxicology. *Id*.

However, Mash lacks any medical degree and is not licensed to practice medicine or psychiatry in any state. She has never performed an autopsy and is not qualified or licensed to do that, either. (Ex. B, Mash Dep. 259:21-260:5.)

Mash is a controversial figure. She is strongly associated with a Schedule I drug, ibogaine, and its metabolite, noribogaine. Mash has pursued research on ibogaine for decades, although she is almost alone in the entire academic world in doing so. In her view, the drug is useful for treating addiction to practically everything, from heroin, to crack cocaine, to alcohol, to nicotine. *Id*. at 234:9-235:1. In fact, she has written about reports that "a *single dose* of ibogaine eliminates opiate withdrawal symptoms . . . for extended periods of time." Ex. C, Mash et al., *Ibogaine: complex pharmacokinetics, concerns for safety, and preliminary efficacy measures,* 914 Ann. N.Y. Acad. Sci.. 394 (2000) (abstract) (emphasis added). In her view, ibogaine "resets the opiates, blocks the opiate withdrawal," and acts as a cure for opiate addiction.[1] If she were right, the opioid crisis would be over.

The drug—which Mash has described as an "African rain-forest psychedelic"[2]— induces psychedelic hallucinations after administration. Mash believes that, during these hallucinations, "It's as if the plant is teaching you something fundamental about who you

---

[1] KRON Evening News, *"Ibogaine,"* (KRON television broadcast Feb. 20, 2004), *available at* https://www.youtube.com/watch?v=Cowq9EqVjY4?t=7m11s (at 7:11).
[2] This quote appears in the *Miami New Times*, Ex. D at 13. Mash described this piece as "a great article on my work on ibogaine." Ex. B at 162:4-9.

are as a person."[3] Mash believes that "for detox from opiates, it's a slam dunk." (Ex. B at 249:25-250:4.)

No government agency, drug company, or reputable doctor agrees. Ibogaine is a dangerous Schedule I drug, relegated to far and illegal corners of the Internet. Mash admits that people have died after taking it. *Id.* at 251:24-252:1. The National Institute on Drug Abuse refused to fund Mash's ibogaine research. *Id.* at 241:2-12, 241:16-23. No drug company has agreed to fund Mash's ibogaine research either. *Id.* at 242:16-243:2.

Mash's interest in ibogaine is not solely academic. Because she cannot legally sell ibogaine in the United States, Mash went to the Caribbean island of St. Kitts and established the "Healing Visions Institute for Addiction Recovery." *Id.* 236:7-19. As described in the *Miami New Times,* Mash and her lawyer ex-husband established this "Institute" as a for-profit company. (Ex. D at 14.) In her offshore clinic, Mash charged vulnerable drug addicts as much as $12,000 per course for "treatment" with this unlicensed, unproven compound. (Ex. B at 240:9-18.) She has called these psychedelic drug-trippers her "Iboganauts." *Id.* at 252:7-10. Mash holds 14 patents on the ibogaine metabolite and is still developing it for commercial use. *Id.* at 234:19-235:6, 239:19-240:6. Mash has also been a plaintiff and defendant in patent suits involving ibogaine and noribogaine. *Id.* at 247:20-24, 249:2-5.

Mash also holds herself out as an expert in excited delirium. In fact, Mash claims to be the world's foremost expert on this topic. *Id.* at 154:6-21. In her "brain bank," she collects brains of people who are alleged to have died from the disease. *Id.* at 150:11-

---

[3] KRON video at 7:35; Ex. B at 251:11-15 (authenticating video).

150:20. She says her brain bank is the only collection of such brains in the world, and claims that no other researcher in the world could study the topic the way she can. *Id*. at 151:11-152:7.

Mash's work on so-called "excited delirium"—itself a controversial diagnosis not generally accepted by medicine—is itself highly controversial. She claims to be developing a laboratory test which would allow a technician to analyze brain proteins to determine if a person suffered from excited delirium at the time of his or her death. *Id*. at 154:22-155:4. However, she admits that her test is not yet available; that "[t]here aren't a lot of neuroscientists that work on this"; that her work is "not acknowledged" in neuroscience generally; and that she hasn't attracted sufficient testable brains, research interest, or commercial incentive to develop this test. *Id*. at 155:5-156:12. Mash did not attempt to run this test on Mathew's brain.

Excited delirium is a controversial quasi-medical diagnosis. It is not recognized by the American Medical Association or the American Psychiatric Association. It is not found in the Diagnostic Statistical Manual. It is, however, a hobbyhorse for defendants accused of sudden deaths and a very useful alternative "diagnosis" for people who have died in custody or after being struck by Tasers. Taser International (a/k/a "Axon") encourages facially neutral academic research on excited delirium, which protects the Taser business. Mash's brain research fills the bill.

However, Mash has links to Taser that make her less than neutral. Although she strenuously denies that Taser had ever funded any of her research, she did admit to having received at least $24,000 from the company as part of a series of expert witness

engagements. *Id*. at 221:21-222:2 (part of a long answer). In her expert witness career, of the cases involving an in-custody death, Mash has testified in favor of police or the Taser company 100% of the time. *Id*. at 129:2-15. (The only time Mash considered working for a dead person's family, she decided not to "go[] forward with it." *Id*.) Similarly, 100% of the time Mash has testified in an "excited delirium" case, she testified for the police or for Taser. *Id*. at 130:23-131:1.

Taser runs to Mash to shore up its defenses and to support police accused of killing citizens with its product. A lengthy, investigative report on Tasers by Reuters, Ex. E, *available at* https://www.reuters.com/investigates/special-report/usa-taser-experts/, disclosed the hidden links between and among Taser, Mash, and the Sheriff's other expert Charles Wetli. (In fact, all of the Sheriff's experts are linked together. Mash and the Sheriff's expert Darrell Ross have spoken at Vegas conferences run by a private "Institute" owned by the Sheriff's expert John Peters, Ex. O (conference schedule); the Institute has been funded by Taser. The conference also features Michael Brave, Taser's in-house counsel who has sponsored Mash in litigation. Ex. B at 110:12-16. Mash, Wetli, Brave, and Peters also have chapters in a book edited by Taser board member Jeffrey Ho. Ex. P.)

The Reuters article, Ex. E, described the death of a teenager who died less than an hour after police shot him with a Taser. Only four hours after he died, the police received an e-mail from Steve Tuttle, a Vice President of Communications at Taser International. (Ex. F at 2.) The e-mail urged police to hire Mash right away. It appears below:

8



5. **TIMELY AND URGENT:** The attending medical examiners should urgently know that the University of Miami Brain Endowment Bank is available with cutting edge research center that can determine drug abuse and look for excited delirium markers: ▇▇▇▇▇▇▇▇▇ is the telephone number. Dr. Deborah Mash is the lead researcher on this matter. This is one critical act that many MEs miss out on because of delays. It's imperative to get this info to the ME as the brain tissues must be collected ASAP. I attached some of Dr. Mash's research on Excited Delirium issues.

Deborah Mash
Professor of Neurology and Molecular and Cellular Jeanne C. Levey
▇▇▇▇▇▇
Miami, FL 33136
▇▇▇▇▇▇▇
▇▇▇▇▇

Mash was consulted in that case, and provided information to the Florida Department of Law Enforcement as part of their investigation. (Ex. B at 220:21-221:10.) Reuters reported that Charles Rosen, the president of the Association for Medical Ethics, criticized Mash for failing to tell FDLE about her conflict of interest, due to her past work for Taser. (Ex. E.)

Mash testified that Taser has recommended her to other police agencies as well, and that she "encourage[s]" these recommendations. (Ex. B at 225:14-226:16.)

## IV.   Mash's opinions.

Mash's report, Ex. A, is disordered and does not cleanly delineate the discrete opinions on which she intends to testify. Her opinions are intermixed with a slanted recitation of the factual record. Distilling her opinions into an outline, she appears to offer the following:

- Cause of death opinions. Pages 9, 13-14.
  - o   Criticisms of the medical examiner's methodology. Page 9.
  - o   "In this instance, the manner of death . . . would suggest that the manner of death was due to natural causes." (Sic.) Page 13.

- o "[I]t is my opinion, to a reasonable degree of scientific and medical probability, that Mr. Ajibade's death was due to natural causes associated with his psychiatric diagnosis of bipolar disorder." Page 14.

- Opinions about the history and presentation of excited delirium, pages 9-13, including:

  - o Conjecture about the "precise mechanism of lethality." Pages 11.

  - o Admissions that excited delirium is "not a currently recognized medical or psychiatric diagnosis." Page 12.

- Medical opinions and information about bipolar disorder and bipolar mania.

  - o "Bipolar disorder usually develops in a person's mid-teens or early adult years. . . . Symptoms of bipolar disorder can be mild and infrequent or severe, and patients with the disease may experience symptoms in different ways." Page 4.

  - o "Mr. Ajibade evidence signs and symptoms of this syndrome, . . . ." Page 8.

  - o "A layperson unfamiliar with the disorder may not recognize the signs or symptoms . . . ." Page 8.

  - o "Mania is the cardinal feature and a core symptom of bipolar disorder." Page 11.

- Psychiatric causation testimony, page 12-13, and possibly elsewhere, including:

  - o Mathew's "known psychiatric condition" "would provide an explanation for why he was at risk for delirious mania."

- Medical opinions and information about sickle cell trait. Page 9.

Importantly, although Mash's report gives general, expository information about excited delirium, it does *not* state that Mathew actually suffered from excited delirium. Nor did the report actually state that excited delirium was a cause of Mathew's death.

10

Although she hovers around the topic, Mash refused to commit these opinions to an express writing. (She knows how to write the words; she has done so in several other cases, where she offers her cookie-cutter expert reports. Ex. G at *Petro* § VI, *Heston* § VI, *Mann* § VI.) Instead, Mash left these opinions to be uncovered during her deposition.

At her deposition, Mash expressed several brand new opinions not stated in her report. These include:

- That Mathew died of "a heightened state of manic delirium." (Ex. B at 13:11-15; 33:22-24.) (According to Mash, manic delirium, delirious mania, and excited delirium "are basically describing the same syndrome" because "they're synonymous." *Id*. at 18:13-19:3.)

- That Mathew was under the influence of marijuana, which contributed to his death. *Id*. at 13:11-12, 13:17-18; 33:25-34:1.

- That Mathew had sickle cell trait and died of respiratory compromise as a result. *Id*. at 13:11-12, 14:2-8; 38:17-19. (Later, she conceded: "there is . . . no hard evidence that Mathew actually had the sickle cell trait. *Id*. at 184:2-5.)

- That a "neurocardiac" mechanism—not identified by any other expert in this case—meant that Mathew's bipolar disorder "signal[ed] directly to the heart," killing him. *Id*. at 22:10-23:3.

- That Mathew's bipolar disorder created a "cardiorespiratory signal" such that "the respiratory centers in the brain will shut down." *Id*. at 23:11-13. Despite numerous chances, *e.g.*, *id*. at 23:21-24:2, 24:16-21, 27:25-28:4, 28:21-29:2, she could not show where this opinion appeared in her report. Finally, she conceded that it isn't there. ("Q: Where does it say that? A: It doesn't." *Id*. at 29:3-19.) No other expert offered this opinion.

Mash's opinions—whether disclosed timely or untimely—are a jumbled mess of wild theories, suppositions, and untestable propositions. They should be excluded in their entirety because she lacks any reasonable scientific basis to offer them.

### A.    Cause of death opinions should be excluded entirely.

Most of Mash's opinions have to do with the cause of Mathew's death or—as she

insists on calling it, "mechanism of lethality." *Id*. at 7:22-8:4, 8:23-9:2. While she claims

she is *not* opining on "cause of death," in reality, she is, and she treats the terms as

synonymous. ("The point is cause of death, mechanism of lethality." *Id*. at 72:8-24.)

Her report flat out offers the following assertion, "that Mr. Ajibade's death was due to natural causes." (Ex. A at 4.) At deposition, she dictated the handwritten list at left, Ex. H, of six possible causes of Mathew's death. (Ex. B at 13:11-14:19 (dictating list); 79:2-24 (agreeing to contents).)

Over and over, she offered her ideas as to the causes of Mathew's death, calling various factors "contributory to Mathew's death, yes," *id*. at 21:3-10;

referring to a "lethal mix . . . that caused his death," *id*. at 28:19-20; declaring that bipolar

disorder "can place a person at risk for neurocardiac death," *id*. at 32:5-18; referring to

"neurocardiac" episodes as "a likely cause of sudden death" that "could underlie"

Mathew's death, *id*. at 35:14-36:20, 37:13-25; saying that "the final mechanism of

[Mathew's] lethality in this matter was his fatal arrhythmia," *id.* at 86:13-16 (in longer answer 85:12-86:25); and on and on.

According to Mash, "You put all this together, it's a lethal time bomb. He dies." *Id.* at 86:24-25. (Despite this witch's brew of possible causal factors, however, Mash is sure that the Taser is blameless. *Id.* at 256:3-9.)

Unquestionably, Mash opines on the causes of Mathew's death. The fatal problem here is, as Mash herself admits: "***I am not a medical doctor and, therefore, I cannot render an opinion on cause of death.***" *Id.* at 7:22-8:4 (emphasis added). Indeed, Mash is not legally qualified to serve as a medical examiner in her state or in Georgia. Fla. Stat. § 406.06; Ga. Code § 45-16-80.

But although she is no medical doctor, she full well intends to testify like one. Her report was offered "to a reasonable degree of . . . medical probability." (Ex. A at 14.) She offers numerous quasi-medical assertions. And she made numerous criticisms of the GBI's neutral M.D. pathologist who conducted Mathew's autopsy. *E.g.*, "The medical examiner ruled out" Mash's causes of death "without a thorough consideration of alternative mechanisms of lethality to support her determination of cause and manner of death." *Id*. at 9.

Under Rule 702 and *Daubert*, a witness must have the relevant qualifications to testify regarding the matters she wishes to address. The qualification inquiry is separate from any inquiry into the reliability of the expert's opinion. *Quiet Tech. DC-8, Inc.*, 326

F.3d at 1341. By her own admission, Mash is simply unqualified to offer any opinions that go to causes of Mathew's death. She must be excluded from offering those opinions.

**B.      All excited delirium testimony should be excluded.**

Mash's opinion regarding cause of death very much includes her determination that Mathew died of excited delirium, or as she sometimes put it, "manic delirium." Again, these terms are "synonymous." (Ex. B at 19:4-20:1.)

Mash stands alone among witnesses in this case offering the opinion that Mathew suffered from this condition, which was the first one on her list of lethal causes. *Id.* at 13:11-15; Ex. H, Mash Dep. Ex. 1. Mash admits that excited delirium is what she discussed with defense counsel when she was very first hired. Ex. B at 108:24-109:14. Although she refused to put it in writing in her report, she apparently never let go of the diagnosis. By the time of her deposition, the diagnosis had apparently become concrete enough to put into words.

Mash's medical diagnosis here is stunning, particularly given her own limited credentials. But it is also remarkable that Mash stands alone. Four board-certified pathologists reviewed Mathew's death—the Georgia Bureau of Investigation's and three experts for the parties. In addition, Corizon offers another M.D. expert. These five M.D.s *unanimously* ruled out excited delirium as a cause of death:

14

| Witness | Sponsor | Testimony | Cite |
|---|---|---|---|
| Stacey Desamours | GBI | Q. Did you consider excited delirium as a diagnosis prior to rendering your opinion as to the cause of death of Mr. Ajibade? A. Yes. Q. And did you rule that out? A. I did. | Ex. I, Desamours Dep. 44:21-45:2. |
| Daniel Spitz | Plaintiffs | Q. Do you agree with Dr. Desamours that Mr. Ajibade's death, cause of death was not excited delirium? A. I don't believe it was. | Ex. J, Spitz Dep. 96:12-14. |
| Gerald Gowitt | Corizon | A. I just don't think he has an excited delirium. And I have signed out a number of cases of excited delirium. | Ex. K, Gowitt Dep. 47:1-3. |
| Charles Wetli | Sheriff | A. No. He didn't have excited delirium. | Ex. L, Wetli Dep. 20:22. |
| Thomas Fowlkes (M.D., not a pathologist) | Corizon | Q. So is it correct to say that you are unable to say to a reasonable degree of medical probability that he, in fact, died from any type of excited delirium? A. Yes, that is correct. I did not form that opinion and don't—at this time, and don't intend to offer that as an opinion. | Ex. M, Fowlkes Dep. 38:11-17. |

Mash was presented with their testimony, these exact words, of the four

pathologists (Fowlkes had not yet testified). When asked how she is qualified to dispute

the pathologists' conclusions, she stuck to her guns, stating: "I have disagreed with many

doctors over many things over many years." (Ex. B at 65:24-66:20.) And in an

extraordinary interchange, she said that she believed she could convince all of the

pathologists to change their opinions to match hers:

> Q.    Again, my question was if you agreed or disagreed with
>        them about their conclusions on excited delirium.
>        Every one of them said—and I read it to you—that they
>        did not believe excited delirium was at issue here. And

15

> you said you disagreed with at least some of those—that testimony.
>
> And I want to know: are you disagreeing with the unanimous opinion of the four pathologists about excited delirium?
>
> A.     . . . If I look at—**if I was able to sit with my colleagues**—your colleagues—Dr. Gowitt, Dr. Desamours, Dr. Spitz, Dr. Wetli—**around this table and we went down the excited delirium checklist, they may change their opinion.**

*Id.* at 60:2-11, 61:4-8.

Further, her opinion was striking in that the diagnosis could be made using *just* video evidence alone. "If you look at the video . . . . Those are all features." *Id.* at 61:18-25. She did not back down from her assertion: "[I]f you watch that video and you had your expert[s] sitting around the table, I believe that I could make a very good case to count the number of symptoms in this that would make the clinicians agree that he was in a state of delirious mania." *Id.* at 66:24-67:9.

Mash's excited delirium opinions must be excluded for the following reasons:

1) She never said in her report that Mathew actually suffered from excited delirium. This stands in obvious contrast to her several other cases where she has come out and used the words. (Ex. G (expert reports from other cases).) She moved the goalposts during the deposition.

2) Her video-based manner of diagnosis simply runs counter to her own writings on the topic. This is a serious flaw in her methodology that exposes her opinion as unreliable.

Mash wrote an article, Ex. Q, Deborah C. Mash, *Brain biomarkers for identifying excited delirium as a cause of sudden death*, Forensic Sci. Int'l 190, e13 (2009). In this article, Mash reports on a case series of "ninety excited delirium deaths." *Id*. at e13. The goal was to attempt to find "biomarkers" that would suggest a person's susceptibility to excited delirium. Basic statistics on the 90 individuals were reported in tables 1 and 3. *Id*. at e15.

As explained in table 1, and in her deposition, the mean temperature of the subjects in the analysis was 40.7°C (105.3°F)—which is feverish. *Id*.; Ex. B at 171:3-12. Mash agreed that there were plenty of people in the case series with even higher temperatures like 42°C and 43°C (107.6°F and 109.4°F). *Id*. at 172:17-20. And as explained in table 3 of the article, Ex. Q at e15, cocaine and methamphetamine were detected in 94% of the cases. Only 4.4% of the cases involved no evidence of drug use. *Id*.; *see also* Ex. B at 175:9-21.

Thus, the typical "excited delirium patient" is on considerable stimulant drugs and experiencing a very high body temperature. And this is not particularly controversial— outside of the setting of *this* particular, Mash would probably readily concede it.

Now, Mash grudgingly admitted at deposition, there was no evidence that Mathew experienced an elevated temperature like this; and she grudgingly admitted that there was no evidence that Mathew was using a stimulant drug. *Id*. at 170:24-171:2, 175:22- 176:13. Mathew fits neither of the key criteria for excited delirium. Yet Mash insists that he is an excited delirium case. How? She engages in complete speculation, contrary to the record. As to the body temperature, her theories were that perhaps Nurse Brown failed to detect the temperature. *Id*. at 180:8-181:9. She also speculated that it must have been cold

17

in the jail, because it was January, so if Mathew disrobed, he must have been hot. *Id*. at 178:23-179:10 ("A. . . . it was in January. So it's cold."). She has no information about the temperature in the jail. As to the absence of a stimulant drug, she insisted that it's possible Mathew was on some undetectable designer drug. *Id*. at 175:22-176:3. There is no evidence of any of this. Mash stubbornly fights against all the available evidence to get her theory to fit. It just doesn't.

3) Mash's work is simply unreliable. Mash did not run her "brain protein" tests, and she did not analyze Mathew's brain. She cannot rely on the test that she is supposedly developing to determine if Mathew suffered from excited delirium. *Id*. at 154:22-155:4. Even if she had, she admits her work is "not acknowledged" in neuroscience generally, and given that she supposedly runs the only such brain bank in the world, her work is also not capable of repetition by anyone but her. *Id*. at 155:5-156:12, 151:11-152:7. Thus, her science flunks all four of the classic *Daubert* factors—testability, peer review, known error rate, and general acceptance. *McCorvey*, 298 F.3d at 1256.

Finally, because she cannot properly make the excited delirium diagnosis and because no other expert does, she should be excluded from offering even general background information about excited delirium. Excited delirium is simply a subject with no tether to the case; in other words, because no one will testify on it, her general information lacks "fit." *See United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. 2017).

18

**C.      All testimony that Mathew's alleged marijuana use contributed to his bipolar state should be excluded.**

Mash's next opinion, also undisclosed in her report, is that marijuana use can worsen a preexisting manic episode:

> Q.      Okay. And what I would like to know is what's really your contention here? Is it that cannabis use itself causes or induces a manic episode, or is it that cannabis is just associated with mania?
>
> A.      It worsens.
>
> Q.      Okay. So cannabis use is a causal agent in worsening a preexisting manic episode?
>
> A.      I would say that. I think that's well stated.

Ex. B at 188:6-15. However, any opinion of Mash's that marijuana caused Mathew to have a manic episode, or worsened his manic episode, or otherwise somehow contributed to his death, should be excluded entirely.

First of all, as with the other opinions, she is not a medical doctor or psychiatrist and is not qualified to offer this causation opinion. Also, as with her other opinions, she contradicts every M.D. in the case:

| Witness | Sponsor | Testimony | Cite |
|---|---|---|---|
| Stacey Desamours | GBI | Q. Is it fair to say, then, that your opinion is that the marijuana was not a contributing factor to his death? A. That's correct. | Ex. I, Desamours Dep. 47:9-15. |
| Gerald Gowitt | Corizon | Q. Was the presence of THC a contributing factor for you one way or the other? A. No, it was not. | Ex. K, Gowitt Dep. 118:5-7. |
| Charles Wetli | Sheriff | A. . . . However, in this particular case, we have no evidence that this was a drug-induced death to begin with. . . . | Ex. L, Wetli Dep. 49:13-15. |

19

| Witness | Sponsor | Testimony | Cite |
|---------|---------|-----------|------|
| Thomas Fowlkes (M.D., not a pathologist) | Corizon | Q. Is it your testimony that marijuana use can trigger . . . a manic episode? . . . A. No, that's not my—that's not my testimony. | Ex. M, Fowlkes Dep. 140:17–141:4. |

Mash was asked whether it is even *possible* for marijuana to cause a manic episode, including excited delirium. Although she claimed it is possible, and although she claims to be an expert on neuropharmacology and excited delirium, she has never published this theory. ("And we actually have some other cases, not that I published on, where the only drug on board and what a medical examiner said was excited delirium[,] was marijuana. And it's rare. To be honest with you, it is rare." Ex. B at 190:23-191:2 (within much longer answer at 189:4-191:4).) She admitted that in her 90-person case series of supposed excited delirium deaths, none of those subjects had used marijuana. *Id.* at 191:5-13.

Mash was then asked to point to any medical literature supporting her causation theory. She identified one paper, Ex. N, Melanie Gibbs et al., *Cannabis use and mania symptoms, a systematic review and meta-analysis*, 171 J. Affective Disorders 39 (2015). The Gibbs authors are six researchers mostly associated with the University of Warwick (U.K.). Because theirs was a review article, the Gibbs authors conducted "an exhaustive search to find every paper on the topic of marijuana and exacerbation of mania," and Mash admitted their review encompassed "the full universe of papers" supporting her opinion. (Ex. B at 192:20-193:9.) She also admitted, however, that she "didn't look at every original paper that they cited." *Id.* at 205:16-24.

In their review of all existing science, the Gibbs authors found only "6 studies [that] met full criteria for inclusion." *Id.* at 8. Mash acknowledged that every one of these studies, none of which she read, was found to be at "high risk of bias" under some criterion. *Id.* at 200:17-201:12; Ex. N at 8-9.

The Gibbs article—the only single paper she did cite or did read—is weak science that does not support Mash's contentions. And she stretches it beyond the limits its own authors placed on it. The Gibbs authors wrote:

- "[A]ssociations with mania remain relatively unknown." *Id.* at 2.

- "We were only able to identify a small number of studies of variable quality, thus our conclusions remain preliminary." *Id.*

- Their findings were "tentative." *Id.* More high-quality studies "are required" to fully explain any relationship. *Id.*

- Of the underlying articles being reviewed, some of the papers "rais[ed] the possibility that at least some manic symptomatology could be explained by . . . reverse causality." *Id.* at 18. This meant that "cannabis use could have occurred in the context of existing mania symptoms." *Id.* at 10.

On that last point—the equal possibility that marijuana could cause mania *or* that mania could lead sufferers to marijuana—Mash admitted she did not disagree with the Gibbs' authors analysis. ("Q. Is it wrong? A. . . . . No, it's not wrong." Ex. B at 203:4-16.) Indeed, she agreed "it's a chicken and egg [situation,] is what I'm trying to say here," and "we don't know which one came first." *Id.* at 204:3-25.

A court reviewing a scientific or medical opinion such as this must determine whether there are good grounds for the expert's opinion. And an expert must be able to satisfactorily explain her methodology. Where an expert canvasses the "full universe" of

21

science and comes back with exactly one article, whose authors admit there could be "reverse causality" and that their findings are therefore "tentative," that is not good science. And where a non-M.D. expert like Mash purports to overrule every other M.D. in the case, that is not good medicine either.

Accordingly, Mash should be precluded from offering her opinion that marijuana exacerbated Mathew's bipolar disorder, which is her only opinion as to the role of marijuana. As no other witness in the case opines that marijuana is causal for anything, she should be excluded from discussing marijuana entirely. Again, her opinions simply do not fit with any issue in the case.

### D.      Sickle cell trait testimony

Another set of opinions Mash should be precluded from offering concerns Mathew's supposed sickle cell trait. In the view of the defense pathologists, Gowitt and Wetli, Mathew died in the throes of a sickling crisis—essentially, a sudden death caused by characteristics of the blood. Those pathologists agreed there is no direct evidence that Mathew was ever diagnosed with carrying the trait; it is an inference they make from the circumstances.

This is another of Mash's undisclosed opinions that grew between the time she served her report and the time she testified at deposition. In her report, she offered a single, uncited paragraph on the topic, including that sickle cell trait "may have caused the death of up to 10 college football players since 1974," and another sentence that the trait "could be" a contributing factor to Mathew's death along with "a toxicant that went undetected at autopsy." (Ex. A at 9, 14.) That was the sum total of her opinion in her

22

report. As for the reference to "up to 10 college football players," Mash could not say where she got it. "If you Google. If you Google search, you'll hit it," she testified. (Ex. B at 212:8-15.) Mash admitted that her discussion of sickle cell trait was—at the time she offered her report—only a "hypothesis." *Id.* at 185:8-15.

At deposition, however, she firmed up her opinion to state affirmatively that "the sickle cell trait **is** contributory" to Mathew's death, *id.* at 24:22-25:12, because "subsequent to my writing the report, we **know**" Mathew was diagnosed with the trait, *id.* at 28:5-20 (emphasis added). **Now**, she believes, the trait was part of a "lethal mix for Mr. Ajibade that caused his death." *Id.*

Mash does not "know" Mathew carried the trait. She did not look at the blood pathology herself. *Id.* at 38:22-39:4. She has no documentary evidence that Mathew had the trait. But she criticized Desamours, the GBI pathologist, for ruling out sickle cell trait as a cause of death (*id.* at 25:8-9 ("I felt that was a mistake")). She also criticized Desamours for conducting a "forensic investigation [that] was deficient in a number of areas, and that's another one." *Id.* at 39:14-40:1.

As with many of her opinions, Mash is outside her scope and out of her depth. Her entire opinions on sickle cell trait—as well as the validity of the GBI's autopsy and how the GBI medical examiner conducted it—should be excluded. As Mash herself admitted, she is not really qualified to offer these opinions. "I am not a medical doctor," she testified, "therefore, I cannot render an opinion on cause of death." *Id.* at 7:22-25. Nor is Mash qualified to attack the medical examiner's autopsy when she herself simply has no

credential or legal right to practice in that field. Stunningly, Mash maintains her criticisms of the GBI's Dr. Desamours *even though Mash admits she did not even read Desamours's deposition. Id.* at 47:11-48:7.

Even as an academic, Mash has no expertise with sickle cell trait—she has never published on it, never taught on it, never lectured on it. *Id.* at 182:15-21. She's never diagnosed anyone with having it. *Id.* at 260:18-20. She has never opined, before this case, that any death was caused by sickle cell trait. *Id.* at 185:16-19.

Mash's sickle cell trait "hypothesis," her opinion on the trait's "lethality" generally, and her argument that it was part of a "lethal mix" for Mathew should all be excluded, as should her criticism of the way the GBI examiner ran her autopsy. Mash simply lacks the qualifications and methodology to offer these opinions.

### E.   Cardiorespiratory theory

Mash testified that Mathew's bipolar disorder created a "cardiorespiratory signal" such that "the respiratory centers in the brain will shut down." *Id*. at 23:11-13. Despite numerous chances, *e.g.*, *id*. at 23:21-24:2, 24:16-21, 27:25-28:4, 28:21-29:2, she could not show where this opinion appeared in her report. Finally, she conceded that it isn't there. ("Q: Where does it say that? A: It doesn't." *Id*. at 29:3-19.)

This opinion should be excluded as it was wholly undisclosed prior to her deposition, in violation of Rule 26. Plaintiffs were entirely unable to prepare for this theory of cause of death. And Mash, not a medical doctor, is unable to offer it anyway.

**V.      Conclusion.**

"Because expert witnesses have the potential to be both powerful and quite misleading, it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinion." *United States v. Fultz*, 591 F. App'x 226, 227 (4th Cir. 2015) (quote marks and citation omitted). With Mash, that caution rings true—it rings loud. Although she may wear a white lab coat and run a brain bank, and although her credentials in neuropharmacology may be sound, her quasi-scientific opinions are not. Mash's many theories are methodologically bankrupt. Her testimony must be excluded from the trial.

Respectfully submitted,

/s/ William F. Cash III
Troy A. Rafferty (Fla. Bar No. 024120)
Timothy M. O'Brien (Ga. Bar No. 548714)
William F. Cash III (Fla. Bar No. 68443)
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone:    850-435-7059
Fax:        850-435-7020
E-mail:    trafferty@levinlaw.com
              bcash@levinlaw.com

25

Mark O'Mara (Fla. Bar No. 359701)
Alyssa Flood (Fla. Bar No. 99755)
**O'MARA LAW GROUP**
221 NE Ivanhoe Boulevard
Orlando, FL 32804
Phone:      407-898-5151
Fax:         407-898-2468
E-mail:     mark@omaralawgroup.com

Cameron C. Kuhlman (Ga. Bar No. 596159)
**DUFFY & FEEMSTER, LLC**
236 E. Oglethorpe Ave.
Savannah, GA 31401
Phone:      (912) 236-6311
Fax:         (912) 236-6423
Email:      cck@duffyfeemster.com

William R. Claiborne (Ga. Bar No. 126363)
**THE CLAIBORNE FIRM, P.C.**
410 East Bay Street
Savannah, GA 31401
Phone:      912-236-9559
Fax:         912-236-1884
E-mail:     will@claibornefirm.com

*Counsel for the Plaintiffs*

26

## CERTIFICATE OF SERVICE

I certify that on February 21, 2018, this *Plaintiffs' Motion io Exclude Testimony of the Sheriff's Expert Witness Debra Mash* will be filed on CM/ECF, which will serve it on all parties.

/s/ William F. Cash III
William F. Cash III