UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| **SOLOMAN OLUDAMISI AJIBADE** and **ADENIKE HANNAH AJIBADE,** as natural parents of Mathew Ajibade, and<br><br>**THE ESTATE OF MATHEW AJIBADE** and Chris Oladapo, its Executor,<br><br>**Plaintiffs,**<br><br>*v.*<br><br>**JOHN WILCHER,** in his official capacity as Chatham County Sheriff, et al.,<br><br>**Defendants.** | CASE NO. 4:16-CV-82-WTM-GRS |

**PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF
SHERIFF'S EXPERT WITNESS DARRELL ROSS**

Plaintiffs move under Fed. R. Evid. 702, 703, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to exclude expert testimony, offered by the Sheriff, Debra Johnson, and Andreux Evans-Martinez, from Darrell L. Ross.

Ross, who is currently a social science professor at Valdosta State University, considers himself an expert in officer use-of-force incidents and in-custody deaths. Ross did not attend law school, nor is he a licensed attorney, yet, hhe has spent the last 28 years interpreting use-of-force caselaw for law enforcement and corrections officers.

Ross comes to his assignment with a clear history of taking the side of defendants. Across nearly three decades of work as a private litigation expert evaluating the constitutionality of use-of-force policies and procedures in hundreds of cases, Ross has worked for plaintiffs only twice. With the exception of those two cases, Ross has never (a)

1

expressed an opinion that a police officer or corrections officer acted wrongfully, or (b) that a corrections officer or a police officer violated a plaintiff's constitutional rights, and (c) he has never found that an officer's use of force was excessive.

Despite this disturbingly one-sided track record, Defendants asked Ross to come into this Court and opine as to the Sheriff's policies, procedures and training related to use-of-force incidents and in-custody deaths. Ross concluded that the deputies' use of force was reasonable, that neither the Sheriff nor Lieutenant Johnson, nor Evans-Martinez violated Mathew Ajibade's constitutional rights, and that no officer acted wrongfully. In short, Ross reached the same legal conclusions in this case that he has reached in hundreds of prior cases over nearly three decades of work for law enforcement and corrections agencies.

Ross approaches his assignment with a second significant failing. He purports to be an expert in the subject of "law."[1] In fact, the Court's job is to be the expert in the law. Ross does not get a second vote in the Court's decisions. These conclusions invade the province of the Court and offer no help to the factfinder. Thus, they should be excluded.

Moreover, Ross' methodology is inherently flawed. His expert witness work is not informed by his research, as much as it is his expert witness work that "motivate[es]" and "propels" his scholarship. (Ex. B, Ross Dep. Tr. 44:12-13, 45:1-2.) He relies on his own expert-witness work, and also "picking up the phone and calling [defense attorneys]," for

---

[1] For example, "[w]hat does this mean to a police officer arresting someone when the court says we're going to examine you and to review your use of force based on these standards and the totality, what happened in the jail or the prison or the street." Ex. B at 48:2-7.

2

the data to support his scholarship. *Id*. at 173:6-7. In so doing, Ross not only puts the cart before the horse, he creates a circular loop that undermines the reliability and relevance of his opinions. Because his opinions are based on a limited dataset of self-referential research emanating from his own work as a professional witness, they do not satisfy *Daubert* and Federal Rule of Evidence 702.

## I.   Legal standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Rule 702 "imposes a special obligation" on the trial court to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Trial courts in this Circuit that are tasked with carrying out this gatekeeping function must "engage in a 'rigorous three-part inquiry,'" assessing whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. GP v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). It is the defendants' burden to

3

establish the admissibility of the opinions and testimony of their expert witness. *See Hendrix*, 609 F.3d at 1194 (citation omitted).

## II.     Relevant facts

Mathew Ajibade was arrested by the Savannah-Chatham Metro Police Department on January 1, 2015 while in the throes of a manic episode, and transferred to the Chatham County Detention Center.

While in the jail, Mathew continued to experience manic symptoms. It is undisputed that a dramatic altercation occurred after Mathew, verbally expressing confusion, failed to follow deputies' commands. This fight was started by the deputies and ended by the deputies. During the fight, Mathew was massively overpowered. He was punched several times in the head, kicked, his head bounced on the hard floor, and he was hogtied and carried around face down by his limbs. He was also tied to a chair and Tasered while restrained. Unresponsive to speech, he was left alone to die. No medical treatment was rendered.

The parties disagree about whether the deputies' physical violence and use of the Taser was objectively reasonable. The parties also disagree whether Lieutenant Johnson failed to supervise the deputies under her command on the night Mathew died.  The parties disagree whether there was too much use of the Taser by deputies at CCDC in the months leading up to, and after, Mathew's death. Ross purports to offer helpful testimony to the factfinder on these points, informed by his own experience as a professional witness.

### III.     Ross' background

Ross, who is currently a professor at Valdosta State University, considers himself an expert in officer use-of-force, Ex. B at 24:1-23, and "the whole area of death," *id*. at 45:22-24. Since 1989, he has testified on behalf of law enforcement and corrections officers more than 200 times and at even "more depositions obviously than [that]." *Id*. at 50:20-25. His expert witness work began in earnest after he published his dissertation examining the "actively resisting arrest" factor in *Graham v. Connor*. *Id*. at 24:8-13. He continues to accept new cases at a rate of roughly "10 or 12 cases a year." *Id*. at 53:20-22.

As a private litigation expert evaluating the constitutionality of use-of-force policies and procedures in hundreds of cases, Ross has worked for plaintiffs only twice. *Id*. at 54:21-23. In the first of those notable exceptions, Ross' "impression was that [it] was totally inappropriate" that the plaintiff had been "hogtied with jumper cables." *Id*. at 55:1-8. As Ross clarified, "I don't mind hogtying. It's just the apparatus and training issues." *Id*. The only other issue Ross identified from the hogtying case was that "there was lying going on and deceit by the officers." Ex. B at 56:3-4.

In the second case where Ross worked for a plaintiff, officers "[t]otally misused/abused their use of force and authority on an arrest in a detainment of a trucker, a driver." Ex. B at 55:9-15.

With the exception of those two cases, however, Ross has never expressed an opinion that a police officer or corrections officer acted wrongfully. *Id*. at 56:21-25. With the exception of those two cases, Ross has never expressed an opinion that a corrections officer or a police officer violated a plaintiff's constitutional rights. *Id*. at 57:7-14. With the

5

exception of those two cases, Ross has never found that an officer's use of force was excessive. *Id.* at 57:15-19.

### IV. Ross' opinions.

Defendants asked Ross to opine as to the Sheriff's policies, procedures and training related to use-of-force incidents and in-custody deaths. Ex. A at 7. Not surprisingly, Ross concluded that the deputies' use of force was reasonable, neither the Sheriff nor Lieutenant Johnson, nor Evans-Martinez violated Mathew Ajibade's constitutional rights, and no officer acted wrongfully. *See id.* In short, Ross reached the same legal conclusions in this case that he has reached in hundreds of prior cases over nearly three decades of work for law enforcement and corrections agencies. These conclusions invade the province of the court and offer no help to the factfinder.

Ross does not dispute that, at the time of Mathew's death, the Sheriff's written policy required that a restrained inmate be checked every fifteen minutes. Ex. B at 207:23-208:4. No party disputes that the deputies failed to meet this requirement, including Ross. *Id.* at 208:5-8. Yet, Ross refused to draw any conclusion regarding the significance of the deputies' failure:

> A:   And I agree with you. They didn't do it.
>
> Q.   But I didn't ask you whether you agreed with --
>
> A.   That's my answer.
>
> Q.   With all due respect, Dr. Ross, I'm not asking --
>
> A.   That's my answer. I'm not changing it. I'm responsive to your question. I agree with you they didn't make the checks. It's significant. I agree.

6

*Id.* at 209:8-18.

Ross also offers opinions regarding the subjective qualities of the deputies, such as their perception of Mathew and their reactions to him. For example:

> Despite this, officer Richardson showed patience and restraint pursuant to his training and experience and continued to speak with Mr. Ajibade and attempted to persuade him to cooperate. Mr. Ajibade refused to comply and adopted a threatening posture through his stance and bodily movements which would alert a reasonable officer that he was preparing to fight. Richardson also formed the perception that based on Mr. Ajibade's moving away from the desk area and looking toward the security doors, that he may be contemplating an attempt to escape. Officer Richardson determined that Mr. Ajibade would not comply and instructed him to return to his cell and lightly touched his arm to guide him toward the cell. Mr. Ajibade, however, jerked his arm away and began to actively resist officer Richardson and officers Vinson and Capers who responded to assist.

Ex. A at 16.

> Further, the officers were justified in using force to defend their own personal safety, the safety of other responding officers, in order to protect and control Mr. Ajibade, and to restore order, safety, and security of the jail.

Ex. A at 19.

When asked at what point Mathew demonstrated "violent resistance" to the deputies, Ross opined:

> A.   …I have listed a whole host of things, behaviors indicative of an officer to put them on alert that [Mathew] was uncooperative, his stance, his body movements, his waving of the hands, the clasping of the arms across the chest gave all the contextual cues of an assault or impending assault or fight or at least "I'm going to be uncooperative" at the very

7

> minimum. So at that point in time the officer would
> form the impression and opinion that [Mathew]'s
> not going to cooperate.

Ex. B at 216:11-20.

According to Ross, noncooperation is "synonymous with violent resistance" or at least leads "immediately" to violent resistance. *See* Ex. B at 216:21-217:10. Ross claims these "pre-assault cues," *id*. at 221:7, were developed in light of *Kingsley v. Hendrickson*. *Id*. at 222:18-20. Ross finds that "Richardson believed that Mr. Ajibade was playing games but continued to try to gain his cooperation." Ex. A at 5.

Ross' Report includes his opinion that "Lt. Johnson did not abdicate her supervisory duties by relying on the officers in the cell to perform their job properly, within the jail policies, and within the totality of circumstances facing them and the varied circumstances facing her during the period." Ex. A at 22.

**V.   Argument**

    **A.   Ross' Report should be excluded because his opinions will not help the jury determine any disputed fact.**

With respect to "helpfulness"—the third criterion for admission of expert witness testimony—the Eleventh Circuit has found that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citing 4 Weinstein's Federal Evidence § 702.03[2][a]). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors…the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse. *Id.* at 1263.

8

In the Eleventh Circuit, testimony of use-of-force experts is admissible to the extent it is "regarding prevailing standards in the field of law enforcement." *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990). The expert cannot express opinions about legal conclusions. *Id*. In *Samples*, the Court of Appeals found that the district court erred in admitting testimony from the defendants' use-of-force expert that, in his opinion [the officer in that case] acted reasonably." *Id*. Such testimony "invade[s] the province of the jury, which in th[at] case was to decide the reasonableness of the officer's actions." *Id*.

"An expert may not ... merely tell the jury what result to reach. A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citation omitted) (as quoted in *Wiggins v. Belk, Inc.*, 4:11-CV-88, 2012 WL 135595, at *6 (S.D. Ga. Jan. 17, 2012). As the Sixth Circuit observed: "The problem with [expert witness] testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). *See also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge....").

Ross' Report includes his opinion that "Lt. Johnson did not abdicate her supervisory duties by relying on the officers in the cell to perform their job properly, within the jail policies, and within the totality of circumstances facing them and the varied circumstances facing her during the period." Ex. A at 22. In this case, the issue for the jury is whether Johnson knew that the deputies would act, or fail to act, in violation of

9

Mathew's right to be free from excessive force and deliberate indifference, and failed to stop the deputies from doing so. Re-framing the question as whether Johnson "abdicate[d]" her duties does not change the fact that Ross' opinion amounts to no more than a legal conclusion.

Ross insisted on this conclusion despite being unable, for example, to point to evidence indicating "that Lieutenant Johnson checked with Corporal Evans whether [Evans] was doing the checks." Ex. B at 226:13-24.

Ross' Report includes his opinion that "[t]he actions of the officers were reasonable and did not deprive Mr. Ajibade of his constitutional rights." Ex. A at 15. This opinion is "unhelpful because it addresses the legal sufficiency of Defendants' actions." *Addison v. Arnett*, 2:13-CV-71, 2016 WL 1441803, at *3 (S.D. Ga. Apr. 12, 2016) (Baker, M.J.).

Ross devotes much of his report to opining as to the reasonableness of the policies. *See e.g.*, Ex. A at 19-20. For example, Ross finds that "[t]he CCSO policies on using force, weaponry, restraints and the restraint chair guide officers in the reasonable use of force. In their collective totality, these policies provide a systematic process for guiding officers in the appropriate and reasonable response to various types of detainee resistance." *Id*. at 19. But as at least one other court in this district has found, "[c]omprehension of these policies is within the purview of laymen jurors. Therefore, expert testimony on this subject is neither needful nor helpful." *Addison*, 2016 WL 1441803, at *3.[2]

---

[2] *See also*, *U.S. v. Paradies*, 98 F.3d 1266, 1289-90 (11th Cir.1996) (District court properly limited testimony of defendant's legal expert, in mail fraud prosecution, to exclude testimony about enactment of mail fraud statute and how it changed law and testimony regarding statute's alleged

Ross concludes that "[f]rom reviewing the thousands of pages contained in this civil action it is my opinion that [Johnson] performed her supervisory duties commensurate to the policies of the jail." Ex. A at 32. This opinion, too, is unhelpful commentary on the legal sufficiency of Johnson's actions. *Addison*, 2016 WL 1441803, at *3.

Although he could point to no national standards for quantifying Taser usage in the corrections setting, Ross found that "a pattern and practice of overusing the TASER is non-existent" Ex. A at 29. This too amounts to "impermissible 'law' testimony" and must be excluded. *See United States v. Bradley*, 4:05-cr-059, 2006 WL 8429691, at *4 (S.D. Ga. Feb. 20, 2006)

Ross purports to provide information as to what an excessive use of force claim will include as determined by the Supreme Court in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). Ex. A at 15. Ross further opines that the Sheriff's deputies have received training consistent with *City of Canton* and *Connick v. Thompson*. At his deposition, Ross explained in detail his interpretation of *Graham v. Connor*, 490 U.S. 386 (1989). When asked whether he intended to express an opinion as to these legal standards, Ross replied:

> A. Well, other than I have already articulated in my impressions in response to your questions earlier about the appropriate Fourth, Fourteenth and Eighth Amendments, but nothing beyond that.

---

vagueness, as ignorance of law was not defense to mail fraud charges, such that expert testimony would thus have misled jury, and statute was not vague as matter of law); *U.S. v. Masferrer*, 367 F.Supp.2d 1365, 1376 (S.D.Fla. 2005) ("proffered expert testimony will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments").

Ex. B at 22:3-10. This is not the first time Ross has attempted to explain what Supreme Court cases or other judicial decisions hold. *See e.g.* Ex. C, *White v. Gerardot*, 1:05-cv-382 (N. D. Ind. October 24, 2008) at *6-7; Ex. D, *Ligon v. Lafuaci, et al.*, 13-cv-02875 (N.D. Calif. January 22, 2015). In both cases, the district court excluded Ross' impermissible legal conclusions. The Court should do that here, too.

Finally, Ross offers opinions as to how the "human factors" perceived by Richardson and other deputies informed their decisions. Ross' opinion as to how these factors influenced or affected Mathew or the officers is inadmissible. *See* Ex. D at *2.

Accordingly, his testimony should be excluded.

**B.    Ross' Report fails to meet the reliability requirement of Rule 702.**

Ross' opinions fail the reliability standard in two critical respects: he fails to ground or support his opinions with any objective standard, and his opinions are not based on sufficient facts or data. Accordingly, his testimony is unreliable and should be excluded in its entirety.

Reliability is a key test as to the admissibility of expert opinions. *Daubert*, 509 U.S. at 589. An expert opinion must not rest purely on speculation or self-referential research. The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, obvious cherry-picking. Fed. R. Evid. 702 (expert testimony must be based on "sufficient facts or data" and the "product of reliable principles and methods").

To be sufficiently reliable, the witness must offer the reasoning for his or her conclusions and point to some objective source to show that the witness has followed a recognized analytical method. "An expert who supplies nothing but a bottom line, supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (Easterbrook, J.).

First, Ross claims to have reviewed 5000 pages of evidence in this case at a reading rate of approximately 20 seconds per page. Ex. B at 142:21-143:1. At his deposition, he would not express a preference between two vastly different written restraint chair policies. Ex. B at 199:22-200:4.

Second, Ross refused to apply his own research to the facts of this case. For example, in a book chapter titled "Case Analysis of Restraint Deaths in Law Enforcement and Corrections," Ross concluded that in-custody deaths often "result from reasons not related to the physical aspects of the confrontation or restraint…[including] cardiac ischemia or failure, drug overdose or other underlying disease of the subject." Ex. B at 166:1-7.

At his deposition, Ross could identify no evidence that Mathew suffered from cardiac ischemia or failure, drug overdose or other underlying disease. *See id*. at 166:22-167:13. Despite testifying that this book chapter informed his opinions in this case, Ross objected to "us[ing] it as a template over this case, that's inappropriate." *Id*. at 168:6-7.

Third, Ross' work as a private litigation consultant primarily "motivate[es]" and "propels" his scholarship. Ex. B at 44:12-13, 45:1-2. He relies on his own expert-witness work, and also "pickup up the phone and calling [defense attorneys]," *id*. at 173:6-7, for

13

the data to support his scholarship. In so doing, Ross not only puts the cart before the horse, he creates an infinite loop of confirmation bias that undermines the reliability and relevance of his opinions. Because his opinions are based on a limited dataset of self-referential research emanating from his own work as a professional witness, his unreliable opinions cannot satisfy *Daubert* and Federal Rule of Evidence 702.

Finally, Ross' opinion regarding Taser usage by the Sheriff's deputies is also indicative of his unwillingness to adapt his own predetermined opinions to a particular set of facts.  For example, Ross opined that "[t]he position of corporal and above were trained in the TASER and trained to authorize the use of the TASER. The TASER was retained in a lockbox and was not routinely carried as part of the officer's uniform." Ex. B at 231:25-232:4. Ross cited the testimony of former Jail Administrator Gilberg as his reliance for this opinion. *Id*. at 232:7-10. When asked, however, whether other evidence might change his opinion, namely that Tasers were routinely carried around the units and not kept in lockboxes, Ross replied flatly, "[n]o." *Id*. at 232:11-23.

Respectfully submitted,


/s/ William F. Cash III
Troy A. Rafferty (Fla. Bar No. 024120)
Timothy M. O'Brien (Ga. Bar No. 548714)
William F. Cash III (Fla. Bar No. 68443)
**LEVIN, PAPANTONIO, THOMAS,**
**MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone:    850-435-7059
Fax:       850-435-7020
E-mail:   trafferty@levinlaw.com
              bcash@levinlaw.com

Mark O'Mara (Fla. Bar No. 359701)
Alyssa Flood (Fla. Bar No. 99755)
**O'MARA LAW GROUP**
221 NE Ivanhoe Boulevard
Orlando, FL 32804
Phone:    407-898-5151
Fax:       407-898-2468
E-mail:   mark@omaralawgroup.com

Cameron C. Kuhlman (Ga. Bar No. 596159)
**DUFFY & FEEMSTER, LLC**
236 E. Oglethorpe Ave.
Savannah, GA 31401
Phone:    (912) 236-6311
Fax:       (912) 236-6423
Email:    cck@duffyfeemster.com

William R. Claiborne (Ga. Bar No. 126363)
**THE CLAIBORNE FIRM, P.C.**
410 East Bay Street
Savannah, GA 31401
Phone:    912-236-9559
Fax:       912-236-1884
E-mail:   will@claibornefirm.com

*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on February 21, 2018, this *Plaintiffs' Motion to Exclude Testimony Of Sheriff's Expert Witness Darrell Ross* will be filed on CM/ECF, which will serve it on all parties.

/s/ William F. Cash III
William F. Cash III