# EXHIBIT A

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

August 9, 2017

I, Darrell L. Ross, Ph.D., declare that if called upon as a witness, I would competently testify to the facts set forth herein. I declare the following:

1.  That since August 2010, I have been employed as a Professor, the Department Head and the Director of the Center of Applied Social Sciences at Valdosta State University, Valdosta, GA. That from 2006 to 2010, I served as a Professor and the Director of The School of Law Enforcement and Justice Administration at Western Illinois University, Macomb, IL. That I was a Professor and former Chair of the Department of Criminal Justice at East Carolina University, Greenville, NC from 1992 to 2006. Attached hereto is a current copy of my CV, a list of cases in which I have rendered an opinion within the last four years, and my fee schedule.

2.  That I received my Ph.D. in 1992 from Michigan State University. I have published over 90 articles, five books, six book chapters/monographs, and have made numerous national and international conference presentations (see CV).

3.  That from 1985 to 1992 I served as the Technical Assistance Coordinator for the Criminal Justice Institute at Ferris State University, Big Rapids, MI. My duties included: research and training for police, corrections, security, and military personnel, locally and nationally. I instructed academic courses at Ferris. I was also a certified instructor by the Michigan Commission on Law Enforcement Standards and instructed the state training curriculum in the police academy at Ferris, including the mechanics of arrest, search, and subject control techniques, responding to persons in crisis and responding to the mentally ill, and physical fitness and physical wellness.

4.  That I worked for the Michigan Department of Corrections from 1973 to 1985 as an certified instructor teaching all levels of Department positions and jail officers throughout the state, was a probation officer, prison cell block supervisor, and correction officer. I was the Unit Manager of a psychiatric/protective custody cell block housing 500 mentally ill prisoners at the State Prison of Southern Michigan, Jackson, MI.

5.  That I have developed and have provided numerous line level and administrative training programs for police, correctional officers, military, and security personnel throughout the United States and internationally. That from 1985 to 2008 I was a certified state instructor for the Michigan Department of Corrections Jail Division, provided instruction to instructors, administrators, and detention officers, and assisted in developing the use of force, subject control,

1

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

and prisoner behaviors training curriculum. That I am a certified law enforcement instructor by the GA POST.

That I have served as a consultant and or trainer for: National Institute of Justice, Michigan Commission on Law Enforcement Standards, Topeka, KS PD, Battle Creek, MI PD, MI Sheriff's Association, Illinois Law Enforcement Training and Standards Board, IL State Police, North Carolina Justice Academy, Federal Law Enforcement Training Center, Alaska Peace Officers Training Commission, Pennsylvania Law Enforcement Training and Education Commission, State of Florida Police Training Commission, State of Wyoming Police Training Commission, American Corrections Association, National Institute of Corrections, Michigan Department of Corrections, Michigan Department of Corrections Jail Division, North Carolina Department of Corrections, Corrections Corporation of America, States Attorney's General Office in 6 states, U.S. Attorney's General Office in Florida, Federal Bureau of Prisons, Australia Government, Hong Kong Correctional Services, other agencies across the United States, and various branches of the Military.

6.   That I am familiar with recognized detention and jail use of force standards, practices, policies, procedures, and responses to subject resistance, subject control techniques, the use of Conducted Energy Weapons, the use of restraints, and detention officer use of force training. That since 1987 I have served on the Pressure Point Control Tactics Management, Inc. Advisory Board, teaching these subject control and restraint techniques to thousands of officers and instructors nationally and internationally.

My opinions are based on my knowledge, research, training, and experience of these practices, training various criminal justice, military, and private security personnel, and from reviewing the following case  documents:

- ➤ Plaintiff's Complaint
- ➤ Internal Affairs Investigation Reports
- ➤ CD containing jail surveillance video
- ➤ Chatham County  Sheriff's Office Policy and Procedures Manual
- ➤ CCSO Standard Operating Procedure
- ➤ Personnel Records of:
  - Andreux Evans-Martinez, Post-Training & Training records
  - Nicole J. Meyers
  - Burt Ambrose & Profile Data Report
  - Christopher Reed
  - Debra Johnson & Training records

2

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

- Eric Vinson & Training records
- Paul Folsome & Training Records
- Frederick Burke& Training records
- Mark Capers & Training records
- Jason Kenny & Post Training records
- Maxine Evans & Training records
- Benjamin Webster &Profile Data Report
➢ In-house training records
➢ Training Records of Roy Harris
➢ Training class information of: Jason Kenny and Maxine Evans; Excited Delirium and In-Custody Deaths
➢ Excited Delirium & In-Custody Deaths, Leader Guide
➢ Separation Report of: Jason Kenny & Maxine Evans
➢ Video of IA interview of Eric Vinson
➢ Chatham County Sheriff's Office 2014 Annual Report
➢ Depositions of:
  - Sheriff Wilcher
  - Roy J. Harris, III
  - Kammie Kensey
  - Russell Smith
  - Gregg Rhodes
  - Antonio Solomon
  - Iassc Guthery, Jr.
  - Robert A. Brooks, Jr.
  - Nicole Myers
  - Warren Blanton
  - Melissa Kohn
  - Gregory Brown
  - Debra Thrift
  - Lorenzo Baker
  - David Cody
  - Stephen Cahall
  - Mark Capers
  - Jason Kenny
  - Samuel Richardson
  - Eureka Thomas
  - Thomas M. Gilberg & exhibits
➢ Opinions report of: Mary Perrien, Ph.D., Dennis Root, E. Eugene Miller, and Michael A. Berg

3

Case 4:16-cv-00082-RSB-BKE   Document 201-1   Filed 02/21/18   Page 5 of 34
Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

7.   **Synopsis of the Incident**

On January 1, 2015, Mr. Ajibade was arrested by officers Owens and Baker of the Savannah-Chatham-Metropolitan Police for domestic violence. Mr. Ajibade had assaulted his girlfriend, Odewole. Mr. Ajibade resisted arrest, was taken to the ground and restrained in handcuffs by the officers. EMS responded and examined Odewole who had been struck by Mr. Ajibade and she refused transport to the hospital. The medics also observed Mr. Ajibade and he declined to speak with them and declined treatment. Sergeants Young and Wilson responded on scene and Odewole advised them that Mr. Ajibade had been acting strange throughout the day and that he took medication. Sergeant Young accompanied Odewole to her kitchen and she handed Young a bottle of pills. The bottle contained about 10 pills of Divalproex (500 mg) a generic version of Depakote. The mental health of Mr. Ajibade was discussed with Odewole by the officers and she advised that she did not know of any specifics about his mental health. The medics on scene did not observe any symptoms indicating Mr. Ajibade was in need of immediate mental health care. Sergeant Wilson directed officer Baker to transport him to the Chatham County Jail and he was lodged at about 7:40 pm. The transport occurred without incident.

As the jail video showed, Mr. Ajibade exited the patrol car in the sally port without problem and he walked into the jail and through the security doors under his own power. One of the arresting officers indicated to officers Young and Cahall, that the blood on Mr. Ajibade's shirt was not his, that it was from his girlfriend, that he beat his girlfriend, that he resisted arrest and had to be grounded to restrain him, and that he may have possible mental health issues. Officer Young reported that Mr. Ajibade's medications were sent with him by a family member. Officer Young reported that an officer advised that Mr. Ajibade had been off of his medication. Officer Young asked Mr. Ajibade a series of questions in which Mr. Ajibade did not respond to. Officer Young reported that Mr. Ajiwade responded to his instructions but was slow in his reactions and that he did not observe anything wrong with his bodily movements. Officer Young performed a patdown search of Mr. Ajibade, he provided him with a pair of shower shoes, and directed him to walk through the metal detector. Young placed Mr. Ajibade in cell 6 at about 7:43 pm. Officer Cahill assisted officer Young, prepared the property bag, and informed Young to notify the booking sergeant in order to pass it on to the oncoming shift supervisor. Officer Cahill testified that he gave Mr. Ajibade's medication bottle to the jail nurse which was the jail protocol and he advised the nurse that he was a possible mental health detainee (Dep. pgs. 34-37; 48-49). The video showed that Mr. Ajibade was compliant with Young through the entire admission process and it occurred without incident.

A new shift of officers and supervisors came on duty at about 8:00 pm. The video showed that at about 8:04 pm, a head count was made and officers Richardson, Capers, and two other officers responded to cell 6, which was about 20 feet from the officer's desk, Mr. Ajibade exited the cell, one officer entered the cell and inspected it, while another officer spoke to Mr. Ajibade outside of the cell. Mr. Ajibade returned to the cell without incident. The video showed that Mr. Ajibade was monitored by correction officers while in the cell. The video showed and officers Richardson and Capers testified that during a cell check they noted that Mr. Ajibade was slapping his shower shoes together like he was playing the drums (Capers Dep. pg. 54; Richardson Dep. pgs. 22-24).

Officer Richardson testified in his deposition that he took a phone call after the head count from Ms. Kinsey. Ms. Kinsey advised that Mr. Ajidade may have possible mental health history but it was not confirmed. Richardson made a note of the call on a sticky note regarding the mental health of Mr. Ajibade and placed it on his booking paper work. Richardson later released Mr. Ajibade from the cell at about 11:28 pm in order to initiate the pre-booking process (Dep. pgs. 74-86). After several minutes outside of the cell Mr. Ajibade became argumentative with Richardson, would not comply with his instructions to sit in a chair so his information could be entered into the computer system. Officer Richardson continued to attempt to obtain Mr. Ajibade's cooperation over several minutes and officers Capers and Vinson responded as back-up. Richardson believed that Mr. Ajibade was playing games but continued to try to gain his cooperation. Mr. Ajibade became defiant, took a wide stance with his feet, balled his fists, raised his hands up in the air, and folded his arms across his chest. After several more minutes, Richardson instructed Mr. Ajibade back to his cell and directed him to the cell by pointing toward it. Mr. Ajibade did not comply and Richardson touched Mr. Ajibade's elbow, placed it into an escort hold, and Mr. Ajibade began to resist by twisting and turning his body from Richardson (see video).

Officers Capers and Vinson assisted Richardson and Mr. Ajibade's resistance against the officers and his momentum resulted in the group landing on the floor. Mr. Ajibade landed in the supine position and began to actively and violently resist the officers' efforts physical control by thrashing, thrusting and kicking his legs, moving across the floor, and jerking his arms from the officers' grasp. Mr. Ajibade kicked officer Richardson and Capers, grabbed Capers' lest chest pocket area (where his badge, pen, and key card would be located), and Capers struck Mr. Ajibade with his fist. Officer Vinson was kicked by Mr. Ajibade. Sergeant Rowland responded with a TASER and applied it twice in the Drive Stun mode, which had no effect on Mr. Ajibade

and he continued to actively resist and refused the officers' instructions to stop resisting. During the struggle on the floor, the TASER actually made contact with officers Capers and Vinson. Mr. Ajibade grabbed Rowland's left wrist, and continued to resist the officers, Rowland tripped and fell forward, striking her face on the floor, and she lost control of the TASER.

Rather than comply with the officers' instructions, Mr. Ajibade picked up the TASER and activated it on officers Capers and swung it at the officers. While the TASER was in Mr. Ajibade's possession, Capers struck Mr. Ajibade with his fist two more times and officer Vinson attempted to kick the TASER out of the hand of Mr. Ajibade and it appears that he inadvertently kicked him in the head. Vinson was succeeded in kicking the TASER from Mr. Ajibade's hand and Rowland picked it up. Rowland moved away from the struggle to the desk area and collapsed. She was attended to by other officers, Lt. Johnson, jail nurse Brown, and was eventually transported to the hospital by EMS.

Officers Solomon, Cody, Burke, and Grove responded to assist in controlling Mr. Ajibade and he was eventually controlled and restrained with his hands in handcuffs and ankles secured in leg restraints. Lt. Johnson responded and assessed the situation and directed the officers to place Mr. Ajibade in a detox cell and in a restraint chair. Lt. Johnson went to sergeant Rowland and the officers lifted and carried Mr. Ajibade to an pre-booking cell number 4 at about 11:40 pm. Corporal Kenny responded to the cell and officer Richardson placed the restraint chair in the cell. Kenny instructed non-CERT officers to exit the cell. The officers placed Mr. Ajibade in the restraint chair. Mr. Ajibade resisted the officers, and began screaming. Richardson left the cell and returned with a set of flex-cuffs. Kenny requested the TASER and Richardson left and retrieved the TASER (Richardson Dep. pgs. 52-65). In the restraint chair, secured in handcuffs and leg restraints, Mr. Ajibade continued to resist by kicking his feet and Kenny instructed him to stop. Kenny testified that he applied the TASER four times on Mr. Ajidade in response to his resistance and once he complied he stopped the applications. Mr. Ajibade was secured in the restraint chair with the straps and a spit mask was placed on his face by officer Cody as he was bleeding from the lip.

At about 11:47 pm nurse Brown and Lt. Johnson entered the cell and Brown checked the restraints. From 11:50 pm until about 11:55 am officer Kenny made three checks of Mr. Ajibade, officers Vinson and Capers made a check at 12:09 am, and Evans also made one security check on him in the cell. Evans began a restraint check log. At about 1:36 am sergeant Evans made a check of Mr. Ajibade, found him unresponsive, and called for nurse Brown. Evans called for Lt.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

Johnson and called a code blue at about 1:41 am. Mr. Ajibade was released from the restraint chair and nurse Brown performed medical intervention until EMS responded and took over. Mr. Ajibade was transported to the hospital and he did not survive.

An autopsy was conducted and Dr. Stacey Desamours concluded that the cause of death was associated with physical altercation with law enforcement personnel and subsequent restraint. Dr. Desamours further concluded that the cause of death was a result of a cardiac dysthymia due to the excited physiological state induced by extreme physical exertion, anxiety, and pain of the physical altercation. Additionally, Dr. Desamours held that the cause of death was associated with being restrained in the restrain chair, was left unattended for 1½ hours, fully restrained with a spit mask over his nose and mouth, and an asphyxial component to his death could not be ruled out. Blood toxicology tests showed that Mr. Ajibade had THC levels at 11ng/ml, THC-COOH, marijuana metabolite was at 44 ng/mL and 11-OH-THC was at a level of 2.1 ng/mL.

As a result of the altercation, sergeant Rowland sustained bodily injuries and officer Vinson sustained a bruise to his head and a strained neck. Officer Richardson sustained a cut to his ear.

8. That I have been requested to provide an opinion on the Chatham County Sheriff's Department's Corrections Bureau policies and procedures, the training provided to their correction officers and the actions of Lieutenant Johnson and officer Evans-Martinez.

9. **Opinion #1:** **That the Chatham County Sheriff's Office (CCSO) administrators have not abdicated their responsibility in developing and implementing operational policies**

An important function for correction administrators is to provide their officers with relevant policies and procedures. Policies are means in which an organization provides guidance and reasonable decision making of employees. Policies cannot cover every conceivable situation an employee will confront and must allow for the totality of circumstances and reasonable decisions to be considered when discretionary decisions and actions of employees are involved. As they relate to the claims made in this incident, I have reviewed the following policies of the CCSO:

> ➢ Section III, Security and Control;
> ➢ Chapter IV, Section 20, Reception and Orientation, Number 04/20/01;
> ➢ Chapter IV. Section 24, Health Care,
> ➢ Security and Control, Number 03/15/16;
> ➢ Security Equipment, 03/15/14;
> ➢ Use of Restraints, 03/15/08;
> ➢ Facility and Inmate Searches, 03/15/10;

7

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

- ➢ Use of Firearms and Use of Force, 03/15/15;
- ➢ Use of Force, Number 3-01/010.40;
- ➢ Use of Less Than Lethal Force, Number 3-01/01.45;
- ➢ Use of Restraint Chair, Number 03/15/05;
- ➢ Training and Staff Development, Number 01/04/01; and
- ➢ Inmate Counts, Number 03/15/05

## A.    Policy on Receiving and Orienting Inmates

In my opinion, the administrators of the CCSO have taken a proactive approach by establishing written policies and procedures which set forth rules of conduct and policies which direct officer decisions, actions, responsibilities, and sanctions for failing to follow the policies. In my opinion CCSO administrators have purposed to address the important issue of guiding officers in the performance of their custodial duties, including providing appropriate custodial care of all detainees and using reasonable force in controlling and restraining detainees who become a threat to the security of the facility.

It is an accepted custodial practice to deny admission of an arrestee who demonstrated an obvious severe medical condition or significant behaviors indicating that the arrestee is experiencing a severe mental crisis. Prior to this incident, CCSO administrators developed and implemented the policy on *Receiving and Orienting Inmates* (#4/20/10) which guide officers in receiving and admitting incoming detainees. In my opinion the policy properly directed officers in completing the reception process and is consistent with contemporary detention standards.

Officers Young and Cahall met transporting officer Baker once he escorted Mr. Ajibade through the security doors of the facility. Consistent with the reception policy, Young performed an observation of Mr. Ajibade upon reception, asked him a series of questions, in which Mr. Ajibade did not respond, and Young documented his observations on the Arrest and Transport Disclosure Log and his interaction with Mr. Ajibade (1/1/15 @ 7:40 pm). Young further noted his interaction and observations of Mr. Ajibade in his report (1/12/15) and concluded that it was appropriate to admit Mr. Ajibade into the facility.

Officer Cahall assisted officer Young and testified in his deposition: that he observed Mr. Ajibade's behaviors in the facility, that he was compliant, was quiet, did not say anything, he did as instructed, and observed him in the cell prior to shift change (Pgs. 20-25). Cahall further testified in his deposition: that he spoke with the transporting officer, that he was informed that Mr. Ajibade may have mental health issues, that the officer should advise his sergeant in the jail,

8

that he was given a bottle of pills, that he followed the jail protocol and gave the medications to the nurse (shown on the video), that he observed Mr. Ajibade in cell 6, that he advised the nurse about Mr. Ajibade's possible mental health concerns, that he explained the booking process at the jail, and that he did not observe anything that would give him reason to believe that Mr. Ajibade should not be incarcerated (Pgs. 20-41, 46, 48-49, 52-54). Lieutenant Johnson also testified that the practice of the jail was to pass a new detainee's medication to the jail nurse (Dep. pgs. 97-100). Nurse Brown testified that he did receive the bottle of medication that night (Dep. pgs. 43-44, 66).

In my opinion neither officer Young or Cahall observed any behaviors, signs, symptomologies, or a condition that would lead a trained and experienced officer to form the belief that Mr. Ajibade required immediate mental health attention which would preclude them from accepting him for admission into the jail. The video confirmed the officers' observations and their actions in regard to Mr. Ajibade upon reception. First, Mr. Ajibade exited the patrol car and walked into the jail under his own power. Second, Young and Cahall followed the CCSO policy of admitting an arrestee for admission by asking him appropriate questions. Third, the deputies made visual observations of Mr. Ajibade and they did not observe any serious injuries on his body or observed behaviors which exhibited that he required immediate mental health or medical treatment. Fourth, officer Cahall spoke with officer Baker about Mr. Ajibade's possible mental health concern, advised him to speak with the jail sergeant, received his medications, advised the nurse, and also passed the medications to the nurse.

The video confirms the deputies' impressions made by their observations of Mr. Ajibade and his responses including:

- ➤ Exited the patrol car without problem and complied with officer Baker's instructions,
- ➤ Walked under his own power and escorted to the booking area,
- ➤ Complied with standing at the wall as instructed,
- ➤ Complied with the patdown search after being instructed,
- ➤ Complied with the removal of the handcuffs,
- ➤ Complied with instructions to put on the shower sandals,
- ➤ Complied by walking through the metal detector, and
- ➤ Complied and walked through the booking area and into cell 6 voluntarily and without incident.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

Fifth, neither officer Young or Cahall reported or testified that Mr. Ajibade: refused to cooperate
with them, complained of pain or evidenced any symptoms of being in pain, requested to be
transported to the hospital, exhibited cognitive impairment, was not alert or not oriented,
exhibited a detachment from reality, exhibited bizarre behaviors, exhibited signs of paranoia or
made statements indicating paranoid thought, or that he showed signs of excitement, delirium,
depression, agitation, and or violent behaviors. A diverse population of arrestees is admitted into
the jail on a regular basis. Mr. Ajibade did not manifest behaviors, nor present a medical
condition, or make statements that would alert a reasonable officer to deny him admission.
Indeed, the video showed Mr. Ajibade cooperating with the officers by following their
instructions, was alert, cooperative and compliant throughout the escort process, the personal
search, and voluntarily entered cell number 6 under his own power.

Sixth, officer Young followed the reception policy as I would expect, as he conducted a patdown
search of Mr. Ajibade (note *Reception Policy and Facility and Inmate Search Policy*). It is a
standard correctional practice to search all incoming detainees for obvious security concerns.
The video showed the patdown being conducted and that Mr. Ajibade was cooperative during the
search.

In her deposition testimony, Lieutenant Johnson provided an overview of the reception process at
the CCSO which involves receiving officers, a sergeant and nurse on shift, and including herself
as the watch commander, and how the system at the jail operates (Dep. pgs. 48-78). Assistant jail
administrator, Kohne, also testified in her deposition as to the reception and booking policy and
the admission process that occurs at the jail (Dep. pgs. 65-83). Sheriff Wilcher also described the
booking process in his deposition (Dep. pg. 302).

I conclude that Mr. Ajibade's compliant behaviors, as shown on the video, would cause a
reasonable correction officer to properly form the impression that admission into the jail was
appropriate and consistent with CCSO policy and practice, and contemporary detention practices.
Cooperating with the officers, even though some of his responses might have been slow (most
likely caused by the influence of marijuana), hardly distinguishes Mr. Ajibade as a detainee
experiencing a mental crisis requiring immediate mental health assistance and hospitalization.
Had Mr. Ajibade showed obvious signs of a serious medical condition or showed behaviors
manifesting a severe mental illness requiring immediate treatment I would have expected the
officers to follow the jail policy and practice of denying him admission. Even Dr. Desamours
view of the reception video noted that Mr. Ajibade appeared calm and cooperative and did not

10

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

appear agitated or overly excited. Further, I conclude that the officers followed the proper reception protocol as officer Cahall advised nurse Brown of the mental health concern and gave the medication bottle to the nurse pursuant to the jail practice.

**B.      That the officers provided adequate monitoring of Mr. Ajibade during the pre-booking process**

Mr. Ajibade was placed in cell number 6 which was about 20 feet from the officer's station. As shown on the video the cell can be easily viewed by the officers as it has a window on the door and a window on the side panel of the front of the cell. The cell can be monitored by an officer and/or sergeant at the officer's station and by camera. The video showed several officers making security checks of Mr. Ajibade at the cell until his release from the cell at about 11:28 pm (note *Inmate County Policy*—informal counts).

As shown on the video, at about 8:04 pm several officers reported to the cell, opened the cell door, requested Mr. Ajibade to exit, he voluntarily complied, an officer entered the cell and inspected it, and an officer spoke with Mr. Ajibade. After several minutes he re-entered the cell voluntarily, and the interaction proceeded without incident. During the entire interaction no officer indicated observing any manifestation that Mr. Ajibade was in immediate need of mental health care. Mr. Ajibade did not show any obvious symptoms that he was experiencing a mental health crisis (see the video).

Officer Capers testified in deposition: that when he came on shift that he and other officers were advised that Mr. Ajibade was potentially a mental health concern at the shift briefing, that it is the practice of the jail that the oncoming shift will perform a head count of the inmates (see also the *Inmate Count Policy*), that he made a count of Mr. Ajibade when he came on shift, that he and officers Richardson, Burke, and Vinson had interaction with Mr. Ajibade at his cell, that officer Burke spoke with Mr. Ajibade outside of the cell and wrote his name on the roster, and that Mr. Ajibade was returned to his cell (Dep. pgs. 48, 50-51; see video; see Evans Dep. pgs.42-43). Officer Capers further testified that he recalled making a security check of Mr. Ajibade at his cell and that he and corporal Evans observed that he was singing at the corner of the wall, talking to the corner of the wall, and clapping his shower shoes (Dep. pgs. 54-55). Capers also testified in his deposition: that after speaking to Evans, the game plan was to pull him out to process him, that we wanted everybody present, and we were going to inform the watch commander, and that was the practice (Dep. pg. 55).

11

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

Officer Richardson testified in his deposition: that he understood the pre-booking process, that he received a phone call from Ms. Kinsey regarding the potential of Mr. Ajibades's mental health and placed a sticky note about it on Mr. Ajibade's paper work, that he first made contact with Mr. Ajibade while doing the head count, that he observed Mr. Ajibade's appearing to play the drums with his shower shoes, that it was child-like, and if he were in the cell he may do the same thing (Dep. pgs. 12-23, 24-29, 66, 74-75, 80, 83,). Richardson also testified in his deposition: that any medication that would come in for a detainee would be given to the nurse and the nurse would document it (pgs. 119, 123). Corporal Evans testified in her deposition that she observed Mr. Ajibade in the cell adjacent to where she was sitting and observed him beating his shoes on the bed (Dep. pgs. 46-47).

CCSO has been criticized for allegedly not performing the pre-booking process "immediately" for Mr. Ajibade and for not ensuring that he immediately receive medical screening. Such criticism is absurd because it ignores that Mr. Ajibade did not need immediate medical attention, and fails to account for numerous variables which can exist at any time a detainee enters the facility. For example, a detainee maybe admitted under the influence of a chemical substance requiring several hours to sober up before he or she can respond to booking questions or be medically assessed. Further, depending on the time, day, activity of arresting agencies, and activities occurring at the jail, there may be numerous other detainees in the que and unless there are extreme circumstances, detainees will be processed consistent with the order in which they were admitted.

Officer Richardson testified in his deposition: that it was busy that night, January 1, that there were about 10 to 15 detainees ahead of Mr. Ajibade waiting to be processed, and that it can take about 4 to 6 hours for the nurse to get to a detainee for an assessment depending on how many are waiting (Dep. pgs. 76-77, 118). Capers testified in his deposition: that detainees get booked in order of admission arrival, that it can take about 3-4 hours to process, it just depends, that there were a lot of people there that night, and that he recalled a lot of detainees ahead of Mr. Ajibade (Dep. pgs. 59-60). Lt. Johnson also testified that the pre-booking process can take up from 1 to 3 hours, or longer depending on how many arrestees come in, so it varies (Dep. pgs. 78-79; see also Kuhne Dep. pgs. 76-81). Sheriff Wilcher testified in his deposition: that it can take about 30 minutes to 3 hours to actually book a prisoner, it depends on how busy they are (Dep. pgs. 300-302).

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

Nurse Brown also testified in his deposition: that it can take up to 20 to 45 minutes to perform a medical assessment of a detainee, that a detainee is first pre-booked by an officer before he sees them, that if the policy states, to review immediately, one nurse on duty cannot do it, that there were more than the usual number of detainees there that night, that he was processing detainees and had to also distribute medications to detainees (Dep. pgs. 50, 58-59, 67, 72, 75-76, 79).

A mandated correctional standard for requiring a specific time period for starting and completing the booking process is non-existent and performing the intake process is not measured against a clock. GA Standard, Number 14.12 (*Medical Screening at Time of Booking*) states that "receiving screening shall be performed by the booking officer or designee on all inmates upon admission to the facility and before their placement in the general population or housing area." Mr. Ajibade was placed in cell # 6 in the booking area and had not been assigned to general population or other classification as he was awaiting the process of pre-booking. As Richardson and Brown testified, there were other prisoners waiting to be booked and must be completed prior to others brought into the jail. The issue is whether the officers initiated the process in a timely and reasonable period given the numerous variables impacting the facility, the booking process, and within the totality of circumstances. In my opinion, they initiated the process in a timely and reasonable period for Mr. Ajibade based on the information known to them.

## C.    Policies on Health Care at CCSO

Administrators of CCSO have also developed and implemented health care policies in order to guide correction officers of their duties in regard to detainees' medical care and to communicate to jail health care professionals the possible medical care needs of detainees (see Kohne Dep. pgs. 23, 62-63). Chapter IV, Section 24 outlines the various health care policies of the Corrections Bureau. Like most county jails and/or detention facilities, CCSO had contracted out their health care to a professional health care provider, Corizon. Sheriff Wilcher testified that a medical contract was established to provide medical care for detainees and the contract was with Corizon (Dep. pgs. 52, 54-55, 73).

There are 12 various health care procedures within Section 24 which address: receiving and screening, sick call, emergency care, specialist, prosthetics, special programs, medical services, use of restraints, health education, crisis/suicide prevention and intervention, and mental health and mental retardation services, to mention a few. Nurse Brown testified in his deposition: that if the officers received a pill bottle they would give it to him, and if there were something more immediate it they would tell me, but if not, he would address it when he saw the detainee (Dep.

13

pg. 49). Lieutenant Johnson testified in her deposition that if an officer observed anything out of the ordinary through interaction with an arrestee, he would notify the medical staff (Dep. pg 55).

Officer Richardson testified in his deposition: that if an officer had a concern about the mental health of a detainee, the officer would contact their supervisor, or the shift lieutenant, and that a counselor or a psychologist could be contacted as warranted and that he did not contact Lieutenant Johnson that night (Dep. pgs. 91-94).

In my opinion it is irrelevant whether officer Richardson contacted Lieutenant Johnson with the limited and unconfirmed information about the potential mental health issues of Mr. Ajibade, before he started the pre-booking process. Richardson placed a sticky note on the paper work as a reminder to address the concern of the potential of mental health issues of Mr. Ajibade, which had not been confirmed (Dep. pg. 83). Also, the plan, which was about to be executed when Richardson released Mr. Ajibade from cell 6 at 11:28 pm, was to involve the nurse, Lieutenant Johnson, sergeant Rowland, officer Capers, and then determine a course of action. That course of action was thwarted when Mr. Ajibade decided to physically resist the officers of fulfilling their custodial duties.

In this incident the officers did not willfully delay or deny the pre-booking process with Mr. Ajibade. The officers' actions followed appropriate correction policy and protocol. Information regarding Mr. Ajibade's potential mental health issues were: (a) passed on by Young to the oncoming shift, (b) Young documented his observations of Mr. Ajibade, (c) nurse Brown was on duty performing his medical duties, (d) Capers advised the nurse and gave him the medications, (e) Mr. Ajibade was placed in an observation cell in the booking area by himself and was monitored by officers and by surveillance camera, (f) there were about 700- 840 cameras dispersed throughout the jail which provided surveillance (Wilcher Dep. pg. 15; Harris, Dep. pg. 91), (g) the information regarding Mr. Ajibade was briefed by the oncoming shift of officers, (h) four officers went to Mr. Ajibade's cell during the head count, spoke with him, he exited the cell and cooperated with the officers, (i) officers monitored Mr. Ajibade in his cell and observed him singing and clapping his shower shoes, (j) and the plan was to get the nurse, Lt. Johnson, sergeant Rowland, Richardson, and corporal Evans together to collectively review Mr. Ajibade's background when it was his turn. This was a reasonable and prudent strategy which combined the expertise of trained and experienced correction officers, supervisors, and the jail nurse. The nurse had to complete his assessment of other detainees who were ahead of Mr. Ajibade and there was no compelling reason to put him ahead of another detainee. Mr. Ajibade was released from his

14

cell after about 4 hours and during that time he was monitored by the officers and did not manifest any symptomologies which would suggest that he required immediate mental health care.

In my opinion the officers performed their custodial pre-booking duties with Mr. Ajibade consistent with CCSO's policies and practices in accordance with their observations and assessment of him. Their actions adhere to contemporary detention standards. The policies adequately address the operation of the facility and they properly provide guidance to officers and supervisors. In my opinion, the policies and the actions of the officers underscore that an operational system of reception, admission, pre-booking, health care, and security, were functional at the time of Mr. Ajibade's admission. In my opinion, clapping a set of shower shoes together and singing and talking in the cell, even after receiving unsubstantiated information about the concern of the potential mental health of Mr. Ajibade, would not trigger an officer to seek immediate mental health care. Absent obvious signs of a mental crisis, it would be reasonable for the officers to begin to address the concerns during the pre-booking process that Richardson was about to perform. The actions of the officers were reasonable and did not deprive Mr. Ajibade of his constitutional rights.

D.     **CCSO Policies on Use of Force and the Officers' Response to Resistance**

Correction officers are trained that they may use force: in self-defense, in defense of another, to prevent a crime, to ensure facility safety and security, to prevent a detainee from harming himself, and for medical intervention purposes. Keeping alert to potential problems, detainee behaviors and resistance, threats to jail security, and detainees' assaults is critical to the safe management and operations of the facility.

In conjunction with the justification for using force I teach officers that a claim of excessive force will include examining the following components in accordance with the objective reasonableness standard established by the United States Supreme Court in *Kingsley v. Hendrickson* (2015): (1) the totality of the facts and circumstances that the officer confronted at the moment the officer used the force; (2) from the perception of the officer (s) on scene; (3) the severity of the crime at issue; (4) whether the suspect posed an immediate threat to officers and/or others; (5) whether the suspect is actively resisting; and (6) whether the suspect is attempting to evade seizure by flight. Other considerations may also include: (a) the need to use force, (b) the weapons or potential weapons available to the detainee, (c) the environment and the circumstance variables effecting the confrontation, and (d) the need to preserve internal order and maintain

facility security. In the training that I provide to correction officers, I emphasize to pay attention to the pre-assault cues, behaviors, actions, inactions, and posturing, bodily position and stance of the person, sudden furtive movements and behaviors, arguing with an officer, detainee agitation, charging at an officer, threating statements, or lack of verbalization by the detainee.

Officers are also guided by the department's use of force policy. Prior to this incident, CCSO administrators had developed and implemented the *Use of Force Policy*, Number 3-01/010.40, *Policy on the Use of Restraints*, 03/15/08, *Policy on the Use of Less Than Lethal Force*, Number 3-01/01.45; and the policy on the *Use of the Restraint Chair*, Number 03/15/05.

Detention officers do not have the luxury of scripting their response to the type of resistance they encounter from a detainee. Frequently changes in circumstances that require using force may occur rapidly and spontaneously compelling the officer to make judgments about using force within seconds. Detention officers are taught to use force techniques and force equipment in response to the type of behaviors and resistance displayed by the detainee and based on the need to protect themselves or others from a combative detainee.

The video showed that after officer Richardson released Mr. Ajibade from cell 6 to perform the pre-booking process, he directed him to sit in a chair behind the desk and Mr. Ajibade became argumentative, uncooperative, agitated, and ultimately became a threat to the security to the jail. Despite this, officer Richardson showed patience and restraint pursuant to his training and experience and continued to speak with Mr. Ajibade and attempted to persuade him to cooperate. Mr. Ajibade refused to comply and adopted a threatening posture through his stance and bodily movements which would alert a reasonable officer that he was preparing to fight. Richardson also formed the perception that based on Mr. Ajibade's moving away from the desk area and looking toward the security doors, that he may be contemplating an attempt to escape. Officer Richardson determined that Mr. Ajibade would not comply and instructed him to return to his cell and lightly touched his arm to guide him toward the cell. Mr. Ajibade, however, jerked his arm away and began to actively resist officer Richardson and officers Vinson and Capers who responded to assist.

As seen on the video Mr. Ajibades' resistance can be described as initially presenting verbal noncompliance, threatening bodily posture and positioning, threatening bodily movements, agitation, defensive resistance, and escalating to active aggression. Specifically, Mr. Ajibade: did not comply with Richardson's instructions to move to and sit in the chair, did not cooperate with Richardson, placed his hands in his pockets, positioned his body in a wide stance with a solid

Case 4:16-cv-00082-RSB-BKE   Document 201-1   Filed 02/21/18   Page 18 of 34
Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

base with his feet, moved his arms, clinched his hands into fists, raised his hands up, and raised his arms above his head and began waiving them. These behaviors are associated with agitation and aggressiveness and would cause any trained and experienced officer to be on alert to potential active aggression. Indeed officers Capers and Vinson responded as backup to assist Richardson based on Mr. Ajibade's behaviors and comments. Mr. Ajibade demonstrated defensive resistance when he abruptly pulled his arm away from Richardson who was directing him back to the cell.

Officers Richardson, Capers, and Vinson responded to Mr. Ajibade's resistance and in the process the officers and Mr. Ajibade landed on the floor with Mr. Ajibade landed in the supine position. Rather than comply with the officers instructions to stop resisting, Mr. Ajibade began thrashing, flopping, and vigorously twisting his body, and moving his arms, in an attempt to move away from the officers grasp. The floor was slippery and Mr. Ajibade's resistance moved him across the floor. Mr. Ajibade's resistance escalated and he began kicking the officers and kicked officer Capers and Vinson several times.

Based on Mr. Ajibade's active resistance Capers struck Mr. Ajibade and it did not appear to have any effect on him as he continued to resist and kick. Sergeant Rowland responded and applied two applications of the TASER in the Drive Stun mode and it did not have any effect. Mr. Ajibade grabbed sergeant Rowland's wrist and she moved away. Mr. Ajibade's threat to the officers and resistance further escalated when he grabbed the TASER and began swinging it. Capers was struck with the TASER and he struck Mr. Ajibade two more times in the head and Vinson kicked at the TASER, apparently struck Mr. Ajibade in the head, and the second time struck his hand or the TASER, whereupon the TASER went flying across the floor. Sergeant Rowland picked up the TASER, moved away, and later collapsed on the floor. After the TASER was retrieved by Rowland, Vinson called a code 1078. Vinson reported that he received a knot in his head and a strained neck (Richardson Dep. pgs. 29-33, 39, 40, 42-43, 46-49, 51-55, 101, 107; Capers Dep. pgs. 64, 72, 74, 75-78, 83, 131; and see IA interview of Vinson).

Other officers responded to assist, which I would expect when a 1078 call is broadcasted in the jail. Officers Burke, Solomon, and Cody responded and between the collective efforts of these officers, Mr. Ajibade was controlled and his hands were secured in handcuffs and feet were restrained with leg restraints. Lt. Johnson was on scene and instructed the officers to place Mr. Ajibade in the restraint chair and to place him in the detox cell. Lt. Johnson attended to sergeant Rowland with the nurse and the officers carried Mr. Ajibade into the booking cell number 4 and

Case 4:16-cv-00082-RSB-BKE   Document 201-1   Filed 02/21/18   Page 19 of 34
Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

placed him in the restraint chair. Lieutenant Johnson was not present at the cell when the TASER
was applied by corporal Kenny (Solomon Dep. pgs. 13-16, 21-23; Cody Dep. pgs. 27,    30, 96).

Officer Evans-Martinez also responded to the call. During his deposition, officer Evans-
Martinez testified: that he was not involved in the control and restraint of Mr. Ajibade in the
booking area, that he did not assist in carrying him to the cell, that he held the cell door open as
other officers brought Mr. Ajibade into cell number 4, that he did not enter the cell, that he looked
for a spit-mask but another officer found one, that he did hear the activation of the TASER in the
cell as Mr. Ajibade was being placed into the restraint chair, that the Lieutenant Johnson and a
nurse entered the cell and checked the restraints, that he left the area when instructed by corporal
Kenny, that he was not engaged in the restraint of Mr. Ajibade, that checks of an inmate in a
restraint chair every 15 minutes, and has observed the nurse checking inmates in a restraint chair
previously, and that the use of the TASER was distinguished between an inmate restrained in
handcuffs and restrained in the restraint chair (Dep. pgs. 34-35, 42, 47, 55, 65, 80-81, 83-85).

Lieutenant Johnson was the watch commander that night and responded to the signal as I would
expect. Lt. Johnson encountered a jail emergency with many components to handle. First, she
was alerted that Emergency Medical Services needed to be contacted and she authorized  the call
for sergeant Rowland who had collapsed (pg. 106). Second, Lt. Johnson responded to the
altercation and observed the struggle on the floor between the officers and Mr. Ajibade and asked
where the TASER was (pgs.109-110, 163). Third, once Mr. Ajibade was secured in restraints,
she instructed the officers to place him in the restraint chair, to place him in the detox cell but that
the behaviors would dictate the cell placement, and that she later learned through the
investigation Mr. Ajibade was placed in cell number four so that he would not be incited by other
detainees (pgs. 178, 210, 214, 233-234). Fourth, once Mr. Ajibade was secured and moved to the
detox cell Lt. Johnson spoke to nurse Brown who informed her that Rowland may have suffered
injuries and a concussion (ps.122-125). Fifth, she also spoke with corporal Evans about Rowland,
who was laying on the floor and officer Richardson came up and requested a spit mask (pgs. 128-
129). Sixth, a couple minutes later, Richardson called out for the TASER and she walked back to
the female booking cells with the TASER and handed it to Richardson, and she left to retrieve
a spit mask (pgs. 132-139). Seventh, while outside of the cell she saw Richardson's ear
bleeding, that she saw the red light of the TASER on and heard Kenny instructing Mr. Ajibade to
comply, that she did not hear the TASER being activated inside of the cell, and that she never was
in the cell at that time (pgs. 142-146). Eighth, Lieutenant Johnson left the cell area to return to

Case 4:16-cv-00082-RSB-BKE   Document 201-1   Filed 02/21/18   Page 20 of 34
Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

sergeant Rowland and EMS responded, that she later returned to the cell with the nurse, and that Kenny did not inform her that he had applied the TASER (pgs. 146-161)

In my opinion Lieutenant Johnson responded to the altercation, created by Mr. Ajibade when his non-compliance escalated to active aggression, as I would expect. Officer Richardson showed patience and restraint by using verbal instructions to persuade Mr. Ajibade in cooperating with him and the pre-booking process. Officer Capers was also nearby as Richardson attempted to gain Mr. Ajibade's cooperation with the pre-booking process. Mr. Ajibade's resistance, however, prohibited Richardson, other officers, and ultimately the jail nurse from fulfilling their booking duties when he escalated his resistance. The officers ultimately were forced to use force measures by using empty-hand control measures, and attempted to the use the TASER, after Mr. Ajibade showed that he would not comply and only in response to his defensive and active aggression actions. It was appropriate for Capers to use hand strikes and he used them only in response to being kicked and struck by Mr. Ajibade, and after an application of the TASER by Mr. Ajibade. Also, officer Vinson was justified in using a leg strike to release the grip of Mr. Ajibade from possessing and swinging the TASER. In the hands of an agitated and active aggressive detainee, the TASER became an immediate threat to Richardson, Rowland, Capers, Vinson, to the responding officers, and presented an immediate threat to the security of the jail. It would be appropriate to reestablish control of the TASER. Once Mr. Ajibade released the TASER, no additional hand or leg strikes were applied and additional responding officers were able to secure his hands and legs in restraints through the use of empty-hand control measures.

Due to Mr. Ajibade's active aggression of thrashing his body, striking the officers, and possessing, swinging, and using the TASER, it was appropriate to restrain Mr. Ajibade in restraints to control him. The actions of the officers comport with the use of force and restraint policies and were only used in response to Mr. Ajibade's resistance. Further, the officers were justified in using force to defend their own personal safety, the safety of other responding officers, in order to protect and control Mr. Ajibade, and to restore order, safety, and security of the jail.

The CCSO policies on using force, weaponry, restraints and the restraint chair guide officers in the reasonable use of force. In their collective totality, these policies provide a systematic process for guiding officers in the appropriate and reasonable response to various types of detainee resistance. This is an important issue as officers are provided with numerous force options in which to consider based on varying types of detainee resistance which may potentially be

encountered by an officer. Not all situations can be handled with one or two force options and officers need varying reasonable force options to select from when confronting a resisting detainee. In many confrontations a detainee may first interact with an officer in a compliant mode and within a split-second, elevate his resistance to a physical attack or a deadly force attack against an officer without warning. Therefore, I teach correctional administrators to develop their use of force policies to encompass the totality of the confrontation circumstances, detainee variables, response time issues, and to provide officers with various force options with which to respond to a detainee's type of resistance. CCSO has integrated authorized force options available for officers into the policies.

Further, CCSO has integrated the Pressure Point Control Tactics (PPCT) Force Continuum into the force policy which is linked to the force policy options authorized for officers. A use of force continuum is a graphic illustration which operationalizes the legal use of force and an agency's force policy by depicting several subject resistance typologies and appropriate officer force responses to subject resistance. The continuum guides an officer in decision making when confronted with varying types of subject resistance and accounts for environmental and subject variables and for the totality of the confrontation circumstances.

I am familiar with varying use of force continua. I have served as a consultant to the Michigan Commission on Law Enforcement Standards when they developed their use of force matrix, have instructed it to academy recruits and veteran police and correction officers, and I have explained the mechanics of the continuum during civil trial proceedings. I have assisted in the development of the PPCT force continuum and have instructed it to academy recruits, veteran police and correction officers, and to subject control instructors. I have provided consultation to numerous police and correction agencies on their use of force continua as well.

The CCSO force continuum incorporates the force principles of escalation and de-escalation. The continuum identifies various types of general subject resistance and also provides for reasonable force responses including: officer presence and verbal commands, empty-hand control techniques, intermediate weapons, aerosols, and lethal force. CCSO's policy on the Use of Less Than Lethal Force guides officers in the use of the TASER and other less-lethal force options.

**E.     Lt. Johnson's Supervision of Officers**

In my opinion, Lieutenant Johnson responded to the altercation after hearing the 1078 call as I would expect, and in doing so she fulfilled her managerial responsibilities. On scene, Lt. Johnson

guided the actions of officers but also relied on them to respond within the totality of circumstances facing them, their training, the jail policies, and the behaviors of Mr. Ajibade. Lt. Johnson instructed the officers to place Mr. Ajibade into the detox cell and place him in the restraint chair. The restraint chair provides a viable and effective piece of equipment designed to safely control and to protect a combative detainee. The purpose of using the restraint chair is to minimize injuries to the detainee and to detention personnel. It is used to immobilize a combative/dangerous deatinee, enhances the protection of a detainee from self-initiated or threatened harm, increases the safety of officers and medical staff interacting with an agitated detainee, provides a period for the detainee to calm down, and reduces the likelihood that an agitated detainee will incite other detainees to violence, insuborniation, or misconduct.

The use of the restraint chair in corrections has been an acceptable form of control and restraint for comabtive detainees for years. In my opinion, Lt. Johnson appropriately instructed the officers to place Mr. Ajibade in the restraint chair in response to Mr. Ajibade's active aggression and pursuant to the *Restraint Chair policy*. Additionally, Lt. Johnson instructed the officers to place Mr. Ajibade in the detox cell but learned that they placed him in the pre-booking cell number 4. Richardson testified that it was decided to place Mr. Ajibade in cell number 4 as it would not create an audience with other detainees if he continued his behaviors and it would assist in calming him down so that they could accleopmplish the booking process (pg. 115; see also Capers Dep. pgs. 91-92). While it may have been preferable to place Mr. Ajibade in the detox cell it would be appropriate to place him in a different cell. In the jail environment officers have to be concerned about how the actions of one combative detainee may incite other detainees or how other detainees may incite the behaviors of another detainee. The correctional objective was to place Mr. Ajibade in the restraint chair in a cell which would assist in calming him down so that the booking process could be completed. Based on his prior actions it would not be inappropriate to place him in a cell which would minimize other detainees from inciting him or he creating a potential disturbance with other detainees (see also Johnson Dep. pgs. 234). Placement of Mr. Ajibade in cell number 4 did not deprive him of his constitutional rights.

Lt. Johnson continued to fulfill her supervisory responsibilities by attending to sergeant Rowland's sustained injuries in the booking area, received updates by the nurse regarding Rowland's injuries, received information about EMS responding to the jail to attend to Rowland, the requests for restraints, the use of the restraint chair, the request for the TASER, and the spit mask. Over several minutes, Johnson was attending to these evolving components and rightfully as the watch commander relied upon the trained officers in cell number 4 who were under the

supervision corporal Kenny. Lt. Johnson as well as other officers testified that she was never in cell 4 until nurse Brown entered the cell. Also, Johnson never instructed Kenny to use the TASER, did hear Kenny give verbal commands to Mr. Ajibade to comply, observed the red light of TASER but did not hear the TASER being activated in the cell, and did not know everything that occurred in the cell. In my opinion, Lieutenant Johnson was faced with providing facilitation on many fronts and performed her duties properly during this period. Corporal Kenney was a well trained and experienced CERT supervisor and was trained on how to use the TASER. The officers in the cell were also properly trained to perform their job tasks within the policies of the jail. In any organization, a supervisor has to rely on employees to perform their job correctly. In my opinion, Lt. Johnson did not abdicate her supervisory duties by relying on the officers in the cell to perform their job properly, within the jail policies, and within the totality of circumstances facing them and the varied circumstances facing her during the period.

F.     **Lieutenant Johnson properly performed her supervisory duties after Mr. Ajibade was secured in the restraint chair**

The *Restraint Chair* policy instructs officers to visual observe the detainee restrained in the restraint chair, that the detainee will be checked by medical personnel, that officers are to make visual checks every 15 minutes, that the checks are to be logged on the special observation sheet, and that medical personnel will check the inmate at a minimum of every two hours.

Lt. Johnson testified that once she learned that Mr. Ajibade was secured in the restraint chair, she asked the nurse to check him, that she entered the cell, that Kenny told her he had difficulty in getting his hands from his back, that she told him to leave his hands, that she instructed Kenny to turn the chair around to face the side of the cell, that the nurse checked Mr. Ajibade, and that Mr. Ajibade was moaning, like he was angry (Dep. pgs. 152-157, 195-198). Johnson testified in her deposition: that Mr. Ajibade was coherent in the cell, that she did not monitor what nurse Brown was doing the entire time she was in the cell and that nurse Brown had information about Mr. Ajibade being TASED by Rowland (Dep. pgs. 199, 202-205). Lt. Johnson further testified in her deposition: that a detainee restrained in the restraint chair is to be checked every 15 minutes, that corporal Evans did not conduct the checks of Mr. Ajibade in the restraint chair by policy, that Evans did not complete the check log by policy, and informed Evans to print out the log and have nurse Brown sign it (Dep. pgs. 238 -242). Lt. Johnson also requested information from the officers and advised them to submit a written report (Dep. pgs. 109-113,121, 127).

Corporal Evans testified in her deposition: that she knew a restraint log had to be started and she did start the log, that Capers and Vinson told her they completed a check on Mr. Ajibade in the restraint chair, that she never made a check on Mr. Ajibade from 11:45 to 1:30 am,  that she and Kenny did make a check on him right after he was secured in the cell, that she was aware that the checks are to be made every 15 minutes by policy, that a supervisor fills out the log, that the nurse signed the form but that she did not see him do the check, that she was sitting about 12 feet away from the cell, and that she did not tell anyone about filling out the form without making the checks (Dep. pgs. 99-101, 103-105. 109-113, 123-125).

## Opinion

In my opinion, Lt. Johnson fulfilled her supervisory responsibilities appropriately and in accordance with CCSO policy. This is observed on several levels. First, she knew and by jail policy, that once Mr. Ajibade was secured in the restraint chair she needed to have the nurse check him. Second, Johnson instructed nurse Brown to check him in the cell and they both entered the cell at about 11:47 pm, about one minute after being notified that Mr. Ajibade was secured in the restraint chair (see video). Third, she did not see any injuries or blood on him and she and the nurse left the cell at about 50 seconds later. Fourth, Johnson informed Evans to start a log of the checks made and have the nurse sign indicating the checks performed. Fifth, Johnson spoke with the officers to get an overview of the altercation and informed them to submit their reports.

Kenny, Capers and Vinson and Evans made initial cell checks of Mr. Ajibade. Corporal Evans as the supervisor was aware that she was responsible for ensuring the checks were to be made by policy at 15 minute intervals and that the checks were to be logged after they occurred. However, she testified that she did not perform any checks after her initial check, pre-recorded the checks on the log, and had nurse Brown sign the form. In my opinion, Lt. Johnson did not abdicate her supervisory function during this period. It was appropriate for her to rely on trained, experienced and a knowledgeable supervisor to follow the policy and the practice of the jail performing the checks. Lt. Johnson never instructed Evans not to make any checks on Mr. Ajibade or to  pre-record the checks contrary to jail policy. Indeed, Evans agreed that Lt. Johnson instructed to her start the log and have the nurse sign the form after his check of Mr. Ajibade in the cell when she was in the cell with him.  Moreover, Gilberg testified: that he questioned Evans about logging the checks on the watch sheet and she informed him that she had done so and that Mr. Ajibde was checked according to policy (Dep. pgs. 183, 202).

Additionally, Lt. Johnson performed her supervisory responsibly as I would expect once Evans discovered that Mr. Ajibade was unresponsive in the restraint chair. Evans called her to the cell as well as other officers. Johnson did not delay, responded to the cell, advised the officers to remove Mr. Ajibade from the restraint chair, and instructed that EMS be called. Evans called a code Blue and the nurse responded. Mr. Ajibade was released from the restraint chair, nurse Brown provided medical intervention until EMS personnel responded and took over. Lt. Johnson's actions and response were appropriate.

## G.    Policy Conclusion

I conclude that administrators of CCSO have not abdicated their responsibility in developing and implementing policies which guide officers in performing their custodial duties. Deputy Chief Harris testified in his deposition: that he assisted in developing the policy manual for the department, that he was familiar with the policies, that the policies are updated, and that when a policy is changed, officers are provided training on the policy (Dep. pgs. 12-13, 109, 130, 137). These policies were operational prior to the incident date and they are accessible to officers throughout out the department.

CCSO's policies identified in this civil action comport with the *GA Standards for Adult Pretrial Detention Facilities* (November, 2012). There are 24 broad categories which direct policy development to administrators of adult pretrial detention facilities. The CCSO administrators have developed their policies in alignment with these standards. Indeed, the policies relevant to this incident were written within the GA standards. Moreover, CCSO policies comport with the American Corrections Association (ACA) Standards. These standards are not mandated but are rather professional association recommendations. CCSO administrators have voluntarily developed their policies in concert with the ACA policy recommendations and the appropriate ACA policy recommendation is referenced on the CCSO policy. The CCSO was accredited by the ACA and according to the CCSO's annual report (2014), the department has been accredited by the ACA since 1989 (see also Wilcher Dep. pg. 34; Harris Dep. pg. 120). I conclude that the CCSO administrators have not abdicated their responsibility to provide officers with appropriate policies and procedures in accordance with the GA Administrative Standards.

10. **Opinion #2:    Administrators of CCSO have provided their officers with training
commensurate with their correctional duties**

Consistent with the United States Supreme Court's decisions in *City of Canton v. Harris*, 489
U.S. 378 (1989) and *Connick v. Thompson*, 131 S. Ct. 1350 (2011) CCSO officers have received
ongoing training commensurate with their duties. Administrators of the department have made a
conscious and proactive choice and as a matter of practice to provide officers with basic academy
training and regular in-service training in order to perform their assigned duties. A review of the
officers' depositions and their training records illustrate that prior to the incident date they had
completed academy training, training on department policies and procedures, use of force
training, training on using the TASER, as well as numerous other topics through regular in-
service training sessions.

As required by Georgia law, all jail officers hired after January 1, 1999, must complete the Basic
Jail Officer Training Program (O.C. G.A., § 35-8-24, Title 35, Section 8). The program provides
80 hours of training including the topics of: The Origins of the American Jail, Inmate Rights,
Inmate Discipline & Grievance Procedures, Report Writing, Jail Climate, Ethics and
Professionalism, Stress Awareness, Admissions and Release, Basic Jail Security Procedures,
Searches and Security Inspections, Supervision of Inmates, Emergency Procedures, Abnormal
Behavior and Suicide Prevention, Fire Safety, Inmate Medical Service, Orientation to Chemical
Weapons, Emergency Medical, Universal Precautions for the Detention Officer, Self-Defense
Tactics, Fingerprinting, and Testing. Georgia law also requires that all jail personnel receive 20
hours of annual in-service training (see also the GA Standards for Adult Pretrial Detention
Facilities, 2012).

CCSO administrators have exhibited their commitment to providing all officers with job related
training. The commitment is manifested on many levels. First, in concert with the state training
requirement, CCSO administrators have implemented by policy their commitment to providing
officers with ongoing training in order for to perform their custodial duties. Policy 01/04/01,
*Training and Staff Development* outlines the basic training requirement for correction officers
and addresses the ongoing annual in-service training provided for correction officers. Second,
CCSO has developed and staffed a Training Unit which is devoted to providing On-The-Job
Training, Field Training Officer (FTO), roll call training, and in-service training to all officers
and supervisors of the Corrections Bureau. The training unit comprises a Lieutenant
(Brooks) and several training instructors (See Brooks and Guthery Depositions). Brooks and

Guthery completed the police academy, basic jail training, and are POST certified instructors (GA Peace Officer Standards Training Council). Brooks testified that that the State of Georgia requires 20 hours of training annually and CCSO provides annual training to officers (Dep. pgs. 16-17).

Third, jail administrator Gilberg testified in his deposition: that as a correction officer was hired, they completed the 80 hour required basic training, that the jail provided 2-4 weeks of OJT, that in 2014, correction officers received 5 weeks of classroom training totaling 200 hours, which is over 2½ times what the State requires (Dep. pgs. 45-46). Sheriff Wilcher testified that the training unit of the jail was responsible for providing and sending officers to training, that he believed that he has a duty to see that deputies are properly trained, and that officers are trained on the policies (Dep. pgs. 34, 158-159). Chief Deputy Harris testified that the training unit reported to Major Smith and was responsible for ensuring officers completed the necessary training, officers were trained at the jail by jail instructors, were sent to training, that the jail would bring in outside instructors to provide the training, that the jail provided TASER and policy training, that officers were provided a lot of Roll Call training, and that when a policy was changed the officers were provided training on it the change (s) (Dep. pgs. 26-30, 32, 107, 109, 137).

Fourth, CCSO documented the training completed by each correction officer. A review of the officers' training records reveal that each officer identified in this civil action has completed the Basic Jailer Training, dating back to 1989 (Lt. Johnson). Fifth, a further review of the training records shows that the officers have completed annual in-service training on a regular basis beyond their completion of the basic training course. The records reveal that each officer completed numerous training courses commensurate to their corrections duties. Topics in which training has been completed by the officers relevant to this civil action and prior to the incident date include: policy and procedures, inmate supervision, jail operations, emergency procedures for jailers, interpersonal communications (IPC), Crisis Intervention Team, health issues, use of force, defensive tactics, legal issues, mental health and mental retardation, frisk and search searches, crisis intervention team, First Aid and CPR, Roll Call, handcuffs, Restraint Chair, and TASER training. The training records shows that officers complete an average of 20 courses on an annual basis averaging about 82 hours of training, which quadruples the State requirement of 20 hours.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

Sixth, the following officers testified in their deposition about receiving basic training at the
academy, receiving training on varying policies and procedures, and completing in-service
training prior to the incident date (see Depos. of: Andeux-Evans Martin, pgs. 10, 24-27, 47, 64,
80-85, 87; Capers, pgs. 21, 29-30, 33-35, 39, 41, 47, 59, 108, 128; Cody, pgs. 13, 14, 16-23;
Cahall, 15-16, 17; Evans, pgs. 10, 15-18, 22, 24-26, 88, 77, 94, 115-116, 154-156, 164; Kenny,
pgs. 46-49, 53, 93, 274; Solomon, pgs. 66, 70; Richardson, pgs.17, 72).

Seventh, CCSO administrators have provided supervisors with training commensurate to their
positions beyond the basic jail training and the basic correctional duties. Lieutenant Johnson's
training file reflects that she completed training in: ethics and professionalism, event planning,
jail management/operations, policy and procedures, security procedures, restraint chair,
operational planning, security procedures, staff rules and regulations, jail liability, management
philosophies, emergency preparedness and response, prison rape elimination act, leadership
issues, sexual harassment, supervision, interpersonal communications, to mention a few. Johnson
testified in her deposition: that she completed the basic training school, was taught the job at the
jail by a training officer from 2 to 4 weeks, that she has received training in crisis negotiations,
effective communications, mental health training, crisis intervention training, policy on mental
health detainees, use of force training, policy on mental health and restraints, policy on the
restraint chair, hostage training, and management training (Dep. pgs. 10-14, 15-30, 22-29, 30-34,
37, 40-42).

Eighth, by practice, CCSO chose to certify officers in the use of the TASER and permit the use of
the TASER with the approval of a supervisor. The positions of Corporal and above were trained
in the TASER and trained to authorize the use of the TASER, the TASER was retained in a
locked box, and it was not routinely carried as part of the officer's uniform (Gilberg Dep. pgs. 71,
219).Training records show that Corporal Kenny, Capers, Lt. Johnson, and Corporal Evans had
been trained in the use of the TASER. Kenny's training file indicated that he had been trained to
use the TASER in 2014.

## Opinion

Based on my review of the aforementioned documents it is highly evident that administrators of
the CCSO have made a conscious choice to provide officers with basic jailer training which
comports with the state standard. By state requirement and practice CCSO administrators provide
ongoing annual training to officers in order for them to keep abreast of their correctional duties.
A review of the named officers' training records shows that they have completed over 20 various

27

training courses annually supporting CCSO's practice and commitment to providing officers with ongoing training. Annual training provided to officers averages over 80 hours which exceeds the state requirement. Concomitantly, CCSO administrators have provided training and ongoing accessibility to department policies and procedures which forms the foundation for the training. Jail policies are provided to officers through training, through the OJT program, through Roll Call, updated changes are provided to officers, and officers may access the policies at the jail. By policy and training, the use of the TASER has to be authorized by the lieutenant or higher (Brooks Dep. pg. 71).

The issue of using the TASER on a restrained and fully restrained detainee emerged through the deposition testimony. Brooks testified that the use of the TASER of a fully restrained detainee was not appropriate (Dep. pgs 87). Gilberg testified that the jail practice of using the TASER on a detainee in the restraint chair or in full restraints was not appropriate (Dep. pg. 150). Investigator Smith testified that it was not appropriate to use the TASER on a detainee in full restraints and in the restraint chair, that depending on the circumstances using the TASER was appropriate to secure a detainee in the restraint chair, and just because an employee did not follow the training does not demean the training (Dep. pgs. 46-47, 59-62). Sheriff Wilcher testified that everyone was appropriately trained in the TASER and it was properly monitored from 2012 to 2014 (Dep. pg. 103). Chief deputy Harris testified that in May 2015 he determined to stop the use of the TASER in the jail so that a complete inventory of the video footage of the TASERs could be accomplished, to ensure the TASERs were working properly, to allow the training unit to provide additional training on the use of the TASER, and that prior to May 2015, he did not believe that there was a problem with regard to the use of TASER at the jail (Dep. pgs. 109, 116-118, 178).

In my opinion a concern about the application of the TASER did not emerge until further review of the TASER occurred in May of 2015, which was after the Mr. Ajibade incident. No one testified that a training issue or policy issue emerged prior to Mr. Ajibade's death. There had been no deaths from using the TASER since the jail began using the TASER in 2001. Gilberg testified that since 2001 he was not aware of the use of the TASER as a means of punishment on any detainee and was only aware of one incident where a detainee in full restraints was tasered by an officer, and that the policy did not address this at the time (Dep. pgs. 119, 122, 129, 270). It would be a reasonable and prudent administrative decision to provide additional training to officers to ensure the TASER was appropriately being applied.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

Combined with the department documents reviewed, the deposition testimony of the officers, and department training instructors demonstrate that the CCSO meets the guidelines for managing the training unit. The items reviewed show that CCSO administrators have adequately prepared their officers with operational policies and training with which to respond to the needs of detainees and with varied use of force measures. In my opinion CCSO officers are provided with relevant and current training on a regular basis commensurate with their job responsibilities.

11.   **Opinion #3     A pattern and practice of overusing the TASER is non-existent at CCSO**

The plaintiff has alleged that based on four to seven incidents where the TASER was used in the jail by an officer or supervisor supports the claim of a pattern and practice of excessive force. This assertion is baseless.

First, former jail administrator Gilberg testified in his deposition: that during his tenure at CCSO he did not believe that the use of the TASER was out of control or over used, and the use of force was not over used, that when the IA reviewed the use of 600 TASER incident reports it was first misreported that the TASER was used in each incident but a closer review showed the TASER was on location of the incident but not used, and the report had to be retracted, that he disagreed with the Washington Post's story reporting that a culture of using the TASER as punishment existed at the jail, that he regularly reviewed incident reports where the TASER was deployed from 2001 to 2011 and estimated that the TASER was applied about 14 to 40 times or perhaps 200 times from 2001 to 2011, that out of the 200 estimated TASER applications, only one was with a detainee in full restraints, that the jail incarcerated about 18,000 detainees annually and on average the jail confined about 1,650 detainees daily, that he did not believe that seven incidents of the TASER used on a restrained detainee did not represent a culture of TASER abuse, and that officers make hundreds and thousands of contacts with detainees on a regular basis and he never observed the TASER being used as punishment while he was the jail administrator (Dep. pgs. 34, 36-38, 42-43, 118, 167-168, 262, 270). Gilberg also testified that when it was appropriate he recommended discipline of an officer or sergeant for a violation of policy (Dep. pg. 128).

Second, Captain Smith, the head of IA, testified in his deposition: that it was not a frequent occurrence that an officer used the TASER without a watch commander's permission, that he reviewed 600 incidents were the TASER was on location but it was not deployed, that of all the incidents he has investigated he did not recall an incident where the TASER was misused on a mentally ill detainee, and that four cases of the misapplication of the TASER out of

thousands of applications show a low likelihood of improper usage (Dep. pgs. 228, 232, 236, 248).

Third, chief deputy Harris testified in his deposition: that when an officer needed to be disciplined he would do it, has disciplined officers in the past, that he felt comfortable with what the employees were doing in 2014, that during 2013 through 2014 the TASER was not used much, that he reviewed the use of the TASER and found that the TASER was not being used much—the TASER was on scene but was not deployed, that he estimated that the TASER was used about 20 to 22 times, and that prior to May, 2015 he did not observe a problem with the use of the TASER (Dep. pgs. 36-37, 45, 53-54, 103, 178).

Fourth, corporal Kenny testified in his deposition that during his time at the jail (starting in 2007) he observed the TASER activated hundreds of times but did not observe any detainee deaths from its use (Dep. pg. 296). Fifth, Sheriff Wilcher testified in his deposition: that he had been employed at the CCSO since 1974, that the average daily population at the jail was about 1670 detainees, that the TASER has been used at the jail since 2001 and its use was not a problem, that all of the correction officers were properly trained with the TASER, and that from 2001 to 2015 there were total of 22 deaths at the jail, that there will always be an allged wrongful death in the jail as long as you have inmates in there, that you follow up with the IA reports and the crime lab to see if there was truly a wrongful death as opposed to a death from natural causes, and that while he was the jail administrator there was no reason to believe that on a whole, correction officers were improperly using the TASER (Dep. pgs. 60, 66, 100, 103, 118, 120, 156, 298, 301, 303).

**Opinion**

From a review of these documents, it is clear that a pattern or practice of using or abusing the TASER is non-existent at CCSO. This is observed on several levels. First, three former administrators, Sheriff Wilcher, Harris, and Gilberg all testified in their depositions that the use of the TASER was not overly used or abused by correction officers. Second, Captain Smith testified that in the many years he had been investigating claims of excessive force and reviewing use of force incidents and videos, he did not conclude that the use of the TASER was abused and excessively used on mentally ill detainees. Third, the collective testimony of Wilcher, Harris, Smith, and Gilberg all noted that the likelihood of improperly using the TASER given all of the interactions between correction officers and detainees was low. Fourth, Gilberg and Smith, who reviewed numerous use of force incident reports and videos on a regular basis concluded that the

use of the TASER was not excessive. Fifth, Gilberg and Smith noted that the Washington Post story was inaccurate as a more detailed review of the incidents involving a TASER actually showed that while a TASER was reported to be on location during an incident, it was not always deployed. Sixth, Corporal Kenney testified that he never observed a detainee die from the use of the TASER during his employment at CCSO.

Seventh, examining the estimated use of the TASER at CCSO shows that there is a negligible probability that the TASER would be associated with a death in custody. CCSO admits a very diverse detainee population with varying medical and mental health problems, just like other jails across the country. Gilberg testified in his deposition that on average, about 18,000 detainees were annually admitted into the jail (estimate). Gilberg and Sheriff Wilcher testified that the average daily detainee population was about 1,670 detainees. CCSO's annual report for 2014 showed that the average daily population was about 1,500 detainees, reported that about 17,225 detainees were annually released from the jail, and that on average there were about 60 corrections officers employed at the jail. The report indicated that 68 percent of the detainees were felons who had previous arrest records and 15 percent were convicted and were awaiting transfer to prison.

Gilberg testified that the TASER was adopted at CCSO in 2001 and estimated that on average the TASER may have been used annually through 2011 about 20 times while Harris estimated about 22 times. Based on an estimate of 22 applications, the TASER would be applied about 242 applications over the eleven year period. Over the 11 year period, there would have been about 189,475 detainees released from the jail. The probability of the TASER being applied on a detainee is about 0.13 percent chance likelihood. Further, there is less than 1 percent (0.000005) chance likelihood (negligible) that a detainee death is temporally associated with the use of the TASER at CCSO. Mr. Ajibade's death occurred on January 1, 2015 and it is reported that his death was the first death occurring at the jail after the use of the TASER.

In my opinion, these estimated numbers show that the TASER is used on a very infrequent basis. The estimated numbers actually show the safety of using the TASER as reported by Axon (formerly TASER International) and the National Institute of Justice. After examining numerous incidents where the TASER was applied in law enforcement and after reviewing numerous medical research on the effects of the TASER on the human physiology, the NIJ concluded that the deployment of the Taser has a margin of safety as great as or greater than most alternatives and recommends using the Taser over physical control techniques when it is justified. Laub of the

31

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

DOJ (2011) and Bozeman et. al (2009) report that the Taser is safe and has a statistical probability of risk of death of less than 0.0025%. Kroll et al. (2014) reported that the demonstrated incidence of Taser-induced cardiac arrest is extremely low, if not zero. Axon reports that out of the 310,000 annual field applications of the TASER, only 1 in 3,500 applications may be involved in an arrest-related death (Kroll et al., 2016)

Further, researchers from the Bureau of Justice Statistics reported that from 2001 to 2013 there were about 978 custodial deaths occurring in jails nationwide annually, with an average daily population of 750,000 detainees. About 89 percent of these deaths were from natural causes and custodial suicides. It is estimated that a custodial death after the use of force accounts for less than 2 percent of all custodial deaths.

I conclude that the risk of a custodial death at the CCSO after the use of force is statistically negligible and such a death is rare in occurrence. Out of the various types of and frequency of daily contacts between correction officers and detainees, about 99 percent of the contacts do not involve any use of force. I conclude that a pattern and practice of excessive force does not exist at the CCSO.

12.   **Conclusion**

I conclude that the administrators of the CCSO have not abdicated their administrative duties in regard to providing policies and procedures to the officers at the jail. Commensurate training to the various job tasks of the correction officers has been provided and they are provided with ongoing training in order for the officers to perform their custodial responsibilities and the training is in accordance with the GA standards for adult pretrial detention facilities.

Further, when appropriate, CCSO administrators have disciplined officers for failing to properly follow jail policies. In this case, nine officers were disciplined and Lt. Johnson was allowed to retire. Corporals Evans and Kenny were fired and prosecuted and nurse Brown was fired and prosecuted.

From reviewing the thousands of pages contained in this civil action it is my opinion that Lt. Johnson performed her supervisory duties commensurate to the policies of the jail, in accordance with her numerous hours of training, her experience as a correctional supervisor, and in response to the unfolding circumstances. Lt. Johnson did not direct an officer or other supervisor to violate CCSO policy, to use force to abuse or punish Mr. Ajibade, or to act outside the scope of their authority. Rather Lt. Johnson provided direction to the officers in accordance with CCSO policies

Preliminary Opinions of Darrell L. Ross, Ph.D.
Ajibade v. Sheriff John Wilcher, et. al., No. 4:16-CV-82-WTM-GRS

and procedures and within the totality of circumstances facing her throughout the incident. Lt. Johnson's supervisory actions in no way deprived Mr. Ajibade of his constitutional rights.

Also, officer Evans-Martinez was terminated from the department, appealed the wrongful termination, and was reinstated (see deposition). In my opinion, his involvement in the incident was minimal at best—he responded to the 1078 call as I would expect, did not engage with Mr. Ajibade, held the cell door open so that the officers could place Mr. Ajibade into cell 4, and returned to his correctional duties when advised by corporal Kenny. In my opinion, officer Evans-Martinez followed CCSO policy when he responded to the 1078 call and his response did not deprive Mr. Ajibade of his constitutional rights.

I am prepared to testify to each opinion provided in this preliminary opinions report.

Submitted by,

*Darrell L. Ross, Ph.D.*      August 9, 2017

33