# EXHIBIT B

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                      SAVANNAH DIVISION
 3    --------------------------------§
      SOLOMAN OLUDAMISI AJIBADE and    §
 4    ADENIKE HANNA AJIBADE, as natural §
      parents of Mathew Ajibade, and   §
 5    THE ESTATE OF MATHEW AJIBADE and  § Case No.
      Chris Oladapo, its Executor,     § 4:16-CV-82-WTM-GRS
 6                                      §
          Plaintiffs,                  §
 7                                      §
      vs.                              §
 8                                      §
                                        §
 9    JOHN WILCHER, in his official     §
      capacity as Chatham County        §
10    Sheriff, CORIZON HEALTH, INC.;    §
      CORIZON, LLC; GREGORY BROWN; BURT §
11    AMBROSE; FREDERICK BURKE; ABRAM   §
      BURNS; MARK CAPERS; MAXINE EVANS; §
12    ANDREUX EVANS-MARTINEZ; PAUL      §
      FOLSOME; DEBRA JOHNSON; JASON     §
13    KENNEY; CHRISTOPHER REE; ERIC     §
      VINSON; and BENJAMIN WEBSTER,     §
14                                      §
          Defendants.                  §
15    --------------------------------
16                    DEPOSITION OF
17                   DARRELL ROSS, PhD
18
19                   Valdosta, Georgia
20              Friday, September 22, 2017
21
22              GOLKOW LITIGATION SERVICES
23              Tami Cline, RMR, CRR, FPR
24        877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Darrell Ross, PhD

```
 1                    September 22, 2017

 2                       9:53 a.m.

 3

 4

 5           Deposition of DARRELL ROSS, PhD, held at

 6      Coleman Talley, LLP, 910 North Patterson Street,

 7      Valdosta, Georgia 31601, commencing at 9:53 a.m.,

 8      on the above date, before Tami Cline, Registered

 9      Merit Reporter, Certified Realtime Reporter, and

10      Florida Professional Reporter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Darrell Ross, PhD

```
 1    APPEARANCES:
 2    DUFFY & FEEMSTER, LLC
      BY:  CAMERON C. KUHLMAN, ESQ.
 3    Attorneys at Law
      236 East Oglethorpe Avenue
 4    Savannah, Georgia 31401
      912-236-6311
 5    Cck@duffyfeemster.com
      Representing Plaintiffs
 6
      LEVIN, PAPANTONIO, THOMAS, MITCHELL,
 7    RAFFERTY & PROCTOR, PA
      BY:  WILLIAM F. CASH III, ESQ. (VIA TELEPHONE)
 8    Attorneys at Law
      316 South Baylen Street
 9    Suite 600
      Pensacola, Florida 32502
10    850-435-7000
      Bcash@levinlaw.com
11    Representing Plaintiffs
12    CARLOCK, COPELAND & STAIR, LLP
      BY:  ERIC J. FRISCH, ESQ. (VIA TELEPHONE)
13    Attorneys at Law
      191 Peachtree Street NE
14    Suite 3600
      Atlanta, Georgia 30303-1740
15    404-522-8220
      Efrisch@carlockcopeland.com
16    Representing Defendants Corizon Health and
      Gregory Brown
17
      GILLEN, WITHERS & LAKE, LLC
18    BY:  THOMAS A. WITHERS, ESQ. (VIA TELEPHONE)
      Attorneys at Law
19    8 East Liberty
      Savannah, Georgia 31401
20    912-447-8400
      Twithers@gwllawfirm.com
21    Representing Defendants Corizon Health and
      Gregory Brown
22
23
24
25
```

Darrell Ross, PhD

```
 1     APPEARANCES:

 2        OLIVER MANER, LLP

          BY:  BENJAMIN M. PERKINS, ESQ.

 3        Attorneys at Law

          218 West State Street

 4        Savannah, Georgia 31412

          912-236-3311

 5        Bperkins@olivermaner.com

          Representing Defendants John Wilcher, in his

 6        official capacity as Chatham County Sheriff;

          Andreux Evans-Martinez; and Debra Johnson

 7

 8     ALSO PRESENT:

 9        Austin Ellis

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Darrell Ross, PhD

```
 1                        - - -

 2                     I N D E X

 3                        - - -

 4    Testimony of:  DARRELL ROSS, PhD

 5   DIRECT EXAMINATION BY MR. KUHLMAN................  9

 6

 7

 8                  E X H I B I T S

 9                    (Attached)

10   ROSS EXHIBIT                               PAGE

11   Exhibit 1  Article titled "Safety and Injury    94

12              Profile of Conducted Electrical

13              Weapons Used by Law Enforcement

14              Officers Against Criminal Suspects"

15   Exhibit 2  Article titled "Electronic Control   102

16              Device Exposure:  A Review of

17              Morbidity and Mortality"

18   Exhibit 3  Article titled "Police Use of Force   104

19              and Officer Injuries:  Comparing

20              Conducted Energy Devices (CEDs) to

21              Hands- and Weapon-Based Tactics"

22   Exhibit 4  Article titled "Can TASER Electronic  112

23              Control Devices Cause Cardiac Arrest?

24              by Mark W. Kroll, PhD, et al.

25
```

Darrell Ross, PhD

```
 1                  E X H I B I T S

 2                   (Attached)

 3    ROSS EXHIBIT                              PAGE

 4    Exhibit 5    Article Titled "Can TASER Electronic   114

 5                 Control Devices Cause Cardiac

 6                 Arrest?"  by Douglas P. Zipes, MD

 7    Exhibit 6    Chapter 12, Administrative       144

 8                 Implications, from book "Sudden

 9                 Deaths in Custody," was marked for

10                 identification.)

11    Exhibit 7    Chapter 9, Case Analysis of Restraint  164

12                 Deaths in Law Enforcement and

13                 Corrections, from book "Forensic

14                 Science and Medicine:  Sudden Deaths

15                 in Custody," was marked for

16                 identification.)

17    Exhibit 8    Preliminary Opinions Report of      182

18                 Darrell Ross in Marmelshtein v City

19                 of Southfield

20    Exhibit 9    Case Law Westfield v Kalamazoo County 184

21                 and Mike Stadel

22    Exhibit 10   Preliminary Opinions of Darrell Ross,  186

23                 PhD, in Jennings v Genesee County, et

24                 al.

25
```

Darrell Ross, PhD

```
 1                    E X H I B I T S

 2                      (Attached)

 3    ROSS EXHIBIT                                   PAGE

 4    Exhibit 11     Preliminary Opinions of Darrell   188

 5                   Ross, PhD, in Johnson v Kent

 6                   County, et al.

 7    Exhibit 12     Expert Witness Disclosure of      228

 8                   Darrell C. Ross, PhD

 9    Exhibit 13     Article titled "Examining Kingsley 240

10                   v Hendrickson:  Ending the

11                   Twilight Zone"

12    Exhibit 14     1/09/15 Memo Regarding TASER Usage 250

13

14          (PREVIOUSLY MARKED IN PREVIOUS DISCOVERY)

15    Exhibit P-9    Procedures for Use of the         197

16                   Restraint Chair, Bates No. PA00595

17                   - 00597

18    Exhibit P-88   Uses of TASERs on Restrained      241

19                   Detainees Spreadsheet

20    Joint          Chatham County Policies and       189

21    Exhibit J-2    Procedures

22

23

24

25
```

Darrell Ross, PhD

```
1                        -  -  -

2              THE COURT REPORTER:  Would you raise your

3       right hand, please.

4              Do you swear or affirm the testimony you give

5       in this cause will be the truth, the whole truth

6       and nothing but the truth?

7              THE WITNESS:  I do.

8              MR. KUHLMAN:  Thank you.  Good morning.

9              THE WITNESS:  Good morning.

10             MR. KUHLMAN:  This will be the deposition of

11      Dr. Ross taken in the Ajibade, et al., vs Wilcher,

12      et al., case.  We'll take this pursuant to the

13      Federal Rules of Civil Procedure.  I'm Cameron

14      Kuhlman.  I'm here on behalf of all plaintiffs.

15      And we have also with us Mr. Cash, Bill Cash, on

16      the phone also on behalf of all plaintiffs.

17             I would just ask the other lawyers here to

18      identify themselves for the purposes of the

19      record.

20             MR. PERKINS:  Ben Perkins for the sheriff,

21      Debra Johnson and Andreux Evans-Martinez.

22             MR. FRISCH:  Eric Frisch and Tom Withers for

23      Corizon Health and Greg Brown.

24             MR. KUHLMAN:  Thank you.

25                       -  -  -
```

Darrell Ross, PhD

```
1              DARRELL ROSS, PhD, called as a witness by the

2       Plaintiff, having been first duly sworn, testified

3       as follows:

4                        DIRECT EXAMINATION

5    BY MR. KUHLMAN:

6        Q.   Good morning again, Dr. Ross.

7        A.   Good morning.

8        Q.   You and I haven't met before we just

9       introduced ourselves out here in the hall; is that

10      correct?

11       A.   That's correct.

12       Q.   Okay.  I will endeavor throughout today to

13      ask you questions as clearly as I can.  My wife

14      tells me I have an issue with enunciation, so if you

15      don't understand a question that I have or need some

16      additional -- ask me to repeat it.  Just say so and

17      I'll try to restate the question as clearly as

18      possible.

19       A.   Sure.

20       Q.   How many times in the last six months have

21      you given a deposition?

22       A.   None.

23       Q.   How many times in the last six months have

24      you appeared at trial, provided testimony in a trial

25      setting?
```

Darrell Ross, PhD

1      A.   Last time I testified in trial would have

2    been February.  So that's roughly -- more than six

3    months.

4      Q.   Okay.  And when was the last time that you

5    gave a deposition; do you recall?

6      A.   It would have been January of this year.  It

7    was live testimony.  It was trial testimony

8    vis-á-vis video and telephonic conference that was

9    shown later in trial, and that would have been

10   January of this year.

11     Q.   Okay.  And which of the cases that you

12   disclosed to us as cases that you provided either a

13   report, deposition or trial testimony was that case?

14     A.   The January case?

15     Q.   Yes, sir.

16     A.   Okay.  That would be -- hang on.  That would

17   have been Number 26, Dawson vs Southfield, et al.,

18   lethal force case in federal court in Michigan.

19     Q.   Was that a corrections case or --

20     A.   No.

21     Q.   -- a law enforcement case?

22     A.   A law enforcement case.

23     Q.   Okay.  Of the -- I notice on your list 1

24   through 37 -- is that a -- is that the complete list

25   from the last four years, or do you need to make any

Darrell Ross, PhD

```
 1    amendments to that list today?

 2       A.   There should be one more that I omitted that

 3    I wrote a report for.  I believe it's King vs

 4    Rivera.

 5       Q.   K-e-e-n?

 6       A.   K-i-n-g, King vs Rivera, Battle Creek,

 7    Michigan police department in Michigan.  That would

 8    have been, I think, March or April of this year.  It

 9    was a lethal force case.

10       Q.   Again, a law enforcement case?

11       A.   Law enforcement case, correct.

12       Q.   All right.  So of the 38 or so cases you have

13    identified, the 37 printed and the one extra that

14    you just told us about, I see that you have got your

15    list organized by case, topic, state and court, and

16    I appreciate that helpful description, including the

17    case numbers.  That is exceedingly helpful to us.

18    Can you tell me of those 38 approximately how many

19    of those were law enforcement cases versus

20    corrections cases?  Do you understand the

21    distinction I'm drawing?

22       A.   Oh, yeah.

23       Q.   Okay.

24       A.   It will take me some time.  Do you want me to

25    go through each one and tell you?
```

Darrell Ross, PhD

```
 1       Q.   Yeah.  That would be great.

 2       A.   The first one was law enforcement.

 3            The second one, as indicated, jail death.

 4    That was in the jail, corrections.

 5            The third one, Grabow, that was a detainee

 6    suicide in the jail.

 7            The fourth one is a jail use-of-force case.

 8            Marmishtien is a law enforcement case.

 9            Edgerson is a law enforcement case.

10            Lamley is a law enforcement case.

11            Number 8, Westfield, I believe was a jail

12    use-of-force case.

13            Nine is a jail case, corrections case.

14            Khun is a jail case.

15            Kulpa is a jail case.

16            Twelve, Theoharis is a law enforcement case.

17            Thirteen is a jail case.

18            Fourteen, Ligon, is a law enforcement case.

19            Fifteen is a law enforcement case.

20            Fifteen is a law enforcement case.

21       Q.   Is that 16?

22       A.   Excuse me.  Sixteen.  Yes.

23       Q.   Thank you.

24       A.   Seventeen, Gorrola, is a law enforcement

25    case.
```

Darrell Ross, PhD

1          Eighteen is a jail corrections-related case.

2          Fleisher is a law enforcement case.

3          Love is a jail case, 20.

4          Twenty-one, Brown, is a law enforcement case.

5          Twenty-two is a law enforcement case.

6          Twenty-three is a jail corrections case.

7          Twenty-four, it's a quasi-law

8   enforcement/jail case, Johnson.

9     Q.   Can you just help me -- give me a brief

10  explanation of why it's --

11    A.   Well, it was the City -- I think it was the

12  City of Grand Rapids and the Kent County Sheriff's

13  Department arrested the individual.  They brought

14  him into the sally port and was right at the sally

15  port where we both had law enforcement and jail

16  officers having to restrain him.

17    Q.   Okay.  Thank you.

18    A.   Yes.

19    Q.   Twenty-five?

20    A.   Twenty-five, Beard, is a law enforcement

21  case.

22         Twenty-six is a law enforcement case.

23         Twenty-seven is a jail case.

24         Twenty-eight is a jail case.

25         Twenty-nine is a jail case.

Darrell Ross, PhD

1        Thirty is a jail case.

2        Thirty-one is a jail case.

3        Thirty-two is a jail case.

4        Thirty-three was a law enforcement.

5        Thirty-four is a jail case.

6        Thirty-five is a law enforcement case.

7        Thirty-six, law enforcement.

8        Thirty-seven is a jail case.

9        Then the 38th one we mentioned, that was a

10   law enforcement case.

11   Q.   Okay.  Thank you for providing -- for going

12   through that so thoroughly.

13        Of the -- of the cases that you identified as

14   jail cases, is it -- are all of those cases, as best

15   as you recall, pre-trial detainees?  Are any of

16   those -- they're all detention center or jail cases,

17   not prison cases?

18   A.   That's correct.

19   Q.   Okay.  Have in -- is it fair, then, to say

20   that in the 38 cases we have identified, you have

21   not been asked to provide an opinion in a case

22   involving a prison?

23   A.   That's correct.

24   Q.   Okay.  Have you in the course of your career

25   been asked to provide an opinion in a prison case?

Darrell Ross, PhD

1       A.   I have.

2       Q.   Okay.  Do you draw any meaningful distinction

3    between the applicable standards in a jail case and

4    a prison case, particularly as it relates to use of

5    force?

6       A.   I do.

7       Q.   Okay.  I want to ask you a series of

8    questions about this later, but just if you could

9    just help us sort of lay -- get the landscape case

10   here.  What is -- are there -- are there ways to

11   identify sort of the broad -- is there a broad

12   distinction between the use-of-force standards

13   applicable in a prison context and in a jail

14   context?

15      A.   Yes, there is.

16      Q.   Okay.  What is one of those distinctions?

17      A.   Just one?  The status of the detainee and/or

18   the prisoner.

19      Q.   Okay.  And so what is it about the status of

20   the detainee or the prisoner that changes the

21   applicable standards?

22      A.   Pretrial detainee, as you referred to it, is

23   in jail or going through the process of adjudication

24   or even perhaps been convicted but still pending

25   transfer to a prison.  So that's a little bit

Darrell Ross, PhD

```
 1    different.  As opposed to in a prison where we have
 2    a convicted prisoner who's serving time for,
 3    generally speaking nationwide, two years or more,
 4    has been convicted and is actually incarcerated in a
 5    correctional prison facility run by a state or
 6    private institution.
 7        Q.   I appreciate that distinction between the
 8    characterization of the classes of individuals that
 9    are in custody, those that are in a jail versus
10    those that are in -- folks that have been -- have a
11    conviction and are serving a sentence in a prison.
12         My question, though, was whether or not the
13    way in which the officers approach the use of force,
14    is there a distinction that you -- in your mind
15    between the way an officer in a jail context and an
16    officer in a prison context approaches the standards
17    applicable to the use of force?
18        A.   Not really.
19        Q.   Okay.  Is there a difference in your mind
20    between -- so for our purposes, is it fair to lump
21    the prisoner or the prison context and the jail
22    context together for purposes of the standards
23    applicable for how an officer should or should not
24    use force in those contexts?
25         MR. PERKINS:  I'll object to the extent it
```

Darrell Ross, PhD

1       calls for speculation.  Go ahead.

2   BY MR. KUHLMAN:

3       Q.   Go ahead and answer.

4       A.   Well, when you say "standards" -- and, again,

5   I'm going back to my status of the detainee or the

6   convicted prisoner.  The Fourteenth Amendment

7   basically applies to the pretrial detainee in

8   Kingsley v Hendrickson, a recent US Supreme Court

9   case of 2015, versus a convicted prisoner, which we

10  can go back to Hudson v McMillian and other cases

11  that look at more the standard of sadistic and

12  malicious for the purpose of causing harm.

13       So the standards under the amendments would

14  be different, but in terms of a transport wrist

15  lock, it's a transport wrist lock whether I use it

16  in jail or prison, or if I use a neck restraint,

17  it's the same technique, or if I use a TASER in the

18  jail or prison.  The evaluation of that in terms of

19  allegations of excessive use of force will be

20  different given the status of that detainee and/or

21  prisoner under those particular standards.

22       Q.   Okay.  Thank you.  I'm trying to make just a

23  more broad distinction so that we can have a

24  conversation about law enforcement on the outside

25  and corrections work on the inside, and so I'm

Darrell Ross, PhD

```
 1    asking you if the distinctions between the work of a

 2    corrections officer in a prison and the corrections

 3    officer in a detention center or a jail are

 4    sufficiently sort of minimal as compared to the

 5    distinctions between a corrections officer on the

 6    one hand and a law enforcement officer on the

 7    outside on the other.

 8         MR. PERKINS:  Same objection.

 9         MR. KUHLMAN:  Thank you.

10         THE WITNESS:  I'm confused with your question

11      because you have tied duties of a law enforcement

12      officer that, apparently in your question, overlap

13      with a jail detention officer that then overlaps

14      with a prison corrections officer.  And those

15      three obviously are not the same in that a law

16      enforcement officer is guided by the Fourth

17      Amendment and does street patrol, where a jail

18      officer doesn't do that, nor does a prison

19      officer, unless there's other distinctions that

20      are different about the prison officer's job that

21      may be doing transport, guarding of -- supervising

22      a prisoner in a court setting, in a hospital

23      setting, in some other treatment type of setting.

24         So there are -- in my mind and in the way as

25      I teach in looking at everything, there is
```

Darrell Ross, PhD

1        separate distinctive, yet there is some overlap.

2            So that's how I can answer your question the

3        best -- based on my understanding of your

4        question.  Now, if you want to break it down a

5        little bit more, I can make perhaps further

6        distinctions or clarifications.

7    BY MR. KUHLMAN:

8        Q.   Okay.  Are you familiar with a Venn diagram,

9    the idea of a Venn diagram?

10       A.   No.  You have to educate me on that.

11       Q.   Okay.  As a much more experienced lawyer in

12   Atlanta once referred it to me as, the two circles

13   chart.  So when I say a Venn diagram, I'm referring

14   to essentially two circles that may overlap or don't

15   overlap and then -- so, for example, there may be --

16   there is some area that's common between the two

17   circles.

18       A.   Yeah, I'm familiar with that.

19       Q.   Okay.  Could you -- could you draw for me

20   your understanding of the relationship between law

21   enforcement on the outside, corrections work in the

22   jail and corrections work in a prison in -- can you

23   represent that for me in a model like a Venn

24   diagram?

25       A.   When you say "work," are you talking about

Darrell Ross, PhD

1     job duties?  Job tasks?

2        Q.   No.  I'm talking about the standards of

3     the -- the standards of -- as it relates to the use

4     of force by those officers in those three contexts.

5        A.   I can't do it in your circles.  It would have

6     to be categories that are distinct and separate.  So

7     you would have a column for law enforcement that's

8     guided by the Fourth Amendment.  Boom.

9        Q.   Uh-huh.

10       A.   Secondly, you have jail detainees or jail

11    officers that are guided by the Fourteenth

12    Amendment.  That standard is somewhat different,

13    although there is some overlay from Graham v Conner

14    of the criteria that officers would be examined

15    under excessive force by jail officers.

16           Thirdly, you have another column for the

17    Eighth Amendment, correction/prison officers who are

18    guided by the standards from cases that the Supreme

19    Court has established through the Eighth Amendment.

20       Q.   Okay.

21       A.   So columns, Eighth Amendment, Fourteenth

22    Amendment, Fourth Amendment.

23           Now, if you're asking me techniques for

24    controlling prisoners or detainees or arrestees,

25    there you could overlap many things.  I can use the

Darrell Ross, PhD

1    neck restraint in prison, in jail and on the street,

2    so...

3       Q.   Okay.

4       A.   So if you're -- again, I'm not quite -- you

5    say standards, but I think you're mixing standards

6    with tasks with responsibilities with -- what I'm

7    trying -- what I hear you say is use-of-force

8    techniques perhaps or -- I'm -- if we're just

9    looking at standards, then are you saying examining

10   excessive force claims under a legal standard?

11      Q.   That's not my question.  In fact, let me ask

12   you this just now.  Do you have any legal training?

13      A.   Yes.

14      Q.   What is your -- what is the extent of your

15   legal training?

16      A.   Undergraduate work, master's graduate level

17   work with criminal law, criminal procedures, civil

18   liability.

19      Q.   Okay.

20      A.   Postgraduate work.  I go to training

21   constantly on legal issues that deal with personnel

22   issues in law enforcement, administrative issues in

23   law enforcement, use-of-force issues in law

24   enforcement, jail legal issues, corrections legal

25   issues taught by bona fide certified attorneys in

Darrell Ross, PhD

```
1    their field.  I attend those quite regularly every

2    year.

3        Q.    Okay.  Do you intend to express an opinion or

4    present an opinion in this case either now or at

5    trial as it relates to the legal standards

6    applicable in this case?

7        A.    Well, other than I have already articulated

8    in my impressions in response to your questions

9    earlier about the appropriate Fourth, Fourteenth and

10   Eighth Amendments, but nothing beyond that.

11       Q.    Okay.

12       A.    And I have not rendered any other legal

13   opinions in my report, so -- now, I will be

14   responsive to your questions should you ask me.

15       Q.    Sure.  And I appreciate that.  The more that

16   you and I can understand each other, the more

17   efficient we'll be able -- efficiently we'll be

18   able --

19       A.    Sure.

20       Q.    -- to move through the material.

21            You brought up your undergraduate and your

22   graduate work.  Can you tell me a little bit in more

23   detail about your particular educational background

24   starting with your undergraduate experience?

25       A.    Yes.  I have an associate degree from Lancing
```

Darrell Ross, PhD

1    Community College in criminal justice, graduating

2    there in '76, 1976.  Went on to Michigan State

3    University, obtained an undergraduate degree in

4    criminal justice, Bachelor of Arts in criminal

5    justice at Michigan State and a minor in psychology

6    in 1978.  I went on and pursued a graduate degree in

7    criminal justice at Michigan State University,

8    attaining that degree in 1987, and then received my

9    PhD in higher ed administration at Michigan State

10   University in June 1992.

11       Q.    Okay.  Did you -- can you tell me about

12   the -- your time at the Kennedy School of

13   Government?

14       A.    Yes.  That's postgraduate work.  I spent

15   approximately three to four, five months there on a

16   grant that I received while I was at East Carolina

17   University in Greenville, North Carolina, and went

18   through their Harvard Kennedy School of Government

19   executive leadership program.  It was a leadership

20   in management program that looked at all sorts of

21   styles of leadership, theoretical examples of

22   leadership, application of leadership not only into

23   private organizations, public sector, foundations,

24   educational institutions, so forth.  So it was a

25   very broad-based program.

Darrell Ross, PhD

1      Q.    Okay.  Do you recall -- is it fair -- the

2    title of your dissertation was "An Analysis of

3    Citizen Resisting in Policing"; is that correct?

4      A.    That's correct.

5      Q.    Okay.  Do you recall -- I understand it was

6    some years ago, but do you recall the general thesis

7    of your dissertation?

8      A.    Yes.  It was premised and based on the

9    Supreme Court's decision in Graham v Conner which

10   occurred in 1989, and so in looking at the criteria

11   to evaluate the claims of excessive force, I took

12   the claim of actively resisting arrest as one of the

13   factors or criteria that the court would review.  I

14   designed an inventory that would specifically

15   analyze the types of resisting officers met in the

16   field during arrest situations, analyzed those and

17   subsequently wrote and finished the dissertation

18   based on those analyzed reports that the officers

19   gave me that looked at the types of resistance they

20   encountered during arrest.  And that was the core of

21   that particular research and subsequently related

22   into some training materials and some other

23   publications as a result of that research.

24      Q.    So your dissertation did not consider the

25   other two factors in Graham v Conner, the flight

Darrell Ross, PhD

1    risk or the severity of the crime alleged?

2    A.    Indirectly.

3    Q.    Okay.

4    A.    But more directly focused on the type of

5    resistance that officers were encountering we're

6    trying to classify or categorize the types of

7    resistance that the officers were facing, because

8    the thesis that I had on the -- or the objective or

9    the purpose, since the Supreme Court had identified

10   various criteria -- and one of the central ones was

11   the type of resistance -- I wanted to focus on that

12   to get a better picture so we could train officers

13   better in justifying use of force based on that

14   criteria.

15   Q.    Okay.  I think you said that that led to some

16   training materials; is that correct?

17   A.    That's correct.

18   Q.    Okay.  Did your dissertation also sort of

19   lead to or -- and I don't want you to put too much

20   weight on this phrase "lead to."  I think you -- I'm

21   asking a general question here about the way -- what

22   other scholarship may have emanated from the

23   interest that you developed in your dissertation.

24   A.    Sure.  It emanated into a lot actually, but,

25   one -- to answer your question to be responsive, one

Darrell Ross, PhD

```
 1    specific one was the FBI published an article based

 2    on that -- and I would have to go back; it's in my

 3    CV -- based on the various types of resistance.  So

 4    I had a publication out of that and in a more formal

 5    peer-reviewed journal.  There were some others that

 6    were not peer reviewed.

 7          And it has certainly helped me to promote

 8    other research -- it spun off to other research over

 9    the years based on that, and then, like I said, in

10    terms of doing a lot of training of officers over

11    the years when I made instructors or instructor

12    trainers in pressure point control tactics or

13    system.

14    Q.   What was your first faculty appointment?

15    A.   It was at Ferris State University in 1985.

16    Q.   Okay.  And if memory serves, that puts you

17    pre-doctoral, pre-doc; right?

18    A.   Correct.

19    Q.   Okay.  Even pre -- was that -- your

20    appointment, then, would have been even prior to the

21    completion you have of your master's; correct?

22    A.   Yes.  And to clarify that, I had been working

23    on the master's degree and had stopped for a period

24    of time and then changed occupations, and one of the

25    things that they requested that I do when I took the
```

Darrell Ross, PhD

1    position at Ferris, "I want you to complete your

2    master's" -- because I was only like six credits

3    short -- "and then pursue your doctoral degree,"

4    which I did.

5         So I finished within about a year the

6    remaining credits that I was short on for the

7    master's degree or thesis, which is identified in

8    the CV, and then went on and worked full time and

9    finished my PhD in about four and a half years.

10   Q.   Were you ABD in four and a half years or you

11   completed -- you completed all of the coursework and

12   dissertation in four and a half years?

13   A.   I was ABD in about three, three and a half

14   years.

15   Q.   Okay.  And then the remaining year, year and

16   a half you spent completing --

17   A.   Yeah, about six to eight, nine months.

18   Q.   Okay.  If we were to go looking for your --

19   either your master's thesis or your dissertation, is

20   that something that you could get for us?

21   A.   Sure.  But it's also available through

22   microfilm and fiche through University of Michigan

23   systems.

24   Q.   Okay.  I appreciate that.  You mentioned a

25   career change or you said.  You were -- did --

Darrell Ross, PhD

1    forgive me if I misstate what you said.  You were

2    changing jobs; is that right?

3       A.   That's correct.

4       Q.   Okay.  What was your -- what was your field

5    prior to this change in jobs?

6       A.   Just short of 13 years working for the

7    Michigan Department of Corrections.  Started out in

8    prison work, did probation work for a while and then

9    was in the state academy, corrections academy for

10   four years as an instructor.

11      Q.   Okay.  So what was the last year that you

12   were what I think you characterized as -- in your CV

13   as field experience?

14      A.   It would have been 1985.

15      Q.   Okay.  And in those -- for those years that

16   you were working for the Michigan Department of

17   Corrections, how many of those years were in the

18   prison?

19      A.   Roughly seven.

20      Q.   And what were your responsibilities during

21   that time?

22      A.   I started right out -- right out as a basic

23   corrections officer, went through training, and then

24   went through advanced training, worked various

25   custodial assignments within the prison as a

Darrell Ross, PhD

```
 1    corrections officer.  As I was finishing -- and I
 2    started going to getting my degree at the same time
 3    as I was working.  Finished a degree and then
 4    promoted as a resident unit manager, which is a
 5    supervisor of a cellblock of 500 mentally impaired
 6    prisoners.
 7         I worked in the cellblock as an officer, got
 8    the degree or very close to getting the degree, and
 9    then they promoted me to the supervisor of the
10    cellblock where I had 16 officers and two assistants
11    and a psychologist, psychiatrist and also overseeing
12    the treatment and programs for the 500 mentally
13    impaired prisoners.
14         Then there came a time as I began to pursue
15    my master's degree I really had an interest in
16    teaching.  So I got the master's degree, had a side
17    track curriculum education on CJ education at
18    Michigan State while I was taking my master's, began
19    to teach part time, and that's when I began
20    affiliation with Ferris State University.
21         So there was a point in time there I was --
22    do I want to continue to remain in the Department of
23    Corrections looking in terms of advancement,
24    opportunities for advancement?  Or is this really --
25    and I got the opportunity to go into higher
```

Darrell Ross, PhD

```
 1    education.  It's probably the best decision I ever

 2    made, other than marrying my wife.  But I got that

 3    opportunity and left corrections and went into

 4    higher ed in '85.

 5        Q.   Okay.  So other than the resident unit

 6    manager position that you have just described to me,

 7    did you -- and you mentioned advancement.  Did

 8    you -- did you obtain any higher level of

 9    advancement within the Department of Corrections

10    other than that of resident unit manager?

11        A.   Well, technically in terms of state

12    classification, yes, as an academy instructor.

13        Q.   Okay.

14        A.   So -- but we're not talking, you know -- more

15    money obviously, but in terms of grade or pay or

16    classification, it was a little higher than what the

17    unit manager was.

18        Q.   As a unit manager, were you ever the watch

19    commander for the facility?

20        A.   No.  Just for the unit.

21        Q.   Right.

22        A.   We had 5,500 prisoners locked up in this

23    prison.  It was the world's largest walled prison at

24    the time, and I had 500 prisoners locked up in that.

25    It was the largest cellblock in the Michigan penal
```

Darrell Ross, PhD

```
 1    system at the time.  So I was not the watch
 2    commander.  That would have been the captain and the
 3    deputy administrator for -- let me back up.
 4         You had -- this prison and many prisons like
 5    it were basically broken down and categorized into
 6    two kinds of units.  You had more treatment units
 7    that dealt -- that's what I was, resident unit
 8    manager.  So we had a deputy warden that I reported
 9    to.  So he would be in your terms watch commander.
10    He would be responsible for the unit management, the
11    supervision treatment issues.  Then we had the
12    custodial aspect.  That would be the captain of a
13    particular shift, and that would report to the
14    deputy warden over custody.
15         So you kind of have a bifurcation there of
16    responsibilities.  And so even though at first I
17    started out on the custodial side, in order to get
18    promoted, after you got the degree, I went in terms
19    of -- I would supervise custodial officers from the
20    resident unit manager position.  That was basically
21    under the deputy warden of treatment.
22    Q.   Okay.  So -- and -- it --
23    A.   If that makes sense.
24    Q.   It does make sense.  Thank you.  These next
25    three questions may sound silly, but I have got to
```

Darrell Ross, PhD

1    ask them anyway.

2        You never served as a -- you were never the

3    captain --

4    A.   No.

5    Q.   -- that you have just described?

6    A.   But my rank was equal to a captain as unit

7    manager.

8    Q.   Okay.  But you didn't fulfill the

9    responsibilities that you have just previously

10   described as a captain?

11   A.   That's correct.

12   Q.   And you never served as a deputy warden?

13   A.   No, I have not.

14   Q.   Nor as a warden?

15   A.   No.

16   Q.   Have you been the sheriff?

17   A.   No.

18   Q.   Okay.  Is there any experience beyond 1985

19   where you had -- where you had what you would

20   categorize as field direct experience as you

21   categorized this prior experience?

22   A.   No.

23   Q.   This experience up to 1985 that we have just

24   been talking about, does that experience in any way

25   inform the opinions you have given in this case?

Darrell Ross, PhD

```
1        A.   Oh, sure.

2        Q.   In what way does that experience inform your

3   opinions in this case?

4        A.   Correctional practices.

5        Q.   Which correctional practices are you

6   specifically referring to?

7        A.   The supervision of a jail, supervision of

8   prisoners, use of force of prisoners, classification

9   of prisoners, custodial issues of prisoners,

10   medical/mental health programs, treatment,

11   supervision of prisoners, security and control.  I

12   mean, I could go on and on.  I mean, there are so

13   many facets that could be covered and addressed.  So

14   correctional practices in the operations of a

15   confinement facility whether it's a jail or a

16   prison.

17        Q.   Okay.  The opinions that you express in this

18   case as to the appropriateness of the policies of

19   the Chatham County Sheriff's Office, is that opinion

20   informed by this experience that you have just

21   described?

22        A.   Certainly, as well as other informed things

23   that I have done in my past.

24        Q.   I appreciate the additional information.

25             Is your opinion about the use of -- the
```

Darrell Ross, PhD

1    quantity of or the amount of the TASER that was used

2    at the Chatham County detention center, is that

3    opinion informed by this experience that we have

4    just described?

5         A.   That and others, yes.

6         Q.   What do you mean by "that and others"?

7         A.   Well, understanding how use of force can be

8    used and the reasonableness of use of force given a

9    detainee's behaviors and being trained in the use of

10   the TASER.

11        Q.   Okay.  Were TASERs in use in the prison that

12   you worked out of up to 1985?

13        A.   Not like they are today.  We had stun guns

14   but never -- never on the level of technology that

15   are today.  Very, very rarely used.  It was starting

16   to come in vogue more in the last two or three years

17   as I was leaving the Department of Corrections.

18        Q.   Okay.  So can you help the jury understand

19   the distinction that you have just drawn between

20   what I call a Taser and what you have referred to as

21   a stun gun?

22             MR. PERKINS:  Object to form.

23             THE WITNESS:  A stun gun, early on before

24   what we have modern day technology today, was an

25   apparatus -- it would be very -- it would be using

Darrell Ross, PhD

1        a similar like Taser without the probe mode.  It

2        would be more of touching like you can do with a

3        drive-stun with a TASER.  Totally different type

4        of apparatus but based on -- premised on the same

5        type of technology, touching and having current

6        flow through the body.

7   BY MR. KUHLMAN:

8        Q.   Okay.  Do you recall the policy which was in

9    place on the unit where you were supervising 500

10   mental health -- individuals suffering from various

11   mental health illnesses in the Michigan Department

12   of Corrections?  Do you recall the policy that would

13   have been in place as it relates to the use of the

14   stun gun in that unit in 1985?

15       A.   It was not -- yeah.  It was not activated

16   then.  There was no policy on it because the

17   technology, like I said, came when I was in the

18   academy.  So it was not available or not access for

19   the prison at the time that I led the -- was a

20   corrections officer or I was the unit manager.  So

21   it was more as I was in the academy and training

22   aspect, instructor in the last two years as I was --

23   so roughly we're saying maybe '81, '82, '83 it

24   started to come into play in some extent, and then I

25   left in '85.  So that was well after I was working

Darrell Ross, PhD

```
 1    at the prison.
 2    Q.   This is when you were in the probation or
 3    parole context?
 4    A.   And then -- yes.  Then I moved into the
 5    training aspect.
 6    Q.   Okay.  Let's go back to now what you referred
 7    to as at least the coequal or maybe just less than
 8    the best choice you made in your life, which is --
 9    and I'm putting this underneath the decision to
10    marry your wife, the decision to enter the academy.
11    A.   No.  What I said was the decision to go from
12    practitioner work in corrections to higher education
13    at Ferris State University.  So I left the
14    Department of Corrections, went into higher ed.
15    Q.   I apologize.  When I said the academy, I
16    was -- I use the term "academy" synonymously with
17    higher education, not with the police academy or
18    something like that.  I apologize.
19    A.   That's a distinct difference, yes.
20    Q.   So your decision -- I'm going to ask you a
21    series of questions about your early years in higher
22    education.
23    A.   Okay.
24    Q.   Okay.  Ferris State University was your first
25    appointment; correct?  Is that what you told me?
```

Darrell Ross, PhD

1      A.   Correct.

2      Q.   Okay.  After -- was that a teaching position

3   or research position?

4      A.   It was a combination of both.  Primarily I

5   was hired to help coordinate a new institute at

6   Ferris State University which provided, for lack of

7   a better word, technical consulting services for

8   criminal justice agencies vis-á-vis training,

9   consultation, research, assessment of policies and

10   procedures, assessment of operational programs at a

11   police department or a corrections department,

12   including jails.

13        I did teach at Ferris and I also taught --

14   and this is the distinction here -- at Ferris that's

15   different than some universities, at least in the

16   criminal justice program.  At Ferris they had

17   started in 1972 their baccalaureate degree,

18   four-year degree in criminal justice.  At the same

19   time they were certified as a police academy.  So

20   students interested in receiving their police

21   training at the same time they're getting their

22   education could not only graduate with a four-year

23   degree, baccalaureate degree, but they were also

24   post-certifiable as a police officer in Michigan.

25        So I taught also in that program, defensive

Darrell Ross, PhD

1    tactics and a series of other courses.  So I had a

2    myriad of responsibilities that I was responsible

3    for at Ferris.

4        Q.   Okay.  And it's correct you left there in

5    1992?

6        A.   Correct.

7        Q.   Okay.  And from Ferris where did you go after

8    that?

9        A.   To East Carolina University in Greenville,

10   North Carolina.

11       Q.   Okay.  And how did your role at East Carolina

12   differ from the conditions -- or the roles that you

13   have just described that you provided at Ferris?

14       A.   Sure.  It was more academic.  It was a

15   10-year tract position, publisher/teaching position

16   in criminal justice.  So I was primarily responsible

17   with teaching criminal justice courses and advising

18   students, publishing, researching working on

19   committee work within the university.  But at the

20   same time I had the ability and the opportunity to

21   continue to train police officers and corrections

22   officers on the side in PPCT, pressure point control

23   tactics, all over the country doing that as well as

24   in the state for various academies within the state

25   of North Carolina and various agencies within the

Darrell Ross, PhD

```
1    state, as well as I helped start a 200-hour

2    executive training program for police and

3    correctional executives in the state of North

4    Carolina.

5       Q.   Okay.  When you said "on the side" just a

6    minute ago, the training that you were doing on the

7    side, was that part of your -- was that within your

8    role as a faculty member, or was that a side

9    business?

10      A.   Well, let's go back to your Venn.  It kind of

11   overlaps.  It was -- we're expected to provide

12   services to your discipline, my discipline being

13   criminal justice.  The university did not pay me.

14   That was separate pay and/or -- sometimes it was

15   just service, and we were expected to perform

16   community service as a faculty member at the East

17   Carolina University.  But I would say for the most

18   part 70, 80 percent was -- I didn't have a shingle

19   up that says this is my own private business, but I

20   was more of a consultant that did that for pay on

21   numerous occasions.

22      Q.   You mean 70, 80 percent of your consulting

23   work, some with the remaining 20 or 30 percent being

24   the charitable work or the community service?

25      A.   Correct.
```

Darrell Ross, PhD

```
 1      Q.   Okay.

 2      A.   Roughly in those percentages.

 3      Q.   So that's 70, 80 percent of the subset.  Of

 4   the -- of your time at that time how much -- what

 5   percentage of your time did you spend teaching?

 6      A.   One hundred percent.

 7      Q.   Well, if --

 8      A.   I did this during the days that I didn't

 9   teach or on the weekends or on holidays or breaks or

10   summers.  Sometimes in the summer I had -- we had

11   the option whether we could teach in the summer or

12   not.  Sometimes I forewent that and said, well, I

13   can make a little more extra money doing consulting

14   than teaching at the university.

15      Q.   Okay.  And approximately what percentage of

16   your time did you spend writing during that period?

17      A.   Boy, the first -- it hasn't really changed

18   much.

19      Q.   Okay.

20      A.   That's hard to say.  I mean, I have never

21   really sat down and said okay -- I have never broken

22   it, okay, it's 20 percent here and 30 percent.  It's

23   part of the total job as a faculty member is to do

24   that.  So the days that I wasn't teaching I might be

25   in committee work.  I might be in the office
```

Darrell Ross, PhD

```
1     writing.  I might be at home writing.  I might be
2     out consulting.  I might be taking a case like we
3     have here today.  So it was enough that I got
4     published.
5        Q.   Sure.
6        A.   But I -- it's hard for me to quantify a
7     percentage of time.  I could break it down for you
8     this way, I suppose.  At East Carolina University it
9     was expected that probably 40 percent of your time
10    was spent teaching, another probably 40 percent
11    scholarly in professional development, i.e.,
12    researching and publishing, and then the other 20
13    whatever left there percentage-wise would be
14    service, service work.
15       Q.   What year did you make tenure?
16       A.   I believe it was '98, 1998.
17       Q.   Did your publishing calendar increase or
18    decrease after you made tenure?
19       A.   It increased.
20       Q.   You wrote more after you got tenured?
21       A.   Absolutely.
22       Q.   Okay.  Was there a particular reason why you
23    thought it was time to write more once you made
24    tenure?
25       A.   It wasn't an amount of time.  It was more
```

Darrell Ross, PhD

```
1    opportunity.

2       Q.   Okay.

3       A.   Because I think what happened was after I

4    had -- did the dissertation -- this is only my

5    assessment.  After I did the dissertation, I started

6    to get some publications, and I don't know if the

7    field was really ready to look at more use-of-force

8    issues, but as time grew on and as use of force

9    became more in the domain, in the public eye and in

10   criminal justice as well as law enforcement and so

11   forth, which was my area of expertise more than say

12   not, there was -- it was harder to get published

13   when you're under the clock, to get your name

14   recognized and known, then once you started getting

15   more publications and speaking engagements and

16   training and so forth, because after I got tenure,

17   it seemed like the flood doors just -- opportunities

18   opened then when -- during the time I was trying to

19   get published.

20      Q.   Okay.

21      A.   So for tenure purposes.

22      Q.   Were you -- prior to making tenure, were you

23   in control -- did you have autonomy as far as your

24   research interests or your areas?

25      A.   Oh, absolutely.
```

Darrell Ross, PhD

```
1          Q.   And I assume that this answer would be the

2     same after you were tenured?

3          A.   That's correct.

4          Q.   Okay.  Who were -- can you identify your

5     influences within the academy?  And I don't mean the

6     corrections academy.  I mean --

7          A.   Yeah.

8          Q.   -- higher education.  Who were your

9     influences that -- who most directly influenced your

10    scholarship?

11         A.   Well, the -- I would just say generally the

12    literature, the review of the literature, where it

13    was lacking.

14         Q.   Okay.

15         A.   Certainly Dr. Robert Parsons at Ferris State.

16    I wouldn't say he directed my scholarship, but he

17    certainly was a mentor in terms of the types of

18    activities that I was doing.  I learned that through

19    him when I was at Ferris.  But I think more the

20    catalyst for my interest and motivation to write

21    was -- well, let me just back up and say this.

22              At Michigan State we were taught that if you

23    get a PhD, that's your job, is to research, bring

24    new knowledge to the field.  Don't rely on someone

25    else to write the book.  You should be doing that.
```

Darrell Ross, PhD

1    And that's at Michigan State.  Now, it may be

2    different at other universities.  So that's how we

3    were taught and trained.

4         So getting involved with that certainly was

5    motivation, but I think the primary and one of the

6    more prominent emphasis for me was working on cases

7    to see whether there might be problems that needed

8    researched that could be addressing problems in the

9    field through research.

10   Q.   When you say cases, do you mean legal

11   disputes or do you mean case studies in the --

12   A.   I'm primarily referring to actually working

13   as an expert on a case --

14   Q.   Okay.

15   A.   -- primarily.  But certainly case decisions

16   by the Supreme Court or by a particular circuit, the

17   trends.  I have done numerous studies on trends of

18   liability issues, but primarily from working on a

19   case like we're working on here today or we're here

20   for today to see that there may be potential

21   problems that emerge and working with risk managers

22   across the country that have identified problems

23   when they insure police departments or sheriff's

24   departments.

25        So there's really a constellation of

Darrell Ross, PhD

```
 1    variables that really kind of propel me or interest

 2    me and motivate me to do research or scholarly work.

 3        Q.   Is it fair to say there's a major theme in

 4    your scholarship over -- beginning with your

 5    dissertation and continuing really to the present of

 6    taking the developments and the case law, whether

 7    it's beginning, as you said earlier, with Graham v

 8    Conner or -- and continuing even up until just, you

 9    know, a couple years ago with the Kingsley case, is

10    it fair to say that there is this theme going

11    through your scholarship of interpreting

12    use-of-force decisions for law enforcement or

13    corrections officers?

14        A.   That would be one theme.  I would agree with

15    that.

16        Q.   Okay.  What is another theme that you could

17    identify in your scholarship?

18        A.   Well, from that emanates the other avenues.

19    For example, within the realm of use of force there

20    could be policy-related issues, not just the

21    technique or tactic or a device used.

22             There could be, which I have written on

23    exclusively and studied quite a bit, the whole area

24    of death -- associated deaths from the use of force,

25    either the liability issues of it and/or the
```

Darrell Ross, PhD

1    etiology of the cause of that particular death, what

2    is the background of a particular -- from a

3    use-of-force situation.

4         Training factors that deal -- training issues

5    that deal with the use of force.  What is the best

6    way to address human performance out in the field

7    basically when you're in a dynamic scenario using

8    force with someone who is trying to harm, injure or

9    kill you.

10        So it goes from policy to training to

11   liability issues to training issues to technique

12   issues, application issues.  But I -- much of the

13   core happens to be around, wrapped around, I think,

14   liability but from a broader perspective how then we

15   operationalize that back into a particular

16   department.  So I -- investigation has become an

17   area that I have -- we just published a book just in

18   July in how investigating an officer-related

19   shooting or arrest-related death or a custodial

20   death in jail.

21        So to try to answer your question more

22   succinctly, it would be working as an expert --

23   hired as an expert, retained as an expert to work in

24   a particular case and a topic that I see potential

25   issues that deserve greater research.  That's where

Darrell Ross, PhD

1    I'm probably getting the most of my ideas or

2    motivation to research.

3       Q.   Okay.  So when you say "operationalized

4    liability," you mean that operationalize those

5    liability decisions for law enforcement or for

6    corrections officers?

7       A.   Yes.  Practitioners just do not take time --

8    they don't have the time to sit down and study law

9    decisions unless they go to an annual training, and

10   there they may just get a synopsis of a particular

11   case, a Supreme Court case, or let's say --

12   depending on what agency they're with.  But this

13   is -- I eat and breathe this stuff.  So when someone

14   were to say, "I want you to come and give us

15   training on this," this is what I -- I work at the

16   university and I come home and read cases, work on

17   cases and testify and publish.  So this is -- I

18   don't have much free time, but this is what I do.

19   People look at this and say this is crazy, but this

20   is what I do, so...

21      Q.   Sure.

22      A.   Then I get to share that with them because I

23   know practitioners aren't taking the time.  Even my

24   students, they're just like holy cow, grad students

25   I teach in civil liability.  We learn more in the

Darrell Ross, PhD

1    class than just by just -- just from reading a case.

2    What is the implication?  What's the application?

3    What does this mean to a police officer arresting

4    someone when the court says we're going to examine

5    you and to review your use of force based on these

6    standards and the totality, what happened in the

7    jail or the prison or the street.

8    Q.   What were -- do you recall what year you

9    first provided an expert opinion in a civil dispute?

10   A.   I do.  1989, October 1989 in federal court in

11   Marquette, Michigan.  It was during the World Series

12   when we had an earthquake in San Francisco.

13   Q.   I remember that earthquake.  I wasn't there,

14   but I was --

15   A.   I wasn't either.

16   Q.   -- watching on TV and distinctly watching the

17   bridge go like this and wondering what does this

18   mean.

19   A.   Yeah.

20   Q.   Do you -- in the time -- in the 28 years or

21   so since then, has your work as an expert --

22   separate and apart from your academic work, has your

23   work as an expert in these types of cases continued

24   throughout that period?

25   A.   Yes.

Darrell Ross, PhD

```
1        Q.   Okay.  Has there been a -- how would you --

2    can you draw a line for me to sort of represent the

3    trend of the quantity of work that you did as an

4    expert beginning in 1989 and continuing to today?

5        A.   You mean the frequency of retained --

6    retention as an expert?

7        Q.   Well, I'm not asking you to tell me how

8    much -- to try and remember every single case that

9    you've been in.  I'm asking you whether if in 1989

10   there was one case and then --

11       A.   Yeah, frequency.

12       Q.   Sure.  Frequency.  Yeah.

13       A.   Yeah.

14       Q.   Could you draw that for me beginning in '89

15   and continuing?

16       A.   Well, it would be rough.

17       Q.   That's fine.  We're not doing empirical work

18   here.  We're just trying to get our heads around it.

19       A.   I would say it started to take off in --

20   that's '89.  So '90 -- certainly after I published

21   or did the dissertation.  So '93 it began to go

22   more, and it's probably leveled off or even grew a

23   little bit since, you know, '16, '17.  I can tell

24   you that probably since about 2000 to the current I

25   get about 10 to 12 cases a year.
```

Darrell Ross, PhD

1     Q.   Okay.

2     A.   I'm retained in.

3     Q.   And of the cases that you're retained in --

4     A.   Roughly.  Roughly.  Estimate.

5     Q.   I'm not -- I'm not trying to hold you --

6     A.   Yeah.

7     Q.   -- to a number right now.  I'm trying to get

8   proportion here.

9          Of the 10 to 12 in which you're retained, can

10   you tell me approximately how many of those you

11   ultimately provide testimony?

12          MR. PERKINS:  Trial or deposition?

13   BY MR. KUHLMAN:

14     Q.   Well, I can ask the big question or I can ask

15   you to break it up.  I want to know -- I think I can

16   ask the --

17          MR. PERKINS:  I'm just making it easy.

18          MR. KUHLMAN:  Appreciate it.  Thank you.

19          THE WITNESS:  I can give you a good estimate.

20   I think I have been in live testimony about 200

21   times over the course since about '88.  In

22   depositions -- every one of those -- almost every

23   one of those more depositions -- there's more

24   depositions -- I take more depositions obviously

25   than I go out into live testimony.

Darrell Ross, PhD

1    BY MR. KUHLMAN:

2        Q.   Sure.

3        A.   So roughly speaking about 200 times live

4    testifying in federal court or state court, as the

5    case may be.

6        Q.   Okay.  And so that's live testimony in court,

7    and you said that the number -- so depositions are

8    going to be higher than that; correct?

9        A.   Yeah.  Yes.

10       Q.   And then providing reports is going to be a

11   number that's even higher than that?

12       A.   Because every case since, what, '95/'96 when

13   the rules changed -- it used to be early on you

14   didn't have to write a report, and the rules

15   changed -- I can't remember -- somewhere in the

16   mid '90s.  So now every case you get -- unless it

17   settles before you get a chance to put your opinions

18   in writing.  So every case that I get since about

19   the mid '90s, with a few exceptions, I write a

20   report.

21       Q.   Okay.  And of the cases that -- of those

22   cases -- and I want to deal specifically with, say,

23   the period beginning in, let's say, 2012 and

24   carrying forward.  What percentage of those cases in

25   rough terms did you either provide a report or --

Darrell Ross, PhD

```
1    and then ultimately a deposition or perhaps a

2    deposition and maybe even trial?  So let's -- I'm

3    dealing with the report, the largest number.

4        A.   Since 2012?

5        Q.   Yes, sir.  What --

6        A.   The exact number?  I don't know.

7        Q.   No.  No.  I'm trying to ask you the

8    percentage since 2012 of the reports that you have

9    drafted, what percentage of those approximately have

10   been for either law enforcement or corrections

11   agencies or individual officers?

12       A.   Roughly estimate 60, 65 percent for law

13   enforcement and the remaining for sheriff's

14   department, the jails.

15       Q.   Okay.  65/35?

16       A.   Approximately.

17       Q.   Okay.  I haven't done the math back here

18   on -- when we went through the 38 that you

19   identified, but I'm going to trust for a minute that

20   that number might -- that you might be -- you might

21   have a few more jail cases than 35 percent.

22       A.   Yeah.  Yeah.  I never sat down and quantified

23   it.

24       Q.   Okay.  In those -- but that 65 and 35, that

25   equals 100 percent; correct?
```

Darrell Ross, PhD

1      A.   Correct.

2      Q.   Okay.  Have you at any time since 2012

3   testified on behalf of the detainee or the arrestee

4   or the --

5      A.   For the plaintiff?

6      Q.   Sure.

7      A.   No.

8      Q.   Okay.  Have you -- in those -- beginning in

9   2012 to coming to today, have you ever found that --

10  a constitutional violation by a law enforcement

11  officer or a corrections officer, in your report?

12     A.   Not in my report.  Now, I want to make a

13  distinction.  I have been called on cases during

14  that time period where the defense had called me and

15  I said, "I declined the case because I don't think

16  you have a case.  You don't want me to testify in

17  the case."  So I have declined the case based on

18  what I have formed an opinion that it was not proper

19  conduct, so I decline the case.

20     Q.   Okay.  Earlier you told me that you take 10

21  or 12 cases a year.

22     A.   Roughly, yeah.

23     Q.   Approximately how many do you decline?

24     A.   Boy, I never put a figure on it.  Probably

25  four or five a year.

Darrell Ross, PhD

```
1       Q.   Okay.  And are you ever called by plaintiffs?

2       A.   No.

3       Q.   If you were called by a plaintiff, would you

4    accept a case?

5       A.   Depends.

6       Q.   What would be the factors that you would

7    consider if you were called by a plaintiff in

8    terms --

9       A.   Let me just -- are you talking in 2012 to

10   current or ever?

11      Q.   Well, Mr. Perkins is going to ask me to ask

12   you from 2012 to current.

13      A.   Okay.

14      Q.   But I would love if you could answer the

15   question from since 1989.

16           MR. KUHLMAN:  Do you want to object to that

17   or --

18           MR. PERKINS:  Object to form.  Go ahead.

19   BY MR. KUHLMAN:

20      Q.   Okay.

21      A.   Very rarely have I ever got called by a

22   plaintiff's attorney.  I have taken two in my whole

23   entire life career as an expert.

24      Q.   Okay.

25      A.   One in 1999 or 2000 and one in '97.  The one
```

Darrell Ross, PhD

```
 1    in '97 was -- and I don't remember the case, parties

 2    in the case, but it dealt with a hogtied situation

 3    where a subject died in police custody and he was

 4    hogtied with jumper cables, and my impression was

 5    that that was totally inappropriate.  I don't mind

 6    hogtying.  It's just the apparatus and training

 7    issues.  So that I wrote a report, and they settled

 8    that case out of court.

 9         The second one would have been

10    around '99/2000, and I'm giving an estimate.  These

11    were plaintiff cases where in Mississippi the motor

12    carrier division which stops trucks on the road and

13    so forth --

14    Q.   Weigh masters?

15    A.   Correct.  Totally misused/abused their use of

16    force and authority on an arrest in a detainment of

17    a trucker, a driver.  And I wrote a report in that,

18    and they settled that case.  But those -- those are

19    the only two cases.  Since that time I have not got

20    called.

21    Q.   Okay.  So as -- just to clarify, in that

22    hogtying case that you just mentioned, the earlier

23    case, your problem in that case was not with the

24    hogtying.  It was that they used jumper cables

25    instead of --
```

Darrell Ross, PhD

```
1        A.    Correct.

2        Q.    Well --

3        A.    And there was lying that was going on and

4    deceit by the officers.

5        Q.    So you had a problem in that case because

6    there was lying and deceit by the officers?

7        A.    Yes.  It was unprofessional conduct.

8        Q.    What in particular about the conduct?  Was

9    it -- was there more things that -- were there --

10   was there more conduct that you found unprofessional

11   other than the lying and the deceit?

12       A.    No.  Other than just the department was just

13   totally unprepared to deal with that kind of -- in

14   terms of training and techniques and equipment when

15   the person was high on cocaine, had about 2.5 grams

16   of cocaine in his system, which is something they

17   should be prepared at least to deal with from a more

18   professional and appropriate standard technique.

19       Q.    Okay.

20       A.    Other than that, that would be it.

21       Q.    Okay.  It's -- so it's correct that with the

22   exception of those two cases, you have never

23   expressed an opinion that a police officer has acted

24   wrongfully?

25       A.    No, not in terms of an expert witness case.
```

Darrell Ross, PhD

1      Q.   Okay.  Have you ever testified that a

2   corrections officer acted wrongfully, with the

3   exception of those two cases?

4      A.   No.

5      Q.   Going back to 1989?

6      A.   Correct.

7      Q.   Have you ever found -- expressed an opinion

8   in a report or through testimony prior to the date

9   at which the rules were amended and you were --

10   didn't have to provide a report that an officer,

11   whether that's a corrections officer or a police

12   officer, violated someone's constitutional rights,

13   with the exception of these two cases?

14      A.   No.

15      Q.   Have you ever found beginning in 1989 and

16   continuing to the present, with the exception of

17   these two cases, that an officer's use of force was

18   excessive?

19      A.   No.

20         MR. PERKINS:  You said found that a report or

21      just ever?

22         MR. KUHLMAN:  Well, I'm trying to account --

23      he's already identified that prior to the change

24      in the rules that there were cases that he

25      expressed opinions in in which he didn't have a

Darrell Ross, PhD

1       written report, and so I'm trying to ask one

2       question that accommodates both the time in which

3       there were reports and a time prior to that in

4       which there weren't reports.

5            MR. PERKINS:  Did you hear his prior

6       question?

7            THE WITNESS:  Yeah.  Repeat that again.

8   BY MR. KUHLMAN:

9       Q.   Okay.

10      A.   Or clarify it.

11      Q.   I'll ask two sets of questions then.  In the

12  time since the rules were amended to require a

13  written report on behalf of an expert, in the time

14  since then continuing to the present, have you

15  written an opinion or expressed a written opinion in

16  one of those reports that the use of force by a

17  corrections officer or a law enforcement officer was

18  excessive, with the exception of these two cases?

19      A.   With the exception, no.

20      Q.   Okay.  In the time period prior, between 1989

21  and the change in the rules in which there was no

22  written report necessarily required, did you express

23  an opinion through testimony either at deposition or

24  trial in one of those cases that an officer, a

25  corrections officer or a law enforcement officer,

Darrell Ross, PhD

```
1    used force that was excessive?

2        A.   No.

3        Q.   We've been going about an hour or so here.  I

4    know we don't have a videotape to change, but would

5    you like to take a break or do you need -- would you

6    like to continue?

7        A.   I could use a break.

8             MR. KUHLMAN:  Okay.

9             (A recess was taken from 10:56 a.m. until

10   11:04 a.m.)

11            MR. KUHLMAN:  We're back on the record.

12   BY MR. KUHLMAN:

13       Q.   Dr. Ross, we're back from a short break.

14   Over the break I was thinking about the earthquake

15   in '89, and it made me wonder, when you -- you

16   approach your discipline as an academic, your

17   scholarship, do you write -- is the data that you

18   use primarily empirical data that you gather, or is

19   it more of these case studies that we talked about

20   earlier?

21       A.   It's a blend of both.  I mean, I do empirical

22   research, original prospective research as well as

23   content analysis research.

24       Q.   So I forgot to ask you about leaving East

25   Carolina and where you went after that.  What was
```

Darrell Ross, PhD

```
 1    your next academic appointment?
 2        A.   From there I was -- I interviewed and got
 3    promoted to the director of the law enforcement
 4    program at Western Illinois University in 2006.
 5        Q.   And was that -- was that a training program
 6    or who were your students?
 7        A.   It was a baccalaureate degree program.
 8        Q.   Okay.
 9        A.   It was a criminal justice program.
10        Q.   Okay.
11        A.   We had 2100 students, 1900 on campus and one
12    extension site and 120-plus graduate students at
13    five extension sites in the suburbs of Chicago.
14        Q.   And you were the -- you were the director of
15    the program?
16        A.   Correct.
17        Q.   Okay.  Is this -- is this -- is it fair to
18    say there was a trend that you identified earlier as
19    sort of beginning in Ferris or Ferris was one of the
20    early programs to develop this baccalaureate
21    program, the four-year program that would also have
22    the hands-on training component of it to get the
23    postcertification and undergraduate degree together?
24        A.   Were you saying is it a trend?
25        Q.   Well, how many of these programs exist across
```

Darrell Ross, PhD

```
 1    the country today?

 2        A.   Very few.  This was pretty unique to

 3    Michigan.

 4        Q.   Okay.

 5        A.   So I did not -- that's the only one I have

 6    ever been affiliated with.  None at East Carolina

 7    University was a combination of academic and academy

 8    or at Western or where I am at presently at Valdosta

 9    State.

10        Q.   I'm sorry if I misunderstood.  There was a

11    baccalaureate program at Western Illinois?

12        A.   Yes.  I was the director of that program.

13        Q.   Okay.

14        A.   It was a four-year program with a graduate

15    school in criminal justice.

16        Q.   Okay.  And the graduates -- after that

17    four-year program, were those graduates also

18    postcertified?

19        A.   No.

20        Q.   Okay.

21        A.   They had to go to an academy wherever they

22    were hired.

23        Q.   Okay.  Were the majority of the students

24    ultimately sort of bound for law enforcement or

25    corrections work?
```

Darrell Ross, PhD

```
1       A.   At Western?

2       Q.   Yes.

3       A.   Yes.

4       Q.   Okay.  And what about after you came here to

5    Valdosta State?

6       A.   What about it?

7       Q.   Well, are the -- again, I apologize for an

8    incomplete question.

9            Do you -- the baccalaureate -- there's a

10   four-year baccalaureate program at Western Illinois;

11   correct?

12      A.   Yes.  And a graduate program, graduate

13   school.

14      Q.   And there was also a baccalaureate program at

15   Ferris State?

16      A.   Correct.

17      Q.   Okay.  And it was at Farris State where they

18   had this combined deal where you could come out of

19   that program with a four-year degree and

20   postcertification?

21      A.   Yes.

22      Q.   Okay.  Moving now to Valdosta.  Which -- is

23   there a four-year baccalaureate program at Valdosta?

24      A.   There's many.

25      Q.   Well, is there a -- is there a program
```

Darrell Ross, PhD

```
 1    similar to the program at Western Illinois?

 2    A.   Yes.  Let me break it down for you.

 3    Q.   Thank you.

 4    A.   At Valdosta State I'm the department head of

 5    three programs:  Sociology, anthropology and

 6    criminal justice.  A four-year degree.  I also am

 7    the department head then -- we also have a graduate

 8    program in sociology and criminal justice within

 9    that.  We have about 700 students.

10    Q.   That's a master's program?

11    A.   Yes.

12    Q.   Is there any doctoral program that you

13    supervise now?

14    A.   No.

15    Q.   Okay.  The sociology department, the

16    anthropology department, the criminology department,

17    these are undergraduate majors or programs?

18    A.   The sociology and the anthropology are

19    combined as an undergraduate program.  Criminal

20    justice is its own separate undergraduate program

21    and the soc has its own graduate program as well as

22    criminal justice.

23    Q.   Excuse me for just one moment.

24         Okay.  How many -- as a department head, how

25    many additional faculty members do you supervise?
```

Darrell Ross, PhD

```
 1      A.   Eighteen.

 2      Q.   Across those -- the departments you have just

 3   told me about?

 4      A.   Yes.

 5      Q.   Okay.  Of those 18, how many have -- or have

 6   since you received tenure?

 7      A.   Well, let's see.  Roughly -- I have to take

 8   each one, but 13 to 14 have -- are either assistant

 9   professor, full professor, meaning they have tenure.

10   I have three that are working on tenure.  So they

11   have not been promoted yet.  And I have three that

12   are not on tenure track.  They're lecturers.

13   They're not on the tenure track position.

14      Q.   Like an adjunct?

15      A.   No.

16      Q.   No?

17      A.   No.  They're full time.

18      Q.   Are there any adjunct faculty as well?

19      A.   Yes.

20      Q.   Okay.

21      A.   From time to time -- it just depends on the

22   semester.  I'll have four or five in sociology and

23   another three or four in criminal justice.  Just --

24   but it varies.

25      Q.   Okay.  Are the two lecturers writing?
```

Darrell Ross, PhD

```
 1        A.    No.  They're not required.

 2        Q.    Okay.  Are you supervising anyone's writing

 3    or scholarship right now?

 4        A.    Doctoral students I am.  Not faculty.

 5        Q.    Okay.

 6        A.    When you say supervising, do you mean I'm

 7    mentoring them how to write and research an article

 8    or a topic?

 9        Q.    I'm -- well, my question is both really.  I'm

10    not asking you whether you're -- well, I will ask

11    you this first:  Are you on committee -- how many --

12    are you the paper committee member for a number of

13    doctoral students?

14        A.    Yes, I am.

15        Q.    Okay.  Approximately how many doctoral

16    students?

17        A.    Five.

18        Q.    Okay.  Of the -- of the faculty members that

19    are tenure track right now, are those faculty

20    members also conducting research and publishing

21    right now?

22        A.    Yes.

23        Q.    Okay.  Is there anyone within the department

24    who can be fairly characterized as a mentor for

25    those faculty members?
```

Darrell Ross, PhD

1        A.    Not per se, but there's collaboration amongst

2     faculty to do research and to publish and to present

3     at conferences.  There's collaboration.  I wouldn't

4     say that -- we have 18 to 20 faculty and so forth

5     as -- we don't have an individual, to answer your

6     question, I don't think that oversees that's a

7     mentor for all.  It's more a collaboration.  They

8     know the expectation.  We assist when necessary, if

9     they have questions about research or obtaining a

10    grant or something of that nature, obviously.  But I

11    would say it's more collaboration as opposed to the

12    specific term of mentoring.

13       Q.    Okay.  Of the five doctoral students that

14    you're supervising right now or advising on serving

15    on the committees for, where do you anticipate those

16    five students -- where do you anticipate their

17    placement, ultimate placements?

18       A.    You mean in terms of occupation?

19       Q.    Uh-huh.

20             MR. PERKINS:  Object to form; calls for

21    speculation.  Go ahead.

22             THE WITNESS:  Probably stay where they're at

23    because they're practitioners in the field already

24    in some aspect of criminal justice.

25             ///

Darrell Ross, PhD

```
 1   BY MR. KUHLMAN:

 2       Q.   Okay.  Are any of them in -- currently

 3   practitioners in a corrections environment?

 4       A.   Yes, they are.

 5       Q.   How many of the five?

 6       A.   One.

 7       Q.   Okay.  What is the dissertation topic of that

 8   one doctoral student that you have just identified?

 9       A.   I believe she is looking at -- she's in

10   charge of the Prison Elimination Rape Act for the

11   State of Georgia, so she is in the executive office

12   and executive manager up outside of Atlanta.  So

13   she's going to be doing some research in regard to

14   looking at policies and practices of implementing

15   the Prison Elimination Rape Act in Georgia.

16       Q.   Okay.  Are you assisting her with the

17   research design?

18       A.   I have looked at it.  I have analyzed it for

19   her and approved it, but she came up with it

20   herself.

21       Q.   Okay.  Do you consider yourself an expert in

22   research methods?

23       A.   Yes.  I have taught it for many, many years

24   and done it myself, so yes.

25       Q.   Sure.  Okay.
```

Darrell Ross, PhD

```
 1        A.    Yeah.

 2        Q.    And so of your scholarship in, say, the last

 3     five years, is -- can you tell me whether or not --

 4     well, let's just look at it for a moment.

 5            Number 1, if you want to refer to it, this

 6     might help us.  Number 1 are journal articles on

 7     page 5 of your CV.  This is reviewing the PLRA;

 8     correct?

 9        A.    Correct.

10        Q.    Okay.  Is that -- what -- does that -- does

11     that article inform in any way the opinions that you

12     have expressed in this case?

13        A.    No.

14        Q.    Okay.  Can you identify for me out of, say,

15     the first -- let's take them in groups of ten.  The

16     first ten articles in your -- on your publications

17     list here -- we'll set the books and monographs

18     aside.  I'm talking about journal articles.

19            Of the first ten in the list, are there any

20     of those articles which you can identify as

21     informing or directly related to the opinions that

22     you express in this case?

23        A.    Okay.  Yeah.  Number 3, Number 4, 5, maybe 7.

24     You said -- go through how long?

25        Q.    Through 10.
```

Darrell Ross, PhD

```
 1        A.    Roughly maybe -- some aspects of 9 and 10.

 2        Q.    Okay.  You mentioned earlier collaboration

 3    with other faculty members within the departments.

 4    Do you recall that?

 5        A.    Yeah.

 6        Q.    Do you -- did you collaborate with any of

 7    your co-faculty members within the departments in

 8    either the -- did they review earlier drafts of

 9    these -- or coauthor any of these one, two, three,

10    four, five, six articles you have identified?

11        A.    Has my faculty reviewed this?  No.

12        Q.    Do you share drafts within the department,

13    working drafts or working papers?

14        A.    No.

15        Q.    Do other faculty members share their working

16    papers with you?

17        A.    They have.

18        Q.    Okay.  Would you say it's fair that -- is it

19    fair to say that the other faculty members within

20    the department are aware of your general research

21    interests?

22        A.    Yes.

23        Q.    Are they aware of your general positions that

24    you take within the papers?

25        A.    If they read them.
```

Darrell Ross, PhD

```
 1      Q.   Okay.  Do you -- have you --

 2           MR. PERKINS:  He'll fire them right back to

 3      you all day.

 4           MR. KUHLMAN:  That's fine.

 5   BY MR. KUHLMAN:

 6      Q.   Do your other faculty -- do the other faculty

 7      members know you're here today?

 8      A.   No.

 9      Q.   Okay.  Are they aware of your additional work

10      as an expert?

11      A.   Yes.

12      Q.   Okay.  Are they -- are they generally aware

13      of the positions you take in the cases in which you

14      express opinions?

15      A.   I don't know that.  I don't share -- this is

16      something that I don't really share with them and

17      don't have an opportunity to, so I doubt it.

18      Q.   What percentage of your income in the last

19      four years has been derived from your work as an

20      expert?

21      A.   The 30 to 40 percent.

22      Q.   And the balance, the 60 to 70 percent comes

23      from your faculty appointments?

24      A.   Yes.

25      Q.   Does Valdosta State have an institutional
```

Darrell Ross, PhD

```
 1    review board?

 2    A.   Yes.

 3    Q.   Have you submitted any of your scholarship in

 4    the last ten years, any of the -- any of your

 5    proposed research to the IRB?

 6    A.   Yes.

 7    Q.   Okay.  Has any of that -- have the -- has the

 8    IRB approved all of your proposed projects?

 9    A.   Yes.

10    Q.   Without comment?

11    A.   Without comment.

12    Q.   Okay.  Can you tell me about the most recent

13    piece that you submitted to IRB?

14    A.   It would be Number 5.

15    Q.   Okay.  I'd like to ask you a series of

16    questions about the design of the research that you

17    conducted in order to write Number 5, the article.

18    What was the -- what was the -- what methods did you

19    utilize?

20    A.   I use a prospective methodology.

21    Q.   And can you help the jury understand what a

22    prospective methodology is?

23         MR. PERKINS:  Object to form.

24         THE WITNESS:  Sure.  It's a methodology that

25    looks at incidents and the nature phenomenon in
```

Darrell Ross, PhD

```
 1      realtime.

 2   BY MR. KUHLMAN:

 3      Q.   And so do you -- how do you design a sample

 4   or how do you determine the sample to be evaluated

 5   in realtime in this -- for this piece?

 6      A.   This particular research involves 17 police

 7   departments in the United States and primarily was

 8   those that I had done some training for in the past,

 9   had some contact there in the past and they agreed

10   to, for a year, document on an instrument that I

11   designed and actually modified from Dr. Christine

12   Hall's research in Canada, with her permission, to

13   look at the violent -- the outcomes of violent

14   arrest situations in placing subjects in the prone

15   restraint position.

16          So every time that an officer had a level of

17   defense of resistance or higher, violent or

18   combative type of resistance, they would fill out

19   the instrument and would submit that to a supervisor

20   who was overseeing collecting of the instruments at

21   that agency.  At the end of the year, they sent me

22   the instruments that were collected for that agency.

23   And I had a coauthor on that who assisted me in

24   doing -- assisted the stats, the statistical

25   analysis of those, of the data that we received over
```

Darrell Ross, PhD

```
 1    the year.

 2         Q.   Okay.  And were there significant findings?

 3         A.   Yes, there was.

 4         Q.   And what were those findings?

 5         A.   That on these violent confrontations, every

 6    arrestee was placed in the prone position, was

 7    handcuffed and/or legs were restrained in many of

 8    these.  All of them were handcuffed.  Many of them

 9    were hobbled, that TASERs were used in approximately

10    20 percent of these cases, that 20 percent exhibited

11    six signs or symptomatologies of excited delirium,

12    that none of these subjects died in police custody

13    even though various measures of force and devices

14    and equipment was used and placed in the prone

15    position with weight on their back from 1 to 5

16    minutes.

17            There was about 4 percent that received what

18    we considered a significant injury, a broken arm,

19    something of that nature, and then 16 received just

20    bruises, contusions.  But no one died in the

21    research, which is consistent with Dr. Hall's study

22    in Canada.  But I wanted to do one in the United

23    States.

24         Q.   And that was approved -- the instruments and

25    the collection methods were all approved by the IRB?
```

Darrell Ross, PhD

1      A.   Yes.  And what I did was -- for that was -- I
2      didn't have to submit anything in writing to the
3      IRB.  I called the director of the graduate program
4      and the chair of the committee and said here's what
5      I'm going to do.  And I said I'm not -- the
6      instrument that we're using will be basically
7      secondary information, secondary analysis.  We're
8      not surveying anyone.  We're not putting humans --
9      not doing a human subjects study per se.
10          So it was a secondary clearance in that we
11     were not exposing any type of population to an
12     experimental design or experimental TASERs or
13     restraints or putting someone in a lab, something of
14     that nature.  So it was taking reports that officers
15     would file in the field.  From their report they
16     would take information and transfer it to the
17     instrument that was stored in the agency for 12
18     months, and then they sent me those instruments to
19     analyze.
20      Q.   Okay.  How many instruments did you -- were
21     ultimately returned?
22      A.   We had 1,100, and out of that, 1,085 were
23     usable.
24      Q.   From the 17 different departments that you --
25      A.   Yes.

Darrell Ross, PhD

```
 1        Q.    -- sent them out to?

 2        A.    That's correct.

 3        Q.    Okay.  You mentioned earlier you had a

 4    coauthor who did the -- who ran the stats.  Did

 5    you -- so you did not participate in the regression

 6    analysis or the heavy --

 7        A.    Very limitedly.

 8        Q.    Okay.

 9        A.    But he did it, yes.  He did the stat

10    analysis.

11        Q.    Okay.  Is that the way that you have

12    conducted your research generally speaking, that you

13    include a coauthor for the heavy data work?

14        A.    Not always, but sometimes, yes.

15        Q.    Okay.  When was the last time that you

16    yourself were primarily responsible for the

17    regression analysis on a data set for one of your

18    articles?

19        A.    That's a good question.  I want to say maybe

20    2005 or '06.

21        Q.    Okay.

22        A.    Somewhere in there roughly.

23        Q.    Okay.  Why don't you talk to your co-faculty

24    members about your work as an expert?

25              MR. PERKINS:  Object to form;
```

Darrell Ross, PhD

```
 1        proportionality.  Go ahead.

 2             THE WITNESS:  Why don't I?

 3   BY MR. KUHLMAN:

 4        Q.   Yes, sir.

 5        A.   No reason.

 6        Q.   Okay.  Everybody goes home at the end of the

 7   day and does other things and --

 8        A.   That's correct.

 9        Q.   Okay.

10        A.   I'm more -- my position as a leader there,

11   I'm more concerned with helping them try to get

12   tenure and get their career promoted.  I'm not the

13   type of personality or type of person that would go

14   around and, hey, look what I did last week or

15   whatever.  But the work speaks for itself and it

16   gets out, because I have to be reviewed by faculty

17   every five years as well.  So they're well aware

18   what I do.

19        Q.   When was the last time you were reviewed,

20   your scholarship was reviewed?

21        A.   Well, all my work was.

22        Q.   Okay.

23        A.   It's not just scholarship.

24        Q.   Okay.

25        A.   2015.
```

Darrell Ross, PhD

```
 1        Q.   Was there a written report of the -- as a

 2     result of that review?

 3        A.   Yes, there was.

 4        Q.   Would you be able to provide us a copy of

 5     that report?

 6        A.   Of which report?

 7             MR. PERKINS:  Object to the form;

 8        proportionality.

 9     BY MR. KUHLMAN:

10        Q.   Of the report conducted by the faculty

11     committee that you just mentioned that reviews you

12     every five years.

13        A.   Sure.

14        Q.   Okay.  It's fair to say that placements are

15     down from 1992, when you got your PhD, to today;

16     correct?

17        A.   What do you mean "placements"?

18        Q.   That doctoral placements, that the number of

19     faculty appointments are -- there are fewer jobs

20     available today than there were when you came into

21     the higher ed in '92.

22        A.   In criminal justice or generally?

23        Q.   In your field.

24        A.   You know, I don't know that I totally agree

25     with it.  I haven't checked the stats lately in the
```

Darrell Ross, PhD

```
1    higher ed chronicle, but I see position openings

2    quite a bit --

3        Q.   Okay.

4        A.   -- in the field, in my field, in sociology,

5    anthropology and criminal justice.  I don't get into

6    biology or chemistry or other fields, but in my

7    field it's -- I would say it might be down more than

8    sociology but not so much in criminal justice.

9    There seems to be more folks that are -- who have

10   come in the '70s and '80s and now retiring, which is

11   opening up some positions.  Now, if you're talking

12   about new -- it just depends on the university and

13   their program growth.

14       Q.   I'm just wondering about -- you said just a

15   minute ago that you spend -- you're primarily

16   focused -- when you're over there, you're primarily

17   focused on making sure that folks -- that grad

18   students get jobs.  Is that what you said or not?

19       A.   No, I didn't say that.

20       Q.   Okay.  Can you tell me, then, what -- how I

21   misunderstood your earlier statement about what it

22   is that you spend your time over there doing?

23           I'm having -- it's a broad question, but I'm

24   referring to --

25       A.   I don't understand your question, and I never
```

Darrell Ross, PhD

1    said I'm more concerned about graduate students

2    getting a job.  So I don't know where -- read back

3    whatever we had in the dep, but I'm not sure.  I'm

4    not following you.

5        Q.   Okay.  I asked you why you didn't -- why you

6    didn't talk with or why nobody asked you about your

7    work as an expert, and you said you didn't need to

8    because that was something you did outside of hours.

9    Is that right?

10       A.   Correct.

11       Q.   Okay.  And then it's my understanding that

12   just after that you told me about what it -- you

13   made an affirmative statement about what it is you

14   do do when you're in the department.  That was the

15   question I was asking about.

16       A.   Well, I lead the department, so I have a lot

17   of responsibilities in the department.

18       Q.   Sure.

19       A.   I teach class.  I supervise all the faculty.

20   I have to schedule all the courses.  I have to

21   participate in meetings with the dean, with faculty,

22   with groups, with students.  I have to evaluate

23   faculty every year.  I have to evaluate their

24   scholarship.  So it's more about me as the leader of

25   that department leading them in terms of making sure

Darrell Ross, PhD

1    that they're on track to -- towards progress,

2    towards tenure, towards their scholarship, their

3    teaching.  I sit in their class and evaluate their

4    teaching.  So it's more about me as the leader

5    attending to their needs as opposed to, "Hey, come

6    in my office and listen to me today."

7        Q.   Okay.  I apologize.  I misunderstood.

8        A.   Yeah.

9        Q.   Or I think I -- I think I understood you at

10   the time, but I misstated that, that you were -- you

11   were trying to convey, I think, that your -- when

12   you're in the department, you're more focused on

13   outreach to the other -- you're outwardly focused or

14   externally focused instead of drawing the folks in

15   and saying, "Look at what I've written or see what

16   I've worked on"?

17       A.   Yes, exactly.  Rarely has that come up.

18       Q.   Again, I apologize for the detour.

19       A.   That's fine.

20       Q.   Let's go back here for just a second to

21   the -- to your publication -- to the journal

22   articles.  Number 3, was there -- was there any

23   research methodology employed using that in order --

24   off of that article?

25       A.   Yeah.  I think I just used some basic

Darrell Ross, PhD

1    descriptive stats to review the trends and the

2    Department of Justice review of those institutions

3    that they found in violation.

4        Q.   Okay.  And in Number 4?

5        A.   Number 4 was just taking that Supreme Court

6    case and analyzing and writing on that and then

7    looking at cases pre the decision, taking secondly

8    the decision and reviewing that from the Supreme

9    Court and what that really means now under the

10   Fourteenth Amendment and then postdecisions that

11   had -- at least at the time that I wrote the article

12   that had been starting to apply this case to

13   situations and incidents in jails.

14       Q.   Okay.  So out of this small set of your

15   articles, is it fair to say that those articles,

16   whether or not they're predicated on original

17   research or an analysis of Supreme Court decisions

18   or some other data set that's not necessarily

19   research designed by you, the conclusions that you

20   reach in those articles are only as good as the data

21   upon which they're predicated; correct?

22       A.   That's true with any research.

23       Q.   Okay.  And so I asked you that as to just

24   these few articles, but I think you have already

25   answered -- you anticipated and answered my other

Darrell Ross, PhD

1    question, which is that can be the case across your

2    work.

3        A.   That in --

4        Q.   Go ahead.

5        A.   My work or anybody's work.

6        Q.   If your data is junk, your conclusions don't

7    matter.

8        A.   That's true.

9        Q.   Okay.  Just to round this out, let's just

10   look at just very briefly if you can tell me about

11   the next five.  We're not going to --

12            MR. KUHLMAN:  Don't worry, Ben.  We're not

13       going through 90 publications today.

14            MR. PERKINS:  Good.  Object to form;

15       proportionality.

16   BY MR. KUHLMAN:

17       Q.   Okay.  11 to 15 were -- out of 11 to 15, I

18   believe that's Mr. Cash coming off of mute.

19            Anyhow, 11 to 15, are there any of those

20   articles that inform your opinions expressed in this

21   case?

22       A.   11 through 15?  Some perhaps in Item 12.

23   That would be it.

24       Q.   Okay.  And now working backwards to the

25   monographs or book chapter section, can you identify

Darrell Ross, PhD

```
1     for me from that list which books or individual

2     chapters that you have authored inform your -- the

3     opinions you express in this case?

4         A.   Well, book 1, Number 1, book 2, book 3, book

5     4.  Monographs Number 1.

6         Q.   Is that also Number 5?

7         A.   No.  Monograph.  Under monograph I said

8     Number 1.

9         Q.   Are we not looking -- I have got monographs

10    and book chapters consolidated as a single list on

11    mine from 1 through 9.

12        A.   Correct.  And you said books, too; right?

13    I'm going back to books.

14        Q.   Okay.  I apologize.

15        A.   Yeah.  Book 1.  I said book 2, book 3, book

16    4.  Now monographs books Number 1 under the

17    monographs, somewhat maybe 2 under monographs,

18    vaguely -- you know, maybe somewhat of 4 but not

19    specific on point.  Number 5.

20        Q.   How is Number 4 not directly on point?

21        A.   Well, because this -- that particular article

22    was written pretty exclusively on excited delirium,

23    symptomatologies associated, excited delirium.

24    So -- and I don't consider this case an excited

25    delirium case.
```

Darrell Ross, PhD

```
 1      Q.   Okay.  Just to clarify on that, you don't

 2   intend to offer the jury an opinion -- and I don't

 3   think I see it in your report for here -- about

 4   excited delirium; correct?

 5      A.   Correct.

 6      Q.   Okay.  Go ahead.  Number 6.

 7      A.   Probably 6 and that would -- let's see.

 8   Yeah, probably 7 and 8.  And 9 is more with

 9   custodial suicides, and this is not a suicide case.

10      Q.   Okay.  I would like to turn to your -- the

11   opinions that you express in your report.  I'd like

12   to start by asking you about Opinion Number 3

13   beginning on page 29.  Again, this may seem like an

14   obvious question, but --

15      A.   29.  Okay.

16      Q.   Who wrote the report?

17      A.   I did.

18      Q.   Approximately how many hours did it take you

19   to compose these first 33 pages of your report?

20      A.   Just the report, writing the report?

21      Q.   (Nodding head.)

22      A.   Twenty-five or 26 probably.

23      Q.   Twenty-five or 26 hours --

24      A.   Yeah.

25      Q.   -- writing the report itself?
```

Darrell Ross, PhD

```
 1      A.   Right.

 2      Q.   Okay.  How many hours did you spend reviewing

 3   the materials that you rely on in forming the

 4   opinions?

 5      A.   About another 20 to 21 hours.

 6      Q.   Okay.

 7      A.   Roughly I have got about 47 hours into this

 8   case.

 9      Q.   Does that include any time communicating with

10   Mr. Perkins?

11      A.   Yes.

12      Q.   Approximately how many hours of the 47 that

13   you got in this case did you spend communicating

14   with Mr. Perkins?

15      A.   Hour, hour and a half over various time

16   periods, roughly.

17      Q.   Do you recall when Mr. Perkins first called

18   you about the case?

19      A.   He did not call me.

20      Q.   Okay.  How did he --

21      A.   An associate of his called me.  I think it

22   was Ms. Meadows.  Back in September of '16.

23      Q.   What information did Ms. Meadows provide to

24   you at that time?

25      A.   It was a brief sketch, overview, highlight of
```

Darrell Ross, PhD

```
1    the facts of the case.

2      Q.   Okay.  Did you agree to take the case in that

3    initial conversation?

4      A.   No.  I said, "Please send me what you have

5    now, some documents, if you have generated officer

6    reports or investigation, what have you.  And I'll

7    begin the preliminary review, and then I'll let you

8    know."

9      Q.   I apologize.  You said September of -- a year

10   ago; is that correct?

11     A.   2016, correct.

12     Q.   Okay.  And then the balance of your time

13   after the initial conversation -- I assume -- is it

14   fair to say then you reviewed the documents -- she

15   sent you the documents that you asked for?

16     A.   Correct.

17     Q.   And then at that point you made your decision

18   to accept the case?

19     A.   Well, I called back and talked to her for a

20   period of time.  In between there she left, and -- I

21   believe that this is correct.  And I started to

22   speak with Mr. Perkins.

23     Q.   Okay.

24     A.   And I said, "Yeah, I would be willing to take

25   the case and offer up my opinion."  And I wanted to
```

Darrell Ross, PhD

1    make sure what my role as an expert was in the case,

2    what I was specifically to review and opine on.

3        Q.   Approximately how many hours did you spend

4    reviewing the documents before you made the

5    decision -- you accepted the case?

6        A.   I don't know.  I didn't time it.  I didn't

7    clock it.  I didn't --

8        Q.   Was it less than five hours?

9        A.   No.  Probably five or six.

10       Q.   I'm going to get our socks on over our boots

11   here for just a minute, but if you'll turn with me

12   to the earlier portion of your report, to the

13   reliance materials section, again, on page 2.

14           Earlier today when we were -- before we went

15   on the record, we had a brief conversation about the

16   materials that you reviewed in this case.  Can you

17   just very -- take as much time as you need, but if

18   you can just go through the list beginning on --

19   there at the bottom of page 2 and continuing through

20   the end of page 3 and confirm for me whether or not

21   there need to be any changes, additions or

22   subtractions to those materials.

23       A.   I can tell you to add.  There were five

24   TASER-related incidents that was provided to me

25   after I submitted the report.

Darrell Ross, PhD

1     Q.   Okay.  With the exception of this addition,

2     the list is otherwise complete?

3     A.   Yes, sir.

4     Q.   Okay.

5          MR. PERKINS:  I think I wrote you an e-mail,

6     Cameron, in which I identified some documents that

7     had been produced related to training that I also

8     provided to Dr. Ross.

9          THE WITNESS:  There were training exhibits or

10    files on Lieutenant Johnson, I believe, yes, and

11    maybe Jason Kenny.  I think maybe Martinez.  That

12    was it, as I recall.

13         MR. KUHLMAN:  Ben, I apologize.  Could you

14    maybe send that to me again?  Or we can do it

15    later.  But it may have been that only went to

16    Bill, and I don't know that I got it.  If I did, I

17    apologize.

18         MR. PERKINS:  Yeah.  I have got the e-mail

19    right here, actually.  I printed it for you.

20         MR. KUHLMAN:  Okay.

21         MR. PERKINS:  Here you go.

22         MR. KUHLMAN:  Thank you.

23         MR. PERKINS:  Sure.

24         MR. KUHLMAN:  Oh, I apologize.  Yes, I do

25    recall this e-mail.  I thought you were saying

Darrell Ross, PhD

```
 1      something -- I was looking for additional

 2      attachments.  Thank you.

 3   BY MR. KUHLMAN:

 4      Q.   The videos -- did you -- do you recall

 5   reviewing some videos prepared by another expert in

 6   this case?

 7      A.   Yes.

 8      Q.   Okay.

 9      A.   Mr. Root, I believe.

10      Q.   Yes.

11      A.   Two videos.  I don't know if they were

12   prepared by him, but -- when you say prepared, he

13   took the videos?

14         MR. PERKINS:  It was picture-in-picture

15      videos.

16         THE WITNESS:  Yeah.

17   BY MR. KUHLMAN:

18      Q.   Prepared might be a little generous.  Maybe

19   edited would be a better verb.

20      A.   I would agree with that.

21      Q.   Okay.  Compiled perhaps.  No, he didn't go in

22   there with his handy cam and actually shoot the

23   videos.

24      A.   Yeah.  I know he was not there at the

25   incident.
```

Darrell Ross, PhD

```
1        Q.   These are -- just to be clear, these are
2     surveillance -- these are edited copies of
3     surveillance video which Dennis Root in order to
4     sort of -- or compiled in order to help understand
5     who was who?
6        A.   Correct.
7        Q.   Okay.  And the Internal Affairs reports that
8     I think are in -- that are listed here on -- the
9     Internal Affairs investigation report, the second
10    item on the list.
11       A.   Yes.
12       Q.   Okay.  Does that include -- did you also
13    review the report of one of plaintiff's experts,
14    Mike Berg?
15       A.   His report, yes.
16       Q.   Yes?  Okay.  What about his --
17       A.   That's indicated down at the bottom.
18       Q.   I'm sorry.  What about his deposition
19    transcript?
20       A.   No.
21       Q.   Okay.  Did you review the deposition
22    transcripts of any of plaintiff's experts?
23       A.   No.
24       Q.   Only their reports?
25       A.   Correct.
```

Darrell Ross, PhD

1      Q.    Okay.

2            MR. KUHLMAN:   Thank you, Ben.

3            MR. PERKINS:   Sure.

4    BY MR. KUHLMAN:

5      Q.    Are there any portions of these depositions

6    that you have got listed here which you want to

7    try -- which you want to say you did not, in fact,

8    review or you read each one of these depositions?

9      A.    I read each one of those.

10     Q.    Okay.  And the same goes for the IA reports?

11     A.    Yes.

12     Q.    And the personnel files?

13     A.    Correct.

14     Q.    Okay.  All right.  Let's go back now to

15   page -- I believe it's page 30.

16     A.    Of the report?

17     Q.    Or 29 of your report, yes, sir.  Beginning

18   with the heading Opinion 3.  I want to turn --

19   direct your attention to the end of -- near the end

20   of that.  It's actually on the end of 32, 31 and 32,

21   the bottom paragraph, last line of the paragraph.

22   You have got a couple of citations here.  Can you

23   identify those citations for me?  The last on 31 and

24   going over to 32.

25     A.    When you say "identify," be more specific.

Darrell Ross, PhD

1    What do you want me to -- you mean NIJ, what does

2    that mean?  National Institute of Justice.

3      Q.   No, sir.  I apologize.  The -- you have

4    got -- beginning with the -- you say Laub, "Laub of

5    the DOJ and Bozeman report that" -- and you continue

6    from there.  Are those -- those are authors;

7    correct?

8      A.   Correct.

9      Q.   Okay.  And so in the AP -- or, excuse me, in

10   the APA style, this is a way of indicating a

11   citation to an article; correct?  By listing the

12   author and then the parenthetical year; is that

13   correct?

14     A.   That's correct.

15     Q.   Okay.  So it's fair to say then this is a

16   reference to Laub of the DOJ, an article written by

17   Laub of the DOJ in 2011?

18     A.   It's a report, yes.

19     Q.   It's a report.  Excuse me.

20     A.   Yes.

21     Q.   And is it a separate report by Bozeman

22   et al.?

23     A.   Yes.

24     Q.   Okay.  And what is -- what is the reported

25   finding of those two authors as indicated in your

Darrell Ross, PhD

1    report?

2      A.   Well, Laub was part of a greater expert

3    technical working group on the use of the TASER and

4    TASER-related deaths with -- I have to go back and

5    double-check, but it's about 25 to 30 medical

6    doctors and some practitioners who reviewed over

7    300-plus -- it's like a meta-analysis almost of

8    medical review articles on the use of the TASER and

9    medical complications or implications from that.

10   And from that working group and from their review,

11   they produced about a 74-page report on the

12   application and use of the TASER as related to

13   associated deaths.

14     Q.   Okay.  And what about Bozeman?

15     A.   Bozeman was additional authors.  It's a

16   separate.  He did his own research in the field with

17   other researchers in 2009 and did an analysis of the

18   use of TASERs and gave some, I think, limited

19   statistical analysis but showed the safety and

20   significance and the probability of using a TASER

21   and the risk of death.

22     Q.   Okay.  Is it accurate to say that those are

23   two additional materials, those -- those two reports

24   are additional materials that you relied on in

25   forming the opinions expressed in the report?

Darrell Ross, PhD

1      A.   I don't know if I -- I guess the word "rely,"

2   it supported my opinion, put it that way.

3      Q.   I'll use your word, supported your opinion.

4   And you're welcome to correct me if I --

5      A.   Okay.

6      Q.   -- happen to slip up and say rely later when

7   I'm talking to you about this.

8           Do you remember -- well, I'll just -- I'm

9   going to show you -- can we get Ross 1.

10                        - - -

11          (Ross Exhibit 1, Article titled "Safety and

12   Injury Profile of Conducted Electrical Weapons Used by

13   Law Enforcement Officers Against Criminal Suspects", was

14   marked for identification.)

15                        - - -

16   BY MR. KUHLMAN:

17      Q.   I'm going to show you what we have marked

18   here as Ross 1.  Can you tell me -- this is a

19   journal article.  Can you tell me the title of the

20   journal article?

21      A.   Yeah.  "Safety and Injury Profile of

22   Conducted Electrical Weapons Used by Law Enforcement

23   Officers Against Criminal Suspects."

24      Q.   Okay.  Is this the article that you've got

25   the short cite to in your conclusion, Bozeman

Darrell Ross, PhD

1     et al.?

2        A.   Correct.

3        Q.   Okay.  And so if you open the article to

4     after the discussion, toward the end of the

5     discussion, which you might expect to be a

6     conclusion, the -- this is on page 487 of the

7     article, the right-hand column, can you read to me

8     the first full paragraph there?  "In this large

9     multicenter" -- the sentence begins, "In this large

10    multicenter cohort..."

11       A.   Do you want me to read it aloud?

12       Q.   Yes.  The first sentence.

13       A.   "In the large multicenter cohort, the

14    observed risk of significant injury after conducted

15    electrical weapon used by law enforcement officers

16    is 0.025 [sic] percent."

17            Do you want me to continue?

18       Q.   Well, no.  Just that sentence.  But is it --

19    is it 0.025 or is it 0.25?

20       A.   0.25.

21       Q.   Okay.  So can you find -- can you point me to

22    the portion of the article where the risk factor

23    that you have identified in your piece is 0.0025?

24       A.   Well, it might be a typo but --

25            MR. PERKINS:  No.  He's saying -- that says

Darrell Ross, PhD

```
 1        risk of significant injury, and this one says --
 2            MR. KUHLMAN:  Mr. Perkins, if we have the
 3        witness do the testifying here, I'd appreciate it.
 4            MR. PERKINS:  I'm just trying to help him
 5        understand your question.
 6            THE WITNESS:  Well, I think that's also from
 7        the Laub article report as well.  So that's
 8        probably where I got that from.  But also in terms
 9        of his injury and/or death as I think reported in
10        his case abstract.
11   BY MR. KUHLMAN:
12        Q.   Okay.  But it's fair to say that in your
13   report you write, "Bozeman et al. reports that the
14   TASER is safe and has a statistical probability of
15   risk or death of less than 0.0025 percent."
16   Correct?
17        A.   Correct.
18        Q.   Okay.  Is there a -- can you show me the
19   incidents or the finding within Bozeman et al. that
20   supports that -- or is indicated by that citation?
21        A.   Well, again, it might be an extra zero there,
22   but the title itself, the case -- secondly, the case
23   abstract says that it's safe.  It says it has -- no
24   more than 99 percent of the subjects do not
25   experience significant injuries after conducted
```

Darrell Ross, PhD

1    electrical weapon use.  So that's where I would get

2    that information from.

3        Q.   With all due respect, Dr. Ross, within your,

4    you know, nearly 30 years, you know, within the --

5    coming up in 25 years in the academy, there's a

6    significant difference between a figure 0.25 percent

7    and a figure 0.0025 percent.

8        A.   That's correct.  I would agree with that.

9        Q.   Okay.  So it may be that the conclusions

10   reached by Ross are not necessarily -- excuse me, by

11   Bozeman, are not necessarily consistent with what

12   you have got written here in the report.

13       A.   I would say by a typo.

14       Q.   Okay.  So should we -- should we amend your

15   report to say 0.25?

16       A.   I would think so, yeah.

17       Q.   Okay.

18       A.   That would be fine.

19            MR. PERKINS:  Hold on.  Okay.  I object.

20       Object to the question because that's a misleading

21       question and misleading statement.  His report

22       says the risk of death of less than

23       0.0025 percent.  This report references risk of

24       serious injury of 0.25 percent.  So it's an

25       entirely separate issue that you're trying to get

Darrell Ross, PhD

1    him to agree to.

2         MR. KUHLMAN:  No.  I'm getting him to -- I'm

3    asking him whether the conclusion that he reaches

4    in his report, including a direct citation to an

5    article, is directly borne out in that article.

6    If you want to find for me a place where the

7    article says the risk of death is 0.0025, I would

8    be happy to hear that from the witness.

9         MR. PERKINS:  Well, I would challenge you to

10   find anybody who's going to give you a higher

11   statistical percentage than that as to cause of

12   death.  And I also object to this question and

13   lines of proportionality since he's an expert.

14   We've already admitted he didn't die as a result

15   of the TASER itself.  They both said it was a

16   contributing factor.  So why you're asking these

17   questions is beyond me.

18        MR. KUHLMAN:  Respectfully, Mr. Perkins, this

19   is my one opportunity to explore the territory

20   that -- the conclusions and opinions reached by an

21   expert that y'all have put up.  And so to the

22   extent that Dr. Ross has expressed opinions here

23   which are informed by his work as a social

24   scientist and a researcher, I think I'm entitled

25   to ask him whether or not --

Darrell Ross, PhD

```
 1          MR. PERKINS:  I didn't instruct him not to
 2      answer, Cameron.  I just made my objection.  Go
 3      ahead.
 4          MR. KUHLMAN:  Well, you have got a lot of
 5      instruction in your answer -- in your objection,
 6      and I would appreciate it --
 7          MR. PERKINS:  You have got to go to Athens.
 8      I have to go somewhere.  Come on, Cameron.  Let's
 9      just move on.
10  BY MR. KUHLMAN:
11      Q.   Dr. Ross, again, just in the Bozeman article,
12   can you identify for me any evaluation that in this
13   study of the application and multiple -- or the --
14   multiple applications of a TASER in a short time
15   frame?
16      A.   I don't follow the question.
17      Q.   Okay.  Do you see on page 483 of the
18   article --
19      A.   I'm there.
20      Q.   Okay.  Of the right-hand column.  This is
21   talking about the data which we have just said -- I
22   think you testified just a minute ago that the
23   conclusions reached by a social science researcher
24   is only as good as the data; correct?  Is that your
25   earlier testimony?
```

Darrell Ross, PhD

```
 1      A.    That's correct.

 2      Q.    Okay.  The data that -- upon which Bozeman

 3   et al. reached their conclusion are described in

 4   more detail on page 483; correct?

 5      A.    More detail than what?

 6      Q.    Well, are detailed.  This is within the

 7   results section of the article; correct?

 8      A.    I would answer that the data is reflected --

 9   characteristics of the agencies are reflected on 483

10   in Table 2 as you're referring to, and it

11   subsequently goes on to much more explanation in the

12   subsequent pages.

13      Q.    Okay.  Can you tell me what the median number

14   of conducted electrical weapon discharges was in

15   this -- in the data collected by Bozeman et al.?

16      A.    The median application?

17      Q.    Number of discharges, yes, sir.

18      A.    I'd have to read this thing.  It doesn't say

19   that in that table.

20      Q.    No, it's not in the table.  It's in the

21   column on the bottom.  The right-hand column, three

22   lines up from the bottom.

23      A.    Probe mode was used in 784 cases, drive-stun

24   mode was in 327, and both modes in 90 cases.

25      Q.    And the next sentence?
```

Darrell Ross, PhD

1      A.   And the mean number of conducted electrical

2      weapon discharges was 1.8.  The median was 1.

3      Q.   Okay.  Based on your training and experience

4      and more than 30 years of providing training to law

5      enforcement agencies, is it a fair conclusion to

6      draw from this data that multiple applications,

7      meaning more than one, is safe?

8      A.   Yes.  Oh, absolutely.

9      Q.   How is that an appropriate conclusion to draw

10     from a data set where the median number of

11     applications was one?

12     A.   Because in 99 percent of the other ones there

13     was no injury.

14     Q.   But in 99 percent -- what do you mean?

15     A.   As he says conclusion on the front page in

16     his abstract, "To our knowledge, these findings

17     represent the first large, independent, multicenter

18     study of conducted electrical weapon injury

19     epidemiology and suggest that more than 99 percent

20     of subjects do not experience significant injuries

21     after conducted electrical weapon use."

22     Q.   Okay.  But is there anything in that

23     conclusion that indicates that this is -- this

24     report is based on study of instances including

25     multiple applications?

Darrell Ross, PhD

```
1        A.    Yes.

2        Q.    What is the median --

3        A.    When you say -- excuse me.  Multiple

4     applications of, what, trigger pulls?  Multiple

5     applications on subjects?  There were a number of

6     subjects -- there were 1200 subjects that were

7     exposed to the conducted electrical weapon over 36

8     months.

9        Q.    The number -- when I asked you for the

10    median, I'm talking about the number of conducted

11    electrical weapons discharges.

12       A.    And the mean number was 1.

13       Q.    One.  Thank you.

14       A.    Discharges.

15             MR. KUHLMAN:  Do you want to go off the

16    record for a minute?

17             MR. PERKINS:  Yeah.

18             MR. KUHLMAN:  Do you need a break?

19             MR. PERKINS:  Sure.

20             MR. KUHLMAN:  Okay.  Let's take a break.

21             (A recess was taken from 12:03 p.m. until

22    12:04 p.m.)

23             MR. KUHLMAN:  Back on.

24                         - - -

25             (Ross Exhibit 2, Article titled "Electronic
```

Darrell Ross, PhD

```
 1   Control Device Exposure:  A Review of Morbidity and

 2   Mortality", was marked for identification.)

 3                            - - -

 4   BY MR. KUHLMAN:

 5       Q.   Dr. Ross, I'm going to show you what we have

 6    marked as Ross 2.  Can you read me the title of this

 7    article?

 8       A.   "Electronic Control Device Exposure:  A

 9    Review of Morbidity and Mortality."

10       Q.   Okay.  Do you recognize this article?

11       A.   No.

12       Q.   Okay.  Do you recognize the names of any of

13    the authors?

14       A.   No, I don't.

15       Q.   Okay.  Do you recognize the journal in which

16    it was published?

17       A.   Yes.

18       Q.   Okay.  What's the journal in which it was

19    published?

20       A.   Annals of Emergency Medicine.

21       Q.   Okay.  And what was the journal that the

22    Bozeman article -- the Bozeman report was published?

23       A.   Annals of Emergency Medicine.

24       Q.   It's the same publication; correct?

25       A.   Correct.
```

Darrell Ross, PhD

```
 1      Q.   And what's the year of this publication?

 2      A.   2011.

 3      Q.   Okay.  As compared to the Bozeman piece?

 4      A.   2009.

 5      Q.   Okay.  Do you have any reason to question the

 6   veracity of an article published in the Annals of

 7   Emergency Medicine?

 8      A.   Not unless I have read it.

 9      Q.   I understand that, but just by mere --

10      A.   I can't answer that.

11      Q.   -- appearance in the article -- in the

12   journal?

13      A.   No, I can't answer that.

14      Q.   Okay.  Have you read this article?

15      A.   No, I have not.

16      Q.   Okay.  You can set that aside.

17                      - - -

18           (Ross Exhibit 3, Article titled "Police Use of

19   Force and Officer Injuries:  Comparing Conducted Energy

20   Devices (CEDs) to Hands- and Weapon-Based Tactics", was

21   marked for identification.)

22                      - - -

23   BY MR. KUHLMAN:

24      Q.   I'm going to show you what we have marked as

25   Ross 3.  Can you read me the title of that article?
```

Darrell Ross, PhD

```
 1      A.    "Police Use of Force and Officer Injuries:

 2   Comparing Conducted Energy Devices (CEDs) to Hands-

 3   and Weapon-Based Tactics."

 4      Q.    Okay.  Do you recognize any of the names of

 5   the authors of this article?

 6      A.    Yes.  William Terrill.

 7      Q.    Okay.  Who's affiliated or affiliated with

 8   Michigan State; correct?

 9      A.    Correct.

10      Q.    Is Professor Terrill, Dr. Terrill, someone

11   you know?

12      A.    No.

13      Q.    Okay.  You-all just share former

14   institutional affiliation?

15      A.    Well, I graduated from there.  He works

16   there.

17      Q.    Okay.  Have you had any opportunity to review

18   his scholarship in this area?

19      A.    Only this article about four or five years

20   ago.

21      Q.    Okay.  So you have, in fact, reviewed --

22            MR. KUHLMAN:  I'm sorry, Ben.

23   BY MR. KUHLMAN:

24      Q.    You have, in fact, reviewed this article?

25      A.    Yes.
```

Darrell Ross, PhD

1        Q.   Okay.  Are you aware of the conclusion --

2    well, are you -- which -- which -- what is the name

3    of the journal in which this article is published?

4        A.   Police -- excuse me.  Policy Quarterly.

5        Q.   Okay.  And the year of publication?

6        A.   2012.

7        Q.   Okay.  Are you generally aware of the

8    conclusion reached by this -- by these authors?

9        A.   Like I said, I read it many years ago.  I

10   would have to reread it to answer any specific

11   questions you might have.

12       Q.   Okay.  We'll set that aside for now.

13            Turning back now to your report for a minute,

14   the sentence after -- we have just been talking

15   about Bozeman.  The next sentence in that report, in

16   your report, is a cite to Kroll; is that correct?

17       A.   That's correct.

18       Q.   Okay.

19       A.   Et al.

20       Q.   Okay.  Kroll et al.  Excuse me.  A 2014

21   article; correct?

22       A.   Correct.

23       Q.   All right.  What is the -- what is the

24   reported finding of Kroll et al., 2014?

25       A.   As I indicated in the sentence there, his

Darrell Ross, PhD

1     finding of TASER-induced cardiac arrest is extremely

2     low, if not zero.

3        Q.   Okay.  Do you -- are you personally aware of

4     Dr. Kroll?

5        A.   Yes, I am.

6        Q.   Okay.  Are you-all friends?

7        A.   I would say we're acquaintances.

8        Q.   Okay.

9        A.   We have done training together.  I don't know

10    if friends -- I have not socialized outside of our

11    occupation.

12       Q.   But you-all have a professional acquaintance?

13       A.   Yes.

14       Q.   Do you have similar research interests?

15       A.   Yes.

16       Q.   Those being the use of force by law

17    enforcement and corrections officers?

18       A.   I would say no.  We would depart there.  Mine

19    is more use of force.  His is more the electrical

20    reaction and implications of using the TASER during

21    use of force and explaining the use of TASERs as it

22    impacts the physiology of the body.  That's clearly

23    outside my area of expertise.  Trust me.

24       Q.   That's -- I appreciate that classic -- that's

25    a very -- that's a scholarly answer.  Thank you for

1    distinguishing your project from his.

2         Were you able to read his article, though?

3    You have cited it.

4    A.   Yes.

5    Q.   So I assume you have at least enough of an

6    understanding and experience to be able to read his

7    article and draw some conclusion from it; correct?

8    A.   Correct.  And I have been in many of his

9    training classes.

10   Q.   Okay.  Would you -- is it fair to say that

11   you-all agree on the effects of the TASER?  Do you

12   agree with his findings generally?

13   A.   Yes, I do generally.

14   Q.   Okay.  Do you know whether he agrees with the

15   conclusions you reach in your research?

16   A.   That I couldn't tell you.  Other than let me

17   just tell you -- I guess I have to digress on that

18   just thinking about it a little bit more.  He's

19   reviewed the research that I have done when we talk

20   about the violent prone restraint we did for the 17

21   departments over the year period, and then he's

22   reviewed and agreed with what we have found and our

23   conclusions in that particular study.

24        He's also, I would say, agreed with our

25   conclusions.  Mr. Mike Brave and myself who did an

Darrell Ross, PhD

```
1    assessment of the liability trends of associated

2    deaths after the use of the TASER, secondly.

3         And I don't think -- I don't think there's

4    any other right off the top of my head of other

5    articles or research.

6    Q.   Have you -- you-all haven't ever coauthored

7    anything?

8    A.   No, sir.

9    Q.   Okay.  Have you ever presented on a panel

10   together?

11   A.   Yes, we have.

12   Q.   Okay.  What panel was that?

13   A.   2015 -- excuse me, 2016, April, March or

14   April in 2016.  It's in my CV.  Dr. Kroll, myself

15   and Michael Brave presented at the International Law

16   Enforcement Educators and Trainers Association

17   conference, and that -- I think it was in Chicago at

18   that time.  We presented a four-hour presentation on

19   investigating associated arrest-related deaths.  He

20   made a presentation as part of that four-hour

21   presentation.

22        Then this past June, June of '17, 2017, he

23   was part of a conference that I presented at.  He

24   presented at the conference.  Use of force in police

25   world in Miami, Florida, or just north of that in a
```

Darrell Ross, PhD

```
1      conference that we presented.  He presented a

2      presentation.  I also presented information as well,

3      a presentation at that conference.

4           Q.   I don't see that one on your --

5           A.   It's conference presentations.  It would be

6      back further --

7           Q.   Oh, I apologize.

8           A.   -- in the -- I can direct you to that real

9      quick.

10               It would be on page 32.  Let me see.  Where

11     is it?

12          Q.   Is it June '17?

13          A.   Yes, June '17, the second item.

14          Q.   Okay.  Were there slides or was that a paper

15     presentation?

16          A.   From me?

17          Q.   From either of you.

18          A.   He had a PowerPoint presentation, and I also

19     did.

20          Q.   Okay.  Is that something you kept, your

21     PowerPoint presentation?

22          A.   Oh, absolutely.

23          Q.   Okay.  So if we ask Mr. Perkins for a copy of

24     it, we can get a copy of the PowerPoint from that?

25          A.   Sure.
```

Darrell Ross, PhD

```
 1        Q.    Okay.  What about Dr. Kroll's materials?

 2        A.    I don't have a copy of that.

 3        Q.    I understand.  I would ask you the same

 4    questions about the Chicago training.  Did you-all

 5    get together ahead of time to develop the training

 6    program together?

 7        A.    No, not -- it was over the phone.

 8        Q.    Okay.  And then was it a joint presentation

 9    or you each took a portion of the time?

10        A.    It was a joint presentation where we took a

11    portion of the time, so yeah.

12        Q.    Okay.  What about the materials that you used

13    to prepare for that presentation?

14        A.    I have that.

15        Q.    And, again, if we ask Mr. Perkins for it, we

16    could get it from you?

17        A.    Sure.

18        Q.    Okay.  All right.  Any other professional

19    associations or affiliations or collaborations with

20    Dr. Kroll that you can think of?

21        A.    Yes.

22        Q.    Okay.  What, for example?

23        A.    That is on our most recent book.  He wrote a

24    chapter in the book that we -- I just published with

25    Dr. Vilke in July of '17.  He wrote a chapter on how
```

Darrell Ross, PhD

```
 1    to investigate TASER-related/associated death after

 2    the use of a TASER.

 3        Q.   Right.  Okay.  I want to show you we're going

 4    to do Ross 4 here.

 5                        - - -

 6        (Ross Exhibit 4, Article titled "Can TASER

 7    Electronic Control Devices Cause Cardiac Arrest? by Mark

 8    W. Kroll, PhD, et al., was marked for identification.)

 9                        - - -

10    BY MR. KUHLMAN:

11        Q.   Let me show you what we have marked as

12    Ross 4.  Can you tell me the name of this article?

13        A.   "Can TASER Electronic Control Devices Cause

14    Cardiac Arrest?"

15        Q.   Okay.  Is this the article in which you refer

16    to in your conclusion or the report that the

17    incidents of TASER-induced cardiac arrest is

18    extremely low?

19        A.   Correct.

20        Q.   Okay.  Do you have any reason to dispute or

21    quibble with the methodology Dr. Kroll et al.

22    utilized in reaching their findings here?

23        A.   No.

24        Q.   Okay.  Can you -- are you -- you have read

25    this article, I assume?
```

Darrell Ross, PhD

1      A.   Yes.

2      Q.   Okay.  Because it, in fact, informs the

3    opinions you reach in this case?

4      A.   Yes.

5      Q.   All right.  And tell us just generally what

6    is the conclusion -- maybe just a little bit more

7    detail than the conclusion as summarized in your

8    report.

9      A.   Well, as he states -- Dr. Kroll et al. and

10   his other coauthors state in terms of their

11   reviewing the number of applications of the

12   controlled energy devices or electronic controlled

13   devices and looked at other cases, and they come to

14   a conclusion based on the number of forceful

15   arrests, the number of applications in the field,

16   the result in investigation, examination, analysis

17   of case studies.  They come to a conclusion then in

18   terms of looking at some of the physiological

19   implications, responses of the TASER.

20        They list 12 cases in which they -- case

21   studies they have investigated where they had the

22   materials or access to those and then come to the

23   conclusion based on the nature of the TASER, the

24   arrest, the condition of the subject that the

25   likelihood -- and I want to make sure -- they come

Darrell Ross, PhD

1    with their conclusion on page 98 under discussion

2    three findings.

3        Q.   Okay.  And what are those findings?

4        A.   Number 1, demonstrated incident of

5    ECD-induced cardiac arrest is extremely low, if not

6    zero, which I cited in my report.

7             Two, conclusions of all connections between

8    ECD use and cardiac arrest are speculative at best.

9             And, three, the role of several non-ECD

10   confounding factors explaining cardiac arrest are

11   not accounted for the published case reports.

12       Q.   Okay.  I want to show you what I promise is

13   the last one before lunch.  I think we're on 5 here.

14                        - - -

15            (Ross Exhibit 5, Article Titled "Can TASER

16   Electronic Control Devices Cause Cardiac Arrest?" by

17   Douglas P. Zipes, MD, was marked for identification.)

18                        - - -

19   BY MR. KUHLMAN:

20       Q.   Can you tell me the name of this article, the

21   title of the article?

22       A.   Yes.  "Can TASER Electronic Devices Cause

23   Cardiac Arrest?"  This is by Dr. Zipes.

24       Q.   Okay.

25       A.   Z-i-p-e-s.

Darrell Ross, PhD

1      Q.   And what is the -- what is the journal or the

2    publication?

3      A.   Circulation.

4      Q.   I'm sorry?

5      A.   Circulation.

6      Q.   Okay.  And is that the same journal as

7    Dr. Knowles -- Kroll, excuse me, Dr. Kroll's article

8    appeared in?

9      A.   Yes.

10     Q.   Okay.  And what is the date of Dr. Kroll's

11   article?

12     A.   2014.

13     Q.   Okay.  And the date of Dr. Zipes'?

14     A.   2014.

15     Q.   Okay.  Have you reviewed this article?

16     A.   I have, but it's been awhile.

17     Q.   Okay.  Can you -- can you look back at 4 in

18   the middle of the left column in between the two

19   lines there.  What does it say?

20     A.   "Response by Zipes on page 100."

21     Q.   Okay.  And then in Number 5 there, what is --

22   in the same, in the bracket.

23     A.   "Response by Kroll et al. on page 111."

24     Q.   Okay.  Based on what you understand about

25   these two authors and -- or multiple authors with

Darrell Ross, PhD

1    Dr. Kroll, is it -- is it fair to characterize these

2    two articles as part of an ongoing debate between

3    these two about the safety of the use of a TASER?

4        A.   I can answer it this way:  It's a larger

5    debate beyond just Dr. Zipes and Dr. Kroll and his

6    coauthors.  It's much larger than just those

7    authors.  It's in the whole community, I would say,

8    of those who have taken occasion to opine.  And

9    there's other authors that I have read in this

10   debate, as you describe it, that counter Dr. Zipes'

11   conclusions.

12       Q.   Okay.  But there's no -- it's fair to say

13   there's no agreement in the literature as of right

14   now about the safety of a TASER?

15       A.   Oh, yeah.  I would disagree with that.

16       Q.   I'm sorry.  You would disagree with --

17       A.   Yeah, I would disagree, that there is in the

18   literature conclusion that TASER is safe.

19       Q.   I understand that there's a -- that there

20   are -- there is a conclusion in the literature that

21   the TASER is safe, but Dr. Zipes et al., not

22   necessarily in the same article, but Dr. Zipes and

23   other authors have reached the opposite conclusion.

24   Is that fair to say?

25       A.   Very minimal.  I would say, if we're trying

Darrell Ross, PhD

```
 1      to look at using some of your questioning earlier in

 2      terms of proportionality and percentage-wise, that

 3      he would be in the minority, Dr. Zipes.

 4          Q.   Okay.  Well, you were the one I think who

 5      characterized it is a part of a larger conversation.

 6      You said it's not just between these two authors.

 7          A.   Oh, yeah, I would agree with that.

 8          Q.   Okay.  So whether or not there's consensus on

 9      this issue is an open question?

10              MR. PERKINS:  Object to form.

11              THE WITNESS:  No.  I would say the percentage

12          of the consensus is that it's safe by the medical

13          researchers who have actually done human subject

14          research on the use of the TASER and published the

15          results.  So it's 99 percent of all those versus

16          the single one of Zipes.

17      BY MR. KUHLMAN:

18          Q.   Are you aware of a distinction in the

19      literature between single use applications and

20      multiple use applications?

21          A.   Oh, yes.

22          Q.   And is the conclusion reached by the study of

23      multiple use applications the same as the

24      conclusions reached by single use applications?

25          A.   By and large, yes.
```

Darrell Ross, PhD

```
1      Q.   Can you provide any -- can you direct us to

2   an article or other publication which would help us

3   settle this debate?

4      A.   I don't know if it would ever settle it

5   because people have differing opinions, but I can

6   direct you -- not off the top of my head.  Well, I

7   can one.  My study that I did with violent prone

8   incidents.

9      Q.   The one you told us about earlier?

10     A.   Correct.

11     Q.   Okay.  And your conclusion there is?

12     A.   That 200 applications of the TASER with four

13  trigger pulls was safe.  Nobody died.

14     Q.   And that data was collected from 17 agencies

15  that you selected?

16     A.   Correct.  That I asked to voluntarily

17  participate.

18     Q.   Right.

19     A.   And they agreed.

20     Q.   And how did you arrive at those 17 -- remind

21  me again how you arrived at those 17 agencies.

22     A.   We analyzed the reports that they submitted.

23     Q.   No.  No.  I'm sorry.  The design stage, how

24  did you select those 17 agencies to participate in

25  the --
```

Darrell Ross, PhD

1      A.   I sent a call out to agencies that were

2   across the country.

3      Q.   Okay.  And so is it your conclusion that

4   that -- those 17 was sufficiently randomized to

5   produce results that were both reliable and

6   repeatable?

7      A.   Yes, because it involved municipal police

8   departments, small and large and medium size, across

9   the country.  It wasn't just from one region.  It

10  wasn't just from one size agency.

11          And, secondly, it was also sheriff's

12  departments, road department deputies.  So we had

13  sheriff's department, municipalities across the

14  United States and not just from one region, not one

15  department.

16          MR. KUHLMAN:  Okay.  I'm at a place where I

17      would be willing to take a break.  I don't know.

18      How about y'all?

19          MR. PERKINS:  That's fine.

20          THE WITNESS:  That's fine.

21          (A recess was taken from 12:24 p.m. until

22   1:33 p.m.)

23          (Mr. Cash not present on telephone.)

24          MR. KUHLMAN:  We are back after a lunch

25      break.

Darrell Ross, PhD

```
 1   BY MR. KUHLMAN:

 2      Q.   Dr. Ross, I just want to ask you a few

 3   housekeeping matters here as we get back from the

 4   break.  You're not a physician; correct?

 5      A.   No, sir.

 6      Q.   You don't have any medical training?

 7      A.   No, sir.

 8      Q.   Okay.  And I think earlier you told me you're

 9   not a lawyer; right?

10      A.   Correct.

11      Q.   Okay.  And so you didn't -- you didn't go to

12   law school?

13      A.   No, I did not.

14      Q.   Okay.  Do you have any counseling or

15   psychology training, mental health-specific training

16   or education?

17      A.   Mental health training, yes.

18      Q.   Okay.  But you don't have a -- you're --

19   you're -- do you intend to offer an opinion in this

20   case about mental health diagnoses?

21           MR. PERKINS:  Object to form.

22   BY MR. KUHLMAN:

23      Q.   Do you feel like you're qualified to offer an

24   opinion about a mental health diagnosis in this

25   case?
```

Darrell Ross, PhD

```
1              MR. PERKINS:  Object to form.

2              THE WITNESS:  If you're asking me am I going

3         to opine about some type of classification of

4         mental health, no.

5    BY MR. KUHLMAN:

6         Q.   Okay.

7         A.   I'm not going to -- I'm not going to diagnose

8    anyone, nor have I rendered any opinion in that

9    regard.

10        Q.   So if you're not a medical doctor -- for

11   example, you're not a cardiologist either; correct?

12        A.   That's correct.

13        Q.   And you're not a pathologist?

14        A.   Correct.

15        Q.   So are you going to express -- do you intend

16   to express an opinion in this case about the cause

17   of Mathew's death?

18        A.   Not generally, no.  Not unless you ask me a

19   question.  I'll be responsive to any question you

20   ask.

21        Q.   I appreciate that.

22             Are you going to -- you don't intend to

23   express an opinion about the medicine in this case;

24   correct?

25        A.   No.
```

Darrell Ross, PhD

```
 1        Q.    What about are you a trained licensed
 2    practical nurse?
 3        A.    No.
 4        Q.    Okay.  Do you intend to express an opinion
 5    about -- in this case about the nursing care
 6    provided by Greg Brown?
 7        A.    No.
 8        Q.    Okay.  Are you a corrections health care
 9    administrator?
10        A.    No.
11        Q.    So is it fair to say that you don't intend to
12    express any opinions about the Corizon Health Care
13    policies in this case?
14        A.    No.
15        Q.    Okay.
16        A.    No.
17        Q.    Just so we're clear, the practical experience
18    that we talked about earlier that you have ended in
19    1985?
20            MR. PERKINS:  Object to form.
21            THE WITNESS:  That's correct.
22    BY MR. KUHLMAN:
23        Q.    Okay.  And --
24            MR. PERKINS:  You said practical experience?
25            ///
```

Darrell Ross, PhD

```
 1   BY MR. KUHLMAN:

 2        Q.   Well, let's use the term in the CV.  Field

 3   experience; is that correct?

 4        A.   That's correct.

 5        Q.   Okay.  And that in the time since 1985 you

 6   have been in higher education?

 7        A.   That's correct.

 8        Q.   Okay.  Of the -- I want to ask you about the

 9   training programs that you provided for law

10   enforcement officers.  Do you -- what sort of

11   categories -- what categories of corrections

12   officers are the primary audience for your training

13   materials?

14        A.   What kind of corrections officers?

15        Q.   What categories -- and I'm talking here

16   mostly in terms of, like, rank.  And I'll just ask

17   you, is it the policy makers and the administrators

18   that are your target audience for your training or

19   is it line level officers?

20        A.   I have trained all, but probably primarily

21   more over the last ten years would be more

22   administrator sheriffs, jail administrators, chief

23   deputies, undersheriffs depending on what state

24   you're from.

25        Q.   Okay.  And, again, those are all -- whether
```

Darrell Ross, PhD

1      everybody -- every agency seems to have a different

2      sort of title for what is effectively management of

3      the facility; correct?

4          A.   Right.  Right.

5          Q.   All right.  Or in the case of law

6      enforcement, management of the law enforcement

7      activity outside of the facility, the agency?

8          A.   That's correct.

9          Q.   Okay.  When was the last time that you can

10     recall providing a training to line level officers?

11         A.   Corrections officers or police officers?

12         Q.   Corrections officers.

13         A.   It would have been last month.

14         Q.   Okay.  Is that the program -- is that the

15     presentation that we -- have we discussed that

16     presentation?

17         A.   I don't believe so.

18         Q.   Okay.  What was that?

19         A.   That was a mixture of the administrators and

20     the corrections officers and executives, midlevel

21     administrators, trainers, instructors and officers.

22     So it was a combination.  And that was in August of

23     2017 in Pigeon Forge, Tennessee, at the corrections

24     officers -- corrections facility training officer

25     conference put on by the Tennessee Corrections

Darrell Ross, PhD

1    Institute, which is a state agency.

2        Q.   Okay.  At one of these -- at these

3    conferences has it been your experience that the

4    various agency folks that show up and that -- is

5    that a collaborative environment, or is it a --

6    there's attendees and presenters?

7        A.   Well, yeah, there's attendees and presenters

8    and instructors.  I was one of among several

9    presenters that presented to the audience.

10       Q.   Okay.  Is there interaction amongst the

11   presenters and the attendees outside of the formal

12   setting of the presentations themselves?

13       A.   Well, I'm sure there is, but I wasn't there

14   long enough for that to happen with me.  I had lunch

15   with them, and then I had to get back on the road to

16   get back to --

17       Q.   So there's not a cocktail hour or reception?

18       A.   Oh, I'm sure there was.  I wasn't involved in

19   it, though.

20       Q.   Okay.  I'm trying to find out about the ways

21   in which information is sort of communicated amongst

22   agencies at these conferences.  Is it just a few

23   people stand up on the stage and give a presentation

24   and the audience listens, or is it that there's, you

25   know, side conversations going on or sort of small

Darrell Ross, PhD

```
1    groups that emerge?  I'm just trying to get a

2    feeling for the larger context.

3        A.   I think it depends on the nature of the

4    conference, the specific conference, the specific

5    association that hosts or sponsors the conference.

6    So it can happen with all of those things, and it

7    can happen with a combination of several of those

8    variables you just identified.

9        Q.   Okay.  Do you -- in this case you

10   identified -- you reviewed a lot of the sheriff's

11   department policies; is that correct?

12       A.   Yes, sir.

13       Q.   Okay.  Bear with me for just a moment here

14   while I -- did you -- let's turn to your report.

15   Let's look at Opinion Number 1 beginning on page 7.

16           You identify here at the bottom of the

17   page continuing on to page 8 a set of -- you say, "I

18   have reviewed the following policies of CCSO."  Let

19   me know when you're with me there.

20       A.   I'm with you.

21       Q.   Okay.  I want to ask you about these policies

22   in a minute, but before we look at the specific

23   policies in -- as to -- in Chatham County Sheriff's

24   Office and the Chatham County detention center, I

25   want to ask you about the policy-making process
```

Darrell Ross, PhD

```
 1    generally.

 2         Is it -- is it fair to say that you've

 3    expressed opinion elsewhere that policy making is a

 4    feedback loop where the policies are initially, you

 5    know, promulgated by an agency, but then those

 6    policies have to be checked against how they're

 7    actually implemented?  It's a broad question and --

 8         MR. PERKINS:  Object to form.

 9         THE WITNESS:  Are you saying I said that in

10      my report or is that just my philosophy or opinion

11      based on that question?

12  BY MR. KUHLMAN:

13      Q.   I'm asking whether -- is that a fair

14    statement of opinions you expressed elsewhere

15    outside of this report?

16      A.   Fair.

17      Q.   Okay.  So is that a -- is it -- is that

18    because you can't just have a policy that exists in

19    isolation?  Is that a fair statement?

20      A.   Sure.

21      Q.   Okay.  So what is the process by which in

22    this ideal model that you've written about elsewhere

23    of developing a policy and then getting feedback on

24    the implementation of that policy?  Can you describe

25    that process to me, please?
```

Darrell Ross, PhD

```
1       A.    How I see it generally in the correctional or

2       law enforcement agencies?

3       Q.    Yes.

4       A.    There's a lot of catalysts.  There are a lot

5       of variables and things that emerge from that.

6       First we want to make sure that policy reflects

7       various state standards, and that really helps drive

8       the policy.

9             Secondly, what helps drive policies are

10      particularly US constitutional case decisions and

11      then state court decisions and then respective

12      circuit court decisions that -- like, for example,

13      we're in the Eleventh Circuit, so if I'm a jail

14      sheriff or jail administrator, I should be keeping

15      attune to not only what's going on in the state but

16      the federal circuits and the US Supreme Court as

17      well.

18            I have got to think about operational aspects

19      of how officers are to perform their duties, so that

20      flows into the policy.  But once a policy is finally

21      developed -- and I have always advocated -- and some

22      places do it differently.  It doesn't mean it's the

23      right way.  But I have always advocated to have a

24      committee, particularly when we talk about use of

25      force, have a training instructor, have line level
```

Darrell Ross, PhD

```
1    officers.  If you have unions that are a part of a

2    particular agency, then the union should have

3    representation and input and administration should

4    have somebody.  So it's a -- to me it's a policy

5    committee.  It's policy development by committee.

6         Once that's done and everybody has a chance

7    to have input, we shake it out.  It's going to take

8    several times for additions and revisions to that

9    before we actually make it official.  Then an

10   officer should be trained on it.  Everybody should

11   be trained on the policy.  And once that training

12   has been provided, then we'll start implementing it

13   out into the jail, the prison, out on the street.

14   Supervisors are responsible for ensuring that

15   officers follow the policy, and then officers need

16   to be held accountable and officers need to ensure

17   that they're following policy.

18        And the thing about writing policy, it's not

19   an easy thing to do.  You have to write it in such a

20   way that reflects various standards that you want to

21   incorporate in the law but at the same time

22   understanding that you can't write a policy for

23   every given confrontation or situation an officer

24   may encounter.  So discretion has to be integrated

25   into the policy.  Guidelines directing -- at the
```

Darrell Ross, PhD

```
1    same time letting the officer make decisions as

2    certain variables come up that you just can't codify

3    in a policy.

4      Q.   So please correct me if I'm wrong, but it's

5    my -- is it fair to say that much of your work,

6    whether -- setting aside working as an -- providing

7    expert opinions but your consulting work, the

8    training of these agencies, your -- I think you said

9    much earlier this morning that not necessarily --

10   it's hard for the agencies themselves to necessarily

11   keep up with these developments.  So you see

12   yourself as someone who goes in and provides the

13   latest information and helps them update and

14   revise -- helps an agency, a corrections agency, for

15   example, update and revise its policy to reflect the

16   current state of the law and conditions; correct?

17     A.   I would agree with that.

18     Q.   Okay.  And is it also part of your role in

19   that capacity to help the agency to determine

20   whether or not its supervisors are checking back on

21   the policy or -- just a minute ago you described it

22   as the supervisors have a responsibility to see that

23   the policies are, in fact, being implemented; is

24   that correct?

25     A.   That's true.  I would agree with that.
```

Darrell Ross, PhD

```
1        Q.   Okay.  And so in this -- in this general

2   context -- excuse me.  Strike that.

3            In this ideal circumstance, a committee of

4   upper management folks within a corrections agency

5   get together, including some of the trainers, and

6   develop a policy.  The policy is implemented, and

7   then the supervisors are responsible for checking to

8   see that the other officers are, in fact, adhering

9   to the policy; is that correct?

10       A.   Correct.  And I would add another dimension

11  just thinking off-the-cuff as responding.  But, you

12  know, in terms of that committee, once a policy --

13  the legal counsel for that entity should be part of

14  that, and/or at least at the minimum the policy

15  should be run by legal counsel, even the risk

16  manager in many cases, to get their input and to

17  ensure that the policy is actually within the

18  constitution and/or the state law itself.

19       Q.   Sure.  So let's -- let's assume for a second

20  that the policy developed was adequate based --

21  whether it met the constitutional standards, the

22  state law standards or any regulations, et cetera.

23  You've got -- you've got yourself this adequate

24  policy; right?

25       A.   Yeah.  And I would agree with that word,
```

Darrell Ross, PhD

1    adequate, adequate policy.

2        Q.   Okay.  So you have got an adequate policy,

3    but is it -- is it -- you would also agree that it's

4    not sufficient to simply just get this policy and go

5    put it on the shelf somewhere; correct?

6        A.   Yes, I would agree with that.

7        Q.   The policy is really meaningless if it's a

8    little more than just some paper in a book in an

9    office somewhere; correct?

10       A.   Well, I don't know if it's meaningless, but

11   it's certainly not being implemented if it's just

12   stored away on a shelf somewhere.

13       Q.   You've talked a lot about agency liability.

14   You've written about agency liability.  You've

15   looked at various agencies.  You have examined it.

16   You have tried to help agencies avoid liability;

17   right?

18       A.   Correct.

19       Q.   Okay.  From that perspective of managing risk

20   and evaluating liability, would you be more

21   concerned or less concerned by an agency that took

22   its policies and simply put it on a shelf and then

23   ran an operation that had very little connection to

24   the policies?

25       A.   Yeah, I would agree with that.  I would be

Darrell Ross, PhD

```
1    concerned about that.

2        Q.   That would be a concern to you; right?

3        A.   Oh, yes.

4        Q.   Because there wouldn't be any way to describe

5    or ensure that the constitutionally adequate

6    policies that are on the shelf are, in fact,

7    actually being implemented on the line at the line

8    level?

9        A.   That's correct.

10       Q.   Okay.  Assume for me for a second that there

11   is a break in the chain of command, so to speak,

12   that the committee that develops a policy puts it

13   together.  The line level officers are over here,

14   and then in the middle where you would have maybe

15   a -- maybe not a watch commander but a shift

16   supervisor, these sort of middle -- this middle rung

17   of the chain of command.  Is that -- do you

18   understand what I mean by a middle rung of the chain

19   of command?

20       A.   Yes, I do.

21       Q.   Okay.  If they were -- if that middle rung

22   was distracted or otherwise preoccupied with other

23   activities that didn't involve the checking on the

24   line level officers that you described to me just a

25   minute ago as an essential part of the process,
```

Darrell Ross, PhD

```
 1     would you see that as a problem?
 2            MR. PERKINS:  Object to form.
 3            THE WITNESS:  Do you mean on one shift or for
 4      ten years?
 5   BY MR. KUHLMAN:
 6      Q.   Well, is it a problem for one shift?
 7      A.   If it's just one day, that's not a problem to
 8    me.  But, I mean, if this is a regular practice over
 9    years, that could be a problem.  But if you're
10    talking about just distracted for a shift or a week
11    or very, very short period of time, that's not a
12    problem.  I'm thinking -- I'm thinking
13    longitudinally.
14      Q.   Sure.
15      A.   That would perhaps be -- could pose or create
16    a significant problem.
17      Q.   So help me bracket that for a second, because
18    you said on the one hand ten years and one day.
19    Those are the outside limits.  Let's bring that down
20    just a little bit if you can.  I think you said a
21    couple of shifts or a week, that wouldn't -- you
22    wouldn't see a problem with that; correct?
23      A.   Yeah.  Because when you say distracted, I'm
24    thinking like, well, okay, we had a hurricane last
25    week.  So that may -- that could go on for a month.
```

Darrell Ross, PhD

 1    That doesn't mean we're attending to everything in

 2    that policy that particular -- during that quote, as

 3    you put it, distraction or some emergency or some

 4    fire.  You burn the jail down or something of that

 5    nature.

 6         So the way I'm tracking with you is there's

 7    always some nuances in there that we have to think

 8    about.  Some distraction could be a whole host of

 9    months that we're not going to attend to that

10    because of the nature of circumstances that dictate

11    that.

12    Q.   If, let's say, for six months the supervisors

13    were not checking the work of the line level

14    officers against the policy, would that six-month

15    period be a problem for you?

16         MR. PERKINS:  Object to form.

17         MR. KUHLMAN:  This is not -- this is a

18    hypothetical.  What's wrong with the question?

19         MR. PERKINS:  The problem is -- the word

20    "problem" is what I'm having -- I keep objecting

21    to the form for.  It just seems like a very vague

22    term, but, anyway, go ahead.

23  BY MR. KUHLMAN:

24    Q.   Do you understand the question, Dr. Ross?

25    A.   I sort of do.  Are you saying within

Darrell Ross, PhD

```
1    180 days, six months -- I guess it's not something

2    that in my expertise or impression, based on your

3    hypothetical as you have phrased it, is that we may

4    not -- a supervisor may not be constantly checking

5    on in terms of how often is there contact?  How big

6    of an agency are we talking about?  What's the

7    interaction with that supervisor?  It depends on the

8    agency's evaluation process, their accountability

9    process, their evaluation mechanisms they put into

10   place.  So if a hypothetical, then I have to give

11   you variables that I can't really quantify based on

12   your hypothetical.

13       Q.   I appreciate your reluctance to come into my

14   universe.  I will try to be more precise or narrow

15   in my question.

16           Let's say -- okay.  Now, assume for me for a

17   minute that one of the trainers who is responsible

18   for taking the policy off the shelf and getting the

19   line level officers into a class and saying this is

20   what -- this is how we do things at this facility --

21   are you with me so far?

22       A.   Sure.

23       Q.   Let's say -- assume for a second that that

24   trainer is unhappy with or dissatisfied by the

25   particular policy that he has to pull from the
```

Darrell Ross, PhD

```
 1    shelf, and so instead of pulling from the shelf,

 2    he's been to a conference.  He comes back from the

 3    conference, and he pulls out a policy that he

 4    brought back from the conference and he just uses

 5    that in his training instead of the one on the

 6    shelf.  Do you see any problems with that?

 7        A.   Well, unless his administrator or his

 8    supervisor said, "We don't want you to train what

 9    you've learned at the conference.  We only want you

10    to train" -- I don't know what his directive is.

11        Q.   Right.

12        A.   It may just be in this world of hypotheticals

13    that the supervisor said, "Please share with other

14    officers what you learned at that conference."  It

15    doesn't mean that he's avoiding or prohibiting the

16    use of the policies on the shelf.  He's only sharing

17    with them what he learned at the conference that may

18    be part of a policy that they talked about at the

19    conference.

20        Q.   But isn't it fair to say that when you start

21    to do this sort of ad hoc modification, that it

22    creates a problem -- it creates inconsistent results

23    for the line level officers?  Because, let's say,

24    for example, only a small percentage or even, you

25    know, a modest percentage of the line level officers
```

Darrell Ross, PhD

```
 1    attended the training with this new -- with this new

 2    policy.  Isn't that going to create an inconsistent

 3    outcome for the officers who are trained under that

 4    policy versus the officers who think they're subject

 5    to the policy that's back on the shelf?

 6        A.   No, not necessarily in my mind.  It's only

 7    what the executive administrator told him to train.

 8    He's only doing what the purported objective of his

 9    training was to do.

10        Q.   But in my hypothetical the trainer is not

11    responding to a directive.  The trainer is acting on

12    his own.

13        A.   Okay.  And you have to give me more than

14    that.

15        Q.   Well, it's -- the trainer is not saying --

16    it's not that the jail administrator -- in my

17    hypothetical the jail -- it's not the case that the

18    jail administrator went to the trainer and said, "We

19    don't -- we want you to use a different method, and

20    here's the method that you use.  Go train

21    everybody."  That's -- those are not the facts in my

22    hypothetical.  Okay?

23        A.   Well, it's not my -- I don't follow those

24    facts very well.  That doesn't seem to -- it might

25    be in a fantasy hypothetical, but in reality --
```

Darrell Ross, PhD

```
 1    that's where I'm having a hard time --

 2    Q.   Okay.

 3    A.   -- syncing up to that hypothetical.

 4    Q.   Okay.

 5    A.   Because if I -- let me just elaborate.  If

 6    I'm the administrator allowing you to have time to

 7    train, I want to know what you're training.  I'm not

 8    just going to go say, "Oh, next Tuesday at 5:00,

 9    Bob, go out here and start training what you

10    learned."

11         I want to know what you trained -- what you

12    learned and what you're going to train so I can

13    agree or not agree with it.  I don't know very many

14    agencies even in a hypothetical that are just going

15    to let someone just arbitrarily come in and train

16    someone -- train other officers without having

17    some -- at least some minimal level of oversight

18    about what they're communicating or training or

19    teaching.

20    Q.   Well, wouldn't it be difficult to oversee

21    that training if the folks who are responsible for

22    overseeing the training were, to use my earlier

23    phrase, distracted by other activities?

24    A.   Possibly.

25    Q.   Let's say, for example, that the jail
```

Darrell Ross, PhD

```
 1    administrator was working on an expansion project at

 2    the facility and not involved in the day-to-day

 3    operations of the corrections program.

 4        A.   But there could be other supervisors.

 5        Q.   I understand that.

 6        A.   So the jail administrator is not just going

 7    to solely be on this project.  Maybe that's his or

 8    her function, but there's other people he can

 9    delegate that to.

10        Q.   Okay.  Turning to pages 7 and 8 again.  These

11    one, two, three, four, five, six, seven, eight,

12    nine, ten, eleven, twelve, thirteen policies that

13    you have got listed here -- are you with me?

14        A.   Yes, sir.

15        Q.   Those policies, do you -- you reviewed each

16    one of those; correct?

17        A.   Yes, sir.

18        Q.   Okay.  They -- excuse me for just a minute.

19             It's your opinion as we sit here today that

20    those policies, if they were sitting on the shelf,

21    were adequate?

22        A.   I'm saying to you today that regardless of

23    where they're sitting on the shelf they're adequate.

24        Q.   I understand that.  I'm trying to break this

25    up a little bit.
```

Darrell Ross, PhD

```
 1      A.   Okay.

 2      Q.   Tell me why that's a problem.

 3      A.   Well, is that a hypothetical?  Because we

 4    went from a hypothetical to actual existing

 5    policies, and these policies, in my impression,

 6    weren't sitting on a shelf.  So they were not a

 7    problem, and they were adequate and they were

 8    functional and operational, and officers testified

 9    to that.

10      Q.   Okay.  So, again, my question is, if these

11    policies were sitting on a shelf, would they be

12    themselves adequate?

13      A.   Sure.

14      Q.   Okay.  You've added on to that to say in your

15    review of this that these policies weren't just

16    simply sitting on a shelf, that they were involved

17    in this -- they were part of this feedback loop that

18    we have previously described?

19      A.   I don't know if I would call it a feedback

20    loop.

21      Q.   Okay.

22      A.   They were certainly trained to -- and there

23    was evidence in the testimony that I read that they

24    were actually followed and were applied to to this

25    case.
```

Darrell Ross, PhD

1    Q.   Okay.  And what facts do you have that

2    support that conclusion?

3    A.   Over 2,000 pages of depositions and reports

4    and investigations and the officers' testimony and

5    how they started off receiving Mr. Ajibade into the

6    facility and his housing and his placement and the

7    security that they provided and the practices that

8    they were experienced and had prior experience and

9    history with of receiving other detainees into the

10   facility.  The videotape confirms and shows the

11   practice which underscores what these policies are

12   directing the officers to do.

13   Q.   Okay.  Do you need all 2,000 pages to reach

14   that conclusion?

15   A.   It may be more than 2,000.  I didn't really

16   count.  I have two Xerox boxes and two notebooks of

17   documents, plus videos, plus cases I looked at,

18   deposition testimony.  So I have reviewed everything

19   that's in this report, and it did help me to come to

20   the -- my conclusions, opinions and my impressions.

21   Q.   Okay.  I think the number is more like 5,000

22   but --

23   A.   I'm not going to dispute that.

24   Q.   Okay.  And you have got about 30 hours I

25   think what you told us earlier; correct?

Darrell Ross, PhD

```
1       A.    Just reading.

2       Q.    Yeah.  Okay.  Is this your book?

3       A.    Yes, sir.

4       Q.    Okay.

5       A.    It's mine and my coauthor, yes, as well as

6    contributing authors.

7       Q.    Okay.

8       A.    Thanks for buying it.

9       Q.    Sure.  I have shown a copy of "Sudden Deaths

10   in Custody" showing as editors yourself and

11   Dr. Khan; correct?

12      A.    Yes, sir.

13      Q.    Okay.  I'm not going to -- we're not going to

14   mark the whole book, but if you could just tell me

15   in broad terms, you didn't write every chapter in

16   the book?

17      A.    Oh, no.

18      Q.    Okay.  Which of the chapters, if you recall,

19   did you -- were you the author or coauthor of?

20      A.    If you look at the table of contents, it

21   spells it out.  Without -- it's 11 years old, so if

22   you give me the table of contents, I can show you.

23      Q.    I would be happy to.

24      A.    It's got my name right there.

25      Q.    So I see Chapter 1.
```

Darrell Ross, PhD

```
 1      A.   Chapter 1 I wrote.  Chapter 9 I wrote, 11 and

 2   12.

 3      Q.   Okay.

 4      A.   And then obviously edited every chapter,

 5   reviewed every chapter, made some recommendations,

 6   along with Dr. Chan, of the other chapters.

 7      Q.   So in the 11 years, I think, since you wrote

 8   these chapters and edited the chapters that you did,

 9   in fact, author, is there anything that you want to

10   tell me today that would change the positions that

11   you have taken in -- particularly in Chapters 1, 9

12   and 12?

13           MR. PERKINS:  Object to form.

14           THE WITNESS:  Sure.

15   BY MR. KUHLMAN:

16      Q.   Okay.  I want to show you -- let's mark this

17   as 6.  This is Ross 6.

18                        - - -

19           (Exhibit 6, Chapter 12, Administrative

20   Implications, from book "Sudden Deaths in Custody," was

21   marked for identification.)

22                        - - -

23   BY MR. KUHLMAN:

24      Q.   Can you tell me what the title of this

25   document appears to be?
```

Darrell Ross, PhD

1      A.   It's Chapter 12, Administrative Implications,

2    a chapter of the book that's under questioning at

3    the moment.

4           MR. KUHLMAN:  Let's go off the record for

5       just a second.

6           (Discussion off the record.)

7           MR. KUHLMAN:  We can go back on.

8    BY MR. KUHLMAN:

9      Q.   Dr. Ross, could you give us -- I've shown you

10   Chapter 12.  Could you take a look through there and

11   tell me if there's anything that indicates this is

12   not a true and accurate copy of the chapter as it

13   appears in the print copy?

14     A.   Yeah, it appears to -- it appears to be,

15   yeah.  Short on copying -- it didn't get some of the

16   pages, just about lining it up on the copying

17   machine.  Other than that, yeah.

18     Q.   Okay.

19     A.   It looks like it.

20     Q.   Can you help us -- and plaintiffs will bear

21   all responsibility for getting a couple of these

22   page numbers cut off.

23           Can you help us walk through -- on page 204

24   you have got here -- it says, "Generally, incidents

25   of sudden in-custody deaths revolve around four

Darrell Ross, PhD

1    broad areas."

2        Can you tell me about those four broad areas?

3    A.   You want me to just read them or, I mean,

4    expand and explain on them?  Which basically that's

5    what's contained in the chapter.

6    Q.   Right.  And I'm going to ask you questions

7    about the chapter, but just help us lay a little bit

8    of the landscape here of what we're about to

9    encounter.

10   A.   Okay.  And going back to your earlier

11   question is there certain things -- there are some

12   things that have more research and more studies that

13   have occurred since we wrote this book that -- until

14   the present date of even sitting here.  So, yeah,

15   there's things that -- and that's why we wrote the

16   second book.  Nonetheless, it just came out in

17   July of 2017.

18       The degree and type of force/restraint

19   measures, a sudden in-custody death now more

20   commonly referred to as an arrest-related death is

21   normally -- we're not talking about a pursuit death

22   and police chase.  We're not talking about

23   officer-involved shooting.  We're talking about

24   cases that stem from use-of-force measures,

25   use-of-force control.  So that's number one.  It

Darrell Ross, PhD

```
 1    stems from we have a violent, combative subject who

 2    needs to be controlled and restrained and

 3    subsequently dies after a period of time fighting

 4    against being controlled and restrained by officers.

 5         Secondly, the medical and psychological

 6    factors associated with the death of the subject,

 7    that could impose or include the medical condition

 8    of the subject, preexisting conditions, all internal

 9    organs, brain deficiency, brain abnormalities, organ

10    failure, on and on and on, psychological factors,

11    mental health, refers to mental health concerns.

12         And in number two that also could respond to

13    or correlate to substance abuse histories of the

14    subject.  It has created and contributed to their

15    medical condition or their psychological condition.

16    The failure to take prescribed medication either for

17    medical issues and/or for mental health issues.  So

18    there's a lot of things that go under number two,

19    which I know we kind of want to keep this deposition

20    at least to about -- so -- but, I mean -- and so in

21    a somewhat quasi routine time period here.

22         Three, could be medical care issues provided

23    or requested by responding officers.  In other

24    words, once we have a person restrained and

25    controlled, what subsequent medical care issues
```

Darrell Ross, PhD

1    should we be providing to that individual based on

2    any injuries that are observable or apparent or

3    problems that emerge after medical -- medical

4    conditions that may emerge after the restraint.

5         And then often sometimes it could include the

6    method used for transporting the subject, whether we

7    transport -- whether the officers transported

8    somebody in the back of a police patrol car or other

9    type of police vehicle and/or ambulance/EMS.

10   Q.   Thank you.  Again earlier you told us this is

11   one of the materials -- part of your scholarship or

12   part of your writing that you relied on or that

13   informed your opinions in this case; correct?

14   A.   I don't think I said that.

15   Q.   Well, I asked you which pieces of --

16   A.   Oh, did I?  Yeah.  Book, book.  I gotcha.

17   I'm with you.  I'm sorry.  I'm sorry.  I apologize.

18   Yeah.  Yes.

19   Q.   Okay.  You circled the whole book, but is it

20   fair to say that this chapter out of the book is

21   also -- is part of the book?

22   A.   This is chapter 12 of the book.

23   Q.   Yeah.

24   A.   But to answer your question, as I reviewed

25   all of the, now knowing, 5 ,000 pages and sitting

Darrell Ross, PhD

1    down and writing and typing up my report, I can't

2    say that I thought about Chapter 12 or any chapter

3    in that book as I sit down to write my report.

4        Q.   Well, when I read Chapter 12, it seemed like

5    it would have been something that guided you in your

6    opinions.  If I'm mistaken in that, please tell me

7    so, and we'll move on.  But it seems like there's a

8    lot of material in here that is pertinent to the

9    facts in this particular case?

10       A.   I would agree with your assessment it's

11   pertinent to the facts of the case, but where I

12   disagree is that I didn't have this chapter open on

13   page 209 to sit down and go, okay, on this page and

14   this section I'm reading -- okay.  And I'm writing

15   and typing based on what I'm reading.

16       Q.   Okay.

17       A.   It's the collective -- you have to understand

18   I have been studying this stuff since 1988.  So when

19   I sit down to write an opinion based on the case of

20   this nature, I don't -- I have it in my head.  So

21   it's not that I have a particular book or our books

22   on a particular page as I'm putting together my

23   opinion and writing it and structuring it on the

24   computer from the report, if that makes sense.

25       Q.   It does.  There's this great quote from the

Darrell Ross, PhD

```
 1    author Umberto Eco, who passed away recently, who

 2    says -- you know, he said if he wants to write a

 3    novel, he takes all this information, read all of

 4    it, and then he would shred it and sit down with a

 5    clean sheet of paper.  So I can appreciate that you

 6    didn't necessarily have it in front of you.  But I

 7    think what you have told me -- and I want you to --

 8    I want to be clear about this.  You have told me

 9    that it does -- as part of your body of your life's

10    work, this has informed the opinions that you

11    express today.

12       A.   Oh, I would -- yes.  The whole book, not just

13    this chapter.

14       Q.   Okay.  Fair.  We can go through the whole

15    book if y'all want.

16       A.   That's up to you.

17       Q.   Can you help me understand the stages that

18    you describe of a risk management approach here?  We

19    have got stage 1, incident analysis; stage 2, policy

20    development; stage 3, risk control, and so on and so

21    forth.

22       A.   Well, a lot of my work over the years -- and

23    what I mean by work, experience and writings and

24    trainings and consulting and providing technical

25    services to agencies.  It's kind of based through a
```

Darrell Ross, PhD

```
1     prism of risk management, through a lens of risk

2     management.  So I approach a lot of topics, this one

3     included, from that prism or from that lens or from

4     that risk management perspective.

5          So in order to kind of walk administrators or

6     the reader through that, I start down how to analyze

7     the situation that leads us then into, well, if we

8     have this incident and these problems, what emerges

9     as some of the significant variables or factors that

10    could lead us to policy development, training,

11    implementation, monitoring, so forth.

12    Q.   Sure.  So on page 205, for example, you

13    wrote, "Moreover, administrators are encouraged to

14    analyze their own agency arrest, incident records,

15    use-of-force reports, and local community hospital

16    emergency room records in order to determine the

17    frequency of contact with subjects who are under the

18    influence of various substances or who exhibit

19    mental impairment."

20         Do you see where I'm at?

21    A.   Yes, sir.

22    Q.   Do you have any reason to qualify that

23    encouragement that you gave 11 years ago to

24    agencies --

25    A.   No.
```

Darrell Ross, PhD

1      Q.   -- today?

2      A.   No, sir.

3      Q.   Okay.  Turning to stage 2, developer --

4    once -- is it fair to say that stage 2 is predicated

5    upon a comprehensive incident analysis?

6      A.   Yes.  That's kind of the recommended -- you

7    have done these review of incidents and what

8    emerged -- what themes are common trends are

9    patterns that can help guide policy development.

10     Q.   Because you really can't change the policy if

11   you don't have any data to make your determinations

12   from.

13     A.   Well, I think you can.  I'm encouraging

14   others to do it a little different way.  But, yeah,

15   you could.  Depending on what the policy is, that

16   could happen.  I'm not saying that's the best way,

17   but I'm saying -- and I'm not saying this is the

18   only way.  I'm saying this is one way to do it, and

19   I would encourage -- and I have trained in this to

20   sheriffs and chiefs and administrators this is

21   another way of thinking about doing that.

22     Q.   But, again, this is your model; right?

23     A.   Yes.

24     Q.   You're not -- you're not regurgitating

25   somebody's else's model.  This is something you have

Darrell Ross, PhD

1    clearly spent a bunch of time thinking about and

2    developing; right?

3       A.   Correct.  But I'm not going to fault

4    somebody, if they have another way that they do it,

5    to say that you didn't follow this, so, therefore,

6    that's an inadequate policy or system.

7       Q.   Thank you for the clarification.

8            Stage 3, what is -- how do you select a risk

9    control strategy?

10      A.   Well, basically you have those as I outline

11   or identify in sentence two.  This comes from risk

12   management principles, concepts, the whole idea of

13   risk management.  So these are things I didn't just

14   think of, but these are ways that risk managers, any

15   type of occupation suggest that these are the ways

16   to attack or to prevent or address certain types of

17   risks.  So you have to then pick the ones that are

18   most, based on your risk analysis of the incident,

19   what you can live with in your agency that best fits

20   the purpose, the mission, objective and core

21   objective of that particular agency.

22      Q.   What's risk transfer?

23      A.   Transferring the risk is stopping something

24   and transferring to some other entity so that you're

25   not engaged in that.

Darrell Ross, PhD

```
 1      Q.   What did --

 2      A.   For example --

 3      Q.   Go ahead.

 4      A.   Some police departments -- or even stopping a

 5   particular -- some police departments in the past --

 6   and you still see it in the south particularly -- is

 7   provide escorts for funerals going from the funeral

 8   facility, parlor, for lack of a better building, to

 9   the cemetery.  And oftentimes when motorcyclists,

10   motorcycle units for police departments or patrol

11   units go in an intersection, they have been hit and

12   killed because citizens are disregarding and blowing

13   right through.  So some -- one way to transfer that

14   risk or stop that risk is stop the funeral escorts,

15   which many departments in the north and unions have

16   stopped that.

17        So that could be one way of doing that or

18   transferring it -- here's one in corrections.

19   Instead of hiring perhaps your own medical doctor,

20   you transfer the risk and hire an outside contractor

21   for health care.

22      Q.   Okay.  So that would transfer some of the

23   risk associated with medical claims that would be

24   brought by detainees or arrestees --

25      A.   Correct.
```

Darrell Ross, PhD

```
1        Q.    -- to the vendor as opposed to the --
2        A.    To the -- exactly.
3        Q.    Okay.  Is it -- in that calculous, is it your
4    opinion that a sheriff or a warden can shift
5    100 percent of the risk to the vendor in that
6    example you just shared with me?
7        A.    It depends on the contract and the state law
8    and a whole host of things.
9        Q.    So there's no constitutional prohibition in
10   your mind against a sheriff shifting 100 percent of
11   his risk to the vendor?
12       A.    I'm not sure about that.  I couldn't answer
13   that precisely, because, again, that depends on
14   state law.
15       Q.    What is segregation of resources?
16       A.    Having more -- duplicate types of equipment.
17   So if you have a hurricane and one generator goes
18   out, you don't just say, "Okay, we're out," or
19   transmissions or radios go out.  You have duplicate
20   of services, replication of that.  In case one goes
21   down, instead of having two or three cars, you have
22   a fleet of numerous cars of equipment, radio, that
23   type of thing, devices.
24       Q.    Okay.  I want to ask you about the last two
25   stages here very briefly.  Implementation of the
```

Darrell Ross, PhD

```
 1    risk strategies.  This, again, is something you told
 2    me earlier.  Supervisors overseeing the execution of
 3    the report of the approach and enforcing the
 4    strategy -- and enforcing that the strategy was
 5    correctly implemented.
 6         Is it fair to say that this stage 4 is wholly
 7    dependent on the effectiveness of the supervisors in
 8    executing -- overseeing and enforcing the approach?
 9    A.   I would agree with you in part.  I wouldn't
10    say solely because the supervisor can't -- I would
11    agree that there is some accountability on the part
12    of the supervisor to ensure his or her subordinates
13    are following a policy.  But if I'm on vacation --
14    and I have trained them very well and I'm a
15    supervisor.  But I'm on vacation and Officer X
16    decides to go up and take a baton and just hit
17    somebody upside the head against a policy, that's
18    where I would depart with you with that particular
19    type of question.
20    Q.   What if the supervisor is not on vacation but
21    is standing right there next to the subordinate?
22    A.   Possibly.  You have to look at the
23    circumstances, but, yeah, possibly.
24    Q.   Okay.  That would be -- it's possible in your
25    mind for that to be an abdication of the
```

Darrell Ross, PhD

1    responsibility that you have described here in the

2    orientation?

3        A.   If the supervisor is fully aware, cognitive

4    of what's going on, yes, that possibly could be a

5    problem, yes.

6        Q.   Okay.  And, finally, Number 5, monitoring and

7    assessing risk control.  This is -- who is

8    responsible for the monitoring in this stage of the

9    process?

10       A.   Well, it depends on how the agency would take

11   this model on and then assign it.  It could be a

12   compliance officer.  It could be a sergeant.  It

13   could be a civilian they have hired to do this.  It

14   could be a whole host of things.

15       Q.   Based on your review of 5,000 pages in this

16   case and presumably information that you would have

17   developed about how Chatham County Sheriff's Office

18   has operated, who do you think in that model would

19   have been responsible -- had Chatham County been

20   using your model, who would have been the monitor

21   that you describe here in stage 5?

22       A.   Using this model hypothetically?

23       Q.   Yes.

24       A.   All right.  It could have been perhaps the

25   jail administrator.  It could have been somebody

Darrell Ross, PhD

1    even outside of corrections.  It could have been --

2    I can't remember her name.  Colon, I believe.

3        Q.   Melissa Kohne?

4        A.   Yes.

5        Q.   K-o-h-n-e?

6        A.   Yes.  She was some administrator within the

7    corrections bureau.  So someone like that position

8    could have recorded and tracked and assessed and

9    monitored all sorts of things in the jail.

10       Q.   And what are some -- what are some of the

11   monitoring instruments -- I think you used

12   instruments in your own research from the 17

13   agencies for your most recent piece.

14            What is -- what are some of the instruments

15   that you would have recommended for monitoring in a

16   circumstance at a place like Chatham County?

17       A.   They already have it set up.  They have a

18   report system that I think is two to three pages.

19   They had figures and they had checkoff boxes in

20   there.  So they could have taken that, and someone

21   who has perhaps computer technology experience and

22   education and talent could have -- and put that in

23   and put in fields and then taken it from the

24   incident report or taken it right off of the

25   computer, because now we get a much more

Darrell Ross, PhD

1    sophisticated yearly, monthly, whatever to track

2    those reports.

3       Q.   Right.  You're talking -- are you referring

4    here to the incident -- the use-of-force incident

5    form?

6       A.   Yes.

7       Q.   Okay.  I think -- is it fair to say that you

8    have written that the use-of-force incident form

9    should be completed by all officers who participate

10   in a particular use of force; correct?

11      A.   Depends on --

12      Q.   Go ahead.

13      A.   When you say "all," it depends on how -- if

14   they were standing there, perhaps not.  But if they

15   touch someone, perhaps.  Assisted in grabbing an arm

16   to secure a handcuff, in that regard, whatever their

17   level was.  If it was really -- it's hard to

18   explain.  Centrally involved there should be a

19   report.

20      Q.   Okay.  Let me help you try to narrow it down

21   a little bit.

22           Let's say that -- assume for me that you have

23   got a situation where there's three or four officers

24   involved, and it's not three or four officers

25   standing around but three or four officers actively

Darrell Ross, PhD

```
 1      involved in the restraint of the detainee or the

 2      application of the use of force.  Is it sufficient

 3      in your mind for the -- for only one of those

 4      officers to complete the incident use-of-force form

 5      in detail or do all of those officers need to do it?

 6          A.   I think one could do it in detail, but it

 7      kind of varies because some agencies require all and

 8      some say the primary officer and get information

 9      from Fred and Bobby and Sue and put all of that

10      collectively with that officer in that particular

11      report.  So I have -- it can be either way.

12          Q.   Has it been your experience that individual

13      officers who participate in use-of-force incidents

14      may have some reluctance to fairly characterize or

15      accurately report the information on the form for

16      fear of some disciplinary action?

17          A.   No, not in my experience.

18          Q.   Officers are 100 percent transparent in their

19      reporting form?

20          A.   I didn't say that.

21          Q.   Okay.

22          A.   You said reluctant.

23          Q.   Okay.  So where is the space in between my

24      question and your --

25          A.   Well, I think what happens from time to time
```

Darrell Ross, PhD

```
1     is we have better report writers than we have

2     others, and recollection of events may be different.

3     So you're going to see discrepancies and different

4     perspectives and observations and so forth and

5     interpretation and things coming in at certain

6     different times than an officer who was there

7     throughout the process, so, no.  I think there is

8     some reluctance, and, yeah, they're going to review

9     obviously.  So there's that potential that they may

10    not write it up properly, so they would get extra

11    evaluation or questions of assessment by a

12    supervisor.  That's possible.  Sure.

13       Q.   Turn with me to 215 in the chapter here, Item

14    Number 13.

15       A.   Okay.

16       Q.   Reporting use of force.  When you write,

17    "This section should explain that responding

18    officers will submit a report" -- do you see where

19    I'm at?

20       A.   Yes.

21       Q.   "This section should explain that responding

22    officers will submit a report indicating their

23    participation in the incident."

24            When you use the plural there officers, are

25    you saying that -- do you mean that to mean multiple
```

Darrell Ross, PhD

1    officers are going -- multiple officers or that

2    there are obviously multiple officers in an agency?

3       A.   Multiple officers that respond to that

4    incident --

5       Q.   Okay.

6       A.   -- and that might have -- any level of

7    participation that they might have had in that

8    incident.  So if I'm just directing traffic out on

9    the street, I may not -- because I didn't use force,

10   so I may not write a report.  I responded.  Well,

11   what we're trying to -- what I'm trying to encourage

12   folks to think about here is, unless you have some

13   other -- and this is where I say early on, I don't

14   know, 20, 30 minutes ago about, yeah, there's a lot

15   more information I write in this book.  It's my

16   experience I'm finding more and more that sometimes

17   just the primary officer writes the report for the

18   collective benefit of the others that responded.  So

19   sometimes you will get that in some cases.  I see

20   that more in the law enforcement side than I do in

21   the jail side.

22      Q.   So is it still your opinion today that the

23   better practice is for those officers which

24   responded or participated in the incident to all

25   complete a use-of-force incident form?

Darrell Ross, PhD

```
1        A.    If it's possible.  And I think that's a good

2    practice.

3        Q.    Okay.  Just one more question about -- from

4    Chapter 12 here.  It's on the same page or same set

5    of pages, 215 section and 214.

6              In Number 10 you say here this section -- in

7    the monitoring and restraining section, "This

8    section should address monitoring procedures of

9    restrained subjects after a violent use-of-force

10   encounter."

11       A.    Uh-huh.  I'm with you.

12       Q.    What is your opinion of -- as we sit here

13   today, what would constitute adequate monitoring of

14   a subject who has been subject to a use-of-force

15   incident?

16       A.    Periodic assessment of conscious or

17   nonconscious behaviors of the subject.

18       Q.    What's the periodic rate?

19       A.    It depends.

20       Q.    On what factors?

21       A.    Well, if I'm out in the street or if I'm in

22   the jail.  So that's a factor.

23       Q.    Okay.  I'm talking about -- I want to limit

24   my question to being in the jail.

25       A.    All right.  You didn't say that.
```

Darrell Ross, PhD

```
 1        Q.   I understand that.  I'm trying to clarify.

 2        A.   Generally the practice is -- I have seen 30

 3     minutes, every 30 minutes to every 15 minutes.

 4             MR. KUHLMAN:  Okay.  We have got -- this

 5        is -- if I steamroll over a break, y'all just let

 6        me know, but I'm going to keep going unless you

 7        tell me otherwise.

 8             MR. PERKINS:  Okay.

 9                          - - -

10             (Exhibit 7, Chapter 9, Case Analysis of

11     Restraint Deaths in Law Enforcement and Corrections,

12     from book "Forensic Science and Medicine:  Sudden Deaths

13     in Custody," was marked for identification.)

14                          - - -

15             MR. KUHLMAN:  I'm going to show you what

16        we've marked as Ross 7.

17             For the folks on the phone, we're looking at

18        Chapter 9 if you have got an attachment.

19             What's the title of --

20             MR. FRISCH:  I never got the attachment, but

21        press on.

22     BY MR. KUHLMAN:

23        Q.   What's the title, Dr. Ross, of Chapter 9?

24        A.   "Case Analysis of Restraint Deaths in Law

25     Enforcement and Corrections."
```

Darrell Ross, PhD

```
1         Q.   Okay.  And this is a chapter that you

2    authored?

3         A.   Yes, sir.

4         Q.   Okay.  Did you have a coauthor on that

5    chapter?

6         A.   No.

7         Q.   Okay.  Is there anything -- before we get

8    into it, just at first blush, is there anything

9    about this chapter that you think needs to be

10   updated or revised in the 11 years since you wrote

11   it?

12        A.   Well, there's just more research that's been

13   published and conducted since we wrote -- I wrote

14   this chapter and we wrote the book.

15        Q.   Okay.

16        A.   There's additional information that could

17   be -- and there's more case law that's been decided,

18   thousands of cases in the last 11 years.  So yeah.

19        Q.   Sure.  Turning to page -- I'm going to ask

20   you a series of questions related to Chapter 9 here,

21   and if at any point I say -- I ask you something

22   about this chapter that is out of date or you think

23   the particular thing we're talking about is out of

24   date based on this new research and cases, I would

25   appreciate it if you would just tell me that.
```

Darrell Ross, PhD

```
1            In the -- on page 140 at the top of the

2     page you write, "The death may result from reasons

3     not related to the physical aspects of the

4     confrontation or restraint.  The death may have

5     occurred from cardiac ischemia or failure, drug

6     overdose or other underlying disease of the

7     subject."

8            Do you see that part?

9     A.   Yes.

10    Q.   Is there anything about those two sentences

11    that needs to be updated or revised in the 11 years

12    since you have written this piece?

13    A.   No.  I would say that that's what we're

14    finding now in the research and more medical

15    research.  It's multifactor of these -- in addition

16    to other psychological conditions or medical

17    conditions --

18    Q.   In the five -- okay.

19    A.   -- of the subject.

20    Q.   I'm sorry to interrupt.

21    A.   That's all right.

22    Q.   In the 5,000 pages that you reviewed in

23    getting ready for this case in order to express your

24    opinions, did you find any evidence of cardiac

25    ischemia or failure on the part of Mathew Ajibade?
```

Darrell Ross, PhD

```
 1      A.    Only what I read in the autopsy.  I don't
 2   remember cardiac ischemia --
 3      Q.    Okay.
 4      A.    -- as being listed.
 5      Q.    Okay.  Do you see -- do you recall from your
 6   review of those same 5,000 pages any evidence which
 7   would suggest that Mr. Ajibade suffered from a drug
 8   overdose?
 9      A.    No.  But he was under the influence of
10   marijuana.
11      Q.    Well, is under the influence of marijuana one
12   of the items to add to your serial list here on
13   page 140?
14      A.    Now, if you're trying to play games -- all
15   right.  Let's stop there.  If you're taking one
16   sentence out of one book out of one chapter to try
17   to transfer and transplant it over to the facts of
18   this case, that's totally erroneous.  So you're
19   taking one sentence.  That's not all-encompassing.
20   There's other factors, like I said, multifactors
21   that could be added to that sentence.  It's not just
22   those three or four variables that are listed there.
23   So this is an inappropriate question on your part
24   for me to try to take one sentence and then apply it
25   to a cascade of things that the autopsy showed in
```

Darrell Ross, PhD

```
 1    this report or in this case.

 2    Q.   I didn't ask you to opine --

 3    A.   Yeah, you did.  You asked me -- drug overdose

 4    was not happening with Mr. Ajibade.  Okay?  But he

 5    was under the influence of marijuana.  So to try to

 6    take this sentence and use it as a template over

 7    this case, that's inappropriate.

 8    Q.   Respectfully, Dr. Ross, I didn't ask you that

 9    question.  I asked you --

10    A.   Yes, you did.  And an objection to your

11    question, you can't take this sentence and try to

12    make a full-blown template question over what

13    happened in that case.  It's not related.

14    Q.   I'm not asking a full-blown template question

15    and --

16    A.   But you're going down that road of questions.

17    I see it, so --

18    Q.   Dr. Ross, you're familiar --

19    A.   -- you ask your questions, and I'll give you

20    my response.

21    Q.   You're familiar with the procedure in a

22    deposition, and you're familiar with the unfortunate

23    fact that I have to ask the questions and you have

24    to do your best to answer the questions --

25    A.   And I'm giving you my full response.
```

Darrell Ross, PhD

```
1       Q.   -- and it doesn't -- unless your lawyer
2   instructs you not to -- and so far I don't believe I
3   have heard from Mr. Perkins an instruction not to
4   answer the question.
5       A.   I'm not answering the question.  I'm giving
6   you the response that you can't take one sentence
7   and one word and say because you wrote drug overdose
8   in this chapter and because your client didn't have
9   a drug overdose that somehow this is misleading or
10  not -- this is inaccurate.  That's totally
11  erroneous, misstates all the facts in this case, and
12  as the deposition -- I have the right to counter
13  that.  I know what the rules of depositions are.
14      Q.   I appreciate the helpful clarification,
15  Dr. Ross.  I didn't -- those conclusions are ones
16  that you have drawn on yourself.  I have not drawn
17  those conclusions.
18      A.   You said from the autopsy and evidence of
19  5,000 pages; correct?
20      Q.   My question --
21      A.   Is that the question?
22      Q.   Well, we can read back the question.
23      A.   Read it back then.
24      Q.   Okay.
25           MR. PERKINS:  You can have it read back, or I
```

Darrell Ross, PhD

```
 1        suggest, Cameron, ask your questions and let's
 2        just keep going.
 3             THE WITNESS:  And for the record, you don't
 4        have to try to intimidate me with that stare.
 5   BY MR. KUHLMAN:
 6        Q.   Dr. Ross, I --
 7        A.   I have been in numerous depositions.  I know
 8     how it works.
 9        Q.   Okay.  I don't have any intention of
10     intimidating you.
11        A.   You're trying.
12        Q.   I'm --
13        A.   That's my perception, and perception to me is
14     reality.  And that's what's happening in this at
15     this point in the stage, and the judge can read it
16     and he can or she can make up their decision.
17        Q.   Okay.
18        A.   Badgering the witness.
19        Q.   I'll ask the question again.  Dr. Ross, in
20     your review of the 5,000 pages that you reviewed in
21     preparing to give the opinions in your report and
22     the opinions that you will provide at trial, did you
23     find any evidence that Mathew Ajibade's death was
24     caused by a drug overdose?
25        A.   No, but he was under the influence of
```

Darrell Ross, PhD

```
 1    marijuana, which contributed to his death according

 2    to the medical examiner.

 3       Q.   Is there any evidence in the 5,000 pages that

 4    you reviewed in preparing for this to express your

 5    opinions in this case of some underlying disease

 6    suffered by Mathew Ajibade which contributed to his

 7    death?

 8       A.   I'd have to go back and look at the autopsy,

 9    and to make it short for you, the autopsy was like

10    12 to 15 pages.  So excluding the 5,000, let's just

11    deal with the autopsy.

12       Q.   So, again, you relied -- in forming your

13    opinion, you relied on the incident reports, the

14    documents provided to you by Mr. Perkins, and the

15    autopsy, which we have just talked about; correct?

16       A.   Correct.

17       Q.   Okay.  On page 145 under the heading of

18    "Methodology," the second paragraph.

19       A.   I'm there.

20       Q.   Okay.  You describe 145 case reports of

21    sudden in-custody death after a violent restraint

22    incident.

23       A.   Correct.

24       Q.   Can you tell me about these data sources that

25    you describe here, these police detention,
```

Darrell Ross, PhD

```
 1    litigation documents, et cetera.  How did you come

 2    to be in possession of these -- this data?

 3       A.   Some I served as an expert witness, and

 4    others were given to me by other experts who have

 5    served as experts or attorneys who had cases.

 6       Q.   Okay.  Just to be clear, the cases in which

 7    you served as an expert which you testified earlier

 8    you never found a constitutional violation or

 9    wrongdoing on the part of the police or the

10    corrections officers, those are the data in which

11    you used to collect and analyze for the findings

12    that you use in this book?

13          MR. PERKINS:  Object to form.  That's a

14       misstatement of his testimony.

15          THE WITNESS:  That is some of the data that I

16       used.  As I said, some attorneys gave me other

17       data that I was not retained as an expert witness.

18    BY MR. KUHLMAN:

19       Q.   Who are those attorneys that --

20       A.   Oh, gee, you're asking -- all over the

21    country.

22       Q.   Well, how did these attorneys come to know

23    that you were going to conduct an analysis of sudden

24    in-custody deaths?

25       A.   By reading the case I was able to contact
```

Darrell Ross, PhD

```
 1   some of them throughout the country.
 2      Q.   How did you determine which cases you would
 3   reach out to counsel to try and retrieve this data
 4   in order to conduct your analysis?
 5      A.   How did I do it?  Through the phone.
 6      Q.   No.  I don't mean the mechanics of picking up
 7   the phone and calling a lawyer.  I'm asking about
 8   how did you arrive at the 145 cases which you would
 9   evaluate?
10      A.   From a sample that was placed on -- either
11   the ones I knew that attorneys had that I had
12   association with in the past or was able to reach
13   out to them through a conference or association at a
14   training session or actually read the case and got
15   ahold of the file and said, "If you can send me the
16   information that's pertinent to what I want to look
17   at in this particular case, please send it to me."
18      Q.   Okay.  So it wasn't a randomized data
19   setting?
20      A.   No.
21      Q.   Do you have page 162 in that set?
22      A.   Okay.
23      Q.   The penultimate paragraph on the page begins
24   with the word "Fourth."
25      A.   Okay.
```

Darrell Ross, PhD

```
 1       Q.   Do you find that statistically significant

 2    that of the cases, deaths that you reviewed,

 3    31 percent of those deaths involved a person who had

 4    a history of mental illness, primarily a bipolar

 5    disease known as manic depressive or schizophrenia?

 6       A.   Do I consider it significant?

 7       Q.   Yes.

 8       A.   It's almost -- it's a little less than

 9    one-third, so statistically that would be right up

10    there.

11       Q.   Are you aware of the incidents of this

12    diagnosis in the general population?

13       A.   Yeah.  I can't -- boy, I just presented a

14    training on that about two years ago, a year and a

15    half ago, from NAMI, National Association of Mental

16    Health.  I can't remember the absolute figure or

17    percentage, but I'm familiar with it.  I can track

18    it down real quick and look at it.

19       Q.   If you would like to supplement that, you can

20    give it to Mr. Perkins and he can get it to us.

21       A.   Sure.

22       Q.   I appreciate that.

23            But is it accurate to say there is a higher

24    incidence of individuals who had a history of this

25    particular mental -- history of mental illness,
```

Darrell Ross, PhD

```
 1    primarily bipolar disease known as manic-depressive

 2    or schizophrenia, within the in-custody population

 3    than in the general population, the non-custody --

 4    the general population out in the world?

 5       A.   I don't follow your question.

 6       Q.   Is there a higher concentration of

 7    individuals suffering from mental illness with --

 8    inside the walls or outside the walls?

 9       A.   I don't think you can compare apples and

10    oranges there.  I'm not talking about walls here.

11    I'm talking about out in the street primarily.  I

12    would say this to your question, that police

13    probably have more contact and come across those who

14    are suffering from mental illness, and depending on

15    the demographics of their community makes a big

16    difference.  So they come in contact -- there's a

17    high likelihood they're going to have more police

18    contact.  Same like a doctor, an emergency room,

19    EMS.  Very similar along the same line of thinking

20    or experience there.

21       Q.   Okay.  So if later when you go and look and

22    you find that the incidents of this -- of mental

23    illness, particularly bipolar, manic depressive,

24    schizophrenia, is lower in the general population

25    than it is in the population that you discovered,
```

Darrell Ross, PhD

1    the 31 percent, would it be appropriate to draw from

2    that conclusion that there is a higher incidence of

3    individuals suffering from these, from mental

4    illness, as described here?

5         MR. FRISCH:  Objection to the form.

6         MR. PERKINS:  Join.

7         THE WITNESS:  You're going -- I can already

8      tell I can't understand that question.  You need

9      to rephrase that.

10   BY MR. KUHLMAN:

11      Q.   All right.  Well, how about this, I will

12   reserve my question until you have a chance to

13   supplement your report with your findings about the

14   incidence of mental illness in the general

15   population.

16         MR. FRISCH:  Object to form.

17         MR. PERKINS:  Join.

18         MR. KUHLMAN:  Thank you.

19   BY MR. KUHLMAN:

20      Q.   Assume for me for a minute that 31 percent is

21   higher than the general population.  Can you do that

22   for me?

23      A.   I'm with you.

24      Q.   Okay.  If one -- if nearly one in three

25   individuals that law enforcement individuals

Darrell Ross, PhD

```
 1    encounter on the street or in a corrections

 2    environment is suffering from mental illness, is

 3    that not all the more reason to screen for the

 4    symptoms of mental illness presented by these

 5    individuals?

 6         MR. PERKINS:  Object to form.

 7         THE WITNESS:  I don't know how you do that --

 8         MR. FRISCH:  Object to form of the question.

 9         THE WITNESS:  I don't know how you do that on

10      the street.

11  BY MR. KUHLMAN:

12      Q.   What about in the corrections environment?

13      A.   Down the road when you --

14         MR. FRISCH:  Same objection.

15         MR. PERKINS:  Join.

16         THE WITNESS:  It's basically.

17  BY MR. KUHLMAN:

18      Q.   These folks are going to enter their

19      objections and give you some instruction on how to

20      answer, but just try to ignore them for a second and

21      answer the question.

22         THE WITNESS:  I don't think anyone's giving

23        me instructions how to answer.  They're objecting.

24         MR. FRISCH:  Hold on.  Hold on.  We're going

25        to make our objection.  Nobody should ignore
```

Darrell Ross, PhD

```
 1        anybody.  Court Reporter, just take it down.

 2        Let's just ask questions, do objections and keep

 3        things moving.

 4             MR. KUHLMAN:  Can you read back the question?

 5             THE COURT REPORTER:  "QUESTION:  What about

 6        in the corrections environment?"

 7             "ANSWER:  Down the road when you" --

 8             THE WITNESS:  Screening-wise.

 9   BY MR. KUHLMAN:

10        Q.   Yes.

11        A.   Let me go back to this number you keep

12   referring to.

13        Q.   Okay.

14        A.   This was in this small -- 145 small sample.

15   Okay, 31 percent.  This is not all-inclusive of the

16   whole community, the whole population who are

17   mentally ill, because as I premised this off 30, 40

18   minutes ago, I have done studies -- there have been

19   other studies that have been done subsequent to this

20   that those who demonstrate the same symptomatologies

21   of these who died who are 31 percent mentally ill or

22   had the parent history of mental illness.  It wasn't

23   a bona fide -- see, none of these the officer in the

24   street or in corrections is going to say, "Yeah, I

25   know that guy's bipolar," on the street or in
```

Darrell Ross, PhD

```
 1    corrections.  They're not trained to do that.  Or

 2    their schizophrenia.  That's why you go to the

 3    reports later to get that information that's

 4    post-death.  A lot of things come up in an

 5    investigation.

 6         So officers on the street are not trained,

 7    one, to screen individuals.  They only go by

 8    behaviors.  Same with the corrections officer.  So

 9    with this data set you're talking about 31 percent

10    of the 145 demonstrated these and, based on case

11    reports and autopsies, investigations suffered from

12    mental illness.  There's been subsequent studies

13    that show same symptomatologies with mentally ill

14    who had these symptomatologies who fought when

15    restrained and didn't die.

16    Q.   Okay.  Is there any reason that you have

17    right now to change your answer from earlier today

18    when we talked about how the conclusions are only as

19    good as the data upon which they're predicated?

20    A.   No.

21    Q.   Okay.

22    A.    No.  We're only talking -- to follow up, in

23    what you're reading on this particular chapter in

24    this particular page, again, is only representative

25    of that 145 data source, not in its entirety.  And
```

Darrell Ross, PhD

```
 1    there's other cases that show mentally ill or even
 2    on drugs didn't die after an altercation of this,
 3    and that's the whole premises.  You can't just look
 4    at half -- one side of the coin.
 5    Q.   Okay.  I want to draw your attention to one
 6    more passage from this chapter and then we will set
 7    this book down for a time.
 8         The last paragraph, the last full
 9    paragraph on the page, the second sentence,
10    "Although there are numerous factors that must be
11    considered, prior to determining the cause or
12    contributing elements of death, this research
13    suggests there's strong evidence that drug abuse,
14    components of psychosis, and the condition of the
15    internal organs, particularly the heart, play
16    significant roles in an unexpected custodial death."
17         My question is, whether or not in the 11
18    years since you wrote this piece you have additional
19    evidence which would suggest a change or a variation
20    on the conclusion you reach in this chapter.
21    A.   And I would answer that there is more support
22    for that statement now in the medical literature and
23    research, that supports those variables as well as
24    among others.  And I think you're getting ready to
25    depose Dr. Mash and Dr. Wetli down the road;
```

Darrell Ross, PhD

1    correct.

2        Q.   Have you talked with Dr. Mash or Dr. Wetli in

3    this case?

4        A.   No, I have not.  But I am saying those are

5    the experts that will -- can opine further than what

6    I can.

7        Q.   I'm just asking you if you stand by the

8    statement here that --

9        A.   Oh, I stand by the statement, and I say

10   there's more evidence to even support that sentence.

11       Q.   Okay.  I appreciate that.

12            Which of the -- which of the other experts

13   have you talked to about this case?

14       A.   None.

15       Q.   How did you come to find out who they were?

16       A.   You.  You informed me.

17       Q.   I'm sorry?

18       A.   You.

19       Q.   I don't believe I said Dr. Wetli or

20   Dr. Mash's name.

21       A.   You didn't say their name, but you didn't

22   have to.  You put it on the witness list.  Notice of

23   depositions.  This is your document; right?

24       Q.   You're right.

25       A.   And right here it says John Peters on page 1,

Darrell Ross, PhD

```
1    Charles Wetli on page 2, just for the record, and on

2    page 3 Dr. Mash.

3      Q.   You got me, Doctor.  Thank you for that

4    clarification.

5      A.   You're welcome.

6           MR. KUHLMAN:  Y'all need a break?

7           THE COURT REPORTER:  I could use a minute.

8           MR. KUHLMAN:  Okay.  Let's take five minutes.

9     (A recess was taken from 2:52 p.m. until 3:00 p.m.)

10          MR. KUHLMAN:  We're back on.

11   BY MR. KUHLMAN:

12     Q.   Dr. Ross, we're back over a short break here.

13    I want to ask you about some more paper here.

14          MR. KUHLMAN:  What number are we on?

15          THE COURT REPORTER:  We are on 8.

16                          - - -

17          (Exhibit 8, Preliminary Opinions Report of

18   Darrell Ross in Marmelshtein v City of Southfield, was

19   marked for identification.)

20                          - - -

21   BY MR. KUHLMAN:

22     Q.   I'm going to show you what has been marked as

23    Ross 8, will be marked as Ross 8.  Can you identify

24    that document for me?

25     A.   Marmelshtein vs City of Southfield, et al.
```

Darrell Ross, PhD

1      Q.   Okay.  Is this -- earlier you mentioned the

2   Marmelshtein case, if I'm not mistaken when went we

3   through the list of your prior history?

4      A.   Yes.  I mentioned this is a law enforcement

5   case.

6      Q.   Okay.  Is there -- do you have any reason to

7   disagree that this is a true and accurate copy of

8   the report that you prepared, the opinion and report

9   that you prepared in that case?

10     A.   Well, I would --

11     Q.   Okay.

12     A.   -- that I have not read it, and so I don't

13  know what you're handing me other than my name's on

14  it.  I don't know if you have altered it in some way

15  or not without fully reading it, so...

16     Q.   Well, go ahead and take a minute, if you

17  will, and take a look at it and see if -- I'm going

18  to represent to you that we got this off the

19  court -- we got this -- we received this from PACER,

20  from the court's public record, and we made no

21  modifications other than stapling the pages that

22  came out of our photo copier.  But if you see

23  something that you think contradicts that, please

24  let me know.

25     A.   No.  All I'm saying is, again, you just gave

Darrell Ross, PhD

1    me a document with numerous pages with my name on it

2    that's stapled, and I'm just looking at it cursory.

3    It appears to be a report that I submitted.  I'm

4    familiar with the case.

5        Q.   Okay.

6        A.   And I did -- as I articulated earlier, I did

7    write a report in this case.

8        Q.   This is -- this is -- on the heading it says,

9    "Preliminary Opinions Report."  Was there a -- was

10   there a subsequent or a final opinion report that

11   you provided in this case?

12       A.   No.  This was the only report that I

13   submitted.

14       Q.   Okay.  Thank you.

15                     - - -

16           (Exhibit 9, Case Law Westfield v Kalamazoo

17   County and Mike Stadel, was marked for identification.)

18                     - - -

19   BY MR. KUHLMAN:

20       Q.   I'm going to show you what we have marked as

21   Ross 9.  This we printed from Westlaw.  If you look

22   at the middle of the top third of the page there in

23   bold I believe it's got the title.  What is this

24   document?

25       A.   It says -- you want me to read the whole

Darrell Ross, PhD

```
 1    title?

 2       Q.   Just the bold part there under the --

 3       A.   "Preliminary opinions of the report of

 4    Darrell Ross, PhD."

 5       Q.   Okay.

 6       A.   And just for the record, I don't structure my

 7    reports this way, so this must be -- the court did

 8    this in some way then, because that's not how I

 9    structure my reports.  And I don't put down at the

10    bottom Westlaw, Thomson Reuters, and so forth and so

11    on.

12       Q.   How do you structure your reports?

13       A.   As I do -- as I did in this case.

14       Q.   Okay.  You use a template when you start a

15    new report?

16       A.   A template?

17       Q.   Yeah, like a Microsoft -- do you use

18    Microsoft Word?

19       A.   Yes.

20       Q.   Do you open just a blank document?

21       A.   Yes.

22       Q.   Okay.  It just so happens that you're

23    particular enough to make sure the formatting

24    matches every time?

25       A.   Yes.
```

Darrell Ross, PhD

```
1      Q.   Okay.

2      A.   And usually I start off -- like the first --

3   like I did in this case, this report, at least up to

4   the first six items, and then from there, depending

5   on the facts and circumstances or the type of case

6   it is.  So I have never seen this in this format.

7   This says 2014, and I'd have to go back and reread

8   this.  But it's got my -- somehow it's got my name

9   on it, but, again, it's not the format in which I

10  use.

11     Q.   Did you -- were you, in fact, retained as an

12  expert in the Westfield vs Kalamazoo County and Mike

13  Stadel case?

14     A.   Yes.  Again, I would have to review.  I can't

15  recall the facts of all the circumstances of it, but

16  as far as I can -- yeah.  It's on my witness list

17  that I submitted, so yes.

18     Q.   Right.  So if you -- as we sit here right

19  now, you don't -- you haven't been able to identify

20  anything which would suggest to you that this is

21  not, in fact, a copy of your report at least as

22  processed by the court or by West Publishing?

23     A.   Correct.

24                        - - -

25          (Exhibit 10, Preliminary Opinions of Darrell
```

Darrell Ross, PhD

```
1   Ross, PhD, in Jennings v Genesee County, et al., was

2   marked for identification.)

3                        - - -

4   BY MR. KUHLMAN:

5       Q.   Okay.  Let me show you what we have marked

6   here as Ross 10.  The cover sheet says Exhibit L,

7   but if you open up the cover sheet, does this look

8   more like the format that you recognize --

9       A.   Yes.

10      Q.   -- as one of your reports?

11      A.   Uh-huh.

12      Q.   Okay.  And is this the Jennings v Genesee

13  County Deputies case in which you were retained as

14  an expert?

15      A.   Yes.

16      Q.   Okay.  Is there anything in looking at the

17  report today that indicates to you that this is in

18  some way not a true and accurate copy of your -- the

19  report you provided in that case?

20      A.   It doesn't appear to be.  The only thing I

21  didn't put on was the top header on each page.

22      Q.   I'll represent to you that that is a feature

23  of the court's electronic case filing/case

24  management system.

25      A.   I'm sure it is.
```

Darrell Ross, PhD

1      Q.   All of these documents seem to get one of

2   these.

3      A.   So other than that, this would have been the

4   report I submitted.  An I think that was in, yeah,

5   July 20, 2015.  Yes.

6      Q.   It was filed with the court in

7   December of '16, but you're correct, right, that you

8   authored it in July of '15?

9      A.   Correct.  Yeah.  What the attorneys do and

10   when they submit it is out of my control.

11      Q.   Okay.  I have got one more of these for you.

12                        - - -

13          (Exhibit 11, Preliminary Opinions of Darrell

14   Ross, PhD, in Johnson v Kent County, et al., was marked

15   for identification.)

16                        - - -

17   BY MR. KUHLMAN:

18      Q.   This we're going to have the unfortunate

19   position of marking this as Exhibit 11, Ross 11 for

20   purposes of this deposition, and it's regrettably

21   under a cover sheet Exhibit 12.  Again, we have got

22   the ECF header at the top, but do you recognize this

23   as the report that you provided in the Johnson v

24   Kent County case?

25      A.   Yes.

Darrell Ross, PhD

1      Q.   Is there anything, sitting here today

2   reviewing these pages 1 through 14, which would

3   indicate to you that this is not the report that you

4   provided in the Johnson v Kent County case?

5      A.   No, it doesn't appear to be.  No.  I have

6   gone through all of that up to page 12 and 13.

7   Yeah.  It appears -- it appears that way.

8      Q.   Thank you.  I'm going to show you what has

9   come to be known as J-2.

10                         - - -

11         (Joint Exhibit J-2, Chatham County Policies and

12   Procedures, was marked for identification.)

13                         - - -

14         MR. KUHLMAN:  For those of you following

15      along at home, this is the joint exhibit list

16      agreed to by sheriff and plaintiff.  This is the

17      use of force and other sheriff's policies, written

18      policies bound together in a nice format.

19   BY MR. KUHLMAN:

20      Q.   Dr. Ross, do you recognize -- opening that

21   up, do you recognize those as the policies which

22   appear in a couple different places in your report

23   as policies you reviewed in this case?

24      A.   If you will give me a second to crossmatch

25   what you have here to what I put in my --

Darrell Ross, PhD

```
1      Q.   Sure.

2      A.   -- opinions report.

3           Well, for one, my number for the restraint

4      chair is Number 03/15/05.  This one is 03/15/09,

5      which you have here.  So unless we have two

6      different restraint chair policies.

7      Q.   What number do you show as your number?  I

8      apologize.

9      A.   On page 8 Number 03/15-05 -- or /05.  I'm not

10     disputing.  I'm just saying that this might be a

11     different one than the one I reviewed.  That's why

12     I'm checking it.

13          And, again, the use of restraints I have as

14     Number 03/15/08, and this is 04/24/05.

15          MR. PERKINS:  What was the question, Cameron?

16      I'm sorry.

17          MR. KUHLMAN:  I asked him if this -- if J-2

18      were the policies that he referred to, relied on

19      in forming his opinions, and he's identified a

20      couple discrepancies between the versions of the

21      policies that he says formed the basis of his

22      opinions and the policies that we have got bound

23      together in this joint exhibit.

24          THE WITNESS:  You have next in Tab F -- I did

25      read this, but it's not in my report.  MH-109
```

Darrell Ross, PhD

```
 1        dealing with use of restraints on mental

 2        health/mental retardation designated inmates.

 3              And then the same in Tab G, G as in George,

 4        MH-108, "Subject, Crisis Suicide Intervention,"

 5        which I didn't see this as a suicide case, nor did

 6        I list it as a policy on either page 7 or 8 of my

 7        report.

 8   BY MR. KUHLMAN:

 9        Q.   The unfortunate thing about entering into

10     agreements is that we sort of have to leave the set

11     bound together after we agree that that's going to

12     be the set.  And so although I understand that

13     that's not --

14        A.   I'm just trying to --

15        Q.   Sure.

16        A.   -- articulate that these policies were

17     provided by Mr. Perkins to me, and as my impressions

18     and opinions were formed from reading the pages and

19     the documents, these are the policies, based on that

20     task and assignment I was given, that I relied on

21     for my report, on pages 7 and 8 of my report, not

22     some of these in your document.

23              For example, another one, code of ethics

24     policy 1/03/19.

25        Q.   Is that Tab J?
```

Darrell Ross, PhD

```
 1      A.   Yes, sir.  No.  It's Tab H.

 2      Q.   H, yeah.

 3      A.   Then --

 4      Q.   Hold on one second.  I'm sorry to interrupt.

 5      A.   Yeah.

 6      Q.   You had a different version of the code of

 7   ethics or you didn't rely on it?

 8      A.   I didn't rely on it.  I don't know.

 9      Q.   Okay.

10      A.   I have to -- I have all the policies that I

11   was given, so we can cross-reference that.

12      Q.   Okay.

13      A.   But I didn't -- again my task was not to see

14   if these officers were ethical or not.  My task as

15   clearly spelled out in Items 8 of -- on page 7.

16           Anyway, let's see.

17           MR. KUHLMAN:  Don't you have one of these?

18           MR. PERKINS:  Yeah.  You gave it to me.

19           THE WITNESS:  The -- just to affirm -- now,

20      on Tab I that's correct on training and staff

21      development.  That's what I have in my report

22      here.

23           And then Tab J is emergency response team

24      policy 1/04/02, which I don't have in my -- either

25      my page 7 or 8.  Did not rely on that policy for
```

Darrell Ross, PhD

```
1        my opinions and did not consider this to be an

2        emergency response team call-out or incident.

3    BY MR. KUHLMAN:

4        Q.   Do you recall from your review of the record

5    that several of the officers that did, in fact,

6    respond were CERT team members?

7        A.   Sure.  So what?

8        Q.   Do you --

9        A.   Yeah, I do remember that.  Yeah.

10       Q.   Do you recall from your reading of the

11   depositions, in particular the depositions of

12   Mr. Capers and Mr. Kenny, that there were orders

13   given for CERT team only to be in certain parts at

14   that -- at certain points during the event or the

15   incident?

16       A.   What I do recall is I believe his comment was

17   to be in the cell, not at certain points.  My recall

18   of the question is in the cell.

19       Q.   So you're representing it spatially.  I was

20   representing it temporally.  We will agree it was in

21   the cell, which can be described as a certain period

22   of the overall incident; correct?

23       A.   But -- yes, but this was not a call out CERT

24   emergency use of the special response team of the

25   jail.
```

Darrell Ross, PhD

1    Q.   Right.  So it's not fair to say this was a

2    planned use of force.  This was an unplanned use of

3    force.

4    A.   It's spontaneous.

5    Q.   Spontaneous.  Okay.

6    A.   So with that caveat and that explanation, in

7    syncing your Exhibit J-2 with what I have in my

8    opinions report page 7 and 8, there are several

9    there that --

10   Q.   Don't match.

11   A.   -- that don't match.  Exactly.  That's a good

12   way of saying.

13   Q.   Can you -- would you mind -- I know you said

14   you brought them.  Would you mind retrieving from

15   the materials you brought today the 3/15/05, the use

16   of force?  I believe that's what -- is that accurate

17   to say that use --

18   A.   Let's see.  Use of force.  It's on page 8

19   you're referring to?  The 301-010.40 and/or 3/15/15.

20   Q.   On -- it's on the --

21   A.   Page 8 or 7?

22   Q.   3/15 -- is it 3/15/08, the use of restraints?

23   Excuse me.  It's 3/15 -- no.  I was right.  Use of

24   restraints are number 3/15/05.  3/15/05 I believe is

25   you said that this -- we have got 3/15/09 here in

Darrell Ross, PhD

1     this bound copy.

2        A.   Okay.  I have to go back.  I don't remember

3     what I said.  You're talking about use of force;

4     correct?

5        Q.   No.  I'm talking about the use of the

6     restraint chair.

7        A.   Restraints -- restraint chair?

8        Q.   Yes, sir.  It's Tab B in this book.

9        A.   3/15/09 in the bound packet you gave me.

10       Q.   Yes.  You indicated that you had not seen

11    3/15/09, that the restraint chair policy that you

12    relied on in forming your opinions was 3/15/05.

13           MR. PERKINS:  To clear this up, do you want

14        to look at --

15           THE WITNESS:  I'll look at it.

16           MR. PERKINS:  -- your document and see?

17           THE WITNESS:  Yeah.  I'm not saying I didn't

18        look at these.  I'm saying that I had -- what was

19        given to me is -- I don't recall two different

20        restraint chair policies, to be quite honest with

21        you, after 5,000 pages.  But I can look at the

22        documents if that's what you want me to do.

23    BY MR. KUHLMAN:

24       Q.   Right.  And, again, I'm just trying to make

25    sure we have -- to the extent there's some consensus

Darrell Ross, PhD

1    here, I want to make sure that when we say these are

2    the policies in effect we're talking about the same

3    set of written policies.

4          MR. KUHLMAN:  Do you have any helpful

5      clarification how we might --

6          MR. PERKINS:  Let's get him to look and see.

7      He could have a typo in there as far as the

8      number.  That would solve the issue; right?

9          MR. KUHLMAN:  Yeah.

10          MR. PERKINS:  Okay.  Let's go off the record

11      for now.  Are you okay with that?

12          MR. KUHLMAN:  Yeah.

13      (A recess was taken from 3:18 p.m. until 3:27 p.m.)

14          MR. KUHLMAN:  We can go back on.

15    BY MR. KUHLMAN:

16      Q.   All right.  Dr. Ross, we're back on the

17    record after a short break.  Before the break I was

18    asking you about what we have identified as Joint

19    Exhibit J-2, Tab B.  And in Tab B here we have what

20    we understand to be the sheriff's use of restraint

21    chair policy that was in effect at the time of

22    Mathew Ajibade's death.  In J-2 it's listed as

23    Policy Number 3/15/09.

24          Do you have -- do you have a copy of 3/15/09

25    in front of you now?

Darrell Ross, PhD

```
1        A.    Yes.

2        Q.    Okay.  Have you had an opportunity to review

3    3/15/09?

4        A.    Yes.

5        Q.    Okay.  Is there anything about 3/15/09,

6    having read it today, which strikes you as different

7    than the policy that you say you reviewed in order

8    to form your opinions in the report?

9        A.    Only to say that there's another policy

10   that's sitting on the table that's a little more

11   lengthier than this one that I also reviewed.

12       Q.    Okay.

13       A.    So there's -- and I don't know the date of

14   that one or this one, but they're different.

15       Q.    Okay.  But let's --

16             MR. KUHLMAN:  Can we make a copy of this?

17             MR. PERKINS:  Sure.  Can I take a look at it?

18             MR. KUHLMAN:  Yeah.

19             MR. PERKINS:  We're off the record.

20   (A recess was taken from 3:29 p.m. until 3:32 p.m.)

21             MR. KUHLMAN:  We're back on.

22                          - - -

23             (Exhibit P-9, Procedures for Use of the

24   Restraint Chair, Bates No. PA00595 - 00597, was

25   previously marked for identification.)
```

Darrell Ross, PhD

```
 1                        - - -

 2   BY MR. KUHLMAN:

 3      Q.   Dr. Ross, again, after a short break, I'm

 4   going to show you what we have premarked as P-9,

 5   papa 9.  Do you recognize the -- what's the title of

 6   that document?

 7      A.   "Procedures for the Use of the Restraint

 8   Chair."

 9      Q.   Okay.  Earlier you testified that you

10   reviewed the Internal Affairs reports that were

11   completed in the investigation of this case.  Do you

12   recall that?

13      A.   Yes.

14      Q.   And do you recall, in your review of those

15   reports, coming across this particular policy that

16   we have just identified as P-9?

17      A.   Correct.

18      Q.   Okay.  Can you do for me the arduous favor of

19   looking at P-9 alongside Tab B from J-2?

20      A.   Yes.

21      Q.   Okay.  And help the jury understand where

22   these two documents are similar and where they are

23   different.

24           MR. PERKINS:  Object to form.

25           ///
```

Darrell Ross, PhD

```
1    BY MR. KUHLMAN:

2        Q.   Go ahead and answer if you can.

3        A.   Well, they seem pretty similar in format and

4    narrative and direction, instruction.  The one

5    that's identified as Policy Number 03/15/09 seems to

6    be written, my impression, more custodial and

7    security and control related directing the officer,

8    where the other has that but has additional

9    information and steps than 3/15/09.

10       Q.   Okay.  Earlier I think we agreed to use this

11   word "adequate"; correct?

12       A.   Yes.

13       Q.   As it relates to a particular policy?

14       A.   Correct.

15       Q.   Or evaluating a particular policy; correct?

16       A.   Correct.

17       Q.   Okay.  Do you have any reason to sitting here

18   today looking at these two to consider whether one

19   or the other is not, in fact, adequate based on your

20   training and experience?

21       A.   No.  I find them adequate.

22       Q.   Okay.  If you had to pick in your ideal

23   environment where you're designing a correctional

24   facility and implementing policies there, which of

25   these two policies would you prefer?
```

Darrell Ross, PhD

```
 1      A.   I can see blending both of them.  I mean, I
 2   can see advantages of one and advantages of the
 3   other.  So I can't -- I can't make a distinction
 4   that this one is better than this one or vice versa.
 5      Q.   Setting aside my unreasonable request to ask
 6   you to make a value judgment, I just want to look at
 7   the actual contents and express an opinion.  I'm not
 8   sure there's a wrong answer here.  I just would like
 9   to know because I'm not a corrections expert.  So I
10   would like to know from your perspective which one
11   of these policies you would prefer if you were
12   designing the scheme.
13      A.   I think they're both adequate.  It addresses
14   the need and the use of the restraint chair.
15      Q.   Okay.  Can I look at that one for just a
16   moment?
17           There's a complete copy of P-9.  Can you see
18   in -- let's call this J-2 for our purposes, J-2B.
19   Do you see anywhere in that policy the requirement
20   for observation of the restrained individual?
21      A.   You're saying 3/15/09?
22      Q.   That's correct.
23      A.   Item D conducting visual observations every
24   15 minutes --
25      Q.   Okay.
```

Darrell Ross, PhD

```
1        A.    -- of the restrained inmate.

2        Q.    What is -- okay.  And on the -- and then

3   Item E?

4        A.    Medical personnel must check the inmate at a

5   minimum every two hours.

6        Q.    Okay.  And to get a little bit out of order

7   here, Item A?

8        A.    Direct visual observation by staff members is

9   continuous prior to the medical assessment.

10        Q.    Is the medical assessment a part of the

11   process of -- at what point in the process of

12   placing a subject or detainee into a restraint chair

13   is the medical assessment completed?

14        A.    Just as you mentioned, after he's restrained

15   in the restraint chair.

16        Q.    Okay.  And so up until that medical

17   assessment, this particular policy calls for direct

18   visual observation?

19        A.    That's not how I read it.  My inference

20   here -- my impression is that once they're secured

21   you'll have observation.  You can't have -- can't

22   start it until you get them secured.

23        Q.    Okay.  Well, but if there are individuals in

24   the -- you know, if there are individuals -- if

25   members of the corrections staff are placing a
```

Darrell Ross, PhD

```
1    detainee into restraints, they're not doing it like

2    this looking -- and I'm gesturing over my shoulder.

3    I mean, they're watching the detainee as he's --

4    A.    Exactly.

5    Q.    So there are eyes on the detainee throughout

6    the process up until the -- continuously prior to

7    medical assessment.

8    A.    Correct.

9    Q.    Okay.  If you look at the -- look at P-9 for

10   a second with me, the Number 1, A-1, what does A-1

11   call for there?

12   A.    "The camera operator will videotape the

13   offender throughout the entire process of the use of

14   restraint chair.  Care will be taken to protect the

15   safety of the camera operator."

16   Q.    Okay.  In your model corrections environment

17   would you prefer a camera operator with videotape or

18   visual observation?

19   A.    At what point?  During the whole process?

20   Q.    Prior to the medical assessment?

21   A.    I rather have visual observation without the

22   camera.

23   Q.    What makes you say that?

24   A.    Because I have the ability -- the person has

25   the ability to have various eyes from various
```

Darrell Ross, PhD

```
 1    angles.  If you have one operator, you're only

 2    getting it from one perhaps perspective, which you

 3    may have things that comes into play that obscure

 4    the camera operator, getting bumped, the camera goes

 5    away so we don't get to see the continuous use of

 6    that.  So I would rather have eyes normal -- I mean,

 7    both are great, but if you say I prefer, I would

 8    rather have direct observation at the time and at

 9    intervals that are necessary to make the observation

10    by the officer.

11        Q.   Okay.  And so that multiangle perspective

12    that you just described requires multiple

13    individuals; correct?

14        A.   It could, yes.  Or I could be moving.  That

15    one person could be moving different -- in different

16    angles.  Yes, more than one set of eyes, because

17    that's normally what's going to take three to four

18    to five officers anyway to restrain somebody that's

19    violent and combative and doesn't want to be placed

20    in the chair.

21        Q.   Well, isn't it reasonable to say in order to

22    have a better perspective than a single camera

23    operator, you have got to have more than one set of

24    eyes, because if you only have one set of eyes

25    moving around, that's the same as if the camera
```

Darrell Ross, PhD

```
1    operator were moving around; correct?

2    A.   At that point in time, yes.

3    Q.   Right.  Okay.  So these multiple

4    perspectives -- these multiple visual perspectives,

5    is that not consistent with your conclusion in the

6    book that a use-of-force incident report should be

7    completed by multiple officers?

8    A.   That have participation in it, in whatever

9    level that they may be participating.

10   Q.   To give this more holistic perspective of

11   what occurred; correct?

12   A.   I would agree with that.

13   Q.   Okay.  Number 2 on this sheet I think refers

14   to something we talked about earlier, which is,

15   "Whenever possible, all security-related

16   applications of the restraint chair will be approved

17   in advance..."

18        Do you see any advanced approval -- advance

19   approval requirement in J-2B here, the other

20   document?

21   A.   Well, let's finish the sentence first --

22   Q.   Okay.

23   A.   -- if you don't mind.

24   Q.   Sure.

25   A.   "...by the facility or head/acting facility
```

Darrell Ross, PhD

```
1    head."

2         Item B, "Approval for the use of restraint

3    chair must be obtained from an individual at the

4    rank of lieutenant or above."

5    Q.   Okay.  So there's no -- there's sort of some

6    ambiguity in the tense there, but you would read

7    both of those to require prior approval?

8    A.   Correct.

9    Q.   Okay.

10   A.   Based on the policy.  Now -- that's as far as

11   I'll go with that.

12   Q.   Okay.  Number 5 on the -- on P-9 says,

13   "Placement of an offender in the restraint chair

14   will be accomplished by a use-of-force team."

15        Is the -- what is a -- what is a use-of-force

16   team?

17   A.   I don't know what -- how they would classify

18   that here.  I've not seen any document that would

19   identify or specify that.

20   Q.   Is there some suggestion in that language,

21   though, that not just anyone can put a detainee into

22   a restraint chair?

23   A.   I wouldn't read it that way.  The

24   use-of-force team could be a collection of officers.

25   Q.   Okay.  The detail, the specific steps on the
```

Darrell Ross, PhD

1    second page of P-9, do you see that level of detail

2    in the policy marked P-2B?

3        A.   Yes.

4        Q.   I'm sorry?

5        A.   Specific steps Item 3A through --

6        Q.   J?

7        A.   Yeah, whatever is in there.  J.  I see those.

8        Q.   Okay.  You see those in this policy?

9        A.   Right.

10       Q.   But do they --

11       A.   They're not in this policy, in 3/15/09.

12       Q.   Right.  Is it generally your opinion that the

13   more information, the more guidance you can provide,

14   the better it is for the line officers who are

15   tasked with complying with these policies?

16       A.   Sure.

17       Q.   Okay.

18       A.   But it doesn't mean it has to be in the

19   policy.

20       Q.   I didn't -- it wasn't a requirement.  I said

21   is it better.

22       A.   I just wanted to clarify to make sure what

23   we're talking about.

24       Q.   Okay.  I'm not -- I wasn't trying to make a

25   binary distinction.  I was trying to make a scaled

Darrell Ross, PhD

```
 1    distinction.

 2            And then in here we've got on C2 -- what do

 3    we have for the frequency of the checks?

 4    A.    You're talking about P whatever it is.

 5    Q.    I'm talking about P-9.

 6    A.    Every 15 minutes.

 7    Q.    Okay.

 8    A.    C2.

 9    Q.    Okay.  And is that -- is there any

10    distinction there from P -- excuse me, J-2B?  I'll

11    help you.  It's at Item ID.

12    A.    You lost me on that one, Counselor.

13    Q.    Okay.  Is there -- can we agree that there's

14    a requirement of 15-minute checks in P-9?

15    A.    Yes.

16    Q.    Okay.  Do you see a requirement of 15-minute

17    checks in J-2B?

18    A.    Yes.

19    Q.    Okay.  So --

20    A.    And it's actually Item D specifically.

21    Q.    Item D of Exhibit J-2B, as in bravo?

22    A.    Yes, sir.

23    Q.    Okay.  So is it fair to say, then, that

24    regardless of which of these policies may have been

25    in effect at the time of Mr. Ajibade's death, it was
```

Darrell Ross, PhD

```
 1    the official policy of the Chatham County Sheriff's

 2    Office that a restrained individual was to be

 3    checked every 15 minutes?

 4        A.   That is correct.

 5        Q.   Okay.  In your review of the video evidence

 6    in this case, did you observe Mr. Ajibade being

 7    checked every 15 minutes?

 8        A.   No.

 9        Q.   Okay.  What conclusion would you draw from

10    the failure of Chatham County Sheriff's Office staff

11    to fulfill their obligations under the policy of

12    checking Mr. Ajibade every 15 minutes?

13            MR. PERKINS:  Object to form to the extent

14        "staff" is plural.

15            MR. KUHLMAN:  Think staff can be singular or

16        plural?

17            MR. PERKINS:  I know.  That's why I objected

18        to it.

19            THE WITNESS:  That they didn't make the check

20        every 15 minutes.

21    BY MR. KUHLMAN:

22        Q.   Right.  Is that -- that's not significant to

23    you?

24        A.   You didn't ask me that.  You said what do I

25    conclude, and I conclude they didn't make the
```

Darrell Ross, PhD

```
 1    checks.  I agree with you.  I put it in my report.
 2       Q.   I appreciate that factual observation.  I'm
 3    asking you about the significance now of the failure
 4    of any Chatham County Sheriff's Office employee to
 5    check on Mr. Ajibade, as required by the policy,
 6    every 15 minutes.
 7            MR. PERKINS:  Object to form.
 8            THE WITNESS:  And I agree with you.  They
 9       didn't do it.
10    BY MR. KUHLMAN:
11       Q.   But I didn't ask you whether you agreed
12    with --
13       A.   That's my answer.
14       Q.   With all due respect, Dr. Ross, I'm not
15    asking --
16       A.   That's my answer.  I'm not changing it.  I'm
17    responsive to your question.  I agree with you they
18    didn't make the checks.  It's significant.  I agree.
19       Q.   Okay.  Thank you.
20            I'm going to try to save you some time here,
21    Dr. Ross.
22            We'll send this to Mr. Perkins and y'all can
23    verify it later, but are we on the right track here
24    that this is the slides you referred to earlier from
25    the presentation?
```

Darrell Ross, PhD

```
1      A.   If you scroll up a little bit, I want to make

2    sure.

3      Q.   Let me see if I know how to operate it.

4      A.   Because the "and" underneath that needs to

5    have --

6      Q.   Oh, the ampersand?

7      A.   There you go.  And Michael Brave.  That's it.

8      Q.   Okay.  This was the one at the -- in

9    St. Louis?

10     A.   That's correct.

11     Q.   Did you give the same presentation or a

12   different one in Chicago?

13     A.   It was a different one.

14     Q.   Okay.  Were there slides from the Chicago

15   presentation?

16     A.   Yes.

17     Q.   Okay.  So we could get those also?

18     A.   Yes.

19     Q.   Okay.  Thank you.

20          Can you turn with me to page 12 of your

21   report?  This is within the report in section of

22   your opinion that says, "The officers provided

23   adequate monitoring of Mr. Ajibade during the

24   pre-booking process."  We're on the second page of

25   that section.  Are you with me?
```

Darrell Ross, PhD

```
1        A.   No, I'm not yet.

2        Q.   Okay.

3        A.   You said page 12?

4        Q.   Yes, sir.

5             MR. PERKINS:  What's the question?

6             MR. KUHLMAN:  My question would be, "Are you

7        with me?"  I'm trying to direct his attention to

8        the middle paragraph of page 12 within the section

9        adequate monitoring during pre-booking process.

10            THE WITNESS:  What sentence?  What line?

11   BY MR. KUHLMAN:

12       Q.   The last line of the middle paragraph.

13       A.   That's not what mine says.  Page 12.

14       Q.   My apologies, Dr. Ross.  We're getting --

15   we're getting hung up here.  I'm referring to an

16   entire section.  I was trying to say we're within

17   the Section B.

18       A.   You didn't -- okay.  I'm sorry.  You didn't

19   say that.  You said on page 12 middle paragraph.

20       Q.   Okay.

21       A.   Monitoring.  So I'm looking for the word

22   "monitoring," but now that you said section.  I'm

23   with you.

24       Q.   Okay.  Are you now on -- do you see the

25   paragraph in the middle of page 12?
```

Darrell Ross, PhD

```
 1      A.   I have been there.   Yeah.

 2      Q.   Okay.   You write at the first paragraph -- at

 3   the first sentence of that paragraph, "CCSO has been

 4   criticized for allegedly not performing the

 5   pre-booking process immediately for Mr. Ajibade and

 6   not ensuring that he immediately received medical

 7   screening."

 8           Do you see that portion?

 9      A.   Yes.

10      Q.   Okay.   And you've got "immediately" in scare

11   quotes; correct?

12      A.   Correct.

13      Q.   Okay.   And then you go on to categorize that

14   criticism as absurd because the events say

15   Mr. Ajibade did not need immediate medical

16   attention; correct?

17      A.   That's correct.

18      Q.   Okay.   What -- from what perspective are you

19   expressing this opinion that Mr. Ajibade did not

20   need immediate medical attention?

21      A.   What perspective?

22      Q.   Yes.   Is it your perspective as a professor?

23   Is it your perspective -- you're not a medical

24   doctor, so it can't be your perspective from a

25   medical doctor.   So from what perspective is this
```

Darrell Ross, PhD

```
 1    opinion?

 2       A.   From my own personal perspective.

 3       Q.   Okay.  So it's your understanding that a

 4    corrections officer or somebody who has experience

 5    in the corrections environment ought to be in a

 6    position to be able to determine whether or not an

 7    individual needs immediate medical attention?

 8       A.   If it's obvious and shows -- there's several

 9    things.  You could have a complaint by the detainee.

10    You could have obvious apparent injuries of the

11    detainee, behaviors that would indicate that or

12    actual communication from the detainee saying, "I'm

13    in pain" or "I need hospitalization."  So

14    observations, assessments based on the experience of

15    the corrections officers, their training and

16    consistent with their observations of the detainee

17    as he enters into the facility.

18       Q.   And is the same -- can the same be said for

19    mental health needs as we have just said for medical

20    needs?

21       A.   Yes, behaviors.  Absolutely.

22       Q.   So it's possible -- it's possible, if not

23    expected, that a corrections officers should be on

24    the lookout for behaviors which indicate either a

25    serious medical need or a serious mental health need
```

Darrell Ross, PhD

```
1     from a detainee?

2        A.    Behaviors, yes, I would agree with that.

3        Q.    Okay.  You don't -- it doesn't require any

4     specialized medical training to identify these

5     behaviors?

6        A.    From where?

7        Q.    I'm sorry?

8        A.    From a corrections officer or talking

9     medical?

10       Q.    As a corrections officer.

11       A.    They receive training, but I wouldn't -- when

12    you say "specialized," they would get -- they would

13    get more training than a lay citizen.

14       Q.    Right.  More --

15       A.    To help them make that assessment.

16       Q.    Right.  But that's not -- but they don't need

17    to go to nursing school in order to make that

18    assessment?

19       A.    Not on behaviors, no.

20       Q.    Thank you.

21             In the last paragraph you write that, "Unless

22    there are extreme circumstances, detainees will be

23    processed consistent with the order in which they

24    are admitted."  Is there anything that changes

25    between the time that you wrote this report and
```

Darrell Ross, PhD

```
1    today that would change your opinion that it's

2    first-in/first-out processing?

3        A.   Where are you at again, sir?

4        Q.   I'm the middle -- I'm sorry.  I'm at the last

5    line of the middle paragraph.

6        A.   Last line in the middle paragraph.

7        Q.   Yeah.

8        A.   Yes, that doesn't change.  My opinion hasn't

9    changed with that statement.

10       Q.   Okay.  Well, can you tell me -- give me an

11   example of an extreme circumstance which would

12   permit a departure from this sequence?

13       A.   This case.

14       Q.   Okay.

15       A.   When he became violent, that became a

16   departure.  Up until that time he was no problem.

17   So this case -- once Richardson took him out of the

18   cell, Mr. Ajibade, and he began to violently resist

19   the officers, that became a -- if you want -- your

20   language, coming from an unusual circumstance that

21   would require them to stop what they were doing and

22   attend to this particular detainee and his

23   behaviors.  This is a perfect example of that.

24       Q.   When did the violent resistance begin?

25       A.   Outside the officers' station when they
```

Darrell Ross, PhD

1    released him from cell 6.

2        Q.    Okay.  Can you tell me from your review of

3    the documents in this case and the video which

4    initial -- what was Mr. Ajibade's initial

5    demonstration of violent resistance?

6        A.    This would have been several minutes after he

7    was out of cell 6 when Officer Richardson and

8    Capers, particularly Officer Richardson, was trying

9    to communicate with him to sit in a chair, and at

10   that point in time he -- Mr. Ajibade became

11   agitated.  I have listed a whole host of things,

12   behaviors indicative of an officer to put them on

13   alert that he was uncooperative, his stance, his

14   body movements, his waving of the hands, the

15   clasping of the arms across the chest gave all the

16   contextual cues of an assault or impending assault

17   or fight or at least "I'm going to be uncooperative"

18   at the very minimum.  So at that point in time the

19   officer would form the impression and opinion that

20   he's not going to cooperate.

21       Q.    Okay.  Is it your -- is noncooperation in

22   your mind synonymous with violent resistance?

23       A.    It led to it.

24       Q.    How many intermediate steps are there between

25   this behavior you just described and violent

Darrell Ross, PhD

```
1    resistance, known cooperation and violent

2    resistance?

3      A.   There was none.  It went from that to

4    immediately violent resistance.

5      Q.   Okay.  And what was the -- what was the first

6    physical manifestation by Mr. Ajibade of his violent

7    resistance?

8      A.   Well, first he demonstrated his body posture

9    and body dynamics to an officer that he was not

10   going to cooperate.

11     Q.   Okay.

12     A.   Secondly, he jerked his hands away from the

13   officer -- from Officer Richardson and then began to

14   actively engage with the officers.

15     Q.   Okay.

16     A.   And when I say officers, Richardson, Vinson

17   and Capers.

18     Q.   Thank you.  When he -- when Mr. Ajibade, you

19   say, jerked away, can you show me just with your --

20   can you just show me with your arms or with your

21   body which -- how you characterize that jerking

22   away?

23     A.   He first threw his hands up and started

24   pulling away his arms this way.

25     Q.   Okay.
```

Darrell Ross, PhD

1      A.    And twisting his body to get away from the

2    officers.  In other words, suggesting and showing,

3    that I don't want you to touch me, that I'm prepared

4    to, perhaps in the officer's mind with that type of

5    behavior -- and we teach officers to engage with

6    you.  He just didn't put his hands down to his side

7    and just become passive or sit down.  He became

8    active.  He became agitated.  He became aggressive.

9      Q.    Okay.  So the twisting of his body at that

10   point --

11     A.    And the positioning of his hands and arms.

12     Q.    Okay.  Let's think of a -- let's try to come

13   up with some shorthand to describe -- to refer to

14   twisting of the --

15          MR. KUHLMAN:  I'm getting there.  Okay?

16          MR. PERKINS:  Well, I'm saying, we've got the

17     video.  I don't know why you're doing this.

18          MR. KUHLMAN:  Well --

19          MR. PERKINS:  Of course, but, I mean, we can

20     watch the video and he can explain his opinions.

21     I can call it up for you right now.

22          MR. KUHLMAN:  I want to look at the video in

23     just a second then.

24          MR. PERKINS:  Okay.

25          ///

Darrell Ross, PhD

```
 1   BY MR. KUHLMAN:

 2       Q.   Dr. Ross, in your -- several times today we

 3   have talked about Graham v Conner and we have talked

 4   about the Kinsley case; correct?

 5       A.   Well, at least Graham.

 6       Q.   Okay.  And I think you indicated that you

 7   have written -- you wrote an article shortly after

 8   the Kinsley opinion was published that drew from it

 9   information that would be helpful for risk

10   management or corrections officers' development of

11   policy and implementation of the policy; is that

12   correct?

13       A.   Yes, as well as a number of other things, but

14   I would agree with that.

15       Q.   Okay.  In fact, you mention the Kinsley case

16   in your opinion on page 15; correct?

17       A.   That's correct.

18       Q.   And you identify the factors there that you

19   say create the totality of -- or the totality of the

20   facts and circumstances confronted by the officer at

21   the moment; correct?

22       A.   Correct.

23       Q.   Okay.

24           MR. PERKINS:  Cameron, do you know Root said

25       that use of force leading up -- leading to this
```

Darrell Ross, PhD

1        incident were reasonable?  I'm just wondering if

2        you're wasting time.  I mean, I know you have

3        somewhere to be today.  You're about trying to

4        argue against qualified immunity on the use of

5        force.

6              MR. KUHLMAN:  I'm not arguing with you it's

7        qualified immunity on the use of force.  I'm

8        trying to understand how Dr. Ross's opinions

9        relate to one another.

10             MR. PERKINS:  Okay.

11             MR. KUHLMAN:  But I appreciate the help, Ben.

12             MR. PERKINS:  Okay.

13   BY MR. KUHLMAN:

14        Q.   Dr. Ross, you say on page 16, at the top of

15   page 16 --

16        A.   16?

17        Q.   Yes, sir.

18             Do you see where you write, "I emphasize to

19   pay attention to the pre-assault cues, behaviors,

20   actions, inactions and posturing"?  And the list

21   goes on body position, stance of the person, sudden

22   furtive movements, behaviors, arguing with an

23   officer, detainee agitation, charging at an officer,

24   threatening statements or lack of verbalization by

25   the detainee.

Darrell Ross, PhD

1      A.   I'm with you.

2      Q.   Okay.  Do you -- are those factors -- are

3   those cues in the Kingsley case or are those cues

4   something you have developed on your own?

5      A.   Well, behaviors would be part of the Kingsley

6   case in terms of that, but these -- these -- that

7   then flows into these pre-assault cues, contextual

8   cues as we would see in the jail or law enforcement.

9   These are all body dynamics suggesting for officers

10   being on high alert to increase their safety and as

11   I say to emphasize to pay attention.  So they're not

12   smacked spontaneously other or charged or kicked or

13   run over or a sundry of other things.

14        So these are all the types of things we teach

15   officers, as I say, in the training I provide for

16   them to cue into when you're talking to an

17   individual who may be one -- at one point compliant

18   and spontaneous all of a sudden and, based on these

19   factors, goes from 1 to 100 just that fast.  So you

20   have to be prepared for that.

21      Q.   And, again, these cues, can you put them with

22   one of the -- do they belong with any one factor in

23   particular from Kingsley?  You got the factors from

24   Kingsley numbered here 1 through 6, and then --

25      A.   We're back on 15 you mean?

Darrell Ross, PhD

```
 1      Q.   I'm trying to refer at the same time to
 2   bottom of 15 and top of 16.
 3      A.   Well, it would relate to the perception of
 4   the officer.  It would relate to Number 4, the
 5   suspect posed an immediate threat.  These are all
 6   threatening cues of preemptive types of behaviors
 7   that could flow into actively resistance, okay,
 8   which is Number 5, and Number 6 which is attempting
 9   to evade seizure by flight.  You can't read into the
10   intent of someone's mind, the suspect or arrestee or
11   detainee.  So you have to be cognizant of those
12   facts.
13          Then it flows into the others I have listed
14   there, A through whatever it is, D.  Environment has
15   to be looked at in case -- here we have a jail.
16   Weapons or potential weapons, prisoners always have
17   weapons.
18      Q.   So, again, these -- your cues are things you
19   have developed in light of what you read in the
20   case; correct?
21      A.   These are from -- yes, and my studies -- for
22   example, which we talked about earlier, my
23   dissertation on citizen resistance, what I studied,
24   the types of behaviors that flows with Graham v
25   Connor's actively resisting.  What are those
```

Darrell Ross, PhD

```
1    behaviors as well as what the FBI's developed, what

2    other trainers have developed over the years and

3    what I have researched and studies both in looking

4    at instances in corrections and on the street.

5        Q.   Okay.

6        A.   Law enforcement officers.

7        Q.   Can you turn with me to page 23 of your

8    report?

9        A.   Okay.

10       Q.   Bottom paragraph there.  I'm going to ask you

11   about the second sentence.  "Corporal Evans as the

12   supervisor," beginning there.  Do you see where I

13   am?

14       A.   Yes.

15       Q.   Okay.  Is it accurate to say that from your

16   opinion is that Corporal Evans knew she was supposed

17   to be doing the checks but she didn't do the checks?

18       A.   Correct.

19       Q.   Okay.  What confuses me is that you then go

20   on to say that Lieutenant Johnson did not abdicate

21   her supervisory function during this period.  Is

22   that -- is that conclusion premised on some evidence

23   that Lieutenant Johnson did not know that Corporal

24   Evans was not doing the checks?

25       A.   On some evidence?
```

Darrell Ross, PhD

```
 1              MR. PERKINS:  Object to form.

 2   BY MR. KUHLMAN:

 3       Q.   Well, Lieutenant Johnson has a responsibility

 4   to supervise Corporal Evans; correct?

 5       A.   Correct.

 6       Q.   Okay.  And Corporal Evans has a

 7   responsibility to do the checks; correct?

 8       A.   Correct.

 9       Q.   Okay.  So if Corporal Evans doesn't do the

10   checks, doesn't that fall back to Lieutenant

11   Johnson?

12       A.   No.

13       Q.   Why not?

14       A.   Because the policy directs the officer to do

15   the checks.  The lieutenant or the supervisor can't

16   be with somebody 100 percent of the time.  So you're

17   here today.  What's your supervisor doing back at

18   your office?  Are you responsible or is he

19   responsible for you?  He's not here.

20              So what I'm saying is, everyone, that I read

21   in all of the 5,000 pages went through basic

22   academy, went through all the policies and

23   procedures, their CTO program or FTO program, was

24   trained has been chronically trained testified, they

25   knew the policies, testified they knew the
```

Darrell Ross, PhD

1   responsibility.  And in this case Evans failed to do

2   her responsibility.  That's not Johnson's

3   responsibility or her fault.  That's her fault to

4   not fulfill -- Evans, to fulfill her training and

5   policy based on the circumstances of this case.

6       Q.   So what were Lieutenant Johnson's

7   responsibilities then?

8       A.   At what time?

9       Q.   On -- from the time at which Mr. Ajibade is

10  in the chair until he's later found at approximately

11  1:30?

12      A.   Well, she articulated she started gathering

13  reports and started to talk to involved officers at

14  some point in time to try to get somewhat of a

15  handle what was going on and had attended to

16  Sergeant Roland and EMS that was attending to her

17  and transporting her ultimately out of the facility

18  to the hospital and trying to get a handle on what

19  was going on at this time.  So she was responsible

20  for that and not for the individual oversight of

21  shadowing a person -- I mean, there is 20 officers

22  there that evening.  She's not -- she can't be with

23  every one of these officers, in particular when they

24  know their job, and they have testified they know

25  their job.

Darrell Ross, PhD

1      Q.   Well, you introduced an interesting

2      hypothetical a few moments ago when you asked about

3      what my supervisor was doing back at the office

4      while I was down here.  I think you would agree with

5      me that my supervisor, to the extent I have a

6      supervisor, could check on me either by phone or by

7      e-mail throughout the day without necessarily -- and

8      not necessarily have to shadow me or be right

9      sitting in this chair to have some idea of whether

10     or not I was or was not completing a task for which

11     I was responsible at that time; correct?

12     A.   Correct.

13     Q.   Okay.  Is there any evidence that you

14     reviewed in this case that supports a conclusion

15     that Lieutenant Johnson checked with Corporal Evans

16     whether she was doing the checks?

17     A.   I think there is, but I don't think there's

18     any evidence contrary that she didn't.

19     Q.   Just the first part of the question.

20     A.   No.  That's my answer.

21     Q.   Well --

22     A.   That's my answer.

23     Q.   Okay.

24     A.   I'm standing by it.  I'm not changing it.

25     Now, you can ask a different question if you would

Darrell Ross, PhD

```
1    like, but that's my response to your question.
2       Q.   Do your answers to the questions I'm -- would
3    the answers to my questions that I have been asking
4    you today, are they fixed or would they change if
5    there was new evidence introduced?
6       A.   I'm always open to looking at new evidence.
7       Q.   Okay.  So if --
8       A.   As I reported on my report, these are
9    preliminary opinions.
10      Q.   Well, I appreciate that, and so I'm asking
11   you whether or not if there was evidence or some
12   indication in the record that Lieutenant Johnson did
13   not check with Corporal Evans whether she was doing
14   the checks, would that change your opinion about
15   whether or not Lieutenant Johnson abdicated her
16   supervisory responsibility?
17      A.   Absolutely not.
18      Q.   It wouldn't change your opinion?
19      A.   No.  No.
20      Q.   So it doesn't matter whether or not
21   Lieutenant Johnson checked with Corporal Evans
22   whether she was making the checks?
23      A.   No, it doesn't.  Corporal Evans had her duty
24   to do it, and she didn't do it.  While Lieutenant
25   Johnson is attending to totally a sundry of other
```

Darrell Ross, PhD

```
1    items to deal with that's involved in this case or

2    other issues that have come up.

3            MR. PERKINS:  I think you may have only 45

4       minutes left just because of the firm closing.

5            MR. KUHLMAN:  Okay.  Let's take -- how long

6       have we been going?  Do you want to take five

7       minutes here and let me see if I can --

8            MR. PERKINS:  Sure.

9            MR. KUHLMAN:  -- come to some more deliberate

10      speed?

11           MR. PERKINS:  Sure.

12    (A recess was taken from 4:10 p.m. until 4:22 p.m.)

13           MR. KUHLMAN:  We'll go back on.

14                        - - -

15           (Exhibit 12, Expert Witness Disclosure of

16    Darrell C. Ross, PhD, was marked for identification.)

17                        - - -

18    BY MR. KUHLMAN:

19      Q.   Dr. Ross, we just took another break, but I

20      want to show you what we have marked as Ross 12.  Is

21      that a copy of the report you have given in this

22      case, along with your CV?

23      A.   Okay.  The report appears to be in order

24      there.  Yes, sir, it appears to be in order here.

25      Q.   Thank you.  Sitting here today -- it's been
```

Darrell Ross, PhD

```
 1    some weeks I suppose since you drafted the report.
 2    Are there any typographical errors or other larger
 3    issues that you would like to identify and correct
 4    here on the record today?
 5      A.   Yes.  We mentioned -- what did you say, 12?
 6           Page 14.  I think that's right.  It should
 7    be -- page 14, last paragraph, fifth sentence down,
 8    Item D should be Cahall instead of Capers.  Do you
 9    want me to go ahead and write that in?
10      Q.   Sure.
11      A.   Cahall.  And I think that's it.  Right.
12           MR. PERKINS:  It's on page 14.  The
13    handwriting on page 14 of Exhibit 12 is your
14    handwriting?
15           THE WITNESS:  Correct.
16           MR. PERKINS:  Okay.
17    BY MR. KUHLMAN:
18      Q.   Were there any other --
19      A.   I think that's it, to the best of my
20    recollection.  Yes.
21      Q.   While I'm thinking about it, do you recall
22    the approximate date when you wrote your first draft
23    of this report or sat down as you described earlier
24    with a fresh sheet of paper and wrote the report in
25    the Ajibade case?
```

Darrell Ross, PhD

```
 1     A.    Roughly.  So it would have been about four or

 2     five days prior.  So about August 5th, 4th, 3rd,

 3     somewhere in there.

 4     Q.    Okay.  A little more housekeeping on page 13,

 5     which is right where the edit you made, in

 6     approximately the dead middle of the page, you

 7     refer -- you say the issue is, "Whether the officers

 8     initiated the process..."

 9           Do you see where I am?

10     A.    Yes.

11     Q.    Okay. "...in a timely and reasonable period

12     given the numerous variables impacting the

13     facility," et cetera.

14     A.    Correct.

15     Q.    Based on your review of the records in this

16     case, if you have it to say, wouldn't -- how

17     would -- what would have constituted a timely and

18     reasonable initiation of the process?

19     A.    You mean a period of time?

20     Q.    Yes, sir.

21     A.    No more than what was happening in the case.

22     Q.    So the time at which the officers made the

23     decision to take Mr. Ajibade out of the holding cell

24     to be processed, that was the ideal time for that to

25     occur?
```

Darrell Ross, PhD

1     A.   Correct.

2     Q.   Okay.  And I assume that -- is it fair to say

3     that that's based on the factors that you have

4     identified here, the numerous variables impacting

5     the facility?  Would that be the population, the

6     number of folks coming in the door, the staff

7     available?  Are these the factors that you would

8     identify?

9     A.   Yes, and their duties that they are

10    performing in concert for their assignment and the

11    detainees that were already in the queue ahead of

12    Mr. Ajibade.

13    Q.   Okay.  Turning to page 27 of your report,

14    this -- again, I don't want to throw you off here,

15    but this is under your second opinion.  The heading

16    for your second opinion appears two pages earlier on

17    25.  It says, "Administrators of CCSO have provided

18    their officers with training commensurate with their

19    correctional duties."  I want you to look at 27.

20    I'm just trying to give you some orientation for

21    what portion of the report we're in.

22         You have got some reasons enumerated here.

23    I'm talking about the paragraph that begins,

24    "Eighth, by practice."  You write in there that,

25    "The position of corporal and above were trained in

Darrell Ross, PhD

1     the TASER and trained to authorize the use of the

2     TASER.  The TASER was retained in a lockbox and was

3     not routinely carried as part of the officer's

4     uniform."

5          Do you see that portion?

6     A.   Yes.

7     Q.   And you're relying there on the deposition

8     testimony of former jail administrator Gilberg;

9     correct?

10    A.   Correct.

11    Q.   Okay.  If -- I want you to assume for a

12    second that there were additional facts and those

13    additional facts were somewhat different than the

14    facts you have got here, namely that the TASERs on

15    the units were not retained in a lockbox and that it

16    was routinely carried not as part of a uniform but

17    routinely carried around the unit.  If those two

18    facts were true -- and I'm not saying whether they

19    are or aren't.  I'm just asking you to assume for a

20    second that they are true.  Would that change your

21    opinion about the appropriateness of the use of the

22    TASER within this particular facility?

23    A.   No.

24    Q.   Why not?

25    A.   It just wouldn't.

Darrell Ross, PhD

1      Q.   Okay.  What facts would change your opinion?

2    What characterization of the use of the TASER would

3    you find inappropriate in a facility such as Chatham

4    County Sheriff's Office?

5      A.   The use of the TASER?

6      Q.   No.

7      A.   You said use.  That's why I'm clarifying.

8      Q.   I'm asking you about the atmospheric

9    circumstances, how the TASER is stored, where the

10   TASER is stored, who has access to it, whether its

11   training is required in order to be able to touch

12   the TASER, whether or not there are -- you have to

13   make some showing of need for it with a supervisor,

14   these sorts of -- these are the factors that I'm

15   suggesting.

16        Can you identify -- can you describe an

17   atmosphere in which you would find that the -- an

18   atmosphere which was inadequate or created dangerous

19   conditions for detainees that involves a TASER?

20     A.   No, I cannot off the top of my head.

21     Q.   Okay.  In your -- in your opinion, then, if

22   each officer on a unit had a TASER on his or her

23   belt and could deploy that TASER at a moment's

24   notice, that would be fine?

25     A.   That would be fine.  It happens on the street

Darrell Ross, PhD

1    all the time.

2        Q.   Okay.  And so that's your opinion in this

3    case based on what you know about Chatham County

4    Sheriff's Office and that detention center, that it

5    would be appropriate for each deputy or corrections

6    officer to be carrying a TASER on the belt and

7    deploy it without any reference to a supervising

8    officer?

9        A.   I don't have a problem with it, but they have

10   a much more restrictive policy than that.  So my

11   opinion is agreeing -- I have no problems with them

12   carrying handcuffs or any pepper spray and/or TASER,

13   every one of them.

14       Q.   Okay.  Is there any -- is there any OC spray

15   or pepper spray issue in this case that you've

16   identified?

17       A.   No.  But I'm just saying in terms of having

18   available resources to me, it's much better to have

19   it when I need it than to wait 30 seconds or ten

20   minutes later when I'm getting the stuff knocked out

21   of me, so...

22       Q.   Okay.

23       A.   But I find no fault in the policy for what

24   they restricted.  My own personal opinion, if I was

25   a sheriff, I would have let everybody, as long as

Darrell Ross, PhD

1    they're trained and follow policy.

2    Q.   Okay.  You identify on page 28 the last

3    paragraph -- the last full paragraph on the page,

4    "In my opinion, a concern about the application of

5    the TASER did not emerge until further review of the

6    TASER occurred in May of 2015."

7         Do you see that part?

8    A.   Yes.

9    Q.   Why is it in your opinion that no concern

10   emerged until May of 2015?

11   A.   Because that's what the officer -- that's

12   what the sheriff, Gilberg, Smith, Harris all

13   testified to in the collective testimony.  They --

14   in response to questions asked of them in their

15   depositions saw no problems prior to this incident,

16   and it only became apparent to them after the

17   incident when they began to investigate more and

18   more cases, and that's after this incident.  So up

19   until that incident and from -- let's even go back.

20   As I recall my recollection of reading materials, I

21   started to authorize the use of the TASER in 2001.

22   So 2001 up until this point in time, which is early

23   2015, January, none of the administrators saw any

24   problems with the use of the TASER.

25   Q.   Okay.  I have two questions about that.  One,

Darrell Ross, PhD

1    if the TASER had been -- I think I know the answer

2    based on what you said a minute ago, but I want to

3    confirm.

4         If the TASER had, in fact, been used as much

5    as they discovered that it had been being used in

6    2015 -- the discovery was in May of 2015, but the

7    discovery was of uses of the TASER prior to

8    Mr. Ajibade's death; correct?

9    A.   Correct.

10   Q.   Okay.  If they -- if you had --

11   A.   Well, let me --

12   Q.   Go ahead.

13   A.   And there was some after his death.

14   Q.   Fair point.  But it's not that there were all

15   of the uses of the TASER that were discovered on

16   May of 2015 were somehow compressed into the week

17   before May of 2015.  There was a lag in the

18   discovery of this data; correct?

19   A.   A lag in discovery.

20   Q.   Yes.  So if in November or December of 2014

21   you had been in the facility and been aware of the

22   amount or the frequency of the use of the TASER as

23   later discovered, you wouldn't have had a problem

24   with that?

25   A.   No, because it was very, very low.  It was

Darrell Ross, PhD

1    like 22 or 23.

2        Q.   Right.  So it doesn't -- where do you get

3    that 22 or 23 from?

4        A.   From the -- from Sheriff Wilcher, Harris and

5    Smith and Gilberg's testimony.

6        Q.   Okay.  So that wouldn't have been -- that

7    wouldn't have been a problem.  And it's -- and is it

8    your opinion in this case that even if those three

9    folks that you just mentioned, Harris, Wilcher and

10   Gilberg -- or Harris, Wilcher, Gilberg and the

11   sheriff --

12       A.   Four.

13       Q.   Four.  It didn't matter that they didn't know

14   about it until May of 2015 because even if they had

15   known about it in November or December or

16   December leading up to it, it would have been fine?

17          MR. PERKINS:  Object to form.

18   BY MR. KUHLMAN:

19       Q.   Do you understand the question?

20       A.   I don't know what they're -- yeah.  I'm

21   struggling with it.  That's why I'm pausing.  I'm

22   not sure what their knowledge was at the time in

23   terms of saying whether it's fine or not.

24       Q.   Well, I think that the record suggests they

25   didn't know about it.  I think that's --

Darrell Ross, PhD

```
1       A.   I would agree with that.

2       Q.   Yes.  But I'm asking you to assume that had

3    they known about it.  You're saying it wouldn't have

4    been a problem because it was all appropriate?

5       A.   Correct.

6       Q.   Okay.

7            MR. PERKINS:  Object to form.

8    BY MR. KUHLMAN:

9       Q.   Do you guys want to go off the record?

10      A.   Well, I would like you to clarify that it was

11    all appropriate, the last portion of your statement.

12   BY MR. KUHLMAN:

13      Q.   Do you disagree with the sheriff's statement

14    as published in a newspaper article that the TASER

15    was being used too much?

16      A.   No, I do not agree with that.

17      Q.   Okay.  Do you -- so my question, then, was

18    that the -- was -- when I said appropriate, I meant

19    the frequency of the use of the TASER.

20      A.   Okay.  I would agree with that, the

21    frequency, yes.

22      Q.   Was appropriate?

23      A.   Yes, sir.

24      Q.   Okay.  Did you identify in your review of

25    those incidences which came up in the May 15 -- I
```

Darrell Ross, PhD

```
1    don't know if you want to call it investigation.

2    The discovery, if you will.  Did you have any

3    problems with those individual uses of force

4    incidences, those incidences?

5       A.   From reviewing those, there may be one or two

6    in terms of the actual application of the TASER to

7    have to go back and look, but what I had issue of

8    was not reporting the use of the TASER.  I think

9    that was the focus of the concern.

10      Q.   Can you say that one more time?  I'm sorry.

11      A.   What I said was I would have to go back and

12   look at those individually, those cases, but my

13   general impression was that there were several

14   cases.  The use may have been appropriate, going to

15   your question, but what I found more concerning, as

16   well as the investigators, was not reporting the use

17   of the TASER.

18      Q.   Because --

19      A.   Failing to report.

20      Q.   Because, again, on this theme that we have

21   been discussing all day, the supervisor's ability to

22   make policy or to implement policy is only as good

23   as their ability to understand what they -- the data

24   that they have received.  If they don't receive the

25   data, they can't effectively supervise; correct?
```

Darrell Ross, PhD

```
 1      A.   Well, I wouldn't -- no, I don't agree with --
 2   you can supervise people well without data.  What
 3   I'm saying is you can't supervise people who
 4   blatantly disregard policy and you don't know about
 5   it until later down the road.  That's what's
 6   problematic.
 7      Q.   Right.  So in this example, the data that I
 8   was referring to would have been the evidence of the
 9   instances in which folks were blatantly disregarding
10   policy.  So if you don't have that knowledge, you
11   can't address it because you don't know about it.
12      A.   Right.
13      Q.   Okay.  This, as we get into the evening here,
14   this is --
15           MR. KUHLMAN:  Mark this as 13.
16                       - - -
17           (Exhibit 13, Article titled "Examining Kingsley
18   v Hendrickson:  Ending the Twilight Zone," was marked
19   for identification.)
20                       - - -
21   BY MR. KUHLMAN:
22      Q.   We have been talking -- we referenced this
23   article a couple of times, I think.  This is "titled
24   Kingsley vs Hendrickson:  Ending the Twilight Zone."
25   Is this the copy, to the best of your knowledge, of
```

Darrell Ross, PhD

1      the article that you wrote and have referred --

2      referenced in your opinions here today and in your

3      report?

4          A.   It appears to be, yes.

5                            - - -

6          (Exhibit P-88, Uses of TASERs on Restrained

7      Detainees Spreadsheet, was previously marked for

8      identification.)

9                            - - -

10     BY MR. KUHLMAN:

11         Q.   Okay.  I'm going to show you what what's been

12     premarked as P-88.

13         A.   Did you want me to do something with that

14     article?

15         Q.   I don't.  We have talked about it before.  I

16     would like to have a copy attached to the record.

17     So I just want to make sure we have a true and

18     accurate copy of it.

19             This is P-88.  This is -- the title, "Uses of

20     TASERs on Restrained Detainees."  Forgive me.  It's

21     a spreadsheet that seems to be printed which never

22     seems to go well, but looking over this document,

23     can you tell me whether or not you relied on or

24     reviewed this document in reaching the opinions that

25     you express in your report and have discussed today?

Darrell Ross, PhD

```
 1        A.    I reviewed it.

 2        Q.    Okay.  Did it inform your opinions?

 3        A.    No.

 4        Q.    Why not?

 5        A.    Because all I have is dates with officers'

 6   names, with inmates' names, with a field about

 7   restraint device inmate, injury.  There's no

 8   content.  There's no correlation to a report,

 9   incident, investigation, circumstance, situation, et

10   cetera, et cetera.

11        Q.    Okay.  I think you --

12        A.    It's just a listing, like an Excel sheet.

13        Q.    Is this -- is this the spreadsheet or the

14   report that you refer to in your report as having to

15   be -- I think you characterized it as having

16   withdrawn, been withdrawn?

17        A.    What page?

18        Q.    Well, just bear with me a second.  I

19   apologize.

20             On page 29 referring to the testimony of

21   former jail administrator Gilberg in the middle of

22   that --

23        A.    Sure.  I see it.

24        Q.    The report had to be retracted.  Do you know

25   what report he's referring to?
```

Darrell Ross, PhD

```
 1        A.   I think the Post story or investigation that

 2   was contained in the IA because there was confusion

 3   about what this really meant at first blush it

 4   appeared that we had roughly whatever the number is,

 5   roughly 600 --

 6             MR. PERKINS:  You're referring to P-88?

 7             THE WITNESS:  P-88, yes.

 8             MR. PERKINS:  Go ahead.

 9             THE WITNESS:  And that, holy crap, 600.  You

10        know, it was astonishing for them that, no, a

11        TASER was just there, not deployed.  That's what

12        became retracted and gave a different account and

13        version of what actually occurred.

14   BY MR. KUHLMAN:

15        Q.   Okay.  The Washington Post, as far as you

16   know, hasn't issued a retraction of the statements

17   of the sheriff that it published?

18        A.   I have no idea.

19        Q.   Okay.  But I am just clearing up you said

20   earlier you thought it might have been The

21   Washington Post retracted.  Is this the document

22   that was retracted?

23        A.   I have idea.

24        Q.   Okay.

25        A.   This is not a report.  This is just a listing
```

Darrell Ross, PhD

```
 1      of instances.

 2      Q.   I understand that.  Did you review the

 3      testimony of now Sheriff Wilcher who's the nominal

 4      defendant in this case?

 5      A.   Yes, sir.

 6      Q.   Okay.  And you write in your report that he

 7      testified that -- I'm on page 30 here -- the bottom

 8      of that paragraph right before you got the heading

 9      that says "Opinion."

10      A.   Correct.

11      Q.   You say that, "There will always be an

12      alleged wrongful death in the jail as long as you

13      have inmates in there."  That's -- that's just you

14      summarizing the testimony of Sheriff Wilcher;

15      correct?

16      A.   That's his statement, and I referenced the

17      pages where it came from.  I would have to go back

18      and look at the specific page, but that's what he

19      stated in his response to a question.

20      Q.   Right.  Did you -- did you -- do you recall

21      from that -- from that -- your review of that

22      transcript that there was an exhibit that was being

23      asked about in the context of this wrongful death

24      characterization?

25      A.   That there was an exhibit?
```

Darrell Ross, PhD

```
1      Q.   Yeah.  That --

2      A.   Not that I recall.

3      Q.   Okay.  Would you like -- would you like to

4   look at a copy of Sheriff Wilcher's deposition to --

5   or do you want me to just --

6      A.   Whatever you want me to do.

7           MR. KUHLMAN:  Ben, do you have a copy there

8      handy?

9           MR. PERKINS:  Of what?

10          MR. KUHLMAN:  Wilcher's transcript.

11          MR. PERKINS:  No.

12          MR. KUHLMAN:  Okay.

13  BY MR. KUHLMAN:

14     Q.   Are you aware that Sheriff Wilcher sought or

15  ran for office in the midst of this case?

16     A.   In the midst of this case?  I'm not sure when

17  he ran for office.

18     Q.   Sheriff Wilcher ran for office at some time

19  after Mathew Ajibade had passed away but prior to

20  today.

21     A.   Okay.

22     Q.   Can you agree with that much?

23     A.   I'm taking your word for it.

24     Q.   Okay.  So you don't -- you don't recall

25  reading about statements that Sheriff Wilcher -- in
```

Darrell Ross, PhD

```
 1     his transcript you don't recall reading those

 2     portions of his transcript where he described --

 3     where there were questions about campaign materials

 4     and statements he made during the campaign about the

 5     way that the jail had been managed?

 6        A.   No.

 7        Q.   Okay.  Do you recall reviewing a management

 8     audit that was conducted of the facility prior to

 9     Mr. Ajibade's death?

10        A.   No.

11        Q.   Okay.  So that -- if there was -- if --

12     assume with me for a second that there was a

13     management audit which found disagreement among

14     folks at the sort of the administrative level just

15     underneath the sheriff and which created a

16     disruptive environment within the facility.  If that

17     was, in fact, true, would it -- would those be some

18     of the circumstances that we -- and I'm going all

19     the way back to the beginning of today where we

20     talked about how we have a break between policies at

21     the management level and getting to the

22     supervisor -- and, excuse me, getting to the line

23     officers, and we talked about this breakdown between

24     the top and the bottom.  Do you recall that --

25        A.   I have no idea what you're talking about.
```

Darrell Ross, PhD

```
1        Q.   Okay.  I feared you might.

2             If there was -- if there was a chaotic

3    management problem at the Chatham County detention

4    center in the months prior to Mr. Ajibade's death,

5    would those facts in any way change your opinion --

6    the opinions that you express today?

7        A.   Absolutely not.

8        Q.   Okay.  Do you know if there is a

9    statistically significant average number of

10   appropriate uses of TASER in sort of the national

11   data?  You did some math in your report about --

12       A.   Yes.

13       Q.   -- 20 times is okay or however many -- you

14   know, you did some math; right?

15       A.   Based on estimates that came from the

16   deposition testimony.

17       Q.   I understand that.  I'm asking you whether or

18   not there's -- you can point to some national

19   standards that compare to this, to the data that you

20   have in front of you here.

21       A.   Not in corrections there's not.

22       Q.   Okay.  In law -- outside -- in law

23   enforcement is there data?

24       A.   Axon keeps it.

25       Q.   I'm sorry?
```

Darrell Ross, PhD

```
1        A.    Axon, TASER International has all of that

2    data.

3        Q.    On the number of deployments?

4        A.    Absolutely.

5        Q.    Okay.  They just don't report it for

6    corrections environment or --

7        A.    Well, you would have to go through and -- I

8    don't think there's -- that I have not seen.  I have

9    not seen one that's, you know, separated out.  These

10   are all street law enforcement and corrections, but

11   they keep all track of -- they have a system where

12   they keep track of all trigger pulls and all uses

13   and applications of TASER that they have sold.

14       Q.    Okay.  Are you aware of anybody in the

15   literature or anybody in the academy that has

16   evaluated that data or done any analysis of TASER

17   data?

18       A.    Not that I'm aware of.  It would only be

19   published articles that looked at several

20   departments and not every department in the whole

21   United States that used TASER.

22       Q.    Okay.  Are you aware of warnings issued by

23   TASER International itself about the risks

24   associated with the use of its own devices?

25       A.    Yes.
```

Darrell Ross, PhD

```
1        Q.   Okay.  How do those warnings comport with the

2   conclusions in your report that TASER is largely

3   safe?

4        A.   I think they comport well.

5        Q.   Okay.  Did you compare the -- we have talked

6   about the adequacy of the policies at the Chatham

7   County Sheriff's Office; correct?

8        A.   Yes, sir.

9        Q.   Did you do any comparison of those policies

10  to -- you refer to the Georgia standards, correct,

11  in your report?

12       A.   Correct.

13       Q.   Okay.  Is there any sort of national

14  standards to which you would refer or is it a state

15  specific?

16       A.   State specific.

17       Q.   Okay.  And so those are the -- who is the

18  promulgating body for those state-specific

19  standards?

20       A.   The Georgia jail and adult detention centers.

21       Q.   Okay.  Is that an accrediting body?

22       A.   No, not that I know of.  Not that I'm aware

23  of.

24            MR. KUHLMAN:  Okay.  I am very close to being

25       finished.  If you will bear with me for just a
```

Darrell Ross, PhD

```
 1      minute.

 2            MR. PERKINS:  Take your time.

 3            MR. KUHLMAN:  I will --

 4            MR. PERKINS:  I did check.  You have a little

 5      more time.  I think they close at 5:30.  So I hate

 6      to tell you that, but I need to be up front with

 7      you as well since I asked.

 8            MR. KUHLMAN:  I appreciate it.  Thank you.

 9            MR. PERKINS:  You're welcome.

10            (Discussion off the record.)

11                        - - -

12            (Exhibit 14, 1/09/15 Memo Regarding TASER

13      Usage, was marked for identification.)

14                        - - -

15      BY MR. KUHLMAN:

16            Q.   Dr. Ross, I'm going to show you what we're

17      going to mark here as Ross 14.  This is an

18      interoffice correspondence dated January 9, 2015.

19      Do you recognize this memo?

20            A.   I read it, yes, sir.

21            Q.   Okay.  Did this memo in any way inform the

22      opinions that you formed in this case?

23            A.   Let's put it this way:  When you say

24      "informed," it helped clarify testimony in the

25      depositions.
```

Darrell Ross, PhD

1      Q.   How did it help clarify testimony in the

2   depositions?

3      A.   Because they kept referring to a memo, and I

4   didn't know where that memo was until, I don't know,

5   later on.  Somewhere I received a copy of this.

6      Q.   Okay.

7      A.   So like many depositions, when you don't have

8   all the exhibits of a particular individual's dep

9   and they refer to a memo, Exhibit 2 or a schematic

10   or a photo and you don't have it, it's like, okay,

11   that's good.  Everybody in the room knows about it,

12   but somebody's trying to read the record and has no

13   clue.

14      Q.   Are there any other transcripts that come to

15   mind right now that refer to documents which you

16   weren't able to --

17      A.   Not at this point.

18      Q.   -- get to?

19      A.   No.

20      Q.   Do you -- there's some kind of all caps

21   language here in the middle of the memo.

22      A.   I see.

23      Q.   Okay.  It says -- and then, I'm sorry, before

24   we talk about that, if you'll turn the page, there's

25   a second memo, interoffice correspondence that says,

Darrell Ross, PhD

```
 1      "This memo supersedes prior memo dated January 9."

 2      Do you recall reviewing this memo?

 3        A.   I think so.  I believe so.

 4        Q.   Okay.  So --

 5        A.   But I don't recall the third page that's

 6      connected to it.  I don't recall seeing that.  Now,

 7      you might -- with everything I reviewed, I just

 8      don't recall that particular third sheet, but I do

 9      recall these first two.

10        Q.   Can you tell me whether it's appropriate to

11      drive stun a detainee in full restraints?

12        A.   According to this memo or --

13        Q.   No.  According to your experience and

14      training.

15        A.   Oh, I think it's allowable, yes.  It's

16      authorized.

17        Q.   So why --

18        A.   Depending on their behaviors.

19        Q.   What behaviors would merit the drive stunning

20      of a detainee in full restraints?

21        A.   If they're head-butting you, if they're

22      trying to bite you.

23        Q.   How would a detainee in full restraints be

24      able to bite --

25        A.   Would you like me to show you?
```

Darrell Ross, PhD

```
 1       Q.   This is --

 2            MR. PERKINS:  When you say full restraints?

 3       What do you mean?

 4            MR. KUHLMAN:  Well --

 5            MR. PERKINS:  In a chair or what?

 6            MR. KUHLMAN:  Let's ask Dr. Ross to unpack

 7       it.

 8   BY MR. KUHLMAN:

 9       Q.   What do you mean when -- what do you hear --

10       referring back to our sort of --

11       A.   Yeah.  Well, you're answering it and showing

12       me Exhibit 14 in full restraints.  So full

13       restraints -- let's put it in -- we can put it in a

14       couple ways.  I already said I disagreed with the

15       memo about full restraints.  Chatham County has

16       determined for their own practice to restrict that,

17       which that's fine.  I have a different philosophy

18       about it.  So my understanding of full restraints is

19       what they're saying here is someone who is

20       controlled and restrained, hands behind their back

21       and legs shackled; correct?

22       Q.   Where do you see -- where are you reading

23       from?

24       A.   Well, that's what I'm learning from reading

25       from all the testimony.  That's how they define it.
```

Darrell Ross, PhD

```
 1    That's how Officer Gilberg, jail administrator,

 2    former jail administrator defined full restraints in

 3    his testimony.

 4       Q.   Right.  So I'm looking at -- I'm looking at

 5    the third page here where they have written that,

 6    "Full restraints mean a detainee's hands and feet

 7    are being restrained and restricted."

 8       A.   That's what I just said.  Yeah.  I would

 9    agree with that.

10       Q.   All right.  So that could be with handcuffs

11    and leg irons?

12       A.   Could be.

13       Q.   Okay.

14       A.   That's how I understand.  That's my

15    impression.  So that doesn't mean that the detainee

16    doesn't have other personal weapons at his disposal

17    to use.

18       Q.   Okay.  What --

19       A.   I have seen actually kicks with full

20    restraints on.

21       Q.   Okay.  Is it --

22       A.   I have seen detainees try to bite and

23    actually bite officers, because you have to be in

24    and around them and in close proximity.  So there's

25    nothing restricting the head.  The head is not
```

Darrell Ross, PhD

```
 1    secured, and so that's possible.  And I have seen it

 2    actually possible.  So, yeah.  My philosophy, yeah,

 3    a drive stun could be permitted in those situations.

 4        Q.   Okay.  I have just got one last series of

 5    questions here.  For you and I think we're -- we are

 6    going to be -- did you -- did you have any evidence

 7    that you reviewed in the record that would -- I'm

 8    showing today -- the policy -- the TASER policy

 9    changed prior to these -- between the effective date

10    of the policy that you reviewed and these memos in

11    January and February of '15?

12            MR. PERKINS:  Object to form.

13            THE WITNESS:  Did I see a change in the

14      policy?  No.  I didn't get a policy that was

15      changed.

16  BY MR. KUHLMAN:

17        Q.   Okay.  Earlier you told us about the case --

18    the one case involved officers hogtying a detainee

19    or an arrestee using battery cables; right?

20        A.   That's correct.  Jumper cables.

21        Q.   Jumper cables.  Excuse me.

22            And in that case you also said that that was

23    a case where you found that the officers had lied;

24    correct?

25        A.   Yes, sir.
```

Darrell Ross, PhD

```
 1      Q.   And that you identified as a problem;

 2   correct?

 3      A.   Correct.

 4      Q.   And lying isn't -- isn't appropriate or

 5   helpful in that environment; right?

 6      A.   Absolutely.

 7      Q.   All right.  So the sheriff -- let's talk

 8   about CCDC, for example.  The sheriff can't be

 9   everywhere; correct?

10      A.   Correct.

11      Q.   All right.  But, yet, he's ultimately

12   responsible for -- he or she is ultimately

13   responsible for what goes on inside his facility;

14   right?

15      A.   Well, that's debatable on that, but

16   generally, as long as we have got good direction.

17      Q.   Okay.

18      A.   So, I mean, I could go down a long path, but

19   generally --

20           MR. PERKINS:  Object to form to the extent it

21       calls for speculation.

22           MR. KUHLMAN:  Thank you.

23           THE WITNESS:  Yeah.  That's --

24   BY MR. KUHLMAN:

25      Q.   But because he can't be everywhere and yet he
```

Darrell Ross, PhD

```
 1    bears at least some responsibility for what goes on

 2    in his or her facility, he implements policies, as

 3    we have talked about before; right?

 4    A.   Yes, sir.

 5    Q.   And that policy is enforced through training?

 6    A.   Correct.

 7    Q.   And supervision?

 8    A.   Correct.

 9    Q.   And discipline?

10    A.   Correct.

11    Q.   Okay.  Now --

12    A.   And officers adhering to the policy and being

13    accountable.

14    Q.   Right.  And he's got to know -- he's got to

15    know whether or not the officers are adhering to the

16    policy in order to know whether or not they need

17    additional training or additional discipline?

18    A.   That's true.

19    Q.   Okay.  He can't effectively manage the

20    facility or the agency if he doesn't know what's

21    going on inside his own facility; correct?

22    A.   Correct.

23         MR. PERKINS:  Object to form.

24    BY MR. KUHLMAN:

25    Q.   All right.  In other words, just like you
```

Darrell Ross, PhD

```
 1    writing your articles as an academic or as a
 2    professor, you have got to have good data in order
 3    to have good conclusions, the sheriff has to have
 4    good data in order to develop and implement
 5    effective policies; correct?
 6        A.   Well, those are not mutually exclusive, and
 7    those are two apples and oranges, and that's not
 8    even associated.  I disagree with that.
 9        Q.   That it's -- that it's not a fair parallel to
10    say --
11        A.   I agree with that.  That's not a fair
12    parallel.
13        Q.   Okay.  Is the inputs and outputs -- strike
14    that.
15             If the sheriff isn't aware that deputies are
16    disregarding his written policy, then he can't
17    effectively change the policy or change the training
18    program; correct?
19        A.   I disagree.  But generally I would agree with
20    that, but there are parts that I disagree.
21        Q.   Well, if he didn't know about it, then he
22    wouldn't -- then assume for a second that he didn't
23    know that things were happening or that the policies
24    weren't being adhered to.  There would be no reason
25    to change the policy; correct?
```

Darrell Ross, PhD

```
1      A.   No.  That's not -- I do disagree with that.

2    I said, no, I don't agree with that.

3      Q.   What would be the reason to change the policy

4    if, from the sheriff's perspective, everything is as

5    it should be?

6      A.   A change in the law.  The Supreme Court comes

7    down with a case, just like you handed me my article

8    on Kingsley there, that should necessitate a policy.

9    If you're going to change a practice, that should

10   change a policy.  If we're going to get -- advent

11   new technology in the department, use a new device,

12   that should change policy.  So there's a lot of

13   things.  It's not just, as you're trying to lead me

14   down this path, of inappropriate behavior.  There's

15   all sorts of things that change policies.

16     Q.   I appreciate your anticipation of where we

17   might or might not be going, but let me just use a

18   little spatial model for just a second here to try

19   to move this along so we can all go home.

20          Those things -- the changes in the law that

21   you just described, let's say those come from the

22   top down to the sheriff and he's got to make changes

23   based on what he gets from that direction.  Okay?

24   That doesn't have anything to do with whether or not

25   the line officers are effectively adhering to the
```

Darrell Ross, PhD

```
 1    policy; correct?

 2       A.   No.  It will be.  It will ultimately, because

 3    the law changes performance.  One day I can not do a

 4    strip search and the Supreme Court says, "Thou shalt

 5    do a strip search."  So that's going to change how

 6    you do -- a corrections officer does on his

 7    day-to-day job.  Absolutely.

 8       Q.   Okay.  But the sheriff -- again, just to

 9    reiterate, the sheriff needs to know what's going on

10    with the line officers; correct?

11       A.   I would agree with that, and he gets

12    information from his supervisors.

13       Q.   Correct.  Thank you.

14            If an officer doesn't report an incident to a

15    supervisor, then it's reasonable to expect that that

16    incident, that knowledge is not going to then in

17    turn get to the sheriff; correct?

18       A.   Exactly.

19       Q.   Right.  So if the sheriff -- and then the

20    supervisors also don't know what's going on because

21    they're not hearing about it from the line officers;

22    right?  Correct?

23       A.   Correct, for an officer.

24       Q.   Okay.  And, therefore, if the officers -- if

25    officers lie, as they did in one of the two cases
```

Darrell Ross, PhD

1    you found in your entire career where there was

2    wrongdoing, that's going to interfere with the

3    supervisor's ability to get accurate data; correct?

4        A.   Now you're saying data.  You're mixing data

5    with supervisory responsibilities.

6        Q.   Okay.

7        A.   You can run in any organization without --

8    police organization really without data.  It's been

9    done many, many years.  When I think of data, I

10   think what you're -- if I'm understanding your

11   question, tracking incidents, recording the

12   percentage and number of times that we use a

13   particular technique -- I know a lot of departments

14   right now that don't collect data, and they run

15   their organization very efficiently.  So when you

16   say data, I would disagree with that.

17       Q.   Okay.  But if it's the responsibility of the

18   supervisor to report what the supervisor learns from

19   the line officers to the sheriff --

20       A.   Information I would say.

21       Q.   Information, okay.  If the line officers give

22   the supervisor wrong information, if the line

23   officers lie to the supervisor, then the supervisor

24   is not going to give correct information to the

25   sheriff; correct?

Darrell Ross, PhD

```
1     A.   Yeah.  That's logical.  Yeah.

2     Q.   Thank you.

3     A.   Yes.

4     Q.   And that breakdown is going to interfere with

5   the sheriff's ability to set effective policies.

6     A.   Not necessarily, no.

7     Q.   Does it cloud the sheriff's views in his own

8   facility?

9     A.   I don't think so.

10    Q.   The sheriff getting misinformation from the

11  line level up doesn't cloud his view of the way

12  things are in his facility?

13    A.   Now you're saying misinformation.  You said

14  no information.

15    Q.   I meant to say -- we're working from this --

16  these lies that are being told at the line level.

17  So that means the misinformation gets communicated

18  to the supervisors who then in turn pass it to the

19  sheriff.

20    A.   There's nothing he can do about it until he

21  learns the real truth of something.

22    Q.   Right.  Again, his ability to do anything,

23  the sheriff, I mean, is predicated on his ability to

24  receive truthful information; correct?

25    A.   No.  He can still do his job, but it would
```

Darrell Ross, PhD

```
 1    certainly help if he has reliable information.
 2    Q.   Okay.  He can effectively work with
 3    misinformation -- the misinformation is not going to
 4    interfere with his ability to effectively do his
 5    job?
 6    A.   It depends on -- I see sheriffs all the time
 7    function in a very efficient manner, but when they
 8    have -- even though they may not have full
 9    information, once they get full information, then,
10    yeah, it's incumbent upon them to investigate and
11    then let's get the true information so that we
12    can -- if there are changes that have to be made, we
13    would direct that.  We would approach that.  He
14    would change that.  He would or she would, as the
15    case may be.
16    Q.   Okay.  But, again, there's -- your review of
17    this -- of the facts that you have got, the facts
18    that you reviewed in order to form the opinions that
19    you have in this case, nowhere in that -- in that
20    data set -- is it fair to call that a data set, the
21    things that you relied on to form your opinions?
22    A.   I didn't look at data-generated numbers.
23    There was nothing that was produced in any of these
24    documents that generated numbers other than what was
25    estimated in deposition testimony by Gilberg,
```

Darrell Ross, PhD

```
 1    Wilcher, Harris and Smith.  And based on their

 2    estimates, that's the only numbers I actually

 3    assessed.

 4         So if you're asking me did I have some type

 5    of evidence or document that gave me numbers dating

 6    back longitudinally, I didn't see any of that.

 7    Q.   Okay.  But there's a set of information.

 8    Your reliance materials, right, that you used to

 9    formulate your opinions?

10    A.   Correct.

11    Q.   Okay.  Within the reliance materials, which

12    we have said several times today is about 5,000

13    pages and some videos, do you recall whether or not

14    there was evidence within those materials of

15    officers lying to their -- line officers lying to

16    supervisors as similar to the one case you

17    identified earlier today where you found a problem

18    with the officers?

19    A.   I saw two.

20    Q.   One of the two cases?

21    A.   Two cases.

22    Q.   Yes.

23    A.   Of lying.

24    Q.   There was lying -- excuse me.  There was

25    lying in both of -- in the two cases where you found
```

Darrell Ross, PhD

```
1    a problem in your entire career?

2    A.   You said in what I read in this case.   I

3    found two cases in this 5,000 pieces of evidence

4    that you asked --

5    Q.   Okay.

6    A.   -- did I find any evidence of cases where

7    people were lying.

8    Q.   Yes.

9    A.   And I saw two.

10   Q.   Okay.  And how is the lying that is in this

11   case different than the lying that you identified in

12   the hogtying with the jumper cables case?

13   A.   Lying is lying.  There was no difference.

14        MR. KUHLMAN:  Thank you.  Those are all the

15   questions I have for you at this time.

16        MR. PERKINS:  Eric, have you got any

17   questions?

18        MR. FRISCH:  No, I do not.  Thank you.

19        MR. PERKINS:  All right.  I have no

20   questions.  Thank you, everybody.  Have a good

21   evening.  Oh, reading and signing.

22        MR. KUHLMAN:  Can we agree that he'll remain

23   under oath until he reads and signs?  Would you

24   like to read and sign?

25        THE WITNESS:  Yes.
```

Darrell Ross, PhD

```
 1            MR. KUHLMAN:  It will save you the trouble of

 2      notarizing something.

 3            THE COURT REPORTER:  Do you need this typed

 4      up regular?

 5            MR. KUHLMAN:  Yes, that's fine.

 6            THE COURT REPORTER:  Would you like a copy?

 7            MR. PERKINS:  Yes.  I need a ptx and a PDF of

 8      the exhibits.

 9            (Whereupon, the deposition concluded at

10      5:12 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Darrell Ross, PhD

```
 1                    C E R T I F I C A T E

 2

 3           I, Tami Cline, Registered Merit Reporter,

 4      Certified Realtime Reporter, and Florida

 5      Professional Reporter, do hereby certify that,

 6      pursuant to notice, the deposition of DARRELL ROSS,

 7      PhD was duly taken on November 8, 2011, at 9:53 a.m.

 8      before me.

 9           The said DARRELL ROSS, PhD was duly sworn by

10      me according to law to tell the truth, the whole

11      truth and nothing but the truth and thereupon did

12      testify as set forth in the above transcript of

13      testimony.  The testimony was taken down

14      stenographically by me.  I do further certify that

15      the above deposition is full, complete, and a true

16      record of all the testimony given by the said

17      witness.

18

19           _____

20           Tami Cline, RMR, CRR, FPR

21

22           (The foregoing certification of this

23      transcript does not apply to any reproduction of the

24      same by any means, unless under the direct control

25      and/or supervision of the certifying reporter.)
```

Darrell Ross, PhD

1                    INSTRUCTIONS TO WITNESS

2

3

4           Please read your deposition over carefully

5     and make any necessary corrections.  You should

6     state the reason in the appropriate space on the

7     errata sheet for any corrections that are made.

8

9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your

11    deposition.

12

13          It is imperative that you return the original

14    errata sheet to the deposing attorney within thirty

15    (30) days of receipt of the deposition transcript by

16    you.  If you fail to do so, the deposition

17    transcript may be deemed to be accurate and may be

18    used in court.

19

20

21

22

23

24

25

Darrell Ross, PhD

```
 1                      - - - - - -

 2                    E R R A T A

 3                      - - - - - -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6       REASON: _____

 7    _____  _____  _____

 8       REASON: _____

 9    _____  _____  _____

10       REASON: _____

11    _____  _____  _____

12       REASON: _____

13    _____  _____  _____

14       REASON: _____

15    _____  _____  _____

16       REASON: _____

17    _____  _____  _____

18       REASON: _____

19    _____  _____  _____

20       REASON: _____

21    _____  _____  _____

22       REASON: _____

23    _____  _____  _____

24       REASON: _____

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     to 271, and that the same is a correct transcription

 6     of the answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11

12     _____     _____

13     DARRELL ROSS, PhD                             DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     ____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

Darrell Ross, PhD

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```