Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

SOLOMAN OLUDAMISI AJIBADE and     )
ADENIKE HANNAH AJIBADE, as        )
natural parents of Mathew         )
Ajibade, and THE ESTATE OF        )
MATHEW AJIBADE and CHRIS          )
OLADAPO, its Executor,            )
                                  )
            Plaintiffs,           )
                                  )
        vs.                       )CIVIL ACTION NO.
                                  )
JOHN WILCHER, in his official     )4:16-CV-82-WTM-GRS
capacity as Chatham County        )
Sheriff, et al.,                  )
                                  )
            Defendants.           )
                                  )


DEPOSITION OF


LAMILES HILL



January 18, 2017

9:22 a.m.


Chatham County Attorney's Office

124 Bull Street

Savannah, Georgia


Annette Pacheco, RPR, RMR, CCR-B-2153

```
 1                  APPEARANCES OF COUNSEL
 2    On behalf of the Plaintiffs:
 3         WILLIAM F. CASH III, Esq.
           LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY
 4         & PROCTOR, P.A.
           316 South Baylen Street, Suite 600
 5         Pensacola, Florida  32502
           850-435-7163
 6         bcash@levinlaw.com
 7    On behalf of the Defendants Debra Johnson and Andreux
      Evans-Martinez:
 8
           BENJAMIN M. PERKINS, Esq.
 9         LAUREN E.H. MEADOWS, Esq.
           OLIVER MANER LLP
10         218 West State Street
           Savannah, Georgia  31401
11         912-236-3311
           bperkins@olivermaner.com
12         lmeadows@olivermaner.com
13    On behalf of the Defendants Corizon Health, Corizon,
      and Gregory Brown:
14
           EMILY C. WARD, Esq. (By telephone)
15         CARLOCK COPELAND & STAIR LLP
           191 Peachtree Street, NE, Suite 3600
16         Atlanta, Georgia  30303-1740
           404-522-8220
17         eward@carlockcopeland.com
18    On behalf of the Defendants Sheriff John Wilcher and
      the Chatham County Detention Center:
19
           R. JONATHAN HART, Esq.
20         JENNIFER R. BURNS, Esq.
           CHATHAM COUNTY ATTORNEY'S OFFICE
21         124 Bull Street
           Suite 240
22         Savannah, Georgia  31401
           912-652-7881
23         jburns@chathamcounty.org
24    Also Present:  Constance Cooper
25                          -  -  -
```

LaMiles Hill

Page 3

1                       INDEX TO EXHIBITS

2    Plaintiff's

3      Exhibit              Description              Page

4    Exhibit 1       Personnel file of LaMiles Hill      10

5    Exhibit 2       Listing of videos                   43

6    Exhibit 3       Training records - Hill, LaMiles     84

7    Exhibit 4       Employee Statement of Incident      118

8    Exhibit 5       Interoffice Correspondence
                     dated January 9, 2015, to
9                    All Staff from Major G. G.
                     Wilson                              119
10
     Exhibit 11C     Taser log                            71
11
     Exhibit 13      Taser CEW Warnings, Instructions
12                   and Information: Citizen            131

13   Exhibit 97      Taser log                            71

14   Exhibit J1-A    Map                                  66

15   Exhibit J3      Map                                  66

16

17

         (Original Exhibits 1 through 5, 11C, 13, 97,
18   J1-A and J3 have been attached to the original
     transcript.)
19

20

21

22   EXAMINATION

23       by Mr. Cash                                       4

24

25

LaMiles Hill

```
                                                   Page 4
 1              (Reporter disclosure made pursuant to
 2      Article 10.B. of the Rules and Regulations of the
 3      Board of Court Reporting of the Judicial Council of
 4      Georgia.)
 5                      LAMILES HILL,
 6      having been first duly sworn, was examined and
 7      testified as follows:
 8                      EXAMINATION
 9      BY MR. CASH:
10          Q.    All right.  You're LaMiles Hill?
11          A.    Yes.
12          Q.    Would you prefer to be called Captain Hill
13      or Mr. Hill?
14          A.    Whatever.  Whatever's comfortable with
15      you.
16          Q.    How about I call you Captain?
17          A.    Okay.
18          Q.    Okay.  I understand that you're currently
19      employed with the Chatham County Sheriff; is that
20      right?
21          A.    Yes.
22          Q.    And you hold the rank of captain?
23          A.    Yes.
24          Q.    And you were employed on January 1st and
25      2nd of 2015?
```

LaMiles Hill

Page 5

1      A.      Yes.

2      Q.      And those were the days that Mathew

3   Ajibade was in the CCSO?  The jail, rather?

4      A.      Yes.

5      Q.      And you're familiar generally with the

6   case involving Mr. Ajibade, including the events that

7   led up to his death?

8      A.      Yes.

9      Q.      And you're familiar that he walked into

10  the jail alive and died in one of those cells?

11     A.      Yes.

12     Q.      Did you have any interactions with

13  Mr. Ajibade during the time that he was present?

14     A.      No.

15     Q.      But you're familiar with the fact that

16  there are several other deputies who were involved

17  and you've reviewed some of the videos showing their

18  actions on that date?

19     A.      Yes.

20     Q.      What other involvement did you have with

21  Mr. Ajibade or the case surrounding the events that

22  occurred there?

23     A.      Other than pulling a video from the --

24  downloading a video, I didn't have any other

25  involvement with them.  But I was called to give

LaMiles Hill

Page 6

1    testimony in the Kenny case, in the actual criminal

2    case.  And it was basically in reference to some of

3    the training that they receive, which I wasn't there

4    with them, in Florida.

5        Q.    Right.

6        A.    So with the US C-SOG.  So that was pretty

7    much it.

8        Q.    And you did talk to internal affairs on

9    this case, too; right?  You gave a statement to --

10       A.    Yes.

11       Q.    -- Nicole Meyers and Warren Blanton?

12       A.    Oh, yes.  It was about the training.  We

13   were going to internal affairs.  I discussed the

14   training in Florida that I went to because I did not

15   go to the same exact one that Kenny went to.  So I

16   gave my accounts from the training that I went to,

17   yes.

18       Q.    Okay.  Have you ever given any deposition

19   testimony before?

20       A.    I think so, but I don't think -- I'm not

21   sure here with the county.  I can't remember.  I

22   can't remember here with the county.  I know I've

23   done it years ago in another civil matter.  Not here

24   with the county.  I'm not sure if I've done it with

25   the county or not, but I know I've done it in the

LaMiles Hill

Page 7

1  past with a civil matter.

2      Q.    Was it a domestic relations case?  Divorce

3  case?

4      A.    No.  It was a -- it was a case where a

5  woman got killed during a robbery out there at the

6  Wal-Mart on 17 before I even got into law

7  enforcement.

8      Q.    Okay.

9      A.    Yeah.  Her attorney -- I mean, the

10 family's attorney or Wal-Mart's attorney, I did a

11 deposition with them.

12     Q.    Okay.  Other than that, that's the only

13 time you think you've given a deposition?

14     A.    I can't be sure, but that's the only one

15 that comes into mind in a setup sort of like this

16 right here.

17     Q.    Right.  You've given trial testimony

18 before obviously?

19     A.    Right.

20     Q.    How many times would you say?

21     A.    One.

22     Q.    Okay.  Never testified at a criminal trial

23 for anybody else?

24     A.    No.

25     Q.    Okay.  Well, I understand that you had --

LaMiles Hill

Page 8

1    I hope you had a chance to meet with the county's

2    attorney and just go over the rules of the road for

3    depositions.

4         A.    Uh-huh.

5         Q.    But if you didn't, I'd just like to give

6    you a couple pointers.

7         A.    Okay.

8         Q.    The most important thing from my

9    perspective, and I would think from your perspective,

10   is that we communicate clearly in both directions.

11        A.    Uh-huh.

12        Q.    And the way this works is I ask a

13   question.  Some of these lawyers down at the table or

14   on the phone may want to object to that question.

15        A.    Okay.

16        Q.    And then after they object, generally go

17   ahead and give an answer unless we make it obvious

18   not to answer.  But they'd appreciate it if you'd

19   give them a second or two to make an objection before

20   you give an answer.

21        A.    Okay.

22        Q.    Our court reporter has already graciously

23   corrected us once not to step on each other's toes

24   when we talk.  I'm terrible at that and I will try to

25   do my best to make clear when I'm done with the

LaMiles Hill

Page 9

1    question and try not to interrupt you either.

2          A.    Okay.

3          Q.    If I ask you any question that is

4    ambiguous or that doesn't make sense or that you

5    don't understand, I would appreciate it if you would

6    just tell me that you don't understand my question.

7          A.    Okay.

8          Q.    It's probably my fault and I'll be glad to

9    rephrase that question.

10          Could we agree that if you go ahead and

11   answer a question and you didn't ask me to clarify

12   it, that you understood that question?

13         A.    Yes.

14         Q.    Okay.  All right.  We can also take breaks

15   any time you want.  I hope to be done by 12:30.

16         A.    Okay.

17         Q.    I think that would be generous, but, you

18   know, that's a long time.  We're not going to do this

19   in one stretch, for sure.  So I want to make sure you

20   get breaks and get a chance to collect yourself.

21         A.    Okay.

22         Q.    It's not a marathon or a pressure test.

23         A.    All right.

24         Q.    Okay.  I want you to know I've been given

25   some documents from the county that are supposed to

LaMiles Hill

Page 10

1    constitute your personnel record.

2         A.    Okay.

3         Q.    And I just wanted to mark this one and

4    have you take a look at it and see if this looks like

5    your personnel file.

6         A.    Okay.

7         Q.    So I will make this Exhibit Hill 1?

8         A.    Okay.

9               (Plaintiff's Exhibit 1 was marked for

10        identification.)

11        Q.    (By Mr. Cash) And that's a lot to read,

12   but if you'll just flip through it.

13        A.    Uh-huh.

14        Q.    Let me know if this is what you think is

15   your personnel file.  I will tell you that this does

16   not include all the training records that I was

17   provided.

18        A.    Okay.

19        Q.    Okay.

20        A.    I need to initial this?

21        Q.    No.  No.

22        A.    Oh, oh.  Okay.

23        Q.    You can just say, yeah, that looks like my

24   personnel file.

25        A.    Yes, this looks like my personnel file.

LaMiles Hill

Page 11

1     Q.    Okay.  And I'll tell you I read every page

2  of that and your training records and it appears that

3  you have an excellent record with the sheriff, which

4  is to be commended.

5         One thing I wanted to ask and I didn't see

6  it in there is if you'd ever been disciplined for any

7  reason while you're in the employ of the sheriff?

8     A.    Not to my knowledge.  Not to my, you know,

9  in my memory, no.

10    Q.    Okay.  And I'm not drawing for --

11    A.    I mean, what I'm saying is like nothing,

12 you know, where something was written or something

13 like that.  Maybe a supervisor, hey, you need to do

14 this different or something like that, but nothing

15 that I can think of that was a written document.

16    Q.    Okay.  You're saying there's no formal

17 written disciplinary action that you can remember.

18 Can you think of any formal unwritten disciplinary

19 action you've sustained?

20    A.    No.

21    Q.    Okay.  All right.  That's fine.  And

22 that's good to hear.

23    A.    Okay.

24    Q.    So from reading your record, I wanted to

25 make a little sketch of your biography partly for the

LaMiles Hill

Page 12

1    record here.

2         A.    Okay.

3         Q.    As I understand it, you graduated from

4    Savannah High School in 1995; is that right?

5         A.    Yes.

6         Q.    And it looks like you completed a year of

7    college?

8         A.    A little -- yeah, around a year.  The

9    first year, yeah.

10        Q.    All right.  I understand you were in the

11   Army from 1998 to 2002 when you completed with the

12   rank of sergeant?

13        A.    Yes.

14        Q.    You started with the sheriff about March

15   2004?

16        A.    Yes.

17        Q.    What led you to want to join the sheriff's

18   office?

19        A.    Just looking for a job.

20        Q.    All right.  Do you get any particular

21   rewards out of being part of the office?  Any

22   personal satisfaction or is there any motivating

23   factor why you picked this job versus something else?

24        A.    At the time, no.  I was just looking to

25   get into a career.  And that was it.  Something -- a

LaMiles Hill

Page 13

1   career.

2       Q.   All right.  I read that you got promoted

3   to corporal in 2008?

4       A.   Yes.

5       Q.   Is that right?

6       A.   Was it 2008 or '09?  Somewhere in that

7   time frame, yes.

8       Q.   All right.

9       A.   It was '08, 2008.

10      Q.   Okay.  You were the February 2010

11  corrections officer of the month?

12      A.   Unit 2?  Was I Unit 2 at the time?  You're

13  going back quite awhile.

14      Q.   Fair enough.

15      A.   Yeah.  Fair.

16      Q.   Okay.

17      A.   Yes.  I know I was corrections officer of

18  the month one time before, yes.

19      Q.   Okay.  I saw you were promoted to sergeant

20  in 2012 and lieutenant in August of 2014?

21      A.   Yes.

22      Q.   And that's the rank you held during the

23  Mathew Ajibade incident; is that right?

24      A.   Which one?

25      Q.   Lieutenant.

LaMiles Hill

Page 14

1       A.      Yeah.   It was either sergeant or
2    lieutenant.  I can't -- I can't quite remember where
3    I was at as far as my position at the time.  But it's
4    between one of those two, I know.
5       Q.      Okay.   Lieutenant's higher than sergeant;
6    right?  And I'm not -- I think it is.  Okay.  I don't
7    know my ranks that well myself.
8       A.      Yeah.
9       Q.      So let me ask you -- let me stop this
10   timeline here.  At the time that Mr. Ajibade was in
11   the facility January 2015, what were your duties at
12   that time?
13      A.      Wow.   At that time, '15, that time frame,
14   I was either -- I was either between -- there's only
15   two spots I would have been between.  That was either
16   in the intel -- well, not really.  At that time it
17   wasn't the intel area, or housing Unit 4 supervisor,
18   I want to say.  It was between one of those two
19   because I was either the sergeant or the lieutenant.
20   It's been such a long time, I can't quite -- at that
21   time frame, it's between one of those two areas.
22   That's the only place I've been during that time
23   frame that I can remember.
24      Q.      Could you expand that for me.  If you were
25   the lieutenant at that time --

LaMiles Hill

1     A.     If I was a lieutenant at that time over

2  housing Unit 4, I would have been the unit manager of

3  housing Unit 4.  Now, if I was in the intel section,

4  I would have been over -- like I was doing the

5  downloading the videos and getting that information

6  and everything and providing that information the to

7  security captain while in transition waiting for my

8  assignment to -- as a unit manager to another area.

9     Q.     Okay.

10    A.     So it was somewhere in that, you know what

11 I mean?  I'm going back January 2015.  It's between

12 those two -- those two areas where I was actually --

13 my duties were.

14    Q.     Okay.  First you said you were the unit

15 manager of housing Unit 4 at one point.

16    A.     That be would the lieutenant side.

17    Q.     Okay.

18    A.     That was where I went at after that

19 incident.  That's the lieutenant side.

20    Q.     Well, tell me about that.  What does that

21 mean to be the unit manager?

22    A.     Unit manager of Unit 4 would mean I would

23 have oversaw the supervision of the staff as well as

24 the inmates in the housing unit area, which at the

25 time would have put Unit 4 as the mental health dorm

LaMiles Hill

Page 16

1    area.  That's where I would have been supervising

2    somewhere between 25 and 30 staff.  Well, yeah, 20,

3    30 staff members and probably between a hundred and

4    maybe 60 -- about 150, maybe 200 inmates at the time.

5         Q.    Would every one of those inmates be

6    classified with mental health?

7         A.    No.  No.  We would have had one full dorm

8    of up to 56 mental health inmates.  Then another dorm

9    of about maybe 50 stepdown, not as severe mental

10   health inmates.  Then two dorms of general population

11   inmates.

12        Q.    Okay.  When you say "stepdown," you're

13   describing someone somewhere between mental health

14   and general population?

15        A.    Right.  Right.

16        Q.    Okay.  And what would your day-to-day

17   tasks look like?

18        A.    Day-to-day tasks would have looked like me

19   coming in and showing that I had adequate staff to

20   run the area.  Then I would have handled all the

21   paperwork as far as reviewing incident reports, use

22   of force reports, any complaints, staff or inmate

23   grievances, making sure -- ensuring that the

24   information was dealt with, and also for any security

25   concerns or anything to the security captain, watch

LaMiles Hill

Page 17

1    commander in the housing unit area, handling any

2    codes or signals that took place and transpired while

3    I was there in my unit also.

4        Q.    Okay.  All right.  Now, the other job you

5    described was doing intel.

6        A.    Right.

7        Q.    Did I say that right?

8        A.    Right.  That was -- that was -- under

9    that, I was at the -- worked primarily under the

10   security captain.  I went, reviewed cameras,

11   provided -- would download incidents, bring those

12   forward to the security captain.  Also, I would have

13   had an officer under me and our job would have been

14   downloading all the cameras' incidents for them.  We

15   handled the fire inspections and fire, you know, all

16   those inspections ensuring that everything was kept

17   up for fire code, for the fire marshal.  Also, that

18   was pretty much -- pretty much it right now.

19       Q.    Okay.  And, Captain, just so I have some

20   sense of the volume here, when you were doing that

21   work, how often would you have occasion to download

22   camera videos?

23       A.    Daily.

24       Q.    Every day?

25       A.    Daily.  We were -- there was always

LaMiles Hill

Page 18

1  something -- there's always something, a code or

2  signal, code or signal -- any code or signal pretty

3  much taking place in the complex, we had to download.

4      Q.    Okay.  And so if you were the one who

5  downloaded these videos for the Ajibade incident,

6  does that make it more likely, in your mind, that you

7  were doing the intel work or that you were the unit

8  manager?

9      A.    It -- well, what happened with that, that

10  morning, it was, the minute I got to work, I need the

11  video.  You know what I mean?  Even if I wasn't the

12  intel or the -- it was the first person the minute I

13  walked in the door because of the magnitude of what

14  took place --

15      Q.    Sure.

16      A.    -- it was -- they knew I knew how to get

17  it.  It was I need the video.  So I was basically --

18  like I'm telling you, as soon as I walked into work,

19  they saw me, they said, hey, we need you to get this

20  video.  So I was on it.

21      Q.    What time did you come to work?

22      A.    At work probably, back then, I would say,

23  because I normally between a 7:15, 7:25 person,

24  somewhere around that time when I walked in.

25      Q.    Okay.  Now, when you were told they needed

LaMiles Hill

Page 19

1    the video right away, was that the same day that

2    Mr. Ajibade died?

3         A.    Right.  When I came in, they needed -- I

4    was told they need the video.  GBI, the

5    investigators, they were already there on scene.  So

6    they wanted the video for, you know, for -- as far as

7    the investigation.  So I went straight to start

8    working on getting the video.

9              There was -- started download -- got in.

10   You know, first I had to research what time he came

11   in and everything and trying to find the initial when

12   he came in on the cameras and everything and start

13   right -- start getting times, time frames at first to

14   download it.

15             What initially took place was, there was

16   an initial attempt to download, like the --

17   everything in volume from the camera angles of when

18   he first came in.  But because there was so much

19   going -- because there was so much down, let's put it

20   that way, trying -- and the program was having a

21   problem downloading that data with so much activity

22   going on with that program at that time, that it

23   failed like twice.

24             So found that I could download some

25   shorter -- shorter versions for the initial, for

LaMiles Hill

Page 20

1    people to look at, you know.  So those shorter

2    versions were downloaded.  And then that -- later

3    that evening when all the activity slowed down as far

4    as people were getting off work, not as many people

5    logged onto the computer or the program, the big

6    download was taking -- was done so that -- because it

7    was going to take hours for it to download.  And when

8    everybody left work, that download was put into

9    activity, and it downloaded overnight, and the next

10   morning it was ready.

11        Q.    Okay.  So let me just recap and make sure

12   I understand.

13        A.    Uh-huh.

14        Q.    Mr. Ajibade died around 1:00 or 2:00 in

15   the morning on January 2nd of 2015.

16        A.    Uh-huh.

17        Q.    And then you came to work around seven,

18   between 7:00 and 8:00 the same day; right?

19        A.    I want to say it was, yeah, because I

20   think it was, what, it was New Year's Day or New

21   Year's Eve.  That was the --

22        Q.    He went in on New Year's Day.

23        A.    He went in on New Year's Day, which was

24   the --

25        Q.    The 1st.

LaMiles Hill

Page 21

1      A.    The 1st?

2      Q.    So he did not pass until after midnight on

3  the 2nd?

4      A.    On the 2nd.  So, yeah, we came back to

5  work the next day.  Because the next morning, I mean,

6  it was, yeah, everybody was all over the place.

7      Q.    Who told you that they needed the video?

8      A.    Honestly, I can't quite remember who

9  directed -- who specifically told me to download the

10  video, but I know when I came in, the first thing was

11  "Hill, we need the video."

12     Q.    Okay.

13     A.    I know that.  And I was sent right away to

14  go and start getting it.

15     Q.    This was an oral -- I'm sorry to interrupt

16  you.

17     A.    Yeah.

18     Q.    This was an oral command?

19     A.    An oral command; right.

20     Q.    Not anything in writing?

21     A.    No.

22     Q.    Or like a formal request was made?

23     A.    No.

24     Q.    You just show up and they needed it?

25     A.    Yeah.

LaMiles Hill

Page 22

1      Q.     And if I heard you right, you said that
2   you were able to make some smaller downloads, but
3   that you couldn't do the full download until people
4   got off the system and the day ended?
5      A.     Uh-huh.
6      Q.     Around about what time do you think you
7   made the longer download?
8      A.     The longer download had to start after
9   4:00.
10     Q.     P.M.?
11     A.     P.M., yeah.  The longer download had to
12  start after 4 p.m.  And it had to run pretty much
13  most of the night.  I don't know what time it
14  completed that night, but the next morning it was
15  ready.
16     Q.     Okay.
17     A.     Because it went through the issue of
18  downloading several times during the day and it
19  wouldn't work.
20     Q.     Now, when you made the longer downloads
21  that afternoon into that evening, are those the
22  downloads that you worked with from there on out or
23  did you make -- did you cut those downloads down or
24  make any edits or changes to those downloads?
25     A.     No.

LaMiles Hill

Page 23

1      Q.    All right.  I'm going to show you a list

2  of the videos that I have.

3      A.    Okay.

4      Q.    Basically this is a printout of the videos

5  that have been produced to me.  And the way I read

6  it -- and I'd love to get your interpretation on it.

7      A.    Uh-huh.

8      Q.    But as I read it, you have camera 116,

9  there's one cut, and then there's a separate cut from

10 that.  And these are two different time frames.

11     A.    Uh-huh.

12     Q.    And then like with 117, I've got six

13 different videos, and each one has a different sort

14 of subset to it.  So these are all from the same

15 camera, but they're not continuous in time.  And I

16 can show you how that appears to me.  I can show you

17 the videos, if that's what you want to look at.

18     A.    The one thing I can say on this right

19 here, there's no way of me knowing if that's the

20 specific version I downloaded.

21     Q.    That's what you're here to help me figure

22 out.

23     A.    Right.  And that's what I'm -- that's

24 where I'm going to have to -- there's no way of me

25 knowing if this was the specific actual one that --

LaMiles Hill

Page 24

1    you know, because I know other people downloaded

2    after I did.  So I don't know -- possibly downloaded

3    after me.

4         Q.    Okay.

5         A.    So I don't know.

6         Q.    Well, I'm going to circle back to that in

7    one second.

8         A.    Okay.

9         Q.    But let me point out -- I'm going to make

10   some times up if that's okay.

11        A.    Okay.

12        Q.    I'm going to say this first video is like

13   7 to 9 p.m.  And the next one is 10:15 to 10:25.

14        A.    Uh-huh.

15        Q.    And then the next one is 11:30 to

16   midnight.  There are pieces, there are time pieces

17   from that same camera where that camera has been

18   chopped up in time.

19        A.    Uh-huh.

20        Q.    Even if you don't know if you did these

21   videos --

22        A.    Uh-huh.

23        Q.    -- are you the person who ever made clips

24   of the videos to cut them out, you know, cut out

25   pieces from the continuous sequence of what was in

LaMiles Hill

Page 25

1   the cameras?

2        A.    If they were not a -- not to say cut out.

3   That's saying that, you know, you cut -- it wasn't

4   cut out.  Any video initially that I did all included

5   Ajibade.  You know what I mean?

6        Q.    Right.

7        A.    So if it was -- where he was, if those

8   videos -- that video followed him and his, you know,

9   him and his -- the whole -- his whole time right

10  there.  Now, anything that was -- you want -- like

11  you're saying right here with a cut.  Well, there

12  really -- this was done to get something to the GBI.

13  Any video that was -- or anything that anyone else

14  needed or wanted, it was available for them for at

15  least 21 days after the incident.  Those videos --

16  every camera back there, every one of these ones

17  listed right here for 21 days afterwards, the full

18  version was available.

19            So because it was even -- even when the

20  GBI was given -- and, see, that's the only copy that

21  I know is the one that I did was the one that I gave

22  the GBI agent.  So anything that they need -- I even

23  told them anything else you need, if you need more,

24  you know, you have up until at that time two days --

25  well, a day and a half hadn't went by.  So they

LaMiles Hill

Page 26

1   had -- well, about a day -- yeah, a day and a half

2   went by.  So you've got about 19 more days to get

3   anything else you need.  You know what I mean?

4         Q.    Just so I clearly establish this --

5         A.    Uh-huh.

6         Q.    -- you're saying that the videos last 21

7   days before they get --

8         A.    Looped, yes.

9         Q.    -- recorded over?

10        A.    Yes.

11        Q.    Let me come at the cut issue another way.

12  And by saying cut, I am not intending to imply that

13  anything important was deleted or that there's

14  anything negative about making the cut.  But we've

15  been advised that, you know, the volume of data

16  available is enormous, and that there are editorial

17  decisions that the person downloading the data makes

18  in order to decide which video actually is relevant

19  to the investigation.

20            Did you ever make any editorial decisions

21  about what to pull versus what not to pull?

22        A.    No.  Just follow his movements.  That was

23  basically -- that was -- follow the inmate's

24  movements and what happened while he was there.  Not

25  anything else.  When they say get the video, they say

LaMiles Hill

1   get the video.  They want to see everything he went

2   through while he was right there.  So that's what the

3   video should show, everything that happened while he

4   was in the facility.

5       Q.   Okay.  When you made the downloads that

6   you made --

7       A.   Uh-huh.

8       Q.   -- the night of January 2nd -- this is

9   after everybody else went home.  This is 4:00 at

10   night -- when you were making those downloads, were

11   you looking at the video that was available to ensure

12   that it was relevant to Mathew Ajibade or to the

13   deputies that interacted with him?

14      A.   Huh-uh.  Basically, what I -- basically,

15   actually, honestly and truly, when I was downloading

16   those videos, I wasn't even fully, you know, like

17   looking to see did this happen, did this happen.  It

18   was, okay, time start.  He gets -- here's the police

19   where they bring him in through the sallyport.  Okay?

20   Start the time when the truck pulls up.  All right.

21   Goes in through the sallyport.  All right?  That's

22   the time that he goes through the sallyport.  And the

23   time right here where he's in the building right

24   there.  Now he's on the wall.  That camera got him

25   from that wall from here, when he moves over to this

LaMiles Hill

1   wall.  You got to have the camera that, you know,

2   just like, just like with a movie, following him

3   along throughout the complex from camera to camera.

4          Q.    Okay.  Well, I guess I'm confused.

5          A.    Okay.

6          Q.    You were told when he came into the

7   facility?

8          A.    Uh-huh.

9          Q.    Okay.

10         A.    Right.

11         Q.    And you knew what he looked like when you

12   were making these downloads?

13         A.    I had pulled -- no, I didn't have to pull

14   up.  They already had a picture of him somewhere

15   around, not even a hard card picture.  Did they have

16   a picture of him?  They didn't even have a picture of

17   him.  They told me what he had on, I want to say, and

18   I think some people who had already been by there

19   seen what he looked like because I didn't go back

20   there to even -- like I said, I --

21         Q.    You didn't see the body?

22         A.    No, I didn't even go back there to even

23   look at the body or anything like that.  And so they

24   gave me a time when he supposed to have came in, I

25   want to say metro officers bringing him in.  When you

LaMiles Hill

Page 29

1    go to the camera, you already know what you're

2    looking for, what you seen, and then you just go from

3    there and follow on in and follow along.  And that's

4    what it went from clip to clip.

5            The issue that we was having and part of

6    the reason why some of it had to be broken down was,

7    like I said with the program, the program will not

8    download, say, the -- extremely, extremely, extremely

9    long.  Saying like, say, hey, from this camera right

10   here, camera 1, female holding or, hey, let's do that

11   camera for the whole 12 hours, you know what I mean,

12   plus until the next morning, that camera.  So that's

13   12 hours for that one camera.  Then you're talking

14   another 12 hours for the next camera.  Then another

15   12 hours for the next camera.

16           That -- what would have took place would

17   have been the program would have had to sit there for

18   two, three days with no interference trying to

19   download this whole incident with that volume of

20   cameras trying to get all of the information.

21   Because just with this right here, it took the whole

22   night pretty much probably to get what it did get

23   without it not failing.  Because there were several

24   attempts with trying to do it where it failed going,

25   you know, long, long, long, long.

LaMiles Hill

Page 30

1        Q.    Let me break that down.

2        A.    Okay.

3        Q.    You're saying if the requested clip to be

4   downloaded is too long, like you said 12 hours, that

5   will take too long to download off the system.  And

6   so no reasonable person --

7        A.    No --

8        Q.    Let me reask that question.

9        A.    Okay.

10       Q.    And forget about this list.

11       A.    Okay.

12       Q.    Forget about this list for a second.

13       A.    Okay.

14       Q.    You're saying that if I -- all I'm saying

15   I think I heard you say is if the clip's too long,

16   it'll take too long to download it?

17       A.    No, no.  That's not what I'm saying.

18       Q.    Okay.

19       A.    What I'm saying is the program itself, the

20   program, whenever you try, if you try to download one

21   camera and this incident transpired, by that time,

22   you're talking the time and you try to get the entire

23   12 hours on that one camera, then the next camera

24   angle you get, that's another 12 hours.  That's 24

25   hours.  That's another -- the next camera, that's 36.

LaMiles Hill

Page 31

1      Another camera, that's 48.

2           Q.    I'm following.

3           A.    Now, and if you keep downloading each one

4      of those cameras, you would have probably been --

5      we're talking about days of video footage and you're

6      asking a computer program to try and download that

7      much video in a limited amount of time in a small

8      amount of frame if it didn't corrupt.  Not say

9      corrupt, but if it didn't, say, kick it out.  Because

10     like I said, previous attempts it was not letting us

11     download successfully.  And so that's -- that's what

12     I'm saying if you're talking about trying to get a

13     continuous for each camera angle at that time.  So

14     the only --

15          Q.    If I'm hearing you right, though, to go

16     back to what I asked you.

17          A.    Uh-huh.

18          Q.    You're saying that if you download too

19     many clips that are too long, it will take too long

20     to download the video?

21          A.    No, it's not that it won't take too long.

22          Q.    Or it might crash?

23          A.    It will crash.

24          Q.    Okay.  It won't take too long?

25          A.    No, it won't take long.

LaMiles Hill

Page 32

1      Q.    It is possible to download all the clips

2  if you wanted to as long as it doesn't crash?

3      A.    Yeah, as long as it doesn't crash.  But

4  the only way you could do that, because you've got to

5  be reminded, this is an ongoing running system that

6  was supporting at least 400 cameras at the same time.

7  And you can't just stop the program to -- you know

8  what I mean?  All the security cameras in the jail

9  would have had to stop and you would have had to

10  dedicate the whole program to just this download.

11      Q.    Let me get you back on track here.

12      A.    Okay.

13      Q.    Maybe I can make this a little clearer.

14  I'm going to show you some of the videos.

15      A.    Okay.

16      Q.    And so this will be female holding cell

17  No. 2 with no number on that.

18      A.    Okay.

19      Q.    All right.  I'm just showing you --

20          MS. BURNS:  For the purpose of the record,

21      can you identify which one --

22      Q.    (By Mr. Cash) I will.  Don't worry.  This

23  one starts at 11:39:59.

24      A.    Okay.

25      Q.    And this one runs through 11:48:39.

LaMiles Hill

Page 33

1        A.     Uh-huh.

2        Q.     So it's 8 minutes and 40 seconds.

3        A.     Right.

4        Q.     Okay.  That's female holding cell No. 1

5   with no suffix.  Now we'll go to female holding cell

6   No. 1, suffix No. 1.  It's underscore 1.

7        A.     Okay.

8        Q.     This clip when you open it, starts at

9   12:01:59.

10        A.     Uh-huh.

11        Q.     And then it runs for a different 11

12   minutes.

13        A.     Uh-huh.

14        Q.     Here's what I'm asking you then.  Are you

15   the person who made the decision to make this clip

16   have 8 minutes and then pick up for another 11-minute

17   time later and has these different clips pick up

18   different?

19        A.     I don't know if that --

20        Q.     Let me finish my question.

21        A.     I'm sorry, yeah.

22        Q.     These clips are not continuous pieces of

23   time.  And I want to know are you the person who made

24   the decision which pieces of time to capture and

25   which pieces of time not to capture?

LaMiles Hill

Page 34

 1        A.     I'm not sure on this one because the only

 2   way I could be sure is if you have this specific one

 3   I gave the GBI agent.

 4        Q.     Okay.  And so because you can't tell me

 5   that the set of files I put in front of you --

 6        A.     Right.

 7        Q.     -- is the set you gave to the GBI --

 8        A.     Right.

 9        Q.     -- you can't tell me that you made this

10   set?

11        A.     Right.

12        Q.     Is that fair?

13        A.     That's fair.

14        Q.     Okay.  It's possible that this set was

15   made by a different person altogether?

16        A.     Yeah.  It's possible.

17        Q.     It's possible this is the set you gave the

18   GBI?

19        A.     I'm not going to say that neither.  The

20   only --

21        Q.     Well, it's possible?  I'm not saying it

22   is.

23        A.     No.  I'll say the only one that I can

24   really account for is the one that I gave that GBI

25   agent.  So that I can look at it and then I can go,

LaMiles Hill

Page 35

1  okay, this block, this block, this block.  Because I

2  wasn't the only person who had capabilities of

3  downloading these incidents for this -- for this

4  incident.  And other people downloaded, I'm pretty

5  sure, because that's part of the reason -- just to

6  give you insight -- either download or watching, that

7  was part of the reason the program was crashing

8  during the time of this incident.

9       Q.    You're going to say too many people might

10 have been using it at the same time?

11      A.    Right.

12      Q.    Okay.  I'm going to ask you about those

13 other people in a second.

14      A.    Okay.

15      Q.    But I want to close out this thing about

16 the clips.

17      A.    Okay.

18      Q.    Did you ever make clips of a set duration

19 like this?

20      A.    Yeah.  I had to.

21      Q.    Okay.  So like some of these are 11-, 20-,

22 30-minute clips?

23      A.    I don't know on the one -- unless I have

24 the specific one that I had.

25      Q.    Understood.  Understood.

LaMiles Hill

1      A.     Yeah.   So I can't give you that unless I

2  have the one that I specifically made.  I can go

3  into -- go into that.  But if I don't have the one

4  that I specifically did, then I can't, you know, give

5  you anything or something that I'm not sure that I

6  made.

7      Q.     Right.  I understand you can't agree with

8  this list.

9      A.     Right.

10     Q.     But I'm asking you did you make clips

11 along these lines of 10, 20, 30 minutes?

12     A.     I can't say because I'm trying to -- I

13 can't say if they were 10, 20 without having it --

14 you know, because honestly and truly, I have -- when

15 I did it, I never even sat there and looked and

16 reviewed the whole video and everything.  It was get

17 it downloaded, go through the cameras, follow him.

18 And once you follow him -- and so if there were

19 clips, if there were clips, they followed him, his

20 movements, I guess that's the best way, follow

21 Ajibade throughout the whole video.

22     Q.     Well, Captain, that's the point I just

23 keep trying to get back to you over and over.

24     A.     Oh, okay.

25     Q.     And I can't honestly understand what

LaMiles Hill

Page 37

1    you're telling me.

2          A.    Okay.

3          Q.    Because I think you're saying you followed

4    his movements and you wanted to download the video --

5          A.    Uh-huh.

6          Q.    -- that showed Ajibade.

7          A.    Right.

8          Q.    Which, to my mind, means you made a

9    decision about which footage to pull.

10          A.    Yeah.

11          Q.    But then you won't agree with me that you

12    made clips.

13          A.    I see what your saying.

14          Q.    So I'm confused.  Did you make clips or

15    did you not make clips?  And if I'm not explaining it

16    right or if you're not explaining it right, this is

17    our chance to get things straight.  But when you say

18    you followed his movements and you pulled video, to

19    me that sounds like you could be the guy who made

20    these clips, and that's what I'm trying to figure

21    out.

22          A.    Okay.  All right.  Let me make it clear

23    now.

24          Q.    Okay.

25          A.    Now, there's some understanding.  All

LaMiles Hill

Page 38

1    right.  With the video -- because now I can

2    understand what you're saying -- when clips were

3    made, because -- and I will say this.  Just like when

4    he got out of the van in the sallyport, okay, he gets

5    out of the van in the sallyport.  He comes into the

6    door of the facility.  Do I sit there and gum up the

7    program with 12 hours of just looking at the

8    sallyport right there of a van and numerous cars

9    coming into the sallyport after this whole incident

10   happened.  And then -- you know what I mean?  And

11   knowing that I need that space to ensure that what

12   video we do get is captured, you know, we have space

13   for to get in.

14            So if that's the understanding your

15   question right there and saying, yes, in certain

16   areas, clips were made.  When I say "clips," his

17   movements after he departed that area, was no longer

18   in that area, the video footage from that area was

19   not added into the video.

20       Q.    Okay.

21       A.    Okay?

22       Q.    And when we say "was not added into the

23   video," we mean by you?

24       A.    Right.

25       Q.    Okay.

LaMiles Hill

Page 39

1       A.      I mean, not just to say it was no longer

2   any video of the -- pertinent to the actual incident.

3       Q.      Okay.  And the deciding factor you used in

4   deciding whether to pull video, as I understand it,

5   over and over here is if Mr. Ajibade was present in

6   that footage, then you pulled that video?

7       A.      Right.

8       Q.      Is it true to say that if Mr. Ajibade

9   wasn't in the video or hadn't been in the video for

10  some time, then you chose not to pull that type of

11  footage?

12      A.      No.  It's not safe to say because there

13  had -- there was a point where when he was in the

14  holding cell --

15      Q.      Right.

16      A.      -- that point right there should have been

17  the longest point of the video.  Now, if -- where it

18  didn't matter because that showed when people were

19  going around and checking on him.  So that's why I

20  say I don't know which version of this right here

21  that you all have or you all are referring to, that's

22  what I'm saying, compared to anything else.  But --

23  yeah, okay.

24      Q.      All right.  If you gave the videos to

25  GBI --

LaMiles Hill

Page 40

1      A.     Uh-huh.

2      Q.     -- what -- and I recognize it's been two

3   years.

4      A.     Okay.

5      Q.     What do you think I might be able to look

6   at after two years to figure out which videos you

7   gave the GBI on January 2nd, 2015?

8      A.     Well, he should have --

9      Q.     I'm giving you examples.

10     A.     Yeah.

11     Q.     Like maybe you burned it onto a DVD and

12  made a copy of it.  Or maybe you put it in a file in

13  your computer and you saved it.

14     A.     I can't --

15     Q.     Or you made a log saying these are the

16  files that I'm giving the GBI.  What, if anything,

17  could we go back to look at to sort of prove what you

18  gave the GBI?

19     A.     I don't think it was DVD's.  I think it

20  was more -- I think it was a large flash file.

21     Q.     Okay.

22     A.     If I'm not mistaken.  I'm just trying to

23  remember because it was a big file.  I know that.

24     Q.     Okay.  Would you have a log of the videos

25  that you gave to GBI?

LaMiles Hill

Page 41

1        A.      I thought -- I think they were keeping --

2    anything I was giving to them, they were supposed to

3    be documenting -- you know, he -- I want to say --

4    didn't he have me sign something?

5        Q.      Well, if you gave them a flash drive, did

6    you keep a list of the files that were going on the

7    flash drive?

8        A.      No.  Because it was, like I said, it was a

9    get-it-done-type deal.  Hurry up.  We need this.

10   Get-it-done-type deal.  So it mainly just going

11   visual just boom to boom, boom to boom.  Because

12   basically the way the program works, as you are

13   putting -- as you can see how it is right here on

14   here, well, it doesn't really show it on here, but

15   when you have this camera, if you have a camera and

16   you come across, then it adds the start time, end

17   time across.  Then you go to the next camera, start

18   time, end time.

19            So with a video this long, with this much

20   information, you're basically, as you're going down

21   through the program to -- your list is compiled

22   within a program.

23       Q.      Okay.  Did you make any clips for anybody

24   else like the sheriff or IA?

25       A.      It was not the long one.

LaMiles Hill

Page 42

1     Q.    Okay.

2     A.    Because, you know, the long one, of

3  course, the long one was overnight.  So -- and the

4  GBI needed -- they were wanting and the command staff

5  wanted that information given to the GBI.

6          But like I said, and that's why I'm

7  saying, other people may have --

8     Q.    I'll ask you about the other people in a

9  minute.

10    A.    Okay.  Okay.

11    Q.    So I understand the afternoon to the

12  evening of January 2nd, you made a set of clips that

13  you gave to the GBI on flash drive?

14    A.    Uh-huh.

15    Q.    At any point did you make a different set

16  of clips and give them to anyone else?

17    A.    I think we did shorter ones in the

18  beginning for the command staff.  I'm pretty sure we

19  did shorter clips.  The shorter clips showed, you

20  know, the main incident, the wall, the struggle, what

21  took place around at the cell.

22    Q.    Okay.

23    A.    So the short -- and actually, if I -- I

24  don't even think I had to make them.  They were --

25  like I said, part of our issue was people were

LaMiles Hill

Page 43

1   looking on their computers who logged in and they

2   were looking at it live -- I mean, not live, but

3   playing it back, looking at the whole incident also.

4   And that's why I said, I had to what until the

5   evening because you had -- and there was no way to

6   track who was looking at it.

7        Q.    Right.

8        A.    And who was logged onto the computer on

9   the program at that time trying to see what took

10  place and everything.  So that was part of the issue

11  with the download portion.  So I'm not -- I know

12  command staff was looking at it -- I can tell you

13  that confidently -- and wanting information, wanting

14  information.

15            Then the next portion came with the

16  downloads.  And that's what I'm saying.  I don't know

17  who else was downloading during the time I was

18  downloading.

19       Q.    Okay.  Since we used -- I didn't plan to

20  mark this as an exhibit, but I will.  I'll make it

21  Hill 2.

22       A.    Okay.

23            (Plaintiff's Exhibit 2 was marked for

24       identification.)

25       Q.    (By Mr. Cash) Just so everyone's clear,

LaMiles Hill

Page 44

1    this is a printout of this -- it's from Microsoft

2    Windows, my personal collection of the videos that

3    were provided.  And I believe these are the videos

4    that were given to me by the sheriff directly.

5         A.    Okay.

6         Q.    But that's what this was.

7         A.    Real quick.  On that one, do you have --

8    because this is all broken up, and I don't -- it

9    looks like it's out of sequence.

10        Q.    Well, I'll tell you, I have one -- if

11   you're asking about this full video, I do have one

12   from the same holding cell that is extremely long,

13   and I'm curious if this is the one that you were

14   referring to.  It's labeled "Full Version Code Blue."

15   It's from a different time frame.  I don't know why,

16   but this version starts --

17        A.    See, and that's the issue right there.

18   And I can tell you -- I want to say mine was

19   continuous.

20        Q.    Let me say this one starts at 11:39.

21        A.    Well, no, no, no.  What I'm saying is you

22   have broken versions --

23        Q.    Right.

24        A.    -- all the way through.

25        Q.    Yes.  Most of the cameras have been cut.

LaMiles Hill

Page 45

1        A.      Broken.

2        Q.      And you don't think you made cuts within

3    the same camera?

4        A.      How long -- let me see how long is that

5    one right there?  That's how many minutes?

6        Q.      This one is camera 117.  It starts at

7    11:39 and it goes two hours and 28 minutes.  So this

8    shows him going into the cell.  This shows him being

9    in the cell.  Right in here is where they start going

10   in.  And then it shows they go and check on him here

11   at the end and then they had the code blue.

12       A.      So that one is the whole time he was there

13   for two hours and --

14       Q.      Two and a half hours.

15       A.      Two and a half hours.  And the next one is

16   how long?

17       Q.      The next one on this list, like we looked

18   at this one already.  This was like eight minutes.

19   Suffix, no suffix.  Suffix 1 was 11 minutes.  This

20   one is about 11 minutes.  So these are chopped up.

21   This is not the set that you made.

22       A.      No.  I don't -- I don't recall.  Because

23   if you got it for two hours, why would I chop it -- I

24   mean, if I could have got the two hours, I could have

25   got the -- the best way -- the best thing on that

LaMiles Hill

Page 46

1   right there, if we get the video that I gave the GBI.

2   So the GBI -- so y'all don't have the version that

3   the GBI had?

4        Q.    I don't know what I have.  That is why

5   you're here.

6        A.    Okay.  You need --

7        Q.    The sheriff indicated you would be the

8   person who would --

9        A.    Okay.  You need to get the version.  For

10  me, I mean, you know, because you're asking me

11  questions about -- about it, but you don't have --

12  you're not presenting me what I know I did so that I

13  can explain why if there was that in that version I

14  did.

15          What I'm seeing now is -- what I'm saying,

16  possibly because it all should be under -- you got

17  everything divvied up on your computer right now

18  basically where they're broken down camera by camera.

19  And they're saying "Full Version Code Blue."  I

20  didn't label my stuff like that.  So I know --

21       Q.    And I know that, you know, I didn't make

22  these cuts.

23       A.    Right.

24       Q.    But these are the files the way I received

25  them from the sheriff.

LaMiles Hill

Page 47

1      A.    Okay.

2      Q.    I will say I might put the words "code

3  blue" on the file myself.

4      A.    Oh, okay.

5      Q.    But I did not change any of the other

6  camera names.

7      A.    But that's what I'm saying.  If you -- to

8  really truly answer some of the questions that you're

9  asking me, and the way -- to give you the answers,

10 you need to get the version that I gave the GBI.

11     Q.    Okay.

12     A.    So then I can sit here and we can -- and I

13 can explain to you, hey, this was done because of

14 this.  This was done because of that.

15     Q.    I understand.

16     A.    If you see this, I can say this and say

17 that.

18     Q.    So let me close all this out --

19     A.    Okay.

20     Q.    -- and move on to something else.

21     A.    All right.

22     Q.    There's no way or for you and me sitting

23 here right now to figure out what you gave the GBI?

24     A.    Well, the GBI --

25     Q.    Except asking you --

LaMiles Hill

Page 48

1       A.    Yes.   Except through the GBI and the one

2   that he received on -- because he came back.   So that

3   should have been the 3rd of January.   The one that

4   should have been -- yeah.   The one that he

5   received -- that they received on the 3rd of January.

6       Q.    Which is how long it took to make your

7   download during the night of the 2nd?

8       A.    (Nods head affirmatively.)

9       Q.    Okay.   But you didn't have a log or make a

10  list of what you gave the GBI on the 3rd?

11      A.    What has happened is several -- just like

12  you have right here.   I've seen different versions.

13      Q.    Okay.

14      A.    So I don't know which one.   I know the one

15  I gave the GBI.   You know what I mean?

16      Q.    I'm with you.   All right.   You mentioned

17  other people have the ability to download these

18  videos.

19      A.    Right.   At that time, yes.

20      Q.    Is Bobby Irvin one of these people?

21      A.    I don't know if he was at that time or

22  not.   I mean --

23      Q.    What do you know about Bobby Irvin?

24      A.    I know Bobby Irvin is a lieutenant over

25  the IA.   At that time he was working intel over,

LaMiles Hill

Page 49

1   actually over by me, over in the area where I was at.

2   He handled all the exterior investigative and

3   criminal investigative material.  I handled

4   in-house --

5        Q.    Okay.

6        A.    -- investigative material and incidents.

7        Q.    Okay.  Do you have any supposition whether

8   he did or did not have involvement with the Ajibade

9   case?

10       A.    Don't know.

11       Q.    You just don't know one way or the other?

12       A.    No, I don't know one way -- because like I

13  said, when I -- that morning, I knew nothing about it

14  until I came into work.  When I got into work, it was

15  like we need this, we need that, we need this.

16       Q.    All right.  All right.  Let me round you

17  back here.

18       A.    Okay.

19       Q.    I don't want to go over the same things

20  over and over again.

21       A.    Okay.  That's fine.

22       Q.    So I can save time for everybody here.

23       A.    Uh-huh.

24       Q.    But who else do you know for a fact or --

25  let me start over.

LaMiles Hill

Page 50

1              Are you aware of anybody else who was

2       involved with downloading the videos from

3       Mr. Ajibade's incident?

4           A.    I was -- at that time I was so busy in

5       there trying to figure out why, when I was initially

6       doing it, wasn't it down -- you know, why it kept

7       failing.

8           Q.    Right.

9           A.    And, you know, because I know the

10      importance of everybody trying to do it, and I

11      went -- I even went to the command -- I think even

12      went to -- as a matter of fact, I even went to

13      Colonel Gilbert and told him, I said, look, I'm

14      having a problem downloading it.  It must be because

15      everybody's in here on this computer downloading.

16      The only way I can think -- the only thing I can

17      think of is I'm going to have to download it

18      overnight because you have so many people on it right

19      now and I don't -- there's no way to tell it who's on

20      it trying to look at it and everything else.

21          Q.    And I appreciate that and I've heard that.

22      But can you give me the name of anybody that you know

23      made a download?

24          A.    No way for me -- the only -- the only

25      people who possibly could do that would be our IT

LaMiles Hill

Page 51

1    department, and I don't know if they even have -- if

2    they can go into the program and track.  And it won't

3    be able to tell you -- well, it may be able to tell

4    you who, but -- because everyone should have their

5    own log-in into it.  But I don't know if it keeps a

6    file of downloads.

7         Q.    Well, that is exactly where I was going

8    next.

9         A.    Yeah.

10        Q.    There is a log-in for the cameras, the

11   camera system?

12        A.    Yes.

13        Q.    I understand the system is called Endura?

14        A.    Yes, Endura.  Endura, yes.

15        Q.    So not everybody in this facility has

16   access to Endura; is that right?

17        A.    At that time, no.

18        Q.    Isn't it true that there's a very good

19   security reason why the average deputy should not

20   have access to Endura?

21        A.    Well, I can't -- I can't give an answer on

22   that because there are -- like I stated earlier,

23   Endura's run throughout the entire facility.

24        Q.    Right.

25        A.    And deputies do need the capability --

LaMiles Hill

Page 52

1    let's put it this way:  The program runs on

2    permission.  So you can say some permissions or some

3    people should be privy to some permissions.  But to

4    say that everyone should be, that's too generalized

5    of a statement.

6         Q.    Okay.  Let me ask you this:  Does every

7    person in the facility have a log-in of some kind?

8         A.    Actually, they don't.  They don't have a

9    personal log-in.  But there are some generic log-ins.

10        Q.    Like Unit 4 might be a log-in?

11        A.    Uh-huh.

12        Q.    Okay.  And then people share these generic

13   log-ins?

14        A.    Right.

15        Q.    And then are some of the log-ins locked

16   down to certain areas of the facility?  Is that how

17   that works?

18        A.    Well, no.  What happens is they are --

19   yeah, you have the generic log-ins for -- I want to

20   see how it was back then.  See, there's a difference

21   because since, you know, it's been two years, things

22   have changed with that.  And so I'm trying to go back

23   to the way it was back then.

24             You have some aspects, I want to say, of

25   it that was just centralized to those areas, you

LaMiles Hill

Page 53

1    know, because we ended up having problems.  I can't

2    give you a clear one on that one.  You have to

3    actually check with IT to see what they have

4    permissions-wise set back then.

5              But I can say the download factor,

6    download factor really could have been done if a

7    person had -- I mean, if a person had another

8    person's log-in who had access, I mean, just like

9    anything, they could have downloaded from any

10   centralized area if they logged in on it.  So . . .

11        Q.    When you do the downloads, where do the

12   files go?  Do they go to the local computer where

13   they're downloaded or do they get downloaded to some

14   other server, some central place?

15        A.    A local computer or external hard drive.

16        Q.    Okay.  There's no like common download

17   server on a network where when you make -- when you

18   choose your downloads --

19        A.    Actually, at that time --

20        Q.    Let me finish, please.  I'm just asking is

21   there a centralized place where when you make a

22   download, it goes to a server and then it's shared?

23        A.    All right.  At that time we did -- we were

24   using a -- a server.

25        Q.    Okay.

LaMiles Hill

Page 54

1        A.    But what the issue was with videos, we

2   only could put so many videos on that server and you

3   had to pull them off.

4        Q.    It would run out of space?

5        A.    It would run out of space; correct.  And

6   then on that server, what happened, that video was so

7   big, I think they had to put it on an external hard

8   drive.

9        Q.    You mean when you say that video, you mean

10  for the Ajibade matter?

11       A.    Right.  And I want to say some shorter

12  clips did end up on the external -- I mean, not the

13  external, but the -- that's why I'm telling you.

14       Q.    They wound up on the shared server?

15       A.    Right.

16       Q.    But would you say that after two years,

17  they're probably gone from there?

18       A.    I don't know.

19       Q.    You don't know?  Okay.

20       A.    Honestly, truly, I don't -- no, no, no.

21  Actually, I don't know.  IT would be the people who

22  could give you that answer.

23       Q.    What's the name of the server we're

24  talking about?  How do you get to it?

25       A.    It was either the S drive or the N drive.

LaMiles Hill

Page 55

1      Q.    Okay.

2      A.    So we had two servers, the S or the N

3   drive.  The S drive was for sensitive incidents and

4   the N drive, there was a folder in the N drive for,

5   you know, just common things that took place in the

6   complex with supervisors going in.  If they had a

7   fight in the area that night, we could put that video

8   in the N drive.  They come to work, they can see it.

9   They can go ahead and proceed with the inmate

10  disciplinary board because they can see what

11  transpired, what video they had to show.

12     Q.    Okay.  I've been apprised that there's a

13  county IT and then there's a sheriff's IT.

14     A.    Uh-huh.

15     Q.    So which one manages --

16     A.    Sheriff's.

17     Q.    Okay.  Sheriff's manages the Endura

18  system?

19     A.    Uh-huh.

20     Q.    And manages this server or S or N drive

21  that you're talking about?

22     A.    Right.

23     Q.    And to be clear, you're not sure if it

24  logs when you make a download or not?

25     A.    No.  It would take the IT --

LaMiles Hill

Page 56

1      Q.    At the Sheriff's?

2      A.    Yeah.  Yeah.

3      Q.    Okay.  All right.  We jumped around in the

4  plan of questions I was going to ask you.  It would

5  probably be best if I could get a short break.

6            (Recess from 10:22 a.m. to 10:33 a.m.)

7      Q.    (By Mr. Cash) Okay.  I've got a couple

8  more general questions then about the system.

9      A.    Okay.

10     Q.    When were you trained on it?

11     A.    I was trained on it, let's say back in

12  20 -- let's see.  When did they finish?  I'm thinking

13  back to when we finished the construction, new jail

14  construction.  Basically I got trained on it -- it

15  was over the phone actually with the company that

16  installed it.  I spoke with one of their -- we had an

17  issue where we needed to download a video from

18  something that took place in the complex, and over

19  the phone, he walked me through it.  And once he

20  walked me through it, I was able to go from there

21  with it, as far as that goes.

22     Q.    Do you know like what year that would have

23  been?

24     A.    I'm trying to remember the incident

25  because that would definitely let me know when it

LaMiles Hill

Page 57

1   took place.

2        Q.    Okay.

3        A.    It was an incident -- it was something

4   that took place -- this took place in 2015.  I was at

5   video visitation before that.  It had to take place,

6   I want to say somewhere in 2012 time frame.  2012,

7   2013.

8        Q.    Is when you were trained on Endura?

9        A.    I want -- I'm not going to say trained.

10  I'm not going to use the word "trained."  I'm going

11  to say I was given instructions on how to use the

12  program as far as getting the -- recovering video by

13  the -- matter of fact, what's his name?  One of the

14  owners of the company actually out in Alabama, MTS.

15  So me and him was on the phone.  I was in the IT

16  area.  We needed the video.  He sat there with me and

17  walked me all the way through how to do it.

18       Q.    Okay.  All right.  I appreciate that.

19       A.    Okay.

20       Q.    I want to put a couple maps in front of

21  you.

22       A.    Okay.

23       Q.    This is a map that we have been referring

24  to in this case as J1-A, which means it's a subset of

25  J1, which is a larger picture of the facility.  But

LaMiles Hill

Page 58

1   with J1-A, we have tried to capture the areas where

2   Mathew entered.  And we've had past testimony to show

3   he came in through the sallyport here.  He was placed

4   in one of these holding cells here.  The scuffle

5   happened here by the prebooking area.

6           A.    Uh-huh.

7           Q.    He was taken through here and into the

8   female holding cell where he died.  And I just wanted

9   to orient you on the map.  Do you agree with this

10  being an accurate map of the facility as you know it?

11          A.    Yes.  This is -- I know y'all got J1-A on

12  it, but C, C building.  Basically by our construction

13  photos, this is C-1.

14          Q.    Okay.  You know this building as C-1?

15          A.    Right.

16          Q.    But this is an accurate --

17          A.    Yeah.  Yeah.  This is fairly accurate.

18          Q.    The reason I showed you that is I show you

19  another exhibit called J3, which is -- I tried to put

20  a mark, this green line here, to mark where it would

21  line up with the other map.

22          A.    Right.

23          Q.    So unfortunately, this copy, J3, is cut

24  off to the extent it doesn't show the sallyport.  It

25  doesn't show this.

LaMiles Hill

Page 59

1        A.      Gotcha.

2        Q.      Basically it's the same map.  But the

3   difference with J3 is J3 has the cameras shown on it.

4        A.      Right.

5        Q.      Would you take a look at J3 and just tell

6   me if you think that J3 is an accurate map of the

7   facility, including where the cameras are.

8        A.      It may be -- some of these cameras have

9   been moved.  Not say moved, but -- yeah.  Some have

10  been moved on what few angle they have from then to

11  now.  So I'm going back into time when I look at this

12  to try and see.

13       Q.      Okay.

14       A.      And the way they were labeled was

15  different in the program.  Not -- in the program, the

16  way they were labeled in the program is different now

17  than the way they were back in 2015 also.  Some of

18  them the names have changed a little bit.

19       Q.      Okay.

20       A.      And some of the positions have changed.

21  How recent is this map?

22       Q.      I don't know.

23       A.      Because this looks like we had --

24       Q.      Well, let me --

25       A.      Yeah.  This has actually -- because you

LaMiles Hill

Page 60

1    don't have --

2         Q.    Let me ask you this.

3         A.    You got cameras there.  No, I'm just

4    looking to try and --

5         Q.    Definitely orient yourself.  Make sure

6    you're comfortable with what you're looking at.  And

7    I want to focus you in on how this would have

8    appeared in January of 2015, best you can remember.

9         A.    Okay.

10        Q.    Because if they've changed, if they were

11   changed last week, I don't care.

12        A.    Okay.

13        Q.    I'm only interested in what we could have

14   seen when Mathew was in the facility.

15        A.    Okay.

16        Q.    And I don't have a date for this

17   particular map.  Is there anything, looking at the

18   map and comparing it with your memory how it looked

19   in January of '15, is there anything wrong with this

20   map that we should correct that you can see?

21        A.    No.  Other than the only other thing, like

22   I said, the camera positions, I just can't give you

23   an accurate of what they were actually aligned like

24   on here based upon where they were facing.  But

25   physical, the physical layout is the same.

LaMiles Hill

1          Q.     Okay.

2                 MR. CASH:   Jennifer, I would like to find

3          some way to link up all the cameras from the

4          clips that we've been given with the cameras on

5          the map and was wondering if this would be

6          better done off the record rather than --

7                 MS. BURNS:   Let's go off the record for a

8          second.

9                 MR. CASH:   It might just be easier.   We

10         can go off the record.

11                (Discussion off the record.)

12         Q.     (By Mr. Cash) Okay.   So Captain Hill, did

13    we just get the chance to go off the record and mark

14    Exhibit J1-A and J3?

15         A.     Yes.

16         Q.     And the marks in blue are your handwriting

17    and your marks?

18         A.     Yes.

19         Q.     And did we go through each video that I

20    have and match the camera number from that video with

21    the handwritten blue pen that you wrote on the

22    exhibits?

23         A.     Yes.

24         Q.     And were a couple of the cameras that we

25    looked at pointing in a different direction?

LaMiles Hill

Page 62

1       A.      Yes.

2       Q.      So it looks like camera 134 on the

3   printout is facing one way, but you've drawn an arrow

4   showing that it points a different way?

5       A.      Yes.

6       Q.      Okay.  And then you added camera, it looks

7   like 138, 136, 130 and 144 because we didn't have a

8   drawing that showed those cameras?

9       A.      Yes.

10      Q.      Okay.  What do we know, if anything, about

11  the status of the other cameras that you didn't mark?

12  So just to make it easy, I'm going to say in the area

13  of the scuffle, between 134 and 137, and on 138 on

14  the other side, these three here, are those working

15  or are they still there?

16      A.      This one right here -- I don't even know

17  what number it is -- that's pointing facing back

18  towards the sergeant's desk, I guess that's the best

19  way to describe it, that picks up the view walking

20  backs -- picks up the view of actually going to the

21  sergeant's desk actually.

22      Q.      Okay.  And I'm going to try to --

23      A.      I don't know if this camera actually is

24  still there.

25      Q.      Let me put the number on the record.

LaMiles Hill

Page 63

1       A.      Okay.

2       Q.      It's CC161G-MP.  All right.  Now, you're

3   not sure if that camera is still there or not?

4       A.      Right.  I'm not sure.

5       Q.      Or was there at the time?

6       A.      Yeah, there at the time, and what it was

7   actually looking at at the time.  Because like I

8   said, some of these, actually, to see this that I

9   showed you, they are turned and looking at other --

10      Q.      You're saying the drawing doesn't

11  necessarily match the way they were used --

12      A.      Right.

13      Q.      -- at the time?

14      A.      Right.

15      Q.      Okay.

16      A.      Some of them, yes.

17      Q.      All right.  What about the two cameras

18  that face into these intox cells?  Were they active?

19      A.      Yeah.  But they face -- that's not even a

20  cell.  It's an opening.  So they face right there

21  looking at the intox machines.

22      Q.      Okay.  And you didn't pull any footage

23  from those cameras?

24      A.      No.  Because all those look -- they don't

25  see anything out in the booking area.  All they do is

LaMiles Hill

Page 64

1   look like into a corridor.  I mean, just that little

2   space that's right in there.  That's all those two

3   cameras right there look at.

4        Q.    Okay.  And then next to them you have the

5   detox cells; right?

6        A.    Right.

7        Q.    Does this symbol in the corner here, it

8   says "CC," does that reflect another camera?

9        A.    Those are -- yeah.  Each one has their

10  individual cameras for those individual cells.

11       Q.    So the cameras in those cells would have a

12  perfect view of everything that goes on inside that

13  cell?

14            MR. HART:  Object to form.

15       A.    Well, not perfect view.  Because all

16  they -- they are in the top of the cell and they're

17  looking -- they're looking down.  So at an angle.

18       Q.    (By Mr. Cash) Okay.

19       A.    So you can't say a perfect view.  You just

20  can say they have a view.

21       Q.    Is it a very good view?

22       A.    Depends on the way the person is --

23  depends on what's in there.  What are you trying to

24  look at on the inside?  You see what I'm saying?

25       Q.    Okay.  Do you know if people are put in

LaMiles Hill

Page 65

1    these cells with these cameras so that -- so that the

2    camera can be used to record them?

3         A.    Yes.   It's part of the detox, part of the

4    reason why that they're put in there for other detox.

5    So the camera at least gives somewhat of -- because

6    if a person is facing -- where the camera is, the

7    front, there's -- the doors are glassy through doors.

8    So take me, for an example.   I'm six-two.   If I'm

9    standing more from the center of that cell to this

10   way that I'm standing, you're not going to see what's

11   going on in the front with me.

12        Q.    Right.   Although if you were at the desk

13   here, you'd have a pretty easy view of the front?

14        A.    Yeah.   Depending -- yeah, it all depends

15   if someone's on this portion of the desk, yes.

16        Q.    All right.   This Exhibit J3, have you ever

17   seen this in this format before?

18        A.    Not in -- I have seen it in the

19   construction -- not construction.   The flyer -- the

20   fire evacuation plan.

21        Q.    Okay.   You're not the person who pulled

22   this map in order to produce in this case?

23        A.    No.

24        Q.    Okay.

25        A.    Not that I know of.

LaMiles Hill

Page 66

1        Q.     All right.

2        A.     Actually, the way I normally look at that

3    area is through the screenshot pictures for the

4    control panels.

5        Q.     You mean the views from the cameras

6    themselves?

7        A.     Huh-uh.   No.

8        Q.     What do you mean?

9        A.     Control panel view.   Each area --

10       Q.     Help me out.

11       A.     Each area has a control panel and a

12   control panel maps out that area.   So that is how you

13   can -- that's how I see, normally see the layout of

14   every area is from a control panel view.

15       Q.     And you're saying not on the blueprints

16   like this?

17       A.     No, not on the blueprints like that.

18             (Plaintiff's Exhibits J1-A and J3 were

19        marked for identification.)

20       Q.     (By Mr. Cash) I just want the record to

21   show that I updated the exhibits because so that --

22   it says J3 Hill and J1-A Hill just so -- because

23   she's got markings on them and I want these to be

24   distinct from the other joint exhibits.

25             All right.   Now, just so we're clear,

LaMiles Hill

Page 67

1    although the detox cells have cameras in them --

2         A.    Uh-huh.

3         Q.    -- the cells, the female holding cells

4    where Mathew was ultimately taken, they do not have

5    cameras in them, do the?

6         A.    No.  Well, back then they did not.

7         Q.    Do they now?

8         A.    Yes.

9         Q.    When did that happen?

10        A.    I can't give an exact date, but it's --

11   can't give an exact date on it, but they have them

12   now.

13        Q.    Was that in the last year?

14        A.    Maybe a few -- at one point maybe a couple

15   in the last year.  Some of it prior to that.

16        Q.    Why were cameras added to these female

17   holding cells?

18        A.    I don't have an answer to that.  They were

19   reformatted and fitted.  Two were made into padded

20   cells and the other two are observation cells.

21   So . . .

22        Q.    So which ones have the cameras?

23        A.    All four.

24        Q.    Okay.  But it was after Mathew Ajibade

25   died in one of those cells that the cameras were

LaMiles Hill

Page 68

1    added?

2         A.    Uh-huh.

3         Q.    How'd you find out about it?

4         A.    About what?

5         Q.    The cameras being added.

6         A.    The cameras being added?  It was put out

7    that they were going to make them into observation

8    cells.  Well, padded and observation cells.

9         Q.    So just common knowledge?

10        A.    Uh-huh.  And they came up with a procedure

11   on how -- what type inmates would go in those cells

12   and under what conditions would they go into those

13   cells, that they be used.

14        Q.    And what are those procedures?

15        A.    In the padded cell, those cells would

16   be -- are used for inmates who exhibit that they're

17   going to commit self-harm.  We've had incidents where

18   we had inmates who have tried to beat their heads on

19   the cell or seriously try to injure themselves in a

20   regular normal cell.  So they will actually be put

21   into a padded cell.  Not to say that they can't

22   injure themselves in it, but likely it reduces the

23   risk of them harming themselves in a padded cell.

24              The observation cells, those are the cells

25   up there.  They're used for observing those inmates.

LaMiles Hill

Page 69

1    If the detox cells were to get full or our suicide

2    prevention cells were to get full, then those are

3    like our backup to those cells.

4         Q.    Knowing what you know about Mathew, would

5    Mathew, if you had had those cells at the time Mathew

6    was in the jail, would Mathew have qualified to go

7    into any of those cells?

8         A.    I can't --

9              MR. HART:   I'm going to object to the form

10        because you prefaced it with what he knows.

11        That means he knows something.

12             MR. CASH:   Every question will presume the

13        witness knows something.

14             MR. HART:   You can answer the question.

15             THE WITNESS:   Oh, okay.

16             MR. HART:   You want to reask the question

17        for him?

18        A.    Well, the answer to that question is I

19   can't give you an answer because I don't know the

20   behavior of Mathew Ajibade when he came in.   I don't

21   know any of that.   You know, I actually can count the

22   number of times that I've actually seen some of the

23   video of that.   And I just stayed -- tried to

24   separate myself from the entire incident as far as

25   looking at the video and making any judgment on his

LaMiles Hill

Page 70

1    demeanor or anything like that when he came in.

2           So I'm not qualified to say that he

3    would -- and just, you know, for the record,

4    individuals who go in those cells, they're seen by a

5    licensed professional counselor, mental health, who

6    would evaluate those individuals whenever -- if they

7    were here or as soon as they came in to see if that

8    was an appropriate place for them to be at.  In the

9    way that we use them now.

10          Q.    (By Mr. Cash) Okay.  Well, I appreciate

11   that.

12          A.    Uh-huh.

13          Q.    Let's switch to the Taser videos now.

14          A.    Okay.

15          Q.    First I want to just put some logs in

16   front of you, see if I can't find the best set of

17   logs to work with here.  Just hang onto that.  Let me

18   get you the next one.  I've got another copy for you.

19   I'm sorry.  Actually, I don't.

20          MR. HART:  That's okay.  I can get close

21       enough to anything.

22          MR. CASH:  I do have another copy of this

23       one.  I have three different versions.  I'm

24       going to see which one is the easiest to use and

25       I'm going to ask you about it.

LaMiles Hill

Page 71

 1                THE WITNESS:  Okay.

 2                MR. HART:  Do you know what you're looking

 3       at?

 4                THE WITNESS:  Uh-huh.  Yeah, I know what

 5       I'm looking at.

 6                MR. HART:  Good.

 7                (Plaintiff's Exhibit 97 was marked for

 8       identification.)

 9       Q.    (By Mr. Cash) Okay.  Captain, just to

10  identify all these for the record here, I have put in

11  front of you P-97, which is a four-page document that

12  starts with PA965 and goes through to 968.

13       A.    Uh-huh.

14                (Plaintiff's Exhibit 11C was marked for

15       identification.)

16       Q.    (By Mr. Cash) I have put in front of you

17  P-11C, which is PA1282 and 83.  It's a two-page

18  document.  And this is a version that is attached to

19  Nicole Meyers's IA report.

20       A.    Uh-huh.

21       Q.    And then I have another copy of the same

22  thing, but it's -- I think it's easier to read and

23  it's harder to read.  It's just a different scan.

24  You can see that the text, the colors are a little

25  different.

LaMiles Hill

Page 72

1            But you've had a chance to look at all

2    three of these?

3            MR. HART:  This and this is the same?

4            MR. CASH:  It should be.  It's just

5        that --

6            MR. HART:  Got different line colors.

7            MR. CASH:  Because the blue highlighting

8        didn't come across whoever made the copies.  I

9        think this is the easier one to read mostly, but

10       it's up to you.  You can use either one.

11           THE WITNESS:  Okay.

12       Q.    (By Mr. Cash) You've seen these three

13   documents in front of you?

14       A.    Right.  I've seen them before.

15       Q.    Okay.  So the first thing I want you to do

16   is tell me what is this one, P-97.

17       A.    P-97 is actually the information from the

18   Taser program that you can download the report.  One

19   is the report and one is the actual -- for the actual

20   device.

21       Q.    Well, let's stick with this one first --

22       A.    Okay.

23       Q.    -- if we can.  I understand that it was

24   part of your job to pull the videos off of the Taser?

25       A.    No.

LaMiles Hill

Page 73

1        Q.     Okay.

2        A.     My job was, at that time I was told, like

3    I said on that morning --

4        Q.     I'm just talking about the Taser.

5        A.     Oh, okay.

6        Q.     So I stand corrected.

7        A.     Yeah.  Yeah.

8        Q.     But yesterday the county's attorney told

9    me that you were the person who downloaded the videos

10   off the Taser?

11       A.     Right.  I was the person who downloaded

12   off the Taser for this incident.

13       Q.     For this incident?

14       A.     Right.

15       Q.     Okay.  We're back on track.

16       A.     All right.

17       Q.     All right.  But you don't -- and all I

18   care about for these questions --

19       A.     Yeah.

20       Q.     -- is having to do with Mathew's incident.

21       A.     Okay.  That's fine.

22       Q.     All right.  So when did you do that?

23       A.     That -- the Taser -- was it the same day

24   or the next day?  I'm not sure if it was the same day

25   or the next day, but -- was it in between time trying

LaMiles Hill

Page 74

1    to get the video or not?  I'm not sure, but it was in

2    that same two-day time frame --

3         Q.    Okay.

4         A.    -- of when I gave them, the GBI, that

5    video or that -- the day prior or the day I gave them

6    the video, in that time frame of those two days is

7    when I downloaded the Taser.

8         Q.    You're saying on January 2nd or January

9    3rd --

10        A.    Uh-huh.

11        Q.    -- you connected the Taser to a computer

12   and pulled the videos?

13        A.    Right.  Right.

14        Q.    And you produced those to the GBI?

15        A.    Along with -- I think along with these

16   printed reports, also.  Yeah.  I did the video and

17   print these copies of these printed reports.

18        Q.    Well, so this is one thing that I was

19   curious about is our exhibit, P-97, says this report

20   was created on January 6th.

21        A.    Uh-huh.

22        Q.    So is that the date that you provided the

23   videos to GBI?

24        A.    Don't know.  The report -- anyone could

25   have pulled it from the -- did they have this, the

LaMiles Hill

Page 75

1   program?  What date was this one pulled?

2          Q.    Let's stick to this one.

3          A.    Okay.  All right.  Because this is the one

4   I know we made copies of with the video.  And the

5   Taser, I want to say it was given to the GBI.

6          Q.    The whole Taser?

7          A.    After I finished pulling the video, it was

8   given to the command staff.  So I don't know what

9   they did with it after that.  But I thought GBI got

10  the Taser also.

11         Q.    Okay.  Just to be clear, you're saying --

12         A.    Yeah.

13         Q.    -- the video was given to the command

14  staff and you're not sure what happened to the Taser

15  itself?

16         A.    Right.

17         Q.    Is that right?

18         A.    Right.

19         Q.    Okay.  All right.  I went through this

20  report and it looks like Mr. Ajibade's incident, it

21  looks like probably starts here on line 14 --

22         A.    Uh-huh.

23         Q.    -- at 2336 --

24         A.    Uh-huh.

25         Q.    -- on that night.  Because the next

LaMiles Hill

Page 76

1   earliest one is 11:00 in the morning.  Do you recall

2   that this is the first Taser incident, line 14?

3        A.    When I did the one I did, it was -- I

4   printed out that.

5        Q.    All right.  We'll jump to that one then.

6   We'll put P-97 aside.

7        A.    Okay.

8        Q.    Well look at the one that's attached to

9   Nicole Meyers's report.

10       A.    Okay.

11       Q.    Because I do think you like this one

12   better.  This is PA1282.

13       A.    All right.

14       Q.    So what is this?

15       A.    This is the report that when you plug that

16  Taser into the computer program --

17       Q.    Yeah.

18       A.    -- that specific Taser, you can get

19  different versions of the report.

20       Q.    Okay.

21       A.    So when it did the video, pulling the

22  video, it shows -- outlines this was the block of

23  time.  As you can see, the start from here on down to

24  here.  And it even shows when it was connected and

25  the day it was connected.

LaMiles Hill

Page 77

1              So, actually, that's when I pulled the

2    video.  USB connected right there.  So that's when I

3    connected at -- that Taser was connected to the

4    computer at 8:37 on January the 2nd.

5         Q.    Okay.  And you're relying on sequence No.

6    450 --

7         A.    That's right.

8         Q.    -- on page 1283?

9         A.    That's right.  Because nobody else would

10   have had -- would have had access to that Taser or to

11   plug it into the computer unless you were doing --

12   about to conduct a download.  So that's the USB

13   connected right there for the -- to download the

14   video off that Taser.

15        Q.    Okay.  And that means that if P-97 shows

16   the date was January 6th, this just must have

17   happened later?

18        A.    Yeah, that happened later.

19        Q.    All right.  Fine.  When you did the

20   download --

21        A.    Uh-huh.

22        Q.    -- did you actually print this report

23   out --

24        A.    Uh-huh.

25        Q.    -- and hand this to GBI, too?

LaMiles Hill

Page 78

1      A.    Uh-huh.   They should have got a copy --
2  well, I gave it to the command staff.
3      Q.    To give to GBI?
4      A.    Right.
5      Q.    I want to ask you about some of these
6  markings and this handwriting.
7      A.    Okay.
8      Q.    Some of these rows are blue and some of
9  them are yellow.   Did you make these marks?
10      A.    No.
11      Q.    Down on the side here, I believe it says
12  no contact, no contact, contact, contact.
13      A.    It wasn't me.
14      Q.    That's not your handwriting?
15      A.    It must have been someone after I gave it
16  to them, forwarded it up to them.
17      Q.    Down here where it says, "Kenny, Kenny,
18  Kenny, Kenny," you didn't write that?
19      A.    No.
20      Q.    You just gave them a clean report?
21      A.    A clean report.
22      Q.    Whose marks are these?
23      A.    I do not know.
24      Q.    Did you write this top part?
25      A.    No.

LaMiles Hill

Page 79

1      Q.    Okay.

2      A.    When I sent it forward, that's what I say,

3  I didn't -- it was strictly information they got from

4  me, a clean report and everything.  And like I said,

5  that shows you what time I did the Taser.

6      Q.    Okay.  I may have a question about the

7  particular video.

8      A.    Okay.

9            MR. HART:  Can I look at this?

10           MR. CASH:  Sure.

11     A.    Actually, somebody else, according to this

12  right here, connected it to a USB at 7, 8:00 that

13  night.  Yeah.  Okay.

14     Q.    (By Mr. Cash) Okay.  You're referring to

15  line 455?

16     A.    Uh-huh.

17     Q.    Okay.  All right.  Let me ask you some of

18  the same questions about the Taser video.

19     A.    Okay.

20     Q.    When you pull the Taser videos, is there a

21  centralized place where these videos are stored?

22     A.    On this incident right here, it was

23  pulled.  A copy was made.  It was downloaded to the

24  local computer.  A copy was made.  It was sent forth.

25     Q.    With future incidents or with all

LaMiles Hill

Page 80

1    incidents, is there a place where videos are kept?

2         A.    Yeah.    There is actually a -- I don't know

3    what they call it -- evidence.com.    Now -- or it may

4    have been -- I don't know if it was then or now --

5    but evidence.com, they can store them there.

6         Q.    Is that a Web site?

7         A.    Uh-huh.    I think it's on the Taser where

8    the videos are -- you have to talk to one of the IT

9    people who deal with it, or one of the Taser

10   instructors to get more information on it.    But

11   that's where they were going.    At this time I don't

12   know.    At this time what they were -- at this time --

13        Q.    Let me ask you about policies.

14        A.    Uh-huh.

15        Q.    Is there a policy that says every Taser

16   video is copied off and saved for a period or

17   forever?

18        A.    I don't --

19        Q.    You're not aware of any policy?

20        A.    Yeah.    I'm going back to that time.

21        Q.    Okay.    Is that answer different if you

22   look at today?  Do you have a policy on that now?

23        A.    Well, we don't -- we don't use -- we

24   haven't used a Taser since this -- not too long after

25   this incident.    So we haven't used a Taser.

LaMiles Hill

Page 81

1         Q.    When was the last time the jail had the

2    Taser used?

3         A.    That's a good question.  It's been quite

4    awhile.  Since -- this happened, what, '15?

5         Q.    January '15.

6         A.    I'm just estimating.  I'm going to say

7    sometime in '15.

8         Q.    In 2015, the sheriff pulled all the Tasers

9    out of the jail?

10        A.    I'm not exactly sure, but I want to say --

11   it wasn't the sheriff.  It was the chief deputy who

12   was acting in, I think, in the auspice of the

13   sheriff.

14        Q.    All right.

15        A.    I remember when he had them pulled because

16   he had me go around and pull them all.  I just can't

17   remember what month and time that we pulled them, but

18   I know we haven't used Tasers in the jail in quite

19   awhile.  We haven't had them in a while.  So I know

20   it's been over a year.  Since I've been a captain a

21   year, we haven't had the Tasers.

22        Q.    Do you know what the reason was?

23        A.    I don't exactly know if that was a command

24   staff decision.  That's all I can tell you on that

25   and a directive to go collect the Tasers.  So . . .

LaMiles Hill

Page 82

1    Q.    Who issued that directive?

2    A.    Roy Harris.

3    Q.    Okay.  Well, prior to that time, prior to

4    the time the Tasers were collected by you, was there

5    a policy to store the videos that were downloaded off

6    of Tasers?

7    A.    I'm not sure.  What would have been a

8    function of -- at that time, it would have been a

9    function of the security captain or a captain or

10   above.  So I wouldn't know the specifics of their job

11   at that time being I was either a sergeant or a

12   corporal.  You know what I mean?

13   Q.    Right.  I think we agreed you might have

14   been a lieutenant at this time?

15   A.    Yeah.  Well, possibly a lieutenant at the

16   time.  Yeah.  So . . .

17   Q.    Okay.

18   A.    But it would have been something above --

19   unless specifically given a directive to store it,

20   you mean?  Like on this case right here, it was a

21   specific directive, hey, I need you to go down.

22   Q.    I've seen documents that suggest that

23   there was a department-wide review of all Taser

24   videos that was done in May of 2015.

25   A.    Okay.

LaMiles Hill

Page 83

1       Q.    Do you know about that?

2       A.    That was done by IA?  Yeah.  And I think

3  enforcement.  Well, IA -- enforcement did it.

4  Between IA and enforcement, they went there you and

5  reviewed all the Tasers, yeah.  So around that,

6  that's probably when it -- they were taken, I guess.

7       Q.    Were you part of that review?

8       A.    No.

9       Q.    When they made the decision to review all

10  the Taser videos that were available, where were

11  those Taser videos located?

12       A.    Still in the Tasers.

13       Q.    You don't think some of them had been

14  pulled off like you did in this instance?

15       A.    Don't know, you know.  They were all

16  collected, downloaded, but we wasn't privy to, you

17  know, what was seen, what was done with what, what

18  was pulled, no.

19            As a matter of fact, I don't even know how

20  long we had had them prior to that because we

21  actually had another device prior to that.  So Karbon

22  Arms.  And, you know, they went out of business and

23  everything, so . . .

24       Q.    All right.  Let me do a little business

25  with the exhibits to help me with anything.

LaMiles Hill

Page 84

1          A.     Uh-huh.

2          Q.     I think I'm done with that.

3          A.     Oh.

4          Q.     All right.  I'm going to put a cleaner

5     sticker on a cleaner copy and get rid of the old one.

6     So this is not an exhibit.

7               MR. HART:  Can I have the old ones.

8               MR. CASH:  You sure can.

9               (Plaintiff's Exhibit 3 was marked for

10          identification.)

11          Q.     (By Mr. Cash) All right.  Captain Hill, I

12     want to just briefly show you your training records

13     that were provided to me.  This is Exhibit Hill 3.

14     And I want to tell you that this is not a complete

15     list of all the training that I have received for

16     you.

17          A.     Oh, okay.

18          Q.     And mainly I'm just showing this to you to

19     get you to review it and tell me that you think it's

20     an accurate copy of your trainings.  I can explain

21     it.  It's two pieces.

22          A.     Uh-huh.

23          Q.     First of all, does this look like your

24     training records?

25          A.     Yeah.  It looks like a copy from my POST,

LaMiles Hill

Page 85

1    yeah.

2         Q.    Okay.  POST is Peace Officer Standard

3    Training?

4         A.    Yes.

5         Q.    All right.  Just generally, looking at it,

6    do these look like the courses you've taken and the

7    dates you've taken them?

8         A.    Yes.

9         Q.    Okay.  All right.  You may not use that

10   again.  I just wanted to get it marked for the

11   record.

12        A.    Oh, okay.

13        Q.    Okay.  I want to ask you some questions

14   now about the policy on Taser use as it existed on

15   January 1st, 2015.

16        A.    Okay.

17        Q.    When Mr. Ajibade came into the facility,

18   what was the policy authorizing deputies to use the

19   Taser?

20        A.    Policy authorizing them to use the Taser?

21        Q.    Right.

22        A.    That was back on the 15th.  I mean, '15.

23   I want to say -- I'm not going to be really give you

24   a clear answer on that right now because like so many

25   things came out, changed even after that time frame,

LaMiles Hill

Page 86

1    around that time frame to just, you know, just say

2    this was the actual policy at the time of this --

3    that incident.  I'm not going to be able to just, you

4    know, give you that, you know, that definite.

5         Q.    Well, you're Taser certified; right?

6         A.    Not now, no.

7         Q.    You were in January of 2015?  You were

8    authorized to use the Taser; right?

9         A.    Yeah, right.  Right.

10        Q.    And you were trained on using the Taser;

11   right?

12        A.    Right.  Right.

13        Q.    So, surely, there was a policy that told

14   you when you could and could not use a Taser?

15        A.    Right.

16        Q.    Right?

17        A.    Well --

18        Q.    And you --

19              MR. HART:  Can he finish his answer?

20              MR. CASH:  Sure.

21        A.    There were procedures.  There were general

22   policies.  I can go into the training.  I can go into

23   that.  That's what I'm saying.  Are you looking for

24   the general training that we had or the procedures

25   or --

LaMiles Hill

Page 87

1        Q.    Well, I don't make a distinction between
2    policy and procedures.
3        A.    Oh, okay.
4        Q.    Let me try to ask it in a clearer way.
5        A.    Okay.
6        Q.    What were the circumstances in January of
7    2015 under which a deputy was allowed to use a Taser
8    in the detention center?
9        A.    Circumstances.  All right.  Basically you
10   use the look at the totality of the circumstances of
11   the actual incident, i.e., if any officers or staff
12   are in danger.  That -- that is -- that was a
13   determining factor.
14       Q.    And that would permit the use of the
15   Taser?
16       A.    That would permit, depending on, like I
17   said, totality of the circumstances.  If an officer
18   was in danger of being -- of bodily harm or injury,
19   that would -- there were some core general things you
20   have to consider from the training, i.e., if the
21   person was pregnant, if the person after being tased
22   would sustain a great bodily injury from falling,
23   from an elevated position or something like that.
24            It really -- really, when you look at the
25   totality of the circumstances, like I said, of those

LaMiles Hill

Page 88

1    circumstances being the opportunity, ability, the

2    jeopardy of that detainee of being able to do harm to

3    someone.  I mean, you know, what a reasonable officer

4    would use or do in that situation, you know.

5         Q.    Were there any clear cut scenarios where

6    you were absolutely not permitted to use a Taser?  I

7    think pregnant is one.

8         A.    Yeah.  Pregnant.  You were told it

9    wouldn't be wise to use it if water as at play.  You

10   know, if there was a lot of water around.

11        Q.    But was that a clear cut reason not to use

12   it?

13        A.    No.

14        Q.    That's what I'm asking you.

15        A.    You're talking clear cut?  I know about

16   pregnant.  What's another clear cut reason?  I can't

17   really say.  That's real clear cut right off the top

18   of my head right now.

19        Q.    Okay.  The only clear cut case where Taser

20   use was absolutely forbidden was if the detainee was

21   pregnant?

22        A.    No.  I'm not saying that was the only.

23        Q.    Okay.

24        A.    I'm going to say the totality of the

25   circumstances dictated what would come into play.

LaMiles Hill

Page 89

1    You know what I mean?  A person had to evaluate what

2    was happening right then right now because -- and I

3    can -- you know, and I can go into this because I

4    know this has been one that, I think, everyone's

5    arguing because it came out during that time, the

6    person was in restraints.

7              Well, there have been incidents where

8    people in restraints can put people in great bodily

9    harm or in harm.  And people have been tased in the

10   past in restraints where they were committing -- so

11   that's why I want -- I don't know if that's the

12   clear cut way you're looking, but there's -- the

13   totality of the circumstances dictate because we've

14   had incidents where people have been in full

15   restraints and assaulted staff and knocked staff out.

16   So I'm not -- there was nothing -- the totality of

17   the circumstances would dictate that.

18        Q.    Okay.

19        A.    Yeah.

20        Q.    Well, so, other than being pregnant, there

21   is no or was no absolute bar to using the Taser in

22   January of 2015, not even being in restraints?  Being

23   pregnant is the only one that you can say?  Is that

24   true?

25        A.    To my knowledge right now, and back then,

LaMiles Hill

1    other than any definite restraints in the training

2    that we got from Taser, restraints on, as far as I'm

3    saying, definites where you couldn't tase someone, if

4    Taser didn't have it and if it wasn't -- you look to

5    the totality of the circumstances.

6         Q.    Okay.  Would officer's discretion play a

7    role?

8         A.    I won't say discretion.  I'll say totality

9    of the circumstances.  The officer has to assess the

10   threat level, the danger level to themselves and the

11   staff and people who were around them to deem, you

12   know, if it was necessary or if it's necessary.

13        Q.    Okay.

14        A.    So, yeah.  So -- I didn't mean to cut you

15   off.  To an extent, discretion, but not really

16   discretion when you have to have those opportunity,

17   ability and jeopardy involved in it.

18        Q.    It sounds like the sheriff did not have,

19   in January of 2015, a policy that said you should not

20   use a Taser on someone who is classified as mental

21   health?

22        A.    No.  I'm not familiar with one, I'll put

23   it this way, if there was one or if there wasn't one.

24   I'm not familiar with that policy or was familiar --

25   let me put it that way -- in 2015 was familiar with

LaMiles Hill

Page 91

1    that policy.  If there was one or if there wasn't

2    one, I wasn't familiar with it.

3        Q.    Okay.  Now, you yourself have used the

4    Taser on a person who was restrained; correct?

5        A.    Uh-huh.  Yes.

6        Q.    And what were the circumstances of that?

7        A.    The officer was being assaulted by the

8    person who was being restrained.  I mean, by the

9    person who was restrained.

10       Q.    Was that person in full restraints?

11       A.    They were in hand and leg shackles.

12       Q.    Okay.

13       A.    I was coming into work in housing Unit 2

14   at the time.  The all wing officer was running the

15   females hour out.  As a matter of fact, she was a

16   mental health female.  She was on her hour out.  The

17   female detainee lunged towards the officer and

18   started beating the officer in the chest.

19            Seeing that, the Taser was in the hub --

20   hub area.  Grabbed the Taser, ran into the wing, and

21   instantly deployed the Taser so that the officer

22   could get away from the detainee.  The detainee fell

23   to the floor.  The officer stepped away from the

24   detainee, was in shock, of course, because she had

25   been assaulted.  Staff arrived.  The inmate was

LaMiles Hill

Page 92

1    checked, cleared by medical.  Put the inmate up.  The

2    officer was also checked and cleared by medical.  But

3    the officer was in, like I said, immediate danger

4    because the inmate was assaulting the officer, yes.

5         Q.    Did you get permission to use the Taser

6    before you did it?

7         A.    No.

8         Q.    Okay.

9         A.    No.

10        Q.    Did the officer suffer any injuries in

11   that incident?

12        A.    The officer, I think, more of the shock of

13   the inmate actually hitting because she was actually

14   hit with a closed fist, hands in the chest.

15        Q.    I assume with the handcuffs on hitting

16   with both fists?

17        A.    With both fists and they were loud enough

18   for me to hear the strikes.  So, yeah.

19        Q.    Okay.  Other than being startled by the

20   assault, did the officer suffer any injuries?

21        A.    No.  No.  I mean, nothing where she had to

22   go to the hospital or anything like that.  No.

23        Q.    Who was the officer?

24        A.    The officer was -- oh, Lord, what is her

25   name?  I see her face plain as day.  I'm trying to

LaMiles Hill

Page 93

```
 1    remember her name.  Oh, my goodness.  I see her face
 2    plain as day, but I can't remember what her name is.
 3    Oh, goodness.  It was -- you got to be kidding me.  I
 4    can't remember it right now offhand.  Yeah.  Yeah.
 5    If it comes to me, I'll let you know.
 6         Q.    And we won't tell her that you forgot her
 7    name.
 8         A.    Yeah.  Oh, I know it now.  Ella Murchison.
 9    That's her name.
10         Q.    Murchison?
11         A.    Ella is her first name.  Last name
12    Murchison.
13         Q.    Is she still employed?
14         A.    Yes, she's still employed with the
15    sheriff's office.
16         Q.    Okay.  Do you remember who that inmate
17    was?
18         A.    I want to say her first name was Emma.
19    No, I can't.  I'm not going to guess.  I can't quite
20    remember what the inmate's name was.
21         Q.    All right.  Can you guess as to the month
22    and year this happened?
23         A.    I was a corporal.  So 2008, '09, somewhere
24    in that time frame.  '08 or '09, somewhere in that
25    time frame.
```

LaMiles Hill

Page 94

1      Q.    Okay.

2      A.    I hadn't been a corporal too long.  So

3  whenever I got promoted to corporal, this thing

4  happened very, very long after that.

5      Q.    And then a year later you were a

6  corrections officer of the month?

7      A.    Yeah.  So . . .

8      Q.    Okay.  Did you write that up, that episode

9  up in a use of force report?

10     A.    Yes, I did a use of force and incident

11  report.  I had to do an incident report and use of

12  force because a Taser was used and force was used,

13  yeah.

14     Q.    Any reason that you know of why that

15  wouldn't be in your personnel file?

16     A.    No.

17     Q.    I know you don't maintain the file.

18     A.    Yeah, right.  I don't maintain the file.

19     Q.    But there's nothing you can think of that

20  would explain why it wouldn't be in there?

21     A.    No.  No.

22     Q.    Okay.  Were you disciplined?

23     A.    No.

24     Q.    Okay.

25     A.    Not even talked to.  Oh, yes.  Yeah.  I

LaMiles Hill

Page 95

1   had one supervisor, but that's happened right, you

2   know, during the incident and everything where the

3   watch commander asked why didn't I call in.

4   Basically told us this was an incident where the

5   person was -- officer was being attacked right here

6   in front of me, you know.  So, you know, so . . .

7           Q.    Okay.

8           A.    That was it.  Nothing -- nothing else.

9   Heard nothing else afterwards about it.

10          Q.    Okay.  So even though she had a mental

11  health classification, she was in hand restraints,

12  she was in leg restraints, you still felt it was

13  fully justified to use a Taser because the officer

14  was at risk?

15          A.    Well, the officer was being physically

16  assaulted at the time.

17          Q.    Right.

18          A.    Right.

19          Q.    That's your --

20          A.    Uh-huh.

21          Q.    And you think that complies with the

22  policy that was in effect at that time?

23          A.    Well, I don't -- obviously, I don't know

24  because nobody ever came back to me and said I did

25  anything wrong --

LaMiles Hill

Page 96

1        Q.    Okay.

2        A.    -- at that time, which was back in, like I

3   say, it was in '08.  And my only options was do I go

4   over there and physically fight this female inmate or

5   do I -- which I, you know, had to look at myself at

6   the time.  I was in some kind of a shape back then.

7   So how would it look me going and putting my hands,

8   open or closed fist, even though she's assaulting an

9   officer?

10            So that seemed like the better option, you

11  know, to get.  And like I said, it was the totality

12  of the circumstances.  I had to think fast and get in

13  there and help that officer.

14       Q.    Okay.  I want to go, I guess, while you're

15  talking about this so much, I want to go to your

16  training records, if I can.

17       A.    Uh-huh.

18       Q.    And I want to highlight a couple of

19  records for you --

20       A.    Okay.

21       Q.    -- that I've marked on my copy.

22       A.    Okay.

23       Q.    I see you going back.  This is on page

24  10302.

25       A.    Uh-huh.

LaMiles Hill

Page 97

1      Q.      Going back to March 31st, 2004 --

2      A.      Uh-huh.

3      Q.      -- I see four hours of Taser electrical

4   device training.  This is right when you started your

5   job?

6      A.      Right.

7      Q.      Were you then authorized to use the Taser

8   after you received this four hours of training?

9      A.      Going back to the -- from what I knew back

10  then, because, you know, this is when I'm just coming

11  in new, the lieutenants were the only ones that I

12  ever saw with them.  You know what I mean?  Or the

13  hub supervisor were the only ones, you know, coming

14  on.

15          When we first got trained when I came on

16  to work, this was basically like a standard or

17  voluntary -- not say voluntary -- yeah, it was

18  voluntary back then training that we -- I mean, you

19  had to go through the training but, I mean, you had

20  to go either -- to be authorized to use it, you had

21  to be tased.  So, of course, we had some people who

22  say I'm not going to use it.  So I didn't want to be

23  tased.

24          So basically that was the statement.  If

25  you ever had to use it, the only way you can use it

LaMiles Hill

Page 98

1   if you actually go through the being tased part.  And

2   I don't know if that was part of how it was supposed

3   to be trained through Taser back then or not.

4          Q.    You got tased in March of 2004?

5          A.    Oh, yes, I did.

6          Q.    And were you allowed to use the Taser

7   after that, after that class was finished?

8          A.    No one ever said I could or couldn't.

9          Q.    Okay.

10         A.    But I'm not going to say couldn't because

11  there were things put in place.  The watch

12  commander -- there was the watch commanders and the

13  lieutenants back in when I first came in, they

14  basically made -- lieutenants, sergeants and above,

15  those were the people -- well, actually, and

16  corporals -- supervisors were basically the only ones

17  who really dealt with the Taser when I first came on.

18  So there were supervisors who dealt with it.

19         Q.    Is it fair to say this:  You received

20  training in 2004 --

21         A.    Uh-huh.

22         Q.    -- but you don't know whether you were

23  allowed to use the Taser after the training?

24         A.    Mostly the supervisors have the capability

25  of using it.

LaMiles Hill

Page 99

1      Q.    Okay.

2      A.    Because even as a wing officer, if -- if

3   we had a situation, we're called down, we're called,

4   supervisors and the supervisors will respond, whether

5   it be the watch commander told a sergeant that he was

6   authorized to go in there with it or -- you see what

7   I'm saying?

8      Q.    A supervisor --

9      A.    A supervisor had to -- yeah, to use it,

10  yeah.

11     Q.    Okay.  I flipped ahead, May 31st, 2007,

12  Taser X26.  This is the next Taser class I found in

13  your records after 2004.

14     A.    Uh-huh.

15     Q.    And then I didn't see another Taser class

16  at all until 2015.

17     A.    Uh-huh.

18     Q.    Is that right?  That you only received two

19  classes, one in '04 and one in '07?

20     A.    Actually, I got a -- what did we do

21  another -- I did some training up in West Virginia

22  where I did another Taser-type training in West

23  Virginia.  But as far as the department, that was --

24  yeah, that's when we had our initial -- our Taser

25  classes.

LaMiles Hill

Page 100

1      Q.      Okay.  Well, tell me about the West
2  Virginia training just briefly.  When did it occur?
3      A.      Oh, boy.  Taser was putting on a little
4  class and demonstration up there at a mock prison
5  riot.
6      Q.      Okay.
7      A.      So, yeah.  So that's when that occurred up
8  there at the mock prison riot.  Taser was doing a --
9  a vendor class to try and get people to purchase them
10  and everything.  And I got tased in that one, too.
11      Q.      I know about those classes.  Do you know
12  about when it was?
13      A.      Let's see.  I went up there in '09, '10,
14  '11.  Oh, man.  I don't know which one it was.  I
15  don't think it was my first time.  It might have been
16  our second time.  It was either '10 or '11.  2010 or
17  '11.  One of those two years.  But that's the last
18  time I did do something with any, you know, any
19  Taser-type training prior to the one in 2015.
20      Q.      Right.  All right.  And I'm going to come
21  back to that one.
22      A.      Okay.
23      Q.      All right.  Let me move on to something
24  else.  You were interviewed by the IA after --
25      A.      Uh-huh.

LaMiles Hill

1      Q.    -- Mathew died; correct?

2      A.    Uh-huh.

3      Q.    And this is the Nicole Meyers' report that

4  we have marked P-11A.

5      A.    Okay.

6      Q.    And I will not make it an official exhibit

7  here because we've marked it so many times.

8      A.    Okay.

9      Q.    So if you flip to page 18.  That's where

10 they talk about you.

11     A.    Okay.

12     Q.    And I'll have some questions for you.

13     A.    All right.

14     Q.    I'm going to pretty much walk you through

15 this.

16     A.    All right.  That's fine.

17     Q.    So you see your interview there?

18     A.    Uh-huh.

19     Q.    First of all, have you seen the Meyers

20 report in its entirety?  Have you ever seen this

21 report before?

22     A.    I don't think I've ever seen a written

23 copy of this report.

24     Q.    Okay.  And you also did a handwritten

25 statement --

LaMiles Hill

Page 102

1          A.    Right.

2          Q.    -- which is attached to this report?

3          A.    Okay.

4          Q.    And this interview was videotaped?

5          A.    Right.

6          Q.    But you haven't seen their writeup of your

7     video; is that right?

8          A.    Yeah.

9          Q.    Okay.

10         A.    Because they don't give us -- you know,

11    when they do this, they do the interviews, we don't

12    get copies of it unless we go, I think -- I forgot

13    how that works, if we have to do an official request

14    for them to give us a copy of the final report.

15         Q.    Okay.  I'm going to probably read most of

16    this to you but I want to stop along the way, if

17    that's all right.

18         A.    Okay.

19         Q.    But here they just say, "We started the

20    interview.  We gave you your Garrity warnings."  And

21    then they say, "We began the interview by asking him

22    what his Dynamic Cell Extraction Training in Florida

23    consisted of."

24               So I guess I want to stop and ask what did

25    you tell them about this training in Florida?

LaMiles Hill

1        A.     Basically it was through the US C-SOG.

2    The training basically went through the option --

3    basically it covered your options as detention --

4    well, as an officer or correctional officer with

5    different types of -- different types of basic tools,

6    that it went through all the tools that you had that

7    you could use or work with to deal with those

8    situations that -- like situations in a correctional

9    environment with hostile inmates and just different

10   situations.

11       Q.     You said US?

12       A.     C-SOG.

13       Q.     Can you spell that for us?

14       A.     US-C -- I'm sorry.  US-CSOG.

15       Q.     Okay.  Thank you.  A portion of the

16   training was about the use of a Taser; right?

17       A.     Right.

18       Q.     So what were the recommendations from the

19   Florida training?

20       A.     From the training, their -- and this is

21   what they constantly said, go back to your department

22   and your departmental policies.

23       Q.     Okay.

24       A.     That's basically No. 1.  So they just gave

25   some recommendations, but ultimately, and they said

LaMiles Hill

Page 104

1   it over and over again, go back to your departmental

2   heads and everything, you go back to your

3   departmental policies and procedures if you are

4   authorized to use Tasers.  Because we have people

5   from multiple agencies and every agency didn't allow

6   this or didn't allow that.  So there was different

7   training allowed by each agency.  I mean, not

8   training, but different guidelines by different

9   agencies.

10       Q.     This was a training that the sheriff sent

11  you to?

12       A.     Uh-huh.

13       Q.     Did you receive credit for attending this

14  training as part of your training records?

15       A.     I don't know because it was out of state.

16  So I don't know if Georgia was going to honor it.  I

17  think we brought back the paper --

18       Q.     Okay.

19       A.     -- certificates and turned them into

20  training.  So if it didn't end up in there, Georgia

21  might have didn't recognize it.  I mean, I don't work

22  at training, so I don't know what they'll take.

23       Q.     Okay.  Well, did the Florida trainers

24  train you that it would be okay to use the Taser on

25  someone who's fully restrained?

LaMiles Hill

1      A.      My instructor -- I don't even think we

2  even went into that portion.  I mean, we were -- like

3  I said, different training, looking at different

4  tools.  We didn't even cover anything --

5      Q.      You didn't cover what to do if the person

6  is in restraints?

7      A.      No.

8      Q.      Did you cover what to do if the person has

9  a mental health condition?

10     A.      We did some of the things because it

11 varied from agency to agency.  So we listened to what

12 other people said their agency said they can do, what

13 they're saying and then what -- you know, he put out

14 some of the guidelines that US C-SOG operated under,

15 like that.

16     Q.      Okay.  So when you came back, though, you

17 continued to follow the sheriff's policies?  You

18 understood it?

19     A.      Well, yes.  I came back following the

20 specific conferences and I understood.  Information

21 was brought back about the training and everything

22 and submitted to the security cabinet.  Let them know

23 what we learned, some of the things we may need to

24 look at, and possibly some of the changes we can

25 make.  That was pretty much it.

LaMiles Hill

1        Q.    Okay.  I want to keep going on with the

2   interview here.  It says, "Hill is taught first and

3   foremost a camera should always be present during any

4   use of force incident."

5        A.    Uh-huh.

6        Q.    That refers to a video camera; right?

7        A.    Right.  And that was one of the things

8   that I learned at the training in Florida.

9        Q.    Was that not a policy that the sheriff

10  had?

11       A.    It was a policy for the CERT team, if

12  there was a CERT team activation.

13       Q.    Okay.

14       A.    But not a -- and if you had time to get

15  one, you know what I mean?  To get one, yeah.

16       Q.    Let me focus on the events with

17  Mr. Ajibade.

18       A.    Okay.

19       Q.    After the scuffle occurred, he was put

20  into a restraint chair and wheeled into the female

21  holding cell?

22       A.    Uh-huh.

23       Q.    And I guess you've seen the tapes where,

24  you know, he's left alone for a period of time and

25  the deputies come back?

LaMiles Hill

1       A.      Uh-huh.

2       Q.      Did the deputies have time to get a camera

3    at that point?

4       A.      When you're looking at -- what do you mean

5    come back?

6       Q.      After they put him in the cell and they

7    recongregated, did they have time to get a video

8    camera and record what they were going to do?

9       A.      Was he already in the restraint chair or

10   not in the restraint chair?

11      Q.      I believe so.

12      A.      So he was already in a restraint chair?

13      Q.      Right.

14      A.      Well, that's -- at that point why would

15   you need the camera?

16      Q.      Okay.  Let me ask you this:  When the

17   Taser was brought into the cell, wasn't there time to

18   have a camera present with the --

19      A.      The camera was present.  The Taser has a

20   camera.

21      Q.      And you think that's sufficient?

22      A.      Well, in a situation right there where you

23   had so much going on so fast and people were running

24   into a situation, and it was all going on like right

25   there, and this wasn't a -- it wasn't something that

LaMiles Hill

1   was preplanned out by the staff to respond to.  It

2   wasn't something where they had brought a camera --

3   once they got them on restraints on the floor, the

4   time to go and get one, yes, someone could have been

5   delegated to go get one with the amount of people who

6   came there.

7           But to save time-wise, when that should

8   have occurred, I can't give you that because, you

9   know, that's going to be in the perspective of the

10  people who were there at that time.  But there should

11  have been a delegation of someone at some point to

12  get it, especially when they knew when they were

13  going to put him in the chair.  Or if the chair was

14  going to be deemed when he had to go into the chair.

15      Q.   Let me move on in the interview.

16      A.   Okay.

17      Q.   They write, "No one in restraints should

18  ever be tased.  Once compliance is made, the officer

19  should deescalate.  Nothing was taught in Florida

20  training regarding the use of a Taser while a

21  detainee was in restraints."

22      A.   Uh-huh.

23      Q.   All this is describing the Florida class?

24      A.   Uh-huh.  Most of it, yeah.

25      Q.   Okay.  The Florida class harped on

LaMiles Hill

Page 109

1    following your own departmental policies?

2        A.    Uh-huh.

3        Q.    And then it writes:  "It was put out in

4    the letter from administration you will not tase an

5    inmate in restraints."  What's that talking about?

6        A.    That was -- that is, I guess, in an office

7    memo that was put out, I don't know, man, two and

8    some change.  Someone put it in an interoffice memo

9    that detainees will not be tased while in the

10   restraints.

11       Q.    Do you remember anything about when that

12   was?

13       A.    Is that before or after that?  I can't

14   remember if that happened after that or before it.

15       Q.    Meaning you don't know whether that letter

16   came out before Mathew was killed or after?

17       A.    Yeah, right.  I can't quite remember if it

18   was before or right after it.

19       Q.    All right.

20       A.    But I know an interoffice correspondence

21   letter went out stating that.

22       Q.    Flip me to the next page, 19.

23       A.    Okay.

24       Q.    This is referring to you.  It says, "When

25   he watched the Taser video footage, he saw Ajibade

LaMiles Hill

Page 110

1    rise up once, maybe twice" --

2                MR. HART:  I don't mean to interrupt.  But

3         can he go ahead and just read the rest of it and

4         then come back and you ask questions?

5                MR. CASH:  Yeah.  I don't want to take a

6         huge amount of time with all of it.  The first

7         paragraph is what I'm asking about.

8                THE WITNESS:  Okay.  You can go ahead.

9         Q.    (By Mr. Cash) Okay.  All right.  It says

10   you told the investigators that "there were more than

11   enough officers to hold Ajibade down in order to

12   secure him in the chair.  Because his hands were

13   never left free, he could not have become

14   assaultive."  Correct?

15        A.    Uh-huh.

16        Q.    Is that what you told the investigators?

17        A.    Yeah, that's what I told them at the time

18   of this.

19        Q.    Okay.  So given the fact that Mr. Ajibade

20   could not assault the officers --

21        A.    Well, I'm just --

22        Q.    -- do you believe that it would have been

23   appropriate for them to use the Taser since they had

24   the opportunity to just hold him down?

25                MS. MEADOWS:  Object to form.

LaMiles Hill

Page 111

1            MR. HART:  You can go ahead and answer.

2       A.    Okay.  With this question right here, with

3  what you just asked me, and even with what I said

4  right here, over the past, let's see, year, over the

5  past, I'm going to say year and a half, I've changed

6  on that because I've been involved in several other

7  incidents since then where a detainee has been in the

8  restraint chair and they have been able to assault

9  staff while in the restraint chair, i.e., spitting,

10  i.e. attempting to bite.

11            We've had -- and at this time, yes, I

12  thought that, you know, a person couldn't be --

13  couldn't do serious -- cause serious injury or

14  assault on someone while they were in the restraint

15  chair.  But that has since changed because I have

16  personally been in areas since then where we

17  attempted to put people in the chair and these people

18  have been assaultive to include trying to head butt

19  people while in a restraint chair.

20            So I could say at that time when I made

21  this statement didn't think that it couldn't happen,

22  but since then I've been involved in some incidents

23  where I have seen where we have individuals, and

24  there are certain individuals who can be assaultive

25  while in a restraint chair, even with their hands

LaMiles Hill

Page 112

1   behind them.

2       Q.    Okay.  So your current view is that even

3   if someone is restrained, it would still be okay to

4   use the Taser on that person --

5       A.    I'm not saying --

6       Q.    I've got to finish.  I want to ask a clean

7   question and get a clean answer.

8       A.    Okay.

9       Q.    Because I want to make sure these are

10  clean on both sides.

11      A.    Uh-huh.

12      Q.    It sounds like to me your current view is

13  if someone is in restraints, they could still assault

14  an officer.  And, therefore, your view is that it

15  would be okay to use the Taser in circumstances like

16  that?

17      A.    No.

18      Q.    Is that true?

19      A.    No.

20      Q.    Okay.

21      A.    Totality of the circumstances.

22      Q.    Well, does that permit that some of the

23  time it would be okay to use the Taser on a person

24  who is restrained and attempting to assault an

25  officer?

1     A.    No.  I'll give you an example.

2     Q.    Okay.

3     A.    If I have a detainee who's in the chair,

4   the officer is bending down trying to strap that

5   detainee's lap into the chair, the detainee reaches

6   out and bites and latches onto the side of that

7   officer's face or ear or something like that, the

8   inmate is not responding to pressure points or --

9   pressure points, strikes, at that moment, and you

10  have either pepper spray or a Taser right there to

11  hopefully give you -- what is your option then, you

12  know.

13     Q.    So tasing is okay?

14     A.    I am not saying tasing is okay.  You have

15  to weigh the totality of the circumstances.

16     Q.    Is tasing an option in those cases?

17     A.    Depends, like I said, on the totality of

18  the circumstances.  If they're -- each incident is

19  going to be different.  There is no one use of force

20  incident that is going to be the same.  And I'm not

21  saying that it's okay to tase someone in a restraint

22  chair.  I'm not saying that it is totally never,

23  never, ever, ever, because just like the scenario I

24  just put forth to you.  That is going to be a -- that

25  officer making a reasonable choice -- making a choice

LaMiles Hill

Page 114

1   based upon their experience and the totality of the

2   circumstances if they're going to take and choose

3   that option versus any other option that may be

4   immediately available for them to protect the person

5   who is right there.

6       Q.   But I just want to get this straight.  The

7   Taser is a possible option in a circumstance like the

8   one you described?

9       A.   Not a full tase.  I wouldn't say a full

10  tase, no.

11      Q.   You would say a drive stun?

12      A.   Yeah.  For compliance, for pain

13  compliance.

14      Q.   Right.  It is okay to drive stun an inmate

15  who is restrained, who is actively attempting to

16  assault an officer?

17      A.   No.  No.  The totality of the

18  circumstances.  I will tell you it's the totality.

19  If you've got an officer that is right there that's

20  being aggravatedly assaulted while an inmate is in

21  the restraint chair, officer's being aggravatedly

22  assaulted, I'm sitting there.  I'm that -- I'm the

23  inmate.  I'm sitting there and I have latched on with

24  my mouth onto an officer's neck, face, arm, anything

25  that's right there.  Staff, everyone who's around

LaMiles Hill

1    have tried other options to get me to unlatch.

2           Let's use the case of a mental health

3    inmate or an inmate that's on drugs, unknown drugs.

4    Flakka, that's a good one right there to use.  Or

5    something like flakka where eating flesh would not

6    be -- it's nothing to them to latch onto someone's

7    flesh and pain compliance didn't work.  I am not

8    going to right here say I would totally say no Taser

9    should never be used because I'm going to say there

10   are, although may possibly be rare, there are extreme

11   cases where pain compliance may have to be used to

12   get that individual.  I'm not saying a full tase, but

13   just a pain compliance of a drive stun may have to be

14   used in certain extreme situations.

15          So I can't give you a definite no because

16   it's going to be dependent on the totality of the

17   circumstances, the ability, opportunity and jeopardy.

18   Those are the guidelines we live -- I mean, we serve

19   by, protect by.  And if you have -- so just in that

20   scenario, I would say I can't give you a full -- I

21   know you want a full yes or a full no, but it's an

22   open-ended because the totality of the circumstance.

23      Q.    Okay.  Well, I appreciate your response.

24   And is that based on the training that you received

25   and is that based on the policies of the sheriff that

LaMiles Hill

Page 116

1    were in effect at the time you had access to Tasers?

2        A.    Based on the -- yeah.  Based on training

3    and experience that had at the time, based on if the

4    totalities met that level, totality of the

5    circumstances met that level at that time, I would

6    not completely just rule out.  I'm not saying in this

7    specific case that it warranted it or didn't warrant

8    it.  I'm just saying I cannot give an answer totally

9    yes or no.

10            I know when this came out, after doing

11   research, after looking at some of the changes in our

12   society -- because even since this right here, this

13   interview, looking at videos of mental health,

14   flakka, and seeing the difference in the type of

15   individuals you may come across and how aggressive

16   and violent they can become now, you can't just give

17   a full yes or no.

18            Now, whatever policy has, our policy has

19   and dictates, yes, I am going to go by what our

20   policy and procedures are put in front of me.

21   Because anything outside of that, then I would own

22   it.  But my opinion, which I can't give you what

23   you're looking for with my opinion.  Okay?

24       Q.    Well, let me subtract some facts out of

25   your hypothetical.

LaMiles Hill

Page 117

1      A.      Okay.

2      Q.      I appreciate your laying it out.

3      A.      Uh-huh.

4      Q.      But there's no evidence that Mathew was

5  actually biting onto and latching onto the flesh of

6  any of the deputies in the cell; right?

7      A.      I don't know.

8      Q.      You've never heard that?

9      A.      I don't know what was -- all I seen was

10  the floor and outside of what happened in the cell

11  and a few clips from the Taser video.  That's it.

12     Q.      Is this still your final conclusion?

13     A.      Uh-huh.

14     Q.      "Hill went back and forth with his opinion

15  as to whether or not the Taser should have been

16  utilized on Ajibade.  Due to there being little or no

17  video footage, he simply was unsure if Kenny's

18  actions were warranted."  Is that true?  Is that true

19  today?

20     A.      That's still true because if you don't

21  have -- even with video, video doesn't always show

22  everything that is transpiring completely in the

23  moment of what's going on.  And there's no video in

24  there to give me a full range of what was the

25  aggressiveness.  All we have was those short

LaMiles Hill

Page 118

1    five-second clips from the Taser video.

2         Q.    Right.  So if you were to appear in court

3    to testify in this case, you wouldn't say one way or

4    the other whether you thought Kenny's actions were

5    justified?

6         A.    No, I won't.

7         Q.    Would you have any testimony in favor of

8    or against the actions of any of the other officers?

9         A.    It's not my -- it's -- that's an

10   opinionated question.  I mean, their actions and

11   their reasons why they did that would be for them to

12   explain when they're on the stand.  I can't attest to

13   what they were thinking in their head when this

14   happened, when that happened, when that happened.

15   So . . .

16        Q.    Okay.  All right.  I'm going to show you

17   your --

18        A.    Okay.

19        Q.    -- handwritten statement.

20             (Plaintiff's Exhibit 4 was marked for

21        identification.)

22        Q.    (By Mr. Cash) I'm getting close to getting

23   done, by the way?

24        A.    That's fine.

25        Q.    I know I told you that I'll try to get you

LaMiles Hill

Page 119

1    out of here.  This is going to be Exhibit Hill 4.

2    This is marked PA1199 through 1202.  All right.

3                MR. HART:  Read your statement.

4        Q.    (By Mr. Cash) This is the statement that

5    you gave.  Is this the statement you gave to the IA

6    investigator?

7                MR. HART:  Just read it first.

8        Q.    (By Mr. Cash) You can say if this is your

9    signature and this is the date.

10       A.    Yeah, that's my signature and date at the

11   bottom.

12       Q.    All right.  You can take all the time

13   reading it, if you want, but that's the only question

14   I had for you.

15               MR. HART:  Yeah.  If that's it, that's it.

16               MR. CASH:  All right.  That's all I wanted

17          was for you to testify that that's your

18          statement.  I'm not going to ask you any

19          questions about it.

20               (Plaintiff's Exhibit 5 was marked for

21          identification.)

22       Q.    (By Mr. Cash) Okay.  So I want to show you

23   a memo from January 9th --

24       A.    Uh-huh.

25       Q.    -- 2015 that I'll mark as Hill 5.  Have

LaMiles Hill

Page 120

```
 1   you seen this before?
 2        A.    Yes.
 3        Q.    Is this the memo that you were referring
 4   to in the Meyers IA interview transcript?
 5        A.    Yeah.
 6        Q.    So that's when they said a memo came down
 7   saying you shall not tase an inmate in restraints?
 8        A.    Uh-huh.
 9        Q.    This is the memo you were talking about?
10        A.    Yes.  That's what we were referring to in
11   that conversation.
12        Q.    And you know this is dated after Mathew
13   died; right?
14        A.    Uh-huh.
15        Q.    Okay.  If you want to take time to read
16   it, that's fine with me.
17              All right.  I've got some questions about
18   this one.
19        A.    And going -- okay.  That's fine.  Go
20   ahead.
21        Q.    First thing is this says, "This memo
22   supersedes prior memo dated January 9th."  And it's
23   also dated January 9th.  Were there two memos on this
24   day?
25        A.    That's what I'm trying to figure -- I was
```

LaMiles Hill

Page 121

1    reading that when I read it.  So I don't know.  Did

2    they revise the memo?  You're asking the wrong

3    person.

4           Q.    Okay.

5           A.    Honestly and truly.  I don't know what

6    that's referring to right off the top of my head.

7           Q.    Okay.  Well, it says, "Per departmental

8    policy and procedures, no inmate will be tased while

9    in full restraint arm/leg or after being placed in a

10   restraint chair."

11          A.    Okay.

12          Q.    Now, that's a clear cut case of you can't

13   use a Taser; right?

14          A.    Uh-huh.

15          Q.    And in your view, prior to getting this

16   memo, the policy did not include these clear cut

17   rules?

18          A.    Not that I -- to my recollection, because

19   I may be wrong, I don't recall where it was at in the

20   policy.  And if it was in there, then I must have

21   overlooked it or I just can't recall it right now.

22          Q.    Okay.  So to the best of your memory, you

23   don't remember there being clear rules saying don't

24   tase in restraints or in the restraint chair before

25   getting this?

LaMiles Hill

Page 122

1      A.    Right.

2      Q.    Okay.

3      A.    All I can go by with that is basically,

4    like in my IA interview, you know, when they talked

5    to me in my IA interview about the same incident that

6    I had with the aggressive female, the one who

7    assaulted the officer, which I brought up, hey, I had

8    a situation where someone was in and I stepped in and

9    had to help an officer.  And . . .

10     Q.    Okay.  They also say this:  "Any inmate

11   placed in the restraint chair during intake in

12   Receiving and Discharge will be placed in detox cell

13   1, 2 or 6 in the old booking area."  Now, is that a

14   new rule?

15     A.    At that time I wasn't up at one of the

16   officers who -- I didn't work up in booking prior

17   to -- actually never worked in -- well, afterwards,

18   maybe back in late 2015, I got moved, assigned up to

19   booking.  But that would be someone who worked --

20   you'd have to ask someone who worked in booking or

21   R&D area right after they opened it up after

22   construction.  You know what I mean?  If that was put

23   up.

24     Q.    Okay.  At the bottom they say, "No officer

25   will routinely carry a Taser in a holster or by any

LaMiles Hill

Page 123

1   other means within the facility."  Did that happen?

2        A.    When?

3        Q.    At any time?  Did people carry a Taser

4   routinely?

5        A.    At one point.

6        Q.    When was that?

7        A.    Years ago.  I can't -- it was years ago in

8   Unit 4.

9        Q.    The mental health unit --

10       A.    Right.  Right.

11       Q.    -- that you worked in?

12       A.    No.  No.  I mean, well, back at that time,

13  I wasn't working there.  But years ago, you'd have to

14  ask them who actually ran it.  But at one point the

15  secondary officer had one because we had had several

16  assaults on staff in there.

17       Q.    Okay.  So that officer was permitted to

18  carry a Taser in a holster at all times?

19       A.    Uh-huh.  But that didn't last long.  I

20  think they stopped it.

21       Q.    Okay.

22       A.    After a couple of months.

23       Q.    Can you give me any detail when this would

24  have been?

25       A.    Between -- wow.  I came in in '04.  2008

LaMiles Hill

Page 124

1   is -- well, let's say between 2007 and maybe 2010,

2   somewhere like that.

3        Q.    Okay.  Was it still going on at the time

4   of this memo?

5        A.    No.

6        Q.    In places in the facility?

7        A.    No.

8        Q.    Why did they feel the need to put this in

9   all caps in a memo that changed the policy?

10            MR. HART:  Object to form.

11            MS. MEADOWS:  Same.

12       A.    I don't know.  I'm not the one who wrote

13   this.

14       Q.    (By Mr. Cash) I know that.  I know.

15       A.    Yeah.

16       Q.    Okay.  Let me give you this one as well.

17   I'm just going to put these together in the same

18   exhibit.  This follows on later, February 9th.  It's

19   another memo.  It's page 2344 in the sheriff's --

20   have you seen this one?

21       A.    Yes.

22       Q.    Okay.  Major Wilson and Major Middleton

23   write:  "All staff are reminded that no

24   Taser-conducted electrical weapon needs to be used

25   when a detainee is in full restraints.  Do not drive

LaMiles Hill

Page 125

1    stun any detainee while in full restraints."

2         A.    Uh-huh.

3         Q.    Again, was this a policy change from the

4    policy that was in effect when Mathew was in the

5    facility?

6         A.    I mean, I know it's a directive.  There

7    was a change.  It's a directive.  So, basically, I

8    mean, it's a directive saying that you couldn't do

9    it.  So under this, like what I had to do with that

10   officer, I would have been in violation under this.

11   So that's all I can say.

12        Q.    Okay.  The policy changed with these two

13   memos, didn't it?

14        A.    I'm not sure if -- these are directives.

15   I don't know if they're policy.  They're directives.

16        Q.    Okay.  It refers here to the direct

17   receipt on January 6.  And I know this is a

18   long-shot, but we agreed this was confusing that the

19   January 9th memo referred to a memo dated January

20   9th.  Now, I'm curious if you can tell me, did they

21   really mean January 6th or do you remember this

22   January 6th memo?

23        A.    Not at all.  I couldn't tell you on that

24   right now.  Honestly and truly, you'll have to check

25   and see, check with them and see if there was

LaMiles Hill

Page 126

1    something.

2         Q.    I mean, this doesn't refresh your memory

3    that it was the 6th, the 9th and then February 9th?

4         A.    I don't know.

5         Q.    It's never been given to us.  So I want to

6    ask people that might have seen it.

7         A.    Uh-huh.

8         Q.    Okay.  Captain Hill, to go back, in your

9    training records --

10        A.    Uh-huh.

11        Q.    -- and this is on page 10188, it shows

12   that on January 13th, 2015 --

13        A.    Uh-huh.

14        Q.    -- so nine days after the January memo,

15   that you received an hour of a course called Taser

16   Update.  And unlike some of these, it was directly

17   provided by the Chatham County Sheriff's Office.

18        A.    Uh-huh.

19        Q.    One hour.

20        A.    Uh-huh.

21        Q.    And I have seen in other deputy's files

22   they also received that same one hour of training.

23   Tell me everything you can remember about that

24   training.

25        A.    That training -- that training right there

LaMiles Hill

1   was basically talking about -- because basically we

2   got an hour for it, but we didn't complete it.

3        Q.    What does that mean?

4        A.    I mean, basically the information that the

5   instructor got from the Taser company wasn't --

6   wasn't basically with what we had and basically the

7   information we got from Taser and the information

8   that was in our policy, there were some conflicting

9   issues.  So the class stopped after an hour and we

10  had -- they had to have a discussion.  So . . .

11       Q.    I'm sorry.  In the class it was discovered

12  that the policies didn't match Taser International's

13  recommendation?

14       A.    Well, no.  Taser International actually

15  gave us more freedom, but then our policies were more

16  restrictive.  And so like Taser International in the

17  training had where drive stun, where it talked about

18  pain compliance and everything.  And we're sitting in

19  the classroom, we're like time out.  We just got --

20  when was that one?

21       Q.    The January 9th memo?

22       A.    There you go.

23       Q.    Okay.

24       A.    So is this -- y'all got some stuff y'all

25  need to look at with this Taser International and

LaMiles Hill

Page 128

1    that January 9th memo.  So they made a phone call and

2    they said, yeah, we do need -- and the class

3    wasn't -- that's really supposed to be more than a

4    one-hour class.  If you look at any other Taser

5    classes, it went more than an hour.

6         Q.    Yeah.  So the January 13th class was

7    presented by Taser International?

8         A.    No.

9         Q.    Who was the leader for the class?

10        A.    Our training department.

11        Q.    Okay.  But you, the deputies, brought to

12   their attention that the training from Taser

13   International was too liberal for the policies that

14   were in effect --

15        A.    Uh-huh.

16        Q.    -- at Chatham County?

17        A.    Uh-huh.

18        Q.    Okay.  Was this supposed to last longer

19   than an hour?

20        A.    Uh-huh.

21        Q.    Was it scheduled for more --

22        A.    Well, I didn't write the class.  I mean,

23   you know, so I know that we left, and when it was

24   discovered that there was some conflict in the

25   issues, that was the end of the class.

LaMiles Hill

Page 129

1      Q.     Okay.  So just so I'm clear, the class

2   completed, but then you were notified --

3      A.     No, it wasn't completed.

4      Q.     It was aborted in the middle of the class?

5      A.     Aborted.

6      Q.     Okay.  And this was because the deputies

7   themselves pointed out to the --

8      A.     I was sitting there.  I mean, you know, I

9   was sitting right there.

10      Q.     You and your fellow deputies pointed out

11   to the training department this training is

12   incorrect?

13      A.     Not -- not to say incorrect.  I'm saying

14   that we need -- we needed some clarification.  If

15   Taser was saying drive stun is an option and stuff,

16   why are you showing us drive stun as an option if the

17   policy is saying and we got directives that's saying

18   it's not an option.  So you're going to confuse

19   people with thinking that they can.

20            So that's why it was stopped.  I'm

21   surprised they even put down an hour for it because

22   it wasn't even an hour, actually.  It was stopped.

23   And we -- and they was brought to command and the

24   sheriff's attention and everything.  And I don't know

25   if it was brought to the sheriff, but I know it was

LaMiles Hill

1    brought to the training director's attention and

2    everything.  And they said huh-uh.

3         Q.    Were you confused by the class?

4         A.    No.  I wasn't confused because I had my

5    memo right there, and I'm looking at it.  That's why

6    I could tell you exactly what -- so it was -- so

7    basically what it was saying -- you know, basically

8    what you have in that class, you had supervisors, and

9    supervisors were brought in that class so that we can

10   ensure -- they was given to us, the class, to be

11   given to us so we can look and see if there were

12   any -- while we were going through the class, so that

13   we could all be updated on our Taser training.

14              And when we saw that, it was brought to

15   command staff's attention.  And so they said okay.

16   Hold up.  We need to go look at this and review this

17   training and all to make sure everything is good.

18        Q.    Okay.  I think I have one last document I

19   want to ask you about, if you want to power through.

20        A.    Uh-huh.

21        Q.    Can you tell me the name of the person and

22   all who led the training that was aborted?

23        A.    It was -- I want to say Corporal

24   Robertson.

25              MR. HART:  Don't guess.

LaMiles Hill

1      A.    I'm not going to guess.  I know it was

2   the -- yeah.  It was Corporal Robinson.  It was

3   Corporal Robinson.  Him and with some assistance from

4   Corporal Guthrie.  Or Private Guthrie at the time.

5              (Plaintiff's Exhibit 13 was marked for

6         identification.)

7      Q.    (By Mr. Cash) Okay.  All right.  I want to

8   give you an exhibit, which is P-13.

9      A.    Uh-huh.

10      Q.    Do you recognize this?

11      A.    Huh-uh.  Nope.

12      Q.    Never seen this before?  Okay.  I'm going

13   to tell you that these are the warnings that were

14   issued by Taser International, and you can see it's

15   bold in the center here.  It's says March 15th, 2013.

16   And these are the warnings that were in effect on

17   January 1st and January 2nd when Mathew Ajibade died

18   in the jail.  And you've never seen these

19   instructions before; is that right?

20      A.    Not sure if this was in the first few

21   slides or that presentation or in that training or

22   not.

23      Q.    Okay.  Right in the middle here it says,

24   "Read and obey.  Do not use or attempt to use any CEW

25   model" -- that means the Taser?

LaMiles Hill

Page 132

1          A.     Uh-huh.

2          Q.     "Unless you have read, understood and are

3    following all current instructions, warnings and

4    relevant Taser training materials before using Taser

5    CEW."

6          A.     Uh-huh.

7          Q.     But if you had never seen this, then you

8    were not following these instructions; isn't that

9    correct?

10         A.     Uh-huh.

11         Q.     Let me take you to the black box at the

12   bottom.

13         A.     Uh-huh.

14         Q.     Cumulative effects.

15         A.     Uh-huh.

16         Q.     It says right here, "Repeated, prolonged

17   or continuous CEW applications may contribute to

18   cumulative exhaustion, stress, cardiac, physiologic,

19   metabolic, respiratory and associated medical risks

20   which could increase the risk of death or serious

21   injury."  Were you aware of that?

22         A.     Prior to -- let's see.  Let's see.  This

23   training right here was done in -- I mean, this came

24   out when?  March 15th, 2013.  No, not prior to --

25   well, I'm trying to think back.  Actually, I was

LaMiles Hill

Page 133

1    because I got some -- I got this in the class in

2    US C-SOG.

3         Q.    Okay.

4         A.    I didn't get this actual form.

5         Q.    Right.

6         A.    But I got the effects, what could happen

7    if, if the person was tased multiple times.  Because

8    we went over that in our class about what was your

9    department policy on how many times you could tase

10   someone or do an activation.  So that was one -- that

11   warning was read prior in that class.

12        Q.    So you were trained in Florida that

13   repeated use of a Taser could cause this list of

14   physical injuries which could lead to death; is that

15   right?

16        A.    Yeah.

17        Q.    Was that something that the department,

18   sheriff here trained its people on in its classes?

19        A.    You would have to -- because you would

20   have to get with the training department to see what

21   the curriculum, the instructors had.

22        Q.    Well, you took --

23        A.    I took it -- that's what I'm saying -- in

24   2004.  I think the last one was 2007.

25        Q.    Yeah.

LaMiles Hill

1      A.     Anything after the one I took in 2007,

2    which this came out in 2013, which I got mine, you

3    know that one, the warning in, what, it was August or

4    September, that I went to it in '14 to that class.

5    But I don't know what they were teaching all of the

6    new hires from '07 to '15.

7      Q.     Right.

8      A.     You would have to get with training.

9      Q.     The sheriff trained you in 2007 and 2010?

10     A.     Right.

11     Q.     And then not again --

12     A.     No, no, no.  2004, 2007.

13     Q.     Excuse me.  2004 and 2007.  And then not

14   again until 2015 with the class that got aborted?

15     A.     Right.

16     Q.     So in the 2004 and 2007 classes, were you

17   taught about these dangers from the repeated tasing?

18     A.     These dangers didn't come up until 2013 on

19   here; right?

20     Q.     Well, is the answer no, the sheriff did

21   not train you that repeated Taser use could hurt

22   someone?

23     A.     No, that's not true.  Because even back in

24   2004, if you look at the -- you'll have to go into

25   the sheriff -- the sheriff training course, the

LaMiles Hill

Page 135

1    outline of what they had in the course for Tasers

2    back then.  In our policy -- I won't say it was in

3    our policies -- you know, I'm not going to guess.

4    But you have to review prior policies in the

5    sheriff's office on how many activations it can have.

6          Q.    You don't know, though, do you?

7          A.    No, I don't know.

8          Q.    And you're a CERT team leader?

9          A.    No.  No, no, no.  Not a CERT team leader.

10   There's no CERT team anymore.

11         Q.    Okay.

12         A.    All right.

13         Q.    You were on a CERT team; right?

14         A.    I was on a CERT team.

15         Q.    Okay.

16         A.    And with the CERT team and the training

17   that we received and was -- you know what?  End

18   policy.  I want to say there was no more than two or

19   three activations.  So this warning, this warning, it

20   depends on when it came out in relevance to the

21   policy.  You can't -- you can't -- it's like right

22   now, this says 2013.

23               For me, it's different because actually

24   prior to the Ajibade incident, I got exposed to the

25   warning in Florida.  I can't speak for Officer A, B,

LaMiles Hill

Page 136

1    C, D, E, F, G, when they got exposed to this warning.

2    We're talking about me right here.

3         Q.    If Officer Kenny exposed Ajibade to the

4    Taser four separate times --

5         A.    Uh-huh.

6         Q.    -- he falls within this warning because he

7    administered multiple uses; right?

8         A.    But there's --

9               MR. HART:   Object to the form.

10        Q.    (By Mr. Cash)  True?

11              MR. HART:   Object to the form.

12        A.    There's a question.  First of all, how

13   long were all the contacts with the Taser?

14        Q.    (By Mr. Cash)  Listen.  I'm just --

15              MR. HART:   Let him finish.  You asked it.

16              MR. CASH:   I'm just asking you if he was

17        hit four times and if that's multiple hits.

18        That's all I'm asking.

19        A.    Now, we're going to -- the question is --

20   it goes into how many times he was hit with the

21   Taser, like you said.  But now we're talking how long

22   were the durations of the contacts to Ajibade's skin.

23              MR. CASH:   Uh-huh.

24        A.    Because as you can see in the video, it

25   wasn't where anybody -- you're talking about when

LaMiles Hill

Page 137

1    they -- when a person is drive stunned and it's

2    electric and they can move away from it.  So you're

3    talking really about the duration.  Even though you

4    have a squeeze and an activation and it says, what,

5    five seconds, it doesn't necessarily mean a person

6    was going through that electrical shock for the

7    entire five seconds.  So he was jumping.  He was

8    moving around and you could have had where he took

9    half a second with one.  Took half a second with the

10   other.  Took half a second with the other.  And now

11   you're not having a full five seconds.  Even though

12   he was struck four different times doesn't mean that

13   he have four, five-second full rides of drive stun.

14        Q.    (By Mr. Cash) But Captain Hill, you just

15   don't know?

16        A.    I don't know.  Right.  And no one really

17   actually knows exactly how long that Kenny had the

18   Taser up against his skin.

19        Q.    All right.  Yeah.  The only person who

20   does know is Kenny because Ajibade died; right?

21        A.    Right.  Right.

22             MR. HART:  Ask a question.  Don't make a

23        statement.

24        Q.    (By Mr. Cash) Stress and pain.

25        A.    Okay.

LaMiles Hill

Page 138

1        Q.     "CEW use, anticipation of use or response

2    to use can cause startled panic, fear, anger, rage,

3    temporary discomfort, pain or strife, which may be

4    injurious or fatal to some people."  This is my

5    question to you.

6        A.     Uh-huh.

7        Q.     Were you ever trained that just bringing a

8    Taser onto the scene, anticipation of use could cause

9    these dangerous physical symptoms and reactions?

10       A.     Yeah, because when -- just bringing a

11   Taser onto the scene, we've always been taught that

12   you are -- it's use of force.

13       Q.     Just the display of the Taser?

14       A.     Just the display, just to bring out and

15   point it at somebody is a use of force.  So that's

16   why we would have to write a use of force form, fill

17   out a use of force form.  And that's why at the

18   department, we had so many use of force forms to fill

19   out from people who brought a Taser onto the scene

20   because we understood that once you pull it out and

21   you point it, it's a use of force.  And people got it

22   misconstrued that pulling it out and pointing it

23   meant that we were using it every time we pulled it

24   out.

25              Now, that I remember being taught in the

LaMiles Hill

1    class.

2              MR. HART:  How much longer you got?

3              MR. CASH:  Ten minutes or less.

4         Q.    (By Mr. Cash) How about this one?  "To

5    reduce the risk of injury, 2, avoid sensitive areas.

6    When practicable, avoid intentionally targeting the

7    CEW on sensitive areas of the body," and I'm going to

8    skip this list because it says "groin/genitals."

9         A.    Uh-huh.

10        Q.    Were you ever trained by the sheriff to

11   avoid using the Taser on someone's groin or genitals?

12        A.    Yeah.  That was in the class because we

13   had a diagram.

14        Q.    Which class?

15        A.    Taser class.  My 2004 and '07.

16        Q.    Okay.  And you knew that if you did do

17   that, it could increase the risk of someone's injury?

18        A.    Uh-huh.  Because they talked about if a

19   prong hit one of the genitals, of course, it's -- it

20   was a dart.  You had the barb actually with a firing.

21   And that's why we were given a diagram of what

22   area -- but now there's a difference when you talk

23   about this, when you talk about this in the sense of

24   drive stun or full activation.  So this isn't saying

25   which one it is that you just pointed out to me.  So

LaMiles Hill

Page 140

1    which one --

2         Q.    Were you trained that it's okay to drive

3    stun someone in the groin?  You just can't shoot them

4    with the barbs or what?

5         A.    Now we're talking about what part of the

6    groin are you talking about.  Are you talking

7    about --

8         Q.    This wording says groin and genitals.

9         A.    Right.  But, now, it has been -- we're

10   talking -- are you talking the meaty part of the

11   groin or are you talking the actual genitals of the

12   groin?

13        Q.    What were you trained?  What areas were

14   you trained to avoid and in which month and year?

15   That's what I'm asking.

16        A.    Okay.  To avoid:  The heart, the head, the

17   actual genitals, the fatty -- because just in the

18   diagram where you see on the chart where we looked

19   was the thigh area, the back area.  And so you've got

20   to have -- if you're going to say groin, you need to

21   get from Taser are they talking in the groin, the

22   actual genitals, or are they talking the muscle group

23   all in that area because what's the difference from

24   the back of the thigh and the inner thigh.

25        Q.    Are you telling me the policy that you --

1    A.    No.  I'm telling you -- I'm telling you --

2    Q.    Let me ask my question.

3    A.    -- the training from Taser.

4    Q.    Listen.  Let me get it out.

5    A.    Okay.

6    Q.    I'm trying to wrap this up.  Did the

7    sheriff have a clear policy of where not to tase?

8    A.    It was Taser's recommendation based upon

9    the diagram that we were trained on in the Taser

10   class.

11   Q.    All right.  Go to page 5, please.

12   A.    Okay.  Page 5.  All right.

13   Q.    Drive stun.

14   A.    Yes.

15   Q.    Drive stun mode is for pain compliance

16   only.  "The use of a hand-held CEW in drive stun mode

17   is painful but generally does not cause

18   incapacitation.  Drive stun use may not be effective

19   on emotionally disturbed persons or others who may

20   not respond to pain due to a mind/body disconnect.

21   Avoid using repeated drive stuns on such individuals

22   if compliance is not achieved."

23         Were you trained to avoid using drive stun

24   mode on an emotionally disturbed person by the

25   sheriff?

LaMiles Hill

Page 142

1      A.     Who makes the determination if they're

2  emotionally disturbed?

3      Q.     I'm asking you clearly did the sheriff

4  train you to avoid using drive stun on a person who's

5  emotionally disturbed?

6      A.     That will be something you have to get out

7  of the -- the instructors who taught the class

8  training those.

9      Q.     What do you remember about that?

10     A.     What I remember about that is, like I

11 said -- well, actually, I don't remember, I'm just

12 going to be honest with you, because, like I said,

13 it's in whatever the training tools or that they give

14 and put the class on, that instructor, that's

15 whatever they had in the training tools because --

16     Q.     Okay.  But listen.  I appreciate that's

17 what the tools are, but I'm asking you what you

18 remember about it.  So if you don't remember being

19 trained one way or the other about emotionally

20 disturbed persons, that's fine.  And you can say

21 that.  But I'm trying to get to your knowledge, not

22 what I could ask somebody else.

23     A.     Emotionally disturbed, though, that's a

24 very general statement.  I mean, one way or another,

25 as an officer or as anyone, how can I determine

LaMiles Hill

1   what's deemed emotionally disturbed or not

2   emotionally disturbed or person's normal behavior?

3       Q.    The person who you tased while she was in

4   restraints --

5       A.    Uh-huh.

6       Q.    -- you said had a mental health

7   classification?

8       A.    Uh-huh.

9       Q.    Yet, Taser International says to avoid

10  using the drive stun on a person who's emotionally

11  disturbed.

12      A.    Uh-huh.

13      Q.    And you weren't disciplined for that

14  incident?

15      A.    Huh-uh.

16      Q.    Okay.  So was the sheriff's policy in

17  conflict with what you've read here from Taser

18  International?

19      A.    Actually, you got to go back to find out

20  when was this put out by Taser International.

21  Because if this was put out -- you don't have a

22  time/date of when they put this out.  So when my

23  actions took place, according to this right here,

24  this was put out in 2013.  My actions took place in

25  2008, 2009.  That's, what, four years apart.  Apples

LaMiles Hill

Page 144

1    and oranges when you're talking all the research and

2    everything that they had after my incidents compared

3    to this right now.

4            So we need to know when Taser put that

5    statement out for me to give a valid answer on that.

6    Now, if they put it out prior to my training in '07

7    or in my training in 2007 or 2004, that's one thing.

8    But if it all came out after that, you know, when I

9    did what I did, even Taser International didn't have

10   that information at that time.  And I can't -- and

11   I'm not inclined to know if they had all the

12   information about the mental health at that time.

13           I think a lot -- some of this information

14   probably came out from the situation that we're

15   sitting here right now where Taser International had

16   to start doing some catch-all.  Not catch-all, but

17   start separating themselves from some of these issues

18   with their devices.

19       Q.    Uh-huh.

20       A.    So . . .

21       Q.    The devices have issues, don't they?

22       A.    Well, yes.

23           MR. CASH:  Okay.  I have no further

24   questions.  12:38.

25           MS. MEADOWS:  Emily, do you have anything?

LaMiles Hill

Page 145

1              MS. WARD:  No.

2              MR. CASH:  All right.  I appreciate your

3     time.

4              (Deposition concluded at 12:38 p.m.)

5              (Pursuant to Rule 30(e) of the Federal

6     Rules of Civil Procedure and/or O.C.G.A.

7     9-11-30(e), signature of the witness has been

8     waived.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LaMiles Hill

Page 146

1                  CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF CHATHAM:

5

                I hereby certify that the foregoing
6    transcript was reported as stated in the caption and
     the questions and answers thereto were reduced to
7    writing by me; that the foregoing 145 pages represent
     a true, correct, and complete transcript of the
8    evidence given on January 18, 2017, by the witness,
     LAMILES HILL, who was first duly sworn by me.
9
                I certify that I am not disqualified
10   for a relationship of interest under
     O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
11   Reporter here as an employee of Gilbert & Jones, Inc.
     who was contacted by Golkow Global Litigation
12   Services to provide court reporting services for the
     proceedings; I will not be taking these proceedings
13   under any contract that is prohibited by
     O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
14   Rules and Regulations of the Board; and by the
     attached disclosure form I confirm that neither I nor
15   Gilbert & Jones, Inc. are a party to a contract
     prohibited by O.C.G.A. 15-14-37(a) and (b) or
16   Article 7.C. of the Rules and Regulations of the
     Board.
17
                This 22nd day of January, 2017.
18

19

20

21

22              _____
                Annette Pacheco, CCR-B-2153
23

24

25

LaMiles Hill

1                    DISCLOSURE OF NO CONTRACT

2           I, Debbie Gilbert, do hereby disclose
    pursuant to Article 10.B of the Rules and Regulations
3   of the Board of Court Reporting of the Judicial
    Council of Georgia that Gilbert & Jones, Inc. was
4   contacted by Golkow Global Litigation Services to
    provide court reporting services for these
5   proceedings and there is no contract that is
    prohibited by O.C.G.A. 15-14-37(a) and (b) or
6   Article 7.C. of the Rules and Regulations of the
    Board for the taking of these proceedings.

7
            There is no contract to provide reporting
8   services between Gilbert & Jones, Inc. or any person
    with whom Gilbert & Jones, Inc. has a principal and
9   agency relationship nor any attorney at law in this
    action, party to this action, party having a
10  financial interest in this action, or agent for an
    attorney at law in this action, party to this action,
11  or party having a financial interest in this action.
    Any and all financial arrangements beyond our usual
12  and customary rates have been disclosed and offered
    to all parties.

13
            This 22nd day of January, 2017.

14

                    _____
17                  Debbie Gilbert, FIRM
                    REPRESENTATIVE
18                  Gilbert & Jones, Inc.

19

20

21

22

23

24

25

LaMiles Hill

1                DISCLOSURE OF NO CONTRACT

2            I,                      , do hereby
   disclose pursuant to Article 10.B of the Rules and
3  Regulations of the Board of Court Reporting of the
   Judicial Council of Georgia that
4  was contacted by                    to provide
   court reporting services for these proceedings and
5  there is no contract that is prohibited by O.C.G.A.
   15-14-37(a) and (b) or Article 7.C. of the Rules and
6  Regulations of the Board for the taking of these
   proceedings.

7

8           There is no contract to provide reporting
   services between                    or any person
   with whom                    has a principal
9  and agency relationship nor any attorney at law in
   this action, party to this action, party having a
10 financial interest in this action, or agent for an
   attorney at law in this action, party to this action,
11 or party having a financial interest in this action.
   Any and all financial arrangements beyond our usual
12 and customary rates have been disclosed and offered
   to all parties.

13

14          This      day of                , 2017.

15               /s/

16               FIRM REPRESENTATIVE
                 REFERRING FIRM

17

18

19

20

21

22

23

24

25