```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF GEORGIA
                  SAVANNAH DIVISION

SOLOMAN OLUDAMISI AJIBADE and   )
ADENIKE HANNAH AJIBADE, as      )
natural parents of Mathew       )
Ajibade, and THE ESTATE OF      )
MATHEW AJIBADE and CHRIS        )
OLADAPO, its Executor,          )
                                )
            Plaintiffs,          )
                                )
        vs.                     )CIVIL ACTION NO.
                                )
JOHN WILCHER, in his official   )4:16-CV-82-WTM-GRS
capacity as Chatham County      )

Sheriff, et al.,                )

                                )

            Defendants.         )



            VIDEOTAPED DEPOSITION OF


                  MAXINE EVANS



              September 19, 2016

                 2:03 p.m.



              218 West State Street

              Savannah, Georgia


         Annette Pacheco, RPR, RMR, CCR-B-2153
```

Maxine Evans

 1                    APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3        MARK M. O'MARA, Esq.
          O'Mara Law Group
 4        221 NE Ivanhoe Boulevard, Suite 200
          Orlando, Florida  32804
 5        mark@omaralawgroup.com

 6        WILLIAM F. CASH, III, Esq.
          Levin, Papantonio, Thomas, Mitchell, Rafferty
 7        & Proctor, P.A.
          316 South Baylen Street
 8        Suite 600
          Pensacola, Florida  32502
 9        bcash@levinlaw.com

10        WILLIAM R. CLAIBORNE, Esq.
          CAMERON C. KUHLMAN, Esq.
11        The Claiborne Firm, P.C.
          410 East Bay Street
12        Savannah, Georgia  31401

13
     On behalf of the Defendants Debra Johnson and Andrew
14   Evans-Martinez:

15        BENJAMIN PERKINS, Esq.
          Oliver Maner, LLP
16        218 West State Street
          Savannah, Georgia  31401
17        bperkins@olivermaner.com

18

19

20

21

22

23

24

25

Maxine Evans

Page 3

1    On behalf of the Defendants Corizon Health, Corizon,
     and Gregory Brown:
2
          EMILY C. WARD, Esq.
3         Carlock Copeland
          191 Peachtree Street, NE
4         Suite 3600
          Atlanta, Georgia  30303-1740
5         eward@carlockcopeland.com

6         THOMAS A. WITHERS, Esq.
          Gillen, Withers & Lake, LLC
7         8 East Liberty Street
          Savannah, Georgia  31401
8         twithers@gwllawfirm.com

9
     On behalf of the Defendant Sheriff John Wilcher:
10
          R. JONATHAN HART, Esq.
11        JENNIFER R. BURNS, Esq.
          Chatham County Attorney's Office
12        124 Bull Street
          Suite 240
13        Savannah, Georgia  31401
          jburns@chathamcounty.org
14
15   Also Present:  Caitlin Frenkel
                     David Liebhauser, Videographer
16                   Debra Johnson
                     Bobby Phillips, Esquire
17                       Phillips & Carson
                         420 W. Broughton Street
18                       2nd Floor
                         Savannah, Georgia  31401
19                       912-232-0081
                         For the Witness
20

21
                              - - -
22

23

24

25

Maxine Evans

Page 4

```
 1                   INDEX TO EXAMINATIONS

 2        Examination                               Page

 3    Examination by Mr. O'Mara                        5

 4    Examination by Mr. Perkins                     147

 5    Examination by Mr. Withers                     157

 6    Examination by Mr. O'Mara                      161

 7    Examination by Mr. Perkins                     163

 8    Examination by Mr. O'Mara                      164

 9                        - - -

10                    INDEX TO EXHIBITS

11    Defendant's

12      Exhibit           Description              Page

13

14    Exhibit 1      Chatham County Sheriff's Office
                     Employee Statement of Incident   133
15

16

         (Original Exhibit 1 has been attached to the
17    original transcript.)

18

19

20

21

22

23

24

25
```

Maxine Evans

Page 5

```
 1   (Reporter disclosure made pursuant to Article 10.B.
 2   of the Rules and Regulations of the Board of Court
 3   Reporting of the Judicial Council of Georgia.)
 4            THE VIDEOGRAPHER:  Okay.  We're on video.
 5        My name's Dave Liebhauser.  I'm videographer for
 6        Golkow Technologies.  Today's date is September
 7        19th, 2016, and the time on the monitor is 1403.
 8        This video is being taken in Savannah, Georgia
 9        in the matter of Ajibade versus Wilcher, et al.
10        for the U.S. District Court, Southern District
11        of Savannah -- Southern District of Georgia,
12        Savannah Division.
13            The deponent is Maxine Evans.  The court
14        reporter is Annette Pacheco who will now swear
15        the witness in.
16                   MAXINE EVANS,
17   having been first duly sworn, was examined and
18   testified as follows:
19                   EXAMINATION
20   BY MR. O'MARA:
21        Q.    Good afternoon, ma'am.  State your name,
22   please.
23        A.    Maxine Evans.
24        Q.    And your address.
25        A.    7225 Grant Street, Savannah, Georgia
```

Maxine Evans

1    31406.

2        Q.    I'm sorry.  The name of the street?

3        A.    Grant, G-r-a-n-t.

4        Q.    And are you working presently?

5        A.    No.

6        Q.    When's the last time you worked?

7        A.    I believe -- I had like a, it was like a

8    part, little part-time job, but it was cleaning

9    office buildings.

10       Q.    Okay.  Of course, you know why I'm here;

11   right?

12       A.    Yes.

13       Q.    I'm representing the estate of Mathew

14   Ajibade along with co-counsel.  And, of course, your

15   name came to us in discovery, so I want to ask you

16   some questions about that.  Okay?

17       A.    Yes.

18       Q.    I understand you have your attorney here

19   with you?

20       A.    Yes.

21       Q.    As we go through this, a couple of sort of

22   ground rules.  One, you were placed under oath so

23   it's because we're going to presume obviously that

24   you're going to tell the truth.  More importantly

25   that we can rely on the evidence in the future.

Maxine Evans

Page 7

1              So if you have questions about my

2     questions, feel free to let me know.  I will tell

3     you, as I'm sure Mr. Phillips has, that discovery's

4     pretty wide open in these cases, so I can ask almost

5     anything.  The only rights you have to not answer

6     questions is if there's privilege issues that will

7     protect you.  For example, if I said to you what did

8     Mr. Phillips say to you about this case, that's a

9     protected conversation.  We can never get to that

10    attorney/client privilege.  There are a few others

11    but for the most part, you'll be required to answer

12    the questions as I pose them.  But I do want to make

13    sure that you understand them.  Okay?

14         A.    Okay.

15         Q.    So feel free to stop me.  You'll also

16    notice that, as many lawyers, I have the disease

17    where I start asking run-on questions.  If it lasts

18    more than about 30 seconds for you to ask a question,

19    I'm probably running on.  So stop me.  We'll rephrase

20    it.  We'll get it to a point where I want you to be

21    able to answer it.  Okay?

22         A.    Okay.

23         Q.    Also, if you want to take a break during

24    it, this is not a marathon session.  I'm hoping to

25    have it done by 5:00.  We'll see how it goes.  Water,

Maxine Evans

Page 8

1    sugar, coffee, whatever you might need's over there.

2    Okay?

3          A.    Okay.

4          Q.    I understand, of course, that you were a

5    corrections officer with Chatham County?

6          A.    Yes.

7          Q.    Do me a favor.  Let's back it up then in

8    time and tell me your first year as a law enforcement

9    officer or corrections officer.

10         A.    2000.

11         Q.    All right.

12         A.    April 2000.

13         Q.    And I believe before that you were in the

14   military?

15         A.    Yes.

16         Q.    So in 2 000, tell me what brought you to

17   go into law enforcement.  When I call it law

18   enforcement, that's my term.

19         A.    Right.

20         Q.    But law enforcement officer, sort of a

21   side or a subcategory of corrections officer.

22         A.    Same thing.

23         Q.    What brought you into being in law

24   enforcement?

25         A.    Well, when I retired from the military, I

Maxine Evans

Page 9

1    wanted to -- since I retired here in Savannah,

2    Georgia, I felt like I wanted to serve the community

3    that I was going to reside in.  So that's why I

4    became a corrections officer.

5         Q.    All right.  And what you --

6         A.    Or a deputy.

7         Q.    I'm sorry.

8         A.    I said or a deputy.

9         Q.    Okay.  And, oh, a couple other ground

10   rules I forgot.  We need to be careful of a couple

11   things.  Talking over each other a little bit.  Just

12   because I'll be asking a question and sometimes I'll

13   have more to it.

14         Also, it's very easy for us in normal

15   conversation for you to know exactly what I'm asking

16   already and want to answer it.  I do it all the time.

17   We need to be careful because the court reporter can

18   only get that down.

19         And the other thing that I do all the time

20   is this.  And she knows that I mean yes.  The record

21   says maybe lawyer nodded head without giving any

22   verbal indication of what in God's name he was

23   talking about.  So we have to be careful of all that.

24   Okay?

25         A.    Okay.

Maxine Evans

Page 10

1      Q.    All right.  So what training did you go
2  through to become law enforcement?
3      A.    They sent me to school called BJOT.  Basic
4  jailer's officer's training.
5      Q.    And where was that?
6      A.    It was held at Brunswick.
7      Q.    All right.  How long of a program was it?
8      A.    Probably six, maybe eight weeks.
9      Q.    Forty hours a week?
10     A.    Yes.
11     Q.    Did you stay there like overnight?  Did
12  they have classes at night?
13     A.    No.
14     Q.    All right.
15     A.    Sorry.
16     Q.    That's all right.  Any concerns that you
17  may have had with passing that course?
18     A.    Not other than passing.
19     Q.    Right.  Okay.  So you didn't have to take
20  it a second time?
21     A.    No.
22     Q.    Or redo testing or do anything like that?
23     A.    No.
24     Q.    And what type of certificate, if any, did
25  you get once you passed?

Maxine Evans

Page 11

1        A.     You get a basic jailer's certification.

2   You get certification certificate.

3        Q.     Uh-huh.  Okay.  And do you recall when it

4   was that you took the BJOT course?

5        A.     I started in April 2000 and I completed

6   it, I believe, in June, maybe April.  Yeah, about

7   beginning of June.

8        Q.     Okay.

9        A.     April or June somewhere.

10            THE COURT REPORTER:  I'm sorry.

11            THE WITNESS:  April or June somewhere

12        thereabouts.

13        Q.     (By Mr. O'Mara) Okay.  And once you had

14   that certificate, what did you do with it?

15        A.     I took it home and put it up.

16        Q.     Yeah.  I mean, sort of once, once you now

17   had a BJOT certificate, did you look for employment

18   in law enforcement?

19        A.     The county sent me to the school.

20        Q.     Okay.

21        A.     So I was already employed.

22        Q.     All right.  And once you had your

23   certification, did you begin to work at Chatham

24   County?

25        A.     Yes.

Maxine Evans

Page 12

```
 1        Q.    Did you work anywhere else in between --
 2        A.    No.
 3        Q.    -- getting your certificate and going
 4   right to Chatham County?
 5        A.    No.
 6        Q.    Okay.
 7              MR. PHILLIPS:  I think she's saying she
 8        was employed first.
 9              MR. O'MARA:  Right.
10              MR. PHILLIPS:  And then they sent her.
11              THE WITNESS:  Right.
12        Q.    (By Mr. O'Mara) I just want to make sure
13   that we're not missing any steps along the way.
14        A.    All right.
15        Q.    So then tell me what your initial job
16   duties entailed as a jailer or corrections officer
17   with Chatham.
18        A.    A basic jailer, you make sure -- you're --
19   it's the same as security of the detainees that were
20   there.  It's part of staff.
21        Q.    All right.  And was it part of the BJOT
22   training that you would learn about the policies and
23   procedures at Chatham or was that learned once you
24   got there after you received your certificate?
25        A.    It was all inclusive.
```

Maxine Evans

Page 13

1        Q.     All right.

2        A.     When you go to BJOT, they teach you how to

3    become a corrections officer.  And then the jail's

4    training teaches us about the policies and

5    procedures.

6        Q.     Okay.  So and the BJOT training, there are

7    certain basic principles, correct, that you learn?

8    Would that be accurate?

9        A.     Yes.

10       Q.     All right.  I mean, you learn how to

11   become, like you say, a jailer.  I sort of call them

12   corrections officers.  You learn --

13       A.     How to basically deal with the detainees.

14       Q.     Okay.  Tell me some of what you can

15   recall.  I know we're going back 16 years, but

16   just -- and I'm not going to grade you on this one,

17   but just tell me what you recall the high points

18   being from how to be a good corrections officer, from

19   what you learned at BJOT.

20       A.     Well, first of all, I mean, you've got to

21   respect, even though he's a detainee, you respect

22   them and they'll respect you.  You treat them with --

23   you treat them like they're human.  I mean -- and if

24   they have any concerns, you'll address their

25   concerns.  And if it's a concern that you can't

Maxine Evans

Page 14

1    answer, then you forward it up the chain of command.

2         Q.    Did BJOT give you instruction on the use

3    of force spectrum?

4         A.    Not --

5              MR. PHILLIPS:  If you don't remember, just

6         tell him that.

7         A.    Yeah, I don't remember.

8         Q.    (By Mr. O'Mara) Okay.  So you don't recall

9    whether or not any initial training, before you got

10   your certificate, there was any training on use of

11   force?

12        A.    Not that, not that I recall.

13        Q.    Okay.  Anything else that you can recall

14   specifically from the BJOT training?

15        A.    I was just excited about becoming a

16   jailer, I mean, being an officer.

17        Q.    Uh-huh.  Did they teach you anything, for

18   example, crisis intervention training, anything about

19   how to handle --

20        A.    Not at that time, no.

21        Q.    Did they talk to you at all about how to

22   handle mental health patients?

23        A.    Not at that time, no.

24        Q.    Okay.  So now we get the certificate.

25   You're now a corrections officer.  Tell me what

Maxine Evans

Page 15

1    training you were given on the policies and

2    procedures within Chatham County.

3           A.     Within the policy and procedures of

4    Chatham County, they train us the CPR, firearms.  We

5    have some mental health training, but it wasn't like

6    extensive like when you go through a, the crisis

7    intervention course.

8           Q.     Okay.  Let's break that down a little bit.

9    When you say "firearms," you mean the actual firearms

10   training?

11          A.     How to carry a firearm, how to shoot, you

12   know, shoot it, safety of using it, holding it.

13          Q.     Okay.  Generally speaking, there are no

14   firearms active or available within the jail facility

15   during normal business hours; is that correct?

16          A.     Right.  Not inside, no.

17          Q.     Okay.  So in addition to firearms, any

18   additional training?  I'm leaving BJOT behind.  So if

19   our conversation reminds you of something that you

20   learned in BJOT, let me know.  Just tell me that's

21   where -- because if not, I'm going to presume that

22   everything we talked about from this point forward is

23   what you learned on site or with every training we'll

24   talk about at Chatham County.  Can we have that as a

25   premise?

Maxine Evans

Page 16

1          A.     (Nods head affirmatively.)

2          Q.     All right.  So you learned about firearms.

3    What other weapon systems did you learn about at

4    Chatham County?

5          A.     Mace.  Well, we call it mace, but pepper

6    spray.

7          Q.     Okay.

8          A.     The baton.

9          Q.     Anything else?

10         A.     Pepper spray.  Baton.  That's it.

11         Q.     Okay.

12         A.     That I can recall.

13         Q.     All right.  And how was that taught to

14   you?  Was that -- and I'll give you an example.  Was

15   that read this book on it?  Was that training classes

16   inside the facility, outside the facility?  Sort of

17   fill me in on that.

18         A.     When we have -- how to use the baton, it

19   was a physical you go in and you sit in the class.

20   You have the paper portion and then you have the

21   actual hands-on portion.

22         Q.     Okay.  So that was on the baton?

23         A.     That's on the baton.  Same thing with the

24   pepper spray.  You have the classroom setting and

25   then they'll take you out and actually, you know, let

Maxine Evans

Page 17

1    you see what it feels like to be sprayed with pepper

2    spray.

3         Q.    Okay.  Ever get any training on Tasers?

4         A.    Not the actual Taser because it was two

5    Tasers.  The first Taser I didn't get training on.

6    But when they were switching over to the newer Taser,

7    Taser, I can't remember, recall the model of it, but

8    I received that training.

9         Q.    Okay.  And tell me about that training.

10        A.    It was a classroom setting-type of

11   training.

12        Q.    Do you recall who taught it?

13        A.    I think he's Sergeant Murphy now.

14        Q.    All right.  Just so I'm clear, how many

15   years ago are we talking about with the upgraded

16   Taser training that you went to?

17        A.    I'd say as recently as 20 maybe '14.

18        Q.    All right.  Not long before this incident

19   happened?

20        A.    Right.

21        Q.    It happened at the end of 2014?

22        A.    Right.

23        Q.    How long a class was that?

24        A.    I can't recall.  I mean, I know it was

25   more -- it might, might have been a day.

Maxine Evans

Page 18

1        Q.     Okay.

2        A.     Day or two.

3        Q.     You mentioned crisis intervention

4    training.  Tell me about that.

5        A.     The department was sending officers to a

6    crisis intervention training class which was being

7    taught, I think it was by Savannah Metro PD.

8        Q.     Okay.

9        A.     And it was held over at Savannah Technical

10   College.

11       Q.     And did you go to that?

12       A.     Yes, I did.

13       Q.     How long was it?

14       A.     How long was the class or --

15       Q.     The class.

16       A.     It was a week.

17       Q.     About 40 hours?

18       A.     Yes.

19       Q.     What did you learn?

20       A.     I, I learned a lot.  How to actually deal

21   with mentally ill individuals.

22       Q.     Tell me --

23       A.     How to talk to them, how to approach them,

24   how to recognize if something is wrong and just how

25   to communicate with them.

Maxine Evans

Page 19

1        Q.     Tell me a bit more about what you learned

2    from CIT as to how to identify those who might be

3    mentally ill or have mental health concerns.

4        A.     Well, you have -- what I learned is that

5    you need to assesses them first to see what's

6    creating or causing the problem the way that they're

7    acting.

8        Q.     Okay.

9        A.     And you kind of like try to talk to them

10   and either try to calm them down and get them to, you

11   know, a point where if he needs help, you can get

12   help for him.

13       Q.     Did they -- tell me what they trained you

14   about how to assess or how to look or what elements

15   or indicators would they give you to try and identify

16   somebody who had a mental health concern.

17       A.     Repeat that, please.

18       Q.     Sure.  That was my first lawyer, my lawyer

19   question.  What did they tell you about what to look

20   for when trying to figure out when somebody's got a

21   mental health concern?

22       A.     Are we saying symptoms?

23       Q.     Yes.

24       A.     Okay.  The way that they're acting,

25   basically.  The way they're talking, be it ranting or

Maxine Evans

Page 20

1    walking, pacing.  But that was it that I can recall.

2         Q.    And if you had those indicators or those

3    symptoms, what were you to do about them in your CIT

4    training?

5         A.    For my CIT training, I would try to talk

6    to them, communicate with them first to calm, to calm

7    them down.

8         Q.    Okay.

9         A.    And if that wasn't working, then I --

10   well, actually, I continued to just talk to them

11   until I can get them to calm down.

12        Q.    Okay.  And if they are inconsolable or

13   can't calm down, what other options are you trained

14   on?

15        A.    To get help.

16        Q.    And what do you mean by that?

17        A.    Get someone that's medically, medically

18   able to do that.

19        Q.    All right.  And in Chatham County jail,

20   who would that be?

21        A.    What?

22        Q.    The person who would be able to help with,

23   you get them to help you?

24        A.    A medical facility.

25        Q.    Okay.  And what does that consist of?

Maxine Evans

Page 21

1          A.      If a doctor's there, the doctors, nurses.

2          Q.      Any other training techniques, techniques

3      that you learned with the CIT training as to how to

4      interact with somebody who you now have the belief

5      had the mental health concerns?  How you interact

6      with them?  Any other training?

7          A.      Repeat that again.

8          Q.      Sure.  Any other training that you

9      received in how to interact with a mentally ill

10     inmate?

11         A.      When our training department has training

12     on the subject --

13         Q.      Okay.

14         A.      -- that's the training we have.

15         Q.      Sure.  We'll talk about that in a minute.

16     Right now I'm talking about the CIT training.

17         A.      Right.

18         Q.      Anything specific to the crisis

19     intervention training, the 40 hours that you took

20     over at the school?  Anything else that you recall

21     from that training about how to handle somebody with

22     a mental health concern?

23         A.      No, not that I recall.

24         Q.      Did they give you any training or any

25     insight into whether or not they should be restrained

Maxine Evans

Page 22

1    or how to restrain them or anything like that?

2         A.    Not that I recall.

3         Q.    Okay.  Anything else then from the CIT

4    training that we haven't talked about about how to

5    interact with somebody with a mental health concern?

6         A.    Not that I recall.

7         Q.    You said that there was other trainings

8    that you went through with Chatham County?

9         A.    The baton training, firearms, CPR.

10        Q.    Yeah.  I meant -- I thought that you said

11   a moment ago that you had gotten some other trainings

12   while at Chatham County that had a hand on mental

13   health inmates?

14        A.    When we would have -- when it was time for

15   us to like get our hours, the training department

16   would have, you know, set up a class on different

17   topics.  And that's how we would --

18        Q.    Tell me some of those topics.

19        A.    They can range anywhere from CPR training

20   to --

21        Q.    I'm sorry.  Let me interrupt you.  I want

22   to get really specific on this question to training

23   regarding how to handle inmates with mental health

24   concerns.  Any additional training?

25        A.    No.  Just how to handle, how to deal with

Maxine Evans

Page 23

1   mental health individuals.

2        Q.    I think you said that that was covered, in

3   part, in your CIT training?

4        A.    CIT was a different class.  That was an

5   outside source.

6        Q.    Right.

7        A.    When I'm thinking of the inside source, in

8   our training department, they also give us classes.

9   But they're not like the CIT training courses.

10       Q.    Right.  And that's what I want to talk to

11  you about, those additional courses or trainings that

12  you received while at Chatham County about how to

13  handle mental health inmates.

14       A.    So you're asking me what Chatham County

15  taught me?

16       Q.    Yes.

17       A.    Okay.  Basically it wasn't hands-on.  It

18  was basically the instructor got up and put slides on

19  the board and we would just like take it all in.

20       Q.    Well, tell me what you took in.

21       A.    They would train us on -- what is it?  I

22  can't think of it.  Mental illness.  I'm trying to

23  recall the video that they show.  I'm drawing a

24  blank.

25            MR. PHILLIPS:  Do you remember about the

Maxine Evans

Page 24

1       video from --

2               MR. O'MARA:  Whoa, whoa, whoa, whoa.

3       That's okay.  She doesn't remember, she doesn't

4       remember.

5       A.    I can't recall the name of it.  When an

6   individual has -- they're acting erratic and they

7   show -- the video shows how like when an individual

8   is acting erratic and, you know, how an officer would

9   talk to them and try to get them under control.

10      Q.    (By Mr. O'Mara) Okay.

11      A.    But I can't think of the name of the, what

12  they call it.

13      Q.    All right.  So one way that you learned

14  from Chatham County was how to try and -- my term,

15  but let me know if it's accurate or not -- sort of

16  talk them down?

17      A.    Right.

18      Q.    Okay.  And then what else do you learn

19  besides that technique?

20      A.    That was it basically.  It's how to talk

21  to a mental, mental health individual.

22      Q.    Okay.  When did you receive that training?

23      A.    That was a, like an annual training.  They

24  have it every year.

25      Q.    So since 2000 or thereabouts, you would

Maxine Evans

Page 25

1  have been to 15, 14 of them, 13 of them?

2        A.    Correct.

3        Q.    Every year?

4        A.    Thereabout, yes.

5        Q.    All right.  Do you remember the name of

6  the training?

7        A.    No.

8        Q.    And I think you made mention already, but

9  who would be training you on that?  What person?

10       A.    No.  I don't know.  It ranged from when

11  Sergeant Steve Darnsteadt, when he was there.

12       Q.    Steve, I'm sorry?

13       A.    Steve Darnsteadt.  Steve was a training

14  instructor.  Sherry Rogers, when she was there, she

15  was training instructor.  Who else?  Holmes,

16  Nathaniel Holmes.  Who else?

17       Q.    So then anybody else?

18       A.    Not that I can remember.

19       Q.    From those trainings, the '13, '14,

20  whatever it was, annual trainings, what else were you

21  taught besides how to talk them down?

22       A.    What else?  That was it.  I mean,

23  basically like you just watch the video and they --

24  the instructor did most of the talking, and it would

25  ask us some questions and, you know, other officers

Maxine Evans

Page 26

1    or someone would answer.

2        Q.    So for these annual trainings, did you

3    have workbooks?  Did you take tests?

4        A.    No.

5        Q.    Nothing?

6        A.    (Shakes head negatively.)

7        Q.    So was there any way that Chatham County

8    checked as to whether or not you learned what they

9    were teaching?

10       A.    At the end of the class, we signed what

11   was called a C-12.

12       Q.    And what's a C-12?

13       A.    A roster as to who all was there and so

14   that you can get credit for your hours.

15       Q.    Okay.  My understanding is there was a CIT

16   training, you actually get sort of an additional

17   certificate --

18       A.    Right.

19       Q.    -- for CIT training.

20       A.    Right.

21       Q.    And you had received that?

22       A.    Yes.

23       Q.    Is there a required followup to maintain

24   that through Chatham County?

25       A.    No.

Maxine Evans

Page 27

1        Q.      Once you get it, you have it forever?

2        A.      Yes.

3        Q.      Similar question then for these other

4    trainings.  Was there anything where once you

5    completed one of these training courses, that you

6    would get a certificate?

7        A.      No.  You just sign the C-12.  You just get

8    training hours.

9        Q.      Anything else you can remember from any of

10   those annual trainings regarding mental health

11   inmates?  And we both know what we're talking about

12   when I talk about that category?

13       A.      Right.

14       Q.      People, inmates that you're in charge of

15   or interacting with that may have mental health

16   concerns?

17       A.      Right.

18       Q.      Is that okay as we're going through this?

19   You have to say yes.

20       A.      Yes.

21       Q.      You're doing great and I know sometimes it

22   sounds like a silly question, but I don't want to go

23   off on my definition of it if we're not enmeshed on

24   it.  Okay?

25       A.      Okay.

Maxine Evans

Page 28

1       Q.    Any other high points or anything at all

2   that you can remember from that training at Chatham

3   County regarding how to help or handle mental health

4   inmates?

5       A.    No.

6       Q.    Anything that you learned outside of

7   Chatham County?  Like did you go to any other

8   coursework yourself?

9       A.    No.

10      Q.    I know some people take courses at

11  community college or whatever.  Any of that?

12      A.    No.

13      Q.    So all of your training regarding how to

14  handle mental health inmates then would have come

15  from the initial certification; correct?

16      A.    Correct.

17      Q.    Along with CIT, whatever was in there;

18  correct?

19      A.    Correct.

20      Q.    And these answer?

21      A.    Correct.

22      Q.    Anything else?

23      A.    No.

24      Q.    Did notice of your supervisors ever, you

25  know, get together with the, with you, with other

Maxine Evans

Page 29

1    people and go over any of the concerns they were

2    having with mental health patients?  Like sit down

3    and say we have this problem and bring you up to

4    speed on it?

5         A.    No.

6         Q.    Did any of that sort of happen as a matter

7    of course or no?

8         A.    I'm sorry?

9         Q.    Would that happen as a matter of course or

10   just didn't happen?

11        A.    Didn't happen.

12        Q.    So getting away from just your training

13   for a second in that particular instance.  So if you

14   just come on shift at 6 p.m. and there is a patient

15   or an inmate with a mental health concern, how would

16   that be communicated to you?

17        A.    Through my supervisor.

18        Q.    Okay.

19        A.    My supervisor could brief everyone as to

20   who we have or who we're dealing with.

21        Q.    Okay.  I'm going to come back to that

22   because I want to put it in context --

23        A.    Okay.

24        Q.    -- of Matthew's case.

25        A.    Okay.

Maxine Evans

Page 30

1      Q.    But generally speaking, you would be
2  briefed concerning whatever inmates might be about to
3  be under your control?
4      A.    Correct.
5      Q.    And when you started with Chatham County
6  back in 2000, you were with them continuously;
7  correct?
8      A.    Yes.
9      Q.    Until your termination?
10     A.    Correct.
11     Q.    There was no time off for any reason.  You
12  didn't leave and come back, did you?
13     A.    No.
14     Q.    All right.  Let's sort of then go to what
15  brings us all here today.  Obviously you were working
16  that day; correct?
17     A.    Yes.
18     Q.    And tell me when you got on duty.
19     A.    I arrived that evening.  We had a briefing
20  in our muster room.  And the briefing, that's where
21  the watch commander briefs everyone that's coming on
22  shift of, you know, things that transpired throughout
23  the day.
24     Q.    Okay.  And what time do you have to get on
25  shift this day?

Maxine Evans

Page 31

1      A.     Okay.  Briefing was at 7:30 and I arrived

2   in my area to work around about 8:00.

3      Q.     All right.

4      A.     Between --

5      Q.     Let's back up a little bit.  When did your

6   shift start?

7      A.     Once, once we're done with briefing --

8      Q.     Okay.

9      A.     -- and we arrive to your unit.  I mean,

10  whatever unit you're assigned to.

11     Q.     And what was your position?

12     A.     I was the assistant supervisor.

13     Q.     Does that have a rank with it?

14     A.     Corporal, yes.

15     Q.     Okay.  And you're the Corporal always?

16     A.     Right.

17     Q.     Correct?  And then sometimes you have

18  different roles.  Were you -- you were then in the

19  role of assistant supervisor; is that accurate?  Or

20  are you always an assistant supervisor back then as

21  well?

22     A.     Always assistant supervisor.

23     Q.     Okay.  So tell me where that then fits you

24  in the hierarchy of those people at the jail.  So you

25  come on -- go ahead.  No, go ahead.

Maxine Evans

Page 32

1     A.    I have a sergeant.  She was my supervisor.

2  And then I fell under her.  And the privates fell

3  under myself and the sergeant.

4     Q.    Okay.  And then above the sergeant would

5  be?

6     A.    Lieutenant.

7     Q.    All right.  And this night, my

8  understanding was the lieutenant was the watch

9  commander; is that accurate?

10    A.    Yes.

11    Q.    Okay.  Lieutenant Johnson?

12    A.    Yes.

13    Q.    What do you understand watch commander to

14  mean?

15    A.    She, she or, he or she is in charge of the

16  entire facility.

17    Q.    So when you came on duty that day,

18  whenever you got there, tell me about the briefing

19  that you had 7:30 or thereabouts.

20    A.    I can't recall what was said or what was

21  going on, but I didn't recall -- I don't recall

22  anything being briefed about R and D, you know, as to

23  any situations or things we needed to be talked

24  about.

25    Q.    Well, tell me generally then what is the

Maxine Evans

Page 33

1    briefing supposed to cover.

2        A.    From my understanding, a briefing

3    generally tells us the actions or whatever transpired

4    throughout the jail through that day.  Like if a

5    detainee broke something or there was a fight,

6    someone went to the hole for something, that's

7    basically how we were briefed.  And whatever unit --

8    they would go by units.  In unit, whatever unit had a

9    situation, they would brief us on the situation of

10   each unit.

11       Q.    Okay.  And in addition to this being

12   communicated to you verbally just talked about at the

13   briefing, where else is everything kept?

14       A.    Where's the information kept?

15       Q.    Yes.

16       A.    Okay.  When you say "kept," what --

17       Q.    Well, we know that there are several

18   different, I understand -- and fill me in and correct

19   me where I'm wrong -- that there are several

20   different information systems in the jail for

21   information to be kept.  One is Share Point.  One is

22   Phoenix.  There may be another one where you can go

23   and get information.

24            So I'm just curious if you had an event,

25   let's just say Unit 2 inmates being highly disruptive

Maxine Evans

Page 34

1   or whatever.

2          A.     Uh-huh.

3          Q.     You go to the briefing and you hear that.

4   But where else is that information kept?

5          A.     Line staff wasn't privileged to that, to

6   basically get on the computer and see what the watch

7   commander, the notes the watch commander had.

8   Whatever the watch commander tells us during

9   briefing, that's what we, we went with.  When we go

10  to our unit or where you're assigned to, then the

11  sergeant would get briefed again from the off-going

12  sergeant as to what transpired in that area.  And

13  then the sergeant would disseminate it down if it

14  needed to be disseminated down.

15         Q.     Just so I'm clear, are you saying that as

16  the corporal, you put yourself in line staff where

17  you say line staff?  Is that corporal?  Is that you?

18         A.     Basic -- yes.

19         Q.     So is it your understanding that you

20  didn't have access to certain information that your

21  supervisors or superiors did have access to?

22         A.     The Share Point system, at one point, I

23  guess they could go on and read the notes from the

24  watch commander or whatever happened.  But they --

25  the -- what's it called? -- the department that runs

Maxine Evans

Page 35

1    the computers or whatever, they block that from us

2    having that access.

3         Q.    When did that happen?

4         A.    I can't recall when it happened.

5         Q.    In the time line with Matthew's death,

6    obviously it would have been before that?

7         A.    Right.

8         Q.    Was it well before that?  A year before

9    that?  A decade before that?

10        A.    Not a decade.  I'd say maybe it could have

11   been, it could have been about a year, a year or two.

12        Q.    And do you have any understanding why that

13   happened?

14        A.    No.

15        Q.    Nothing whatsoever as to why information

16   that was available to you in the past was now not

17   available?

18        A.    From my understanding or from what I, and

19   I'm going from hearsay, that officers were looking

20   at, at the watch commander notes and whatever.  And

21   they were sharing it with other people that didn't

22   have a need to know.  That was my understanding.

23        Q.    Okay.  All right.  Did you hear any

24   specific examples of that?  It sounded like this is a

25   bit of a jail rumor mill that's going on as to how it

Maxine Evans

Page 36

1    was cut off; is that accurate?

2         A.    Right.

3         Q.    I don't want to use my term.

4         A.    No, you're right.

5         Q.    I'm just hearing what you're saying.   So

6    any specific incidents that you're aware of as to

7    information that was taken off Share Point and shared

8    inappropriately?

9         A.    No, not that I can recall.

10        Q.    Anybody who you know who was disciplined

11   for that?

12        A.    Not that I can recall.

13        Q.    Do you think was that a year, maybe two --

14        A.    Could have been.

15        Q.    -- before Matthew's passing that this

16   shift came in information flow?

17        A.    Yes.

18        Q.    Okay.   So we sort of went off on a bit of

19   a tangent there about the information, but -- so when

20   you are done with a briefing at 7:30 or now you're

21   going to your shift --

22        A.    Uh-huh.

23        Q.    -- is there any other place that that

24   information is kept besides verbally being

25   communicated to you during the briefing?

Maxine Evans

Page 37

1     A.     The watch commander had the logbook and I

2  think it's on the computer.

3     Q.     Okay.  Let's try and -- I want to delve

4  into that a little bit because we've heard a lot of

5  testimony about logbook.  What is that in your

6  definition?

7     A.     The logbook is, it's a green logbook.  It

8  was a green book.  I don't want to -- like ledger.

9     Q.     Okay.

10     A.     And everything that's happened in that

11  ledger, everything that's written in that ledger are

12  incidents or whatever transpired throughout the jail.

13  But then they went to the computer and then they took

14  away, did away with the book and everything got put

15  in the computer.

16     Q.     Okay.  So on this day of Matthew's

17  passing, was there the green ledger logbook?  Did it

18  still exist then?

19     A.     I didn't see the -- I don't recall the

20  watch commander coming in with a logbook.

21     Q.     I mean, just generally.  Are we talking

22  about the end of January of 2014?  I'm trying to get

23  a feel for when, based on your testimony, when we

24  moved or the jail moved from this logbook to their

25  computer.

Maxine Evans

Page 38

1       A.    Okay.  The watch commander's area and my

2   area are two different areas.  Whatever the watch

3   commander does, I don't -- I didn't get involved in.

4   So I can't say what happened or when the turnover or

5   transition happened.  I just stayed in my area which

6   was being a corporal and working in R and D.

7       Q.    But you understood my question?  I'm

8   trying to find out when, from your awareness, this

9   written logbook went away?

10      A.    No.  I don't know when it went away.  I

11  just heard that everything was being put into Share

12  Point.  When the, when the computer people was

13  upgrading the systems and doing everything,

14  everything was going to turn over to Share Point.

15      Q.    Okay.  And did you have any access to

16  Share Point?

17      A.    Yes.

18      Q.    Okay.  But there was some -- and I'm just

19  trying to get a feel.  Was there parts of the Share

20  Point database or information that you could not get

21  to?

22      A.    Right.  Yes.  I couldn't get to.

23      Q.    Okay.  And what could you get to or what

24  could you not get to?

25      A.    I could have access to writing reports,

Maxine Evans

Page 39

1    sending the reports to my supervisor so she can go

2    over them, read them, and I can sign them.  Basically

3    that was it.  Jail forms.

4         Q.    And what -- go ahead.

5         A.    That, that -- basically jail forms and

6    writing reports.

7         Q.    So what types of events were you then

8    required to write reports about?

9         A.    Anything that was significant.

10        Q.    Okay.  So how do you define significant?

11        A.    If I had a, an officer that was

12   disrespectful, it was called -- we would write him,

13   write him, write him up for that.

14        Q.    Okay.  And --

15        A.    And if we had any fights, someone got ill,

16   you write a report to that.

17        Q.    Okay.  And are there any policies or

18   procedures in place that you're aware of in Chatham

19   County to help you decide what is a

20   significant-enough event to write a report about it?

21        A.    Yes.

22        Q.    And tell me about that.

23        A.    It states in the policy if you -- if

24   there's an incident, write a report.

25        Q.    Okay.  And the incidents would include the

Maxine Evans

Page 40

1    ones that you just mentioned to me?

2         A.    Yes.

3         Q.    And how quickly is it your obligation then

4    to write those reports?

5         A.    If you're not -- you should write it as

6    soon as you can.  But if you're busy at that point,

7    you know, and you can't do it right away, make sure

8    it gets done before the end of your shift.

9         Q.    So when these reports are put into Share

10   Point, do you then print out copies that go and get

11   distributed or does it all stay resident on the

12   computer program?

13        A.    It stays in the computer program but you

14   print out the copy so you can have a signature on it.

15        Q.    So if you have an incident report that you

16   fill out, would you fill it out on the computer?

17        A.    Right.

18        Q.    Not handwritten?

19        A.    No.

20        Q.    But then print it out to sign it?

21        A.    Yes.

22        Q.    And then what happens with those copies?

23        A.    Once you print it out and you get -- I

24   would get my supervisor to sign it.  She would take

25   it and she would read over it, correct it if it needs

Maxine Evans

Page 41

1   to be corrected.  Give it back to me.  I go back and

2   make my corrections.  Reprint it out.  Give it back

3   to her.  She'll proofread it again.  And once she has

4   it, she takes it to the unit lieutenant.  And the

5   lieutenant will get it and forward it up chain of

6   command.

7          Q.    Do you know from your own knowledge that

8   that information, that flow back up is also

9   identified on the Share Point?  So that the

10  information is still maintained on Share Point as

11  well?

12         A.    Yes.

13         Q.    Okay.  We talked a little bit ago, I

14  mentioned the, the term "Phoenix."  What do you

15  understand that software to be?

16         A.    Oh.  Phoenix was when I first started

17  working at the jail.  I never really did anything

18  with Phoenix.

19         Q.    Do you know what it is?

20         A.    If we're talking about the, the computer

21  program?

22         Q.    Yes.

23         A.    Yes.  I mean, that's just what they called

24  it.  Phoenix.

25         Q.    What would it do or what would you do on

Maxine Evans

Page 42

1    it?

2         A.    Phoenix was like an operating system.

3    When you open it up, you could pull up detainees and

4    just look at their information.

5         Q.    Let me ask you this way:  Was that

6    something where you would actually input information

7    into it or was it just for you to get information out

8    of or both?

9         A.    Information out of, I believe, at that

10   time.

11        Q.    All right.  So this night you go in and

12   you have the briefing.  You don't recall anything

13   mentioned about Mr. Ajibade; is that accurate?

14        A.    Yes.

15        Q.    So then tell me what you do after

16   briefing.

17        A.    I went to my area.  And my sergeant, she

18   went to the station where the --

19        Q.    I'm sorry to interrupt you a little bit

20   just so we get it.  We're trying to keep all the

21   names down right.  So you know who your sergeant was.

22   We don't.

23        A.    I'm sorry.

24        Q.    That's okay.  But as you go through it,

25   you're going to say lieutenant, you're going to say

Maxine Evans

Page 43

1   sergeant.  I'm going to stop you.

2        A.    Okay.

3        Q.    So if you can just add names, that'll help

4   us?

5        A.    All right.  We arrived to R and D.

6   Sergeant Anza Rowland, she went to the supervisor's

7   station and she was briefed by or she was being

8   briefed by Corporal Broom at that time because he was

9   the supervisor for that offgoing shift.  And while

10  they were being briefed, I came in.

11            And the other line staff, they go and meet

12  up with the other line, offgoing line staff so that

13  they can get an accountability as to how many

14  individuals were in R and D.  I came in.  I was told

15  by, I think, Corporal Broom at that time told me

16  that, he said that we had a lot of females that

17  needed to be dressed out.  So I said okay.  And then

18  he continued to brief Sergeant Rowland as to what was

19  going on.

20            I walked in so that I could get a count of

21  how many different females that needed to be dressed

22  out.  And once I got my count, then I left the area

23  and went back into what is called a property room.

24       Q.    Okay.

25       A.    And then I get in the property room.  And

Maxine Evans

Page 44

1    what that consists of is getting their jail uniforms,

2    underclothes.  I get that, put those in stacks.  That

3    way I can start changing out the females that's

4    there.

5         Q.    Okay.  Before that, though, you had some

6    awareness that Mr. Ajibade was in the jail; correct?

7         A.    No.

8         Q.    Nothing whatsoever?

9         A.    No.  I didn't even know he was there.

10        Q.    Okay.  So you go back and start working

11   with property and the uniforms?

12        A.    Right.

13        Q.    What happens next or what do you do next?

14        A.    I started -- I come out.  Once I got the

15   sets all together, maybe about five sets, I come out

16   and I get my first set of females.  I take them back

17   and I started dressing them out.

18        Q.    Okay.  Then what happens?

19        A.    And I continued to do so until that's when

20   I heard a call come over.  It was like a real faint

21   call come over the radio.  And then I stopped what I

22   was doing and I listened.  And then I could hear one

23   of the officers say they were having, they were

24   having a 10-78.

25        Q.    What does that mean to you?

Maxine Evans

Page 45

1          A.     That means an officer needs assistance.

2          Q.     Okay.  And within the context of hearing a

3     10-78, what does that indicate to the officers that

4     hear it that they're supposed to do?

5          A.     Come and assist the officer that needs

6     help.

7          Q.     Okay.  Is that sort of an all hands on

8     kind of call?

9          A.     Yes.  Yes.

10         Q.     All right.  And so what do you do in

11    response to the 10-78?

12         A.     I bring the females that I had that were

13    being dressed out, I bring them out and I make -- and

14    secure them back into their cells.  And then that's

15    when I go see what was going on where the 10-78 was

16    being called.

17         Q.     And what do you see?  What's the first

18    thing you see when you come on scene?

19         A.     When I come on scene, I see

20    Officer Dennison, Capers, Richardson, I believe there

21    was another officer, they were all in the scuffle

22    with Mr. Ajibade.  And then when I walk up to the,

23    walk up and see them, I see that it was enough

24    officers there to take care of him because I had

25    looked to the right, and that's when I saw

Maxine Evans

Page 46

1    Sergeant Rowland laying on the floor and she had

2    blood coming from her.  So my instinct was to go and

3    try to move her away because the incident was, was so

4    in close proximity.

5              So my -- I went there to assist

6    Nurse Brown and removed her away from the incident

7    that was going on.

8         Q.    Okay.

9         A.    Scuffle that was going on.

10        Q.    And up until that point, no prior contact

11   with Mr. Ajibade or any awareness of him?

12        A.    Prior to that, while I was changing out

13   the females and I had brought a group out,

14   Private Richardson was in the prebooking area.  He

15   was the officer doing the prebooking.  And when I

16   came out, I went down to, I call it the U section.

17   And I sat down for a brief minute and Private Capers

18   was standing there.  And Mr. Ajibade -- I was talking

19   to him about -- I said something to Capers about

20   something.

21              Anyway, he was, Mr. Ajibade was in the

22   cell adjacent to where I was sitting, and I could

23   hear him, you know, he was beating his shoes on the

24   bed.  And after that, Mark, I mean Capers, he said

25   something to me.

Maxine Evans

Page 47

```
 1              And so I said, "Well, I got to go back and
 2     finish with these females."  And then I got up.  And
 3     at that point -- when I got up and walked out, that
 4     was it.
 5          Q.   Okay.  No other conversation with
 6     Mr. Ajibade or what --
 7          A.   No, I didn't talk to him at all.
 8          Q.   Okay.
 9          A.   Not Mr. Ajibade.  I didn't talk to him.  I
10     didn't say anything to him.
11          Q.   Did you observe anything else that he had
12     done?
13          A.   No.
14          Q.   Did you hear him say anything?
15          A.   No.
16          Q.   Did you say anything to Capers about him?
17          A.   I'm sorry?
18          Q.   Did you say anything to Capers about him?
19          A.   I don't recall.  When he was making the
20     noise, I just, I looked toward the cell while Mark
21     was standing, leaning at the --
22          Q.   When you say "Mark," you mean Capers?
23          A.   I'm sorry.
24          Q.   That's okay.
25          A.   Capers was leaning on the, on the counter.
```

Maxine Evans

Page 48

1  And I don't know if I asked him who was that or -- I

2  can't recall if I asked him that or not.

3       Q.    Okay.  Was he making any facial maneuvers

4  or anything like that or anything that caught your

5  attention?  I'm talking about Mr. Ajibade.

6       A.    That caught my attention?

7       Q.    Yes.

8       A.    Not other than him beating his slides on

9  the bed.

10      Q.    And by slides we're talking --

11      A.    Shoes.

12      Q.    Shoes.

13      A.    Yeah, shoes.

14      Q.    Okay.  Anything else that caught your

15  attention or gave you any cause for concern?

16      A.    No.

17      Q.    Okay.  So then you go back to doing what

18  you're doing?

19      A.    Correct.

20      Q.    Which was dealing with the females?

21      A.    Yes.

22      Q.    All right.  Any other communication or

23  contact with Mr. Ajibade until the scuffle that you

24  testified about a moment ago?  Anything in the middle

25  of that that we haven't talked about?

Maxine Evans

Page 49

1          A.     Not dealing with him, no.

2          Q.     Okay.  Did you hear anything else about

3    him?

4          A.     (Shakes head negatively.)

5          Q.     You have to answer out loud.

6          A.     Oh, I'm sorry.  No.

7          Q.     And then you come back for the 10-78?

8          A.     Correct.

9          Q.     And what do you do?  I think you said you

10   attend to Sergeant Rowland.  But take me up from that

11   point forward then.

12         A.     From Sergeant Rowland?

13         Q.     Yes, when you were tending to her.

14         A.     I stayed with her the entire time until

15   she -- the ambulance or EMS came and picked her up

16   and took her out.

17         Q.     And about how long was that?

18         A.     As far as?

19         Q.     Well, I mean --

20         A.     Staying with her?

21         Q.     Yes.

22         A.     That lasted -- it could have been -- I'm

23   not sure.  In between -- it could have been 30

24   minutes.

25         Q.     Before EMS got there?

Maxine Evans

Page 50

1          A.      Correct.   Thereabout 20, 30 minutes.

2          Q.      All right.   And then what do you do after

3     the -- does EMS come at some point?

4          A.      Yes.   They come and they assess her and

5     they put her on the gurney and they take her out.

6     And then one of the officers was assigned by the

7     lieutenant that someone needs to go with her, and

8     that was Private Burke.   He left and he, he left and

9     went with Sergeant Rowland.

10         Q.      Who was with you there when you were with

11    Sergeant Rowland?

12         A.      Gregory Brown, the nurse.

13         Q.      Okay.   Was he there for the -- how long

14    was he there?

15         A.      He was there -- actually, when I came up,

16    he was already on scene with her.   And I think he was

17    trying to either talk to her or see what was going

18    on.   And I know when I came up and saw that he was

19    there, I immediately, too, went to her and he said

20    let's move her away from the, what, what was going

21    on, the scuffle with him.   And so we moved her away

22    from that area, moved her behind the counter.

23         Q.      My understanding, because, obviously,

24    there's some video of everything, and I think I know

25    the part you're talking about where you were maybe

Maxine Evans

Page 51

```
 1    10-15 feet away from where the scuffle is going on.
 2    Is that what you're talking about?  When --
 3         A.    Yes.
 4         Q.    Okay.  Now, follow me through from there.
 5    You and Brown take role in where?
 6         A.    We moved her away from the scuffle.  And I
 7    wouldn't say 15 feet.  I'd say, you know -- well, I
 8    don't know.  I'd have to measure it, but it was
 9    pretty close proximity.  And when we -- what we did,
10    he just -- we moved her behind a counter, in the same
11    area but --
12         Q.    Okay.
13         A.    -- behind a counter.
14         Q.    And then did you stay with her
15    consistently until the EMT got there?
16         A.    Yes.
17         Q.    My understanding from other discovery was
18    that she was sitting in an area not far from the
19    Sally port entrance.  Is that your memory or no?
20         A.    She was sitting?
21         Q.    Sitting or laying down.  Where were you
22    waiting with her for EMS?  I'll put it that way.
23         A.    In the R and D area --
24         Q.    Okay.
25         A.    -- where we had moved her to the, behind
```

Maxine Evans

Page 52

1    the prebooking area counter.

2         Q.    And was Nurse Brown with you?

3         A.    Yes.

4         Q.    And was he with you the whole time that

5    y'all were waiting for EMS?

6         A.    Yes.

7         Q.    Did he ever leave?

8         A.    No.

9         Q.    Okay.  And who else was with you?

10        A.    Lieutenant Johnson.  She arrived -- she

11   was there on the scene.

12        Q.    Okay.  And did she also stay with you the

13   entire time until EMS arrived?

14        A.    She was, she was there while Nurse Brown

15   was attending to her, and I was trying to keep her

16   calm.  And she was standing, she was standing there.

17        Q.    "She" being?

18        A.    Lieutenant Johnson was standing there.

19   And Private Richardson, I recall, came back to her

20   and he stated that Mr. Ajibade wasn't -- he was still

21   acting up, in other words.  He needed a Taser.  And

22   that he was acting up.  And then Lieutenant Johnson

23   said, "Really?"  And then she left and went back with

24   him.  And myself and Nurse Brown stayed with

25   Sergeant Rowland until EMS came.

Maxine Evans

Page 53

1          Then when EMS arrived on the scene, I

2    believe Lieutenant Johnson, she came back out to see

3    what, you know, what was going on with

4    Sergeant Rowland.  And then she said, "Let's get an

5    officer to go out with her."  And that was

6    Private Burke.

7          Q.    Now, was Private Burke also in that group

8    sitting with Rowland to begin with?

9          A.    No.  Private Burke was in the area when

10   they moved Ajibade to the other area.

11         Q.    Okay.  All right.  So Lieutenant comes

12   back out.  They get Burke.  And where do you go?

13         A.    After Sergeant Rowland leaves and goes to

14   EMS, I tried to get some normalcy what was going on

15   because other outside agencies were bringing in

16   arrestees.  And so what I was doing was trying to get

17   them situated as well.  So I come back up to the

18   supervisor's area.

19         Q.    Now, when you say "supervisor's area,"

20   we've seen a map of the facility and it's sort of a

21   booking sergeant desk?

22         A.    Right.

23         Q.    Is that what you're talking about?

24         A.    Yes.

25         Q.    And that's sort of -- if I'm walking

Maxine Evans

Page 54

1    through Sally port, the U area that you talked about,

2    and I'm walking through Sally port, I've got some

3    holdings cells on the right-hand side, the detox

4    cells on the left?

5         A.    Right.

6         Q.    And I'm walking, if I walk through that

7    open door, and that's right where the, what you call

8    supervisor's desk?

9         A.    Correct.

10        Q.    That's the booking sergeant's desk?

11        A.    Correct.

12        Q.    Same desk?

13        A.    Right.

14        Q.    Okay.  So that's where you go?

15        A.    Yes.

16        Q.    All right.  And what do you do in there?

17        A.    I go back because, again, I had agencies

18   there that had arrestees in.  Some of the officers,

19   when the scuffle broke out, we, they came in and they

20   immediately locked some of those arrestees down or in

21   cells so that there wouldn't be any more arrestees

22   while everything was going on.

23             So I come back to the supervisor's desk

24   and I start going, trying to take deep breaths and

25   calm myself down and say, okay, let's try to get some

Maxine Evans

Page 55

1    organization and order through what I had to do next.

2         Q.    Which was what?

3         A.    Start getting some of these arrestees

4    signed in and so that they can get -- so that the

5    arresting officers wouldn't have, you know, the line

6    wouldn't be so long for the arresting officers

7    waiting to get their paperwork so they can go back

8    out.

9         Q.    From your memory -- well, from the time

10   the 10-78 was called to the time you showed up, about

11   how many minutes was that?  Do you recall?

12        A.    I can't recall.

13        Q.    Was it like one or two or was it 10 or --

14   I'm just trying to get a feel.

15        A.    From the time I heard the 10-78 and

16   arrived out in the area?

17        Q.    Yeah.

18        A.    I'd say probably no more than, you know,

19   no more than maybe five, maybe five or 10 minutes, if

20   that.

21        Q.    Okay.  Well, let's go back a little bit.

22   So when you hear the 10-78, you're dealing with some

23   of the female inmates?

24        A.    Correct.  Dressing them out.

25        Q.    Okay.  And how long did that take you to

Maxine Evans

Page 56

1    secure that or put them away or finish dressing them?

2        A.    Well, at that particular time, the ones

3    that I had when I brought them, those out, I'd say

4    about --

5        Q.    Let me ask you --

6        A.    Yeah.

7        Q.    If you had an answer, I was going to ask

8    you a different way.

9        A.    Okay.

10            MR. PHILLIPS:  Do you want any water?

11            THE WITNESS:  Please.

12            MR. O'MARA:  There's Coke, Sprite or

13        coffee.

14            THE WITNESS:  Just water.

15            MR. O'MARA:  Mr. Phillips, I was going to

16        keep going.

17            MR. PHILLIPS:  Yeah, that's fine.

18        Q.    (By Mr. O'Mara) Have you looked at the

19    tapes of the whole investigation that's sort of been

20    floating around?

21        A.    What I saw is when GBI Agent

22    Cyrus Purdiman, when Cyrus Purdiman showed me a video

23    of what happened, and I saw it in court.

24        Q.    Okay.  Would you then defer to the

25    accuracy of the video as far as the time line of when

Maxine Evans

Page 57

1    the 10-78 went out and when you got there?

2              Let me ask it this way:  At a certain

3    point, we can see you show up in the video.

4         A.    Right.

5         Q.    Correct?  Was that -- when we see you show

6    up and the scuffle's still going on, that was the

7    first time you showed up; right?

8         A.    Correct.

9         Q.    You had not been in that area during the

10   scuffle before, had you?

11        A.    Correct.

12        Q.    Okay.  So whenever the 10-78 was put out

13   until we see you in the video, that's the time it

14   takes?

15        A.    Right.

16        Q.    All right.  And then -- so from your

17   understanding, how long did the, did it take from the

18   time the scuffle broke out until they had Matthew in

19   the cell?

20        A.    Repeat it.

21        Q.    Uh-huh.  From the time the scuffle broke

22   out --

23        A.    Right.

24        Q.    -- which presumably was when the 10-78 was

25   called?

Maxine Evans

Page 58

1        A.      Right.

2        Q.      And that is an assumption by you, I guess,

3    because you didn't see it?

4        A.      Right.

5        Q.      But from the time the 10-78 was called

6    until he was put in the cell, how long do you think

7    that was?

8        A.      I can only say however long the video is.

9        Q.      Okay.  No present memory of the time?

10       A.      No.

11       Q.      You would defer, of course, to the video?

12       A.      Right.

13       Q.      All right.  Do you know how many of law

14   enforcement agencies brought arrestees in during

15   whatever that time was that it took for that scuffle

16   to turn into a -- to put him in the cell?

17       A.      I can't recall, but it was quite a few.

18   Maybe -- it could have been like three, four, three

19   or four agencies.  And that's including the state

20   troopers.

21       Q.      Okay.  All right.  So now, you're now

22   dealing at, I think we're up to the point where

23   you're at the supervisor's station or the booking

24   sergeant's desk dealing with however number of those

25   were; is that accurate?

Maxine Evans

Page 59

1        A.     Right.

2        Q.     So then what happens next?  What do you

3    next do?

4        A.     I continue to try to get the arrestees

5    signed in.  And then we have a system, it's called

6    the GCIC.  Whereas if an officer's out on the street

7    and they probably pull somebody over, they do a check

8    on them.  And if they get like a what we call a hit

9    or a warrant, it'll come through our system and the

10   light will go off.  And once I get it, I have ten

11   minutes to answer that hit.  And I have to leave that

12   area and go to another area of the jail, which is

13   called the warrant room, and go pull the warrant, if

14   they do have a warrant, and answer that hit.  Come

15   back and then answer that hit.

16       Q.     And is that one of the primary

17   responsibilities in the position you held that night?

18       A.     Correct.

19       Q.     And who else can do that?

20       A.     The supervisor -- the only ones that can

21   get in the warrant room is supervisors.

22       Q.     And who was that that night?

23       A.     Sergeant Rowland was the supervisor.  But

24   since she was not there and I had to go fill that

25   role, I became that person.

Maxine Evans

Page 60

```
 1        Q.    Okay.  So you were -- at the point that
 2   Sergeant Rowland is incapacitated pulling out of the
 3   facility --
 4        A.    Right.
 5        Q.    -- what is that -- what position does that
 6   put you into?
 7        A.    It puts me as being the supervisor.
 8        Q.    Of?
 9        A.    Of the shift.
10        Q.    Okay.  A particular area?
11        A.    R and D.
12        Q.    Okay.  So are you now in charge of R and
13   D?
14        A.    Correct.
15        Q.    At this point.
16        A.    Yes.
17        Q.    Anybody else that you could have assigned
18   to handle the warrants issue?
19        A.    No, because they can't, they can't go into
20   the warrant room.  That warrant room only -- the only
21   people that had access to the warrant room, of
22   course, the watch commander, and R and D supervisors.
23        Q.    Okay.  When we say supervisors, were there
24   any other supervisors at R and D that night?
25        A.    I was it.
```

Maxine Evans

Page 61

1     Q.    Okay.  And were there supervisors from any

2     of the other pods or sections that could have

3     assisted with warrant review?

4     A.    From another unit?

5     Q.    Yeah.

6     A.    No.

7     Q.    Why not?

8     A.    That's the way it was set up.  I don't --

9     if you didn't, if you didn't work in R and D, you

10    didn't have a need to go into the warrant room.

11    Q.    So tell me about the policy that suggests

12    that a warrant should be responded to within ten

13    minutes?

14    A.    To be honest, I haven't seen a policy.

15    All I was told that there -- when I started -- I came

16    to R and D in May of -- I hadn't been in R and D but

17    only five, maybe six months.  And I was told that

18    when you, when we get a warrant, it has to be

19    answered.  And when we get a hit, it has to be

20    answered within ten minutes.

21    Q.    Okay.  And what exceptions are there to

22    that rule?

23    A.    None from what I was told.

24    Q.    Okay.  So as the supervisor there at R and

25    D, this night or any other night, how do you

Maxine Evans

Page 62

1    prioritize what needs to be addressed just generally?

2         A.    Prioritizing, if I -- if I'm not -- if I

3    don't have to deal with getting a warrant or a hit,

4    try to get these officers in and back out.

5         Q.    Okay.  What else?  And tell me how you

6    sort of -- in the situation that happened here with

7    Sergeant Rowland seemed to need medical attention?

8         A.    Right.

9         Q.    Would you prioritize that over looking for

10   a warrant?

11        A.    Prioritize Sergeant Rowland over a

12   warrant?

13        Q.    Sure.

14        A.    No.  Sergeant Rowland would be seen first.

15        Q.    Okay.

16        A.    And then after, whatever's -- whatever is

17   determined about her, then we go from there.

18        Q.    Okay.  I want to make sure that we

19   understand, that you understand the question.

20        A.    Okay.

21        Q.    So when -- if you had gotten a warrant

22   call during the moment that you saw Sergeant Rowland

23   on the floor, what would -- how would you prioritize

24   Sergeant Rowland compared to having to get the

25   warrant answered?

Maxine Evans

Page 63

1      A.     I would ask for assistance because there

2   was only limited amount of people that could go in

3   the warrant room.  So by the lieutenant being there,

4   Lieutenant Johnson being there, what I would do, I

5   would immediate let her, inform her that we have a

6   warrant, you know, we have a hit and Sergeant Rowland

7   needs to go.

8            I can go answer the warrant and, of

9   course, she being the lieutenant, she being stayed

10  there with Sergeant Rowland until she was out.

11     Q.     Okay.  So how often would you then handle

12  prioritized emergencies that come up when you have to

13  deal with a warrant?

14     A.     If I'm dealing with the warrant, then the

15  next in line would be one of the privates would then

16  take care of whatever's going on until I return to my

17  area.

18     Q.     Okay.  Have you -- has it ever taken you

19  longer than ten minutes to respond to a warrant

20  request?

21     A.     Not that I can recall.

22     Q.     Okay.  So you're answering -- how many of

23  those warrant requests do you remember having that

24  night?

25     A.     I had two.

Maxine Evans

Page 64

1      Q.    Okay.  And from the time in to the time

2  you respond is, by your own definition, no more than

3  ten minutes?

4      A.    Correct.

5      Q.    Do you recall when they came in in

6  relation to everything else that was going on that

7  night?

8      A.    Once Mr. Ajibade and everything was

9  cleared and they had him in the, I guess the holding

10  area, when I was at the sergeant's desk, that's when

11  I got my first warrant, the first hit.  Because I was

12  trying to get the officers situated that was already

13  there, get them signed in.  Then the light came on

14  and I went to go answer that hit.

15     Q.    I'm sorry.  Just not getting too far into

16  the security, but you got a few things out there.

17  What do you mean when the light goes on?

18     A.    There's a little flashing red light that

19  comes on to let us know that a hit is coming through

20  the system, the GCIC hit is coming through.  And then

21  it comes off like a printer.

22     Q.    Which means that a local agency has

23  checked -- I'm just going to guess here from just my

24  experience and tell me, I'm going to ask you to fix

25  it all.  So a local law enforcement agency has looked

Maxine Evans

Page 65

1    into what they can look into.  They see that there

2    may be a warrant outstanding on this guy in the

3    jurisdiction.  They follow that information and use

4    it for confirmation of the actual warrant.  Is that

5    what you guys do?

6         A.    Correct.

7         Q.    Is that accurate?

8         A.    Yes.

9         Q.    So -- and there's some emergency light

10   that flashes that tells you we have a request from a,

11   probably an on-the-street deputy for law enforcement

12   needing your confirmation on a warrant?

13        A.    Correct.

14        Q.    Is that -- did I miss anything on that?

15   Is that pretty much what we're talking about?

16        A.    Exactly what we're talking about.

17        Q.    Okay.  Okay.  So you're rejecting a couple

18   of those and also whatever law enforcement officers

19   have come in?

20        A.    Correct.

21        Q.    Anything else that you're doing?

22        A.    That's it.

23        Q.    So what are your duties now as the

24   supervisor of R and D now that Rowland is, now that

25   Rowland's not there?

Maxine Evans

Page 66

1              MR. PHILLIPS:  That's what I wondered, you

2      know.

3      Q.    (By Mr. O'Mara) Yeah.  Now that Rowland is

4  no longer there, you are -- you have become the

5  supervisor of R and D?

6      A.    Correct.

7      Q.    And what are your duties?

8      A.    To take over what she would normally do if

9  she was there.  I would be at the supervisor's desk.

10  I would answer the warrant hit.  The lobby officer,

11  when people in and put bond, secure a bond on

12  individuals, it would come through a chute and I

13  would have to get those bonds, write them out

14  physically.

15              And after I get the paperwork, put it in a

16  basket or inbox so that the property officer can come

17  and pick those up so that we can people discharged or

18  released from the jail if they have a bond.

19      Q.    You also now have sort of supervisory

20  authority over all the inmates in R and D; correct?

21      A.    Yes.

22      Q.    They're now under your charge; is that

23  accurate?

24      A.    Yes.

25      Q.    Including Mr. Ajibade, of course?

Maxine Evans

Page 67

1      A.    Right.

2      Q.    So as you're going through all of these

3   other activities, are we now in the time line where

4   Mr. Ajibade is already in the cell?

5      A.    Yes.

6      Q.    Okay.  And you weren't present for any of

7   what happened in the cell, were you?

8      A.    No.

9      Q.    Okay.  What did other people tell you

10  happened with Mr. Ajibade in the cell?

11     A.    Before he was placed in the cell or --

12     Q.    No.  After.

13     A.    After he was placed in the cell?

14     Q.    Let's take it real slowly.

15     A.    Okay.

16     Q.    So you show up at the scene of the

17  10-78 --

18     A.    Right.

19     Q.    -- and the scuffle's going on.

20     A.    Correct.

21     Q.    You go deal with Sergeant Rowland?

22     A.    Correct.

23     Q.    And she goes to EMS?

24     A.    Yes.

25     Q.    Now you're sort of in charge?

Maxine Evans

Page 68

1        A.     Yes.

2        Q.     The situation has now ended at the cell by

3    this point; is that accurate?  By the cell, I mean

4    with Mr. Ajibade in the restraint chair in No. 1 and

5    booking.

6        A.     Well, there -- when I came to the

7    supervisor's desk, Lieutenant Johnson and a few of

8    the other officers were still in the area, in that

9    area where Mr. Ajibade was.

10        Q.     So they come out and tell me who tells you

11    what about what's going on.

12        A.     Basically no one tells me what was going

13    on.  I just -- I tried to get -- I was at the

14    supervisor's desk tending to my duties that I had to

15    attend to as far as getting everything organized and

16    getting everything back in order.

17        Q.     And --

18        A.     Lieutenant Johnson was with the other

19    officers and she was briefing them or talking to

20    them, I believe.

21        Q.     Okay.  Did nobody come up to you and talk

22    to you about what had just happened in the cell?

23        A.     No.

24        Q.     Nobody?

25        A.     No.

Maxine Evans

Page 69

1        Q.    Okay.  Did you ask anybody --

2        A.    No.

3        Q.    Hold on.  No, you're doing great.  Did you

4   ask anybody, since now he is in your charge, what's

5   going on with that inmate in there?

6        A.    I believe I asked Private Capers and

7   Vinson after they were there if he was okay and if he

8   was all right.

9        Q.    Okay.  Now, this was -- just give me the

10  time line on that.

11       A.    Whatever the video shows.  I can't recall.

12       Q.    Okay.  Tell me where it was when you were

13  talking to Capers and/or Vinson.

14       A.    At the supervisor's area.

15       Q.    Okay.  So they would have come up to it?

16       A.    They was -- yeah, they came up to the

17  desk.

18       Q.    Okay.  How lengthy was that conversation?

19       A.    Not very lengthy.

20       Q.    Tell me what you said or what they said.

21       A.    I asked them how he was doing.  They said

22  he was, you know, he was okay.  And then Mark Capers

23  was standing at the bed along with Private Vinson and

24  that's when Private Capers looked at Vinson, he said,

25  "Man, you got a knot on your head."

Maxine Evans

Page 70

1          And then Vinson started rubbing his head

2     and he was like, "Oh, I didn't even know it was

3     there."

4          And then later he, he --

5     Q.    He being?

6     A.    Private Vinson.  Later he just started

7     rubbing his head, and then the next thing I knew, I

8     think Private Capers said something about getting it

9     checked out.  And then I remember

10    Lieutenant Johnson -- I think he went to either

11    Lieutenant Johnson or Lieutenant Johnson came to him

12    and said that he needed to go out to get himself

13    checked out as well.  Private Vinson needed to get

14    himself checked.

15    Q.    All right.  Did anyone ever tell you that

16    he was tased?

17    A.    If who was tased?

18    Q.    Ajibade.

19    A.    No.

20    Q.    Vinson didn't tell you that?

21    A.    No.

22    Q.    And Capers didn't tell you that?

23    A.    No.

24    Q.    Is that something that you think that you

25    would like to have known as the supervisor of R and D

Maxine Evans

Page 71

1    that night?

2         A.    Whenever the lieutenant is in the area,

3    she is basically in charge and she disseminates down

4    to me what, what took place or what happened.

5         Q.    Okay.  Did you understand the question?

6    Do you think that information from Capers or Vinson

7    or anybody else, Kenny, Ambrose, you know, all the

8    guys who were there, do you think that that

9    information being passed on to you as a supervisor

10   are, indeed, would have been important for you to

11   know?

12        A.    It would have been important for me to

13   know, but no one shared that with me.

14        Q.    Okay.  At some point you found out that he

15   had been tased several times; is that accurate?

16        A.    No.

17        Q.    You never found out?

18        A.    I found out through the videos.

19        Q.    Okay.  Well, let me ask it this way then,

20   the right way.  When did you first find out that

21   Matthew had been tased?

22        A.    Through the videos.

23        Q.    But I don't know if you saw it that night

24   or three weeks later.  So when --

25        A.    In court.

Maxine Evans

Page 72

1       Q.      I'm sorry?

2       A.      In court.

3       Q.      Okay.

4       A.      When I was in court.  I didn't know, I

5   didn't know any of that until it came out in court.

6       Q.      And when you say "court," you're talking

7   about the criminal trial?

8       A.      The trial, yes.

9       Q.      So up until your criminal trial, you never

10  heard the term that Matthew Ajibade had been tased at

11  the Chatham County jail; is that accurate?

12      A.      As far as seeing it or hearing it; right.

13      Q.      Hearing it.

14      A.      Hearing it.

15      Q.      Never heard it before?

16      A.      Right.

17      Q.      First time you heard that he was tased was

18  in your own criminal trial?

19      A.      Right.

20      Q.      Okay.  Nobody ever told you that?  Johnson

21  never told you that; is that correct?

22      A.      Johnson?

23      Q.      I'm sorry.  Lieutenant Johnson.

24      A.      No, she didn't tell me that.

25      Q.      Capers, Vinson, Ambrose, Kenny, none of

Maxine Evans

Page 73

1    them ever told you that --

2          A.    That he had been tased, no.

3          Q.    -- that he had been tased?

4                MR. PHILLIPS:  I need to talk to her just

5          a minute.

6                MR. O'MARA:  You're allowed to.

7                THE WITNESS:  I need to go to the

8          bathroom, too.

9                MR. PHILLIPS:  She's got to go to the

10         bathroom.

11               MR. O'MARA:  Perfect timing.  Not, not

12         even coincidentally.

13               THE WITNESS:  No, but I need a break.

14               MR. O'MARA:  No, it's terrific.  I was

15         going to say it's been about an hour, so you

16         should take a break.

17               THE VIDEOGRAPHER:  Okay.  We're going off

18         the video at 1519.

19               (Recess from 3:19 p.m. to 3:32 p.m.)

20               THE VIDEOGRAPHER:  Okay.  We're back on

21         the video at 1532.

22         Q.    (By Mr. O'Mara) Following up, I know that

23    we took a break right after a question I had asked

24    you about when the first time was that you heard

25    about the fact that Matthew had been tased.  And I

Maxine Evans

Page 74

1    think your answer was that you first learned about it

2    at trial?

3         A.    Right.

4         Q.    Did you want to sort of expound on that

5    answer a bit?

6         A.    Yeah.  Having thought about it, when I did

7    learn about it was like through the media and, you

8    know, some people like people talking that he had

9    been tased.

10        Q.    Okay.  But nothing that you found out in

11   the normal course of your work that night?

12        A.    Correct.

13        Q.    Okay.  And that would have been an event

14   that you would wanted to have known of; is that

15   accurate?

16        A.    Yes.

17        Q.    That night?

18        A.    Yes.

19        Q.    And had you known of that tasing, would

20   you have acted any differently towards handling

21   Mr. Ajibade?

22        A.    Would I have acted any --

23        Q.    Would you have been more sensitized to the

24   situation that he had been tased --

25        A.    Sure.

Maxine Evans

Page 75

1      Q.      -- if you had been told about it?

2      A.      Yes.

3      Q.      Okay.  And what -- tell me what you would

4    have done differently.

5      A.      Well, after the detainee was subdued or

6    restrained, there shouldn't -- I don't, I don't

7    believe he should have been tased if he was already

8    restrained.

9      Q.      Okay.  So if you -- if there was a video

10   in the room, it was looking down at him and you saw

11   him restrained, you would have said don't tase him or

12   something like that?  Is that what you're sort of

13   saying?

14     A.      There wouldn't have been a need for him to

15   be tased.

16     Q.      Why not?

17     A.      Because he was already restrained.  He, he

18   couldn't hurt anyone.  He couldn't cause harm to

19   anyone.

20     Q.      And where do you get that from?

21     A.      From the new training from the Taser.

22     Q.      Okay.

23     A.      From the new training Taser.

24     Q.      From the training that you had on the new

25   Taser?

Maxine Evans

Page 76

1       A.     Correct.

2       Q.     The training that you had gotten before

3  Matthew's event?

4       A.     Right.

5       Q.     Okay.  So if you had been given the

6  information, if Capers had walked up to you and said,

7  as an example, you know, Kenny tased him four times,

8  restrained or not, just knowing that he was tased,

9  would your -- would you have then acted differently?

10  What would you have done differently in dealing with

11  Matthew?

12       A.     If Mark Capers would have came to me and

13  told me that Sergeant Kenny tased him four times, I

14  would have asked why.

15       Q.     Okay.

16       A.     You know, what was he doing for him to

17  tase him.  Was he -- I would have asked a series of

18  questions as to why Kenny felt the need to tase him.

19       Q.     Okay.  Would you have made a more

20  affirmative decision to try and get Matthew medical

21  help?

22       A.     Yes.

23       Q.     What would you have done in that regard?

24       A.     I -- if, if Mark would have came up and

25  told me that he had just gotten tased, I would have

Maxine Evans

Page 77

1    tried to go look to see if he was okay and get the

2    medical staff in to check him to make sure that he

3    would have been okay.  And then I would have informed

4    the watch commander.

5         Q.    A Taser event in jail, would you consider

6    that a significant event?

7               MR. PERKINS:  Object to form.

8               THE WITNESS:  I'm sorry.

9         Q.    (By Mr. O'Mara) So when somebody gets

10   tased in the jail, what is supposed to happen after

11   that?

12        A.    They're supposed to get medical help.

13        Q.    For the person tased?

14        A.    Yes.

15        Q.    And what else is supposed to be generated

16   or what else is supposed to occur?

17        A.    Reports written as to why the individual

18   was tased.

19        Q.    Okay.  And what is the purpose of those

20   reports?

21        A.    The purpose is to allow everyone to see

22   what took place as to who tased him and why.

23        Q.    Any explanation that you can give me here

24   today as to why six people or so who were in that

25   cell when he was tased didn't say a word to you about

Maxine Evans

Page 78

1    any of it?

2         A.    The only explanation I can offer is

3    because the lieutenant was there and they looked at

4    her as being the one in charge.  We all, we all do

5    because she was a watch commander.  Anything that

6    goes on has to go through the watch commander or the

7    watch commander on scene and makes the decisions as

8    to what will happen.

9         Q.    Well, is there any policy that you're

10   aware of to make certain that that type of

11   information gets to the people who need it available

12   to them?

13        A.    Am I -- repeat it.

14        Q.    Are you aware of any policy at Chatham

15   County to assure that information like that gets to

16   the people who need it?

17        A.    It may be in policy, but does it happen?

18   No.

19        Q.    And tell me why that that just doesn't

20   seem to happen at Chatham County?

21             MR. PHILLIPS:  When you say "Chatham

22        County" --

23             MR. O'MARA:  Jail.

24             MR. PHILLIPS:  Jail.  Okay.

25        A.    I can't answer why it doesn't get

Maxine Evans

Page 79

1    disseminated properly.

2         Q.    (By Mr. O'Mara) Well, you've been there

3    for 16 years?

4         A.    Yes, I have.

5         Q.    14 years.  Sorry.

6         A.    15.

7         Q.    You're right.  And was this something that

8    was just a matter of course there for the 15 years

9    that you were there?

10             MR. PERKINS:  Object to form.

11        Q.    (By Mr. O'Mara) Let me rephrase it.

12        A.    Yes.

13        Q.    You had mentioned just a moment ago that

14   even though this information should be disseminated,

15   the course is it just doesn't get disseminated; is

16   that accurate?

17        A.    Right.

18        Q.    And has it been that way for all your time

19   there, 15 years?

20        A.    Yes.

21        Q.    Is it just the way it happens at Chatham

22   County, this information doesn't get given to the

23   people who need it?

24        A.    Repeat that one more time.

25        Q.    Sure.

Maxine Evans

Page 80

1        A.     So I can answer it correctly.

2        Q.     Well, for 15 years information about

3    significant events seems to be getting lost,

4    according to your testimony; is that accurate?

5        A.     That's correct.

6        Q.     Well, why is that happening for the past

7    15 years at Chatham County jail?

8        A.     I can't answer why it happened, but it

9    happens.  That's why we have -- when we have the big

10   briefing in the muster room, it all comes out

11   whatever happens in the jail at the muster room.

12            But if anything else happens, the watch

13   commander knows, and generally it's supposed to get

14   disseminated out to the supervisors.  And the

15   supervisors filter it down to the line staff.  But

16   somewhere in there, communication gets broken.

17       Q.     And does that just seem to happen all the

18   time?

19       A.     Yes.

20       Q.     With situations like people getting tased

21   and -- is that one example of how that happens?

22       A.     Yes.

23       Q.     People not getting proper medical care, is

24   that another example?

25       A.     I can't answer whether other people get

Maxine Evans

Page 81

1  proper medical care or not.  It's only whenever -- if

2  it's in my area.

3       Q.    It is now apparent that -- well, do you

4  think that -- had information been available to you

5  that Matthew was suffering from a mental health

6  concern, would you have liked to have had that

7  information available to you?

8       A.    Yes, I would have.

9       Q.    If that information had been made

10 available to you, what would you have done

11 differently in handling Matthew Ajibade?

12      A.    What I would have done was when -- and I

13 want to go back to when Private Richardson pulled him

14 out.  When he came out and saw his -- because I went

15 through the course.  I saw the way that he was acting

16 as far as sitting in a chair and, and the way he

17 started acting.  I would have done it like, okay.  I

18 would have talked to him and said okay, fine.  If you

19 want to sit there, you can sit in the chair.  I

20 always try to keep talking to him, try to find out

21 why he was acting the way he was acting.

22           Because the chair wasn't that important at

23 that time.  When you see someone like that with a,

24 with a problem, you look at him.  You try to assess

25 him.  Okay.  Sit in the chair.  And then he probably

Maxine Evans

Page 82

```
 1    would have got up.  Maybe I could have talked him
 2    down -- well, not talk him down, but talk to him to
 3    the point where he would have gotten up and I could
 4    place him back in the cell since I saw that he wasn't
 5    going to cooperate.
 6              I wouldn't have -- there wouldn't have
 7    been a force.  It could have been where
 8    Private Richardson should have waited until he had
 9    other, other supervisors and other people, and to
10    include the nurse, to come and assess Mr. Ajibade and
11    say, okay.  It's okay.  We can talk to you.  And if
12    he didn't want to cooperate, we could still talk to
13    him and then talk him back where he can be, you know,
14    go back to the cell and then we can get medical help
15    for him.  That's, that's how I would have handled it.
16         Q.   Had -- so have there been other examples
17    or other similar circumstances where you had people
18    that you later found out had mental health concerns
19    that you weren't informed of there at Chatham County?
20         A.   Were there others?
21         Q.   Do you understand the question or did it
22    get -- it got a bit confusing to me.
23         A.   Yeah.
24         Q.   Here's where I'm heading.
25         A.   Okay.
```

Maxine Evans

Page 83

1        Q.    It is now, as we all look back at it,

2   pretty obvious, I think, and let me ask you this:   Is

3   it now obvious to you with what you know about the

4   case that Matthew Ajibade was suffering some mental

5   health disorder while he was at the jail?

6        A.    Yes.

7        Q.    Are you pretty convinced of that now?

8        A.    Yes.

9        Q.    You didn't know about it back then?

10       A.    Right.

11       Q.    Correct?  But you know it now?

12       A.    Yes.

13       Q.    And do you agree that that would have been

14   information that you would liked to have had

15   available to you so you could have handled him

16   differently?

17       A.    Yes.

18       Q.    And if you had that information available

19   to you, you would have handled him differently;

20   correct?

21       A.    Yes.

22       Q.    Like I think you said you would have maybe

23   tried to talk him down or wouldn't have had

24   Richardson -- would have had Richardson treat him

25   more gently?  Or you tell me.

Maxine Evans

Page 84

1       A.    I would have probably told

2   Private Richardson just to let me talk to him first

3   to see if we can -- so I can get some kind of

4   understanding as to why he's behaving the way he is.

5   And then once I see that, then I could have just

6   said, okay.  I would have called for the watch

7   commander.  I would have called for the nurse to come

8   so that, you know, we can all try to talk to him to

9   try to get him calm, calm enough where we can assess

10  him and ask him if he was taking any medications or

11  anything like that.

12      Q.    Okay.  And so you talked a little while

13  ago about the fact that there's an information flow

14  problem with Chatham County; is that accurate?

15      A.    The jail.

16      Q.    At the jail.  I'm sorry.  And that that

17  has been consistent for the time you've been there?

18      A.    Yes.

19      Q.    Has that same information, information

20  flow problem existed with communicating concerns

21  about mental health patients?

22      A.    It probably has.

23      Q.    Well, has there been examples where you

24  wish you knew about a mental health concern that

25  somebody didn't bother to tell you --

Maxine Evans

Page 85

1      A.    No.

2      Q.    -- and it was too late?

3      A.    No.

4      Q.    Do you recall any examples of that?

5      A.    No.

6      Q.    Have there been other times when you have

7    been aware of a mental health concern where you've

8    been able to talk him down or interact with him

9    better?

10      A.    I'm trying to think.  When I was in Unit

11   5, because that's where I've been the majority of my

12   time, another unit would bring some individuals from

13   Unit 4, which was our mental health unit, down to

14   where I worked at.  And they would be in a cell and I

15   could talk to them.  But in trying to, you know, talk

16   to the mental health patients, I mean, inmates.

17      Q.    And have you had success in the past

18   knowing that they have mental health concerns dealing

19   with them with whatever training you have?

20      A.    Yes.

21      Q.    Similarly, you may have answered this,

22   have you had problems or concerns with handling

23   patients or inmates who you later found out had

24   mental health concerns where you wish you knew it at

25   the time?

Maxine Evans

Page 86

1        A.     Repeat that.

2        Q.     Yeah.  What you've testified now is that

3   you wish you knew that you were aware of Matthew's

4   mental health concerns; correct?

5        A.     Yes.

6        Q.     And that you would have treated him

7   differently?

8        A.     Yes.

9        Q.     I'm just curious whether or not there are

10  other examples of people that have been treated a

11  certain way either by you or by other people in the

12  jail because they were ignorant of the mental health

13  concern?

14       A.     No.

15       Q.     Were you ever told of the physical

16  injuries that happened to Matthew in the fight, in

17  the scuffle?  Do you understand what I'm saying?

18             MR. PHILLIPS:  Can you specify when?

19             MR. O'MARA:  Yeah.

20       Q.     (By Mr. O'Mara) You know that there was

21  the scuffle that you came across; right?

22       A.     Yes.

23       Q.     You knew that, right, that it happened?

24  But you didn't see the video until much later.

25  Certainly not that day.

Maxine Evans

Page 87

1      A.    Correct.

2      Q.    Correct?

3      A.    Correct.

4      Q.    So you were not aware looking at it of

5  seeing any injuries that Matthew may have sustained;

6  correct?

7      A.    Correct.

8      Q.    But you now have had a chance to look at

9  the video?

10      A.    Yes.

11      Q.    You know that he was kicked in the head;

12  right?

13      A.    Yes.

14      Q.    And punched in the face?

15      A.    Yes.

16      Q.    If you had been given that information

17  that night, what would you have done differently

18  about Matthew?

19      A.    He would have been seen, you know, by the

20  nurse.

21      Q.    Solely because you were giving the

22  information about the kick to the head and the punch

23  to the face?

24      A.    That would have been my concern, yes.

25      Q.    Okay.  And you were not given that

Maxine Evans

Page 88

1    information; correct?

2         A.    Right.

3         Q.    By anybody?

4         A.    No.

5         Q.    Is that, is that in the same vein as we

6    talked about a minute ago where information flow just

7    doesn't happen at Chatham County jail the way it

8    should?

9         A.    Yes.

10        Q.    And it's that type of information -- does

11   that, does the failure of giving that type of

12   information impacting your ability to do your job

13   right?

14        A.    Yes.

15        Q.    And a large part of your job, as you said,

16   I think the first thing was to secure the safety

17   and -- of inmates and staff; correct?

18        A.    Right.

19        Q.    So when, when was it that you first

20   realized or were told or found out that

21   Matthew Ajibade had a mental health concern?

22        A.    I didn't learn any of this until like from

23   the media and during my, the trial.

24        Q.    So you never really heard it from anybody

25   in the jail?

Maxine Evans

Page 89

1        A.     Right.   No.   No one told me that he was

2   mental health.

3        Q.     Did anybody tell you that when he came in

4   from law enforcement, he came in with the bipolar

5   medication that he was either on or supposed to be

6   on?

7        A.     No.

8        Q.     That was never given, that information was

9   never given to you?

10        A.     No.

11        Q.     Would that piece of information have been

12   significant to you to be aware of?

13        A.     Yes.

14        Q.     And how would you have treated Matthew

15   differently if you were aware of that piece of

16   information?

17        A.     I was sure if he had medication, I would

18   have probably talked to him and asked him when was

19   the last time he had taken -- well, I'd ask him if he

20   was on medication.   And then when was the last time

21   he took his medication.   Then I would talk to the

22   nurse and make him aware of that Mr. Ajibade was --

23   probably had some mental health issues, and that we

24   would deal with him, you know, however the nurse saw

25   fit to, to deal with him.

Maxine Evans

Page 90

1       Q.     Were you also aware that a phone call was

2  made to the jail from one of Matthew's employees or

3  coemployees to tell people at the jail that he had a

4  mental health issue?

5       A.     That was told to me later during my trial,

6  during the trial that Private Richardson had received

7  a phone call from someone on the outside.

8       Q.     And was that information ever communicated

9  to you in your supervisory capacity that night?

10      A.     No.

11      Q.     And had it been, what -- how would you

12 have treated Matthew differently?

13      A.     I would have told staff that, still

14 that -- when I was given the information, of course,

15 I would have told my supervisor -- well, the watch

16 commander -- that I received a phone call from

17 whomever stating that Mr. Ajibade had some mental

18 health issues.

19             And then once we, once I pass that

20 information on, and being the supervisor, I would

21 have said we wouldn't going to bother him at the time

22 or, you know, take him out of the cell until we've

23 got adequate staff on hand to talk to him and deal

24 with him.

25      Q.     Have you ever made the decision while in a

Maxine Evans

Page 91

1  supervisory role of the jail that somebody needs to

2  be transported out of the jail and to a hospital?

3      A.    No, I can't make that, I can't make that

4  call.

5      Q.    You don't make that call yourself?

6      A.    Right.

7      Q.    But have you had occasions during your 15

8  years there where those situations come up?

9      A.    I would consider it line staff.  So, no, I

10  never made those.

11      Q.    I mean, I'm just wondering whether you --

12  not made the decisions.  Were you aware that that

13  would happen on occasion?

14      A.    No.

15      Q.    Never?  Like --

16      A.    I'm sorry.  Repeat the question again.

17      Q.    Okay.  Sure.  No problem.  Speaking

18  specifically any time when an inmate would need to be

19  moved out of the jail into a hospital.

20      A.    Right.

21      Q.    I'm presuming that that's happened a lot

22  during your 15 years there?

23      A.    Uh-huh.

24      Q.    You have to say yes or no.

25      A.    When I say "uh-huh," I was just listening

Maxine Evans

Page 92

1    to what you were saying.

2        Q.    Okay.

3        A.    But I'm not aware of that.  I mean --

4        Q.    Okay.  In your supervisory role that

5    night, if you had information about Matthew's mental

6    health concerns, would you have considered moving him

7    to a hospital facility, if necessary?

8        A.    Again, moving him out of the jail to a

9    mental, to the hospital wouldn't have been my call.

10   That would have been the watch commander, and it

11   would have been above her, Lieutenant Johnson, that

12   would have been above her.  So all I could have done

13   was assess Mr. Ajibade, report it to her,

14   Lieutenant Johnson, and then she take it from there.

15       Q.    So we're now going back to the time line.

16   We're at the point where you're at the booking

17   sheriff's desk taking on the supervisory role?

18       A.    Yes.

19       Q.    And tell me the first, tell me the first

20   time you ever checked in on Matthew Ajibade while you

21   were there.

22       A.    The first time I checked in on

23   Mr. Ajibade, and I didn't realize it because after

24   everything had went on, I was still pretty much, I

25   guess, hyped up or whatever.  And the video shows

Maxine Evans

Page 93

1   that myself and Corporal Kenny, we walked in and

2   looked in on Mr. Ajibade.  And that was shortly

3   after, I think, he had been in the chair.

4        Q.    Just a few minutes later, I think it was

5   seven or eight minutes afterwards?

6        A.    Thereabout, yes.

7        Q.    Just explain that to me.  Did you actually

8   go up to the door?  Did you open the door and go in?

9   Just tell me what you did.

10        A.    Walked in the door, looked in to make sure

11   that there was movement, and just turned around and

12   walked back out.

13        Q.    Okay.

14        A.    That would be it.

15        Q.    All right.  And the next time you checked

16   or saw him?

17        A.    Is after I had just came back from picking

18   up a warrant and before I settled down at the desk to

19   start really doing paperwork, I said, "Let me go

20   check to make sure he's still okay."  And then that's

21   when I went and I looked, peeped in on him and I

22   didn't see any movement.  And I called out to him.

23   Then I opened up the door and called out to him

24   again.  And that's when I closed the door and I ran

25   around to the corner to go get the nurse.

Maxine Evans

Page 94

1      Q.    Okay.  Now, was that the event that was

2  somewhere around 1:30, 1:35 --

3      A.    Correct.

4      Q.    -- a.m.; correct?

5      A.    Yes.

6      Q.    And you had not seen him in between those

7  two times; correct?

8      A.    Correct.

9      Q.    At that point in time from about 11:50,

10  whenever that first check was, until about 1:30,

11  1:35 --

12     A.    Uh-huh.

13     Q.    -- tell me your awareness of who it was

14  you thought you were checking on.  His name, but his

15  circumstance.  What were you aware of?

16     A.    I was just aware that he had been placed

17  in a chair and I believe they, yeah, they had put, I

18  believe they put a spit mask on him.  I was aware

19  they put a spit mask on him, I believe.  And that's

20  why I was going to check to make sure that he was

21  okay.

22     Q.    Okay.  And you testified earlier you were

23  unaware that he had been tased?

24     A.    Correct.

25     Q.    Are you -- were you aware or unaware that

Maxine Evans

Page 95

1    he had been struck or potentially injured?

2              MR. PHILLIPS:  Do you mean in the cell or

3         earlier?

4              MR. O'MARA:  Well, at any time, I guess.

5         Q.    (By Mr. O'Mara) Did anybody ever come

6    out -- let me ask it this way.

7         A.    During the incident?

8         Q.    Did anyone ever come and tell you during

9    the initial incident that what we call a scuffle out

10   there in the booking area, if I can call it that?

11        A.    Right.

12        Q.    Did anyone ever come tell you that he was

13   kicked in the head?

14        A.    No.

15        Q.    That he was punched in the face?

16        A.    No.

17        Q.    That he was put down on the ground in any

18   other form or fashion that may have led to some

19   injury?

20        A.    No.

21        Q.    Okay.  And then in the cell, when they had

22   him in the cell, did anybody come up to you and say

23   he was tased at all?

24        A.    No.

25        Q.    Did anybody ever come to you and say if he

Maxine Evans

Page 96

1    was injured or in any other fashion while in the

2    cell?

3         A.    No.

4         Q.    So were you aware of any of that when you

5    were checking on him?

6         A.    No.

7         Q.    All right.  Let's talk about what you are

8    supposed to do when you have a person in restraints.

9    So you find out or you either put or order to be put

10   or find out that somebody is in a restraint

11   situation.  What are you supposed to do?

12              MR. PHILLIPS:  I'm going to --

13              MR. PERKINS:  Join.

14              MR. PHILLIPS:  -- I'm going to instruct

15         her invoke the privilege, which she'll do.

16         A.    Upon the advice of my attorney, I'm

17   exercising my right to remain silent as granted by

18   the Fifth Amendment to the United States Constitution

19   as qualified in Georgia law under the provisions of

20   O.C.G.A. Section 24-5-505.  Accordingly, no

21   interference may be drawn from my refusal to answer.

22              MR. O'MARA:  Well, just so we're clear, no

23         inference can be drawn to your decision not to

24         testify in a criminal case.  An inference can

25         and most certainly will be drawn in any civil

Maxine Evans

Page 97

1        proceeding.

2              So I don't know -- I don't want to advise

3        you, but I'll make sure that your attorney has

4        advised you that inferences in criminal and

5        inferences in civil are much different.  So I

6        don't know if we want to take a minute on

7        that --

8              MR. PHILLIPS:  We'll be fine.

9              MR. O'MARA:  -- or if we're fine on that.

10       But we certainly tend to have inferences drawn

11       against your refusal to answer questions in this

12       deposition in all pending civil cases.  Just so

13       you're clear.

14             MR. PHILLIPS:  Okay.

15       Q.    (By Mr. O'Mara) Okay.  Did you fill out a

16  privileged -- I'm sorry -- a restraint log in this

17  case?

18       A.    Yes.

19       Q.    And did you fill it out after the -- you

20  realized that Mr. Ajibade had passed?

21       A.    No.

22       Q.    Did you fill it out -- tell me when you

23  filled it out then during the events.

24       A.    The form was generated when I returned

25  back to my -- to the supervisor's desk.  When I came

Maxine Evans

Page 98

1  back and knew that he had been placed in the

2  restraint chair, I went on and got on the Share Point

3  and generated the restraint chair log.

4       Q.    Okay.  Why you and nobody else would --

5       A.    Because he, he was restrained in my area.

6       Q.    So then it's your responsibility to be the

7  one to prepare or to generate a restraint log?

8       A.    Well, in all actuality, it should have

9  been the one who placed him in the restraint chair

10  that should have generated the log.

11      Q.    Do you know who that was?

12      A.    Who placed him in the chair?

13      Q.    Yeah.

14      A.    No.  I wasn't there.

15      Q.    Okay.  So on Share Point -- I guess I'm

16  curious.  So you come out.  You're obviously the

17  supervisor of the area and have authority over

18  Mr. Ajibade at that point; correct?  He's in your

19  area and you're responsible for him?

20      A.    Yes.

21      Q.    Okay.  And so when you go on Share

22  Point -- and this could be an awkward question, but

23  do you go on Share Point and realize that nobody else

24  has done a restraint log yet, so you have to start

25  one or how -- you know what I'm saying?

Maxine Evans

Page 99

1        A.     Well, I generated the restraint chair log

2   because I didn't know if anyone else had generated

3   one.  And I knew that at some point that one needed

4   to be created.  So that's why I took that

5   responsibility and said, okay, I'll go ahead and do

6   the restraint chair, create the restraint chair log.

7        Q.     And why does one have to be created?

8        A.     Well, not created, but filled out and

9   printed.

10       Q.     Yeah.  Why?

11       A.     Because it keeps track of, of the

12   individual that's in the restraint chair, the timing,

13   his time of restraint chair, he's in the restraint

14   chair.

15       Q.     Okay.  And it also identifies the timing

16   that he's supposed to be checked; is that accurate?

17       A.     Correct.

18       Q.     So you fill out -- so when you generate

19   it -- because I know there's been some confusion

20   about generation and filling it out and signing and

21   all that.

22       A.     Okay.

23       Q.     Just define generate for me.

24       A.     I guess I use the term generate meaning go

25   on Share Point, pull up, pull the form up and filling

Maxine Evans

Page 100

1    in the blanks and then printing it out.

2        Q.    Okay.  So when we say "generate" -- we're

3    going to use that -- that's just you taking the

4    template, sort of --

5        A.    Correct.

6        Q.    -- a form, typing in Mr. Ajibade's name?

7        A.    Yes.

8        Q.    And we have it available.  I'm sure you

9    have it too.  All the other identifying information?

10       A.    Correct.

11       Q.    Are the times that are put on, put into

12   Share Point so that they're put then into the

13   computer form or is the form printed out?

14       A.    The form is printed out.

15       Q.    Okay.  And then is the form then filled

16   out during the time of the restraint?

17       A.    Correct.  Yes.

18       Q.    Now, in this case with Mr. Ajibade, you

19   generated the form?

20       A.    Yes.

21       Q.    Okay.  And when was it filled out?

22       A.    Before -- when he got placed into, into

23   the chair, placed into the cell, once he was placed

24   in the cell and the, Lieutenant Johnson, the main

25   staff was still there, I printed it out.  I went on

Maxine Evans

Page 101

1    Share Point and created it then.

2        Q.    Okay.  We know through the discovery that

3    the log restraint suggested it was generated at

4    11:45.  Does that sound about right to you?

5        A.    Yes.

6        Q.    Okay.  And that the initial viewing or

7    checking, the initial check on him was exactly then.

8    The first one would have been 11:45.

9        A.    While they were there, yes.  That counts

10   as a check.

11       Q.    Okay.  And then we also know that on the

12   form there were other times that suggested that he

13   was checked.  I think everyone realizes he -- well,

14   he was never checked those other times; is that

15   accurate?

16       A.    Correct.

17       Q.    Okay.  Yet, that form was filled out as

18   though he had been; is that also accurate?

19       A.    The forms were filled out according to

20   what was stated that he had been checked, yes.

21       Q.    We'll get to that in a minute.

22       A.    Okay.

23       Q.    But -- so when was, when were those actual

24   entries made, though?  Were they all made at one time

25   at the end of the event?

Maxine Evans

Page 102

1      A.     No.  They were made when it happened.

2      Q.     Explain that to me.

3      A.     The first -- when the form was generated,

4  printed out, the time, the first initial check that's

5  on there was when everyone was still there and he

6  appeared to be okay.  That's considered a visual

7  check.

8             MR. PHILLIPS:  That's at 11:45.

9             THE WITNESS:  11:45.

10     Q.     (By Mr. O'Mara) Okay.

11     A.     And then the other checks is when he was

12 supposed to have been checked and the times were

13 placed in there.  They were placed at separate

14 entities.  They weren't placed all at one time.

15     Q.     Okay.  I'll give you an example.  There

16 was one in there that was suggested he was checked at

17 12:10.  Is it your testimony that that 12:10 entry

18 was put in at 12:10 or at some later time, did

19 somebody say I checked him at 12:10 and then you put

20 it in?

21     A.     No.  The 12, like the 12:10 was when I

22 looked at the clock and it said 12:10.

23     Q.     And so what did you fill out at 12:10?

24     A.     The time and I put my initials.

25     Q.     Okay.  And who else had their initials on

Maxine Evans

Page 103

1    there?

2         A.    Nurse Brown had signed the form.

3         Q.    Okay.  And then there were three other

4    entries before the 1:30 or 1:35 one?

5         A.    My initials, yes.

6         Q.    What is your testimony as to when they

7    were placed on that form?

8         A.    When Private Vinson and Capers both came

9    to the desk and told me.  And I asked them, because

10   they went in and looked at him.  And when they came

11   to the desk, I asked them was, was he okay and how

12   did he look, and they said he was okay.

13        Q.    Now, you've had a chance to look at all

14   the videos since as far as whether or not they

15   actually checked on him; right?

16        A.    I saw them in court.

17        Q.    Okay.

18        A.    The first time I seen a video was when

19   Mr. Purdiman showed it to me when he interviewed me.

20   And then the next time I saw videos again was in, at

21   the trial.

22        Q.    You would agree that there isn't any video

23   evidence concerning checks during those times, are

24   there?

25        A.    I'm sorry?

Maxine Evans

Page 104

1       Q.    Would you agree that there are -- there's
2   no video evidence that they ever checked him at 12:10
3   or 12:40 or anything like that, is there?
4             MR. PERKINS:  Object to form.
5       A.    I'm not sure.
6       Q.    (By Mr. O'Mara) Are you aware of any
7   evidence or video evidence supporting the,
8   Mr. Ajibade being checked during those very times
9   that you put in the form?
10      A.    Not other than what's been shown, the
11  video that's being shown.
12      Q.    Okay.  So just so we're clear, you never
13  checked on Mr. Ajibade, correct, from 11:45 was the
14  first one, and then the 1:30, 1:35?
15      A.    Correct.
16      Q.    Okay.
17      A.    The one that --
18            MR. PHILLIPS:  Ask that question again,
19        please.  I don't think she understood it.
20            THE WITNESS:  Yeah.
21      Q.    (By Mr. O'Mara) You never checked yourself
22  on Mr. Ajibade from after 11:45 until 1:30; is that
23  correct?
24      A.    I, I made a check with -- myself and
25  Kenny, we walked in there and we checked on

Maxine Evans

```
                                             Page 105
 1   Mr. Ajibade.

 2          Q.    And when was that?

 3          A.    That was shortly after he had been placed

 4   in the, in the, in the chair.

 5          Q.    Okay.  That was one that was listed at --

 6   maybe I did mess up -- 11:45 was created, about 11:53

 7   was the check where you put down you and Kenny;

 8   correct?

 9          A.    Right.

10          Q.    All right.  Anything after that before

11   1:30?

12                MR. PHILLIPS:  As far as she's concerned?

13          Q.    (By Mr. O'Mara) Yeah.  With what you did.

14          A.    Right.  No.

15          Q.    All right.  Where was that form kept

16   during the intervening time?

17          A.    On the desk.

18          Q.    I'm sorry?

19          A.    On the desk.

20          Q.    And did you ever hear Matthew say anything

21   during the time after the check at about 11:53 and

22   the 1:30 time you saw him unresponsive?

23          A.    Did I hear him say anything?

24          Q.    Did you ever hear him say anything?

25          A.    Not that I can recall.
```

Maxine Evans

Page 106

1      Q.    Make any noises or any screaming or any

2  moaning or anything like that?

3      A.    I'm trying to -- not that I can recall.

4      Q.    Okay.  We know that there's some video

5  evidence, there was some times when you were near the

6  cell and did not go over to it.  Do you know what I'm

7  talking about?  When you were in the area?

8      A.    When I went and I checked on him, I think

9  it was a female?

10     Q.    Yes.

11     A.    Yes.

12     Q.    What was it that stopped you, if anything,

13  from checking on him while you were just 10, 12 feet

14  away?  Check on the --

15     A.    What stopped me?

16     Q.    Yeah.

17     A.    Nothing.  I mean . . .

18     Q.    Why didn't you check on him then?

19     A.    I had just checked on him previously.

20  That was in the same time frame, I believe, when I

21  came, I had just came in and checked on him

22  previously.

23     Q.    Are you talking about the one at 11:53

24  with --

25     A.    11:40 -- 53:42.

Maxine Evans

Page 107

1          Q.     Yeah.

2          A.     The initial.

3          Q.     So, okay.  Then there's also another, some

4    video evidence of you going in to get your lunch?

5          A.     At that point, because I'm diabetic, I

6    hadn't, I didn't eat a dinner meal when I came on

7    shift.  And it was already late and I needed to eat.

8    And I still didn't eat.  I went and got my -- I went

9    and got my lunch.  But when I got it, I just sat it

10   on the desk and I still didn't get a chance to eat

11   it.

12         Q.     Why didn't you check on him then?

13         A.     Because at that time I was -- if I'm not

14   able to do anything concerning my health, then I

15   wouldn't have been able to check on him.  That's

16   basically I was just going to get my lunch.

17                MR. O'MARA:  We need to change tapes.  Why

18         don't we just take another, just a few short

19         break, maybe about a five-minute break or so.

20         Stretch your legs.  And then I may not have a

21         huge amount more.  And I promised somebody I'd

22         be done by 5:00.  So I'm going to try to do

23         that.

24                THE VIDEOGRAPHER:  Okay.  This is the end

25         of tape No. 1.  The time is 1611.

Maxine Evans

Page 108

1          (Recess from 4:11 p.m. to 4:21 p.m.)

2          THE VIDEOGRAPHER:  This is the beginning

3      of tape No. 2 in the deposition of Maxine Evans.

4      The time is 1621.

5      Q.   (By Mr. O'Mara) Great.  Thank you.  All

6   right.  Before a break, we were talking about the

7   restraint log.  And we're going to put up on the

8   screen here in just a second and just have you

9   identify it.  I think this is identified as P-7.  We

10  have agreed to joint exhibits.

11          MR. CASH:  Actually, it's not a joint

12      exhibit.  Sorry.

13          MR. O'MARA:  All right.  P for Plaintiff's

14      7.

15      Q.   (By Mr. O'Mara) Can you identify -- can

16  you see it, first of all?

17      A.   I can see it.

18          MR. PHILLIPS:  Can you turn it on is

19      that --

20      Q.   (By Mr. O'Mara) Well, we're not going to

21  spend a lot of time on it but --

22      A.   I can see it.

23      Q.   All right.  Let's do it that way.  All

24  right.  Can you identify that for me?

25          MR. CASH:  Can you put the lights back on.

Maxine Evans

Page 109

1        A.      Corrections Bureau Restraint Chair Log.

2                THE COURT REPORTER:  I'm sorry.  Say that

3        again.

4                THE WITNESS:  Corrections Bureau Restraint

5        Chair Log.

6        Q.      (By Mr. O'Mara) Okay.  Is that the one

7   that you filled out for Matthew Ajibade that night?

8   Can you see it?

9        A.      Yes.

10       Q.      Okay.  If it's easier, I have it here as

11  well, but if you can see it up there, great.

12               First of all, going down to the bottom of

13  it for a second, you acknowledge that the restraint

14  checks are to be done no more than 15 minutes apart;

15  correct?

16       A.      That's what it says, yes.

17       Q.      Well -- and is that the procedure that was

18  followed by the Chatham County jail?

19       A.      That's what should take place.

20       Q.      Okay.  But in this 15 years that you had

21  been there, was that policy followed or was it

22  ignored?

23       A.      It wasn't being ignored, but a lot of

24  times you can't check him precisely every 15 minutes,

25  depending on your duties and what you're doing.

Maxine Evans

Page 110

1          Q.     Certainly it might be 13 minutes or 17

2     minutes, but was this a policy that was known in the

3     jail?

4          A.     Yes.

5          Q.     And in your experience, was it followed or

6     not?

7          A.     I don't know.  It should have been

8     followed.

9          Q.     Agreed.  The question is was it followed

10    as a matter of course or was it not followed as a

11    matter of course?

12              MR. PERKINS:  You mean specifically in her

13         experience; right?

14         Q.     (By Mr. O'Mara) Your experience.

15         A.     Filling out the restraint chair log was

16    normally the supervisors who filled it out.

17         Q.     Okay.

18         A.     Me being a supervisor, I have -- I filled

19    out far few and in between restraint chair logs.

20         Q.     Okay.

21         A.     So . . .

22         Q.     From your experience with other

23    supervisors, from your knowledge of the way the jail

24    was being run, was the restraint chair logs filled

25    out -- I'm sorry -- were the restraint checks made

Maxine Evans

Page 111

1   every 15 minutes the way they're supposed to or not?

2          A.    They're supposed to.

3          Q.    Right.  But were they actually done?

4                MR. PHILLIPS:  If you know.

5          Q.    (By Mr. O'Mara) Do you have any --

6          A.    No.

7          Q.    -- experience --

8          A.    No.

9          Q.    -- or knowledge?

10         A.    No.  No.

11         Q.    No what?

12         A.    No, I don't have any knowledge as to

13   whether restraint chair logs were being, or the

14   checks were being done at 15 minutes.

15         Q.    Okay.  But you knew this one was to be

16   filled out with checks every 15 minutes; correct?

17         A.    Yes.

18         Q.    Okay.  And that's, that's your name at the

19   top left-hand corner; right?  Corporal Evans?

20         A.    Correct.

21         Q.    And that's your handwriting?

22         A.    The initials.

23         Q.    Okay.  Well, who actually wrote in the

24   Cpl Evans?

25         A.    Me.  I did.

Maxine Evans

Page 112

1      Q.    That's you as well?

2      A.    Right.

3      Q.    Okay.  And it says -- well, under check,

4   under one check, which is the box in the top

5   left-hand corner of the actual grid, can you tell me

6   what that says underneath it?

7      A.    It looks like 2345.

8      Q.    Okay.  And then what's underneath that?

9      A.    My initials.

10     Q.    All right.  And when is it that you filled

11  in that box?

12     A.    At, at that time.

13     Q.    At what time?

14     A.    2345.

15     Q.    And that's when you initialed it?

16     A.    Correct.

17     Q.    Okay.  And down below where it says

18  nurse's name, can you identify that for me?

19     A.    A C line and a B, but I knew it could be

20  Nurse Brown.  I looks like a C but it's probably a G.

21     Q.    Okay.  And then to the right of that,

22  there seems to be initials.  Can you identify that?

23     A.    It looks like LPN.

24     Q.    And what, what does that designate to you?

25  Are those his initials, licensed practicing nurse, or

Maxine Evans

Page 113

1   do you --

2          A.    I don't know too much of medical --

3          Q.    Okay.

4          A.    -- terminology.

5          Q.    And where it says the No. 2 and then check

6   or ck, underneath that, the second box, what, what is

7   on that?

8          A.    0010.

9          Q.    And whose initials?

10         A.    Mine.

11         Q.    Okay.  And when did you fill that in?

12         A.    When I looked at the clock and it was

13  0010.

14         Q.    And why did you fill it in at that point?

15         A.    Because that was the time that, it was

16  either Mark Capers or Vinson, they came to the desk

17  and when I asked them how is he doing.

18         Q.    And what desk were you at when they came

19  up at 1210?

20         A.    The supervisor's desk.

21         Q.    Now, is it practice in the jail that

22  somebody else telling you is enough for you to write

23  in that you checked it and you initialed it?

24         A.    Yes.

25         Q.    Tell me about that practice.

Maxine Evans

Page 114

1          A.     From my understanding, if the individual

2     is in restraints or he's being locked down, it's all

3     of our responsibilities to do a check in, in that

4     area, if you work in that area.

5          Q.     Okay.  And what questions did you pose

6     to -- who was it now?  Who did the 1210 check?

7          A.     Private Vinson and Capers.

8          Q.     Both of them?

9          A.     Correct.

10          Q.     And what questions did you ask them before

11     filling it out that the check had been done?

12          A.     How is he doing?

13          Q.     And what else?

14          A.     I believe I asked him how is he doing and

15     if he was okay.

16          Q.     Okay.  Anything else?

17          A.     Not that I can remember or recall.

18          Q.     Okay.  You know that a nurse is supposed

19     to be present for those checks; correct?

20          A.     In the practice?  The nurse hadn't always

21     been present for the checks.

22          Q.     Tell me what you mean by that.

23          A.     When an individual is restrained or in a

24     chair, if one of the other officers go and check on

25     him, they tell the supervisor, you know, that the

Maxine Evans

Page 115

1    individual appeared to be okay.  But the nurse

2    wouldn't be there to check him.

3          Q.    Do you -- are you aware of any procedures

4    that suggested a nurse should be present for a

5    restraint check?

6          A.    I'm sorry?

7          Q.    Are you aware of any practice, I'm sorry,

8    any policy that suggests that the nurse should be

9    present for these 15-minute checks?

10         A.    I was aware of -- I was made aware of it

11   through the policies.

12         Q.    Tell me about that.

13         A.    When I just -- during the course of this

14   incident.

15         Q.    Okay.  And what were you made aware of?

16         A.    That a nurse should go in and check the,

17   check the individual.

18         Q.    And who told you that?

19         A.    It's in the policy.

20         Q.    Okay.  Was that policy followed in the

21   jail generally or not?

22         A.    Not.

23         Q.    It was not.  And tell me how you know

24   that.

25         A.    I'm only going by when I worked in Unit 5,

Maxine Evans

Page 116

1   when we had individuals in that unit.  But they would

2   be -- they wouldn't be in a restraint chair.  They

3   would be like in a holding cell, but they wouldn't be

4   in a restraint chair.  The nurse -- and they would be

5   restrained through with leg, handcuffs and leg irons.

6        Q.    Okay.  Well, let me ask this:  In those

7   circumstances, is it your understanding that for

8   those people, a restraint log would need to be

9   maintained?

10       A.    Yes.

11       Q.    Okay.  Speaking specifically to restraint

12  chair logs --

13       A.    Okay.

14       Q.    -- slightly differently, is it your

15  understanding that the practice of having a nurse

16  present during a restraint chair check was being

17  followed as a matter of course at the jail or was it

18  not?

19       A.    Not that I'm aware of.

20       Q.    Well, tell me what you mean by that.

21       A.    Because I actually -- I had very seldom

22  dealings with a restraint chair and a restraint chair

23  log because the unit that I worked in didn't require

24  detainees to be locked -- placed in a restraint

25  chair.  Unit 5 was a -- it's a different unit.  It's

Maxine Evans

Page 117

1    not close supervision.

2            So when a detainee was acting up, we would

3    pull him out of his, what they call a pod.  We would

4    bring him out of the pod and put him in a -- it's

5    called an iso cell.  And we just, we put him in the

6    iso cell without leg and hand restraints.  But if he

7    was acting up and they had to restrain him in leg and

8    hand restraints, we'd bring him up, put him in the

9    cell, and the nurse would be there on the scene when

10   it's done.  She'd check -- he or she would check the

11   handcuffs and the leg irons and see that they weren't

12   too tight, and then he would be just sitting there on

13   the bench.

14       Q.    And how often would -- I'm curious now.

15   How often would those checks take place on the irons

16   restraints?

17       A.    The leg and --

18       Q.    How often?

19       A.    The, the way the iso cells was located

20   would be on the same floor or wing as the officer

21   that's running that, that, that wing.  And it would

22   be I'd say about 15, probably about 15 minutes.

23       Q.    Okay.  And do you know whether or not

24   those restraint checks were kept on a separate log as

25   well?

Maxine Evans

Page 118

1        A.      On the restraint chair log.  I mean, not a
2    restraint chair log.  It would be annotated on a
3    sheet of paper, yes.
4        Q.      So now on this one, again, going to box
5    No. 3 checked, what's there?
6        A.      0040.
7        Q.      Okay.  And then who's initials?
8        A.      Mine.
9        Q.      And why did you make that designation in
10   that box?
11       A.      Again, I was told he was okay.
12       Q.      By whom?
13       A.      Mark Capers was still in the area at that
14   time.
15       Q.      Do you recall a conversation or are you
16   just guessing?
17       A.      It's not that I'm guessing.  I know Mark
18   had came to me and he was telling me that -- Mark had
19   walked in there and checked on him.  And he came back
20   and he was like, you know, he was just sitting there.
21       Q.      At 12:40?
22       A.      Yes.
23       Q.      Is that a yes?
24       A.      Yes.
25       Q.      And just so we're clear as we're going

Maxine Evans

Page 119

1  through this, you never saw any, anybody ever check

2  him; right?  You never saw with your own eyes?

3      A.    Not physically.  I mean, I didn't see them

4  like going and checking him.

5      Q.    All right.  You never saw them go in and

6  check; right?

7      A.    Right.

8      Q.    You never saw a nurse go in there and

9  check?

10     A.    No.

11     Q.    Even though you knew a nurse was supposed

12  to go in there and check?

13     A.    Finding out later on that a nurse was

14  supposed to check.

15     Q.    So did you make any notes anywhere that

16  would support your contention now that somebody else

17  told you that they had checked on Matthew?

18     A.    Other than what -- on the paper.

19     Q.    Just on this log?

20     A.    Correct.

21     Q.    There's no notes on any of this log

22  anywhere check done by someone else, is there?

23     A.    No.

24     Q.    And why not?

25     A.    I'm not understanding the question.

Maxine Evans

Page 120

1        Q.     Why didn't you, since you didn't do the

2   check, why didn't you make any notation that somebody

3   else did it?

4        A.     Because I'm the supervisor.  I was the

5   supervisor and I was taking the word of the officers.

6        Q.     Is it your testimony then that you believe

7   the obligation identified on this form that you

8   initialed, that you can let somebody else do that for

9   you?

10       A.     If it's a -- it's -- all the officers --

11  if you're assigned to an area and a person is in a

12  restraint chair, I'm the supervisor, yes.  But the

13  other staff can go in and make checks.

14       Q.     Well, then, why didn't you have them sign

15  the restraint chair log or initial it instead of you

16  doing it?

17       A.     They're not supervisors.

18       Q.     I'm sorry?

19       A.     They're not supervisors.

20       Q.     And there's no policy or procedure at the

21  jail that allows that?

22       A.     In the policies, I believe, and I'm not

23  sure, but because I am the supervisor, I believe

24  I'm -- well, I just took the responsibility of

25  signing the form.

Maxine Evans

Page 121

1       Q.    And on the No., the next box, which sort

2   of reads one hour check, which means an hour into it.

3   Read that to me.

4       A.    0100.

5       Q.    All right.  And what does that indicate?

6       A.    A check was completed.

7       Q.    And who did that check?

8       A.    Another one of the line staff.

9       Q.    And who was that?

10      A.    I'm not sure.

11      Q.    Are those your initials?

12      A.    Correct.

13      Q.    And do you recall talking to anybody about

14  that check?

15      A.    While I was at the desk doing my, you

16  know, forms and doing bonds, I'm trying to think

17  who -- I can't recall.  I think Johnson had already

18  left and went to the hospital.

19          MR. PHILLIPS:  Well, don't guess.

20          THE WITNESS:  Okay.

21      Q.    (By Mr. O'Mara) So you don't recall who

22  that was that would have given you information from

23  which you wrote down --

24      A.    The check.

25      Q.    -- the 1:00 check?

Maxine Evans

Page 122

1       A.    Right.

2       Q.    Is that your testimony?

3       A.    (Nods head affirmatively.)

4       Q.    And then the 1:30 check, was that the time

5  when you found Matthew?

6       A.    Right.  And I came back.  And . . .

7       Q.    There are boxes underneath for the nurse's

8  name; right?  We've talked about that?

9       A.    Yes.

10      Q.    When was that filled in?

11      A.    I think during the initial check, first

12  check.

13      Q.    Well --

14      A.    After he, after we did the 2345, I took

15  the sheet to Nurse Brown and he initialed it.  Well,

16  he put his initials there.

17      Q.    So what we see in the column to the right

18  of nurse's name, that's CB or GB, it's your testimony

19  that was filled out at 12:45?

20      A.    Correct.

21            MR. PHILLIPS:  I think she said 2345.

22            MR. O'MARA:  I'm sorry.  What did I say?

23  23, yeah.

24            THE WITNESS:  2345.

25            MR. O'MARA:  2345.  Sorry.

Maxine Evans

Page 123

1      Q.      (By Mr. O'Mara) Did you ever bring this

2  form back to Nurse Brown to have him review or

3  initial again?

4      A.      No.

5      Q.      Why not?

6      A.      I don't have an answer for that.

7      Q.      I'm sorry?

8      A.      I don't have an answer for that.

9      Q.      Have you ever told anybody that you filled

10 this form out not as it was happening but after

11 everything was done and you realized Matthew was in

12 distress and taken away?

13     A.      No.

14     Q.      Do you recall talking to the internal

15 affairs people and talking to them about when you

16 actually filled it out?

17     A.      When I had the interview, yes, with the

18 internal affairs, I told them when I filled it out.

19 I generated the form when the incident happened after

20 he was placed into the chair and everyone -- and he

21 was subdued.  That's when the form got filled out

22 initially.

23     Q.      So did you ever tell internal affairs that

24 you filled out the form after everything happened

25 with Matthew?

Maxine Evans

Page 124

1        A.     No.

2        Q.     No?

3        A.     I didn't fill it out after -- you fill out

4    the form as it happens.  I didn't do anything after

5    the fact that -- are you speaking of after his

6    deceased?

7        Q.     Yes.

8        A.     Oh, no.  The only thing I told internal

9    affairs was the 1:30 -- when I found Mr. Ajibade, I

10   hadn't put the 0130 in there.  And when the code and

11   everything was called and then when I put that 130 in

12   there was after Colonel Gilberg had came in.  And he

13   asked me, he asked where was the restraint chair log.

14   And I said, "It's here on the desk."

15               And he asked me, "Did you put the time

16   that you found him on there?"

17               And I told him "No."

18               And he said, "Make sure you put that time

19   on there."  If that's what they're referring to,

20   that's what I put on there, just at 1:30.  And that

21   was by Colonel Gilberg telling me to put, place that

22   time on there.

23       Q.     So when was the 1:30 then put on that

24   form?

25       A.     When I was instructed to by

Maxine Evans

Page 125

1    Colonel Gilberg.

2          Q.    Okay.  When was that in actual time?

3          A.    Probably about 135.  Maybe it could have

4    been about 135.

5          Q.    So you got there in five minutes?

6          A.    No.

7          Q.    Is it Gilberg or --

8          A.    Gilberg.

9          Q.    Gilberg.

10         A.    Yes.  It was placed on there when he came

11   in and saw the restraint chair log and asked me about

12   it.  So it could have been like, it could have been

13   like 1:50.  I don't know.  However long it took for

14   him to get there.

15         Q.    Okay.  Because he came only after Matthew

16   passed; right?

17         A.    Correct.

18         Q.    And tell me about his conversation with

19   you.

20         A.    He came in.  He walked to the desk.  And

21   the first thing he wanted was the restraint chair

22   log, that I can recall.  And when he asked for the

23   log, he looked at the log and then he said, "Did you

24   put the last check on there?"

25                And I said, "No, I didn't.  No, I

Maxine Evans

Page 126

1    haven't."

2           And he said, "Make sure that gets put on

3    there."

4       Q.    And did you ever have any conversations

5    with these other people who you spoke to like Vinson

6    and anyone, Capers?  Since right after you found out

7    that Matthew passed, did you have any conversations

8    with Vinson or Capers and asked them any other

9    questions about the information regarding their

10   checking on him?  Do you understand what I'm saying?

11      A.    No.

12      Q.    So supposedly, from your testimony, Capers

13   and/or Vinson on a couple occasions came up and said

14   "he's okay."  Is that --

15      A.    Correct.

16      Q.    -- pretty much accurate?  You took that to

17   be the basis for your filling out this log?

18      A.    Correct.

19      Q.    Right?  Then he passes away and it's 1:30

20   or 2:00 in the morning or whatever.  Did you ever

21   have a conversation with Vinson or with Capers or

22   anybody else to try and document whether or not those

23   checks were actually done and what was looked at

24   into?

25      A.    No.

Maxine Evans

Page 127

1     Q.    Why not?

2     A.    Because Vinson was getting prepared to go

3   out because -- so he can go get his injuries taken

4   care of.  And I was doing my -- I was trying to get

5   back to my normal duties, that is, taking care of the

6   paperwork procedures.

7          MR. PHILLIPS:  I think he means after the

8     fact.

9          THE WITNESS:  After?

10    Q.    (By Mr. O'Mara) Yeah, any time afterwards.

11  At about 1:30 or 1:35, maybe 1 -- well, more like

12  about quarter of, 10 minutes till 2:00, Matthew's

13  called as having passed away; right?  EMTs get there

14  about 20 minutes later and it's done; right?

15    A.    All right.

16    Q.    And he's dead.

17    A.    Okay.

18    Q.    At that point you realized an inmate just

19  died and we have a restraint chair log that suggests

20  he's been checked every 15 minutes; correct?

21    A.    Correct.

22    Q.    You understand that's what's happening;

23  right?  Do you have an awareness of that as you're

24  now dealing with the fact that an inmate just died on

25  your watch?

Maxine Evans

Page 128

1      A.    Realizing that he had just passed, my

2  thoughts were -- and then when the lieutenant came,

3  you know, we were securing the area because we knew

4  that the next step was going to be the investigation

5  part.  So I didn't have any conversations with anyone

6  else.

7      Q.    So you didn't call Capers or talk to him?

8            MR. PHILLIPS:  Just answer.

9      A.    No.

10     Q.    (By Mr. O'Mara) Same thing with Vinson?

11     A.    Vinson had already -- he wasn't in the

12  area.  He had already left and went to the hospital.

13     Q.    Did you call him --

14     A.    No.

15     Q.    -- or text him?

16     A.    No.  I didn't have his personal

17  information.

18     Q.    Never reached out to try and find out how

19  somebody who seemed to have been checked, or at least

20  you wrote down that he was, how it could have

21  happened that these checks turned out to just lead to

22  his death?

23            MR. PERKINS:  Object to form.

24     Q.    (By Mr. O'Mara) You know what I'm saying?

25     A.    No.

Maxine Evans

Page 129

1       Q.    I mean, you're writing down a log saying

2   he's been checked every 15 minutes; right?

3       A.    Yeah.

4       Q.    And it's your initials on it; correct?

5       A.    Yeah.

6       Q.    So when he passes, do you ever go back to

7   the guys who told you he was okay and ask them

8   anything more about it?

9       A.    No.

10      Q.    Never?

11      A.    Not that I can recall.

12      Q.    Well, I mean --

13      A.    I mean, everything started happening so

14  fast.  I mean, you know, once he passed away, then

15  everyone started coming in and no one really asked me

16  any questions and I really didn't ask any questions.

17      Q.    Was the silence about talking to this with

18  other corrections officers intentional?

19      A.    No.

20      Q.    But, yet, you never talked to Capers about

21  it?

22            MR. WITHERS:  Object.  Asked and answered.

23            MR. PERKINS:  Join.

24            MR. O'MARA:  Oh, okay.  But that's

25      really -- I guess you can say it, but it pretty

Maxine Evans

Page 130

 1       much delays us.

 2       Q.    (By Mr. O'Mara) Did you ever talk to

 3   Capers about it ever since?

 4       A.    At the, at the jail?

 5       Q.    Or ever.

 6             MR. PHILLIPS:  Any time.  Any place.

 7       A.    After everything was -- I think we had all

 8   met over at Forsyth Park.

 9       Q.    (By Mr. O'Mara) Okay.  All right.  And

10   when was that?

11       A.    That was way after the incident.  I think

12   everybody had gotten terminated at that point.

13       Q.    All right.  And what did y'all talk about?

14       A.    The way he was acting, the way everything

15   was transpired.  I mean --

16       Q.    Just tell me as though I'm sitting there

17   listening to the conversation.  Just tell me what --

18   who said what and what did you say?

19       A.    Vinson and Capers were basically saying,

20   were talking about, you know, how he was acting, you

21   know.

22       Q.    What were they saying?

23       A.    How they, how he got the Taser.  Vinson

24   was saying that, you know, if that could have been,

25   that could have been a gun, you know.  He was trying

Maxine Evans

Page 131

1    to get the Taser away from Ajibade.  And Mark was

2    saying -- what was Mark saying? -- I think something

3    about maybe Richardson should have just waited, or to

4    that effect.

5             Going back to the initial how it all

6    started, that Richardson should have waited.  Or

7    Richardson should have let someone know that someone

8    had called and said that he had mental issues.  That

9    he never passed that down to, you know, the

10   supervisor, and all this could have been prevented.

11        Q.    That who didn't pass it down?

12        A.    Private Richardson didn't pass it down to

13   the supervisor that he received a call from someone

14   on the outside, from Matthew's family or somebody on

15   the outside saying that he had problems.

16        Q.    Okay.  Was that the first time that you

17   heard that?

18        A.    Heard that call?

19        Q.    That someone outside had called in?  Are

20   I'm just curious.  Maybe you've heard about it before

21   then.  But --

22        A.    I wasn't at the facility when I heard

23   about it.  But it was just -- I believe Mark had told

24   me about it, but that was after the fact.

25        Q.    So did you ask Mark Capers or Vinson, so

Maxine Evans

Page 132

1    what did you guys see when you checked in or did you

2    check in or why did you tell me you checked in, or

3    anything like that?

4        A.    No.  When Vinson said that -- when Vinson

5    and Capers went in and checked, they said he was

6    okay.  I mean, he looked all right.  And Mark's words

7    was "Dude is okay."

8        Q.    When he talked to you at the jail --

9        A.    Correct.

10       Q.    -- I'm just curious now.  Afterwards you

11   meet at Forsyth Park or anywhere else.  Did you have

12   to have any more conversations with him about that?

13       A.    About the checks?

14       Q.    About the checks, yeah.

15       A.    No.

16       Q.    Okay.  There was a statement, followup

17   statement by the sheriff's office.  I'm sorry.  I

18   wasn't sure that I was going to submit this, but I'm

19   going to identify this as PA 805.  But I don't have

20   copies for everybody.  But it is an addendum I'm

21   going to show you in just a second.  I think I want

22   you to have you identify it and then I have a

23   question about it.

24            MR. WITTS:  Would you identify the exhibit

25       again, Mark?

Maxine Evans

Page 133

1          MR. O'MARA:  Yeah.  It is PA-805.  It is

2     one, I'm sorry, a 1/5/2015 handwritten

3     statement, identified at the top by employee's

4     statement of incident.  Can I just mark this if

5     you have one.

6          (Defendant's Exhibit 1 was marked for

7     identification.)

8     Q.    (By Mr. O'Mara) What I identify as

9     Plaintiff's Exhibit Evans 1.  First of all, can you

10    identify that for me?

11    A.    It's an employee statement of incident.

12    Q.    Okay.  And is that your handwriting?

13    A.    Yes.

14    Q.    Okay.  And do you initial and sign on the

15    bottom?

16    A.    The signature at the bottom, yes.

17    Q.    Is that yours?

18    A.    Yes.

19    Q.    And the date of it?

20    A.    01/05/2015.

21    Q.    Okay.  That's a few days after the event?

22    A.    Yes.

23    Q.    And do you recall sending this statement

24    out?

25    A.    Yes.

Maxine Evans

Page 134

1      Q.     Do you recall what led you to filling that

2   statement out?

3      A.     When I went to internal affairs, I was

4   called to come back in.

5      Q.     Okay.  And that was a second interview

6   where they wanted to clear up some issues with you;

7   is that correct?

8      A.     Correct.

9      Q.     About the restraint log?

10      A.     Correct.

11      Q.     Let me just show you, if I might, what

12   I've identified here.  And, first, I guess start

13   here.  I'm not limiting -- read the whole thing if

14   you want.  But from where it says, "From the time he

15   was placed," if you'd just read that out loud so that

16   everybody hears it if they don't have it in front of

17   them.

18      A.     "From the time, from the time he was

19   placed into the, into the chair approximately at

20   2345, I believe he was physically checked by staff

21   and nurse."

22      Q.     And keep reading.

23      A.     "The times after that were times he wasn't

24   physically checked by anyone."

25      Q.     What did you mean by you thought he was

Maxine Evans

Page 135

1    checked, especially after 11:45, but he was not

2    physically checked by anyone after that?

3         A.    When I say "physically," I'm speaking of,

4    as you stated, the nurse going in and physically

5    putting hands on, checking the hands and leg

6    restraints and physically checking him.  Because what

7    they did was a visual check.

8         Q.    Okay.

9         A.    And that's been the practice, visual

10   check.

11        Q.    When you say it's been a practice, a

12   practice at the jail?

13        A.    Yes.

14        Q.    Even when the checks are supposed to be

15   physical?  Is that what you mean?  When you say it's

16   a practice, what do you mean by that?

17        A.    That means that when someone was placed in

18   a, be it -- I'm not going to say restraint chair,

19   because like I say, I didn't have that many

20   situations where I knew the restraint chair.  But the

21   leg and hand restraints, you could do a visual check

22   to make sure that the individual was okay.

23        Q.    Okay.  And was it your understanding that

24   was what was supposed to happen on both regular

25   restraint checks and restraint chair --

Maxine Evans

Page 136

1        A.    Yes.

2        Q.    -- checks?

3        A.    Yes.

4        Q.    And what was the practice at the jail?

5        A.    The visual checks.

6        Q.    Rather than physical checks?

7        A.    Correct.

8        Q.    And how do you know that?

9        A.    Practice through -- from when I arrived

10   there.

11       Q.    For the past 15 years?

12       A.    Right.  Until they revamped the policies

13   or revised the policies.

14       Q.    And tell me about that.

15       A.    Tell you what, sir.

16       Q.    Tell me what you know about the revamped

17   policy and how that changed things?

18       A.    It changed things where I guess they'd

19   have to go physically check when an individual is in

20   a restraint chair.

21       Q.    Okay.  So what you're talking about is

22   when they came out with a new restraint policy that

23   said --

24       A.    A nurse will go in and check.

25       Q.    And it must be a physical check?

Maxine Evans

Page 137

1        A.      (Nods head affirmatively.)

2        Q.      But you acknowledge that the requirements

3    for physical check even existed before the change;

4    right?

5        A.      Correct.

6        Q.      It just wasn't being followed?

7        A.      Again, I'm not sure if it was being

8    followed or not, because I myself having to do that.

9    I wasn't aware of that.

10        Q.      Okay.  What are the detox cells supposed

11    to be used for?

12        A.      Arrestees that come in and they are

13    intoxicated.

14        Q.      Okay.  Any other purpose?

15        A.      My understanding is intoxicated.  Again,

16    working in R and D was new for me.  I had only been

17    up there about maybe months.

18        Q.      Okay.

19        A.      So R and D was new for me.  So I was

20    learning the procedures, working in R and D still,

21    even though I was a supervisor, I still had to learn

22    that area.

23        Q.      Are the detox cells in your awareness or

24    knowledge also used for mental health patients to

25    keep observation on them?

Maxine Evans

Page 138

1          A.     Since my time being in R and D, they've

2     only used them for arrestees that came in that were

3     intoxicated because there was no beds in there.

4     That's why it was low to the ground so that, you

5     know, if they became sick, you know, the drain was

6     there.  They could throw up there and do whatever.

7          Q.     Okay.  And the detox cells are also in the

8     view of the nurse's office; right?

9          A.     Correct.

10          Q.     And knowing now what you know about

11     Mr. Ajibade's concerns, would you have used the detox

12     cell to try and keep better eye on him or would you

13     have left him where he was?

14          A.     The cell that he was in could have been,

15     would have been sufficient because you can see him.

16     It was glass as well.  I mean, you could see in there

17     pretty well.

18          Q.     Tell me -- describe the detox cells.  And

19     when you say it was glass as well, describe first the

20     detox cells and how much glass is on them.

21          A.     Well, the detox cell is, it's clear.  You

22     can see in there.  You have good vision, visual, to

23     see the detainee in there.  But the detox cells

24     doesn't have like a bench or a bed for them to lay

25     on.  It's just a cement slab.  And it's low to the,

Maxine Evans

Page 139

1    low to the floor.  And it has, you know, the drain

2    there.

3                  Whereas the regular cells have a bed.  I

4    mean, well, a metal bed.

5         Q.    Okay.  I just want to clear something up.

6    When you first saw Matthew, he was in a holding cell;

7    correct?

8         A.    Correct.

9         Q.    And I think, but I think it was holding

10   cell No. 6.  But as you walk in from the Sally port,

11   it's off to the right; is that accurate?

12        A.    Correct.

13        Q.    That's the first place you saw him?

14        A.    Right.

15        Q.    And then you also knew he was moved out

16   over to the booking area to get processed; correct?

17        A.    Correct.

18        Q.    From that area, where do you identify the

19   detox cells as being?

20        A.    Adjacent, well, not really adjacent, but

21   catty-corner maybe.

22        Q.    Yeah.  The detox cells, if you're walking

23   back towards the sergeant --

24        A.    The sergeant.

25        Q.    -- they're on your?

Maxine Evans

Page 140

1      A.    In that corner.

2      Q.    Which side?

3      A.    On the right side.  Well, on the left side

4  coming up to the sergeant's desk, but leaving the

5  sergeant's desk, they was on the right side?

6      Q.    If I come into the Sally port and I'm

7  heading to the sergeant's desk, which side?

8      A.    The left side.

9      Q.    Okay.  The detox on the left?

10      A.    Correct.

11      Q.    And those are the ones that have the low

12  bench?

13      A.    Yeah.

14      Q.    And those are the ones that are in the

15  view of the nurse's station; correct?

16      A.    Yes.

17      Q.    All right.  Tell me about the cells then

18  where Mr. Ajibade ended up.  You said that they had

19  viewing as well.  What do you mean by that?

20      A.    Where he ended up at?

21      Q.    Yes.

22      A.    That's the old -- they call that the old

23  prebooking area.

24      Q.    Right.

25      A.    And you can't really see into the cell.

Maxine Evans

Page 141

1   The sergeant's desk is here and the cells were like

2   right adjacent from the sergeant's desk.  You can't

3   see in the cell.  You have to physically get up and

4   go and look inside.

5        Q.    Would you agree that makes observation

6   more difficult?

7        A.    Yes.

8        Q.    Did you talk to anybody about why the

9   decision or how the decision was made to put

10  Mr. Ajibade in the far right-hand cell back there?

11       A.    No.

12       Q.    Did you ever talk to Capers about it?

13       A.    Capers mentioned to me that during the

14  incident, he was told by someone else that

15  Lieutenant Johnson supposedly have told them to put

16  him into the detox cell.  Capers said that he didn't

17  hear her say that.  But he was -- and this is like in

18  general conversation.

19       Q.    With whom?

20       A.    With me.  He was telling me.

21       Q.    And anybody else?

22       A.    I'm sorry?

23       Q.    Anybody else with you, Capers and you?

24  Was there anybody else in the conversation?

25       A.    No.  This was via telephone.  He was -- we

Maxine Evans

Page 142

1    was talking over the phone.

2         Q.    Oh, okay.  So tell me again what he said

3    about the decision to move him, Ajibade, into the

4    back right-hand holding cell?

5         A.    Whose decision it was?

6         Q.    If you -- whatever Capers told you about

7    it.

8         A.    He didn't specify who made the decision to

9    take him back in the prebooking, I mean, the old

10   prebooking area.

11        Q.    Okay.  I'm a couple minutes from being

12   done.  So my last break.  I'm just going to sit here.

13   So we'll take about a five, ten minute break, and I'm

14   going to finish up a couple questions and I am done.

15   There may be some followup questions from the other

16   side, but I'm going to be finished in a few minutes.

17   If you want to just stretch your legs one last time,

18   then I'll be finished with you.

19             THE VIDEOGRAPHER:  All right.  Going off

20        the video at 1701.

21             (Recess from 5:01 p.m. to 5:04 p.m.)

22             THE VIDEOGRAPHER:  We're back on the video

23        at 1704.

24        Q.    (By Mr. O'Mara) All right.  A couple last

25   questions.  You ready?  Yeah.  In a couple different

Maxine Evans

Page 143

1    places in discovery, it suggests that you actually

2    had a conversation with Capers early in the booking

3    process to be wary or be aware of Mr. Ajibade because

4    of the concerns you had with his behavior.  Do you

5    remember that?

6         A.   I didn't have a conversation with Mark.

7    That was soon after I was dressing out the females

8    when I came back.  And I came up to the U area and I

9    sat down for a few minutes.  And that's when I first

10   noticed Mr. Ajibade in cell 6, I believe.  And when

11   he was beating on the bed and I believe I asked like

12   "What's wrong with him?"  I may have said or I may

13   not have said that, but, I mean, Capers was laying

14   over the counter.  And I said, "Well, I'm going to go

15   back so I can get finished with what I was doing."

16   Because Richardson was getting ready to bring him

17   out.

18            So then when Richardson went to go get

19   him, I said, well -- and I knew Richardson was doing

20   prebooking by himself.  Private Burke was in the area

21   as well, but he was doing another part of the duties.

22   And so I told Mark, I told Capers, I said, "Well,

23   just stand by while they bring him out."

24        Q.   And what was the behavior that you noticed

25   that gave you cause or concern to tell Capers to

Maxine Evans

Page 144

1    stand by?

2         A.    Because of the way he was beating on the,

3    on the, on the bed.

4         Q.    Anything else?

5         A.    He didn't say anything.  I didn't say

6    anything to him or I didn't -- it wasn't, if it

7    wasn't him, you know, even when detainees, you know,

8    just show, display, I guess, like maybe they want to

9    fight type of behavior, I just make sure that there

10   was another officer around.

11        Q.    Okay.  Any other behaviors from

12   Mr. Ajibade that concerned you?

13        A.    I'm sorry.

14        Q.    Any other behaviors that concerned you?

15        A.    None that I recollect.

16        Q.    Do you remember telling somebody that he

17   was making weird looks with his eyes or moving his

18   eyes around real strange?

19        A.    I don't recall saying that.

20        Q.    You never said that in the January 2nd

21   interview with the officers?

22        A.    I don't recall saying it.

23        Q.    Or that he was -- like he would open his

24   mouth real wide and just act weird.  Any of that?

25        A.    I don't recall saying that.

Maxine Evans

Page 145

1        Q.    Okay.  I'm just going to put up some

2    discovery that we had gotten I want you to identify

3    it, if you can.  This was received -- and I'm going

4    to try and just -- tell me, can you see that?

5        A.    Yes.

6        Q.    All right.  Identify that for me, if you

7    would.

8        A.    Facebook message.

9        Q.    Yes.  And tell me who was the

10   communication or conversation between?

11       A.    Myself and Kenny.

12       Q.    When you say "Kenny"?

13       A.    Jason Kenny.

14       Q.    Okay.  All the way down that's you and him

15   that are talking back and forth?

16       A.    Correct.

17       Q.    And that's your Facebook?

18       A.    Yes.

19       Q.    And what, what's your Facebook account

20   name?  I know it's on there, but so we have it for

21   the record.

22       A.    The account name is, well, it's my name

23   but my user name to log in would be DianeEE.

24       Q.    Okay.

25       A.    52.

Maxine Evans

Page 146

1        Q.    That's your password?

2        A.    No.

3        Q.    Okay.  I don't need to know your password.

4        A.    My screen name is Maxine Evans.

5        Q.    Okay.

6        A.    But when I -- my user name is DianeEE52.

7        Q.    Okay.  And your cell phone number?

8        A.    60 -- 912-6 -- 604-6002.

9        Q.    And who's the provider?

10       A.    T-Mobile.

11       Q.    And that was the same one you had back

12  then; right?

13       A.    Yes.

14       Q.    And I know that the shift or the commander

15  is given a separate phone for use in the jail as a

16  watch commander?  Maybe not even be aware of that.

17  But are you given, ever given a separate phone to use

18  for communication while in the jail as part of your

19  duties?

20       A.    No.  Not in that jail, no.

21            MR. O'MARA:  Okay.  I don't have any other

22       questions.

23            MR. PERKINS:  I have a few.

24                        EXAMINATION

25  BY MR. PERKINS:

Maxine Evans

1      Q.    Ms. Evans, I'm Ben Perkins.  Represent

2   Debra Johnson and Andrea Evans-Martinez in this

3   matter.  And I only have a few questions.  I

4   apologize to you.  I'm going to bounce around because

5   I'm just following through my notes as I took them to

6   seek clarification.  So bear with me in that regard.

7           With regard to the, what was referred to

8   earlier as a scuffle, what, what did you observe as

9   far as the, what I would call a fight?  I mean, but

10  however you would like to describe it.  What did you

11  see as far as the actual physical contact Mr. Ajibade

12  made with Capers and Vinson?  I'm sorry, Capers

13  others.

14      A.    I didn't -- when I walked in, I saw that

15  they, they pretty much looked like they had him

16  subdued so they can get him restrained.  And I saw

17  Sergeant Rowland to the right and my focus

18  immediately went to her.

19      Q.    Were you present when Rowland was -- or do

20  you recall if you were there when Rowland was

21  describing what happened, how she became injured?

22      A.    No.

23      Q.    Okay.  All right.  And with regard to your

24  observations of Mr. Ajibade at that time, did you see

25  anything that caused you to think that he needed any

Maxine Evans

Page 148

1   type of specialized medical attention at that time?

2        A.    Say that again.

3        Q.    Sure.  You know, your -- you described

4   yourself as having arrived.  You devote your primary

5   attention to Rowland, but I'm guessing that you, at

6   least, looked over there to Ajibade as they were

7   trying to -- as the officers were trying to put

8   handcuffs on him and that sort of thing.  Okay?

9              So when you looked over there, did you see

10  anything about him that indicated to you that, oh, he

11  needs some kind of special medical attention or

12  anything?

13       A.    No.

14       Q.    With regard to seeing Mr. Ajibade in his

15  cell clapping the shower shoes or doing whatever it

16  was he was doing that, I'm going to take a wild guess

17  here and assume that's probably not the first time

18  you've seen an inmate do that; is that right?

19       A.    Right.

20       Q.    Inmates that are alone in cells do things

21  like, do things like that, I'm guessing; is that

22  correct?

23       A.    That's correct.

24       Q.    Okay.  When you first came on this shift,

25  did you speak with the prior corporal or whoever it

Maxine Evans

Page 149

1   was to just kind of get a lay of the land from them?

2        A.     No.   Sergeant Rowland spoke with

3   Corporal Broom and he briefed her as to what was

4   going on.   And I believe he may have told me --

5   because I think he told me that he -- booking was

6   full and he had a lot of females that needed to be

7   dressed out.   And once I got that information, that's

8   when I went to count how many that needed to be

9   dressed out to start that.   Because I knew I was

10  going to be the one dressing out the females.

11       Q.     I just wanted to make sure I understood

12  this.   If -- was it -- were you trained that if an

13  inmate is fully restrained, meaning he is properly in

14  a restraint chair, were you trained that it would be

15  improper to tase or dry stun that inmate?

16       A.     Repeat it.

17       Q.     Sure.   Yeah.   I understand.   If -- were

18  you trained by the Chatham County Sheriff's Office

19  that if an inmate is fully and properly restrained in

20  a restraint chair, that it would be improper to tase

21  or dry stun him?

22       A.     Yes.

23       Q.     You were not present in the women's

24  holding area when Mr. Ajibade was being placed in the

25  restraint chair; is that correct?

Maxine Evans

1       A.    That's correct.

2       Q.    So then you don't know whether or not

3  Debra Johnson was present when Mr. Ajibade was tased

4  or dry stunned; is that correct?

5       A.    That's correct.

6       Q.    There were a number of questions that were

7  asked about information not getting to certain

8  people.  Do you remember those questions that were

9  asked earlier?

10      A.    Yes.

11      Q.    Okay.  It, it, it was pretty general and

12 so I wanted to try and make sure I have an

13 understanding.  So in this case, just as an example,

14 we understand -- I think that you understood from

15 talking to Capers in Forsyth Park that Mr. Richardson

16 was given some information that Mr. Ajibade was a

17 possible mental health issue; is that right?

18      A.    Correct.

19      Q.    Okay.  And it's also your understanding, I

20 gather, that Richardson didn't pass that information

21 onto others; is that right?

22      A.    Correct.

23      Q.    Okay.  And so was that an example of

24 somebody not providing information to others that you

25 were talking about?

Maxine Evans

Page 151

1        A.    Yes.

2        Q.    Okay.  This -- that, that sounds like to

3   me is either a mistake or something of that nature on

4   Richardson's part.  Was that your interpretation of

5   that?

6        A.    Yes.

7              MR. O'MARA:  Object to the form.

8        Q.    (By Mr. Perkins) As to any other times

9   that happens in your 15-year career, can you look

10  back on any of those instances and think of one where

11  it was anything other than just a mistake on the part

12  of an officer of not providing some information?

13       A.    Not that I can recall offhand.

14       Q.    Okay.  And I guess I'm going to ask this a

15  better way.  This is a better way to ask you.

16       A.    Okay.

17       Q.    Were y'all trained to provide pertinent

18  information to your superiors and your -- and the

19  people that are under you?

20       A.    Yes.

21       Q.    Okay.  You indicated in response to one of

22  Mr. O'Mara's questions that you believe that

23  Mr. Ajibade had a mental health issue.  Do you recall

24  that testimony?

25       A.    Say it again.

Maxine Evans

Page 152

1          Q.     Yes.  You told Mr. O'Mara that you

2     believed that Mr. Ajibade was suffering from a mental

3     health issue during his time at the jail.  Do you

4     remember that?  Do you remember saying that?

5          A.     That I believed he --

6          Q.     That you currently do believe that

7     Mr. Ajibade had a mental health issue.

8          A.     After everything's transpired, yeah, now.

9          Q.     Okay.  And my question is:  Is that based

10    on media coverage and things that you've learned

11    after the incident occurred?

12         A.     Correct.

13         Q.     Okay.  You were seen in a video checking

14    on Mr. Ajibade after he had been placed in the chair.

15    And I wanted you to tell us what did you -- first of

16    all, what was the reason that you did that?  Why were

17    you looking on the cell?

18         A.     Because that's -- when they're placed in

19    the chair you're supposed to do a visual check.

20         Q.     Okay.  And a visual check entails looking

21    to see if his chest is rising and he's breathing?

22         A.     And falling, correct.

23         Q.     And did you see that?

24         A.     Yes.

25         Q.     Okay.  Do you recall anything else about

Maxine Evans

Page 153

1    that as far as whether Mr. Ajibade was breathing

2    heavily or, or still struggling or anything like

3    that?

4         A.    No.

5         Q.    Okay.  So he was just -- your observation,

6    what you recall is he was breathing?  You saw his

7    chest rising and falling?

8         A.    When I walked -- when I went up to the

9    window and I looked down on him and I made sure that

10   I could see him, the rise and fall of his stomach

11   moving.

12        Q.    With regard to the, that restraint chair

13   log that was prepared and that you discussed earlier

14   today, I know you said that you printed it off of the

15   Share Point computer program.  Do you recall one way

16   or another whether Lieutenant Johnson asked you to

17   print it out and prepare it?

18        A.    No.

19        Q.    Okay.

20              MR. PHILLIPS:  You don't recall or she

21        didn't?

22        A.    Oh, I don't recall.  But because, again,

23   because I was the supervisor, it was my area, I just

24   went on and generated the, the log.

25        Q.    (By Mr. Perkins) Thank you.  I appreciate

Maxine Evans

1    it.   Okay.   I wanted to ask you some questions about

2    written policy, and that pertains to the 15-minute

3    checks.   Okay?   I understood you, I think, to tell

4    Mr. O'Mara that you understood that even when this

5    event occurred with Mr. Ajibade, that you understood

6    that the policy required a physical check as opposed

7    to a visual check?

8           A.     Visual check.

9           Q.     Okay.   All right.   Okay.   I'm going to

10   show you what has previously been marked as Exhibit

11   5E -- no.   I'm sorry.   What is that?   Is that 5E1?

12                 MR. CASH:   That's J2B.

13                 MR. PERKINS:   J2B.

14                 MR. CASH:   J2B.

15          Q.     (By Mr. Perkins) Okay.   I'm going to hand

16   you what has been marked as Exhibit J2B, and that is

17   policy No. March 15 -- I'm sorry.   I said that wrong.

18   I'm going to hand you what's been identified as

19   policy No. 03/15/09.   Ms. Evans, can you tell us what

20   is the subject of that policy?

21          A.     The subject is use of restraint chair.

22          Q.     Okay.   Thank you.   And then can you read

23   item D on the first page of that, please, out loud?

24          A.     "The officer will conduct subsequent

25   visual observations every 15 minutes of the

Maxine Evans

Page 155

1    restraint, the restrained inmate."

2        Q.    Thank you.  So is that -- and that's

3    consistent what you're saying that a visual check

4    would be conducted every 15 minutes; right?

5        A.    Right.

6        Q.    Thank you.  And then now turn to the

7    second page of that same policy number, and could you

8    read out what, what has been highlighted there as

9    item E.

10       A.    Medical personnel must check the inmate at

11   a minimum of every two hours.

12       Q.    Thank you.  And, Ms. Evans, is that

13   consistent with your understanding that the way that

14   it would work is that an inmate is to be, after he's

15   put in the restraint chair, he is to be -- have his

16   restraints checked by the nurse shortly after he's

17   put in the chair; is that right?

18       A.    Yes.

19       Q.    Okay.  And then for the next, for every 15

20   minutes over the next two hours, he needs to get a

21   visual check by jail staff; is that right?

22       A.    Correct.

23       Q.    And then once you hit that two-hour mark,

24   then the nurse would need to come back; is that

25   right?

Maxine Evans

Page 156

1     A.    Correct.

2     Q.    Okay.  Mr. O'Mara asked you to read from

3  your January 5, 2015, statement.  And one of the

4  things that was written in that statement was you

5  wrote that -- you wrote, towards the middle there,

6  you wrote "the times after that were times he wasn't

7  physically checked by anyone."  You see where you

8  wrote that?

9     A.    Right.

10    Q.    Am I correct in understanding you do know

11  that, you do understand that he was visually checked

12  several times after Nurse Brown did the initial

13  restraint check?

14    A.    Visually checked.

15    Q.    Okay.  And you understand -- you'll defer

16  to the video.  The video shows what it shows as far

17  as when those checks occurred; right?

18    A.    Correct.

19       MR. PERKINS:  All right.  That's all I

20     have.  Thank you.

21       MR. WITHERS:  Let me borrow those.  I'm

22     going to belabor these a little bit.

23       MR. PERKINS:  You better.  Kind of hard to

24     carry it with you.

25       MR. WITHERS:  Well, we'll see if I can

Maxine Evans

Page 157

1          speak loud enough.  Dave, can you hear me okay?

2                    THE VIDEOGRAPHER:  Yeah.

3                              EXAMINATION

4    BY MR. WITHERS:

5          Q.    Ms. Evans, I just want to cover a couple

6    of other of the policies that dealt with the

7    restraint chair check by both security staff and

8    medical staff.  Okay?

9          A.    Okay.

10         Q.    I'm going to hand you what's been marked

11   or show you what's been marked -- I'm going to have

12   to -- I'm going to have to ask counsel.

13                   MR. CASH:  What tab letter is it under?

14        The whole book.

15                   MR. WITHERS:  It's under E.

16                   MR. CASH:  So it's J2E.

17         Q.    (By Mr. Withers) I'm going to hand you

18   what's been marked as Joint Exhibit J2E.

19                   MR. WITHERS:  Did you use 2E just a minute

20        ago?

21                   MR. PERKINS:  I used the one 3/15/09.

22                   MR. CASH:  You used 2B.

23         Q.    (By Mr. Withers) Okay.  Sorry.  I'm going

24   to show you what's been marked 2E and ask you does

25   that identify the subject as use of restraints?

Maxine Evans

Page 158

1        A.    Yes.

2        Q.    And it talks about the policy with respect

3   to the clinical use of restraints, does it not?

4        A.    Yes.

5        Q.    Right here?

6        A.    Yes.

7        Q.    And then it talks about, under paragraph

8   procedure, paragraph B2E, it talks about restraint

9   chairs; correct?

10       A.    Yes.

11       Q.    And then if you flip back a couple of

12  pages, on page 3 of that, paragraph 11, it says,

13  "Restrained inmates must be directly observed by

14  security staff a minimum of every 15 minutes";

15  correct?

16       A.    Yes.

17       Q.    That's security staff; true?

18       A.    True.

19       Q.    "And will be evaluated by the medical

20  staff at least every two hours"; correct?

21       A.    Correct.

22       Q.    And then turning to F, under tab F, this

23  speaks to the policy dealing with the use of

24  restraints on mental health inmates; correct?

25       A.    Correct.

Maxine Evans

Page 159

1      Q.    And it -- under paragraph, under procedure

2   2BE, it says, "Using restraint chairs"; true?

3      A.    True.

4      Q.    And then page 2, paragraph 9, it says,

5   "The medical staff will check the application of

6   restraints to ensure that the restraints are secure";

7   correct?

8      A.    Correct.

9      Q.    And are not injuring the inmate; true?

10      A.    True.

11      Q.    And that was your experience.  In your

12   limited dealing with restraint chairs, your

13   experience was that the medical staff would come in

14   and check the restraints, both the handcuffs and the

15   leg irons; correct?

16      A.    Right.

17         MR. O'MARA:  Object to the form.  Be a bit

18      careful in just leading and testifying.  It's

19      supposed to be her testimony, not yours.

20         MR. WITHERS:  Yeah.

21      Q.    (By Mr. Withers) And that was, that was

22   based on your experience, what you would observe with

23   respect to the medical staff; true?

24      A.    True.

25      Q.    In paragraph 11, page 3 of that same

Maxine Evans

Page 160

1    policy, speaks to restrained inmates again, does it

2    not?

3         A.    Yes.

4         Q.    And it provides that security staff will

5    observe the inmate every 15 minutes; correct?

6         A.    Correct.

7         Q.    And medical staff at least every two

8    hours; correct?

9         A.    Correct.

10        Q.    Your earlier -- when was the last time,

11   Ms. Evans, that -- and I'm just going to stand here

12   if you can pick me up okay.  When was the last time

13   that you had reviewed those policies before today's

14   date, Ms. Evans?

15        A.    When the last time I actually read the

16   policies pertaining to the restraint chair?

17        Q.    Yes, ma'am.

18        A.    When I got them, when I got them and

19   presented them to my attorney.

20        Q.    Okay.  Some months ago, if not over a year

21   ago?

22        A.    Right.

23        Q.    And you would certainly defer today to

24   what is contained in the written policy versus your

25   recollection; is that fair to say?

Maxine Evans

Page 161

1       A.    Say that again, please.

2       Q.    You would defer to what the written policy

3   says as opposed to what your recollection might be;

4   is that fair?

5       A.    Correct.

6       Q.    Give me one second.  And just so I am

7   clear, you generated the Share Point log and printed

8   it out; is that right?

9       A.    Yes.

10      Q.    And then after you printed it out --

11  that's around the 11:45 p.m. hour; is that right?

12      A.    Yes.

13      Q.    After you printed it out, then you

14  presented it to Nurse Brown?

15      A.    Yes.

16      Q.    And he signed it that initial time;

17  correct?

18      A.    Yes.

19            MR. WITHERS:  All right.  I think that's

20      all I've got.  Thank you, ma'am.

21            MR. PERKINS:  Do you have any?

22            MR. HART:  No.

23                     EXAMINATION

24  BY MR. O'MARA:

25      Q.    Just very brief followup.  So the

Maxine Evans

Page 162

1    15-minute minimum, that visual check, that's for

2    someone who's restrained; right?  Correct?

3         A.    Correct.

4         Q.    Okay.  But I think you testified, I just

5    want to be clear, that if you had known somebody had

6    been tased, then you probably would have suggested

7    more medical attention be given; correct?

8         A.    If I knew that he had been tased?

9         Q.    Yes.

10        A.    And the nurse was on -- right there?

11        Q.    Yes.

12        A.    Then, yes, the nurse, he would have

13   been -- I would have asked the nurse did he or she

14   check him after being tased.

15        Q.    And you would have paid even better

16   attention to Mr. Ajibade had you known he had been

17   tased four times; correct?

18        A.    Oh, yes.

19        Q.    Correct?

20        A.    Yes.

21        Q.    And if you had known he had been kicked in

22   the head, would you have been even more aware that

23   the medical condition that could have caused and

24   watched him even closer?

25        A.    Yes.

Maxine Evans

Page 163

1        Q.    And you didn't have that information

2    available to you; right?

3        A.    No.

4        Q.    So even the 15-minute minimum, that's just

5    someone who's just simply retrained; right?

6        A.    Yes.

7        Q.    Okay.  But if you know that he was punched

8    in the face, would you have also made sure that he

9    was focused on more by you and your support staff

10   because of that potential injury?

11       A.    Yes.

12       Q.    None of which was done because none of

13   that information was communicated to you; correct?

14       A.    Correct.

15       Q.    By any of the multitude of jail officers

16   who were there and aware of it; correct?

17       A.    Correct.

18             MR. O'MARA:  Nothing further.

19                          EXAMINATION

20   BY MR. PERKINS:

21       Q.    Ms. Evans, have you ever been present when

22   a nurse checks an inmate after being tased?

23       A.    No.

24       Q.    No?  How about after an inmate's been dry

25   stunned?

Maxine Evans

Page 164

1        A.    No.

2              MR. PERKINS:   Okay.

3                        EXAMINATION

4    BY MR. O'MARA:

5        Q.    Just to be really clear, is it just the

6    policies and procedures at the Chatham County jail to

7    not even check, medical check an inmate who's tased?

8        A.    I'm sorry.  Say that again.

9        Q.    Is it just the policy and procedure at the

10   Chatham County jail that they don't even have medical

11   check an inmate who's been tased?

12       A.    Is that written in policy and procedure?

13       Q.    No.  Your experience.  So when an inmate

14   gets tased, is it the policy and procedure of the

15   jail that they don't even have them checked?

16       A.    I've yet to see an inmate, me visibly see

17   an inmate get tased.

18       Q.    Okay.

19       A.    I haven't seen that.

20       Q.    But have you heard in yours 50 years -- 15

21   years' experience that if an inmate gets tased, they

22   don't even bother checking them medically?

23       A.    No.

24       Q.    How about if you get punched in the face?

25   Is it your knowledge that that doesn't even require

Maxine Evans

Page 165

1   medical to be checked, to check them?

2        A.    If an inmate receives injuries during a

3   scuffle, the nurse checks them.

4        Q.    Okay.  But, seemingly, but in response to

5   the question by Mr. Perkins, does it actually happen?

6        A.    It may happen but I haven't been there to

7   see it happen.  I mean, I haven't been on scene to

8   see that happen.

9             MR. O'MARA:  Okay.  Nothing further,

10        unless you want to have one last shot.  I think

11        we're done.

12             THE VIDEOGRAPHER:  Okay.  That's the

13        conclusion of the deposition of Maxine Evans.

14        We are off the video at 1731.

15   (Deposition concluded at 5:31 p.m.)

16                          (Pursuant to Rule 30(e) of

17   the Federal Rules of Civil Procedure and/or O.C.G.A.

18   9-11-30(e), signature of the witness has been

19   reserved.)

20

21

22

23

24

25

Maxine Evans

Page 166

1                    CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF CHATHAM:

5

6                              I hereby certify that the
     foregoing transcript was reported as stated in the
7    caption and the questions and answers thereto were
     reduced to writing by me; that the foregoing 165
8    pages represent a true, correct, and complete
     transcript of the evidence given on Monday,
9    September 19, 2016, by the witness, MAXINE EVANS, who
     was first duly sworn by me.

10
                              I certify that I am not
11   disqualified
     for a relationship of interest under
12   O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
     Reporter here as an employee of Gilbert & Jones, Inc.
13   who was contacted by Golkow Technologies to provide
     court reporting services for the proceedings; I will
14   not be taking these proceedings under any contract
     that is prohibited by O.C.G.A. 15-14-37(a) and (b) or
15   Article 7.C. of the Rules and Regulations of the
     Board; and by the attached disclosure form I confirm
16   that neither I nor Gilbert & Jones, Inc. are a party
     to a contract prohibited by O.C.G.A. 15-14-37(a) and
17   (b) or Article 7.C. of the Rules and Regulations of
     the Board.

18
                              This 25th day of
19   September, 2016.

20

21

22

23
                         _____
24                       Annette Pacheco, CCR-B-2153

25

Maxine Evans

Page 167

1    DEPOSITION OF:  MAXINE EVANS/AP

2        I do hereby certify that I have read all
     questions propounded to me and all answers given by
3    me on September 19, 2016, taken before Annette
     Pacheco, and that:

4

         1)  There are no changes noted.
5        2)  The following changes are noted:

6        Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
7    Annotated 9-11-30(e), both of which read in part:
     Any changes in form or substance which you desire to
8    make shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
9    Accordingly, to assist you in effecting corrections,
     please use the form below:

10

11   Page No.        Line No.        should read:

12   Reason for Change_____

13   Page No.        Line No.        should read:

14   Reason for Change_____

15   Page No.        Line No.        should read:

16   Reason for Change_____

17   Page No.        Line No.        should read:

18   Reason for Change_____

19   Page No.        Line No.        should read:

20   Reason for Change_____

21   Page No.        Line No.        should read:

22   Reason for Change_____

23   Page No.        Line No.        should read:

24   Reason for Change_____

25

Maxine Evans

Page 168

1    DEPOSITION OF:  MAXINE EVANS/AP

2    Page No.       Line No.       should read:
     _____
3    Reason for Change_____

4    Page No.       Line No.       should read:

5    Reason for Change_____

6    Page No.       Line No.       should read:

7    Reason for Change_____

8    Page No.       Line No.       should read:

9    Reason for Change_____

10   Page No.       Line No.       should read:

11   Reason for Change_____

12   Page No.       Line No.       should read:

13   Reason for Change_____

14   Page No.       Line No.       should read:

15   Reason for Change_____

16   Page No.       Line No.       should read:

17   Reason for Change_____

18
     If supplemental or additional pages are necessary,
19   please furnish same in typewriting annexed to this
     deposition.
20

21
                    MAXINE EVANS
22
     Sworn to and subscribed before me,
23   This the      day of           , 20   .

24
     Notary Public
25   My commission expires:

Maxine Evans

Page 169

1                  DISCLOSURE OF NO CONTRACT

2                              I, Debbie Gilbert, do
   hereby disclose pursuant to Article 10.B of the Rules
3  and Regulations of the Board of Court Reporting of
   the Judicial Council of Georgia that Gilbert & Jones,
4  Inc. was contacted by Golkow Technologies to provide
   court reporting services for these proceedings and
5  there is no contract that is prohibited by O.C.G.A.
   15-14-37(a) and (b) or Article 7.C. of the Rules and
6  Regulations of the Board for the taking of these
   proceedings.
7
                              There is no contract to
8  provide reporting services between Gilbert & Jones,
   Inc. or any person with whom Gilbert & Jones, Inc.
9  has a principal and agency relationship nor any
   attorney at law in this action, party to this action,
10 party having a financial interest in this action, or
   agent for an attorney at law in this action, party to
11 this action, or party having a financial interest in
   this action.  Any and all financial arrangements
12 beyond our usual and customary rates have been
   disclosed and offered to all parties.
13
                              This 25th day of
14 September, 2016.

15

17                    _____
                      Debbie Gilbert, FIRM
18                    REPRESENTATIVE
                      Gilbert & Jones, Inc.
19

20

21

22

23

24

25

Maxine Evans

Page 170

1                DISCLOSURE OF NO CONTRACT

2                                    I,
  _____, do hereby disclose pursuant
3 to Article 10.B of the Rules and Regulations of the
  Board of Court Reporting of the Judicial Council of
4 Georgia that _____ was contacted by
  _____ to provide court reporting
5 services for these proceedings and there is no
  contract that is prohibited by O.C.G.A. 15-14-37(a)
6 and (b) or Article 7.C. of the Rules and Regulations
  of the Board for the taking of these proceedings.

7
                         There is no contract to
8 provide reporting services between _____
  or any person with whom _____ has
9 a principal and agency relationship nor any attorney
  at law in this action, party to this action, party
10 having a financial interest in this action, or agent
  for an attorney at law in this action, party to this
11 action, or party having a financial interest in this
  action.  Any and all financial arrangements beyond
12 our usual and customary rates have been disclosed and
  offered to all parties.

13
                         This _____ day of
14 _____, 2016.

15

16                       /s/
                         FIRM REPRESENTATIVE
17                       REFERRING FIRM

18

19

20

21

22

23

24

25