# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| SOLOMAN OLUDAMISI AJIBADE, as natural parent of Mathew Ajibade; ADENIKE HANNAH AJIBADE, as natural parent of Mathew Ajibade; THE ESTATE OF MATHEW AJIBADE; CHRIS OLADAPO, as executor, | |
| Plaintiffs, | CIVIL ACTION NO.: 4:16-cv-82 |
| v. | |
| JOHN WILCHER, in his official capacity as Chatham County Sheriff; CORIZON HEALTH, INC.; GREGORY BROWN; FREDERICK BURKE; ABRAM BURNS; MARK CAPERS; MAXINE EVANS; ANDREW EVANS-MARTINEZ; PAUL FOLSOME; DEBRA JOHNSON; JASON KENNY; ERIC VINSON, | |
| Defendants. | |

# O R D E R

Before the Court is Chatham County Sheriff John Wilcher's Motion for Summary Judgment as to all claims alleged against him by the Plaintiffs. (Doc. 193.) This case arises from the January 2015 death of Mathew Ajibade while in the Sheriff's custody at the Chatham County Detention Center ("CCDC"). (Doc. 21.) Ajibade's parents and his estate filed this suit against the Sheriff, various corrections officers at the CCDC, the company supplying health services at the CCDC at the time of Ajibade's death, and a nurse on duty at the time of Ajibade's death. (Id.) Against the Sheriff, Plaintiffs assert claims for deliberate indifference to Ajibade's serious medical needs (by maintaining a pattern and practice of substandard medical conditions

for detainees) and wrongful death.[1]  (Id.)  The Sheriff filed a Motion for Summary Judgment, claiming that the deliberate indifference claim against him fails due to a lack of the necessary evidentiary support, (doc. 193-1, pp. 9–30), and that Plaintiffs' wrongful death claim as well as his request for punitive damages both fail as a matter of law, (id. at pp. 30–31).  Plaintiffs filed a Response in opposition, (doc. 231), and the Sheriff filed a Reply, (doc. 248).

No one disputes the tragedy of Matthew Ajibade's death and the emotional pain that his family has no doubt endured.  However, under Section 1983, Sherriff Wilcher cannot be held legally responsible for that tragedy merely due to his supervisory position.  Rather, he must have personally participated in a deprivation of Ajibade's constitutional rights or have established a policy, practice or custom that led to such a deprivation.  The undisputed evidence in this case establishes that Sheriff Wilcher did neither.  For the following reasons, the Court **GRANTS** Defendant Sheriff John Wilcher's Motion for Summary Judgment.  (Doc. 193.)

## BACKGROUND

### I.     Factual Background

#### A.      Arrest and Detention of Mathew Ajibade

The following facts relevant to the disposition of the Sheriff's Motion are undisputed.

On the evening of January 1, 2015, officers with the Savannah-Chatham Metropolitan Police Department arrested Mathew Ajibade for the battery of his girlfriend and they transported him to the CCDC.  (Doc. 181-19 (Owens Depo.), pp. 9–12, 32; doc. 231-2, pp. 1–3.)[2]  Ajibade

---

[1]  Plaintiffs originally also alleged an assault and battery claim and a 42 U.S.C. § 1983 excessive force claim against the Sheriff, (doc. 21), but the Court granted summary judgment to the Sheriff on those claims and dismissed them in a previous Order, (doc. 164).

[2]  There is evidence that the arresting officers had reason to suspect Ajibade may have had a mental health issue and there is also evidence that they advised the booking officers at the CCDC of that suspicion. (Doc. 181-1, pp. 42, 44, 46; doc. 181-4, p. 20; doc. 181-19, pp. 24–25.)  In their Response brief, Plaintiffs claim that, at the time of his arrival at the CCDC, Ajibade had "multiple mental health diagnoses," yet

2

was initially placed in a holding cell where he remained for several hours.  (Id. at pp. 6–8.)  At or around 11:28 p.m., a CCDC officer retrieved Ajibade from the holding cell and took him into a common area to commence the booking process.  (Id. at pp. 7–8.)  During the booking process, a physical struggle between Ajibade and four officers ensued, and one officer called for back-up assistance.  (CM136_Pre_Booking_#4_1 at 11:28:36 through 11:34:02 PM.)[3]  During the struggle, one officer is believed to have drive-stunned Ajibade with a Taser before Ajibade was able to take the Taser from her, at which point he held the Taser up at the officers.[4]  (Doc. 231-2, pp. 15–17; doc. 181-12 (Johnson Depo.), p. 266.)  During the struggle, one officer was injured and ultimately required medical attention.  (Doc. 181-12 (Johnson Depo.), p. 122.)  Over the next few minutes, multiple officers arrived on scene in response to the call for back-up assistance. (CM136_Pre_Booking_#4_1 at 11:34:02 through 11:37:17 PM.)

Lieutenant Debra Johnson, who was the watch commander that evening, arrived in the booking area around 11:36:45 p.m.  (Id. at 11:36:45 PM.)  At this point, Ajibade was lying face

---

Plaintiffs neglect to point to any evidence as to what those diagnoses were and when and by whom they had been made.  (See Doc. 231-1, p. 11.)

[3]  Plaintiffs submitted, and both parties frequently cited, footage from various cameras positioned around the CCDC.  (See Doc. 239 (Notice of Manual Filing).)  This footage features sound, though it is often muffled and therefore difficult to understand.  The Court has reviewed the footage and relies upon it in conjunction with cited deposition testimony.  Since there are a number of video clips from numerous cameras, the Court will refer to them by file name and cite to the exact time of the footage according to the footage.

[4]  "A '[T]aser' is a non-deadly weapon commonly carried by law enforcement."  Fils v. City of Aventura, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011).  The Taser "administers an electric shock to a suspect," typically by "shooting two small probes into the suspect's body."  Id.  "The probes are connected to the firing mechanism via wires. Once fired, the probes lodge under the suspect's skin and administer an electric shock."  Id.  Tasers can also be used in "drive-stun" mode, however, which means that "the probes are removed from the Taser," Flowers v. City of Melbourne, 557 F. App'x 893, 895 n.4 (11th Cir. 2014) (per curiam), and "the Taser [i]s used like a stun gun—the Taser is pressed directly against the skin and produces a burning sensation."  Mingo v. City of Mobile, Ala., 592 F. App'x 793, 796 n.1 (11th Cir. 2014) (per curiam).  Drive-stun mode "reduces the amount of force employed on a person in close range." Flowers, 557 F. App'x at 895 n.4.  As explained by Plaintiffs' expert, "[T]he difference between the probe and drive-stun is it's pain only.  And drive-stun's a pain component tool . . . ."  (Doc. 181-23 (Root Depo.), p. 15.)

3

down on the floor with approximately seven officers holding and/or hovering over him. (Id. at 11:36:55 PM.) After walking over to observe the huddled mass, Johnson retrieved a nearby Taser and (as shown from the video footage) removed something from it. (Id. at 11:36:56 through 11:37:15 PM.) She then walked back over to the group and placed the Taser onto Ajibade's lower body and told Ajibade that he needed to "calm down and let them put the restraints" on him or he would be drive-stunned. (Id. at 11:37:20 through 11:37:33 PM; doc. 181-12 (Johnson Depo.), pp. 175–76.) In response, Ajibade calmed down and, once hand and leg restraints were secured onto him, Johnson stood back up and removed the Taser from Ajibade's skin. (Doc. 181-12 (Johnson Depo.), p. 176; CM136_Pre_Booking_#4_1 at 11:37:42 PM.) It is undisputed that Johnson did not actually tase (or drive-stun) Ajibade. (Doc. 231-2, p. 19.)

Once Ajibade's hands and feet were restrained, Johnson instructed the officers to take Ajibade to a nearby detox cell and place him in a restraint chair for his safety and the safety of others. (Id.) A group of officers carried Ajibade away from the booking area. (CM136_Pre_Booking_#4_1 at 11:39:17 through 11:39:34 PM.)

It is undisputed that, instead of placing Ajibade in the nearby detox cell as instructed by Johnson, the officers took Ajibade and the restraining chair to a different holding cell. (Doc. 231-2, pp. 19–20.) While the officers were carrying Ajibade to the cell, Corporal Jason Kenny arrived on the scene. (Id. at p. 20.) Multiple officers, including Kenny, went inside the holding cell and participated in the process of placing and securing Ajibade into the restraining chair. (See generally CM117_Female_Holding_#2.) At some point during the process, Kenny requested a Taser, and another officer obtained it from Johnson. (Doc. 181-12 (Johnson Depo.), p. 136.) According to his own testimony, Kenny discharged the Taser once while pointing it at

the ground (as both a means of testing it and as a "show of force" in an effort to gain compliance from Ajibade without actually applying it to him). (Doc. 181-13 (Kenny Depo.), p. 145:12–19). Because Ajibade continued to resist even after the test engagement, Kenny then drive-stunned Ajibade. (Id. at pp. 145:12–25, 147:13–23.) Kenny ultimately drive-stunned Ajibade a total of four times because Ajibade continued to resist officers' efforts to secure him in the restraint chair. (Id. at pp. 145, 148–53, 155, 197–98; doc. 181-20 (Samuel Richardson Depo.), p. 62; doc. 219-1 (Burt Ambrose Examination Under Oath by Plaintiffs), p. 20; doc. 219-2 (David Cody Depo.), pp. 53–54; doc. 114-7 (Mark Capers Depo.), p. 9.) At some point, a spit mask was placed onto Ajibade's face. (Doc. 181-13, pp. 19, 215.)

At 11:47:04 p.m., Johnson returned to the vicinity of the cell, accompanied by Nurse Gregory Brown, whom she had asked to come check Ajibade upon his having finally been fully restrained in the chair. (Doc. 181-12, p. 153; CM117_Female_Holding_#2 at 11:47:04 PM.) Both Johnson and Brown entered the cell, and Kenny remained inside the cell. (CM117_Female_Holding_#2 at 11:47:04 PM; doc. 181-12, p. 154.) Nurse Brown had been present when another officer informed Johnson that Ajibade had been tased during the initial struggle in the booking area. (Doc. 181-12 (Johnson Depo.), pp. 201–02.) Johnson does not recall anyone telling Nurse Brown (or Johnson, for that matter) that Ajibade had been drive-stunned multiple times while being placed in the restraint chair. (Id. at p. 200.) Johnson and Nurse Brown were in the cell for just under a minute. (CM117_Female_Holding_#2 at 11:47:06 through 11:47:57 PM.) While Nurse Brown was performing his check, Johnson conversed with Kenny and she heard Ajibade moaning, in her opinion, "like he was angry" and in a way that indicated to her that "definitely . . . he was coherent." (Doc. 181-12 (Johnson Depo.), p. 205.) Her testimony is that, because she was busy speaking to Kenny, she did not see everything that

Nurse Brown did and she only recalls Nurse Brown saying he was checking Ajibade's legs and hands and watching him actually check Ajibade's hands. (Id. at pp. 197–98.) She also recalls Nurse Brown speaking to Ajibade, though she cannot recall what he said. (Id. at pp. 196–97.) She denies observing any blood on Ajibade at this time. (Id. at p. 198.) After she and Nurse Brown left the cell, Johnson was under the impression that another officer was routinely checking on Ajibade pursuant to policy, and she left the scene to attend to her other duties as watch commander that night. (Id. at pp. 238–40.) At 1:35 a.m., approximately an hour and forty-five minutes after Ajibade was secured in the chair, he was found unresponsive, and he was pronounced dead shortly afterwards. (Doc. 231-2, p. 24.)

**B.    Relationship between the CCDC and Corizon Health, Inc.**

At the time Ajibade was detained at the CCDC, Corizon Health Services, Inc. (hereinafter, "Corizon") was the contracted medical provider at the facility (and was Nurse Brown's employer). Plaintiffs' deliberate indifference claim against the Sheriff relies heavily on the theory that the Sheriff was aware that Corizon "was providing inadequate care, that he allowed Corizon to continue, and that deaths such as [Ajibade's] were a known and obvious consequence of his decision to keep his contractor." (Doc. 231-1, p. 15; see also doc. 21, pp. 16–17.) As a result, the Court must examine and discuss the undisputed evidence specified and provided by the parties in connection with these allegations.

It is undisputed that, in August 2014, a Corizon employee, Ms. Riner, raised concerns to a jail administrator about Corizon. (Doc. 193-1, p. 21; doc. 231-1, p. 3.) While the parties provide varying descriptions of Ms. Riner's concerns, the Sheriff points to evidence—which Plaintiffs have not disputed—that, in response, the Sheriff ordered an investigation regarding the concerns Ms. Riner had presented to the administrator. (Doc. 193-1, pp. 21–22.) The parties

also agree that, on August 26, 2014, several representatives of the CCDC (including the Sheriff and Corrections Compliance Manager Melissa Kohne) and several representatives of Corizon (including Ms. Riner and a Corizon physician) met to discuss Ms. Riner's concerns. (Id. at p. 22.; doc. 231-1, p. 3.) In their Response brief, Plaintiffs present a list detailing nine concerns that they claim were among those discussed at the meeting. (doc. 231-1, pp. 3–4.) Plaintiffs, however, fail to provide any record citations to support this list, and the Sheriff, in his Reply brief, disputes the accuracy of this list. (See Doc. 248, pp. 4–5.) Notably, even if the Court could accept the list without record evidence, it does not include any concerns about mental or physical health examinations of detainees during intake or booking, mental health screenings of detainees in general, examinations of detainees after use of force incidents, examinations of detainees after they are secured in a restraint chair, or Nurse Brown (i.e., any performance issues or concerns about him). (See Doc. 231-1, pp. 3–4.) The Sheriff's brief states that, at the meeting, a Corizon physician "expressed a general concern about the adequacy of the healthcare Corizon provided to the inmates at the CCDC, questioning whether medications were being properly distributed," but he "did not identify a single bad patient outcome that allegedly resulted from the alleged issue with medications." (Doc. 193-1, p. 22.) Moreover, Plaintiffs do not point to any evidence regarding (much less corroborating) the doctor's concerns. The Sheriff also indicates that, at the meeting, the group discussed issues Corizon was having with high staffing turnover and whether a specific Corizon employee was technically qualified to hold her job title. (Id.) In sum, there is no evidence that the meeting involved or included a discussion of any issues resembling or relating to the types of constitutional violations alleged by Plaintiffs in this lawsuit.

The Sheriff additionally points to evidence that, in June or July of 2014, the Medical Association of Georgia ("MAG") audited Corizon's operations at the CCDC and found the facility in compliance with the applicable standards for health services in jails.[5] (See generally Doc. 190-11.)

Perhaps the most frustrating shortcoming by Plaintiffs with regard to record citations to support their allegations of Corizon's inadequacies comes on pages 16 and 17 of their Response brief, where they state the following:

> As evidence that the decision to retain Corizon subjected detainees like Mathew to constitutionally inadequate mental-health and medical care, Plaintiffs tendered the expert reports of Lori Roscoe, Mike Berg, and Mary Perrien. These experts agree that retaining Corizon was problematic for the Sheriff. Plaintiffs' expert, Dr. Roscoe, a former MAG auditor, will testify that Corizon would have flunked an audit if the truth about Corizon's operation had been disclosed to auditors. The June 2015 audit did not affirm Corizon's good medical stewardship—it validated the legitimate concerns of Nurse Riner, Medical Director Pugh, Medical Director Faulks, and others.

(Doc. 231-1, pp. 16–17.) As displayed, Plaintiffs neglect to include a single citation to any part of the record to support these allegations. Not only did Plaintiffs not cite to Dr. Roscoe's report, they apparently failed to include a copy of her report in the record as the Court has been unable to locate it despite a diligent search. And, while Mr. Berg and Ms. Perrien's reports are part of the record, Mr. Berg's is 88 pages long, and Ms. Perrien's two reports total 39 pages in length; the Court declines to search through these reports for support where Plaintiff has failed to provide any citation or quotation.[6] Moreover, Plaintiffs' use of vague terms and phrases such as

---

[5] The Court has reviewed the report and notes that the only apparent concern noted in the audit was that the facility had not met "important standards" for pregnancy counseling, which is not relevant to this case. (Doc. 190-10, p. 27.)

[6] "[J]udges are not like pigs, hunting for truffles buried in briefs," United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991). Likewise, judges "are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce." Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th Cir. 1994).

"retaining Corizon was *problematic* for the Sheriff" and "Corizon would have '*flunked*' the audit," (id. (emphases added)), to describe the experts' purported opinions fails to provide any meaningful evidentiary support for Plaintiffs' legal arguments.  In fact, Plaintiffs fail to actually indicate what was "problematic" about retaining Corizon or what the "truth about Corizon's operation" was that would have provided a basis for Corizon to have theoretically "flunked" a MAG audit.  The Court is unable to discern from these assertions that the alluded-to shortcomings would have in any way been related to the constitutional violations alleged by Plaintiffs here.

Similarly, in the very next paragraph of their Response, Plaintiffs egregiously misconstrue testimony from Ms. Kohne (the CCDC compliance manager) in an effort to provide evidence that the Sheriff was aware of widespread failures by Corizon to provide medical care to detainees and that the Sheriff therefore violated federal law by not terminating Corizon in response.  (Id. at p. 17.)  That paragraph states:

> In the months prior to Mathew's death, the Sheriff, his secretary, the Chief Deputy, jail administrators, majors and captains received phone calls from detainees' family members concerned that Corizon was not providing medical care.  Kohne Dep. 47:3-14, 139:24-140:5.  When asked how many of these calls she personally fielded, Assistant Jail Administrator Melissa Kohne responded, "I could not even guesstimate how many times."  Id. at 139:19-25.  These concerns would later be characterized by private consultants hired by the Sheriff as a recognition that Corizon was not providing a "constitutional level of care."  Doc. 181-15, Kohne Dep. 128:1-9, 129:25-130:3.

(Id.)  The Court has reviewed all of Ms. Kohne's testimony relevant to Plaintiffs' contentions in this paragraph.  First, Plaintiffs misleadingly open the paragraph by saying specifically that "*in the months prior* to [Ajibade's] death," (id. (emphasis added)), the CCDC received certain types of phone calls from inmates' families, yet they go on to quote deposition testimony that was not

---

They need not endeavor to "fish a gold coin from a bucket of mud."  U.S. ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003).

given by Ms. Kohne in the temporal context of the months prior to January 2015.  The testimony Plaintiffs quote was given by Ms. Kohne in the context of how many of these calls she had fielded across the *thirty years* she has worked at the CCDC.  (See Doc. 181-15 (Kohne Depo.), p. 48 ("A. I cannot give you specific.  I have to remind you I have 30 years of doing this and 30 years of individuals calling about medical concerns."); id. at pp. 138–48 ("Q. Earlier you testified that you sometimes received these calls . . . . Q. So about how often do you think you would receive one of those phone calls . . . ?  A.  I could not even guesstimate how many times.").)  Indeed, when asked specifically about the number of such calls she personally received in the period of November 2014 through April 2015, Ms. Kohne testified that she would have received "[v]ery few . . . .  [M]aybe a couple a month."  (Id. at p. 141.)  Moreover, Plaintiffs mischaracterize Ms. Kohne's testimony about these calls.  She did not say she was receiving floods of calls claiming inmates were not receiving medical care.  She testified as follows:

> I think the way you're stating that's not correct.  It might—it might have concerns about just medical care or somebody needed to be seen[,] not—not as far as inadequate medical care.  I received calls with family members or grievances from inmates that want to be seen again by medical and I just made sure that— and I was not the only individual—that somebody from medical went and addressed these concerns.  It wasn't that they were receiving inadequate medical care.  It could be, hey, I need to see the dentist.  Am I on the list?

(Id. at p. 138.)  Notably, Ms. Kohne testified about how she would respond to these calls by checking with the relevant person or department to ensure the family member's concern was addressed.  (Id. at p. 48.)  Plaintiffs have not pointed to any testimony from Ms. Kohne indicating that, in handling these calls, she noticed problems with Corizon's provision of care. (See id. at p. 49:5–11 ("Q.  (By Mr. Kuhlman) Do you recall whether in the time prior to your assuming the official position of assistant jail administrator you had—you were skeptical of the care being provided, the healthcare being provided at the facility? . . . A.  No, I wasn't.  No.").)  Finally, Plaintiffs' final statement, that "[t]hese concerns would later be characterized by private

consultants hired by the Sheriff as a recognition that Corizon was not providing a 'constitutional level of care'" is—not surprisingly—also not supported by the cited record evidence. Plaintiffs first cite page 128, lines 1 through 9, which is the following testimony:

> (The record was read by the reporter as requested.)
> Q. (By Mr. Kuhlman) And the MAG auditors noted that that constitutional level of care was not being met?
> A. No. Not the MAG auditors.
> Q. Did the RJS consultants note that the care was not being up to those, quote, "constitutional levels"?

(Id. at p. 128 (emphasis added).) Plaintiffs omit Ms. Kohne's response of "no" to the question of whether the consultants noted that care was not up to constitutional levels. (Id.) The rest of the testimony cited by Plaintiffs to support their claim that private consultants hired by the Sheriff recognized that Corizon was not providing a "constitutional level of care" provides only the following testimony: "Q. (By Mr. Kuhlman) Does that refresh your memory about the conversation that you and Joe McCutchen had about the sheriff's obligations? A. Yes." (Id. at pp. 129:5 through 130:1–3.) Thus, Ms. Kohne's cited testimony does not provide evidence that Corizon was ever deemed by some entity to not be providing a "constitutional level or care" or to have not been up to constitutional standards.

The only other factual allegations offered by Plaintiffs regarding Corizon's alleged shortcomings are that the Sheriff hired consultants to come and review operations *after Ajibade's death* and that the consultants complained that the concerns they ultimately raised (which Plaintiffs neglect to disclose, much less discuss and provide record citations for) "fell on deaf ears." (Doc. 231-1, p. 18.) (Plaintiffs argue this opinion from the consultants—about their perception of the Sheriff's receptiveness to criticism after Ajibade's death—is evidence upon which an inference can be drawn that the Sheriff had the same "deaf ears," so to speak, prior to Ajibade's death. (Id.)) Plaintiffs also offer a vague reference to a "decision not to train the

officer," but they fail to clarify anything more about what type of training the decision pertained to and which officer(s) should have been trained. (Id.)

Toward the end of their Response, Plaintiffs conclusorily allege that the Sheriff "permitted and condoned violations of policies that were designed to protect inmates like [Ajibade]," but nowhere in the Response do they specify the policies that they claim were permitted to be violated. (Id. at 19.)

## II. Claims against the Sheriff

In a prior Order, the Court granted summary judgment to the Sheriff on two claims alleged against him in Plaintiffs' Amended Complaint. (See Doc. 16.) The remaining claims against the Sheriff are: Count III, a 42 U.S.C. § 1983 claim premised upon the Sheriff's alleged maintenance of a pattern and practice of substandard medical conditions for detainees, which Plaintiffs claim caused violations of Ajibade's constitutional rights, resulting in his suffering and death; and Count V, a claim for wrongful death premised upon the allegations in Count III. (Doc. 21, pp. 14-18, 23–24.) Plaintiffs' Amended Complaint additionally features a claim for punitive damages.

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (emphasis and citation omitted).

**DISCUSSION**

**I.      Section 1983: Deliberate Indifference to Physical and Mental Health Needs**

The Sheriff contends that he is entitled to summary judgment on Count III of Plaintiffs' Amended Complaint, which is the claim pursuant to Section 1983 that he maintained a pattern or practice of substandard medical care which resulted in the failure to provide medical care for Ajibade's serious mental and physical health needs.  (Doc. 193.)  The Sheriff urges that the claim fails due to a lack of evidence.

As a pre-trial detainee at the CCDC, Ajibade's constitutional right to be free from deliberate indifference was guaranteed by the Fourteenth Amendment.  However, the Eleventh Circuit Court of Appeals has "historically treated convicted prisoners' Eighth Amendment claims and pretrial detainees' Fourteenth Amendment claims identically."  White v. Cochran, No. 16-17490-G, 2017 WL 6492004, at * 2 (11th Cir. Nov. 27, 2017).[7]  Thus, a deliberate indifference to medical needs claim under the Fourteenth Amendment mirrors analysis of the Eighth Amendment's proscription against cruel and unusual punishment.   See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The standard for cruel and unusual punishment in the medical care context, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate.  Farmer, 511 U.S. at 828.  However, "not every claim by a prisoner that he

---

[7]  In Kingsley v. Hendrickson, the United States Supreme Court found the "language of the [Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause] differs, and the nature of the claims often differs." ___ U.S. ___, 135 S. Ct. 2466, 2475 (2015) (adopting a different test to evaluate pre-trial detainees' excessive force claims than the test used to evaluate convicted prisoners' excessive force claims).  However, the Eleventh Circuit subsequently determined that "Kingsley is not squarely on point with and does not actually abrogate or directly conflict with precedent outside of the context of an excessive[]force claim."  White, 2017 WL 6492004, at *2 n.1 (citing Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (internal citation and punctuation omitted)).

has not received adequate medical treatment states a violation of the Eighth Amendment." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting <u>Estelle</u>, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Hill v. DeKalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1186 (11th Cir. 1994).

Here, the Sheriff had no direct contact with Ajibade. The basis for Plaintiffs' claim against him is his office's supervisory responsibilities over the jail. Section 1983 liability, however, must be based on something more than a defendant's supervisory position or a theory of respondeat superior. <u>Bryant v. Jones</u>, 575 F.3d 1281, 1299 (11th Cir. 2009); <u>Braddy v. Fla. Dep't of Labor & Emp't Sec.</u>, 133 F.3d 797, 801 (11th Cir. 1998). A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations. <u>Braddy,</u> 133 F.3d at 802. In order to establish that a defendant committed a constitutional violation in his supervisory capacity, a plaintiff must show that the defendant instituted a "custom or policy that results in deliberate indifference to constitutional rights or . . . directed his subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1331 (11th Cir. 2007). "[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." <u>Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown</u>, 520 U.S. 397, 397 (1997).

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." <u>Goebert</u>, 510 F.3d at 1332. "A custom is an unwritten practice that is applied consistently

enough to have the same effect as a policy with the force of law." Id. (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." Depew v. City of St. Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986).

The first basis for summary judgment urged by the Sheriff is that "there is no evidence of a constitutional violation" because "none of the Sheriff's employees were deliberately indifferent to Ajibade's medical needs." (Doc. 193-1, p. 9.) The Court declines to delve into this argument, however, particularly since the Court has ordered co-Defendant Maxine Evans (a CCDC employee) and the Plaintiffs to rebrief the issue of whether Evans is entitled to summary judgment on Plaintiffs' claim that she was deliberately indifferent to Ajibade's serious medical need. As a result, the Court cannot grant summary judgment to the Sheriff on this ground.

Next, the Sheriff argues that the claim against him fails as a matter of law because "there is no evidence of a policy, practice or custom that led to Ajibade's death." (Id. at p. 16.) Specifically, he emphasizes that there is no evidence "(1) Corizon provided constitutionally inadequate medical care to CCDC inmates and detainees; (2) that any alleged constitutionally inadequate medical care Corizon provided was pervasive enough that it constituted a pattern or practice; (3) that the Sheriff was aware of any such pattern or practice on the part of Corizon; (4) that the Sheriff was indifferent to any alleged problems with Corizon's delivery of health care to detainees of which he was aware; or (5) that the injuries and damages Mr. Ajibade allegedly suffered were causally linked to this alleged unofficial pattern or practice." (Id. at p. 20.) In his initial brief, the Sheriff examined and discussed (with ample record cites) Ms. Riner's complaints, how the Sheriff and his staff investigated them, the meetings the Sheriff held with Corizon representatives in response to the complaints and investigation, quarterly performance

reviews the Sheriff's office completed with regard to Corizon, and other topics and allegations that he anticipated Plaintiffs may attempt to rely upon as evidence of systemic deliberate indifference. (Id. at pp. 21–27.) He also emphasized the MAG audit that identified no relevant deficiencies in the care being provided at the CCDC. (Id. at p. 28.)

In response, Plaintiffs argue first that, based on the evidence, the Sheriff's decision to retain Corizon after the meeting concerning Ms. Riner's complaints "amounts to *per se* [Section] 1983 liability" (obviating the need for a showing of deliberate indifference) because the "decision to tolerate Corizon" was an intentional act by the Sheriff that violated constitutionally protected rights. (Doc. 231-1, p. 16 (citing McDowell v. Brown, 392 F.3d 1283, 1291 (11th Cir. 2004) (describing "a scheme whereby a governing body's own intentional acts that violate constitutionally protected rights amount to 'per se' § 1983 liability," and explaining that, "where the municipal action *itself* violates federal law, or directs an employee to do so . . . issues of fault and causation are straightforward, and present no difficult questions") (quotations and alterations omitted)). The Court rejects this argument as Plaintiffs have not pointed to any evidence to support a finding that, by not terminating the CCDC's existing contract with Corizon, the Sheriff committed a violation of constitutional rights. To the contrary, the evidence indicates that, during the six months prior to Ajibade's death, the Sheriff and his staff undertook an investigation into concerns raised by Ms. Riner (the results of which investigation the Sheriff found satisfactory) and he also received the results of an independent audit (by MAG) indicating no reason for serious concern about Corizon's performance. Thus, there is no evidence that the Sheriff's non-act, so to speak, of not terminating the existing contract with Corizon "*itself* violate[d] federal law." Id.; Cf. Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 405–06 (examining Owen v. City of Independence, 445 U.S. 622 (1980) (city council discharged an employee

without notice), and <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981) (city imposed content-based speech regulation, in violation of the First Amendment); <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986) (prosecutor was a "final municipal decisionmaker" who directed deputies to illegally enter plaintiff's business)).

Next, Plaintiffs argue that, even if the Sheriff's conduct constitutes facially valid municipal action, the Sheriff is still subject to liability because there is sufficient evidence that his conduct led to a violation of Ajibade's rights and was taken with deliberate indifference as to its known or obvious consequences (namely, the death of a detainee such as Ajibade). (Doc. 231-1, pp. 17–18 (citing <u>Bd. of Cty. Comm'rs v. Brown</u>, 520 U.S. at 407).) According to Plaintiffs, a jury must decide whether the Sheriff's "failure to implement policies, enforce existing policies, or investigate the allegations against Corizon (all after he had a warning that such actions were necessary) combined to cause an obvious and predictable consequence—the death of [Ajibade]." (<u>Id.</u> (alterations omitted) (quoting <u>Franklin v. Tatum</u>, 627 F. App'x 761, 768 (11th Cir. 2015).) Plaintiffs, however, have not pointed to any policies that the Sheriff allegedly failed to implement or enforce, nor have they pointed to evidence indicating that the Sheriff failed to investigate any allegations about Corizon's performance that are in any way relevant to the alleged deficiencies in how Ajibade was treated. To the contrary, the undisputed evidence shows that an investigation was undertaken in response to Ms. Riner's concerns. Further, even if the Sheriff had not responded to Ms. Riner's concerns, there is no evidence that Ms. Riner raised concerns relevant to this case as she did not highlight any deficiencies similar to those alleged as to Ajibade's care. Plaintiffs have not pointed to anything else that could possibly be construed as a "warning" that should have prompted some other or additional investigation by the Sheriff.[8]

---

[8] Plaintiffs point to Ms. Kohne's testimony which they purport indicates that, after Ajibade's death, the Sheriff hired consultants to review operations, and that the consultants complained that some "concerns"

Later, Plaintiffs similarly argue that the Sheriff's liability is "based on repeated failures to address [Ajibade's] serious needs, 'as well as a culture that permitted and condoned violations of policies that were designed to protect inmates like [Ajibade].'" (Id. at p. 19 (quoting Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 929 (7th Cir. 2004)).) Plaintiffs attempt to analogize their case to Woodward, where the Seventh Circuit affirmed a jury verdict finding that the company providing mental health services at the detention center where the decedent was detained (as well as one of its employees) acted with deliberate indifference to the decedent's health and safety while he was detained there. 368 F.3d at 919–20. In Woodward, the pretrial detainee had been at the facility for 19 days when he committed suicide. Id. The evidence indicated that, from the day he entered the center, he had repeatedly indicated to employees of the company that he was having suicidal thoughts, yet he was not seen by a social worker for seven days and then was not seen by a psychiatrist for another seven days, and he was never placed on suicide watch (nor were any other suicide prevention steps taken). Id. at 923–25. Two days after being seen by a psychiatrist, the detainee committed suicide in his cell. Id. at 925. There was also evidence that various employees with whom he had consulted about his mental health had not been adequately trained (particularly in handling potential suicide risks) and/or did not follow policies and procedures that were in place (particularly in filling out and reviewing mental health intake forms). Id. at 923–25. In affirming the jury verdict, the court relied on the evidence that the company failed to adequately train its employees, that it condoned the practice of its employees not completing its mental health intake forms as well as the social

---

(not identified or discussed in Plaintiffs' Response) that they raised "fell on deaf ears." (Doc. 231-1, p. 18 (citing 181-15 (Kohne Depo.), pp. 129–30).) Not only does this appear to be hearsay, but it is too vague to provide evidence, as Plaintiffs claim, upon which a reasonable jury "could infer that the Sheriff's attitude prior to [Ajibade's] death was the same—or worse," particularly where there is no indication that the consultants' concerns were in any way related to the type of issues that Plaintiffs allege violated Ajibade's constitutional rights. (Id.)

worker's practice of not reviewing intake forms before meeting with detainees, and that it condoned the social worker's apparent resistance to putting inmates on suicide watch. Id. at 927–28. Based on this, the court held that "there was enough evidence for the jury to conclude that [the company's] actual practice (as opposed to its written policy) towards the treatment of its mentally ill inmates was so inadequate that [the company] was on notice at the time [the detainee] was incarcerated that there was a substantial risk that he would be deprived of necessary care in violation of his Eighth Amendment rights." Id. at 927. The court also held that there was a "direct causal link" between these deviations from established policy and the suicide, since following the policies could have prevented him from attempting (or at the very least, successfully committing) suicide. Id. at 928.

> Plaintiffs focus on the portion of Woodward wherein the court stated,
>
> [W]e cannot leave unaddressed [the company's] claim that "the plaintiff's failure to introduce evidence of any suicide at the [facility] besides [the decedent's] dooms plaintiff's efforts to prove a custom or practice." [The company] does not get a "one free suicide" pass. The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. See Bd. of Cty. Comm'rs of Bryan Cty., 520 U.S. at 409. Here, there was a direct link between [the company's] policies and [the detainee's] suicide. That no one in the past committed suicide simply shows that [the company] was fortunate, not that it wasn't deliberately indifferent. Moreover, we note that [the company's] liability is based on much more than a single instance of flawed conduct, such as one poorly trained nurse. It was based on repeated failures to ensure [the detainee's] safety—by [the employee who completed the detainee's mental health intake form], by [the social worked], and by [the psychiatrist]—as well as a culture that permitted and condoned violations of policies that were designed to protect inmates like [the decedent].

Id. at 929. Unlike in Woodward, here there is no evidence that the Sheriff permitted or condoned repeated violations of policies or procedures (or that he permitted or condoned any failure to implement necessary policies) on the part of Corizon or its employees, much less is there evidence providing a "direct causal link" between such policy violations or failures and

Ajibade's death.  Plaintiffs have failed to point to any evidence that Ajibade's death was a "highly predictable consequence" of the Sheriff's failure to act in any way.

"[A] custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.  This requirement of proof prevents the imposition of liability based upon an isolated incident."  Craig v. Floyd Cty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (quotations and citations omitted); see also Denham v. Corizon Health, Inc., 675 F. App'x 935, 944 (11th Cir. 2017) ("Assuming that 'providing inadequate medical care' could be a custom and assuming that the medical care provided to [the detainee] was inadequate, [the detainee] failed to present evidence of other incidents that prove that Corizon had a custom of providing inadequate medical care.").  Thus, Plaintiffs cannot rely solely on what happened to Ajibade in this one incident as sufficient evidence for their deliberate indifference claim against the Sheriff to survive summary judgment, and they fail to point to any other evidence tending to support their claim.  Plaintiffs cannot rely on Ms. Riner's concerns (which have not been shown to have been relevant to the alleged issues with Ajibade's treatment and care by Corizon and which were investigated and addressed by the Sheriff), or on generalized testimony that unidentified family members would sometimes call the CCDC to inquire about various unidentified detainees' medical care, or on a state audit (that identified no issues with Corizon's operations prior to Ajibade's death), or on private consultants (who were hired after Ajibade's death and whose conclusions and suggestions have not been explained to the Court) as sufficient evidence for a jury to find that the Sheriff permitted or condoned some custom or practice of inadequate provision of care by Corizon.  (See Doc. 231-1, p. 19.)  As a result, Plaintiffs have not pointed to evidence upon which a reasonable jury could find deliberate indifference by the Sheriff.

Likewise, Plaintiffs have not pointed to evidence that Ajibade's death was a known or obvious consequence of the Sheriff's alleged tolerance of the unspecified inadequate care. As a result, there is no evidence to support Plaintiffs' Section 1983 deliberate indifference claim against the Sheriff and the Court thus **GRANTS** the Sheriff's Motion for Summary Judgment as to this claim.[9]

## II.     Wrongful Death

In Count Five of the Amended Complaint, Ajibade's parents assert a claim for Wrongful Death against all Defendants, including the Sheriff, pursuant to O.C.G.A. §§ 51-4-1, et seq., based on the allegation that "[a]s a direct and proximate result of all of the Defendants' wrongful acts, Mr. Ajibade died by homicide." (Doc. 21, pp. 23–24.) In their Response in Opposition to the Sheriff's Motion for Summary Judgment, Plaintiffs state more specifically that they alleged the wrongful death claim "pursuant to O.C.G.A. § 51-4-1 against the Sheriff premised upon, *inter alia*, his maintenance of a patter[n] and practice of substandard medical conditions for detainees." (Doc. 231-1, p. 20.)

Recovery under Georgia's Wrongful Death statute is available where the death of a human being results from a crime, or from criminal or other negligence, or from property which has been defectively manufactured. O.C.G.A. § 51-4-1(b). The Court has determined that there is no basis for finding that the Sheriff maintained a pattern or practice of substandard medical conditions for detainees. There being no other remaining claims (much less evidence) of any

---

[9] The Court notes that while Plaintiffs make a vague reference to failure to train, they never specify the basis for such a claim against the Sheriff, nor do they point to any evidence of shortcomings as to training or offer any appreciable argument on the topic. (See Doc. 231-1, p. 18 (where Plaintiffs recite Supreme Court case law on failure to train, but then state only that, "In this case, a reasonable juror could find that inmate deaths were a highly predictable consequence of the Sheriff's failure to adequately supervise his contractor, Corizon, [sic]").) Plaintiffs have not presented any factual theory or argument to support a failure to train claim and have not pointed to any evidence to support such a claim. Thus, to the extent Plaintiffs assert a failure to train claim, the Court finds that the Sheriff is entitled to summary judgment on this theory as well.

other wrongdoing by the Sheriff, there is no basis for Plaintiffs to prevail on their wrongful death claim against him. Accordingly, the Court **GRANTS** Defendant Sheriff John Wilcher's Motion for Summary Judgment as to Plaintiffs' wrongful death claim.

### III. Punitive Damages

In their Reply brief, Plaintiffs concede that the Sheriff is immune from punitive damages and thus entitled to summary judgment dismissing their claim for them. As a result, the Court **GRANTS** summary judgment to the Sheriff on Plaintiffs' claim for punitive damages.

### CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendant Sheriff John Wilcher's Motion for Summary Judgment as to all remaining claims asserted against him by all Plaintiffs. (Doc. 193.) As a result, the Court **DISMISSES WITH PREJUDICE** all claims asserted against Defendant Wilcher and **DISMISSES** Defendant Wilcher from this action. The Court **DIRECTS** the Clerk of Court to **TERMINATE** Defendant John Wilcher as a defendant on the Court's docket.

**SO ORDERED**, this 28th day of March, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA