# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

SOLOMAN OLUDAMISI AJIBADE, as natural parent of Mathew Ajibade; ADENIKE HANNAH AJIBADE, as natural parent of Mathew Ajibade; THE ESTATE OF MATHEW AJIBADE; CHRIS OLADAPO, as executor,

        Plaintiffs,

      v.

JOHN WILCHER, in his official capacity as Chatham County Sheriff; CORIZON HEALTH, INC.; GREGORY BROWN; FREDERICK BURKE; ABRAM BURNS; MARK CAPERS; MAXINE EVANS; ANDREW EVANS-MARTINEZ; PAUL FOLSOME; DEBRA JOHNSON; JASON KENNY; ERIC VINSON,

        Defendants.

CIVIL ACTION NO.: 4:16-cv-82

## O R D E R

Before the Court is Defendant Maxine Evans's Motion for Summary Judgment as to all claims alleged against her by the Plaintiffs. (Doc. 183.) This case arises from the January 2015 death of Mathew Ajibade while in the Chatham County Sheriff's custody at the Chatham County Detention Center ("CCDC"). (Doc. 21.) Ajibade's parents and his estate filed this suit against Defendant Evans, who was a corrections officer at the CCDC, as well as the Sheriff, various other corrections officers, the company supplying health services at the CCDC at the time of Ajibade's death, and a nurse on duty at the time of Ajibade's death. (Id.) Against Evans, Plaintiffs assert claims for assault and battery, violations of constitutional rights pursuant to 42

U.S.C. §1983, and wrongful death. (Id.) Defendant Evans filed a Motion for Summary Judgment, claiming that the assault and battery and constitutional violation claims against her lack the necessary evidentiary support and/or are barred by qualified and official immunity and that the wrongful death claim fails as a matter of law. (Doc. 183.) Plaintiffs filed a Response in opposition, (doc. 229). For the following reasons, the Court **GRANTS in part** Defendant Evans's Motion for Summary Judgment. (Doc. 183.) As explained below, the Court reserves ruling on the Motion for Summary Judgment as to Plaintiffs' Section 1983 claim for deliberate indifference to a serious medical need and their wrongful death claim until the parties provide supplemental briefing by the deadlines set forth in this Order.

## BACKGROUND

### I.     Failure to Comply with Applicable Rules

Local Rule 56.1 provides that, "[u]pon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in addition to the brief, there shall be annexed to the motion a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof." S.D. Ga. L.R. 56.1. The rule also requires that "[e]ach statement of material fact shall be supported by a citation to the record." Id. Here, Defendant Evans failed to file a separate Statement of Material Facts as required by Rule 56.1, though she did include a Statement of Facts section within the brief in support of her Motion for Summary Judgment. (See Doc. 183.) To their credit, Plaintiffs separated Evans's Statement of Facts section into a series of numbered paragraphs and provided a response to each one, thereby ensuring they did not run afoul of Local Rule 56.1's provision that "[a]ll material facts set forth in the statement required to be served by

the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party." (See Doc. 229-2.)

The far more concerning deficiency, however, is the quality of both parties' factual assertions and record citations (or lack thereof) in their briefs. Several of Evans's co-Defendants (who are not represented by the same attorney as Evans) have filed separate summary judgment motions. Evans's brief is, in many respects, almost identical to the briefs filed by co-Defendants Debra Johnson and Andreux Evans-Martinez (hereinafter, "Martinez") in support of their summary judgment motions. Generally speaking, counsel for co-defendants in a case are free to coordinate their filings and arguments that they will make to the Court. It certainly aids judicial efficiency when co-defendants in a case agree upon and present statements of fact and arguments (based on those facts) that are consistent (and are therefore subject to consistent responses from plaintiff's counsel). The problem here, however, is that counsel for Evans did a slapdash job of converting the brief that had apparently been drafted for Martinez's Motion for Summary Judgment so that it would apply effectively to Defendant Evans. The "Statement of Facts" section of Evans's brief contains just three sentences that relate directly to Evans: (1) "As all of this was happening, other officers, including Maxine Evans, were arriving on the scene." (Doc. 183-1, p. 7 (no record citations provided).) (2) "Maxine Evans, who was assisting the injured Rowland, played no role in carrying Ajibade to his cell." (Id. (no record citations provided).) (3) "Evans, who never entered the cell, and [sic] was not present outside it the [sic] time of placement." (Id. at p. 8 (no record citations provided).)[1] While the brief does feature a smattering of additional factual assertions concerning Evans in its "Argument and Citation of Authority" section, those assertions either fail to include *any* record citations or—most

---

[1] In their Response, Plaintiffs explicitly admit each of these three statements of fact. (Doc. 229-2, pp. 19–20, 23.)

embarrassingly for Evans's counsel—still feature the citations to *Martinez's* deposition testimony regarding his own conduct. (Compare, e.g., doc. 183-1 (Evans Brief), p. 12 ("It is undisputed that Maxine Evans did not encounter Ajibade until after he stopped fighting Officers Richardson, Capers, Rowland and Vinson and after Ajibade was being restrained with wrist and ankle restraints. (Ex. ___, Martinez depo., p. 35; ex. __, CM 136 at 11:37:17).") with doc. 192-1 (Martinez Brief), p. 13 ("It is undisputed that Martinez did not encounter Ajibade until after he stopped fighting Officers Richardson, Capers, Rowland and Vinson and after Ajibade was being restrained with wrist and ankle restraints. (Doc. 181-16, Martinez depo., p. 35; doc. 181-25, CM 136 at 11:37:17).").)[2]

Plaintiffs' briefing, however, is no better. While they do provide record citations in their own "Statement of Undisputed Material Facts" document, (doc. 229-2), their brief features several material factual assertions that do not include a record cite. (See, e.g., doc. 229-1, p. 5 ("In the meantime, deputies were charged with checking Mathew's physical condition every 15 minutes.") (no record citations provided).) More troubling are inconsistent positions taken within Plaintiff's filings. For example, Plaintiffs admit Evans's averment that she "never entered the cell, and was not present outside it [sic] the time of [Ajibade's] placement" (presumably, into the chair), (doc. 229-2, p. 23), and they never point to any evidence that Evans was otherwise nearby or in the vicinity of the cell. Nonetheless, Plaintiffs proceed, at multiple points of their "Argument and Citation to Authority" section, to make arguments that require such evidence. For instance, they argue that a reasonable officer in Evans's position "could find that Mathew was screaming because he was being tased," yet they cite to no evidence that Evans (whom they

---

[2] The "CM 136" citations are to portions of video footage from various cameras at the CCDC. Evans's brief, however, does not point out, or otherwise provide a way for the Court to determine, which person shown in the various video footage is her. Thus, these citations are of no assistance to the Court.

have admitted was not in the cell or outside of it) did hear or should have heard Ajibade screaming, (doc. 229-1, p. 15).[3]  Perhaps most egregiously, later in their brief, Plaintiffs boldly assert:

> Evans was aware that Mathew was in physical pain and had been moaning since being placed in the restraint chair.  Evans was present in the holding cell area for a portion of time after the use of the taser, heard him moaning, and made no attempt to check on him.

(Id. at p. 19.)  Plaintiffs fail to provide a single record citation to support these critical factual allegations, part of which seem to be in conflict with their admission that Evans was not in the cell or outside of it at some point relative to when Ajibade was placed in the chair.  Similarly, on the next page of their brief, Plaintiffs assert that "Evans was aware that Mathew had been tased four times," (id. at p. 20), yet they cite no record evidence to support such a claim.[4]

In light of the bevy of glaring deficiencies and self-contradictory allegations and arguments contained in both Evans's initial Brief and Plaintiffs' Response, the Court declines at this time to rule on Evans's Motion for Summary Judgment as to Plaintiffs' Section 1983 claim against her for deliberate indifference to a serious medical need or Plaintiffs' wrongful death claim (as its viability depends on the success of the deliberate indifference claim).  The Court **ORDERS** Defendant Evans to file a supplemental brief by **April 26, 2019**.  In the supplemental brief, Defendant Evans shall provide record citations to support all material factual allegations she offers to support her request for summary judgment on Count 2 of Plaintiffs' Amended

---

[3]  Similarly, on one page of their brief, Plaintiffs claim that Evans "failed to supervise her subordinates who were using excessive force," (id. at p.12), and then, confusingly, five pages later, they claim she "supervised use of the taser," (id. at p. 17).  These contradictory allegations are even more confusing because at no point in their filings do Plaintiffs cite to any part of the record to support the averment that she was a supervisor or was involved in supervising the use of a Taser.

[4]  Frankly, the Court is baffled by the fact that Evans did not file a reply, as she was entitled to do, in order to respond to the host of unsupported and/or seemingly contradictory factual allegations and arguments presented by Plaintiffs in their Response.

Complaint ("Deliberate Indifference to Serious Physical and Mental Health Needs"). Within **fourteen (14) days** after Evans's supplemental brief is filed, Plaintiffs shall file a response thereto, which likewise shall include record citations to support all material factual allegations or disputes as to any of Evans's factual allegations. The Court will not consider any legal arguments (in either brief) that are not based upon specified facts supported by a citation to the record.[5] Defendant Evans must file any reply within **fourteen (14) days** of Plaintiffs' response brief.

Plaintiffs have conceded in their Response that Defendant Evans is entitled to summary judgment on their assault and battery claim (Count 6) against her. (Doc. 229-1, p. 21.) Accordingly, the Court **GRANTS** Defendant Evans's Motion for Summary Judgment as to that claim. The Court proceeds to consider the Motion for Summary Judgment as it pertains to the Section 1983 claim for use of excessive force, as this claim is amendable to summary judgment without the need for the Court to consider the deficient and self-contradictory factual allegations and arguments discussed above.

---

[5] Defendant Evans was deposed, and Plaintiffs filed a copy of her deposition with the Court. Yet, neither her own Statement of Material Facts and Brief nor those of Plaintiffs included a single reference or citation to the transcript of her deposition. The Court declines to bear the parties' burdens of sifting through her 170-page deposition transcript to find potential support for their factual allegations. See Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statements of fact."). "[A]ppellate judges 'are not like pigs, hunting for truffles buried in briefs.' Likewise, district court judges are not required to ferret out delectable facts buried in a massive record, like the one in this case." Chavez v. Sec'y Fl. Dept. of Corrs., 647 F.3d 1057, 1061 (11th Cir. 2011) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)); see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

## II. Relevant Facts to Which There Is No Dispute

The following facts relevant to the disposition of Defendant Evans's Motion for Summary Judgment as to Section 1983 Use of Excessive Force claim against her are not in dispute.[6]

On the evening of January 1, 2015, officers with the Savannah-Chatham Metropolitan Police Department arrested Mathew Ajibade for the battery of his girlfriend and transported him to the CCDC. (Doc. 181-19 (Owens Depo.), pp. 9–12, 32; doc. 229-2, pp. 2–4.) Ajibade was initially placed in a holding cell where he remained for several hours. (Doc. 229-2, pp. 7–8.) At or around 11:28 p.m., a CCDC officer retrieved Ajibade from the holding cell and took him into a common area to commence the booking process. (Id.) During that process, a physical struggle between Ajibade and four officers ensued, and one officer called for back-up assistance. (CM136_Pre_Booking_#4_1 at 11:28:36 through 11:34:02 PM.)[7] During the struggle, one officer is believed to have drive-stunned Ajibade with a Taser before Ajibade was able to take the Taser from her, at which point he held the Taser up at the officers.[8] (Doc. 229-2, pp. 16–17;

---

[6] For purposes of consistency, the Court recites essentially the same statement of general facts that it included in its Order on Defendants Johnson and Martinez's Motions for Summary Judgment. The Court has added in the three undisputed statements of fact specific to Evans that—as mentioned in the previous section of this Order—Evans asserted in her Statement of Facts and Plaintiffs specifically admitted in their Response thereto.

[7] Plaintiffs submitted, and both parties frequently cited, footage from various cameras positioned around the CCDC. (See Doc. 239 (Notice of Manual Filing).) This footage features sound, though it is often muffled and therefore difficult to understand. The Court has reviewed the footage and relies upon it in conjunction with various parties' and witnesses' deposition transcripts. Since there are a number of video clips from several cameras, the Court will refer to the clips by file name and cite to the exact time of the footage according to the footage.

[8] "A '[T]aser' is a non-deadly weapon commonly carried by law enforcement." Fils v. City of Aventura, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011). The Taser "administers an electric shock to a suspect," typically by "shooting two small probes into the suspect's body." Id. "The probes are connected to the firing mechanism via wires. Once fired, the probes lodge under the suspect's skin and administer an electric shock." Id. Tasers can also be used in "drive-stun" mode, however, which means that "the probes are removed from the Taser," Flowers v. City of Melbourne, 557 Fed. Appx. 893, 895 n.4 (11th

doc. 181-12 (Johnson Depo.), p. 266.) One officer was injured during the struggle and ultimately required medical attention. (Doc. 181-12, p. 122.) Over the next few minutes, multiple officers arrived on scene in response to the call for back-up assistance. (CM136_Pre_Booking_#4_1 at 11:34:02 through 11:37:17 PM.)

Lieutenant Debra Johnson, who was the watch commander that evening, arrived in the booking area around 11:36:45 PM. (Id. at 11:36:45 PM.) At this point, Ajibade was lying face down on the floor with approximately seven officers holding and/or hovering over him. (Id. at 11:36:55 PM.) After walking over to observe the huddled mass, Johnson retrieved a nearby Taser and (as shown from the video footage) removed something from it. (Id. at 11:36:56 PM through 11:37:15 PM.) She then walked back over to the group and placed the Taser onto Ajibade's lower body and announced to Ajibade that he needed to "calm down and let them put the restraints" on him or he would be drive-stunned. (Id. at 11:37:20 through 11:37:33 PM; doc. 181-12 (Johnson Depo.), pp. 175–76.) In response, Ajibade calmed down and, once hand and leg restraints were secured onto him, Lieutenant Johnson stood back up and removed the Taser from Ajibade's skin. (Doc. 181-12, p. 176; CM136_Pre_Booking_#4_1 at 11:37:42 PM.) It is undisputed that Johnson did not actually tase (or drive-stun) Ajibade. (Doc. 229-2, p. 19.)

Defendant Evans arrived in the booking area at some point while the officers were working to restrain Ajibade's hands and feet. (Id. at pp. 19–20.) After she arrived, Evans assisted with the injured officer. (Id. at p. 20.) Once Ajibade's hands and feet were restrained, Johnson instructed the officers to take Ajibade to a nearby detox cell and place him in a restraint

---

Cir. 2014) (per curiam), and "the Taser [i]s used like a stun gun—the Taser is pressed directly against the skin and produces a burning sensation." Mingo v. City of Mobile, Ala., 592 F. App'x 793, 796 n.1 (11th Cir. 2014) (per curiam). Drive-stun mode "reduces the amount of force employed on a person in close range." Flowers, 557 F. App'x at 895 n.4. As explained by Plaintiffs' expert, "[T]he difference between the probe and drive-stun is it's pain only. And drive-stun's a pain component tool . . . ." (Doc. 181-23 (Root Depo.), p. 15.)

chair for his safety and the safety of others.  (Id.)  A group of officers then carried Ajibade away

from the booking area.  (CM136_Pre_Booking_#4_1 at 11:39:17 through 11:39:34 PM.)  It is

undisputed that Defendant Evans played no role in carrying Ajibade to a cell.  (Doc. 229-2, p.

20.)

It is undisputed that, instead of placing Ajibade in the nearby detox cell, the officers took

Ajibade and the restraining chair to a different holding cell.  (Id.)  While the officers were

carrying Ajibade to the cell, Corporal Jason Kenny arrived on the scene.  (Id. at p. 21.)

When the restraining chair was placed inside the cell, it was positioned so that it faced the

back wall, with the back of the chair facing toward the door.  (Doc. 181-16 (Martinez Depo.), pp.

55:23–25, 56:1–5.)  Thus, when Ajibade was placed into the chair, his back was to the doorway

and his face was not visible to those looking in from outside the cell door.  (Id.)  Multiple

officers, including Corporal Kenny, went into the cell and participated in the process of placing

and securing Ajibade into the restraining chair.  (See generally CM117 Female Holding #2.)

Pursuant to Plaintiffs' Statement of Undisputed Facts, Plaintiffs admit that Defendant Evans

"never entered the cell, and was not present outside it [sic] the time of placement."  (Doc. 229-2,

p. 23.)

Corporal Kenny requested a Taser, and another officer obtained it from Johnson.  (Doc.

181-12 (Johnson Depo.), p. 136.)  According to his own testimony, Corporal Kenny discharged

the Taser once while pointing it at the ground; this was done as both a means of testing it and as

a "show of force" in an effort to gain compliance from Ajibade.  (Doc. 181-13 (Kenny Depo.), p.

145:12–19).  Because Ajibade continued to resist after the test engagement, Corporal Kenny then

drive-stunned Ajibade, though there is no evidence regarding how much time passed between the

test engagement and the initial drive-stun.  (Id. at pp. 145:12–25, 147:13–23.)  According to

Corporal Kenny, Ajibade screamed after the first drive-stun and Corporal Kenny waited "for a second" to see if Ajibade thereafter complied with the commands to sit down. (Id. at p. 149:4–9.) When Ajibade continued "trying to come back up," Corporal Kenny told him to stop resisting and then drive-stunned him a second time. (Id. at pp. 150:20–25, 151:1.) Corporal Kenny testified that he drive-stunned Ajibade a total of four times, that three of the drive stuns lasted fewer than five seconds and one lasted five full seconds, and that he waited ten seconds or less between each drive stun. (Id. at pp. 148:6–18, 153:5–16, 155:5–13, 177:7–14.) He also testified that Ajibade was screaming during this process. (Id. at p. 152:24–25.) After the fourth drive-stun, Ajibade complied with the officer's command to sit down and was then secured into the chair. (Id. at pp. 197:1–5, 198:12–18.)

At some point, a spit mask was placed onto Ajibade's face. (Id. at pp. 19, 215.) Once he was secured in the restraint chair, Lieutenant Johnson and Nurse Gregory Brown went inside the cell for about 51 seconds. (CM117_Female_Holding_#2 at 11:46:59 through 11:47:58 PM; Doc. 181-12 (Johnson Depo.), pp. 194–206.) An officer turned the restraint chair around so that Ajibade faced the door. (Doc. 181-12 (Johnson Depo.), p. 154.) After they exited the cell, the door to the cell was closed. (CM117_Female_Holding_#2 at 11:47:58 through 11:48:30 PM.) At 1:35 a.m., approximately an hour and forty-five minutes after Ajibade was secured in the chair, he was found unresponsive, and he was pronounced dead shortly afterwards. (Doc. 229-2, p. 24.)

## III.    Issues Regarding Restraint and Resistance

Plaintiffs focus much of their attention on proving, via record citations, that Ajibade's hands and legs were cuffed and shackled (respectively) when the officers were attempting to secure him in the restraint chair. Defendant Evans does not appear to dispute this fact. Rather,

the relevant dispute, as discussed in greater detail in later sections of this Order, is whether Ajibade, despite being cuffed and in leg shackles, was resisting the officers as they attempted to secure him in the chair. Many of Plaintiffs' citations provide direct evidence that Ajibade was resisting officers during this point in time.

For instance, Plaintiffs frequently cite to Officer Ambrose's Examination Under Oath,[9] which does discuss how Ajibade's hands were cuffed behind his back and his legs were shackled. (Doc. 219-1, pp. 15, 18.) Notably, however, the cited portions of the Examination also indicate that Ajibade was actively resisting officers' efforts to secure him in the chair. Though he was initially outside of the cell, Ambrose states he heard a man in the cell yelling, "I don't want to be here. Let me go." (Id. at pp. 15–16.) Then Ambrose heard someone else in the cell say, "[C]alm down, calm down. Quit kicking at me." (Id. at p. 15.) When he looked inside the cell, Ambrose saw officers placing Ajibade—whose hands were cuffed behind his back—into the chair, and he observed Ajibade—whom he described as "seem[ing] really upset"—"screaming and yelling" and "thrashing about." (Id. at pp. 16–17.) At some point, Ambrose was told to come into the cell, at which point he observed that Ajibade "kept kicking" and "trying to squirm." (Id. at p. 19.) He explained that Ajibade's "feet were cuffed, but they weren't . . . strapped down to the chair yet." (Id.) Thereafter, Ajibade "was screaming and yelling" and "kicking his feet." (Id. at p. 21.) Another officer came in and "tied [Ajibade's] ankles to the chair" but "[h]e kept kicking." (Id.) He heard Corporal Kenny say, "stop kicking, stop kicking at me," and then saw Kenny grab the Taser and turn the light on. (Id. at p. 21.) Ambrose then heard Kenny say, once again, "stop kicking towards me," at which point Ambrose (who was standing behind Ajibade) observed Ajibade "flailing a little bit" and "moving his feet around and

---

[9] This Examination Under Oath was administered by Plaintiffs' counsel and no counsel for any Defendant was present for purposes of cross-examination. (Doc. 219-1.)

screaming." (<u>Id.</u> at pp. 21–22.) Ambrose then observed Corporal Kenny take the Taser, place it on Ajibade's right thigh, and drive-stun Ajibade. (<u>Id.</u> at p. 22.) According to Ambrose, Ajibade started screaming and Ambrose heard Kenny say, "Stop kicking, you're going to get it again." (<u>Id.</u>) Ambrose did not testify about any additional uses of the Taser and stated that he then "slowly backed out of the room" and heard people calling for the nurse. (<u>Id.</u>) Later in the Examination Ambrose explained that, when Corporal Kenny discharged the Taser the first time, Ajibade was "kicking his legs," even with his "leg chains" on. (<u>Id.</u> at pp. 24–25.) Ambrose also made clear that he only witnessed Ajibade being drive-stunned one time. (<u>Id.</u> at p. 32.)

Plaintiffs also cite to one page of Officer David Cody's deposition transcript to support the assertion that Ajibade "never struck out at anyone while he was being placed in the restraint chair," (doc. 229-2, p. 22), but Cody's testimony actually indicates that he was not able to see Ajibade's legs and was unsure of what Ajibade may have been doing:

> A. . . . And at that point the restraint chair came in and we tried to set him down.
> Q. Okay. And then what happened?
> A. He was resisting.
> Q. Okay. When you say "he was resisting," what do you mean?
> A. He was actively trying to not be placed into the restraint chair.
> Q. You mean he was stiffening his body?
> A. Yes, sir.
> Q. Okay. He was—at no time did he strike anybody because he has his hands behind his back; correct?
> A. That's correct.
> Q. Okay. And his legs are shackled; right?
> A. That is correct.
> Q. He didn't kick anybody; correct?
> A. *I don't know what he did. I was on his left shoulder, so I don't know what his legs were doing.*
> Q. Well, you didn't see him kick anybody, did you?
> A. That's correct.
> Q. Okay. So when you say "resisting," you mean he didn't—he was stiffening his body so he wouldn't be placed in the restraint chair; correct?
> A. Yes. And he was kind of moving, kind of see-sawing, I suppose.
> Q. Okay. So moving his shoulders?
> A. Uh-huh.

(Doc. 219-2, pp. 53–54 (emphasis supplied).)

Plaintiffs also cite to the deposition testimony of Officer Capers to support their assertion that Ajibade was "at least partially restrained when Kenny applied the Taser to [Ajibade's] groin area—four separate times." (Doc. 229-2, p. 28 (citing doc. 181-5 (Capers Depo.), pp. 103–04).) In the cited pages of his deposition, Officer Capers specifically testified as follows:

> Q. And tell me what you remember about what happened when you went into the cell.
> A. They put him in a restraint chair. They sat him in a restraint chair and he was kicking. At one point Richardson or somebody asked for Flexi Cuffs. We bring the Flexi Cuffs in. I grabbed the Flexi Cuffs and I secured—because I was down by his feet. I secured the Flexi Cuffs, the chain on the leg irons to the designated area on the restraint chair.
> Q. So his legs would have been attached to the restraint chair, correct?
> A. Yes.
> Q. Basically his leg irons are attached to the restraint chair, right?
> A. *The chain.*
> Q. The chain in it, right?
> A. Yes.
> Q. So he's got *limited* mobility, correct?
> A. Yes.
> Q. So he can't kick, correct?
> A. Yes.
> Q. Okay. And every time that he was inside that cell he had the leg irons on even before you got into the cell and the hands cuffed behind his back, correct?
> A. Yes.

(Doc. 181-5, pp. 103:9–104:10 (emphases added).) This testimony establishes only that the chain connecting the shackles on each of Ajibade's legs was secured to the chair by use of a Flexi-Cuff, not that each of his feet or ankles were directly secured to the chair. Additionally, this testimony does not establish when the chain was secured in relation to when Corporal Kenny drive-stunned Ajibade.

Finally, the Court notes testimony from Corporal Kenny regarding the safety threats posed by Ajibade notwithstanding the facts that he was cuffed and in leg restraints. Kenny explained that the person in the chair can still use their knees to hit people (even if they are

unable to kick due to leg chains), can spit bodily fluids from their mouth, can use their teeth to bite if an officer comes close enough, and can head-butt an officer. (Doc. 181-13, pp. 142:4–25, 143:8–13, 151:6–10.)[10]

In sum, there is ample evidence in the record that Ajibade was resisting officers' efforts to secure him in the restraint chair, and Plaintiffs have not pointed to any evidence contradicting this evidence. Even viewing the record in the light most favorable to Plaintiffs, they have not presented evidence from which a jury could conclude that Ajibade was not resisting at the times he was drive-stunned or that he had ceased resisting at some point prior to the final drive-stun.

## IV. Claims against Evans

For the reasons set forth at the beginning of this Order, the Court only concerns itself with the claim against Defendant Evans pursuant to 42 U.S.C. § 1983 for use of excessive force.[11] (See Doc. 21, pp. 10–12.) Defendant Evans moves for summary judgment on this claim, arguing not only that the claim is barred by qualified immunity but also that it fails due to an insufficiency of evidence to support it. (Doc. 183-1.) Plaintiffs, on the other hand, urge that summary judgment should not be entered as to this claim because there are genuine disputes regarding material facts and because Defendant Evans is not entitled to qualified immunity.

---

[10] In response to other Defendants' Motions for Summary Judgment in this case, Plaintiffs contend that video from the Taser camera "shows[ Ajibade] was not actively struggling during any of the four instances when the officers used the [T]aser while in the holding cell." (See Doc. 233-1, p. 18.) Although the Plaintiffs failed to direct the Court to the specific Taser videos that they contend represent the four drive-stuns in the holding cell, the Court viewed each of the Taser videos that were filed in this case and found that they do not depict clear evidence on the issue of whether Ajibade was "actively struggling" as Plaintiffs contend. The videos are erratic, are mostly comprised of closeup images of what is presumed to be Ajibade's skin, the sound is muffled, and the majority of the clips are too short in length to show anything of substance. As a result, these videos do not provide a basis for a jury to find that Ajibade was not resisting officers as they tried to secure him into the restraint chair.

[11] Plaintiffs originally sought recovery against Defendant Evans in both her individual and official capacities, (doc. 21, p. 5), and at the time his summary judgment motion was filed and briefed the claims remained pending against her in both capacities. Since then, however, the claims against her in her *official* capacity have been dismissed by agreement of the parties and Order of the Court. (Doc. 269-1, p.2).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d

611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Id.</u> (emphasis and citation omitted).

## DISCUSSION

Count One of Plaintiffs' Amended Complaint seeks to hold Defendant Evans liable pursuant to 42 U.S.C. § 1983 for the use of excessive force on Ajibade. (Doc. 21, pp. 10–12.) In their Response to Defendant Evans's Motion for Summary Judgment, Plaintiffs never assert that Evans used any direct force on Ajibade, and instead assert that she should be held liable for "standing by while her fellow officers deployed the [T]aser" because, in doing so, she "failed to intervene to prevent the use of excessive force."[12] (Doc. 229-1, pp. 7, 12.)

Despite the poor briefing and dearth of record citations by both Defendant Evans and Plaintiffs, the Court **GRANTS** summary judgment to Defendant Evans as to the claim, in Count 1 of the Amended Complaint, that she failed to intervene on the use of excessive force because, as explained below, she is entitled to qualified immunity.

---

[12] Plaintiffs also claim Defendant Evans violated Ajibade's right to be free from the use of excessive force when she "failed to supervise her subordinates who *were* using excessive force." (Doc. 229-1, p. 12.) Even assuming Plaintiffs could present evidence that Defendant Evans was a supervisor (which Plaintiffs have failed to do), the Court declines to consider any such claim of supervisory liability against Defendant Evans in connection with the Section 1983 excessive force claim. Plaintiffs failed to properly plead that claim. The Magistrate Judge already rejected an attempt by Plaintiffs to add supervisory liability claims through an amendment to their Amended Complaint. (Doc. 215.) In that Order, the Magistrate Judge explained that his denial of leave to amend was based in part upon the fact that Defendants "have gone the entire course of the case not specifically preparing to defend against a supervisory liability claim" as well as the fact that "Plaintiffs' other § 1983 claims simply do not *per se* create supervisory liability claims against defendants, regardless of whether they think they should." (<u>Id.</u> at p. 5.)

"If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998) (citing and quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir.1986)); see also Johnson v. White, 725 Fed. Appx. 868, 878 (11th Cir. 2018) ("Even if an officer personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take 'reasonable steps to protect the victim of another officer's use of excessive force.'") (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1330–31 (11th Cir. 2008)).  However, the officer must have both the opportunity to intervene and be in a position to intervene and yet fail to do so. Hadley, 526 F.3d at 1331; see also Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010) (explaining that a direct failure to intervene claim "requir[es] the allegations to include facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct").  When an event occurs so quickly that the officer cannot intervene, an officer is not liable for another's constitutional violation.  Fils, 647 F.3d at 1290 n.21 (citing Brown v. City of Huntsville, Ala., 608 F.3d 724, 740 n.25 (11th Cir. 2010)).

Even if there is evidence indicating an officer failed to intervene in the use of excessive force,[13] however, the officer still may be protected from liability on such a claim by qualified

---

[13]  The Court notes that neither party has pointed to any record evidence affirmatively indicating that Evans was—or was not—in a position to intervene and did—or did not—have an opportunity to intervene when Ajibade was being drive-stunned in the holding cell.  Plaintiffs admit that Defendant Evans did not help carry Ajibade to the holding cell, never entered the cell, and "was not present outside of it [sic] the time of placement," which the Court assumes (but cannot be sure) means she was not present outside of the cell *at* the time the other officers were attempting to secure Ajibade into the restraint chair.  (Doc. 229-2, pp. 19–20, 23); compare id. at p. 19 ("Evans was present in the holding cell area for a portion of time *after* the use of the taser. . . ." (emphasis added).)  Plaintiffs' admission of that (poorly worded) statement, however, does not establish that Defendant Evans was not present in the vicinity of the holding cell when Ajibade was drive-stunned.  On the other hand, Plaintiffs' conclusory argument that a reasonable officer in Evans's circumstances "could find that [Ajibade] was screaming because he was being tased" does not indicate that Evans *was* in the area because it is not premised upon any record citation indicating that Evans actually did hear or should have been able to hear Ajibade screaming while

immunity. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)) (internal quotations and alteration omitted). To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley v. Palm Beach Cnty. Sheriff Dept., 783 F.3d 1347, 1352 (11th Cir. 2015). Here, no one disputes that Defendant Evans was performing discretionary duties at the time in question. (Doc. 229-1, p. 8.) Therefore, she may properly assert the defense and the question becomes whether it bars

---

he was in the holding cell. (Doc. 229-1, p. 15.) Likewise, Plaintiffs' conclusory assertion that a reasonable officer "would at the very least have *returned to the holding cell area* to ensure [Ajibade] was not being tased unnecessarily," does not include a citation to any evidence showing exactly where Evans—who, from the way this assertion reads, had left the holding cell area—was located in relation to the holding cell at this critical point in time. (Id. at p. 15.) In light of the poorly worded allegations and the extreme inadequacy of the record citations with regard to Defendant Evans's knowledge and whereabouts at the time of the drive-stuns in the holding cell (a shortcoming attributable to both Plaintiffs and Defendant Evans), the Court declines to make a merits-based summary judgment determination on this issue.

the claim against her for failure to intervene. The burden now shifts to the Plaintiffs to show

qualified immunity is not appropriate. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Court must grant qualified immunity unless the facts taken in the light most

favorable to Plaintiffs show (1) that there was a violation of the Constitution and (2) that the

illegality of Evans's actions was clearly established at the time of the incident. Hoyt, 672 F.3d at

977. The Court has discretion in deciding which of those two prongs to address first. Pearson v.

Callahan, 555 U.S. 223, 236 (2009). Because it cannot be said that the illegality of Evans's

conduct was clearly known at the time of the incident underlying this lawsuit, the Court declines

to decide whether there was a constitutional violation. Id.

"[T]he touchstone of qualified immunity is notice." Bussey-Morice v. Gomez, 587 F.

App'x 621, 627 (11th Cir. 2014) (citing Holmes, 321 F.3d at 1078). The violation of a

constitutional right is clearly established if a reasonable official would understand that his

conduct violates that right. See Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en

banc). As the Eleventh Circuit Court of Appeals has explained, there are

> two methods to determine whether a reasonable official would understand that his
> conduct violates a constitutional right. The first requires the court to examine
> whether decisions of the United States Supreme Court, the United States Court of
> Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here,
> the Supreme Court of [Georgia]) [have] clearly establish[ed] the law. This
> method does not require [e]xact factual identity with a previously decided case
> but rather demands that the unlawfulness of the conduct must be apparent from
> the pre-existing law.
>
> The second approach asks whether the officer's conduct lies so obviously at the
> very core of what the Fourth Amendment prohibits that the unlawfulness of the
> conduct was readily apparent to [the officer], notwithstanding the lack of fact-
> specific case law on point. Even in the absence of caselaw holding the specific
> conduct unlawful, a general constitutional rule already identified in the decisional
> law may apply with obvious clarity to the specific conduct in question. But this
> principle, which offers a narrow exception to the general rule that only factually
> specific analogous caselaw can clearly establish a constitutional violation, is
> reserved for rare cases.

Moore v. Pederson, 806 F.3d 1036, 1047 (11th Cir. 2015) (quotations and citation omitted).

In their Response brief, Plaintiffs emphasize that they are not required to provide "earlier cases involving 'fundamentally similar' facts," but only have to show that the law that was in effect at the time of the incident gave Evans "fair warning" that her conduct would be unconstitutional. (Doc. 229-1, p. 16 (quoting Hope, 536 U.S. at 741).) They cite three cases as having "repeatedly . . . answered in the negative" the "question whether a [T]aser may be used against a compliant detainee repeatedly." [14] (Id. at p. 17.)

Plaintiffs have inaccurately framed the "question" here. (Id.) As discussed previously in this Order, Plaintiffs have not pointed the Court to any evidence indicating that Ajibade was being compliant when he was drive-stunned in the holding cell. To the contrary, testimony from multiple witnesses supports the finding that he was physically resisting officers and refusing to cooperate in being secured in the restraint chair. (See Doc. 181-13 (Kenny Depo.), pp. 145, 148–53; doc. 181-20 (Samuel Richardson Depo.), p. 62; doc. 219-1 (Burt Ambrose Examination Under Oath by Plaintiffs), p. 20; doc. 219-2 (David Cody Depo.), pp. 53–54; doc. 114-7 (Mark Capers Depo.), p. 9.)

To support their position that Evans violated a clearly established constitutional right, Plaintiffs cite Oliver v. Fiorino, 586 F.3d 898 (11th Cir. 2009), Wate v. Kubler, 839 F.3d 1012 (11th Cir. 2016), and Boynton v. City of Tallahassee, 650 F. App'x 654 (11th Cir. 2016). Plaintiffs provide nothing more than parenthetical information as to the holdings of each of these three cases. Plaintiffs do not appear to contend that any or all of these three cases clearly

---

[14] To the extent Plaintiffs, by disavowing any need to provide cases with "fundamentally similar facts," seek to rely exclusively on the second approach outlined above, the Court emphasizes that this standard "is a difficult one to meet." Bussey-Morice v. Kennedy, 657 F. App'x 909, 913 (11th Cir. 2016) (citing Hoyt, 672 F.3d at 977 ("[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (quoting Priester v. City of Riviera Beach, Fl., 208 F.3d 919, 926 (11th Cir. 2000)).

established that conduct identical to what they allege was exhibited by Evans in this case constitutes excessive force, and rightly so; none of these cases involved officers who allegedly failed to intervene on another officer's use of a Taser (or any kind of force, for that matter). Therefore, none of these cases can be said to have put Evans on notice that her failure to intervene here—assuming, for purposes of this qualified immunity analysis only, that she was in a position to do so and had an opportunity to do so—would violate a clearly established right. Moreover, Wate and Boynton were decided in 2016, at least a year after the incident here. Plaintiffs must carry their burden by looking to the law as interpreted at the time of the alleged violation. Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir. 2003)). As such, whether Wate or Boynton are "materially similar" is irrelevant to the analysis of Plaintiffs' claim. Id.

Thus, Plaintiffs can surmount the qualified immunity hurdle only if Evans's conduct was "so far beyond the hazy border between excessive and acceptable force that [Evans] had to know [she] was violating the Constitution even without case law on point." Id. at 1303 (quotation omitted). That is, Plaintiffs must show that drive-stunning Ajibade was "such outrageous conduct under the circumstances that every reasonable officer would have known" that it violated Ajibade's clearly established constitutional rights and would have intervened to stop such activity. Gomez, 587 F. App'x at 628; see also Hoyt, 672 F.3d at 978 ("This would require that every reasonable officer in [Evans's] position would inevitably" intervene under these circumstances.). Plaintiffs have failed to make such a showing. While it is not apparent from the parties' briefing what position Evans was in, and thus, what she could have known or observed, the Court finds that she is nonetheless entitled to qualified immunity because the conduct upon which she allegedly failed to intervene was not clearly established as a violation of Ajibade's

constitutional rights at the time the conduct occurred. "[W]hen an officer's force does not violate a clearly established right, other officers' failure to intervene does not violate a clearly established right." Kennedy, 657 Fed. Appx. at 915 (citing Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009)). None of the three cases cited by Plaintiffs show that drive-stunning Ajibade was such outrageous conduct under the circumstances that every reasonable officer would have known that it violated Ajibade's clearly established constitutional rights.

First, Oliver is materially distinguishable from this case because, as the Eleventh Circuit explained in a later case, "unlike here, in Oliver, the officer deployed her Taser against an individual despite his substantial compliance with officers' commands" and in circumstances significantly different from those in the instant matter. Gomez, 587 F. App'x at 628 (citing Oliver, 586 F.3d 898). The decedent in Oliver had initially been tased by one officer while another officer was pulling the decedent by the shirt out of a roadway for safety purposes. 586 F.3d at 903. Once the decedent was on the ground, the evidence indicated that he had not tried to get back up or to physically resist or attack the officers. Id. Nonetheless, he was tased an additional seven times while lying on the ground. Id. The Oliver court held that, although the initial deployment of the Taser may have been justified, the repeated tasing was so disproportionate to the level of force necessary that any reasonable officer in the situation would have recognized that her actions were unlawful. Id. at 907–08. Later, in Gomez, the Eleventh Circuit emphasized that the decedent in Oliver "was not suspected of a crime, . . . did not act belligerently or aggressively," and had "complied with most of the officers' directions and made no effort to flee." Id. at 629. The Gomez court also explained that the Court's determination in Oliver—"that the law was clearly established[—was] not due to brightline precedent, but [was] as a matter of obvious clarity." Id. at 629 (citing Oliver, 586 F.3d at 907–08).

Unlike in <u>Oliver</u>, here Ajibade had been arrested on suspicion of a crime (battery) and, immediately prior to being placed in the holding cell, had resisted officers' commands during the booking process, and then had aggressively resisted several other officers when they tried to physically restrain him. He had undertaken a major physical struggle with the officers on the floor and he had worked to wrestle control of the Taser from one of the officers, resulting in that officer being injured. As shown by the video footage, it took several officers just to pin Ajibade down on the floor, and he continued resisting officers even after he was pinned down on the floor in the booking area.

The other two cases Plaintiffs cite—<u>Wate</u> and <u>Boynton</u>— also fail to provide a basis for finding that Evans's conduct violated a clearly established constitutional right. In <u>Wate</u>, an officer attempted to arrest a suspect for suspected battery. 839 F.3d at 1015–16. A struggle ensued, and the officer repeatedly hit the man, got on top of him and pinned him in an effort to handcuff him. <u>Id.</u> at 1016. When another officer arrived on the scene, he deployed his Taser (using probes) and used the Taser on the man a total of five times over a two-minute period. <u>Id.</u> at 1017. Notably, the Court explained that the eyewitness accounts varied, but that several witnesses stated that the suspect had stopped resisting during the two-minute period in which the Taser was being used. <u>Id.</u> at 1020–22. Therefore, the Court held that "while the first or maybe even the second Taser deployment may have been warranted," by the third deployment, the suspect was "handcuffed, immobile, and still," and there was a constitutional violation. <u>Id.</u> at 1021. The Court additionally held that "a reasonable officer in [the tasing officer's] position and under these circumstances would have had fair warning that repeatedly deploying a Taser on [the suspect], after he was handcuffed *and had ceased resisting*, was unconstitutionally excessive." <u>Id.</u> at 1021–22 (emphasis added).

As for <u>Boynton</u>, the court summarized the facts of that case the following way:

> [Officer Norton] respond[ed] to a call about a "combative" medical patient, but by the time he arrived Boynton was not combative at all. In fact, he was barely responsive, lying immobile on the floor of the ambulance. When Norton told him to get onto the stretcher, Boynton did not move, but he also did not struggle or argue when Norton moved him. Norton admits that the only "resistance" he encountered was when Boynton "tensed" his body, making it difficult for him to reposition Boynton on the stretcher. In response, Norton tased Boynton nine times, eight of which were after Boynton had agreed to comply with Norton's demands.

650 F. App'x 654, 660 (11th Cir. 2016). The Court likened the case's facts to those of <u>Oliver</u>, and held that, "[i]n light of <u>Oliver</u>, a reasonable officer in Norton's position would have known that repeatedly tasing Boynton, who was not argumentative, aggressive, or mobile, was unreasonable under the Fourth Amendment." <u>Id.</u> at 661.

This case is different from <u>Wate</u> because the undisputed evidence here is that Ajibade was resisting being secured in the restraint chair, and there is no evidence indicating that he was not resisting or had stopped resisting prior to the final drive stun. Similarly, unlike in <u>Boynton</u>, here the undisputed evidence indicates that Ajibade was not only responsive but was kicking, swaying and arching his back in resistance to being placed in the chair, and was refusing to comply with officers' orders at the time he was drive stunned. As a result, <u>Wate</u> and <u>Boynton</u> cannot be said to indicate that a "general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question." <u>Moore</u>, 806 F.3d at 1047.

There are several Eleventh Circuit cases that provide guidance and contradict Plaintiffs' claim that Evans violated a clearly established right. In <u>Buckley v. Haddock</u>, the Eleventh Circuit granted qualified immunity to an officer using a Taser to gain the compliance from a handcuffed suspect. 292 F. App'x 791 (11th Cir. 2008). The handcuffed, uncooperative plaintiff had refused an officer's order to move from the ground to the patrol car. <u>Id.</u> at 792–93. The officer applied the Taser a total of three times to the uncompliant, but otherwise sedate, plaintiff.

Id.  In a more recent case involving the issue of whether a right was "clearly established" for purposes of defeating qualified immunity, the Court of Appeals looked to Buckley for guidance, explaining:

> [In Buckley,] [t]wo judges of this court concluded that the first two taser shocks did not violate the Constitution.  While the unpublished Buckley opinion is not binding precedent and certainly does not establish that the use of taser shock on a handcuffed plaintiff to bring compliance is constitutional, the clear views of those two judges of this court are relevant to the issue of whether the lesser conduct in the instant case violated clearly established constitutional law.

Alday v. Groover, 601 F. App'x 775, 778 (11th Cir. 2015).[15]  On that basis, the Alday court held that the officer in that case, who had drive-stunned a non-violent handcuffed arrestee in the neck for five to ten seconds after she refused to exit the police car and walk into the detention center, was entitled to qualified immunity.  Id.

In Mann v. Taser Intern., Inc., the use of the Taser was held to be "appropriate given the countervailing government interest of safety and compliance" where a suspect violently resisted arrest, even after being placed in handcuffs and leg shackles, such that she was deemed "a danger to herself and others."  588 F.3d 1291, 1306 (11th Cir. 2009).  See also Sanders v. City of Dothan, 409 Fed. Appx. 285, 290 (11th Cir. 2011) ("It is not clearly established that a police officer is prohibited from momentarily tasering an uncooperative handcuffed arrestee who—after multiple warnings—refuses to comply with that justifiable law-enforcement objective. This law-enforcement conduct is not so clearly in violation of constitutional rights that qualified immunity can be denied without a decision on point.").

In this case, the evidence establishes that, once in the holding cell, Ajibade continued to resist officers' efforts to secure him in the restraint chair, and officers feared that he would use

---

[15]  The Alday court also noted that "[i]n addressing the issue of clearly established constitutional law, we have 'take[n] note of the perspective of reasonable jurists who have attempted to articulate the legal landscape [in non-binding precedent].'"  601 F. App'x at 778 n.1 (quoting Denno v. Sch. Bd. of Volusia Cnty., 218 F.3d 1267, 1272 (11th Cir. 2000)).

his knees, feet, mouth or head to harm them. The evidence before the Court is that, until the final drive-stun was administered, Ajibade was not affected by the drive-stuns and he continued to resist officers. These undisputed facts establish that the officers inside the cell did not violate Ajibade's clearly established rights by drive-stunning him. Because the conduct of the officers inside the holding cell did not violate one of Ajibade's clearly established rights, the Court is bound to find that Evans's failure to intervene upon that conduct likewise did not violate one of Ajibade's clearly established rights.

In summary, Plaintiffs cannot point to "case law with indistinguishable facts clearly establishing the constitutional right [or] a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right." Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291-92 (11th Cir. 2009); see, e.g., Mannor v. Pearce, Civ. No. 4:15-CV-01413-SGC, 2018 WL 1456638, at *6 (N.D. Ala. March 23, 2018) (use of Taser in drive-stun mode in effort to gain compliance from a "passively resistant" handcuffed arrestee who was refusing to stand up at officer's command was not a clearly established violation of constitutional rights). Therefore, Evans is entitled to qualified immunity unless her conduct was "so far beyond the hazy border between excessive and acceptable force that [she] had to know he was violating the Constitution." Willingham, 321 F.3d at 1303. The Court simply cannot find the failure to intervene upon the use of the Taser in drive-stun mode under the circumstances presented here was so far past that border. As such, Evans is entitled to qualified immunity as to Plaintiffs' excessive force claims, and her Motion for Summary Judgment on this ground is due to be granted.

For all of these reasons, the Court **GRANTS** Evans summary judgment as to Plaintiffs' Section 1983 claim that she violated Ajibade's constitutional right to be free from the use of excessive force (Count 1).

**CONCLUSION**

In light of the foregoing, the Court **GRANTS in part** Defendant Maxine Evans's Motion for Summary Judgment as to Count 1 and Count 6 of Plaintiffs' Amended Complaint. (Doc. 183.) The Court reserves ruling on Evans's Motion for Summary Judgment as to Count 2 (Plaintiffs' Section 1983 claim against her for deliberate indifference to a serious medical need) and Count 5 (Plaintiffs' wrongful death claim). The Court **ORDERS** Defendant Evans to file a supplemental brief **by April 26, 2019**. In the supplemental brief, Defendant Evans shall provide record citations to support all material factual allegations she offers in support of her request for summary judgment on Count 2 ("Deliberate Indifference to Serious Physical and Mental Health Needs") and on Count 5 ("Wrongful Death") of Plaintiffs' Amended Complaint. The Court further **ORDERS** that, within **fourteen (14) days** after Evans's supplemental brief is filed, Plaintiffs shall file a response thereto, which likewise shall include record citations to support all material factual allegations or disputes of any of Evans's factual allegations. Defendant Evans must file any reply within **fourteen (14) days** of Plaintiffs' response brief.

**SO ORDERED**, this 28th day of March, 2019.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA