# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

SOLOMAN OLUDAMISI AJIBADE, as
natural parent of Mathew Ajibade; ADENIKE
HANNAH AJIBADE, as natural parent of
Mathew Ajibade; THE ESTATE OF
MATHEW AJIBADE; CHRIS OLADAPO, as
executor,

       Plaintiffs,

       v.

JOHN WILCHER, in his official capacity as
Chatham County Sheriff; CORIZON
HEALTH, INC.; GREGORY BROWN;
FREDERICK BURKE; ABRAM BURNS;
MARK CAPERS; MAXINE EVANS;
ANDREW EVANS-MARTINEZ; PAUL
FOLSOME; DEBRA JOHNSON; JASON
KENNY; ERIC VINSON,

       Defendants.

CIVIL ACTION NO.: 4:16-cv-82

## O R D E R

Before the Court are Defendants Lieutenant Debra Johnson and Andreux Evans-Martinez's Motions for Summary Judgment as to all claims alleged against them by the Plaintiffs. (Docs. 191, 192.) This case arises from the January 2015 death of Mathew Ajibade while in the Chatham County Sheriff's custody at the Chatham County Detention Center ("CCDC"). (Doc. 21.) Ajibade's parents and his estate filed this suit against Defendants Johnson and Martinez, who were corrections officers at the CCDC, as well as the Sheriff, various other corrections officers, the company supplying health services at the CCDC at the time of Ajibade's death, and a nurse on duty at the time of Ajibade's death. (Id.) Against Johnson and

Martinez, Plaintiffs assert claims for violations of Ajibade's constitutional rights pursuant to 42 U.S.C. § 1983, assault and battery, and wrongful death. (Id.) Defendants Johnson and Martinez filed Motions for Summary Judgment, claiming that the assault and battery and constitutional violation claims against them lack the necessary evidentiary support and/or are barred by principles of immunity and that the wrongful death claim against them fails as a matter of law. (Docs. 191, 192). Plaintiffs filed Responses in opposition, (docs. 226, 233), and Defendants Johnson and Martinez filed Replies, (docs. 249, 256). For the following reasons, the Court **GRANTS** Defendants Johnson and Martinez's Motions for Summary Judgment. (Docs. 191, 192.)

## BACKGROUND

### I. Factual Background

The following facts relevant to the disposition of Defendants Johnson and Martinez's Motions are undisputed.

On the evening of January 1, 2015, officers with the Savannah-Chatham Metropolitan Police Department arrested Mathew Ajibade for the battery of his girlfriend and transported him to the CCDC. (Doc. 181-19 (Owens Depo.), pp. 9–12, 32; doc. 226-2, pp. 1–3.) Ajibade was initially placed in a holding cell where he remained for several hours. (Doc. 226-2, pp. 6–8.) At or around 11:28 p.m., a CCDC officer retrieved Ajibade from the holding cell and took him into a common area to commence the booking process. (Id. at pp. 7–8.) During that process, a physical struggle between Ajibade and four officers ensued, and one officer called for back-up assistance. (CM136_Pre_Booking_#4_1 at 11:28:36 through 11:34:02 PM.)[1] During the

---

[1] Plaintiffs submitted, and both parties frequently cited, footage from various cameras positioned around the CCDC. (See Doc. 239 (Notice of Manual Filing).) This footage features sound, though it is often muffled and therefore difficult to understand. The Court has reviewed the footage and relies upon it in conjunction with cited deposition testimony. Since there are a number of video clips from numerous

struggle, one officer is believed to have drive-stunned Ajibade with a Taser before Ajibade was able to take the Taser from her, at which point he held the Taser up at the officers.[2] (Doc. 233-2, p. 13–15; doc. 181-12 (Johnson Depo.), p. 266.) One officer was injured during the struggle and ultimately required medical attention. (Doc. 181-12, p. 122.) Over the next few minutes, multiple officers arrived on scene in response to the call for back-up assistance. (CM136_Pre_Booking_#4_1 at 11:34:02 through 11:37:17 PM.)

Defendant Johnson, who was the watch commander that evening, arrived in the booking area around 11:36:45 PM. (Id. at 11:36:45 PM.) At this point, Ajibade was lying face down on the floor with approximately seven officers holding and/or hovering over him. (Id. at 11:36:55 PM.) After walking over to observe the huddled mass, Johnson retrieved a nearby Taser and (as shown from the video footage) removed something from it. (Id. at 11:36:56 through 11:37:15 PM.) She then walked back over to the group and placed the Taser onto Ajibade's lower body and told Ajibade that he needed to "calm down and let them put the restraints" on him or he would be drive-stunned. (Id. at 11:37:20 through 11:37:33 PM; doc. 181-12 (Johnson Depo.), pp. 175–76.) In response, Ajibade calmed down and, once hand and leg restraints were secured onto him, Defendant Johnson stood back up and removed the Taser from Ajibade's skin. (Doc.

---

cameras, the Court will refer to them by file name and cite to the exact time of the footage according to the footage.

[2] "A '[T]aser' is a non-deadly weapon commonly carried by law enforcement." Fils v. City of Aventura, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011). The Taser "administers an electric shock to a suspect," typically by "shooting two small probes into the suspect's body." Id. "The probes are connected to the firing mechanism via wires. Once fired, the probes lodge under the suspect's skin and administer an electric shock." Id. Tasers can also be used in "drive-stun" mode, however, which means that "the probes are removed from the Taser," Flowers v. City of Melbourne, 557 F. App'x 893, 895 n.4 (11th Cir. 2014) (per curiam), and "the Taser [i]s used like a stun gun—the Taser is pressed directly against the skin and produces a burning sensation." Mingo v. City of Mobile, Ala., 592 F. App'x 793, 796 n.1 (11th Cir. 2014) (per curiam). Drive-stun mode "reduces the amount of force employed on a person in close range." Flowers, 557 Fed. Appx. at 895 n.4. As explained by Plaintiffs' expert, "[T]he difference between the probe and drive-stun is it's pain only. And drive-stun's a pain component tool . . . ." (Doc. 181-23 (Root Depo.), p. 15.)

181-12 at p. 176; CM136_Pre_Booking_#4_1 at 11:37:42 PM.) It is undisputed that Defendant Johnson did not actually tase (or drive-stun) Ajibade. (Doc. 233-2, p. 17.)

Defendant Martinez, who was working in a different area of the CCDC but had been instructed by a superior to respond to the call for back-up assistance, arrived at the booking area at 11:37:17 p.m., just as Defendant Johnson was approaching the huddled group with the Taser. (CM136_Pre_Booking_#4_1at 11:37:17 PM; doc. 181-16 (Martinez Depo.), p. 34:13–24; doc. 226-2, p. 19.) Defendant Martinez paced around the group and then stood on the periphery of the group. (CM136_Pre_Booking_#4_1 at 11:37:17 through 11:37:39 PM.) An additional six or seven officers were also in the general vicinity at this time. (CM136_Pre_Booking_#4_1 at 11:37:17 PM.) Martinez heard Johnson tell Ajibade that if he continued to resist, he would be tased. (Doc. 181-16, p. 35:2–3.)

Once Ajibade's hands and feet were restrained, Johnson instructed the officers to take Ajibade to a nearby detox cell and place him in a restraint chair for his safety and the safety of others. (Doc. 226-2 at p. 19.) A group of officers then carried Ajibade away from the booking area. (CM136_Pre_Booking_#4_1 at 11:39:17 through 11:39:34 PM.) Neither Johnson nor Martinez assisted in carrying Ajibade, and Martinez never made any physical contact with him. (Id. at 11:39:17 through 11:39:34 PM; doc. 226-2 at p. 19.) Rather, Martinez walked behind the group that was carrying Ajibade out of the area. (CM136_Pre_Booking_#4_1 at 11:37:17 through 11:37:39 PM; doc. 181-16, p. 50:9–14.) Johnson went elsewhere to check on one of the officers who had been injured during the initial struggle with Ajibade. (Doc. 233-2, pp. 17–18.) According to his testimony, Defendant Martinez understood his role at this time as being on "stand-by," awaiting any instructions from Defendant Johnson. (Doc. 181-16, p. 48:11–21.)

It is undisputed that, instead of placing Ajibade in the nearby detox cell as instructed by Defendant Johnson, the officers took Ajibade and the restraining chair to a different holding cell. (Doc. 233-2, p. 18.) Defendant Martinez did not participate in the decision to place Ajibade in a different cell and he did not know that, unlike some other cells in the CCDC, the chosen cell did not have a camera positioned to film anything inside the cell.[3] (Doc. 181-16, pp. 39:11–16, 40:19–25, 41:1.) While the other officers were carrying Ajibade to the cell, Corporal Jason Kenny arrived on the scene. (Doc. 233-2, p. 18.)

When the restraining chair was placed inside the cell, it was positioned so that it faced the back wall, with the back of the chair facing toward the door. (Doc. 181-16, pp. 55:23–25, 56:1–5.) Thus, when Ajibade was placed into the chair, his back was to the doorway and his face was not visible to those looking in from outside the cell door. (Id.) Multiple officers, including Corporal Kenny, went into the cell and participated in the process of placing and securing Ajibade into the restraining chair. (See generally CM117_Female_Holding_#2.)

Corporal Kenny requested a Taser, and another officer obtained it from Defendant Johnson. (Doc. 181-12, p. 136.) According to his own testimony, Corporal Kenny discharged the Taser once while pointing it at the ground; this was done as both a means of testing it and as a "show of force" in an effort to gain compliance from Ajibade. (Doc. 181-13 (Kenny Depo.), p. 145:12–19). Because Ajibade continued to resist after the test engagement, Corporal Kenny then drive-stunned Ajibade, though there is no evidence regarding how much time passed between the test engagement and the drive-stun. (Id. at pp. 145:12–25, 147:13–23.) According to Corporal Kenny, Ajibade screamed after the first drive-stun and Corporal Kenny waited "for a second" to see if Ajibade thereafter complied with the commands to sit down. (Id. at p. 149:4–9.) When

---

[3] There is, however, footage of the area outside of the cell, which is what the parties and the Court have relied heavily upon in describing the material portions of the incident.

Ajibade continued "trying to come back up," Corporal Kenny told him to stop resisting and then drive-stunned him a second time. (Id. at pp. 150:20–25, 151:1.) Corporal Kenny testified that he drive-stunned Ajibade a total of four times, that three of the drive stuns lasted fewer than five seconds and one lasted five full seconds, and that he waited ten seconds or less between each drive stun. (Id. at pp. 148:6–18, 153:5–16, 155:5–13, 177:7–14.) He also testified that Ajibade was screaming during this process. (Id. at p. 152:24–25.) After the fourth drive-stun, Ajibade complied with the Kenny's command to sit down and was then secured into the chair. (Id. at pp. 197:1–5, 198:12–18.)

At some point, a spit mask was placed onto Ajibade's face. (Id. at pp. 19, 215.) Once Ajibade was secured in the restraint chair, Nurse Brown went inside the cell to check him. (CM117_Female_Holding_#2 at 11:46:59 through 11:47:58 PM; Doc. 181-12, pp. 194–206.) One or more officers were expected to have been routinely checking on Ajibade, in compliance with CCDC policy, after Nurse Brown left. (Doc. 181-12, p. 238.) At 1:35 a.m., approximately an hour and forty-five minutes after he was secured in the chair, Ajibade was found unresponsive and was pronounced dead shortly afterwards. (Doc. 226-2, pp. 24–25.)

**A. Defendant Johnson's Knowledge and Involvement**

According to the video footage, Defendant Johnson arrived in the vicinity of the holding cell over one minute after Ajibade and the restraint chair were taken into the cell. (See CM117_Female_Holding_#2 at 11:41:10 PM.) She did not enter the cell at this time, though she did look in for roughly five seconds. (Id. at 11:41:10 through 11:41:15 PM.) Defendant Johnson testified that, when she looked in, she saw Corporal Kenny holding the Taser and noticed that the Taser's light was on, but Corporal Kenny was talking to Ajibade, "telling him to calm down." (Doc. 181-12, pp. 138–39.) She then walked away from the doorway and attempted to locate a

spit mask in the area adjacent to the cell. (CM117_Female_Holding_#2 at 11:41:16 through 11:42:06 PM.) After a spit mask was located and sent in to the cell, Defendant Johnson looked over the heads of a few officers standing in front of her in the doorway of the cell for roughly twenty-five seconds. (Id. at 11:42:07 through 11:42:32 PM.) She heard Corporal Kenny "giving [Ajibade] commands to calm down." (Doc. 181-12, p 140.) Next, Defendant Johnson looked at an injury one officer had suffered, and, at 11:42:41 p.m., walked away from the vicinity of the cell. (CM117_Female_Holding_#2 at 11:42:32 through 11:42:41 PM.) She was gone from the area for the next four and a half minutes. (Id. at 11:42:42 through 11:47:03 PM.)

According to her testimony, Defendant Johnson was not aware that Corporal Kenny had used the Taser to drive-stun Ajibade until after Ajibade died. (Doc. 181-12, pp. 251–52.) Plaintiffs have not presented any evidence calling this testimony into dispute. In response to Defendant Johnson's assertion that she was not in the vicinity at the time of Corporal Kenny's drive-stuns, Plaintiffs deny the statement and state: "Johnson approached the . . . cell to assess the situation at 11:41:10. There is a Taser time stamp at 11:43:18, according to [an] internal affairs report." (Doc. 233-2, p. 21 (record citations omitted).) The video footage, however, clearly establishes that, although she was in the vicinity of the cell at 11:41:10 p.m., Defendant Johnson had left the vicinity by 11:43:18 p.m. (See CM117_Female_Holding_#2 at 11:43:18 PM.) Plaintiffs do not direct the Court to any other Taser time stamps (for any of the other drive stuns) that they claim occurred at a time that Defendant Johnson was in the vicinity, nor do they offer any other direct evidence that they claim proves she was aware of the drive stunning at the time it was occurring.[4]

---

[4] In an effort to prove that Johnson should have realized that Ajibade was being tased while being secured in the restraint chair, Plaintiffs claim that, "[b]y her admission, Johnson could hear [Ajibade] screaming at multiple points during this time frame [while he was being placed in the chair.]" (Doc. 233-1, p. 24 (citing doc. 181-12, p. 150:11-12).) Plaintiffs mischaracterize the cited testimony. Johnson was

At 11:47:04 p.m., Defendant Johnson returned to the vicinity of the cell, accompanied by Nurse Brown, whom she had asked to check Ajibade as he was finally fully-restrained in the chair. (Id. at 11:47:04 PM; Doc. 181-12, p. 153.) Both Johnson and Brown entered the cell, and Corporal Kenny remained inside. (CM117_Female_Holding_#2 at 11:47:04 PM; doc. 181-12, p. 154.) Nurse Brown had been present when another officer informed Johnson that Ajibade had been tased during the initial struggle in the booking area. (Doc. 181-12, pp. 201–02.) However, Johnson does not recall anyone telling Nurse Brown (or Johnson, for that matter) that Ajibade was tased multiple times while being placed in the restraint chair. (Id. at p. 200.) While Nurse Brown was performing his check, Johnson conversed with Corporal Kenny and she heard Ajibade moaning, in her opinion, "like he was angry" and in a way that indicated to her that "definitely . . . he was coherent." (Id. at p. 205.) Her testimony is that, because she was busy speaking to Corporal Kenny, she only recalls Nurse Brown saying he was checking Ajibade's legs and hands and watching him actually check Ajibade's hands. (Id. at pp. 197–98.) She denies observing any blood on Ajibade at this time. (Id.) Johnson and Nurse Brown were in the cell for just under a minute. (CM117_Female_Holding_#2 at 11:47:06 through 11:47:57 PM.)

Thereafter, Defendant Johnson left the scene to attend to her other duties as watch commander that night and was under the impression that another officer was routinely checking on Ajibade, pursuant to CCDC policy. (Doc. 181-12, p. 238–40.) Plaintiffs claim that, shortly

asked, "Did you *ever* hear Mr. Ajibade scream?" to which she responded, "I heard Mr. Ajibade scream a lot." (Doc. 181-12, p. 150:10–11 (emphasis added).) The question was not limited to whether she heard him scream specifically while he was in the holding cell. Nor was any follow-up question asked to pinpoint whether she heard any screaming while Ajibade was being restrained in the chair. Moreover, counsel's previous question was broadly phrased: "And it's your testimony that you *never* heard a Taser go off *that night ever*?" (Id. at p. 150:5–6 (emphases added).) The general nature of this inquiry further indicates that the questions were not focused on the specific time period when Ajibade was being placed in the chair. Finally, the video footage demonstrates that Ajibade screamed frequently while Johnson was present in the booking area, indicating Johnson's testimony could just as easily have been about Ajibade's screaming prior to any events in the cell. (CM136_Pre_Booking_#4_1 at 11:36:55 PM through 11:37:42 PM.)

after officers left the area of his cell, Ajibade screamed for help and yelled "I can't breathe." (Doc. 233-2, at p. 26.)  However, Plaintiffs do not point to any evidence that Johnson heard or should have heard these calls for help.  At some point after midnight, Johnson asked Corporal Evans whether Ajibade was okay, and Evans responded that he was.  (Id. at pp. 22–23.)  At 1:35 a.m., Ajibade was found unresponsive and was pronounced dead shortly afterwards.  (Id. at pp. 23, 26.)

### B.  Defendant Martinez's Knowledge and Involvement

It is undisputed that Defendant Martinez did not directly assist with securing Ajibade into the chair and never actually went inside the cell.  (Doc. 226-2, p. 21; doc. 181-16, p. 58:16–17.) Defendant Martinez never spoke to Ajibade.  (Doc. 181-16, p. 45:6–10.)  The closest Defendant Martinez came to the inside of the cell was when he helped hold the door open as the restraining chair was wheeled in behind Ajibade.  (CM117_Female_Holding_#2 at 11:40:00 through 11:40:16 PM.)  After that, he alternated between standing behind multiple other officers outside of the doorway and walking around to locate items that officers inside the cell requested.  (See, e.g., Id. at 11:41:00 through 11:41:34 PM; doc. 181-16, pp. 56:6–11, 19–24, 61:11–14.)  Indeed, Defendant Martinez left the doorway and/or the general area entirely on several occasions for appreciable time periods.  (See CM117 Female Holding #2 at 11:41:00 through 11:41:34, 11:43:01 through 11:44:05, 11:44:37 through 11:44:56 PM, and 11:45:35 through 11:47:27 PM). Further, Defendant Martinez testified that, even when he was near the doorway, he could "not really" see into the cell through all the officers.  (Doc. 181-16, p. 75:3–10.)

At some point while he was in the vicinity of the cell, Defendant Martinez heard a single discharge of a Taser inside the cell.  (Doc. 181-16, p. 59:7–18.)  He testified that he could not see whether Ajibade had been restrained to the restraint chair at the time the Taser was engaged.  (Id.

at pp. 23–24.)  In fact, Defendant Martinez never testified that he actually *saw* the Taser being used.  (See, e.g., Id. at p. 42.)  However, Defendant Martinez did testify that, aside from hearing the Taser discharge on one occasion, he was not aware of any additional discharges.  (Id. at p. 60:7-10.)  Martinez admits that he did not say anything to any of the other officers about whether it was appropriate to use a Taser on Ajibade.  (Id. at p. 60:11–13.)

Defendant Martinez was not in the immediate vicinity of the cell when Nurse Brown entered, but he was in the vicinity when Nurse Brown exited the cell. (CM117_Female_Holding_#2 at 11:46:59 through 11:47:58 PM.)  After Nurse Brown emerged from the cell, Defendant Martinez returned to the wing of the CCDC where he had originally been assigned duties for the night.  (See Doc. 181-16, p. 71:2–16.)  He was not involved with Ajibade after that time.  (Id.at pp. 65:7–10, 66:1–4, 71:2–23.)

While Plaintiffs assert that Defendant Martinez was aware that Ajibade was in physical pain, that Ajibade had been moaning since being placed in the restraint chair, and that Martinez heard these moans, (doc. 226-1, p. 18), they fail to point to any evidence to support those assertions.  Additionally, Plaintiffs claim that, shortly after officers left the area of his cell, Ajibade screamed "Help me" and "I can't breathe."  (Id.)  However, the Court is unaware of any evidence that Martinez, who went back to his post in another wing of the CCDC, heard or should have heard such calls for help.

### C.  Issues Regarding Restraint and Resistance

Plaintiffs focus much of their attention on proving, via record citations, that Ajibade's hands and legs were cuffed and shackled (respectively) when the officers were attempting to secure him in the restraint chair.  Defendants do not appear to dispute this fact.  Rather, the relevant dispute, as discussed in greater detail in later sections of this Order, is whether Ajibade,

despite being cuffed and in leg shackles, was resisting the officers as they attempted to secure him in the chair. Many of Plaintiffs' citations provide direct evidence that Ajibade was resisting officers during this point in time.

For instance, Plaintiffs frequently cite to Officer Ambrose's Examination Under Oath,[5] which does discuss how Ajibade's hands were cuffed behind his back and his legs were shackled. (Doc. 219-1, pp. 15, 18.) Notably, however, the cited portions of the Examination also indicate that Ajibade was actively resisting officers' efforts to secure him in the chair. Though he was initially outside of the cell, Ambrose states he heard a man in the cell yelling, "I don't want to be here. Let me go." (Id. at pp. 15–16.) Then Ambrose heard someone else in the cell say, "[C]alm down, calm down. Quit kicking at me." (Id. at p. 15.) When he looked inside the cell, Ambrose saw officers placing Ajibade—whose hands were cuffed behind his back— into the chair, and he observed Ajibade—whom he described as "seem[ing] really upset"— "screaming and yelling" and "thrashing about." (Id. at pp. 16–17.) At some point, Ambrose was told to come into the cell, at which point he observed that Ajibade "kept kicking" and "trying to squirm." (Id. at p. 19.) He explained that Ajibade's "feet were cuffed, but they weren't . . . strapped down to the chair yet." (Id.) Thereafter, Ajibade "was screaming and yelling" and "kicking his feet." (Id. at p. 21.) Another officer came in and "tied [Ajibade's] ankles to the chair" but "[h]e kept kicking." (Id.) He heard Corporal Kenny say, "stop kicking, stop kicking at me," and then saw Kenny grab the Taser and turn the light on. (Id.) Ambrose then heard Kenny say, once again, "stop kicking towards me," at which point Ambrose (who was standing behind Ajibade) observed Ajibade "flailing a little bit" and "moving his feet around and screaming." (Id. at pp. 21–22.) Ambrose then observed Corporal Kenny take the Taser, place it

<hr>

[5] This Examination Under Oath was administered by Plaintiffs' counsel and no counsel for any Defendant was present for purposes of cross-examination. (Doc. 219-1.)

on Ajibade's right thigh, and drive-stun Ajibade. (Id. at p. 22.) According to Ambrose, Ajibade started screaming and Ambrose heard Kenny say, "Stop kicking, you're going to get it again." (Id.) Ambrose did not testify about any additional uses of the Taser and stated that he then "slowly backed out of the room" and heard people calling for the nurse. (Id.) Later in the Examination Ambrose explained that, when Corporal Kenny discharged the Taser the first time, Ajibade was "kicking his legs," even with his "leg chains" on. (Id. at pp. 24–25.) Ambrose also made clear that he only witnessed Ajibade being drive-stunned one time. (Id. at p. 32.)

Plaintiffs also cite to one page of Officer David Cody's deposition transcript to support the assertion that Ajibade "never struck out at anyone while he was being placed in the restraint chair," (doc. 226-2, p. 21; doc. 233-2, p. 20), but Cody's testimony actually indicates that he was not able to see Ajibade's legs and was unsure of what Ajibade may have been doing:

> A. . . . And at that point the restraint chair came in and we tried to set him down.
> Q. Okay. And then what happened?
> A. He was resisting.
> Q. Okay. When you say "he was resisting," what do you mean?
> A. He was actively trying to not be placed into the restraint chair.
> Q. You mean he was stiffening his body?
> A. Yes, sir.
> Q. Okay. He was—at no time did he strike anybody because he has his hands behind his back; correct?
> A. That's correct.
> Q. Okay. And his legs are shackled; right?
> A. That is correct.
> Q. He didn't kick anybody; correct?
> A. *I don't know what he did. I was on his left shoulder, so I don't know what his legs were doing.*
> Q. Well, you didn't see him kick anybody, did you?
> A. That's correct.
> Q. Okay. So when you say "resisting," you mean he didn't—he was stiffening his body so he wouldn't be placed in the restraint chair; correct?
> A. Yes. And he was kind of moving, kind of see-sawing, I suppose.
> Q. Okay. So moving his shoulders?
> A. Uh-huh.

(Doc. 219-2, pp. 53–54 (emphasis supplied).)

Plaintiffs also cite to the deposition testimony of Officer Capers to support their assertion that Ajibade was "at least partially restrained when Kenny applied the Taser to [Ajibade's] groin area—four separate times." (Doc. 229-2, p. 27; doc. 233-2, pp. 25–26 (both citing doc. 181-5 (Capers Depo.), pp. 103–04).) In the cited pages of his deposition, Officer Capers specifically testified as follows:

> Q. And tell me what you remember about what happened when you went into the cell.
> A. They put him in a restraint chair. They sat him in a restraint chair and he was kicking. At one point Richardson or somebody asked for Flexi Cuffs. We bring the Flexi Cuffs in. I grabbed the Flexi Cuffs and I secured—because I was down by his feet. I secured the Flexi Cuffs, the chain on the leg irons to the designated area on the restraint chair.
> Q. So his legs would have been attached to the restraint chair, correct?
> A. Yes.
> Q. Basically his leg irons are attached to the restraint chair, right?
> A. *The chain.*
> Q. The chain in it, right?
> A. Yes.
> Q. So he's got *limited* mobility, correct?
> A. Yes.
> Q. So he can't kick, correct?
> A. Yes.
> Q. Okay. And every time that he was inside that cell he had the leg irons on even before you got into the cell and the hands cuffed behind his back, correct?
> A. Yes.

(Doc. 181-5, pp. 103:9–104:10 (emphases added).) This testimony establishes only that the chain connecting the shackles on each of Ajibade's legs was secured to the chair by use of a Flexi-Cuff, not that each of his feet or ankles were directly secured to the chair. Additionally, this testimony does not establish when the chain was secured in relation to when Corporal Kenny drive-stunned Ajibade.

Moreover, the Court notes testimony from Corporal Kenny regarding the safety threats posed by Ajibade notwithstanding the facts that he was cuffed and in leg restraints. Kenny explained that the person in the chair can still use their knees to hit people (even if they are

unable to kick due to leg chains), can spit bodily fluids from their mouth, can use their teeth to bite if an officer comes close enough, and can head-butt an officer. (Doc. 181-13, p. 142:4–25, 143:8–13, 151:6–10.)

Plaintiffs also contend, in various areas of their brief and response to Defendants' Statements of Material Facts, that the video from the Taser camera "shows[ Ajibade] was not actively struggling during any of the four instances when the officers used the [T]aser while in the holding cell." (Doc. 233-1, p. 18.) First, Plaintiffs fail to direct the Court to the specific Taser videos that they contend represent the four drive-stuns in the holding cell. More importantly, however, the Court has viewed each of the Taser videos that were filed in this case and finds that they do not depict clear evidence on the issue of whether Ajibade was "actively struggling" as Plaintiffs contend. The videos are erratic, are mostly comprised of closeup images of what is presumed to be Ajibade's skin, the sound is muffled, and the majority of the clips are too short in length to show anything of substance. As a result, these videos cannot be said to provide a basis for a jury to find that Ajibade was not resisting officers as they tried to secure him into the restraint chair.

In sum, there is ample evidence in the record that Ajibade was resisting officers' efforts to secure him in the restraint chair, and Plaintiffs have not pointed to any evidence contradicting this evidence. Even viewing the record in the light most favorable to Plaintiffs, they have not presented evidence from which a jury could conclude that Ajibade was not resisting at the times he was drive-stunned or that he had ceased resisting at some point prior to the final drive-stun.

### D. Ajibade's Mental Health

Plaintiffs claim that, upon or shortly after his arrival, some individuals at the CCDC were notified that Ajibade could be suffering from a mental health issue and that certain things should

have been done in response to this notification. (Doc. 226-2, pp. 25–26; doc. 233-2, pp. 23–24.) However, the Court need not address this factual aspect of the case in this Order as it is not material to the Court's resolution of Defendants Johnson and Martinez's summary judgment motions. There is no evidence that Defendant Martinez or Defendant Johnson knew that Ajibade had any mental health problems. (See, e.g., Doc. 181-12, p. 96:7-24; doc. 181-16, p. 45:11–16.) Plaintiffs have not pointed to any evidence indicating that Johnson or Martinez knew or, as part of their duties, should have investigated and/or determined that Ajibade's mental stability had been called into question.

## II. Claims against Johnson and Martinez

Plaintiffs collectively assert four claims against both Defendant Johnson and Defendant Martinez in their individual capacities:[6] (1) a claim pursuant to 42 U.S.C. § 1983 for use of excessive force (asserted by the Estate only); (2) another claim pursuant to 42 U.S.C. § 1983 for deliberate indifference to serious physical and mental health needs (asserted by the Estate only); (3) a state-law claim for assault and battery against (asserted by the Estate only); and (4) a claim for recovery under the state-law wrongful death statute (asserted by the parents only). (See generally doc. 21.) Defendants Johnson and Martinez move for summary judgment as to all counts, arguing that the first three claims are not only barred by immunity but also fail on the merits, and that the wrongful death claim necessarily fails because it is premised upon the Section 1983 claims that are subject to denial. (Docs. 191-1, 192-1.)

Notably, in their Response brief, Plaintiffs concede that there is insufficient evidence to support an assault and battery claim against Defendant Martinez (though they opposed summary

---

[6] Plaintiffs originally sought recovery against Defendants Johnson and Martinez in both their individual and official capacities. (Doc. 21, p. 5.) At the time their summary judgment motions were filed and briefed, the claims remained pending against Johnson and Martinez in both capacities. Since then, however, the claims against them in their *official* capacities have been dismissed by agreement of the parties and Order of the Court. (Doc. 269-1, p. 2.)

judgment as to the same claim against Defendant Johnson). (Doc. 226-1, p. 20.) As a result, the Court hereby **GRANTS** summary judgment in favor of Defendant Martinez on Count 6 of the Amended Complaint, which is the claim for assault and battery, (doc. 21).

Plaintiffs urge, however, that summary judgment should not be entered as to the remaining three claims against Defendant Martinez and all four claims against Defendant Johnson. The Court will address each claim in turn below.

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the

pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citation omitted).

## DISCUSSION

### I. Section 1983: Use of Excessive Force

Count One of Plaintiffs' Amended Complaint seeks to hold Defendants Johnson and Martinez liable pursuant to 42 U.S.C. § 1983 for the use of excessive force on Ajibade. (Doc. 21, pp. 10–12.) As described above, there is no evidence that Defendant Martinez ever made physical or verbal contact with Ajibade. Although Defendant Johnson made physical and verbal contact with Ajibade (when she pressed the Taser to his skin in the booking area), she, like Defendant Martinez, did not make any verbal or physical contact with Ajibade during the time that he was being carried into the holding cell or while he was being secured in the restraint chair. In their Response, Plaintiffs explain that their cause of action for use of excessive force as to Defendant Martinez is specifically premised on the claim that "he stood by while fellow officers assaulted [Ajibade]," and should therefore be liable for failing to intervene to prevent the

use of excessive force. (Doc. 226-1, pp. 6, 12.) Plaintiffs make no attempt to argue that Defendant Johnson's touching the Taser to Ajibade's skin constituted excessive force. Instead, their argument focuses on proving that she violated Ajibade's constitutional rights by failing to intervene when Ajibade was being drive-stunned inside the holding cell and that qualified immunity does not protect her failure to intervene in the at-issue situation.

Both Johnson and Martinez urge that summary judgment is appropriate on two grounds. First, they claim that they were not in positions to intervene because the undisputed evidence establishes that they lacked sufficient information, opportunity, and knowledge to evaluate whether any force applied to Ajibade was excessive in violation of his constitutional rights. Second, they contend that they are entitled to qualified immunity because, on the date of the incident, no clearly established law placed them on notice that their conduct could have been unlawful.

### A. There is Insufficient Evidence that Johnson or Martinez had the Opportunity to Intervene and were in a Position to Intervene.

Plaintiffs claim Ajibade's constitutional rights were violated when Johnson and Martinez failed to intervene when Ajibade was drive-stunned while being placed into the restraining chair. Johnson and Martinez urge, however, that they are entitled to summary judgment on this claim because the undisputed facts establish that they did not have the opportunity to intervene and were not in a position to intervene at the time in question.

"If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998) (citing and quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir.1986)); see also Johnson v. White, 725 Fed. Appx. 868, 878 (11th Cir. 2018) ("Even if an officer personally did not use

excessive force, an officer who is present at the scene can be alternatively liable for failing to take 'reasonable steps to protect the victim of another officer's use of excessive force.'") (quoting <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1330–31 (11th Cir. 2008)). However, the officer must have the opportunity to intervene and be in a position to intervene and yet fail to do so. <u>Hadley</u>, 526 F.3d at 1331; <u>see also</u> <u>Keating v. City of Miami</u>, 598 F.3d 753, 764 (11th Cir. 2010) (explaining that a direct failure to intervene claim "requir[es] the allegations to include facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct"). When an event occurs so quickly that the officer cannot intervene, an officer is not liable for another's constitutional violation. <u>Fils</u>, 647 F.3d at 1290 n.21 (citing <u>Brown v. City of Huntsville, Ala.</u>, 608 F.3d 724, 740 n.25 (11th Cir. 2010)).

### 1. Defendant Johnson

Defendant Johnson emphasizes that, during the two "very brief periods of time" she was in the vicinity of the holding cell prior to Ajibade being secured into the restraint chair, she "did not see or hear anything except the other Officers in the cell trying to gain compliance and restrain Ajibade in the chair." (Doc. 191-1, pp. 13–14.) Based on her observations, she claims, she "ascertained that Ajibade was resisting being restrained" but did not participate in the restraint process, did not participate in drive-stunning Ajibade and did not even know Ajibade had been drive-stunned during the restraint chair process until after he had passed away. (<u>Id.</u> at pp. 16–17.) As a result, she urges, her "lack of knowledge at the time ends the inquiry because it establishes that [she] was not in a position to intervene." (<u>Id.</u> at p. 17.)

In response, Plaintiffs do not point to any evidence indicating that Johnson actually did see, could see, or otherwise knew that Ajibade was being drive-stunned inside the cell (to provide a basis for a jury to find that she was in a position to intervene and had an opportunity to intervene to stop the drive stunning). Instead, Plaintiffs attempt to support their claim that

Johnson was in a position to intervene to stop the use of excessive force through conjecture, relying wholly on circumstantial evidence mixed with speculation. Plaintiffs' theory is that a reasonable officer in Johnson's position should have *anticipated* that Ajibade would be subjected to excessive force simply because she "was aware that other officers were angry at [Ajibade] and might try to do something to him" and also because she gave the Taser to an officer knowing that he intended to give it to Corporal Kenny. (Doc. 233-1, pp. 23–24.) Plaintiffs claim that Johnson should "at the very least have returned to the holding cell area to ensure [Ajibade] was not being tased unnecessarily." (Id. at p. 25.) This theory is *non sequitur*, however. First, Plaintiffs do not cite to any evidence that actually indicates Johnson knew or had reason to know that other officers were angry at Ajibade and might, therefore, use excessive force. Additionally, by his own undisputed testimony, Corporal Kenny was not present during the initial take down and restraint of Ajibade in the booking area, so Johnson would have even less of a reason to suspect that Kenny would be angry at Ajibade and/or inclined to use excessive force. It additionally bears noting that Johnson herself had just used the Taser without discharging it to obtain compliance from Ajibade. Thus, the fact that she gave the Taser to another officer does not impute to her some knowledge that the Taser would be used to apply excessive force to Ajibade. Plaintiffs' other theory is that Johnson heard Ajibade screaming in the holding cell and "a reasonable officer, under these circumstances, could find that [Ajibade] was screaming because he was being tased." (Id. at p. 24.) As already addressed herein, however, there is no evidence that Johnson heard Ajibade screaming while he was in the holding cell, so there is no basis for this theory either. (See footnote 5, supra.)

"A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v.

Darby, 911 F.2d 1573, 1577 (11th Cir.1990).  Here, there is less than a scintilla of evidence.  There is simply no factual basis for a jury to find that Johnson was in a position to intervene in the drive-stunning of Ajibade while he was in the restraint chair or that Johnson had an opportunity to intervene.  Consequently, Johnson is entitled to summary judgment on Plaintiffs' claim pursuant to 42 U.S.C. § 1983 for the use of excessive force.

### 2.  Defendant Martinez

Defendant Martinez emphasizes that when he heard the Taser discharged while Ajibade was in the holding cell, he could not see whether the Taser was being applied to Ajibade as opposed to being engaged (without being applied) as a warning to Ajibade to gain his compliance.  (Doc. 192-1, p. 15.)  He urges that since he "was not in the cell, could not see into the cell, and was only in the vicinity one time when a Taser discharge could be heard, he lacked sufficient information and knowledge to evaluate whether any force that was applied to Ajibade was excessive in violation of § 1983" and he therefore "was never in a position to intervene" and is entitled to qualified immunity on the excessive force claim.  (Id. at p. 16.)

In response, Plaintiffs do not point to any evidence indicating that Martinez actually did see, could see, or otherwise knew or should have known that Ajibade was being drive-stunned inside the cell when he heard the single Taser discharge from outside the cell.  Instead, Plaintiffs urge that the undisputed facts could provide a basis for a reasonable juror to conclude that Martinez was in a position to intervene to stop the use of excessive force because "[a] reasonable officer, under these circumstances, could find that [Ajibade] was screaming because he was being [drive-stunned]."[7]  (Doc. 226-1, p. 14.)[8]  Notably, however, Plaintiffs fail to cite to any

---

[7]    While there is evidence that Ajibade was drive-stunned while being placed into the restraint chair, there is absolutely no evidence indicating that he was *tased* (with probes that lodged under his skin, see footnote 2, supra) and thus there is no support for Plaintiffs' allegations that Martinez knew or should

record evidence indicating that Martinez actually heard Ajibade screaming at the time he heard the single discharge of the Taser.[9]

Thus, Plaintiffs' argument (in light of the evidence) is that, after hearing the single discharge of the Taser (which very well could have been the test discharge)[10] Martinez should have abandoned whatever task he was attending to and gone into the cell to determine whether excessive force had been used so that he could intervene to prevent any additional use of excessive force. Through this theory, Plaintiffs would have the Court expand the duty to intervene to require an officer who is not in a position to observe the actions of another officer to abandon his task and investigate the acts of the other officer occurring outside of his presence simply because, in theory, the other officer could possibly be applying force that is excessive under the circumstances. Plaintiffs, however, have not provided, and the Court is not aware of, any binding precedent or even persuasive authority, for Plaintiffs' proposed expansion of the duty to intervene. See, e.g., Campbell v. Harvill, No. CA 11-0228-CG-C, 2012 WL 928607, *5 (M.D. Ga. Feb. 15, 2012) ("To be held liable for his nonfeasance, an officer (1) must have *observed or had reason to know* that excessive force would or was being used, and (2) must have

---

have known Ajibade was being tased. As a result, the Court considers Plaintiffs' arguments only in the context of Ajibade being drive-stunned.

[8] In what appears to be a concession that Martinez did not actually observe the Taser being discharged, Plaintiffs fault Martinez for making "no attempt to check on [Ajibade]" to determine what was happening in the cell at that time. (Doc. 226-1, p. 14.)

[9] One would expect Plaintiffs to use the video footage to their advantage, to show that Martinez was close by when Ajibade was screaming while being drive-stunned. Plaintiffs, however, fail to specify any such portion of the video footage. As a result, Plaintiff has not demonstrated that Martinez was in the vicinity when any such screaming took place. Indeed, after watching and listening to the surveillance footage, the Court can only discern one time when it sounds as if Ajibade is screaming, and at that time Martinez is not in the vicinity of the cell. (See CM117_Female_Holding_#2.pef at 11:43:18 through 11:43:27.)

[10] Testimony from Plaintiffs' own expert indicates that a test discharge with a Taser in drive-stun mode would make a sound if it is working. (Doc. 181-23 (Root Depo.), p. 17.)

had both the opportunity and the means to prevent harm from occurring.") (emphasis added and citations omitted), *report and recommendation adopted by* 2012 WL 929614 (M.D. Ga. Mar. 19, 2012). Furthermore, such expansion would undermine not only law enforcement in general but also, in the present context, the safe and orderly functioning of detention centers, as officers would be required to abandon assigned tasks pertaining to booking and securing inmates in order to investigate other officers' activities, resulting in serious threats to public safety. See, e.g., Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996) (holding that an officer who was engaged in arresting a suspect, and who did not observe his fellow officer's use of excessive force on a second suspect, did not have a duty to intervene).

In sum, Plaintiffs have failed to present evidence indicating that Martinez could have observed or did observe excessive force being used against Ajibade. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577; see, e.g., Sheppard v. City of Blackshear, No. 5:12-CV-136, 2015 WL 300458, at *9 (S.D. Ga. Jan. 22, 2015), *aff'd sub nom.* Sheppard v. Pierce Cty., 631 Fed. Appx. 718 (11th Cir. 2015) ("The evidence of [defendant's] contemporary knowledge of the assault taking place in the woods is too speculative to create an issue of fact as to his willful failure to intervene in that assault."). In contrast, the video and Martinez's testimony establish the following compelling facts: (1) Martinez never entered the cell, never had an unobstructed view into the cell, and could "not really" see inside the cell; (2) the restraining chair (and thus Ajibade) were positioned facing the back wall of the cell, with Ajibade's back to the doorway and Martinez, such that even with an unobstructed view into the cell Martinez could not have observed the front of Ajibade's body or his face; (3) Martinez did not see the Taser being discharged or being applied to Ajibade, but

only heard it being discharged a single time; (4) Corporal Kenny admits that he initially discharged the Taser one time as a test and a warning, and did not apply it to Ajibade; (5) Martinez was aware that Ajibade had been refusing to comply with officers' commands and had been resisting officers (resulting in the call for back-up assistance); and (6) Martinez frequently left the vicinity of the doorway to the cell and the general area of the cell during the time period Ajibade was being secured into the chair. In light of these undisputed facts, the Court finds that there is no reasonable basis for a jury to conclude that Martinez violated Ajibade's constitutional rights by failing to intervene after hearing nothing more than a single discharge of the Taser (which the evidence indicates could have been the warning discharge) while Ajibade was being secured in the restraint chair. See Ensley, 142 F.3d at 1407–08 (officer who did not observe the use of excessive force is not in a position to intervene); Souter v. Edelen, Civ. No. 3:10CV65/MCR/EMT, 2011 WL 7162886, at *10 (N.D. Fla. Nov. 7, 2011), r*eport and recommendation adopted*, 3:10CV65/MCR/EMT, 2012 WL 370645 (N.D. Fla. Feb. 3, 2012) (granting summary judgment to an officer where his affidavit and the video footage showed he had no involvement in the activity occurring inside the cell during the two-minute period Plaintiff was allegedly beaten—notwithstanding that "he was momentarily present in the cell"—since his observation of the activity in the cell was "very limited," and also granting summary judgment to another officer who videotaped the activity in the cell because his view "was inhibited by his physical position several feet from the cell, as well as the positions of the officers in the cell, who were essentially huddled over Plaintiff"); Mendoza v. City of Hialeah, Civ. No. 17-21790-Civ-Scola, 2017 WL 6514687, *4 (S.D. Fla. Dec. 20, 2017) ("Even assuming that the force used against the Plaintiff was excessive, the mere fact that [the defendant officers] were present is insufficient to establish that they had the time and opportunity to intervene.");

<u>Johnson v. Lerner</u>, Civ. No. 08-61344-CIV, 2009 WL 3187110, at *6 (S.D. Fla. Sept. 30, 2009) (granting summary judgment to defendant where it was "clear that [plaintiff's] claim that [defendant] should be held responsible for the alleged acts of fellow officers [was] based on his assumption that [defendant] was aware of those alleged acts and failed to intervene" because plaintiff "[did] not know whether [defendant] saw [the other officer] strike him with a flashlight . . . and . . . only assume[d] that [defendant] was aware of the alleged abuse involving the heater" and therefore "it cannot be said that there is evidence refuting [defendant's] statements made under oath that he neither personally abused [plaintiff], nor observed any other officer doing so").[11] Thus, Defendant Martinez is entitled to summary judgment on Plaintiffs' claim pursuant to 42 U.S.C. § 1983 for the use of excessive force.

### B. Qualified Immunity Protects Johnson and Martinez from the Excessive Force Claim

Johnson and Martinez also urge that they are entitled to summary judgment on the excessive force/failure to intervene claim because they are protected from the claim by qualified immunity. The Court agrees.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Dalrymple v. Reno</u>, 334 F.3d 991, 994 (11th Cir. 2003) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002)).

---

[11] Plaintiffs rely heavily on the Eleventh Circuit's Opinion in <u>Detris v. Coats,</u> 523 Fed. Appx. 612 (11th Cir. 2013) (per curiam), to support their argument that summary judgment should be denied as to both Johnson and Martinez. That case, however, is easily distinguishable from the case at hand. In <u>Detris</u>, the Eleventh Circuit was addressing a motion to dismiss, not a motion for summary judgment, and was thus required to consider only whether the facts alleged by plaintiff were sufficient to state claim. <u>Id.</u> at 616–17. The court was not considering evidence (or the absence thereof), as this Court is in this summary judgment ruling. Moreover, the allegation that allowed Detris's case to survive was that the defendants had stood by and watched—and even laughed and made "boorish remarks"—while other officers beat the plaintiff. <u>Id.</u> at 614, 616–17. Here, there is absolutely no evidence to support a finding that Defendant Johnson or Defendant Martinez stood by and watched Ajibade being drive-stunned.

"Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)) (internal quotation marks & alteration omitted).

To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley v. Palm Beach Cty. Sheriff Dept., 783 F.3d 1347, 1352 (11th Cir. 2015). Here, no one disputes that Defendants Johnson and Martinez were performing discretionary duties at the time in question. (Doc. 192-1, p. 26; doc. 226-1, p. 7.) Therefore, they may properly assert the defense, and the question becomes whether it bars the claim against them for failure to intervene. The burden now shifts to the Plaintiffs to show qualified immunity is not appropriate. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Court must grant qualified immunity unless the facts taken in the light most favorable to Plaintiffs show (1) that there was a violation of the Constitution; and (2) that the illegality of the Defendant's actions was clearly established at the time of the incident. Hoyt, 672 F.3d at 977. The Court has discretion in deciding which of those two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The Court has already determined above that

even when viewing the evidence in the light most favorable to Plaintiffs, Johnson and Martinez did not commit a constitutional violation by failing to intervene. Moreover, even if it could somehow be said that they did violate the Constitution, it cannot be said that the illegality of their conduct was clearly known at the time of the incident underlying this lawsuit.

"[T]he touchstone of qualified immunity is notice." Bussey-Morice v. Gomez, 587 F. App'x 621, 627 (11th Cir. 2014) (citing Holmes, 321 F.3d at 1078). The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. See Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). As the Eleventh Circuit Court of Appeals has explained, there are

> two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right. The first requires the court to examine whether decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of [Georgia]) [have] clearly establish[ed] the law. This method does not require [e]xact factual identity with a previously decided case but rather demands that the unlawfulness of the conduct must be apparent from the pre-existing law.

> The second approach asks whether the officer's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law on point. Even in the absence of caselaw holding the specific conduct unlawful, a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question. But this principle, which offers a narrow exception to the general rule that only factually specific analogous caselaw can clearly establish a constitutional violation, is reserved for rare cases.

Moore v. Pederson, 806 F.3d 1036, 1047 (11th Cir. 2015) (quotations and citation omitted).

In their Response briefs, Plaintiffs emphasize that they are not required to provide "earlier cases involving 'fundamentally similar' facts," but only have to show that the law that was in effect at the time of the incident gave Johnson and Martinez "fair warning" that their conduct would be unconstitutional. (Doc. 233-1, p. 20; doc. 226-1, p. 16 (quoting Hope, 536

U.S. at 741).)  They cite three cases as having "repeatedly . . . answered in the negative" the "question whether a [T]aser may be used against a compliant detainee repeatedly."[12]  (Id.)

Plaintiffs have inaccurately framed the "question" here.  (Doc. 226-1, p. 16.)  As discussed previously in this Order, Plaintiffs have not pointed the Court to any evidence indicating that Ajibade was being compliant when he was drive-stunned in the holding cell.  To the contrary, testimony from multiple witnesses supports the finding that he was resisting officers and refusing to cooperate in being secured in the restraint chair.  (Doc. 181-13 (Kenny Depo.), pp. 145, 148–53; doc. 181-20 (Samuel Richardson Depo.), p. 62; doc. 219-1 (Burt Ambrose Examination Under Oath by Plaintiffs), p. 20; doc. 219-2 (David Cody Depo.), pp. 53–54; doc. 114-7 (Mark Capers Depo.), p. 9.)  In any event, the undisputed evidence that is material to the Court's present inquiry establishes that Martinez and Johnson did not know what was going on inside the holding cell other than that officers were working to secure Ajibade in the restraint chair.[13]

To support their position that Johnson and Martinez violated a clearly established constitutional right, Plaintiffs cite Oliver v. Fiorino, 586 F.3d 898 (11th Cir. 2009), Wate v. Kubler, 839 F.3d 1012 (11th Cir. 2016), and Boynton v. City of Tallahassee, 650 F. App'x 654 (11th Cir. 2016).  Plaintiffs provide nothing more than parenthetical information as to the holdings of each of these three cases.  Plaintiffs do not appear to contend that any or all of these

---

[12] To the extent Plaintiffs, by disavowing any need to provide cases with "fundamentally similar facts," seek to rely exclusively on the second approach outlined above, the Court emphasizes that this standard "is a difficult one to meet."  Bussey-Morice v. Kennedy, 657 F. App'x 909, 913 (11th Cir. 2016) (citing Hoyt, 672 F.3d at 977 ("[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (quoting Priester v. City of Riviera Beach, Fl., 208 F.3d 919, 926 (11th Cir. 2000)).

[13]  While Johnson did know that Corporal Kenny had the Taser in the holding cell (and that, at one point, the light was on), there is still no evidence that she knew it would be (and later was) used to drive-stun Ajibade, rather than simply to threaten him into compliance (as Johnson herself had successfully done moments earlier when Ajibade was on the floor in the booking area).

three cases clearly established that conduct identical to that exhibited by Johnson and Martinez in this case constitutes excessive force, and rightly so; none of these cases involved officers who allegedly failed to intervene on another officer's use of a Taser (or any kind of force, for that matter). Therefore, none of these cases can be said to have put Johnson or Martinez on notice that their failure to intervene—given the positions they were in, what they heard and what they knew—would violate a clearly established right. Moreover, Wate and Boynton were decided in 2016, at least a year after the incident. Plaintiffs must carry their burden by looking to the law as interpreted at the time of the alleged violation. Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir. 2003)). As such, whether Wate or Boynton are "materially similar" is irrelevant to the analysis of Plaintiffs' claim. Id.

Thus, Plaintiffs can surmount the qualified immunity hurdle only if Johnson and Martinez's conduct was "so far beyond the hazy border between excessive and acceptable force that [Johnson and Martinez] had to know [they were] violating the Constitution even without case law on point." Id. at 1303 (quotation omitted). That is, Plaintiffs must show that drive-stunning Ajibade was "such outrageous conduct under the circumstances that every reasonable officer would have known" that it violated Ajibade's clearly established constitutional rights and would have intervened to stop such activity. Gomez, 587 F. App'x at 628; Hoyt, 672 F.3d at 978 ("This would require that every reasonable officer in [Johnson or Martinez's] position would inevitably" intervene under these circumstances.). Plaintiffs have failed to make such a showing.

First, Oliver is materially distinguishable from this case because, as the Eleventh Circuit explained in a later case, "unlike here, in Oliver, the officer deployed her Taser against an individual despite his substantial compliance with officers' commands" and in circumstances

significantly different from those in the instant matter.  Gomez, 587 F. App'x at 628 (citing Oliver, 586 F.3d 898).  The decedent in Oliver had initially been tased by one officer while another officer was pulling the decedent by the shirt out of a roadway for safety purposes.  586 F.3d at 903.  Once the decedent was on the ground, the evidence indicated that he had not tried to get back up or to physically resist or attack the officers.  Id.  Nonetheless, he was tased an additional seven times while lying on the ground.  Id.  The Oliver court held that, although the initial deployment of the Taser may have been justified, the repeated tasing was so disproportionate to the level of force necessary that any reasonable officer in the situation would have recognized that her actions were unlawful.  Id. at 907–08.  Later, in Gomez, the Eleventh Circuit emphasized that the decedent in Oliver "was not suspected of a crime, . . . did not act belligerently or aggressively," and had "complied with most of the officers' directions and made no effort to flee."  Id. at 629.  The Gomez court also explained that the Court's determination in Oliver—"that the law was clearly established[—was] not due to brightline precedent, but [was] as a matter of obvious clarity."  Id. at 629 (citing Oliver, 586 F.3d at 907–08).

Unlike in Oliver, here Ajibade had been arrested on suspicion of a crime (battery) and, immediately prior to being placed in the holding cell, had resisted officers' commands during the booking process and then had aggressively resisted several other officers when they tried to physically restrain him.  He had undertaken a major physical struggle with the officers on the floor and he had worked to wrestle control of the Taser from one of the officers, resulting in one officer being drive-stunned and seriously injured.  As shown by the video footage, it took several officers just to pin him down on the floor, and he continued resisting officers even after he was pinned down on the floor in the booking area.  When they responded to the call for additional officers, Johnson and Martinez witnessed multiple officers struggling to pin down and restrain

Ajibade in the booking area. Johnson used the Taser (without discharging it) to threaten Ajibade into ceasing his resistance to officers who were trying to cuff his hands and shackle his legs, and Martinez observed as this took place. Martinez was not in the holding cell and only heard a single discharge of the Taser, and Johnson cannot be placed in the vicinity of the holding cell when Ajibade was actually drive-stunned. Given these circumstances, this case is clearly distinguishable from Oliver[14] and there is no basis under Oliver for this Court to find that either Johnson or Martinez's conduct constituted "such outrageous conduct under the circumstances that every reasonable officer would have known" that it violated Ajibade's clearly established constitutional right and that the officer therefore was required to intervene. This is particularly true since the undisputed evidence establishes that Ajibade was resisting officers while they tried to secure him into the restraint chair.

The other two cases Plaintiffs cite—Wate and Boynton—also fail to provide a basis for finding that Johnson or Martinez's conduct violated a clearly established constitutional right. In Wate, an officer attempted to arrest a suspect for suspected battery. 839 F.3d at 1015–16. A struggle ensued and the officer repeatedly hit the man, got on top of him and pinned him in an effort to handcuff him. Id. at 1016. When another officer arrived on the scene, he deployed his Taser (using probes) and used the Taser on the man a total of five times over a two-minute period. Id.at 1017. Notably, the court explained that the eyewitness accounts varied, but that several witnesses stated that the suspect had stopped resisting during the two-minute period in which the Taser was being used. Id. at 1020–22. Therefore, the court held that "while the first or maybe even the second Taser deployment may have been warranted," by the third deployment, the suspect was "handcuffed, immobile, and still," and there was a constitutional

---

[14] The Court notes that the Oliver court explicitly left open the issue of whether the initial tasing of the decedent was justified, and instead focused on whether the repeated use of Taser force after the initial Taser shock was appropriate. 586 F.3d at 906–07.

violation. Id. at 1021. The court additionally held that "a reasonable officer in [the tasing officer's] position and under these circumstances would have had fair warning that repeatedly deploying a Taser on [the suspect], after he was handcuffed *and had ceased resisting*, was unconstitutionally excessive." Id. at 1021–22 (emphasis added).

> As for Boynton, the court summarized the facts of that case the following way:

> [Officer Norton] respond[ed] to a call about a "combative" medical patient, but by the time he arrived Boynton was not combative at all. In fact, he was barely responsive, lying immobile on the floor of the ambulance. When Norton told him to get onto the stretcher, Boynton did not move, but he also did not struggle or argue when Norton moved him. Norton admits that the only "resistance" he encountered was when Boynton "tensed" his body, making it difficult for him to reposition Boynton on the stretcher. In response, Norton tased Boynton nine times, eight of which were after Boynton had agreed to comply with Norton's demands.

650 F. App'x at 660. The court likened the case's facts to those of Oliver, and held that, "[i]n light of Oliver, a reasonable officer in Norton's position would have known that repeatedly tasing Boynton, who was not argumentative, aggressive, or mobile, was unreasonable under the Fourth Amendment." Id. at 661.

Neither Wate nor Boynton support Plaintiffs' position that Johnson or Martinez's conduct violated a clearly established constitutional right. In contrast to those cases, here, Martinez only heard a single discharge inside the cell (and did not see how the Taser was being used). Johnson never saw or heard the Taser discharged at all. Both of these Defendants knew that Ajibade had already been resisting officers' efforts to restrain him (and Johnson knew he had even grabbed a Taser from another officer earlier and had attempted to use it on several officers). There is no evidence upon which it can be held that Martinez or Johnson did believe or should have believed that Ajibade was being compliant inside the cell. (Indeed, Johnson heard Corporal Kenny inside the cell instructing Ajibade to calm down.) Finally, as discussed further below, this case is different from Wate because the undisputed evidence is that Ajibade was resisting being secured

in the restraint chair, and there is no evidence indicating that he was not resisting or had stopped resisting prior to the final drive stun. Similarly, unlike in Boynton, here the undisputed evidence indicates that Ajibade was not only responsive but was kicking, swaying and arching his back in resistance to being placed in the chair, and was refusing to comply with officers' orders at the time he was drive-stunned. As a result, Wate and Boynton cannot be said to indicate that a "general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question." Moore, 806 F.3d at 1047.

There are several Eleventh Circuit cases that provide guidance and contradict Plaintiffs' claim that Johnson and Martinez violated a clearly established right. In Buckley v. Haddock, the Eleventh Circuit granted qualified immunity to an officer using a Taser to gain the compliance of a handcuffed suspect. 292 F. App'x 791 (11th Cir. 2008). The handcuffed, uncooperative plaintiff had refused an officer's order to move from the ground to the patrol car. Id. at 792–93. The officer applied the Taser a total of three times to the uncompliant, but otherwise sedate, plaintiff. Id. In a more recent case involving the issue of whether a right was "clearly established" for purposes of defeating qualified immunity, the Court of Appeals looked to Buckley for guidance, explaining:

> [In Buckley,] [t]wo judges of this court concluded that the first two taser shocks did not violate the Constitution. While the unpublished Buckley opinion is not binding precedent and certainly does not establish that the use of taser shock on a handcuffed plaintiff to bring compliance is constitutional, the clear views of those two judges of this court are relevant to the issue of whether the lesser conduct in the instant case violated clearly established constitutional law.

Alday v. Groover, 601 F. App'x 775, 778 (11th Cir. 2015).[15] On that basis, the Alday court held that the officer in that case, who had drive-stunned a non-violent handcuffed arrestee in the neck

---

[15] The Alday court also noted that "[i]n addressing the issue of clearly established constitutional law, we have 'take[n] note of the perspective of reasonable jurists who have attempted to articulate the legal

for five to ten seconds after she refused to exit the police car and walk into the detention center, was entitled to qualified immunity.  Id.

In Mann v. Taser Intern., Inc., the use of the Taser was held to be "appropriate given the countervailing government interest of safety and compliance" where a suspect violently resisted arrest, even after being placed in handcuffs and leg shackles, such that she was deemed "a danger to herself and others."  588 F.3d 1291, 1306 (11th 2009).  See also Sanders v. City of Dothan, 409 Fed. Appx. 285, 290 (11th Cir. 2011) ("It is not clearly established that a police officer is prohibited from momentarily tasering an uncooperative handcuffed arrestee who—after multiple warnings—refuses to comply with that justifiable law-enforcement objective. This law-enforcement conduct is not so clearly in violation of constitutional rights that qualified immunity can be denied without a decision on point.").

Johnson and Martinez are additionally entitled to qualified immunity because the conduct upon which they failed to intervene was not clearly established as a violation of Ajibade's constitutional rights at the time the conduct occurred.  "[W]hen an officer's force does not violate a clearly established right, other officers' failure to intervene does not violate a clearly established right."  Kennedy, 657 Fed. Appx. at 915 (citing Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009)).  In this case, the evidence establishes that, once in the holding cell, Ajibade continued to resist officers' efforts to secure him in the restraint chair, and officers feared that he would use his knees, feet, mouth or head to harm them.  The evidence before the Court is that, until the final drive-stun was administered, Ajibade was not affected by the drive-stuns and he continued to resist officers.  These undisputed facts establish that the officers inside the cell did not violate Ajibade's clearly established rights by drive-stunning him.  Because the

landscape [in non-binding precedent].'"  601 F. App'x at 778 n.1 (quoting Denno v. Sch. Bd. of Volusia Cty., 218 F.3d 1267, 1272 (11th Cir. 2000)).

conduct of the officers inside the holding cell did not violate one of Ajibade's clearly established rights, the Court is bound to find that Johnson and Martinez's failure to intervene upon that conduct likewise did not violate one of Ajibade's clearly established rights.

In summary, Plaintiffs cannot point to "case law with indistinguishable facts clearly establishing the constitutional right [or] a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right."  Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291-92 (11th Cir. 2009); see, e.g., Mannor v. Pearce, Civ. No. 4:15-CV-01413-SGC, 2018 WL 1456638, at *6 (N.D. Ala. March 23, 2018) (use of Taser in drive-stun mode in effort to gain compliance from a "passively resistant" handcuffed arrestee who was refusing to stand up at officer's command was not a clearly established violation of constitutional rights).  Therefore, Johnson and Martinez are entitled to qualified immunity unless their conduct was "so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution."  Willingham, 321 F.3d at 1303. The Court simply cannot find the failure to intervene upon the use of the Taser in drive-stun mode under the circumstances presented here was so far past that border.  As such, Johnson and Martinez are entitled to qualified immunity as to Plaintiffs' excessive force claims, and their motions for summary judgment on this ground are due to be granted.

For all of these reasons, the Court **GRANTS** both Johnson[16] and Martinez summary judgment as to Plaintiffs' Section 1983 claim that they violated Ajibade's constitutional right to be free from the use of excessive force (Count 1).

---

[16]    The Court declines to consider the claim of supervisory liability asserted by Plaintiffs against Defendant Johnson in connection with their Section 1983 excessive force claim against her.  (See Doc. 233-1, pp. 25–26 (arguing Johnson is not entitled to qualified immunity because Plaintiffs can establish a *prima facie* claim of supervisory liability against her).)  Plaintiffs failed to properly plead that claim.  The Magistrate Judge already rejected an attempt by Plaintiffs to assert supervisory liability against Johnson through an amendment to their Amended Complaint.  (Doc. 215.)  In that Order, the Magistrate Judge

## II.    Section 1983: Deliberate Indifference to Physical and Mental Health Needs

Defendants Johnson and Martinez also claim that they are entitled to summary judgment on Plaintiffs' claim under Section 1983 that they failed to provide adequate medical care to Ajibade.  They argue that the record lacks evidence to support each element of Plaintiffs' claim that they showed deliberate indifference to Ajibade's serious medical needs.   Johnson and Martinez also claim that qualified immunity protects them from this claim, as Plaintiffs cannot show that they violated any clearly established law.   In response, Plaintiffs claim they have presented sufficient evidence to support such a claim and that neither Defendant is entitled to qualified immunity.

As a pre-trial detainee at the CCDC, Ajibade's constitutional right to be free from deliberate indifference is guaranteed by the Fourteenth Amendment.   However, the Eleventh Circuit Court of Appeals has "historically treated convicted prisoners' Eighth Amendment claims and pretrial detainees' Fourteenth Amendment claims identically."   White v. Cochran, Civ. No. 16-17490-G, 2017 WL 6492004, at * 2 (11th Cir. Nov. 27, 2017).[17]  Thus, a deliberate indifference to medical needs claim under the Fourteenth Amendment mirrors analysis of the

---

explained that his denial of leave to amend was based in part upon the fact that Defendants "have gone the entire course of the case *not* specifically preparing to defend against a supervisory liability claim" as well as the fact that "Plaintiffs' other § 1983 claims simply do not *per se* create supervisory liability claims against defendants, regardless of whether they think they should." (Id. at p. 5.)   To consider the supervisory liability claim as a means of defeating qualified immunity would simply permit Plaintiffs to accomplish a workaround of that Order and Magistrate Judge's sound grounds for denying it.

[17]   In Kingsley v. Hendrickson, the United States Supreme Court found the "language of the [Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause] differs, and the nature of the claims often differs."   ___ U.S. ___, 135 S. Ct. 2466, 2475 (June 22, 2015) (adopting a different test to evaluate pre-trial detainee's excessive force claims than the test used to evaluate convicted prisoners' excessive force claims).   However, the Eleventh Circuit subsequently determined that "Kingsley is not squarely on point with and does not actually abrogate or directly conflict with precedent outside of the context of an excessive[]force claim." White, 2017 WL 6492004, at *2 n.1 (citing Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (internal citation and punctuation omitted)).

Eighth Amendment's proscription against cruel and unusual punishment.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The standard for cruel and unusual punishment in the medical care context, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate.  Farmer, 511 U.S. at 828.  However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

Thus, in order to prove a deliberate indifference to medical care claim, similar to any other deliberate indifference claim, a prisoner must: (1) "satisfy the objective component by showing that [he] had a serious medical need"; (2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and (3) "show that the injury was caused by the defendant's wrongful conduct."  Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).  As to the first component, a medical need is serious if it "'has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Id. (quoting Hill, 40 F.3d at 1187).  Under the second, subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety."  Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995).  Thus, the subjective component requires an inmate to prove: "(1) subjective knowledge of a risk of serious

harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence."[18] Dang ex rel. Dang v. Sheriff, 856 F.3d 842, 850 (11th Cir. 2017) (citing McElligott, 182 F.3d at 1255). "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). Additionally, a defendant who "delays necessary treatment for non-medical reasons" or "knowingly interfere[s] with a physician's prescribed course of treatment" may exhibit deliberate indifference. Id. (citations omitted).

When a claim turns on the quality of treatment provided, however, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." Melton, 841 F.3d at 1224 (quoting Harris, 941 F.2d at 1505). In other words, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 104. Furthermore, deliberate indifference is not established when an inmate receives medical care, but "may have desired different modes of treatment." Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985).

---

[18] The Court recognizes that recent Eleventh Circuit opinions have differed on whether the standard of proof in this context should be more than "gross negligence" or more than "mere negligence." Compare Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2018) ("[I]n order to prove a Fourteenth Amendment violation of deliberate indifference to a substantial risk of serious harm, a plaintiff must prove (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.") with McLeod v. Sec'y, Fla. Dep't of Corr., 679 F. App'x 840, 843 (11th Cir. 2017) (per curiam) (listing the three components of deliberate indifference in a deliberate indifference to serious medical needs case, including (1) the official's subjective knowledge of a risk of serious harm; (2) the official's disregard of that risk; and (3) conduct that is more than mere negligence); Melton v. Abston, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016) (same, and disagreeing with an Eleventh Circuit panel decision stating a claim of deliberate indifference requires proof of more than gross negligence, finding the "more than mere negligence" standard more consistent with Farmer and in line with the decision in McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999)). The Court need not delve into the appropriate standard, however, since Plaintiffs' claim fails on the first two elements as to both Johnson and Martinez.

"In general, serious medical needs are those 'requiring immediate medical attention.'" Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (quoting Hill, 40 F.3d at 1190). There is evidence indicating that Ajibade may have been suffering from a mental health issue at the time he was detained. (Indeed, Defendants' own experts are split on this issue. (See Doc. 191-1, pp. 20–21 n.5.)) There is also photographic and video evidence indicating Ajibade was bleeding (including from his mouth) after his initial altercation with officers at the CCDC. Finally, the Court cannot overlook the fact that Ajibade passed away while still in the restraint chair. In light of the foregoing, and for purposes of these summary judgment motions, the Court assumes, without deciding, that Ajibade was suffering from a serious medical need during and after the time he was being secured into the restraint chair.

Nonetheless, even assuming Ajibade was suffering from a serious medical need, Plaintiffs' claim for deliberate indifference fails as to Martinez and Johnson because Plaintiffs cannot point to evidence showing either of them were deliberately indifferent to Ajibade's medical needs.

## A. Defendant Martinez

To prove Defendants' deliberate indifference, Plaintiffs must be able to show Defendants' "(1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence." Dang, 856 F.3d at 850. Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099–1100 (11th Cir. 2014). The defendant will not be held responsible for failing to act if "he should have perceived the risk but did not . . . ." Farmer, 511 U.S. at 838. Nevertheless, subjective knowledge can be inferred

when the risk was obvious.  Id. at 842.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Id.

In their Response in opposition to Martinez's summary judgment motion, Plaintiffs emphasize the following in support of their deliberate indifference claim against him:

> Evans-Martinez was aware that Mathew was in physical pain and had been moaning since being placed in the restraint chair.  Evans-Martinez was present in the holding cell area for a portion of time after the use of the taser, heard him moaning, and made no attempt to check on him.  Shortly after officers left, Mathew screamed "Help me" and "I can't breathe."  (Video CM117 Female_Holding_Cell #2 11:49:02-11:49:30).  The video shows that the door to the female holding cell area was open.  (Video CM119 Booking Sgt. Desk 11:39:35-11:40:00).  No one was summoned to provide Mathew medical attention.  On multiple other occasions, Mathew can be heard screaming, crying, and moaning.  (See generally Video CM117 Female Holding Cell #211:51:20-1:36:30).
>
> There can be no dispute that no one checked on Mathew for the approximately one-and-a-half hours from the time he was left in the cell to when he was found nonresponsive.  Defendant Maxine Evans, claiming to have performed these checks, falsified the log she completed, and Brown signed it.  (Ex. L (log); Ex. B at PA1064 ("she agreed it was not correct").)  While still alive, Mathew screamed for help, including the words: "I can't breathe."  Id. at PA732.
>
> The only reasonable conclusion to draw from these facts is that jail staff, including Evans-Martinez, willfully disregarded jail policy which was put in place to protect the safety of the detainees and inmates.

(Doc. 226-1, pp. 18–19.)  Plaintiffs then proceed to argue that "[a] reasonable officer in [Martinez's] situation would not have relied on the cursory restraint check that [Ajibade] had received from Nurse Brown as proof that he was being properly treated.  (Id. at p. 19.)  Plaintiffs claim that Martinez "was aware [Ajibade] had been tased four times."  (Id.)

Notably, and as stated previously in this Order, Plaintiffs fail to provide any record evidence to support their assertions that (1) Martinez knew Ajibade was in physical pain, (2) he heard Ajibade moaning or otherwise knew he had been moaning since being secured in the

restraint chair, and (3) Martinez knew Ajibade screamed for help or later screamed, cried or moaned. There is also no evidence that Martinez observed or knew anything about what Nurse Brown did or did not do when he went inside the cell after Ajibade was secured in the chair. Indeed, the video evidence shows that Martinez was not even present when Nurse Brown entered the cell. The Court also notes that Plaintiffs' assertion that Martinez knew Ajibade had been tased four times is likewise wholly unsupported by the record. Martinez's testimony–to which no controverting evidence has been offered—is that he heard the discharge of a Taser inside the cell one time, and the evidence further indicates that this could have been the test/warning discharge. There is no evidence Martinez heard Ajibade screaming, moaning or asking for help.

Here, there is no evidence—either direct or circumstantial—to support a determination that Martinez was aware of facts from which he should have drawn an inference that a substantial risk of serious harm to Ajibade existed, nor is there evidence that he actually did draw such an inference. He did not know whether the Taser had been used on Ajibade, and his hearing a single discharge at most would support an inference that he was aware of Ajibade being tased one time. There is no evidence indicating that he knew anything about Ajibade's medical condition upon his arrival at the CCDC or his condition later, after he struggled with the officers and was ultimately secured in the restraint chair. Furthermore, Martinez never interacted with Ajibade, and only observed him briefly while he was being moved from the booking area to the holding cell and then observed the back of his head from a distance while he was inside the holding cell and Martinez was outside. There is no evidence that he noticed or should have noticed anything about Ajibade's appearance at that time that would indicate a serious medical need. Finally, the Court notes that Martinez was present when Nurse Brown came out of the holding cell, so he had a basis for believing that any necessary issues and treatment would be

handled by a medical professional.  See Williams v. Limestone Cty., Ala., 198 F. App'x 893, 897 (11th Cir. 2006) (even "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care").  As noted above, there is no evidence that Martinez heard Ajibade later screaming, crying, moaning or stating that he was not able to breathe.  To the extent some other officer charged with checking on Ajibade may have failed to do so, Martinez is not subject to liability for his or her inaction, particularly where there is no evidence he was aware that the officer may have neglected to do so.[19]  See, e.g., Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person knows.") (citations omitted).

Plaintiffs do not provide any appreciable response to Martinez's claim that he is entitled to qualified immunity because he did not violate any clearly established law.  Plaintiffs cite cases that they claim establish "numerous circumstances when an officer should have been aware of the risk" of serious harm; according to Plaintiffs, those cases involved situations where an inmate was unable to breathe, or was bleeding significantly from a deep cut, or was unable to eat or drink for several days.  (Doc. 226-1, p. 18.)  The facts known to Martinez in the case at hand in no way resembled any of the situations in those cases relied upon by Plaintiffs.  As a result, Plaintiffs have failed to carry their burden of showing qualified immunity is not appropriate.  Lee, 284 F.3d at 1194.  Plaintiffs have not shown that Martinez violated the Constitution as to Ajibade's serious medical needs or that the illegality of Martinez's actions in this regard was clearly established at the time of the incident

---

[19]  Plaintiffs admit, in their Response to Martinez's Statement of Material Facts, that Martinez had no obligation to return and check on Ajibade after he went back to his regular duties in another area of the jail.  (Doc. 226-2, p. 24.)

As there is no basis for a determination that Martinez was deliberately indifferent to Ajibade's medical needs in violation of Ajibade's constitutional rights or that Martinez was not entitled to the protection of qualified immunity, the Court finds that Martinez is entitled to summary judgment in his favor on this claim.

### B. Defendant Johnson

In their Response brief, Plaintiffs list various factors that they claim should have alerted Defendant Johnson to the existence of an unspecified serious medical need: (1) "she knew that [Ajibade] had been tased multiple times"; (2) she "was aware, or should have been, of the likelihood that [Ajibade] may have a mental health condition"; (3) she "was aware that [Ajibade] was in physical pain and had been moaning since being placed in the restraint chair"; and (4) after Johnson left the area, Ajibade cried out "help me" and "I can't breathe." (Doc. 233-1, pp. 28–29.) Plaintiffs also argue that Johnson could not have reasonably relied on Nurse Brown's restraint check as appropriate medical attention.

As discussed at great length throughout previous sections of this Order, the forgoing allegations simply are not supported by the record. First, Defendant Johnson testified that she only knew of Ajibade having been drive-stunned once (before he was even taken to the holding cell) and she was not aware that he had been drive-stunned in the holding cell until after his death. Plaintiffs have not presented any evidence to dispute this testimony. Next, there is no evidence to support Plaintiffs' claim that Johnson was, or should have been, aware that Ajibade may have been suffering from a mental health condition. Plaintiffs point only to evidence indicating that others at the CCDC may have been made aware of this possibility. Yet, Plaintiffs neglect to offer any basis for such knowledge to be imputed to Defendant Johnson. Similarly, Plaintiffs' citation to the record does not support their claim that Johnson "was aware that

[Ajibade] was in physical pain,"[20] and the Court is not otherwise aware of any supporting evidence. And while Johnson testified that she heard Ajibade moaning, she explained that he was moaning "like he was angry" and in a way that indicated to her that "definitely . . . he was coherent." (Doc. 181-12 (Johnson Depo.), p. 205.) Finally, Plaintiffs do not assert (much less provide evidence) that Johnson heard (or was in a position to hear) Ajibade yell "help me" and "I can't breathe." Thus, the undisputed evidence relied upon by Plaintiffs establishes only that Johnson was aware that Ajibade, who had been involved in a struggle with officers (the majority of which she did not observe), was moaning in apparent anger after having been drive-stunned a single time.

In light of the foregoing, Plaintiffs have failed to present sufficient evidence that Johnson "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," much less sufficient evidence that Johnson actually "dr[e]w the inference," Farmer, 511 U.S. at 837. Additionally, there is simply no basis for the Court to hold that the risk was "so obvious" that subjective knowledge by Johnson should be inferred, as permitted by Farmer. Id. at 842. Since there is no evidence that Johnson had the requisite subjective knowledge of a risk of serious harm, there is also no basis for a finding that she disregarded that risk, particularly since she had a medical professional examine Ajibade.

Finally, the Court addresses Plaintiffs' argument that Johnson cannot escape liability by claiming that she relied on Nurse Brown's check of Ajibade because Nurse Brown's check was inadequate. It is generally accepted in the Eleventh Circuit that "supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." Williams, 198 F. App'x 893, 897 (11th Cir. 2006); see also Keith v. DeKalb Cty., 749

---

[20] Plaintiffs cite one page of Johnson's deposition testimony, but nowhere on that page does Johnson say anything about Ajibade appearing or sounding like he was in pain. (See Doc. 233-1, p. 29 (citing doc. 181-12, p. 157:1–12).)

F.3d 1034, 1050 (11th Cir. 2014) (the law does not require that prison officials ignore the determination and recommendation of medical staff); see also Berry v. Peterman, 604 F.3d 435 (7th Cir. 2010) (the law with respect to prisoners' Eighth Amendment deliberate-indifference claims encourages non-medical personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so); Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) (a claim of medical indifference cannot generally be against non-medical personnel, unless they personally involved themselves with a denial of treatment or deliberately interfered with the medical treatment), *overruled in part on other grounds by* Farmer, 511 U.S. at 840.

Plaintiffs claim that Johnson should not have relied on Nurse Brown's check as proof that Ajibade was being properly treated because Johnson "did not observe Brown check anything other than the restraints,"[21] because Nurse Brown only checked on Ajibade "for a few seconds while Johnson was present,"[22] and because there is no evidence that Nurse Brown checked Ajibade's vital signs. (Doc. 233-1, p. 30.) Plaintiffs cite two cases to support their claim that "[a] supervisory official will be considered deliberately indifferent if there is evidence that the supervisor was aware that medical staff was either mistreating, or not treating, the inmate," (doc.

---

[21] The Court notes that Defendant Johnson testified that she "was not monitoring what Nurse Brown was doing the whole entire time [she] was in the cell," because she was busy speaking to Corporal Kenny at that time. (Doc. 181-12, p. 199.)

[22] In support of this assertion, Plaintiffs cite to a statement made by Johnson during her deposition. Plaintiffs fail to consider and cite the entirety of her testimony on this issue, however, which indicates that she was referring to how long she and Nurse Brown were in the cell and she testified that she was not monitoring what Nurse Brown was doing the entire time they were in the cell, so she could not say how much time he spent examining Ajibade. (See Doc. 181-12, pp. 198–99 ("Q. How long did all of that take? A. We're getting ready to find out [from watching the video footage]. I know it was only a few seconds. So I guess the camera is going to tell us exactly when I walked out. Q. It's going to tell us when you walk out. It's not necessarily going to tell us how long it took Brown to do whatever he did. A. *I can only say for the amount of time that I was in the cell* because I was not monitoring what Nurse Brown was doing the whole entire time I was in the cell.") (emphasis added); doc. 233-1, p. 6 (Plaintiffs state, in their responsive brief, that "Brown was in the cell a total of 51 seconds.").)

233-1, pp. 29–30 (citing Spruill v. Gillis, 372 F.3d 218, 237 (3rd Cir. 2004)), and also "[t]he fact that an inmate ha[s] seen a doctor does not preclude a finding of deliberate indifference if a layman could tell that there was a serious medical need that was not being treated," (id. (citing Goebert v. Lee Cty., 510 F.3d at 1327–28).) As to Plaintiffs' reliance on Spruill, the evidence here does not indicate that Johnson, who was not a medical professional (and was not even aware that Ajibade was suffering from any medical condition requiring treatment), knew or had reason to believe that Nurse Brown was either *not* treating or was *mis*treating Ajibade.[23]  Indeed, she was aware that he performed a check of Ajibade.  As to Plaintiffs' reliance on Goebert, again, Plaintiffs have not demonstrated a basis for a finding that Johnson had reason to believe that Ajibade had a medical need that was serious.[24]  Indeed, Plaintiffs have not actually indicated what it was that Johnson should have known Ajibade needed.

This case is actually more akin to Mann, where the arrestee (whom officers had been informed had mental problems and had stopped taking medication) died shortly after physically and combatively resisting arrest, being Tased several times, and falling out of the back of the patrol car.  588 F.3d at 1307.  The arresting officers had called EMS to examine the arrestee

---

[23]  Indeed, the Spruill court prefaced the statement that Plaintiffs rely on with the following: "If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.  This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on." 372 F.3d at 236.

[24]  Goebert is distinguishable from the case at hand.  In Goebert, a pregnant female inmate informed a jail official that she had been leaking fluid for more than a week, that the problem had grown worse in the previous four days, and that the jail doctor had recommended that she see an obstetrician; however, rather than sending her to the hospital or arranging other care, the official responded only that she could see an obstetrician at her own expense.  510 F.3d at 1327.  The Court commented that "[a] lay person would recognize the need for an obstetrician's attention in the circumstances that [the inmate] described to [the official], including [the jail doctor's] recommendation to that effect, and a factfinder could reasonably conclude from the evidence that [the official] himself did recognize that need."  Id.  In the case at hand, there is no basis for a determination that Johnson should have realized that Ajibade needed something more than an examination by Nurse Brown.

before transporting her to jail.  Id. at 1299–1300.  EMS personnel had not been able to examine her due to her combative nature, but they concluded she was not in any immediate medical distress since she was talking, breathing and responding.  Id. at 1300–01.  The Eleventh Circuit held that while Plaintiffs had presented sufficient evidence that the arrestee had a serious medical need, there was insufficient evidence to indicate that the officers were on notice of this need and that they were deliberately indifferent to it by not taking her for immediate medical treatment. (Id. at 1307.)  The Court noted the following:

> Far from being deliberately indifferent to a serious medical need, the deputies took the precautionary measure of calling EMS after [the arrestee] had fallen out of the patrol car.  EMS personnel, medically trained to recognize and diagnose serious medical problems, testified that [although they were not able to examine her], [she] did not appear in any immediate medical distress because she was verbally responsive and breathing normally. As such, Plaintiffs' argument that the deputies were deliberately indifferent to Melinda's medical needs is without merit.

Id. at 1308.  Like the officers in Mann, Defendant Johnson did not demonstrate deliberate indifference by relying on Nurse Brown, "who was medically trained to recognize serious medical problems," id., to examine Ajibade and determine whether he had any serious medical needs and required any treatment.

In light of the foregoing, the Court **GRANTS** Defendants Martinez and Johnson summary judgment on Plaintiffs' Section 1983 claim that they violated Ajibade's constitutional rights by being deliberately indifferent to Ajibade's serious medical need.[25]

### III.    Assault and Battery (against Defendant Johnson)

Plaintiffs allege a state law claim for assault and battery against Johnson based on her act of touching Ajibade and threatening to use the Taser to drive-stun him while officers worked to

---

[25]  It bears noting that Plaintiffs' briefs do not present any evidence or appreciable discussion regarding the third element of a deliberate indifference claim: proof of causation between the indifference and the Plaintiffs' injury.  This failure provides another independent basis upon which to grant Johnson and Martinez summary judgment on this claim.

restrain him on the floor in the booking area.  (Doc. 21, pp. 24–25; doc. 233-1, pp. 30–31.)  Defendant Johnson urges that she is entitled to summary judgment on the claim against her for assault and battery because her action was justified under the circumstances given the fact that Ajibade was resisting officers (and Plaintiffs' claim therefore fails on the merits).  She also contends she is protected from liability by the doctrine of official immunity because her actions were discretionary and there is no evidence through which Plaintiffs could establish that her actions were carried out with actual malice or intent to injury Ajibade.  (Doc. 191-1, pp. 27–30.)  In response, Plaintiffs reject Johnson's justification argument, urging that the facts viewed in the light most favorable to them show that Ajibade "was no longer actively resisting" at the time in question.  (Doc. 233-1, p. 31.)  Plaintiffs also deny that Johnson is entitled to official immunity because "the facts are sufficient to create a jury question as to whether Johnson acted with actual malice toward Ajibade."  (Id. at p. 32.)

The Court finds that Johnson is protected by official immunity.  Under the Constitution of Georgia, Johnson enjoys official immunity for her discretionary acts unless she acted with "actual malice."  Merrow v. Hawkins, 266 Ga. 390, 467 S.E.2d 336, 337 (1996).  In their Response, Plaintiffs do not dispute that Johnson's at-issue actions were discretionary and they focus their argument on showing evidence that she acted with actual malice.  (Doc. 233-1, pp. 31–32.)  "'Actual malice' requires 'a deliberate intention to do wrong, and does not include implied malice, i.e., the reckless disregard for the rights or safety of others.  A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by [the suspect].'"  Hoyt, 672 F.3d at 981 (quoting Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007) (quotations and citations omitted)).

Plaintiffs claim that Johnson threatened Ajibade with the taser after he was "fully restrained" and "was no longer actively resisting" and that she thereby "unnecessarily caused [Ajibade] to fear being [drive-stunned] again." (Doc. 233-1, p. 31–32.) They claim that since she had no justification for threatening him, "a jury could find that [Johnson's] sole intent was to cause him emotional distress out of anger that he was involved in an altercation with her subordinates." (Id.)

It is undisputed that Johnson came to the scene because of a call for back-up in the middle of a physical struggle between Ajibade and the officers. The video footage shows that, at the time Johnson arrived on-scene, Ajibade was continuing to scream and he can be seen flailing his hand and arm around in resistance to an officer (crouched on his right side) who is attempting to place a handcuff on him. (CM136_Pre_Booking_#4 at 11:36:59 through 11:37:04 PM.) At the time Johnson pressed the Taser against Ajibade's leg and ordered him to calm down, she was able to observe that seven officers were working together to immobilize him (or keep him immobilized) on the floor. (Id. at 11:37:21 through 11:37:43 PM.) Plaintiffs cite no testimony from any of the officers involved in this endeavor that would indicate Ajibade was not actually resisting at this point. Johnson held the Taser against Ajibade's leg (without ever discharging it) only for as long as it took for the other officers to confirm that all of the restraints were locked. (Id.)

In Hoyt, the Eleventh Circuit reversed this Court's determination that two officers were *not* entitled to official immunity on a claim of assault and battery by an arrestee who actually had been tased and drive-stunned multiple times during the process of being arrested. 672 F.3d at 981. The arrestee in Hoyt had initially struggled against the officers attempting to arrest him, but, at the time the Taser was used, he was lying on the ground but refusing to place one of his

arms behind his back (instead keeping it outstretched).  Id. at pp. 975–76.  The Court of Appeals held that the officers were entitled to official immunity because "no reasonable jury could find that [the defendants] used their Tasers with the deliberate intent to do wrong. . . . [T]he Tasers were employed during a struggle to arrest [the plaintiff], who refused to let his arms be brought together and handcuffed."  Id. at 981.  In the case at hand, Plaintiffs' ability to show that Johnson acted with malice towards Ajibade is even weaker than the showing made by the plaintiff in Hoyt.  Here, Johnson did not ever actually discharge the Taser and used it only as a means to help ensure Ajibade would cease actively resisting the seven officers who were attempting to restrain him.  In light of these facts and the guidance provided by Hoyt, the Court finds that no reasonable jury could find that Johnson's use of the Taser evinced actual malice, that is a deliberate intention to do wrong.  Therefore, the Court **GRANTS** Defendant Johnson summary judgment on Plaintiffs' claims of assault and battery.

## IV. Wrongful Death

In Count Five of the Amended Complaint, Ajibade's parents assert a claim for Wrongful Death against all Defendants, including Johnson and Martinez, pursuant to O.C.G.A. §§ 51-4-1, *et seq.*, based on the allegation that, "[a]s a direct and proximate result of all of the Defendants' wrongful acts, Mr. Ajibade died by homicide."  (Doc. 21, pp. 23–24.)  In their Response in Opposition to Defendant Martinez's Motion for Summary Judgment, Plaintiffs state more specifically that they "alleged a wrongful death claim pursuant to O.C.G.A. § 51-4-1 against [ ]Martinez premised upon, *inter alia*, his deliberate indifference to [Ajibade's] serious medical needs."[26]  (Doc. 226-1, p. 20.)

---

[26]  In their Response to Defendant Johnson's Motion for Summary Judgment, Plaintiffs only address the wrongful death claim in the context of whether Johnson is entitled to official immunity from all state law claims, including the wrongful death claim.  (Doc. 233-1, pp. 31–33.)

Recovery under Georgia's Wrongful Death statute is available where the death of a human being results from a crime, or from criminal or other negligence, or from property which has been defectively manufactured. O.C.G.A. § 51-4-1(b). The Court has determined that there is no basis for finding that Defendant Johnson or Defendant Martinez committed assault and battery against Ajibade, that they violated Ajibade's constitutional rights by failing to intervene in a use of excessive force, or that they demonstrated deliberate indifference to a serious medical need. Plaintiffs have made no other allegations (much less presented evidence) of any other wrongdoing by Johnson or Martinez. Consequently, there is no basis for Plaintiffs to prevail on their wrongful death claim against Defendants Johnson and Martinez. Accordingly, the Court **GRANTS** Defendants Johnson and Martinez's Motions for Summary Judgment as to the wrongful death claim.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendant Debra Johnson's Motion for Summary Judgment as to all claims asserted against her by all Plaintiffs, (doc. 191), and likewise **GRANTS** Defendant Andreux Evans-Martinez's Motion for Summary Judgment as to all claims asserted against him by all Plaintiffs, (doc. 192). As a result, the Court **DISMISSES WITH PREJUDICE** all claims asserted against Defendants Debra Johnson and Andreux Evans-Martinez and **DISMISSES** Johnson and Evans-Martinez from this action.

The Court **DIRECTS** the Clerk of Court to **TERMINATE** Defendants Debra Johnson and Andreux Evans-Martinez as defendants on the Court's docket.

**SO ORDERED**, this 28th day of March, 2019.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA